Scott R. Mosko (State Bar No. 106070)
FINNEGAN, HENDERSON, FARABOW,
  GARRETT & DUNNER, L.L.P.
Stanford Research Park
3300 Hillview Avenue
Palo Alto, California 94304
Telephone:    (650) 849-6600
Facsimile:    (650) 849-6666

Attorneys for Defendant
ConnectU LLC

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| FACEBOOK, INC. | CASE NO. C 07-01389 RS |
|                Plaintiff, | **DEFENDANT CONNECTU LLC'S MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM PURSUANT TO FED. R. CIV. P. 12(b)(6)** |
|           v. | |
| CONNECTU LLC (now known as ConnectU, Inc.), PACIFIC NORTHWEST SOFTWARE, INC., WINSTON WILLIAMS, AND DOES 1-25, | Date:      May 2, 2007<br>Time:      9:30 a.m.<br>Dept.:      4<br>Judge:      Hon. Richard Seeborg |
|           Defendants. | |

# TABLE OF CONTENTS

NOTICE OF MOTION ..................................................................................................1

MEMORANDUM OF POINTS AND AUTHORITIES ............................................1

I.      INTRODUCTION ...............................................................................................1

II.     BACKGROUND .................................................................................................2

III.    ARGUMENT ......................................................................................................3

    A.    Facebook Has Failed to Plead a Cause of Action Under California Penal Code
        Section 502(c) .............................................................................................3

        1.    The accessing of email addresses published on an unsecured website
             cannot be the basis of an action under Penal Code § 502 ...........................3

        2.    Facebook's Amended Complaint fails to allege specific facts
             establishing that ConnectU interfered with, damaged, or accessed data
             from Facebook's computer or computer system *without permission* .........7

    B.    Facebook's Common Law Misappropriation Claim Is Preempted, And, In the
        Alternative Facebook Has Failed To Plead a Cause of Action For Common
        Law Misappropriation and Unfair Competition .......................................8

        1.    Preemption and lack of proprietary information.........................................8

        2.    Conclusory allegations of law disguised as fact .......................................10

    C.    Facebook's Claims Based Upon the California Business and Professions Code
        Are Preempted by the CAN-SPAM Act, And, Even if Not Preempted,
        Facebook Does Not Have Standing to Bring Such Claims...................................12

        1.    Preemption ...............................................................................................12

        2.    Standing ...................................................................................................14

    D.    Facebook Has Failed to Plead a Violation of the CAN-SPAM Act And
        Facebook Lacks Standing as a Provider of Internet Access Service ....................16

        1.    Failure to plead ........................................................................................16

        2.    Standing ...................................................................................................17

IV.     CONCLUSION..................................................................................................19

# TABLE OF AUTHORITIES

**Cases:**                                                                                          **Page(s)**

*Advantacare Health Partners v. Access IV, Inc.*
2003 U.S. Dist. LEXIS 26093 (N.D. Cal. 2003) ................................................................... 6

*Ash v. United States*
608 F.2d 178, 179 (5th Cir. 1979) ...................................................................................... 5

*Balboa Ins. Co. v. Trans Global Equities*
218 Cal.App. 3d 1327, 1342 (1990) ...................................................................................... 11

*Balistreri v. Pacifica Police Dept.*
901 F.2d 696, 699 (9th Cir. 1990) ...................................................................................... 3, 17

*Barry v. U.S. Department of Justice*
63 F. Supp. 2d 25, 28 (D.C. Cir. 1999) ................................................................................. 5

*Courtesy Temporary Service, Inc. v. Camacho*
222 Cal.App.3d 1278 (1990) ................................................................................................ 6, 7, 8

*Cox Broadcasting Corp. v. Cohn*
420 U.S. 469, 494-495 (1975) .............................................................................................. 5

*In re Delorean Motor Co.*
991 F.2d 1236, 1240 (6th Civ. 1993) .................................................................................. 3

*Hypertouch, Inc. v. Kennedy-Western University*
U.S. Dist. No. C 04-05203, 2006 WL 648688 ..................................................................... 18

*Lee v. City of Redwood City*
U.S. Dist. No. 06-3340-SBA, 2006 WL 3290407 .................................................................. 6, 8, 11, 18

*Miranda v. Clark County, Nev.*
279 F.2d 1102, 1106 (9th Cir. 2002) .................................................................................... 3, 4, 7, 8, 11, 18

*Morlife, Inc. v. Perry*
56 Cal.App.4[th] 1514 (1997) ............................................................................................... 6

*Omega World Travel, Inc. v. Mummagraphics, Inc.*
469 F.3d 348, 355 (4th Cir. 2006) ...................................................................................... 12

*Ossur Holdings, Inc. v. Bellacure, Inc.*
U.S. Dist. No. 05-1552JLR, 2005 WL 3434440 .................................................................... 5, 10

*Paralyzed Veterans of America v. McPherson*
U.S. Dis. No. 06-4670-SBA, 2006 WL 3462780 .................................................................. 3, 4, 7, 8, 11, 18

*Plana v. Shoresales, LLC*
U.S. Dist. No. JFM-03-1227, 2003 WL 21805290 .................................................................. 9

*Summit Mach. Tool Mfg. Corp. v. Victor CNC Systems, Inc.*
7 F.3d 1434, 1441 (9th Cir. 1993) ...................................................................................... 9

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

*VSL Corp. v. General Tech. Inc.*
44 U.S.P.Q.2d 1301, 1303-4 (N.D. Cal. 1997) ................................................ 10

*Warner Bros. v. American Broadcasting Cos.*
720 F.3d 231, 247 (2d Cir. 1983) ................................................................. 8

*Wright v. Federal Bureau of Investigation*
381 F. Supp. 2d 1114, 1118 (C.D. Cal. 2005) ................................................ 5

**Authorities:**

15 U.S.C. §  7701(6) ................................................................................. 19

15 U.S.C. §  7701(b) ................................................................................ 16

15 U.S.C. §  7704(a) ............................................................................ 13, 17

15 U.S.C. §  7704(b)(1)(A) ......................................................................... 13

15 U.S.C. §  7704(b)(1)(A)(i) ...................................................................... 17

15 U.S.C. §  7706(g)(1) ............................................................................ 18

15 U.S.C. §  7707(b)(1) ...................................................................... 12, 13, 14

17 U.S.C. § 106 .................................................................................... 8

18 U.S.C. §  7701(a)(1) ............................................................................ 13

18 U.S.C. §  7701(a)(2) ............................................................................ 13

47 U.S.C. §  231(e)(4) (2006) ..................................................................... 18

California Business & Professions Code:

    17524.4 ...................................................................................... 14
    17529.1 ...................................................................................... 15
    17529.1(h) .................................................................................... 15
    17529.4 .......................................................................... 12, 13, 14, 15
    17529.8 .................................................................................. 14, 16
    17529.8(a)(1) ................................................................................. 14
    17538.45 ............................................................................... 13, 14, 15
    17538.45(a)(3) ................................................................................ 15
    17538.45(b) ............................................................................... 14, 15
    17538.45(b)(4)(A) ............................................................................ 15
    17538.45(c) ................................................................................... 14

California Penal Code:

    Section 502 ............................................................................ 3, 4, 7, 8
    Section 502(a) ............................................................................... 4, 5
    Section 502(c) ............................................................................ 3, 7, 8
    Section 502(c)(8) .............................................................................. 7

Federal Rules of Civil Procedure:

12(b)(6) ......................................................................... 1, 3

*Preemption of State Spam Laws by the Federal CAN-SPAM Act*
　　72 U. Chi. L. Rev. 355, 358 (2005) by Roger Allan Ford ............................ 12

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## NOTICE OF MOTION

TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

PLEASE TAKE NOTICE that on May 2, 2007 at 9:30 a.m. or soon thereafter as counsel may be heard by Judge Richard Seeborg of above entitled Court, located at 280 South First Street, San Jose, California, Defendant ConnectU LLC will move the court to dismiss the action pursuant to Fed. R. Civ. P. 12(b)(6) because Plaintiff's First, Second, Fourth, Fifth and Sixth Causes of Action of its Amended Complaint fail to state a claim upon which relief can be granted.

This motion is based on this Notice of Motion and Motion, the Declaration of Scott R. Mosko in support of this motion, all the pleadings in the case, and such other arguments and evidence as may properly come before the Court.

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.    INTRODUCTION

This is a retaliatory lawsuit filed by Facebook, Inc. ("Facebook") for the purpose of trying to gain leverage as a result of an earlier-filed federal action in the District of Massachusetts.  As explained in more detail in the background section, Facebook's principals, including Mark Zuckerberg, stole the idea of a social networking website from the principals of ConnectU LLC ("ConnectU"), and then launched thefacebook.com website, apparently now www.facebook.com. ConnectU filed the Massachusetts action in September 2004 as a result of this theft.

This action was initially filed by Facebook in the California Superior Court for the County of Santa Clara.  ConnectU timely removed the action to this Court shortly after Facebook filed an amended complaint.  In this action, Facebook wrongly accuses the competitor it virtually destroyed by its theft, connectu.com, of accessing its website without authorization and downloading clearly visible email addresses that it wrongly characterizes as proprietary information.  There was no "unauthorized" access, and no "proprietary" information was downloaded.  This action was filed to harass ConnectU and deplete its funds.  From the inception of this action, Facebook has engaged in dilatory tactics designed to increase the cost of this baseless litigation.  For example, Facebook wrongly accused four individuals in this case, forcing the expenditure of funds to extricate them

1    from this action.  In June, 2006, the California Superior Court for the County of Santa Clara threw

2    out the claims against each individual defendant, sometimes referred to as "The Dismissed

3    Defendants."  Now Facebook attempts to expand this case, again for the purpose of forcing

4    ConnectU and the newly named parties to spend fees to fight baseless claims.  For the foregoing

5    reasons, most of the claims asserted in the amended complaint must be dismissed.

6    **II.    BACKGROUND**

7         During their college junior year in Massachusetts, Harvard students Cameron Winklevoss,

8    Tyler Winklevoss and Divya Narendra (three out of the four Dismissed Defendants) conceived the

9    idea of connecting people through networks of friends and common interests at universities and

10   colleges throughout the country, beginning with Harvard University.  They envisioned a website that

11   would allow students and alumni of a college or university to create a personal social network

12   specific to that institution, and give the students and alumni a place to meet, exchange information,

13   discuss employment prospects, and serve as an on-line dating service.  (Mosko Decl. Exh. A, ¶ 12.)

14        In November, 2003, fellow Harvard student Mark Zuckerberg agreed to join them and

15   complete the code for the proposed website (initially called HarvardConnection and later renamed

16   ConnectU).  Zuckerberg continually assured The Dismissed Defendants of his commitment and

17   agreement to complete the code so that the website could be launched sufficiently before the end of

18   the 2003-2004 school year.  These assurances and promises were false.  (*Id.* ¶ 14.)

19        While pretending that he was still working with The Dismissed Defendants, Zuckerberg stole

20   their idea, took the code he was writing for them, and registered the domain name

21   "thefacebook.com."  A few weeks after registering this domain name, Zuckerberg launched his own

22   website, misappropriating and incorporating The Dismissed Defendants' ideas and intellectual

23   property.  (*Id.* ¶¶ 19-20.)  On September 2, 2004, ConnectU filed a Complaint against Zuckerberg

24   and others for these wrongful acts in the United States District Court for the District of

25   Massachusetts, Civil Action No. 1:04-CV-11923 (the "Massachusetts Action").  (Mosko Decl. Exh.

26   A)  ConnectU seeks several remedies in the Massachusetts Action, including a Constructive Trust,

27   pursuant to which the Massachusetts Court could order Facebook's site transferred to ConnectU.

28

1    Nearly one year after ConnectU filed the Massachusetts Action, Facebook filed this

2 retaliatory action against ConnectU and The Dismissed Defendants.  After the State Court granted

3 Facebook's motion to file an amended complaint, ConnectU timely removed the action to this Court,

4 and now files this motion to dismiss for failure to state a claim upon which relief can be granted

5 pursuant to Federal Rule of Civil Procedure 12(b)(6).  Facebook's allegations are conclusory.  The

6 amended complaint fails to allege a cognizable legal theory under its First, Second, Fourth, Fifth and

7 Sixth Causes of Action.  *See Balistreri v. Pacifica Police Dept.*, 901 F.2d 696, 699 (9th Cir. 1990);

8 *In re Delorean Motor Co.*, 991 F.2d 1236, 1240 (6th Cir. 1993) (stating that standard for surviving a

9 motion to dismiss for failure to state a claim is "decidedly liberal" but warning that "it requires more

10 than a bare assertion of legal conclusions."); *Paralyzed Veterans of America v. McPherson*, U.S.

11 Dist. No. 06-4670-SBA, 2006 WL 3462780, at *4 (N.D. Cal. Nov. 28, 2006) (quoting *Miranda v.

12 Clark County, Nev.*, 279 F.2d 1102, 1106 (9th Cir. 2002)) ("'Conclusory allegations of law and

13 unwarranted inferences will not defeat a motion to dismiss for failure to state a claim.'").  Pursuant

14 to Fed. R. Civ. P. 12(b)(6), this Court should dismiss Facebook's First, Second, Fourth, Fifth and

15 Sixth Causes of Action.

16 **III.    ARGUMENT**

17    **A.    Facebook Has Failed to Plead a Cause of Action Under California Penal Code
        Section 502(c)**

18

19        **1.    The accessing of email addresses published on an unsecured website
            cannot be the basis of an action under Penal Code § 502**

20        Based on (1) the public nature of an email address, (2) the fact that

21 Facebook's website's purpose is to share the identity of its visitors (and its visitors' friends'

22 identities) with others, and (3) the fact that these email addresses were readily available to any

23 visitor, ConnectU cannot be liable for accessing or using such information.  California Penal Code

24 Section 502 contemplates the protection of data created with the expectation of privacy.  Thus, any

25 access or use of email addresses available on Facebook's website cannot be actionable thereunder.

26        Facebook operates a "social networking" website (Am. Compl. ¶ 10)

27 described as a "social utility that connects you with the people around you."  Facebook Home Page,

28

http://www.facebook.com.  Facebook admits a user need only register to gain access to its site, and in particular to "profiles of other students and alumni"--which, at the relevant time, included their email addresses.  (Am. Compl. ¶ 10.)  Profile information of students' and alumni's "friends at other Universities" were also accessible to the site's users.  (*Id.*)

The primary charging allegation in Facebook's Amended Complaint is paragraph 18.  It reads in part:

> . . . Defendants have gained unauthorized access to Facebook's web site, and have taken extensive amounts of proprietary data from Facebook, including but not limited to user data such as email addresses and other protected data collected and/or created by Facebook . . .

(Am. Complaint ¶ 18.)

Initially, Facebook's failure to adequately plead what "proprietary data" is the subject of this action is fatal to this count.  Particularly in light of the "including but not limited to" and "other protected data" language in paragraph 18, it is unclear what Facebook means by "proprietary data."  For this reason alone, this count must be dismissed.

Further, regarding the data Facebook does identify, i.e. "email addresses," Facebook does not allege that it hides or secures these email addresses from people who access its site.  So, to the extent ConnectU is accused of taking anything "proprietary," this count must be dismissed because there are no factual allegations establishing the proprietary nature of anything on Facebook's website.  *Paralyzed Veterans*, 2006 WL 3462780, at *4 (quoting *Clark County*, 279 F.2d at 1106) ("'Conclusory allegations of law and unwarranted inferences will not defeat a motion to dismiss for failure to state a claim.'").  Moreover, this count must be dismissed with prejudice because these email addresses were not secured, as limitation to them would be contrary to the open, directory nature of the site, and the website's admitted purpose of "social networking."

Indeed, the admission that the taking of email addresses accessible to any person who logs onto this site (Am. Complaint ¶¶ 10, 18) is fatal to this count.  The California Legislature states the purpose of Section 502 is to "protect[] the privacy … [of those who] utilize [] computers, computer systems and data."  Cal. Penal Code §  502(a) (2006).  The logical inference from paragraph 10 of the amended complaint is that people voluntarily provide their email

1  addresses, that Facebook then freely posts on its site.  The only "proprietary" information identified

2  in the amended complaint are these email addresses.  Under the circumstances, and in light of the

3  admission in paragraph 10, these email addresses cannot be "proprietary".  And, in any event,

4  Facebook has failed to plead any facts supporting an assertion that <u>it, i.e. Plaintiff</u> had an expectation

5  of privacy in these email addresses.  Certainly Facebook does not own the email addresses of others.

6  Facebook has not and cannot allege it had an expectation of privacy in these email addresses because

7  the website's users (college students) voluntarily provided them to Facebook with the hope and

8  belief these email addresses would be shared with others.  Further, as admitted in paragraph 10, there

9  can be no expectation of privacy in these email addresses because they are freely and easily available

10  to any visitor to this site.  *See, e.g. Barry v. U.S. Department of Justice*, 63 F. Supp. 2d 25, 28 (D.C.

11  Cir. 1999) (plaintiff had no protectable privacy interest in a report posted on the Internet because it

12  had already been released to the media); *Ash v. United State*s, 608 F.2d 178, 179 (5th Cir. 1979)

13  (disclosure of information in proceeding that was open to Navy personnel was in that sense public

14  and was not a "disclosure" under the Privacy Act); *cf. Cox Broadcasting Corp. v. Cohn*, 420 U.S.

15  469, 494-495 (1975) ("even the prevailing law of invasion of privacy generally recognizes that the

16  interests in privacy fade when the information involved already appears on the public record").

17          Simply put, email addresses either published on a website or easily found on a

18  website are not proprietary because there is no basis upon which one can claim a right of privacy.

19  *See, e.g., Wright v. Federal Bureau of Investigation,* 381 F.Supp.2d 1114, 1118 (C.D. Cal. 2005); *cf.*

20  *Ossur Holdings, Inc. v. Bellacure, Inc.*, U.S. Dist. No. 05-1552JLR, 2005 WL 3434440, at *6 (W.D.

21  Wash. Dec. 14, 2005) (denying a preliminary injunction for breach of a confidentiality agreement

22  because the names and email addresses allegedly disclosed in breach of agreement were generally

23  known to the public).  Absent a reasonable expectation of privacy, Facebook cannot base a Section

24  502 claim on the alleged taking of email addresses published on a website.  *See* Cal. Penal Code

25  § 502(a).

26          Further, given the circumstances in which these email addresses were

27  gathered, Facebook cannot rely on the misappropriation of customer list cases to argue these email

28

Doc. No.  460093                          5

addresses were cloaked with any expectation of privacy.  In such cases, courts have refused to protect customer lists without a showing that their development took a significant amount of time and effort.  *See, e.g., Morlife, Inc. v. Perry,* 56 Cal.App.4th 1514 (1997).  Here, although Facebook pleads in conclusory terms that it expended time, effort and money to develop its "aggregate customer base"[1] (Am. Compl. ¶ 14), the pleading is deficient because there are no facts to support this bare statement.  *See Lee v. City of Redwood City*, U.S. Dist. No. 06-3340-SBA, 2006 WL 3290407, at *3 (N.D. Cal. Nov. 13, 2006) ("The court does not accept as true unreasonable inferences or conclusory legal allegations cast in the form of factual allegations.").  In fact, the conclusions  Facebook does plead are directly contrary to an inference that significant time or effort was expended.  Indeed while Facebook boasts "over three million registered users" (Am. Compl. ¶ 8), Facebook admits its website has been up for less than one year.  (*Id.* ¶ 12.)  Facebook contends it maintains "proprietary rights" that have apparently been in effect only "since at least January 2005."  (*Id.*)  Inviting an unsolicited potential registrant to provide his or her email address that will later be shared with other registrants does not meet the requirement of a protectable customer list. *See Morlife,* 56 Cal.App.4th at 1522 ("As a general principle, the more difficult information is to obtain, and the more time and resources expended by an employer in gathering it, the more likely a court will find such information constitutes a trade secret.").  As stated, no facts are alleged to support any claim that substantial time and resources were expended to obtain these email addresses.

Further, an underlying theme of these "customer list" cases is that the a plaintiff must have taken reasonable steps to maintain its lists as confidential and private.  *Courtesy Temporary Service, Inc. v. Camacho,* 222 Cal. App. 3d 1278 (1990).  In circumstances where customer lists are public, no liability attaches to parties who access and use them.  *See, e.g., Advantacare Health Partners v. Access IV, Inc,* 2003 U.S. Dist LEXIS 26093 (N.D. Cal. 2003). Here, Facebook fails to allege any facts suggesting that the gathered email addresses were

---

[1] It is unclear what Facebook means by "aggregate customer base."  For purposes of this motion Defendants assume it means the email addresses identified in Paragraph 18 of the Amended Complaint.

1  maintained in a confidential way.  There are no facts alleged to support the claim that these email

2  addresses were provided with or maintained in a manner consistent with the expectation of privacy.

3  In fact, Facebook cannot claim ownership of them in this context.  Accordingly, no action pursuant

4  to California Penal Code Section 502 can be asserted and this Court must dismiss Facebook's First

5  Cause of Action.  *See Paralyzed Veterans*, *supra,* 2006 WL 3462780, at *4 (quoting *Clark County*,

6  279 F.2d at 1106) ("'Conclusory allegations of law and unwarranted inferences will not defeat a

7  motion to dismiss for failure to state a claim.'")

8             **2.    Facebook's Amended Complaint fails to allege specific facts establishing
                      that ConnectU interfered with, damaged, or accessed data from
9                     Facebook's computer or computer system *without permission***

10            Facebook vaguely alleges ConnectU violated Penal Code Section 502(c),

11  which includes nine separate proscribed categories of activity.  Eight out of nine subdivisions in

12  Section 502(c) require proof that a defendant "knowingly accesse[d] and without permission"

13  committed a further described wrongful act.  Nowhere in the amended complaint does Facebook

14  provide sufficient factual allegations supporting this element quoted immediately above.  Instead, in

15  conclusory fashion, the amended complaint at paragraph 18 simply alleges that the "Defendants

16  gained unauthorized access."

17            Facebook has failed to plead, nor could it plead, specific facts alleging

18  ConnectU acted *without permission*, as required by Section 502(c).[2]  Facebook has admitted the

19  email addresses at issue in this action were accessible to all who entered the site.  (Am. Compl.

20  ¶ 10.)  For the acted "without permission" element of this claim, does Facebook contend that

21  ConnectU was a registrant of its website and committed the accused activity after the effective date

22  of its terms and conditions?  No.  Does Facebook contend ConnectU hacked its way into Facebook's

23  site and found such information in a location that could be deemed confidential?  No.  Does

---

25      [2] The only subdivision that does not require a showing of action "without permission" is
26  subdivision (8), which reads "knowingly introduces any computer contaminant into any computer,
    computer system, or computer network."  Cal. Penal Code § 502(c)(8).  Facebook has not alleged,
27  nor could it allege, that Defendants introduced a computer contaminant into Facebook's system.

28

1   Facebook contend the email addresses were somehow limited[3] from access to those entering the site?

2   No.  Does Facebook contend one of its registrants provided the readily available email addresses to

3   ConnectU?  No.  Facebook fails to plead any facts supporting the required element of Penal Code

4   Section 502, that the information was accessed or used "without permission."  Because a claim

5   under Penal Code Section 502(c) requires a showing that the conduct was engaged in without

6   permission, Facebook's failure to supply facts supporting this conclusory allegation requires that this

7   Court dismiss Facebook's First Cause of Action.  *See Paralyzed Veterans*, 2006 WL 3462780, at *4

8   (quoting *Clark County*, 279 F.2d at 1106) ("'Conclusory allegations of law and unwarranted

9   inferences will not defeat a motion to dismiss for failure to state a claim.'"); *Lee,* 2006 WL 3290407,

10  at *3 ("The court does not accept as true unreasonable inferences or conclusory legal allegations cast

11  in the form of factual allegations.").

12      **B.    Facebook's Common Law Misappropriation Claim Is Preempted, And, In the**
            **Alternative Facebook Has Failed To Plead a Cause of Action For Common Law**
13          **Misappropriation and Unfair Competition**

14          **1.    Preemption and lack of proprietary information**

15              Facebook's common law misappropriation claim is preempted by Federal

16  copyright and patent law because Facebook has failed to allege, nor could it allege, the necessary

17  "extra element" to save such common law claims from preemption.  In holding that a claim of

18  common law misappropriation was preempted, the Ninth Circuit recognized that:

19          [t]he vagueness of the elements of common law misappropriation has
            engendered various preemption analyses.  For example in *Warner*
20          *Bros. v. American Broadcasting Cos.*, 720 F.3d 231, 247 (2d Cir.
            1983), the court stated unequivocally: "state law claims that rely on the
21          misappropriation branch of unfair competition are preempted,
            [citations]."  Nimmer generally concludes that misappropriation that
22          "consisted simply of the acts of reproduction and distribution . . .
            undoubtedly constitutes a right "within the general scope of copyright
23          as specified by [17 U.S.C.S.] section 106." 1 *Nimmer on Copyright*,
            § 1.01[B][1] at 1-20.3].

24  ─────────────────────

25      [3] Any contention that the email addresses were not public or available to all visitors is belied
    by Plaintiff's actual terms and conditions, which provide, e.g., "You may not engage in advertising
26  to, or solicitation of, other Members to buy or sell any products or services through the Service.  You
    may not transmit any chain letters or junk emails to other members …" (Am. Compl. ¶ 12.)  Indeed
27  these terms acknowledge that the email addresses that can be found on the user profiles on the site
    are available to all visitors to this site.

28

1  *Summit Mach. Tool Mfg. Corp. v. Victor CNC Systems, Inc.*, 7 F.3d 1434, 1441 (9th Cir. 1993).  The

2  Ninth Circuit went on to explain that the common law claim of misappropriation is not entirely

3  preempted, but that in order to avoid preemption, a plaintiff must demonstrate an "extra element"

4  which changes the nature of the action.  *Id.* (listing "extra elements" as (1) breach of fiduciary duty;

5  (2) breach of confidential relationship; or (3) palming off); *see also Plana v. Shoresales, LLC*, U.S.

6  Dist. No. JFM-03-1227, 2003 WL 21805290, at *7 (D. Md. July 14, 2003) (citing *id.*) ("Therefore,

7  because [plaintiff] has not alleged an 'extra element,' but rather simply alleges that defendants

8  appropriated and used his work product without his consent, Count V will be dismissed.").

9  Facebook alleges that it has developed "commercially valuable customer lists, web site components,

10  network, and other information specified in this complaint ('Facebook's Information')" and that

11  ConnectU has "taken such information and without authorization used, disclosed, and held out as

12  their own Facebook's Information."  (Am. Complaint ¶ 33-34.)  Facebook has not alleged that it had

13  a fiduciary relationship with ConnectU; it has not alleged that ConnectU breached a confidential

14  relationship between the parties; and it has not alleged that ConnectU engaged in any form of

15  palming off.  *See Summit*, 7 F.3d at 1441.  Facebook has failed to plead any facts supporting the

16  "extra elements" to support the causes of action mentioned in *Summit*.  Further, and even in the

17  event this Court concludes these listed causes of action in *Summit* are not the only claims that can be

18  asserted to avoid preemption, the amended complaint still must be dismissed.  Plaintiff has failed to

19  plead any facts that would support any additional cause of action.  The second cause of action in the

20  amended complaint is pled in conclusory terms, devoid of any facts supporting them.  Thus

21  Facebook's claim is preempted because it has not alleged, nor could it allege sufficient facts to

22  demonstrate the existence of the "extra element" necessary for a claim of common law

23  misappropriation.  *Summit*, 7 F.3d at 1441.

24          Facebook's claim that ConnectU accessed Facebook's website "without

25  authorization" cannot form the "extra element" necessary to avoid preemption because, as stated in

26  Section IIIA, *supra*, ConnectU has not provided any factual allegations supporting a claim that any

27  of the information allegedly taken by ConnectU (email addresses of Facebook members) was

28

confidential or proprietary. *VSL Corp. v. General Tech. Inc.* 44 U.S.P.Q.2d 1301, 1303-4 (N.D. Cal. 1997) ("[plaintiff] cannot, as a matter of law, state a claim for misappropriation of confidential and proprietary information or unfair competition because the information it provided to [defendant] was not proprietary"). Indeed, as Facebook admits, the email addresses were readily available. (Am. Compl. ¶ 10.); *cf. Ossur Holdings*, *supra*, 2005 WL 3434440, at *6 (denying a preliminary injunction for breach of a confidentiality agreement because the names and email addresses allegedly disclosed in breach of agreement were generally known to the public). Moreover, Facebook's pleadings explicitly allege that ConnectU's *use* of its information was "without authorization," not that ConnectU's *taking* was without authorization. (Am. Complaint ¶ 34.) This makes sense considering that the email addresses were available for the *taking* once a user accessed the site. Use of information, absent a showing of a breach of a confidential relationship; a breach of fiduciary duty; or evidence of palming off, cannot as a matter of law form the basis for a claim of common law misappropriation. *Summit*, 7 F.3d at 1441.

Because Facebook has failed to sufficiently allege facts supporting the existence of the "extra element" necessary to avoid preemption, this Court should dismiss Facebook's Second Cause of Action on preemption grounds. In the alternative, even if not preempted, Facebook has failed to allege the misappropriation of information that was not readily available to a user, and this Court should dismiss Facebook's Second Cause of Action for failure to state a claim. *See VSL Corp.*, 44 U.S.P.Q.2d at 1303-4 ("[plaintiff] cannot, as a matter of law, state a claim for misappropriation of confidential and proprietary information or unfair competition because the information it provided to [defendant] was not proprietary").

## 2. Conclusory allegations of law disguised as fact

Even assuming that the information allegedly appropriated from Facebook's website could be considered proprietary, and that a claim that access to the information "without authorization" is an "extra element" sufficient to avoid preemption, Facebook has not pled sufficient facts to state a claim for common law misappropriation. Instead, Facebook has stated conclusory and unwarranted deductions of fact that require ConnectU and this Court to make unreasonable

inferences. *See Paralyzed Veterans*, 2006 WL 3462780, at *4 (quoting *Clark County*, 279 F.2d at 1106) ("'Conclusory allegations of law and unwarranted inferences will not defeat a motion to dismiss for failure to state a claim.'"); *Lee*, 2006 WL 3290407, at *3 ("The court does not accept as true unreasonable inferences or conclusory legal allegations cast in the form of factual allegations.").

For common law misappropriation, Facebook must allege that (a) it invested substantial time, skill, or money in developing its property; (b) ConnectU appropriated and used its property at little or no cost to ConnectU; (c) ConnectU's appropriation and use of Facebook's property was without its authorization or consent; and (d) Facebook has been injured by ConnectU's conduct. *Balboa Ins. Co. v. Trans Global Equities,* 218 Cal. App. 3d 1327, 1342 (1990). Although Facebook pleads in conclusory terms that it expended time, effort and money to develop its "aggregate customer base"[4] (Am. Compl. ¶ 14), the pleading is deficient because Facebook offers no facts to support this bare statement. *See Paralyzed Veterans*, 2006 WL 3462780, at *4 (quoting *Clark County*, 279 F.2d at 1106). In fact, the specifics Facebook does plead are directly contrary to an inference that significant time or effort was expended. Indeed, while Facebook boasts "over three million registered users" (Am. Compl. ¶ 8), the Amended Complaint admits the website has been up for less than one year. (*Id.* ¶ 12.) In addition, Facebook has failed to allege any facts to demonstrate how ConnectU's alleged access and use was "without authorization." *See Lee,* 2006 WL 3290407, at *3. Thus, Facebook fails to allege any facts supporting two crucial elements of a claim for misappropriation and instead relies upon conclusory allegations of law and unwarranted inferences. As such, this Court should dismiss Facebook's Second Cause of Action for failure to state a claim upon which relief can be granted. *See Paralyzed Veterans*, 2006 WL 346780, *4 ("'Conclusory allegations of law and unwarranted inferences will not defeat a motion to dismiss for failure to state a claim.'").

---

[4] It is unclear what Facebook means by "aggregate customer base." For purposes of this motion Defendants assume it means the email addresses identified in Paragraph 18 of the Amended Complaint.

1

**C.    Facebook's Claims Based Upon the California Business and Professions Code Are Preempted by the CAN-SPAM Act, And, Even if Not Preempted, Facebook Does Not Have Standing to Bring Such Claims**

2

3

**1.    Preemption**

4

The preemption clause of the Controlling the Assault of Non-Solicited

5 Pornography Act (the "CAN-SPAM Act") expressly preempts the provisions of California Business

6 and Professions Code Sections 17529.4 and 17538.45.  *See* 15 U.S.C. § 7707(b)(1) (2006); *see also*

7 Roger Allan Ford, *Preemption of State Spam Laws by the Federal CAN-SPAM Act*, 72 U. Chi. L.

8 Rev. 355, 358 (2005) ("the Act preempts many stronger state laws, including California's law").

9 Section 7707(b)(1) of the CAN-SPAM Act reads: "This chapter supersedes any statute, regulation,

10 or rule of a State or political subdivision of a State that expressly regulates the use of electronic mail

11 to send commercial messages, except to the extent that any such statute, regulation, or rule prohibits

12 falsity or deception in any portion of a commercial, electronic mail message or information attached

13 thereto."  15 U.S.C. § 7707(b)(1).  Section 17529.4 of the Cal. Bus. & Prof. Code makes unlawful

14 the collection of email addresses, whether through automated means or through the use of scripts, if

15 the purpose of such collection is to initiate or advertise in an unsolicited commercial email.  Cal.

16 Bus. & Prof. Code § 17529.4 (2006).  Although Section 17529.4 addresses collection of email

17 addresses through automated means, it does not make such conduct unlawful absent a showing that

18 the purpose of the collection was to *initiate unsolicited commercial email*.  Thus, on its face, Section

19 17529.4 *expressly* regulates the "use of electronic mail to send commercial messages," 15 U.S.C.

20 § 7707(b)(1), by making *any* unsolicited, commercial email, regardless of its content, unlawful if the

21 email address was obtained through automated means.  Simply put, Section 17529.4 is preempted.

22

Congress, in enacting the CAN-SPAM Act, made certain to only make

23 unlawful emails that contained false, deceptive or misleading information.  Congress was aware that

24 certain unsolicited emails could serve useful commercial benefits, and thus crafted a careful balance

25 between those unsolicited emails that would be considered unlawful.  *See Omega World Travel, Inc.*

26 *v. Mummagraphics, Inc.* 469 F.3d 348, 355 (4th Cir. 2006) ("The Act's enacted findings make clear

27 that Congress saw commercial e-mail messages as presenting both benefits and burdens."); 18

28

1    U.S.C. § 7701(a)(1) & (a)(2) ("The convenience and efficiency of electronic mail are threatened by

2    the extremely rapid growth in the volume of unsolicited commercial electronic mail . . . [and

3    electronic mail's] low cost and global reach make it extremely convenient and efficient, and offer

4    unique opportunities for the development and growth of frictionless commerce").  Notably, the

5    CAN-SPAM Act itself addresses the use of automated means to collect email addresses for the

6    purposes of sending unsolicited emails.  *See* 15 U.S.C. § 7704(b)(1)(A).  The Act allows aggravated

7    damages if such conduct is shown in conjunction with a violation of the Act.  *See id.*  But, quite

8    distinct from Section 17529.4, the CAN-SPAM Act requires a showing that the emails sent to

9    addresses obtained by automated means contained false, misleading, or deceptive information, or

10   any other content in violation of Section 7704(a) of the CAN-SPAM Act.  *See id.*  On the other hand,

11   Section 17529.4 makes unlawful *any* unsolicited commercial emails that were sent using email

12   addresses obtained through automated means.  This distinction is dispositive of the preemption issue,

13   as it prevents Section 17529.4 from falling within the "savings clause" of the preemption language in

14   the CAN-SPAM Act.  *See id.* § 7707(b)(1) (preempting any State statute that expressly regulates

15   commercial email "except to the extent that any such statute, regulation, or rule prohibits falsity or

16   deception in any portion of a commercial electronic mail message").  Thus, Section 17529.4 of the

17   California Business and Professions Code expressly regulates the use of unsolicited commercial

18   email but does not address issues of falsity or deception, and is therefore preempted by the CAN-

19   SPAM Act.  As such, this Court should dismiss Facebook's Fourth Cause of Action.

20          Section 17538.45 is preempted by the CAN-SPAM Act for the same reasons

21   that preempt Section 17529.4--Section 17538.45 makes unlawful the delivery or initiation of

22   unsolicited commercial emails regardless of the content of the header information, subjects, or

23   ///

24   ///

25   ///

26   ///

27   ///

28

1    bodies of the emails.  *See* Cal. Bus. & Prof. Code § 17538.45(b) & (c).[5]  Section 17538.45 contains

2    no provisions discussing the misleading, deceptive or fraudulent nature of unsolicited commercial

3    emails.  On the contrary, it prohibits *all* unsolicited commercial emails regardless of the content of

4    their header information, subjects, and bodies.  As explained above, this is in direct contravention of

5    the purpose of the CAN-SPAM Act and is expressly preempted by Section 7707(b)(1) of the Act.

6    *See* 15 U.S.C. § 7707(b)(1).  Accordingly, this Court should dismiss Facebook's Fifth Cause of

7    Action.

8                        **2.    Standing**

9                        Even assuming that Sections 17524.4 and 17538.45 were not preempted,

10   Facebook lacks standing to sue for alleged violations of these sections.  Facebook alleges that

11   ConnectU violated Sections 17529.4 and 17538.45 of the California Business and Professions Code.

12   Section 17529.4, *inter alia*, makes it unlawful for any person or entity to use automated means to

13   initiate or advertise an unsolicited commercial email advertisement from or to California.  Cal. Bus.

14   & Prof. Code § 17529.4.  Section 17524.4 does not contain a provision granting a private right of

15   action.  Rather, the language of Section 17529.8 appears to provide a private right of action for

16   certain persons or entities for violations of Section 17529.4.[6]  *Id.* § 17529.8(a)(1) ("In addition to any

17   other remedies provided by this article or by any provisions of law, a recipient of an unsolicited

---

19   [5] Section 17538.45(b) reads: "No registered user of an electronic mail service provider shall
20   use or cause to be used that electronic mail service provider's equipment located in this state in
     violation of that electronic mail service provider's policy prohibiting or restricting the use of its
     service or equipment *for the initiation of unsolicited electronic mail advertisements*."  Cal. Bus. &
21   Prof. Code § 17538.45(b) (emphasis added).  Section 17538.45(c) reads: "No individual,
     corporation, or other entity shall use or cause to be used, *by initiating an unsolicited electronic mail*
22   *advertisement*, an electronic mail service provider's equipment located in this state in violation of
     that electronic mail service provider's policy prohibiting or restricting the use of its equipment to
23   deliver unsolicited electronic mail advertisements to its registered users."  *Id.* § 17538.45(c)
     (emphasis added).

24
25   [6] Facebook's Fourth Cause of Action alleges violations of Section 17529.4, but the only
     section that could potentially provide Facebook with a private right of action for violations of
     Section 17529.4 is Section 17529.8.  Section 17529.8 provides no additional substantive violations
26   and appears to be a provision intended to provide a method of vindicating one's rights for violations
     of the remaining sections and delineating damages available for such violations.  *See* Cal. Bus. &
27   Prof. Code § 17529.8(a)(1).

28

1   commercial email advertisement transmitted in violation of this article, an electronic mail service

2   provider, or the Attorney General may bring an action against an entity that violates any provision of

3   this article . . .").  Facebook has not alleged, nor could it allege, that it has standing as the recipient

4   of an unsolicited email, or as the Attorney General.

5              Thus, Facebook's only avenue for standing is as an electronic mail service

6   provider.  Nowhere in Facebook's amended complaint does Facebook allege facts or even the bare

7   conclusion that it is an electronic service provider as that term is defined in the Code.  An electronic

8   mail service provider, as defined in Section 17529.1, means "any person, including an Internet

9   service provider, that is an intermediary in sending or receiving electronic mail or that provides to

10  end users of the electronic mail service the ability to send or receive electronic mail."  *Id.*

11  § 17529.1(h).  First, Facebook does not allege that it operates its own email servers and is therefore

12  not an intermediary in sending or receiving email.  Second, Facebook does not allege that it provides

13  its users, or anyone for that matter, with the ability to send or receive email.  Indeed, the logical

14  inference from paragraph 10 of the Amended Complaint would be that none of the email addresses

15  that were allegedly misappropriated by ConnectU was provided by Facebook.

16             Similar arguments for lack of standing apply to Facebook's Section 17538.45

17  count.  Section 17538.45 provides a right of action to an "electronic mail service provider" for

18  violations of the providers policy prohibiting or restricting the use of its service, and contains a

19  definition of the term "electronic mail service provider" identical in function to the definition in

20  Section 17529.4.[7]  Accordingly, Facebook does not have standing to sue under Section 17529.4 or

21  Section 17538.45, and this Court should dismiss Facebook's Fourth and Fifth Causes of Action.[8]

22  ────────────────────────

23       [7] Section 17538.45 defines "Electronic mail service provider" as "any business or
    organization qualified to do business in California that provides registered users the ability to send or
24  receive electronic mail through equipment located in this state and that is an intermediary in sending
    or receiving electronic mail."  *Id.* § 17538.45(a)(3).

25
         [8] Moreover, even if Facebook has standing as an electronic mail service provider, Facebook
26  has improperly brought suit under both Section 17529.4 and Section 17538.45 even though the
    explicit terms of Section 17538.45 provide that an electronic mail service provider who has brought
27  an action for violations of Section 17529.8 cannot also bring an action for violations of Section
    17538.45.  *See id.* § 17538.45(b)(4)(A) ("An electronic mail service provider who has brought an
28                                                                                     (continued…)

**D.    Facebook Has Failed to Plead a Violation of the CAN-SPAM Act And Facebook Lacks Standing as a Provider of Internet Access Service**

**1.    Failure to plead**

Congress's main concern in enacting the CAN-SPAM Act was to ensure that recipients of unsolicited commercial emails were not mislead as to the source or content of the emails and to ensure that recipients had methods to decline to receive additional emails from the sender. *See* 15 U.S.C. § 7701(b).[9]  To guarantee that these concerns were remedied, Congress made the following illegal when present in unsolicited commercial emails:

    (1)    emails containing materially misleading headings;

    (2)    emails containing deceptive subject lines;

    (3)    emails containing no return email address whereby the recipient could contact the sender;

    (4)    emails transmitted after objection by recipient;

    (5)    emails that fail to conspicuously state that the message is an advertisement; or

    (6)    emails that fail to provide the sender's valid physical postal address. 15 U.S.C. § 7704(a)(1)-(5).

Facebook does not allege, nor could it allege, that ConnectU engaged in any of the proscribed behavior listed above.  It is only in passing that Facebook even alleges that ConnectU actually sent commercial electronic emails; yet it blatantly fails to allege that any of the alleged commercial emails were sent in violation of any of the terms of Section 7704(a) listed above. *See id.*  A dismissal for failure to state a claim is proper where either the plaintiff has failed to allege

_____

(…continued)
action against a party for a violation under Section 17529.8 shall not bring an action against that party under this section for the same unsolicited commercial electronic mail advertisement.").

[9] 15 U.S.C. § 7701(b) reads: "On the basis of the findings in subsection (a) of this section, the Congress determines that--(1) there is a substantial government interest in regulation of commercial electronic mail on a nationwide basis; (2) senders of commercial electronic mail should not mislead recipients as to the source or content of such mail; and (3) recipients of commercial electronic mail have a right to decline to receive additional commercial electronic mail from the same source."

1    a cognizable legal theory, or there is an "absence of sufficient facts alleged under a cognizable legal

2    theory." *Balistreri*, 901 F.2d at 699.  Here, this Court could dismiss Facebook's claim under the

3    CAN-SPAM Act under either test.  Facebook alleges that ConnectU "accessed Facebook's computer

4    system without authorization" and "collected electronic email addresses . . . using automated

5    means."  (Am. Compl. ¶¶ 52 & 53.)  Facebook adds, even though it makes no difference in

6    determining liability under the CAN-SPAM Act, that at the time of ConnectU's alleged actions,

7    Facebook's website "contained a notice that member electronic mail addresses were not to be given,

8    sold, or otherwise transferred."  (*Id.* ¶ 54.)  Facebook's allegations mirror the language contained in

9    Section 7704(b)(1)(A)(i) of the CAN-SPAM Act.  However, that section pertains only to

10   "Aggravated violations" and any determination as to the existence of aggravated violations requires

11   proof that the alleged sender of emails was also in violation of  the provisions of Section 7704(a)

12   outlined above.  15 U.S.C. § 7704(b)(1)(A)(i) ("It is unlawful for any person to initiate the

13   transmission . . . of a commercial electronic mail message *that is unlawful under subsection (a) of*

14   *this section* . . . if such person had actual knowledge, or knowledge fairly implied on the basis of

15   objective circumstances, that--(i) the electronic mail address of the recipient was obtained using

16   automated means from an Internet website . . . and such website or online service included, at the

17   time the address was obtained, a notice stating that the operator of such website or online service

18   will not give, sell, or otherwise transfer addresses maintained by such website") (emphasis added).

19   Facebook has failed to allege, nor could it allege, that ConnectU violated Section 7704(a) of the

20   CAN-SPAM Act.  Accordingly, Facebook has failed to allege a cognizable legal theory and this

21   Court should dismiss Facebook's Sixth Cause of Action.

22          **2.    Standing**

23          Even if Facebook's pleadings were sufficient to state a cause of action,

24   Facebook lacks standing to bring suit under the CAN-SPAM Act because Facebook fails to allege

25   ///

26   ///

27

28

1    that it is a provider of Internet access service.[10]  One year ago, this Court determined that an internet

2    company that provided its own email servers, and nothing else, had standing as a provider of Internet

3    access service.  *Hypertouch, Inc. v. Kennedy-Western University*, U.S. Dist. No. C 04-05203, 2006

4    WL 648688, at *3 (N.D. Cal. March 8, 2006).  In finding that the plaintiff had standing, this court

5    analyzed the Congressional justifications for the CAN-SPAM Act and found that one of the concerns

6    of Congress was the cost that internet service providers must bear in responding "to rising volumes

7    of spam by investing in new equipment to increase capacity."  *Id.*, *citing* Report of the Committee on

8    Commerce, Science, and Transportation on S. 877, S. Rep. No. 102, 108th Cong., 1st Sess. 6 (2003).

9    In finding that the plaintiff had standing, this Court emphasized that the plaintiff "administers its

10   own e-mail servers, and is therefore the entity that is potentially forced to increase its capacity due to

11   spam sent to e-mail addresses hosted by those servers."  *Id.*  Here, on the other hand, Facebook

12   would not be subject to any of the harm recognized by this Court in holding that the plaintiff in

13   *Hypertouch* had standing.  Facebook fails to allege that it provides its users with email accounts or

14   addresses, nor does it allege that it administers its own email servers.  This count must be dismissed.

15   *See Paralyzed Veterans*,  2006 WL 3462780, at *4 (quoting *Clark County*, 279 F.2d at 1106); *Lee*,

16   2006 WL 3290407, at *3.

17           In addition, Facebook lacks standing under the CAN-SPAM Act because it

18   cannot demonstrate that it has been "adversely affected"[11] by any of ConnectU's' alleged conduct.

19   The only language in Facebook's Amended Complaint that explicitly addresses its damages as a

20   result of ConnectU's alleged violations of the Act indicates that "[i]n response to ConnectU's mass

21   e-mailings, Facebook was forced to notify at least certain of its members of the apparent breach of

22

23           [10] The CAN-SPAM Act defines Internet access service as "a service that enables users to
     access content, information, electronic mail, or other services offered over the Internet, and may also
24   include access to proprietary content, information, and other services as part of a package of services
     offered to consumers.  Such term does not include telecommunications services."  15 U.S.C.
25   § 7702(11) (stating that the term Internet access service has the meaning given the term in 47 U.S.C.
     § 231(e)(4) (2006)).
26
             [11] The CAN-SPAM Act permits a "provider of Internet access service *adversely affected* by a
27   violation" of the Act to bring a civil action.  15 U.S.C. § 7706(g)(1).

28

1   their privacy by ConnectU . . . Facebook is informed and believes and thereupon alleges that such

2   notice damaged the trust its members placed in Facebook's web site and harmed Facebook's

3   business."  (Am. Compl. ¶ 23.)  Members' lost trust in an internet service is not the type of adverse

4   affect Congress intended to prevent in enacting the CAN-SPAM Act.  *See*, *e.g.,* CAN-SPAM Act,

5   Congressional Findings and Policy, 15 U.S.C. § 7701(6) ("The growth of unsolicited commercial

6   electronic mail imposes significant monetary costs on providers of Internet access services . . . that

7   carry and receive such mail, as there is a finite volume of mail that such providers . . . can handle

8   without further investment in infrastructure.").  Nor is a "breach of privacy" a recognized adverse

9   affect under the CAN-SPAM Act.  *See, e.g., id.*  Accordingly, Facebook has not pled, and cannot

10  plead, that it has been adversely affected by any of ConnectU's alleged conduct and it therefore

11  lacks standing.  Thus, this Court must dismiss Facebook's Sixth Cause of Action.

12  **IV.     CONCLUSION**

13         For the reasons detailed above, ConnectU respectfully requests that this Court dismiss

14  Facebook's First, Second, Fourth, Fifth and Sixth Causes of Action under its Amended Complaint.

15                                          Respectfully submitted,

16  Dated:  March 21, 2007                  FINNEGAN, HENDERSON, FARABOW,
                                              GARRETT & DUNNER, L.L.P.
17

18

19                                          By:_____/s/_____
                                                Scott R. Mosko
20                                              Attorneys for ConnectU LLC

21

22

23

24

25

26

27

28