1  G. HOPKINS GUY, III (State Bar No. 124811)
   I. NEEL CHATTERJEE (State Bar No. 173985)
2  MONTE COOPER (State Bar No. 196746)
   THERESA A. SUTTON (State Bar No. 211857)
3  ORRICK, HERRINGTON & SUTCLIFFE LLP
   1000 Marsh Road
4  Menlo Park, CA 94025
   Telephone:    650-614-7400
5  Facsimile:    650-614-7401

6  Attorneys for Plaintiff
   The Facebook, Inc.

7

8                    UNITED STATES DISTRICT COURT

9                   NORTHERN DISTRICT OF CALIFORNIA

10                        SAN JOSE DIVISION

11

12  THE FACEBOOK, INC.,                   Case No.  5:07-CV-01389-RS

13            Plaintiff,                   **FACEBOOK'S OPPOSITION TO
                                           CONNECTU LLC'S MOTION TO
14       v.                                DISMISS FOR FAILURE TO STATE
                                           A CLAIM PURSUANT TO FED. R.
15  CONNECTU LLC, PACIFIC NORTHWEST        CIV. P. 12(b)(6)**
    SOFTWARE and WINSTON WILLIAMS,
16                                         Date:    May 2, 2007
            Defendants.                    Time:    9:30 A.M.
17                                         Dept:    4
                                           Judge:   Honorable Richard Seeborg
18

19

20

21

22

23

24

25

26

27

28

Dockets.Justia.com

1

# TABLE OF CONTENTS

2

**Page**

3    I.    INTRODUCTION ..................................................................................................1

4    II.    FACTUAL BACKGROUND ................................................................................2

       A.    The Parties .................................................................................................2

5      B.    The Lawsuit ...............................................................................................2

6      C.    Facts Supporting Claims ...........................................................................4

7            1.    Facebook Limits Access to its Website and Use of Information
                   Available on its Website .................................................................4

8            2.    ConnectU's Unauthorized Access and Copying of Information.......5

9    III.    ARGUMENT .......................................................................................................6

       A.    Legal Standard ..........................................................................................6

10     B.    The Superior Court's Order Overruling ConnectU's Demurrer Remains in
             Force And, Therefore, Prohibits ConnectU From Raising The Same

11           Arguments in This Court ...........................................................................7

12     C.    Facebook Has Stated A Claim Under California Penal Code Section
             502(C) .......................................................................................................8

13           1.    The FAC states a claim under at least California Penal Code
                   Section 502(c)(2), 502(c)(6), and 502(c)(7) .................................8

14           2.    ConnectU's Argument That The Type Of Information Stolen
15                 Dictates Whether A Violation of Section 502(c) Occurred Is Wrong........9

16     D.    ConnectU's Motion To Dismiss Facebook's Common Law
             Misappropriation And Unfair Competition Causes Of Action Is Without

17           Merit........................................................................................................10

18           1.    Facebook Has Stated A Claim For Common Law Misappropriation
                   and Unfair Competition .............................................................10

19           2.    Facebook's Claim For Common Law Misappropriation Is Not
                   Preempted By Copyright Law ....................................................10

20           3.    ConnectU Waived Its Right To Assert Federal Preemption...................12

21     E.    ConnectU's Motion To Dismiss Facebook's Business & Professions Code
             Sections 17429.4 and 17538.45 Claims Is Without Merit ...............................12

22           1.    The CAN-SPAM Act Does Not Preempt Business & Professions
                   Code Sections 17529.4 and 17538.45 .........................................13

23           2.    Section 17529.4 Falls Outside The Scope of the Preemption Clause
24                 of the CAN-SPAM Act..................................................................14

25           3.    The CAN-SPAM Act Does Not Preempt Statutes That Related to
                   False And Deceptive Activity ......................................................15

26           4.    Facebook Has Standing to Assert a Claim Pursuant to Bus. & Prof.
                   Code Sections 17529.4 and 17538.45 .........................................16

27     F.    ConnectU's Motion To Dismiss Facebook's CAN-SPAM Act Claim Is
             Without Merit ..........................................................................................17

28

FACEBOOK'S OPPOSITION TO MOTION TO DISMISS
PURSUANT TO FED. R. CIV. P. 12(B)(6)
CASE NO. 5:07-CV-01389-RS

# TABLE OF CONTENTS
**(continued)**

**Page**

      1.     Facebook Has Stated a Claim For Violation Of The CAN-SPAM Act ................................................................................................... 17

      2.     Facebook Has Standing Under The CAN-SPAM Act ............................ 18

IV.     CONCLUSION ............................................................................................... 19

# TABLE OF AUTHORITIES

**Page**

*Cipollone* v. *Liggett Group*, 505 U.S. 504 ................................................................................13

*Conley* v. *Gibson*, 355 U.S. 41 (1957) .....................................................................................6

*Cook, Perkiss & Liehe, Inc.* v. *N. Cal. Collection Serv. Inc.*,
    911 F.2d 242 (9th Cir. 1990) ...........................................................................................7

*FMC Corp.* v. *Holliday*, 498 U.S. 52 (U.S. 1990) ....................................................................13

*Falkowski* v. *Imation Corp.*, 309 F.3d 1123 (9th Cir. 2002),
    *citing Swierkiewicz* v. *Sorema N.A.*, 534 U.S. 506 (2002) ..............................................6

*Feist Pub'lns, Inc.* v. *Rural Tel. Serv. Co.*, 499 U.S. 340 (1991) .............................................12

*Free Speech Coalition, Inc.* v. *Shurtleff*, 2007 U.S. Dist. LEXIS 21556 (D. Utah 2007)............13

*Granny Goose Foods, Inc.* v. *Bhd. of Teamsters & Auto Truck Drivers Local No. 70 of
    Alameda County*, 415 U.S. 423 (1974)...........................................................................7

*Lorillard Tobacco Co. v. Reilly,* 533 U.S. 525, 591, 592 (U.S. 2001)........................................13

*Medtronic, Inc.* v. *Lohr*, 518 U.S. 470 (1996) .........................................................................13

*NL Indus., Inc.* v. *Kaplan*, 792 F.2d 896 (9th Cir. 1986) ........................................................6

*Piekarski* v. *Home Owners Sav. Bank, F.S.B.*, 759 F. Supp. 542 (D. Minn. 1991)......................7

*Pollstar* v. *Gigmania Ltd.*, 170 F. Supp. 2d 974 (E.D. Cal. 2000) ............................................12

*Reddy* v. *Litton Indus., Inc.*, 912 F.2d 291 (9th Cir. 1990) .....................................................7

*Samara Bros.* v. *Wal-Mart Stores*,
    165 F.3d 120 (2d Cir. 1998) *rev'd on other grounds*, 529 U.S. 205 (2000)........................11

*Samura* v. *Kaiser Foundation Health Plan Inc.*, 715 F. Supp. 970 (N.D. Cal 1989)..................12

*Sprietsma* v. *Mercury Marine*, 537 U.S. 51 (2002) ..................................................................14

*Summit Mach. Tool Mfg. Corp.* v. *Victor CNC Sys.*, 7 F.3d 1434 (9th Cir. 1993)......................12

*White Buffalo Ventures, LLC,* v. *Univ. of Tex.*, 420 F.3d 366.....................................................13

**TABLE OF AUTHORITIES**
(continued)

Page

**STATE CASES**

*Balboa Ins. Co.* v. *Trans Global Equities*, 218 Cal. App. 3d 1327 (1990) ................................. 10

*Gordon* v. *Impulse Marketing Group, Inc.*,
    2005 WL. 1619847 (E.D. Wash., July 11, 2005) ................................................................. 15

*Paralyzed Veterans of America* v. *McPherson*, 2006 WL. 3462780 ......................................... 10

*U.S. Golf Assn.* v. *Arroyo Software Corp.*, 69 Cal. App. 4th 607 (1999) ................................. 10

**FEDERAL STATUTES**

15 U.S.C. § 7701(12) ................................................................................................................. 13

15 U.S.C. § 7701(a)(11) ............................................................................................................. 13

U.S.C. § 7702(11) ...................................................................................................................... 18

15 U.S.C. § 7704 ........................................................................................................................ 17

15 U.S.C. § 7704(a)(1) ............................................................................................................... 17

15 U.S.C. §  7704(a)(1)(A) ........................................................................................................ 17

15 U.S.C. § 7706(g) .................................................................................................................... 18

15 U.S.C. § 7707(b) ........................................................................................................ 13, 15, 16

15 U.S.C. § 7707(b)(1) ......................................................................................................... 14, 15

15 U.S.C. § 7707(b)(1) (2006) ................................................................................................... 13

15 U.S.C. § 7707(b)(2) ............................................................................................................... 15

15 U.S.C. Section 7707 ....................................................................................................... 14, 16

17 U.S.C. § 102(a) ...................................................................................................................... 11

17 U.S.C. § 103 .......................................................................................................................... 12

17 U.S.C. 301, House Report No. 94-1476 ......................................................................... 11, 13

28 U.S.C. § 1331 .......................................................................................................................... 4

28 U.S.C. 1446(b) ...................................................................................................................... 12

28 U.S.C. § 1450 .......................................................................................................................... 7

Fed. R. Civ. P. 8(a) .................................................................................................................. 1, 6

1

**TABLE OF AUTHORITIES**
(continued)

2

Page

3

Fed. R. Civ. P. 8(e)..............................................................................................6

4

Fed. R. Civ. P. 12(b)(6) .............................................................................1, 4, 7

5

47 U.S.C. 231(e)(4)............................................................................................18

6

**STATE STATUTES**

7

Cal. Bus. & Prof. Code § 17529.1(e) .............................................................17

8

Cal. Bus. & Prof. Code § 17529.4 ..............................................14, 15, 16, 17

9

Cal. Bus. & Prof. Code § 17529.4(a) ............................................................16

10

Cal. Bus. & Prof. Code § 17529.9 .................................................................16

11

Cal. Bus. & Prof. Code § 17538.45(c) ...........................................................16

12

Cal. Bus. & Prof. Code § 17538.45(f)(3)(B) .................................................16

13

Cal. Penal Code § 502 .....................................................................................9

14

Cal. Penal Code. § 502(a) ................................................................................9

15

Cal. Penal Code § 502(b)(6) ............................................................................9

16

Cal. Penal Code § 502(c) ..........................................................................7, 8, 9

17

Cal. Penal Code § 502(c)(2) ......................................................................3, 8, 9

18

19

20

21

22

23

24

25

26

27

28

## I.      **INTRODUCTION**

This is a case about a company and a number of individuals who hacked into a website, extracted millions of bits of data (including email addresses) and then used the purloined data for their own financial gain.  Facebook, Inc.'s complaint states numerous claims related to the unlawful actions taken by defendants.

ConnectU LLC's motion to dismiss Facebook's First Amended Complaint should be denied.  The Santa Clara Superior Court overruled a demurrer in which ConnectU raised many of the same arguments.  Other arguments, such as preemption of Facebook's common law misappropriation claim, were not raised at all in the earlier proceedings, constituting a waiver on the merits.  Facebook's claim is not preempted.

The First Amended Complaint makes the short and plain statement of a claim required under Rule 8(a).  The well-pleaded facts state that the defendants conspired to circumvent the security of the popular www.facebook.com website in order to steal millions of email addresses of website users, as well as other proprietary information.  In so doing, ConnectU and the others used deceitful practices such as using false user accounts and illicit software programs.  These actions violated Facebook's Terms of Service.  The misappropriated email accounts were then used by ConnectU to spam millions of Facebook users, sometimes using false email addresses, to attempt to have them join a competitive website, www.ConnectU.com.

As to the newly added claims, ConnectU's challenges to the claims under California Business and Professions Code Sections 17529.4 and 17538.45, and the CAN-SPAM Act, 15 U.S.C. Section 7701, *et seq.*, also are without merit.  Facebook has set out facts identifying the deceptive manner in which ConnectU obtained email accounts from the Facebook website and then spammed Facebook users.  Facebook has standing under each of these statutes to bring claims against ConnectU.  Moreover, the California statutes are not preempted by the CAN-SPAM Act, as ConnectU argues.  ConnectU's motion should be denied.

/ / /

/ / /

## II.    FACTUAL BACKGROUND[1]

### A.    The Parties

Facebook, Inc., headquartered in Palo Alto, California, developed and operates one of the most popular online "social networks" on the Internet, www.facebook.com, in which college students and alumni interact with one another based upon existing friendships, collegiate allegiances, and common interests.  First Amended Complaint ("FAC"), ¶¶7, 8.  ConnectU LLC, now a defunct Delaware Limited Liability Company, operates a largely unsuccessful competing website called www.connectu.com.  *Id.*, ¶ 2. ConnectU LLC has apparently been merged into ConnectU, Inc., a Connecticut corporation.  *Id.*

ConnectU hired defendant Pacific Northwest Software ("PNS") to develop a program designed to breach Facebook's security mechanisms and steal user and course data.  *Id.*, ¶ 3. Williams was an employee of PNS and, according to both ConnectU and PNS, developed the program ConnectU used to steal data from Facebook.  *Id.*, ¶ 4.

### B.    The Lawsuit

In mid-2004 and early-2005, defendants ConnectU, its founders Cameron Winklevoss, Tyler Winklevoss, and Divya Narendra, as well as PNS and Williams unlawfully accessed Facebook's website by using false user accounts and developing software programs to breach Facebook's security mechanisms.  *Id.*, ¶¶ 17, 18, 29, 53, 57.  These actions violated Facebook's Terms of Service.  *Id.*, ¶¶ 9, 12, 17, 22, 27, 29, 35, 48, 54.  After gaining access, defendants extracted upwards of 3,000,000 email addresses belonging to Facebook users, as well as course listings for particular colleges that Facebook had diligently collected and processed.  *Id.*, ¶¶ 17, 18, 19, 41; Docket No. 35, Ex. B, 148:20-149:1. After stealing Facebook information, ConnectU then sent unsolicited email, sometimes using false email accounts, to Facebook users inviting them to join ConnectU, a competing website.  *Id.*, ¶¶ 22, 42, 43, 47, 52.

Facebook filed a complaint on August 17, 2005 related to these actions.  Facebook sought,

---

[1]  ConnectU asserts a number of allegations related to its view that this action is retaliatory. Motion to Dismiss at 1-2.  Facebook disagrees with ConnectU's characterization.  Rather than provide the details of issues not relevant to this motion, Facebook will discuss the motion itself and why Facebook has stated a claim.

1    by its complaint, damages based on California common law misappropriation and violations of

2    California Penal Code Section 502(c).  ConnectU filed a Demurrer asserting that Facebook failed

3    to state a claim for which relief could be granted.  *See* October 25, 2005 Demurrer.  ConnectU did

4    not argue preemption in challenging the complaint.

5        Four other defendants moved to quash on the basis of lack of personal jurisdiction.  *See*

6    October 25, 2005 Mot. to Quash.  As a result, the State Court permitted jurisdictional discovery

7    over the defendants' vigorous objections, including granting two different motions to compel.

8    *See, e.g.,* November 21, 2005 Order Granting Facebook's *Ex Parte* Application to Compel

9    Depositions Related to Personal Jurisdiction. As a result of those motions to compel, ConnectU

10   admitted that its principals, PNS, and Williams did, in fact, extract email addresses and course

11   information from Facebook by various means such as misrepresenting the identity of users and

12   developing a program designed to circumvent the security of the website, and then spammed

13   Facebook users.  *See* September 15, 2006, Decl. of Theresa Sutton in Supp. of Opp'n to Mot. to

14   Stay, Ex. I, 25:13-28:19; and Docket No. 35, Ex. B, 148:20-149:1. However, ConnectU contends

15   that these actions all were permissible.  Mot. to Dismiss, 1:21-24.

16       The State Court by Order dated June 2, 2006, overruled ConnectU's Demurrer implicitly

17   finding that Facebook had adequately pled claims for relief under California's common law

18   misappropriation theory and Penal Code Section 502(c) — two of the claims at issue here.  *See*

19   June 2, 2006 Order re Demurrer of Defendant ConnectU LLC.  The Court also held that it lacked

20   personal jurisdiction over the other defendants, and sustained the motion to quash.  *Id.*  Because

21   the case was at issue, ConnectU answered the complaint and, in its Second Affirmative Defense,

22   assigned fault for the acts to unspecified third parties.  *See* June 12, 2006, Answer.

23       During the course of discovery, Facebook uncovered significant facts showing that PNS

24   and Williams were complicit in ConnectU's wrongdoing.  *See* January 23, 2007, Mot. for Leave

25   to File First Amended Comp.  Facebook filed a motion for leave to amend its complaint to add

26   PNS and Williams as parties and allege additional causes of action.  *Id.*  Although ConnectU

27   again objected, the State Court granted Facebook's motion and, on February 23, 2007, Facebook

28   filed its FAC adding two new parties and several new claims, including violations of California

1  Business and Professions Code Sections 17529.4 and 17538.45, and the CAN-SPAM Act, 15

2  U.S.C. Section 7701, *et seq*.  In response, ConnectU filed a Notice of Removal based on Federal

3  Question jurisdiction, 28 U.S.C. § 1331, which PNS and Williams later joined.  Docket Nos. 1,

4  21, 22.

5          On March 21, 2007, ConnectU filed a Motion to Dismiss pursuant to Fed. R. Civ. P.

6  12(b)(6).  Docket No. 25.  PNS and Williams separately filed a joint Motion to Dismiss for lack

7  of personal jurisdiction.  Docket No. 23.  In its Motion to Dismiss, ConnectU challenges the

8  sufficiency of Facebook's pleading for all but two claims for relief.  Notably, ConnectU

9  challenges — for the second time — Facebook's identical claims under Penal Code Section

10  502(c) and California's common law misappropriation doctrine, despite the State Court's having

11  overruled its previous Demurrer.   ConnectU resurrects numerous arguments made in the earlier

12  proceedings.

13      **C.      Facts Supporting Claims**

14          **1.      Facebook Limits Access to its Website and Use of Information
                      Available on its Website**

15

16          Facebook actively protects the nature of access to its computers and computer systems, as

17  well as the use of information provided on its website.  *Id.* ¶¶ 9-13.  In order to legally access user

    profiles and other specific information on Facebook's website, one must register and thereby

18  agree to Facebook's Terms of Use and its Privacy Policy.  *Id.* ¶ 9.  During all relevant times

19  herein, ConnectU was aware of these policies.  *Id.*  ConnectU has a very similar policy for those

20  using its competing website.  *See* www.connectu.com.

21          By registering, and becoming a Facebook member, the user gains personal access to other

22  profiles within his or her University (*i.e.*, to profiles of other students and alumni), as well as to

23  the profiles of friends at other Universities that have explicitly granted such user access.  *Id.* ¶ 10.

24  The Terms of Use and the Privacy Policy have, at all times since the launch of Facebook's

25  website, prohibited all commercial use and access to data and communications therein, except as

26  explicitly authorized by Facebook.  *Id.* ¶ 11.  From at least January 2005 until June 27, 2005, the

27  Terms of Use provided as follows (aside, on information and belief, from non-substantive

28

1   modifications):

2   > The Web site is for the personal use of individual Members only
    > and may not be used in connection with any commercial endeavors.
3   > Organizations, companies, and/or businesses may not become
    > Members and should not use the Service or the Web site for any
4   > purpose. Illegal and/or unauthorized uses of the Web site, including
    > collecting email addresses or other contact information of members
5   > by electronic or other means for the purpose of sending unsolicited
    > email and unauthorized framing of or linking to the Web site will
6   > be investigated, and appropriate legal action will be taken,
    > including without limitation, civil, criminal, and injunctive redress."
7
    *Id.*, ¶ 12. In addition, it provided that:
8
9   > You may not engage in advertising to, or solicitation of, other
    > Members to buy or sell any products or services through the
    > Service. You may not transmit any chain letters or junk email to
10  > other members. Although Facebook cannot monitor the conduct of
    > its members off the Web site, it is also a violation of these rules to
11  > use any information obtained from the Service in order to harass,
    > abuse, or harm another person, or in order to advertise to, solicit, or
12  > sell to any member without their prior consent.

13  *Id.* Lastly, it affirmed:

14  > Facebook owns and retains all proprietary rights in the Web site and
    > the Service. The Web site contains the copyrighted material,
15  > trademarks, and other proprietary information of Facebook, and its
    > licensors. Except for that information which is in the public
16  > domain or for which you have been given written permission, you
    > may not copy, modify, publish, transmit, distribute, perform,
17  > display, or sell any such proprietary information.

18  *Id.*

19      Facebook also restricts access to and always has used its best efforts to keep confidential

20  its aggregate customer lists and other proprietary user and system information, from unauthorized

21  uses and parties. *Id.* ¶ 13. Facebook has generally expended substantial effort, money and time

22  in developing the informational components of its web site, as well as its aggregate customer

23  base. *Id.* ¶ 14. The data on the Facebook's computers, computers systems, and computer

24  networks is highly valuable. *Id.*

25      **2.      ConnectU's Unauthorized Access and Copying of Information**

26      ConnectU gained unauthorized access to Facebook's website on numerous occasions, and

27  has taken extensive amounts of data from Facebook. *Id.* ¶ 18. The misappropriated data includes

28  a large amount of user information, including email addresses and other personal information. *Id.*

1    Such user information (i) cannot properly be viewed by any other user outside the user's

2    University or acknowledged friendship network (*see id.* ¶ 10) or (ii) be taken for any outside

3    commercial purpose.  *See, e.g.*, *id.* ¶ 11; *see also id.* ¶ 18.  ConnectU took this personal

4    information without the benefit of a prior commercial relationship with such users.  *See id.* ¶¶ 18,

5    22.  Other types of data taken by ConnectU and its collaborators were "customer lists, web site

6    components, network, and other information."  *Id.* ¶ 33.

7         At various times, ConnectU distributed emails to Facebook members and otherwise

8    sought to solicit Facebook's members, including the solicitation of members with whom

9    ConnectU had no prior or direct relationship with, in an effort to lure them to ConnectU.  *Id.* ¶¶

10   18, 22.  ConnectU used the email addresses that had been gathered by and/or for ConnectU

11   through Defendants' unauthorized access to and unauthorized appropriations from Facebook's

12   data, computers, computer systems, and computer networks.  *Id.* ¶ 18.

13   **III.    ARGUMENT**

14        **A.    Legal Standard**

15        A motion to dismiss for failure to state a claim must be denied unless it is "clear that no

16   relief could be granted under any set of facts that could be proved consistent with the allegations."

17   *Falkowski v. Imation Corp.*, 309 F.3d 1123, 1132 (9th Cir. 2002), *citing Swierkiewicz v. Sorema*

18   *N.A.*, 534 U.S. 506 (2002).  All material allegations in a complaint should be taken as true and

19   construed in the light most favorable to the plaintiff.  *NL Indus., Inc. v. Kaplan*, 792 F.2d 896,

20   898 (9th Cir. 1986).

21        A complaint need only contain a "short and plain statement of the claim showing that the

22   pleader is entitled to relief."  Fed. R. Civ. P. 8(a).  "Each averment of a pleading shall be simple,

23   concise, and direct. No technical forms of pleading or motions are required."  Fed. R. Civ. P. 8(e).

24   These rules "do not require a claimant to set out in detail the facts upon which he bases his claim.

25   To the contrary, all the Rules require is 'a short and plain statement of the claim' that will give

26   the defendant fair notice of what the plaintiff's claim is and the grounds on which it rests."

27   *Conley v. Gibson*, 355 U.S. 41, 47 (1957).

28        When granting a motion to dismiss, a court is generally required to grant a plaintiff

leave to amend, even if no request to amend the pleading was made, unless amendment would be

futile. *Cook, Perkiss & Liehe, Inc. v. N. Cal. Collection Serv. Inc.*, 911 F.2d 242, 246-47 (9th Cir.

1990). In determining whether amendment would be futile, a court examines whether the FAC

could be amended to cure the defect requiring dismissal "without contradicting any of the

allegations of [the] original complaint." *Reddy v. Litton Indus., Inc.*, 912 F.2d 291, 296 (9th Cir.

1990). Leave to amend should be liberally granted. *Id.* at 296-97.

**B.    The Superior Court's Order Overruling ConnectU's Demurrer Remains in Force And, Therefore, Prohibits ConnectU From Raising The Same Arguments in This Court**

ConnectU argues that Facebook's claims under Cal. Penal Code 502(c) and common law

misappropriation should be dismissed. It makes these arguments without informing the Court

that it previously sought to have these claims dismissed after the original complaint was filed in

this action. *See* October 25, 2005, Demurrer. The Superior Court overruled ConnectU's

demurrer, but ConnectU does not explain why the State Court's Order should be ignored. *See*

June 2, 2006, Order Overruling Demurrer. The entry of that Order precludes granting the Rule

12(b)(6) motion on the same grounds asserted in the California Superior Court, or on grounds that

could have been raised in the demurrer.

"All injunctions, orders, and other proceedings had in [an] action prior to its removal shall

remain in full force and effect until dissolved or modified by the District Court." 28 U.S.C. §

1450; *see also Granny Goose Foods, Inc. v. Bhd. of Teamsters & Auto Truck Drivers Local No.

70 of Alameda County*, 415 U.S. 423, 435-436 (1974). While "Federal courts have the right to

reexamine the issues decided by the state courts, … it is their policy not to do so absent cogent

reasons or exceptional circumstances." Moore's Federal Practice § 134.22[3][c][i](2206).

ConnectU offers no reason or exceptional circumstances to compel this Court to revisit the extant

Order Re ConnectU's Demurrer on these grounds. Indeed, ConnectU does not even inform the

Court of the fact of the earlier June 2, 2006 Order, or that it previously raised identical arguments

in the Superior Court.

Under these circumstances, the "[F]ederal court must treat all state court rulings as if they

had occurred in federal court." *Piekarski v. Home Owners Sav. Bank, F.S.B.*, 759 F. Supp. 542,

1  544 (D. Minn. 1991).  Inasmuch as the state court already agreed the Penal Code Section 502(c)

2  and common law misappropriation claims are viable, ConnectU's motion to dismiss these two

3  causes of action should be denied.

**C.    Facebook Has Stated A Claim Under California Penal Code Section 502(C)**

To the extent the Court is willing to reconsider the California Superior Court's June 2,

2006 Order, it is sufficient to note that Facebook has adequately stated a claim under Penal Code

Section 502.

**1.    The FAC states a claim under at least California Penal Code Section 502(c)(2), 502(c)(6), and 502(c)(7)**

Penal Code Section 502 permits a civil cause of action by a party suffering damage or loss

by reason of a violation of any sub-section of Penal Code Section 502(c) against the violator of

that Section.  Penal Code Section 502(c) enumerates nine different actionable violations, each of

which constitutes a public offense and also subjects the violator to civil liability.  In relevant part,

Section 502(c) reads that any person who does any of the following is liable under Section

502(c):

- Knowingly accesses and without permission takes, copies, or makes use of any data from a computer, computer system, or computer network, or takes or copies any supporting documentation, whether existing or residing internal or external to a computer, computer system or computer network [(c)(2)]

- Knowingly and without permission provides or assists in providing a means of accessing a computer, computer system, or computer network in violation of this section [(c)(6)]

- Knowingly and without permission accesses or causes to be accessed any computer, computer system, or computer network [(c)(7)].

The FAC alleges that ConnectU violated each of these provisions.  FAC ¶¶ 17-25, 28-30.

The FAC details the terms of use that govern each Facebook member's use of the website and the

limitations imposed thereon — i.e., it describes what behavior is permitted and what is not.[2]  Id.

---

[2]  ConnectU incorrectly argues that the FAC does not adequately allege ConnectU's access was "without permission."  Mot. to Dismiss, 7:17-18.  To the extent ConnectU seeks to draw a distinction between the words "without permission" and "unauthorized," its argument must be rejected.  Indeed, the definition of "permission" is "authorization."  Roget's New Millennium™ Thesaurus, First Edition (v 1.3.1). Lexico Publishing Group, LLC, <Thesaurus.com http://thesaurus.reference.com/browse/permission>.  The FAC repeatedly alleges that ConnectU

¶¶ 11, 12.  Specifically, the Terms of Use prohibit unauthorized access, which is defined to include "collecting email addresses or other contact information of members by electronic or other means … ."  *Id.*, ¶ 12.   The FAC alleges that ConnectU "hired Pacific Northwest Software and Winston Williams to write software to gain unauthorized access to Facebook's website and misappropriate information," and that ConnectU took "extensive amounts of proprietary data from Facebook, including but not limited to user data such as email addresses … ."  *Id.*, ¶¶ 17, 18.  The fact that ConnectU resorted to hiring a software developer to enable it to gain access to Facebook's servers and extract data, indicates that its actions were "knowing."  Moreover, Facebook alleges that ConnectU "willfully and maliciously engaged in [said] unauthorized access" and appropriation.  FAC ¶ 19. Facebook has adequately stated a claim for violation of Penal Code Section 502(c).

### 2.  ConnectU's Argument That The Type Of Information Stolen Dictates Whether A Violation of Section 502(c) Occurred Is Wrong

ConnectU cites to cases that have nothing to do with California Penal Code Section 502(c) to argue that Facebook must show that the misappropriated information was subject to an expectation of privacy or was proprietary.  Penal Code 502(c) has no requirement of secrecy or privacy and does not require that the stolen information be proprietary.  Cal. Penal Code § 502.  Rather, Section 502(c) was enacted to protect "businesses… from tampering, interference, damage, and unauthorized access to lawfully created computer data and computer systems."  Cal. Penal Code. § 502(a).  Notably, "data" is defined as "a representation of information, knowledge, facts, concepts, computer software, computer programs or instructions."  Cal. Penal Code § 502(b)(6).  Nothing in this definition requires that the wrongly accessed information be private or proprietary.  In any event, Facebook is a secure website that is only accessible by password.  Uses of the website contents are limited by the Terms of Use.  Such protections easily establish that any user would have an expectation of privacy, and that Facebook has a proprietary interest in its website.

---

gained unauthorized access and describes the type of access that is unauthorized.  FAC ¶¶ 12, 17, 18, 19, 20, 22.

FACEBOOK'S OPPOSITION TO MOTION TO DISMISS
PURSUANT TO FED. R. CIV. P. 12(b)(6)
CASE NO. 5:07-CV-01389-RS

1

**D.    ConnectU's Motion To Dismiss Facebook's Common Law Misappropriation And Unfair Competition Causes Of Action Is Without Merit**

2

3

**1.    Facebook Has Stated A Claim For Common Law Misappropriation and Unfair Competition**

4        To state a claim for relief from ConnectU's misappropriation of Facebook information,

5    Facebook need only allege that (a) it invested substantial time, skill, or money in developing its

6    property; (b) ConnectU appropriated and used its property at little or no cost to ConnectU; (c)

7    ConnectU's appropriation and use of Facebook's property was without its authorization or

8    consent; and (d) Facebook has been injured by ConnectU's conduct. *Balboa Ins. Co. v. Trans*

9    *Global Equities*, 218 Cal. App. 3d 1327, 1342 (1990).  ConnectU does not dispute that

10    Facebook's FAC meets these criteria.  Instead, ConnectU complains that Facebook does not go

11    beyond the basic notice pleading of Rule 8(a) and supply "facts to support" its allegations.

12    ConnectU's Mot. to Dismiss, 11:9-12.

13        Contrary to ConnectU's assertions, the FAC describes 1) the extensive effort to develop

14    the informational components of Facebook's websites (FAC ¶ 14, 21, 33, ), 2) ConnectU's

15    extraction and use of the information at little or no cost to itself (*id.*, ¶¶ 17-19, 34) and 3) injury

16    suffered by Facebook (*id.*, ¶¶ 20, 21, 23, 34, 35).  ConnectU argues that these detailed allegations

17    are conclusory.  ConnectU relies on *Paralyzed Veterans of America v. McPherson*, 2006 WL

18    3462780, *4 for the proposition that "conclusory allegations of law and unwarranted inferences

19    will not defeat a motion to dismiss for failure to state a claim."  ConnectU does not explain how

20    Facebook's detailed factual allegations are "conclusory allegations of law" or "unwarranted

21    inferences."  They are not.  *see, e.g.,*, FAC ¶¶ 16-19, 20-23, 33-35.  As a result, *Paralyzed*

22    *Veterans* is inapposite, and ConnectU's reliance thereon should be ignored.

23

**2.    Facebook's Claim For Common Law Misappropriation Is Not Preempted By Copyright Law**

24        ConnectU alleges that Facebook's claim for common law misappropriation of raw data is

25    preempted by the Copyright Act.  ConnectU is wrong.  Common law misappropriation "is

26    normally invoked in an effort to protect something of value not otherwise covered by patent or

27    copyright law."  *U.S. Golf Assn. v. Arroyo Software Corp.*, 69 Cal. App. 4th 607, 618 (1999).

28

1    "The intention of section 301 is to preempt and abolish any rights under the common law or

2    statutes of a State that are equivalent to copyright and that extend to works coming within the

3    scope of the Federal copyright law." 17 U.S.C. § 301, House Report No. 94–1476.

4    
> Copyright protection subsists, in accordance with this title, in
> original works of authorship fixed in any tangible medium of

5    
> expression, now known or later developed, from which they can be
> perceived, reproduced, or otherwise communicated, either directly

6    
> or with the aid of a machine or device.

7    17 U.S.C. § 102(a).  None of the information Facebook alleges was stolen and misused by

8    ConnectU is "an original work of authorship fixed in any tangible medium of expression," and,

9    therefore, cannot be protected by Copyright law.  Facebook's misappropriation claim arises from

10   ConnectU's repeated invasion into Facebook's computer systems to steal Facebook raw data,

11   such as email addresses, personal profile data, and college course information.  FAC ¶¶ 17, 18,

12   33.  Data, in and of itself, is not expression and is not the result of "authorship."  It is not of the

13   nature and quality that copyright law seeks to protect it.  It is a wholly different subject matter.

14        Facebook also has pled an "extra element."  To decide whether a misappropriation claim

15   is preempted, the Court must employ an "extra element" test:

16   
> If an "extra element" is "required instead of or in addition to the
> acts of reproduction, performance, distribution or display, in order

17   
> to constitute a state-created cause of action, then the right does not
> lie 'within the general scope of copyright,' and there is no

18   
> preemption.

19   *Samara Bros. v. Wal-Mart Stores*, 165 F.3d 120, 131 (2d Cir. 1998) *rev'd on other grounds*, 529

20   U.S. 205 (2000).  The "extra element" is evidenced by ConnectU's misappropriation

21   accomplished through breaches of Facebook's Terms of Use, computer trespass, and deceit.  FAC

22   ¶¶ 17, 18, 19, 22, 24, 35.  Indeed, "intentional deception constitutes an extra element not required

23   in copyright infringement claims."  *Samara Bros., Inc.,* 165 F.3d at 131.

24        The FAC alleges that "aggregate customer lists and other proprietary user and system

25   information," "user data such as email addresses and other data collected and/or created by

26   Facebook," as well as "commercially valuable customer lists, web site components, network, and

27   other information specified in this complaint" have been misappropriated through deceit and in

28   violation of the Terms of Use.  FAC ¶¶ 13, 17-18, 33-34.  Thus, the "extra element" necessary to

1   preclude preemption is adequately pled, and Facebook's claim for relief is not preempted.  *See*

2   *Summit Mach. Tool Mfg. Corp. v. Victor CNC Sys.*, 7 F.3d 1434, 1441 (9th Cir. 1993); *see also*

3   *Pollstar v. Gigmania Ltd.*, 170 F. Supp. 2d 974, 979-80 (E.D. Cal. 2000) (misappropriation of

4   "hot news," including false concert information, added "extra element" to prevent application of

5   copyright preemption).

6        Moreover, even if the "extra element" were not present in Facebook's misappropriation

7   claim, a copyright cannot be obtained in data compilations such as customer lists and facts stored

8   in a database.  *See* 17 U.S.C. § 103 (laying out law governing copyright protection for

9   compilations and derivative works); *see also Feist Pub'lns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S.

10  340, 344 (1991) (holding copying of telephone directory did not infringe upon copyright because

11  facts are not copyrightable).  As a result, Facebook's claim for relief, based on the facts alleged,

12  cannot be preempted by the Copyright Act.  17 U.S.C. § 301

13                    **3.    ConnectU Waived Its Right To Assert Federal Preemption**

14       ConnectU is barred from raising federal copyright preemption because it failed to do so in

15  response to the original complaint.  Facebook's current common law misappropriation claim is

16  identical to that alleged in the original August 17, 2005 complaint.  ConnectU had 30 days to

17  remove this action after it was served with the original complaint.  *See* 28 U.S.C. 1446(b).  It did

18  not do so.  As a result, it waived its right to remove.  *Samura v. Kaiser Foundation Health Plan*

19  *Inc.,* 715 F. Supp. 970, 972 (N.D. Cal 1989) ("Changes to a complaint that create a new basis for

20  removal do not undo the original waiver. 'If a case is removable from the outset, it must be

21  removed within the initial thirty-day period specified by § 1446(b); subsequent events do not

22  make it 'more removable' or 'again removable'") (citations omitted.)

23       **E.    ConnectU's Motion To Dismiss Facebook's Business & Professions Code**
             **Sections 17429.4 and 17538.45 Claims Is Without Merit**[3]

24

25       ConnectU argues that Facebook cannot assert claims under California Business &

26  Professions Code §§ 17529.4 and 17538.45 are preempted by the federal CAN-SPAM Act, 15

27  U.S.C. § 7707(b)(1) (2006).  *See* Mot. to Dismiss, 12-14.  This argument fails because the CAN-

28  _____

[3]  Facebook notes that notice to the state attorney general may be required under Cal. L.R. 3-8(d).

SPAM Act specifically exempts from any preemption argument for activities such as those alleged in Facebook's FAC.

**1.    The CAN-SPAM Act Does Not Preempt Business & Professions Code Sections 17529.4 and 17538.45**

Generally, Courts apply a presumption against preemption of state law. *Cipollone v. Liggett Group,* 505 U.S. 504, 517; *see also Medtronic, Inc. v. Lohr,* 518 U.S. 470, 484 (1996). This presumption is applicable to 15 U.S.C. § 7707(b). *White Buffalo Ventures, LLC, v. Univ. of Tex.,* 420 F.3d 366, 370-73. If Congress' intent to preempt a particular category of regulation is ambiguous, such regulations are not preempted. *Lorillard Tobacco Co. v. Reilly,* 533 U.S. 525, 591, 592 (U.S. 2001); *see also FMC Corp. v. Holliday,* 498 U.S. 52, 67 (U.S. 1990) ("When there is ambiguity in a statutory provision preempting state law, we should apply a strong presumption against the invalidation of well-settled, generally applicable state rules."). Courts have recognized that the CAN-SPAM Act's preemption is very limited in scope and allows for state regulation of unsolicited email which builds off the common foundation of Federal law. *See Free Speech Coalition, Inc. v. Shurtleff,* 2007 U.S. Dist. LEXIS 21556 (D. Utah 2007). Even the Federal CAN-SPAM Act itself acknowledges that "[t]he problems associated with the rapid growth and abuse of unsolicited commercial electronic mail cannot be solved by Federal legislation alone… ." 15 U.S.C. § 7701(12); *see also* 15 U.S.C. § 7701(a)(11) (identifying problems of inconsistent state laws).

The narrow field of preemption is limited by the language used by the CAN-SPAM Act itself. *See Cipollone,* 505 U.S. at 519 (a court "must construe these provisions in light of the presumption against the pre-emption of state police power regulations. This presumption reinforces the appropriateness of a narrow reading" of the state law.)   Specifically, 15 U.S.C. § 7701(b) indicates, "[t]his chapter *supersedes* any statute, regulation, or rule… ." (emphasis added).  The use of the term "supersedes" means that it replaces preexisting laws, but does not replace laws created contemporaneously or thereafter.  This language is quite different from other preemption statutes.  For example, 17 U.S.C. Section 301, the provision in the Copyright statute governing preemption says:

1
2
3

> On or after January 1, 1978, all legal or equitable rights that are equivalent to any of the exclusive rights within the general scope of copyright…are governed exclusively by this title. *Thereafter*, no person is entitled to any such right or equivalent right in any such work under the common law or statutes of any State.

4  (emphasis added).  The Copyright preemption language ensures that the preemption is not just

5  replacing previous law but also preempts prospectively by use of the word "thereafter."  Congress

6  made no such statement about prospective preemption with respect to the CAN-SPAM Act.  As a

7  result, California Business and Professions Code Section 17529.4 cannot be preempted, as it was

8  enacted contemporaneously with the CAN-SPAM Act.

9          **2.      Section 17529.4 Falls Outside The Scope Of The Preemption Clause of The CAN-SPAM Act**

10
11  ConnectU argues that the CAN-SPAM Act expressly preempts California Business and

Professions Code Section 17529.4  This argument fails because California Business and

12  Professions Code Section 17549.4 primarily regulates the *collection* of email addresses, not their

13  use.  The CAN-SPAM Act supersedes any state statute that expressly regulates the use of email to

14  *send* commercial messages:

15
16
17
18

> This Act supersedes any statute, regulation, or rule of a State or political subdivision of a State that expressly regulates the use of electronic mail to *send* commercial messages, except to the extent that any such statute, regulation, or rule prohibits falsity or deception in any portion of a commercial electronic mail message or information attached thereto.

19  15 U.S.C. § 7707(b)(1) (emphasis added).  In determining the scope of preemption, the Court

20  must look to the plain wording of the clause which "necessarily contains the best evidence of

21  Congress's preemptive intent."  *Sprietsma v. Mercury Marine*, 537 U.S. 51, 62-63 (2002).  The

22  plain wording of 15 U.S.C. Section 7707 provides that the CAN-SPAM Act supersedes only

23  those state statutes regulating "the *use of electronic mail* to send commercial messages."

24  (emphasis added.)  The act triggering violation of California Business and Professions Code

25  Section 17549.4, however, is the "collection" of electronic mail addresses with the intent to use

26  the collected electronic mail to send unsolicited commercial e-mail advertisements to or from a

27  California email address:

28          (a) It is unlawful for any person or entity to *collect electronic mail*

*addresses* posted on the Internet *if the purpose of the collection* is for the electronic mail addresses to be used to do either of the following:

> (1) Initiate or advertise in an unsolicited commercial e-mail advertisement from California, or advertise in an unsolicited commercial e-mail advertisement sent from California.

> (2) Initiate or advertise in an unsolicited commercial e-mail advertisement to a California electronic mail address, or advertise in an unsolicited commercial e-mail advertisement sent to California electronic mail address.

Cal. Bus. & Prof. Code § 17529.4. (Emphasis added.)

Although the statute describes the types of uses one must intend, a violation thereof only occurs when the intent to use the email is coupled with the collection of them. Actual use of the emails is not required to violate the Act. Therefore, 17529.4 is not expressly preempted by the CAN-SPAM Act.

### 3. The CAN-SPAM Act Does Not Preempt Statutes That Related to False And Deceptive Activity

The CAN-SPAM Act also is limited in that it does not apply to certain types of state laws, such as those which prohibit "falsity or deception in any portion of a commercial electronic mail message or information attached thereto," 15 U.S.C. § 7707(b), or state laws associated with trespass, contract, tort, fraud or computer crime. 15 U.S.C. § 7707(b)(2). *See Gordon v. Impulse Marketing Group, Inc.*, 2005 WL 1619847 (E.D. Wash., July 11, 2005).

Facebook's claims pursuant to California Business & Professions Code §§ 17529.4 and 17538.45 fall within the these specific exceptions so as not to be preempted — particularly when the presumption against preemption itself is considered. Neither section is preempted to the extent that it proscribes "falsity or deception in any portion of a commercial electronic mail message or information attached thereto." That proscription necessarily includes the origin of the message. 15 U.S.C. § 7707(b)(1).

California Business & Professions Code § 17538.45 cannot be preempted. Section 17538.45 expressly prohibits deception or fraud employed to circumvent Terms of Use employed an electronic mail service provider such as Facebook, and includes the following provision:

> No individual, corporation, or other entity shall use or cause to be

1

> used, by initiating an unsolicited electronic mail advertisement, an
> electronic mail service provider's equipment located in this state *in*
> *violation of the electronic mail service provider's policy prohibiting*
> *or restricting the use of its equipment to deliver unsolicited*
> *electronic mail advertisements to its registers users.*

Cal. Bus. & Prof. Code § 17538.45(c) (emphasis added).  The California legislature added

provisions designed to encourage the use of Terms of Service such as those used by Facebook,

underscoring that this is a statute specifically contemplated not to be preempted by 15 U.S.C.

§ 7707 and because it is based in contract and fraud.  See Cal. Bus. & Prof. Code §

17538.45(f)(3)(B).  Moreover, California Business and Professions Code § 17538.45 was

amended in 2004 by S.B. 186, the same law that created Section 17529.4, and hence also should

be subject to the savings clause in Section 17529.9 to the extent it is necessary to enforce the

exception to preemption for fraudulent or deceptive acts set forth in 15 U.S.C. § 7707(b).

Facebook alleges that ConnectU developed software to circumvent the security of the

website, thus violating the explicit Terms of Use employed by Facebook, in order to gain

unauthorized access to www.facebook.com.  *See* FAC ¶¶ 9-20.  ConnectU then used email

addresses it collected from its illegal and unauthorized entry into the Facebook website to spam

Facebook users for the purpose of having them join ConnectU, Facebook's competitor.   See FAC

¶¶ 16, 21-25, 40-50.  Because this activity is deceptive, violates a contract, and is premised on

trespass, the claim based on Business & Professions Code § 17529.4(a) cannot be preempted

because the application of the statute is subject to a savings clause that permits it to remain

enforceable to the extent the statute "can be given effect without the invalid … application." Cal.

Bus. & Prof. Code § 17529.9.

**4.    Facebook Has Standing to Assert a Claim Pursuant to Bus. & Prof.
Code Sections 17529.4 and 17538.45**

ConnectU's faulty challenge to Facebook's standing to bring claims for relief under

Business and Professions Code Sections 17429.4 and 17538.45 boils down to the idea that

Facebook has not properly alleged that it is an "electronic mail service provider."  This action is

about the defendants' theft of close to 3,000,000 email addresses and other data from the

Facebook website.

Facebook has standing.  ConnectU concludes that because Facebook "does not allege that it operates its own email servers" it therefore is not an intermediary.  Nothing in Section 17529.4 or 17538.45 requires such an averment. Facebook is an "electronic mail service provider" as defined in Section 17529.1(h).  Cal. Bus. & Prof. Code § 17529.1(e) ("'Electronic mail service provider' means any person, including an Internet service provider, that is an intermediary in sending or receiving electronic mail or that provides to end users of the electronic mail service the ability to send or receive electronic mail").  In the FAC Facebook alleges that it is "an interactive computer service which enables social networking amongst present and former university students."  FAC ¶ 7.  It is "interactive" because it enables its the transmission of electronic messages between members.  Facebook further alleges that its Terms of Use expressly prohibit its users from transmitting "any chain letters or junk email to other members" and from "collecting email addresses or other contact information of members by electronic or other means for the purpose of sending unsolicited email … ." *Id.*, ¶ 12.  Thus, Facebook is an "intermediary in sending or receiving electronic mail."  Indeed, it was this intermediary role that allowed ConnectU to extract the millions of email addresses.  *Id.*, ¶¶ 17, 18, 42, 47.

**F.    ConnectU's Motion To Dismiss Facebook's CAN-SPAM Act Claim Is Without Merit**

**1.    Facebook Has Stated a Claim For Violation Of The CAN-SPAM Act**

ConnectU incorrectly argues that Congress made illegal six types of commercial email and that Facebook was required to allege a violation of at least one of them to bring a claim under the CAN-SPAM Act. Mot. to Dismiss, 16:9-16.  As an internet service provider, Facebook is entitled to seek damages based on violations of 15 U.S.C. § 7704.  Section 7704 prohibits the transmission of false or misleading transmission information.  In order to state a claim under the CAN-SPAM Act, Facebook need only allege that the emails sent by ConnectU contained "materially false or materially misleading" header information.  15 U.S.C. § 7704(a)(1).  For purposes of this provision, header information is false or misleading if "an originating electronic mail address, domain name, or Internet Protocol address the access to which for purposes of initiating the message was obtained by means of false or fraudulent pretenses or representations."

1    15 U.S.C. § 7704(a)(1)(A).

2        Facebook's FAC satisfies this requirement.  Facebook alleged that ConnectU "distributed

3    e-mails to members of Facebook and otherwise sought to solicit Facebook's members, including

4    the solicitation of members with whom ConnectU had no prior or direct relationship with."  FAC

5    ¶ 22.  Facebook further alleged that "ConnectU used the email addresses that had been gathered

6    by and/or for ConnectU through Defendants' unauthorized access to and unauthorized

7    appropriations from Facebook's … computers, computer systems, and computer networks." *Id.*

8    Notably, Defendants' unauthorized access was accomplished by developing a computer program

9    specifically designed to circumvent Facebook's security measures and mine its site for email

10   addresses.  *Id.*, ¶¶ 4, 17.  By engaging in the activity alleged in the FAC *i.e.*, gaining unauthorized

11   access to Facebook's website and data, ConnectU initiated electronic mail to Facebook users that

12   contained false and/or misleading transmission information.

13                    **2.    Facebook Has Standing Under The CAN-SPAM Act**

14       Facebook has standing to sue under the CAN-SPAM Act.  Any provider of an "Internet

15   Access Service" has standing to proceed with a claim under the statute.  15 U.S.C. § 7706(g).

16   The term "Internet Access Service" is given the definition afforded in the section 231(e)(4) of the

17   Communications Act of 1934 (47 U.S.C. 231(e)(4)).  15 U.S.C. § 7702(11).  The relevant portion

18   of the Communications Act defines "Internet Access Service" as "a service that enables users to

19   access content, information, electronic mail, or other services offered over the Internet, and may

20   also include access to proprietary content, information, and other services as part of a package of

21   services offered to consumers.  Such term does not include telecommunications services."

22   Facebook enables social networking amongst its registered users via its website.  FAC ¶¶ 7-10.

23   As part of its social networking service Facebook enables its registered users to access services

24   and content through the Facebook website over the Internet, including the ability to access the

25   profiles of other users, and the ability send electronic mail messages to other registered users.

26   FAC ¶¶ 7 – 12. This is precisely the type of service defined in 47 U.S.C. 231(e)(4).

27   / / /

28   / / /

1    **IV.    <u>CONCLUSION</u>**

2           For the reasons set forth herein, ConnectU's motion to dismiss should be denied.

3    Dated: April 11, 2007                    ORRICK, HERRINGTON & SUTCLIFFE LLP

4

5                                             /s/ I. Neel Chatterjee /s/
                                            _____
6                                             I. Neel Chatterjee
                                              Attorneys for Plaintiff
7                                             THE FACEBOOK, INC.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28