Scott R. Mosko (State Bar No. 106070)
FINNEGAN, HENDERSON, FARABOW,
 GARRETT & DUNNER, L.L.P.
Stanford Research Park
3300 Hillview Avenue
Palo Alto, California  94304
Telephone:   (650) 849-6600
Facsimile:   (650) 849-6666

Attorneys for Defendant
ConnectU LLC

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| FACEBOOK, INC. | CASE NO.  C 07-01389 RS |
| Plaintiff, | **DEFENDANT CONNECTU LLC'S, REPLY TO FACEBOOK, INC.'S OPPOSITION TO CONNECTU'S MOTION TO DISMISS PURSUANT TO FED. R. CIV. P. 12(B)(6) FOR FAILURE TO STATE A CLAIM** |
| v. | |
| CONNECTU LLC (now known as ConnectU, Inc.), PACIFIC NORTHWEST SOFTWARE, INC., WINSTON WILLIAMS, AND DOES 1-25, | |
| Defendants. | Date:   May 2, 2007<br>Time:   9:30 a.m.<br>Dept.:   4<br>Judge: Hon. Richard Seeborg |

# TABLE OF CONTENTS

I. THE STATE COURT ORDER REGARDING CONNECTU'S DEMURRER TO THE ORIGINAL COMPLAINT IS IRRELEVANT ..........................................................1

II. FACEBOOK CANNOT MAINTAIN A CAUSE OF ACTION UNDER CALIFORNIA PENAL CODE SECTION 502..................................................................2

    A. The Factual Allegations Supporting Facebook's Section 502 Count are Inconsistent with One of the Stated Purposes of the Statute ..................................2

    B. Facebook's Section 502(c) Count Fails to State a Cause of Action Because it Omits Factual Allegations That Access of the System or Data was "Without Permission" ...........................................................................................................3

III. FACEBOOK'S COMMON LAW MISAPPROPRIATION CLAIM IS PREEMPTED ....4

IV. PLAINTIFF FAILS TO STATE A CAUSE OF ACTION UNDER SECTIONS 17529.4 OR 17538.45 OF THE CALIFORNIA BUSINESS AND PROFESSIONS CODE..................................................................................................................................9

    A. The CAN-SPAM Act Preempts These State Code Allegations..............................9

    B. Section 17529.4 Does Not Fall Within the Savings Clause of the CAN-SPAM Act...........................................................................................................................10

    C. The Limited Exceptions to the Preemption Clause Do Not Save Section 17529.4 or 17538.45 of the California Business and Professions Code................12

    D. Facebook Lacks Standing to Assert Sections 17529.4 and 17538.45 Because it is not an Electronic Service Provider...................................................................13

V. FACEBOOK FAILS TO PLEAD A CAUSE OF ACTION UNDER CAN-SPAM .........14

    A. Attainment of Recipients' Email Addresses by False or Fraudulent Means does not Make All Header Information Materially Misleading............................14

    B. Facebook Lacks Standing Under the CAN-SPAM Act Because it is not a Provider of Internet Access Service......................................................................15

VI. CONCLUSION........................................................................................................15

# TABLE OF AUTHORITIES

**Cases:** Page(s)

*Chamberlan v. Ford Motor Co.*
314 F. Supp.2d 953, 957 (n.D. Cal. 2001) .............................................................................. 10

*Free Speech Coalition, Inc. v. Shurtleff*
No. 05-949, 2007 WL 922247 (D. Utah Mar. 23, 2007) ........................................................ 10

*Gully v. First Nat'l Bank in Meridian*
299 U.S. 109, 116 (1936) .......................................................................................................... 9

*Hill v. United States Fidelity & Guaranty Co.*
428 F.2d 112, 114-115 (5th Cir. 1970) ..................................................................................... 1

*In re Baker & Drake, Inc.*
35 F.3d 1348, 1352-53 (9th Cir. 1994) .................................................................................... 10

*Kodadek v. MTV Networks*
152 F.3d 1209, 1212 (9th Cir. 1998) ......................................................................................... 5

*Lipscher v. LRP Publications, Inc.*
226 F. 3d 1305, 1311 (11th Cir. 2001) ............................................................................. 5, 6, 8

*Metropolitan Life Ins. Co. v. Taylor*
481 U.S. 58 63-64 (1987) .......................................................................................................... 9

*Miranda v. Clark County, Nev.*
279 F.2d 1102, 1106 (9th Cir. 2002) ....................................................................................... 15

*Myers v. Moore Engineering, Inc.*
42 F.3d 452, 454-55 (8th Cir. 1994) .......................................................................................... 1

*Nasso v. Seagal*
263 F. Supp. 2d 596, 608 (E.D.N.Y. 2003) .............................................................................. 1

*Natl. Basketball Ass'n. v. Motorola, Inc.*
105 F.3d 841, 849 (2d Cir. 1997) ..................................................................................... 5, 6, 7

*Omega World Travel, Inc. v. Mummagraphics, Inc.*
469 F.3d 348, 355 (4th Cir. 2006) ........................................................................................... 11

*Ossur Holdings, Inc. v. Bellacure, Inc.*
No. 05-1552JLR, 2005 WL 3434440 (W.D. Wash. Dec. 14, 2005)......................................... 3

*Pacific Gas and Elec. Co. v. State Energy Res. Conservation & Dev. Comm'n*
461 U.S. 190, 204-4 (1983) .................................................................................................... 10

*Paralyzed Veterans of American v. McPherson*
No. 06-4670, 2006 WL 3462780 (N.D. Cal. Nov. 28, 2006) ................................................. 15

*People v. Lawton*
48 Cal. App. 4th Supp. 11, 14 (Cal. Super. 1996) ................................................................... 4

*Pollstar v. Gigmania Ltd.*
170 F. Supp.2d 974, 979-80 (E.D. Cal. 2000) .......................................................................... 7

*Preaseau v. Prudential Ins. Co. of America*
591 F.2d 74, 79 (9th Cir. 1979) ............................................................................................... 1

*ProCD, Inc. v. Zeidenberg*
86 F.3d 1447, 1453 (7th Cir. 1996) ......................................................................................... 5

*Samara Bros., Inc. v. Wal-Mart Stores, Inc.*
165 F.3d 120, 131 (2d Cir. 1998).......................................................................................... 6, 7

*Snead v. Dept. of Social Services of City of New York*
409 F. Supp. 995), 1000 (S.D.N.Y. 1975) .............................................................................. 9

*Summit Mach. Tool Fgf. v. Victor CNC Systems, Inc.*
7 F.3d 1434, 1441-42 (9th Cir. 1993) ...................................................................................... 6

*United States v. Tucor Int'l Inc.*
35 F. Supp. 2d 1172 (N.D. Cal. 1985) ..................................................................................... 3

*Van Voorhis v. District of Columbia*
240 F. Supp. 822, 824 (D.D.C. 1965) ...................................................................................... 9

*White Buffalo Ventures, LLC v. University of Texas of Austin*
420 F.3d 366, 373 (5th Cir. 2005) ......................................................................................... 15

**Authorities:**

    15 U.S.C. § 7701(b)(2) ......................................................................................... 12
    15 U.S.C. § 7704(b)(1)(B) ..................................................................................... 4
    15 U.S.C. § 7707(b)(2) ......................................................................................... 10
    15 U.S.C. § 7707(b)(2)(B) .................................................................................... 10
    15 U.S.C. § 7707(b)(1) ............................................................................... 10, 11, 12
    15 U.S.C. § 7707(b)(2) ......................................................................................... 12
    15 U.S.C. § 7704(a)(1)(A) .................................................................................... 14
    17 U.S.C. § 106.................................................................................................... 5, 6
    18 U.S.C. § 7701(a)(1) ......................................................................................... 11
    18 U.S.C. § 7701(a)(2) ......................................................................................... 11
    28 U.S.C. § 1447(c) ............................................................................................... 8
    28 U.S.C. § 1450................................................................................................... 1

California Business and Professions Code

    17529.1(h)............................................................................................................ 13
    17529.4.........................................................................................9, 10, 11, 12, 13
    17529.4(b)............................................................................................................ 11
    17538.45.......................................................................................9, 10, 11, 12, 13
    17538(a)(3) .......................................................................................................... 13
    17538.45(b).......................................................................................................... 12
    17538.45(c).......................................................................................................... 12

California Penal Code:

    Section 502.................................................................................................... 1, 2, 3

Section 502(a) ............................................................................................. 2
Section 502(c) ............................................................................................. 3, 4
Section 502(c)(2) ........................................................................................ 3
Section 502(c)(6) ........................................................................................ 3
Section 502(c)(7) ........................................................................................ 3

Copyright Act, H.R. Rep. No. 94-1476, at 131 (1976),
*reprinted in* 1976 U.S.C.C.A.N. 5659, 5757

Section 102.................................................................................................. 5
Section 103.................................................................................................. 5
Section 106.................................................................................................. 5, 6
Section 301.................................................................................................. 5

Federal Rules of Civil Procedure

12................................................................................................................. 1
12(h)(2) ....................................................................................................... 2, 9

N.Y. Gen. Bus. Laws § 349 ................................................................................... 6

*Preemption of State Spam Laws by the Federal CAN-SPAM Act*
72 U. Chi. L. Rev. 355, 358 (2005) by Roger Allan Ford

Section 7701(b)........................................................................................... 9
Section 7704(a)(1)(A)................................................................................. 14

## I. THE STATE COURT ORDER REGARDING CONNECTU'S DEMURRER TO THE ORIGINAL COMPLAINT IS IRRELEVANT

Facebook suggests that this Court should ignore the Motion to Dismiss as it concerns the first two causes of action of the Amended Complaint because ConnectU demurred to similar counts in an earlier pleading filed in state court, and the demurrer was overruled. That demurrer however concerned a *different* complaint than the first amended complaint to which this Motion to Dismiss is directed. Thus, the order overruling the demurrer does not apply here. Even if the state court overruled a demurrer to similar counts to which ConnectU's current Motion to Dismiss is directed, the California Penal Code Section 502(c) count and the misappropriation count in the first amended complaint must still be dismissed. A state court order issued prior to removal remains in effect only until it is "dissolved or modified by the District Court." 28 U.S.C. § 1450. Thus the Code expressly provides the District Court with authority to ensure the law is correctly applied because a flawed state court order may be "dissolved or modified." *See e.g. Preaseau v. Prudential Ins. Co. of America* 591 F.2d 74, 79 (9th Cir. 1979) (holding that a party was not barred from refiling for summary judgment after removal even though the state court had already decided the same motion for summary judgment); *Myers v. Moore Engineering, Inc.*, 42 F.3d 452, 454-55 (8th Cir. 1994) (same); *Hill v. United States Fidelity & Guaranty Co.*, 428 F.2d 112, 114-15 (5th Cir. 1970) ("A final decision of a state trial court is not binding on the federal courts as a final expression of the state law."); *Nasso v. Seagal*, 263 F. Supp.2d 596, 608 (E.D.N.Y. 2003) (holding that denial of motion to dismiss by state court prior to removal did not bar defendant from rearguing motion to dismiss before federal court).

Further, the Motion to Dismiss as it concerns the first two counts is different than the demurrer. ConnectU raises new arguments in this Motion, including preemption, that could not have been raised in the state court because this Motion is directed to a pleading with different allegations than the one which was the subject of the demurrer. Facebook fails to cite any case supporting an argument that prevents ConnectU from asserting a different basis, justifying dismissal, than those asserted against a different pleading in a state court demurrer. This is a Motion to Dismiss for failure to state a cause of action pursuant to Federal Rule of Civil Procedure 12, which provides in

part "[a] defense of failure to state a claim upon which relief can be granted . . . may be made in any pleading . . . or by motion for judgment on the pleadings, or at trial on the merits." Fed. R. Civ. P. 12(h)(2). Obviously ConnectU can raise this flaw any time.

## II.   FACEBOOK CANNOT MAINTAIN A CAUSE OF ACTION UNDER CALIFORNIA PENAL CODE SECTION 502

### A.   The Factual Allegations Supporting Facebook's Section 502 Count are Inconsistent with One of the Stated Purposes of the Statute

Facebook's allegation that ConnectU took email addresses from its website jives with one of the stated purposes of Section 502. Specifically, Section 502 was enacted in part to protect the privacy interest of those who use computer systems or data. *See* Cal. Penal Code § 502(a). The "data" alleged to have been taken by ConnectU however was provided by the owners of such data with the intent that it would be widely shared with others. In fact, Facebook specifically admits in its first amended complaint that once a user enters the site, he or she gains access to profiles of other students and alumni. (*See* Am. Compl. ¶ 10.) In other words, the user gets access to everyone's email address because these other users intended such access to be allowed.

Under these circumstances, because the users of the system had no expectation of privacy in the "data" alleged to have been taken, a complaint under Section 502 that asserts such a privacy interest in such data is flawed. Facebook's opposition fails to address ConnectU's point in its moving papers that no privacy interest attached to these email addresses--particularly because they were posted by users with the intent that they would be shared and made available to all who accessed the site. Instead, Facebook responds generally that the website is secure because access to it requires a password, and apparently because of the password, users have an expectation of privacy. This argument is unpersuasive. First, no such expectation has been pled. Facebook does not tell users that access to their email addresses will in any way be limited. Indeed, such a limitation would be contrary to the stated purpose of the website as a social networking site. Moreover, Facebook does not even plead that access to its site is limited--because it isn't.

For there to be a "privacy" interest in data, the provider of the data must expect access to it would be limited. Moreover, reasonable steps limiting access to the data must be taken. Facebook does not plead such a privacy interest in the data, or that it limited access to the data in any

way. Section 502 was enacted to protect a privacy interest. Because there is no privacy interest in the email addresses as alleged in the first amended complaint, ConnectU cannot be charged for violating Section 502 because such prosecution would be inconsistent with the meaning and intent of the statute. *See United States v. Tucor Int'l Inc.*, 35 F. Supp. 2d 1172, 1178 (N.D. Cal. 1985). ("When interpreting a statute, this Court must look first to the plain meaning of the statute's language.) *See also, Ossur Holdings, Inc. v. Bellacure, Inc.* No. 05-1552, 2005 WL 3434440, at *6 (W.D. Wash. Dec. 14, 2005) (denying a preliminary injunction for breach of a confidentiality agreement because the names and email addresses allegedly disclosed in breach of agreement were generally known to the public).

**B.  Facebook's Section 502(c) Count Fails to State a Cause of Action Because it Omits Factual Allegations That Access of the System or Data was "Without Permission"**

In its opposition, Facebook reveals its complaint relies upon three subsections of Section 502, namely Section 502(c)(2), Section 502(c)(6) and Section 502(c)(7). Each of these subsections requires that the system be accessed "without permission." There are no facts pled supporting this element. Instead, the only "facts" that Facebook cites in its opposition in response to this issue concern what ConnectU allegedly did *after* it accessed the data--i.e. ConnectU collected email addresses (Opp. at 9:2-3.) However, for a cause of action to be alleged under any of the three subdivisions relied upon by Facebook, the complaint must clearly set forth how the defendant accessed the data or the system "without permission." This Complaint must be dismissed because no such allegations exist.

Facebook's argument that ConnectU has violated Section 502(c) is based entirely upon its claim that ConnectU violated its Terms-of-Use. Facebook argues that its "Terms of Use and the Privacy Policy have, at all times since the launch of Facebook's website, prohibited all commercial use and access to data and communications therein, except as explicitly authorized by Facebook." (*Id.* at 4.) Facebook quotes extensively from its Terms of Use and explains that "[t]he [Amended Complaint] details the terms of use that govern each Facebook member's use of the website and the limitations imposed thereon--*i.e.*, it describes what behavior is permitted and what is not." (*Id.* at 8.) Facebook argues that any conduct in violation of its Terms of Use is conduct that is

"without permission" as that term is used in Section 502(c). But the "without permission" language of 502(c) refers to whether the alleged violator had permission to access the data, not the manner in which the person uses the data. The statute was enacted to prevent unauthorized access. Here Facebook alleges that once ConnectU accessed Facebook's website, its conduct thereafter was without permission because of the manner in which it used the email addresses. Facebook has not pled facts supporting its claim that ConnectU accessed a secured area of its website. Indeed Facebook has pled facts contrary to the proposition that ConnectU's access was without permission. (*See* Amended Complaint ¶¶ 9 and 10) Facebook's Terms of Use do not cure this defect.

Terms of use do not create legal rights in the Terms' author and cannot create proprietary rights beyond those authorized by the state legislature and by the courts. *Cf.* The CAN-SPAM Act, 15 U.S.C. § 7704(b)(1)(B) (stating that a provision of the Act that makes illegal the transmission of unsolicited, deceptive, and misleading emails sent to email addresses that were obtained in violation of an Internet website's policy does not "create an ownership or proprietary interest in such electronic mail addresses"). Under Facebook's reading of Section 502(c) (a criminal statute), an individual could create terms of use whereby a violation thereof would subject the violator to criminal liability. Certainly the legislature did not intend to permit parties to use terms of use to rewrite, alter and supplement the Code. Section 502's preamble speaks only of the concern for unauthorized access, it does not concern itself with authorized access followed by *use* that is in violation of the terms of use of any given individual. *Cf. People v. Lawton*, 48 Cal.App.4th Supp. 11, 14 (1996) (holding that the *permissible* use of a computer to *access impermissible* levels of data was a violation of Section 502(c)). This makes sense because otherwise an individual could write terms of use so broad in scope that almost any use would thereby be a violation of Section 502(c). Thus, the language of the terms of use is irrelevant to the determination of whether access to computer data is "without permission." This count must be dismissed.

### III. FACEBOOK'S COMMON LAW MISAPPROPRIATION CLAIM IS PREEMPTED

Facebook fails to plead a claim for common law misappropriation because it has not alleged facts to support an "extra element" that would avoid preemption. First, Facebook's argument that preemption does not apply because none of the data allegedly stolen is "an original work of

authorship fixed in a tangible medium of expression" and therefore unprotected by the Copyright Act (17 U.S.C. § 301), is wrong. Facebook is correct that data, in and of itself, is not subject to copyright protection. But it does not follow that statutes regulating uncopyrightable information are not subject to preemption. Indeed, preemption under Section 301 of the Copyright Act "bars state law misappropriation claims with respect to uncopyrightable as well as copyrightable elements." *Natl. Basketball Ass'n v. Motorola, Inc.*, 105 F.3d 841, 849 (2d Cir. 1997) (holding that plaintiff had failed to allege an "extra element" that would save its common law misappropriation claim from preemption).

In analyzing Copyright preemption, courts recognize a two-part test. Preemption occurs if the rights at issue (1) fall within the subject matter of copyright set forth in Sections 102 and 103; and (2) are equivalent to the exclusive rights of Section 106. *Kodadek v. MTV Networks*, 152 F.3d 1209, 1212 (9th Cir. 1998) (preempting claims for unfair competition under California state law); *Lipscher v. LRP Publications, Inc.*, 266 F.3d 1305, 1311 (11th Cir. 2001) (holding that state law claim of "acquisition misconduct" based on competitor's surreptitious use of plaintiff's compiled data was preempted). As for the first prong, the legislative history of the Copyright Act states:

> As long as a work fits within one of the general subject matter categories of sections 102 and 103, the bill prevents the States from protecting it even if it fails to achieve Federal statutory copyright [protection] because it is too minimal or lacking in originality to qualify, or because it has fallen into the public domain.

H.R. Rep. No. 94-1476, at 131 (1976), *reprinted in* 1976 U.S.C.C.A.N. 5659, 5747. As a number of circuits have recognized, one of the functions of the preemption provision of the Copyright Act is to prevent States from enacting legislation that protects information or works of authorship that Congress has determined should be in the public domain. *See Motorola*, 105 F.3d at 849-50; *Lipscher*, 266 F.3d at 1311; *ProCD, Inc. v. Zeidenberg*, 86 F.3d 1447, 1453 (7th Cir. 1996) (holding that state law breach of contract claim was not preempted by Copyright law because it contained an "extra element"). As for the second prong, the exclusive rights under section 106 include the right to reproduce the work, to prepare derivative works, and to distribute copies to the public. *See* 17 U.S.C. § 106. In analyzing the second prong, courts ask whether the state-created right contains an

1  "extra element" instead of, or in addition to, the exclusive rights of reproduction, performance,

2  distribution or display outlined in Section 106.  *See Summit Mach. Tool Mfg. v. Victor CNC Systems,*

3  *Inc.*, 7 F.3d 1434, 1441-42 (9th Cir. 1993); *Motorola*, 105 F.3d at 849-50; *Lipscher*, 266 F.3d 1311.

4  If the "extra element" is not present, the state cause of action is preempted.

5       Here, Facebook's misappropriation claim is preempted because the "data"[1] that it is

6  attempting to protect, whether it consists of email addresses or other amorphous computer related

7  information, is within the subject matter of copyright, because it is information that Congress has

8  decided should be in the public domain.  *Lipscher*, 266 F.3d at 1311.  Thus, the first prong of the

9  preemption analysis is satisfied.

10       Under the second prong, Facebook has failed to allege the "extra element" necessary to

11  demonstrate how its claim of misappropriation protects rights other than those protected by

12  Copyright.  Facebook alleges that ConnectU has "taken such information and without authorization

13  used, disclosed, and held out as their own Facebook's Information."  (Am. Compl. ¶ 34.)  Thus,

14  Facebook's allegations are that ConnectU reproduced its data, displayed its data, and distributed its

15  data, all rights covered by Section 106 of the Copyright Act.  *See* 17 U.S.C. § 106.

16       Facebook's claim that it has alleged "deceit" as the "extra element" necessary to avoid

17  preemption is incorrect as a matter of law.  Facebook's reliance upon *Samara Bros., Inc. v. Wal-*

18  *Mart Stores, Inc.*, 165 F.3d 120, 131 (2d Cir. 1998), *rev'd on other grounds*, 529 U.S. 205 (2000) to

19  support this "deceit as an extra element" argument is misplaced.  *Samara Bros.* involved a line of

20  clothing which was covered by the Copyright Act.  The plaintiff there also alleged that in copying its

---

[1] Facebook fails to identify in its Amended Complaint what "data" it claims was misappropriated.  Facebook ambiguously states that ConnectU has "taken extensive amounts of proprietary data from Facebook, including but not limited to user data such as email addresses and other protected data collected and/or created by Facebook", (Am. Compl. ¶ 18), and that it has "expended considerable time and money developing the commercially valuable customer lists, web site components, network, and other information specified in this complaint." (*Id.* at ¶ 33.) Facebook does not explain what it means by "customer lists, web site components" and "network." Thus, the only "data" that Facebook has specifically identified are the email addresses of its users.  Indeed, the majority of Facebook's complaint focuses on the email addresses.

1  clothing design, defendant had violated a New York *consumer* protection statute, which prohibited

2  deceptive acts in the conduct of business. *Id.*, *citing* N.Y. Gen. Bus. Law § 349. The defendant

3  there contended that the consumer statute was preempted by the Copyright Act. However, the

4  Second Circuit held that the extra element taking this case out of preemption had been alleged as the

5  allegations concerned the "intentional deception of *consumers*." *Samara* 165 F. 3d at 131 (emphasis

6  added). So, according to the Second Circuit, a plaintiff can avoid preemption by alleging and

7  relying upon a state consumer statute designed to protect against public deception. No such

8  allegation exists in the first amended complaint.

9  Here, unlike in *Samara*, Facebook alleges that ConnectU had the *state of mind* to deceive by

10  allegedly violating Facebook's Terms of Use, but Facebook fails to allege, and cannot allege, that

11  any of ConnectU's conduct has been deceitful towards the public. Indeed, deceit of the public is not

12  an element of a claim for common law misappropriation, as pled by Facebook. Thus, Facebook has

13  failed to allege an "extra element" necessary to avoid preemption of its common law

14  misappropriation claim.[2]

15  The Eleventh Circuit's decision in *Lipscher* is analogous to the present case and provides

16  support for the notion that Facebook's misappropriation claim is preempted. 266 F.3d at 1311-12.

17  In that case, the plaintiff, a publisher of summaries of jury verdicts, alleged that a competitor

18  surreptitiously obtained subscriptions to the plaintiff's online services for the purpose of using the

19  information contained in the newsletters to report on jury verdicts. *Id.* at 1308-9. In relevant part,

20  the complaint alleged that the competitor "obtained a subscription to the Verdict Reporter by false

21  pretense, knowing that [plaintiff] was willing to provide defendant [] with a subscription only upon

22  the safeguards described in Exhibit B." *Id.* at 1312. "Exhibit B" was a letter from the plaintiff to the

23  competitor informing the competitor that it was obtaining the publication for "personal information

24

---

25  [2] Facebook cites, in passing, to *Pollstar v. Gigmania Ltd.*, 170 F. Supp.2d 974, 979-80 (E.D. Cal. 2000). *Pollstar* followed the reasoning from *Motorola*, 105 F.3d at 845, and held that
26  misappropriation of "hot news" added the extra element necessary to avoid preemption. This case does not support Facebook. Facebook has not alleged, nor could it allege, that the data allegedly
27  misappropriated from its website should be classified as "hot news" and subject to the protections afforded the plaintiffs in *Motorola* and *Pollstar*.

28

1   only, and not for the purpose of copying, reproducing, or remarking any portion of the publication."

2   *Id.* Based on these facts, the plaintiff alleged that the competitor's access and use of its information

3   was a violation of state unfair competition laws. *Id.* The Eleventh Circuit disagreed and held that

4   the claim was preempted because the plaintiff had failed to allege an "extra element." *Id.* Here,

5   Facebook has alleged that ConnectU accessed its website, yet it admits that such access is not

6   restricted and its website is accessible by all who agree to its Terms of Use. (*See* Am. Compl. ¶¶ 9

7   &10.) Facebook alleges that ConnectU's use of its website was in violation of its Terms of Use, but,

8   like the plaintiff in *Lipscher*, Facebook has failed to allege facts supporting the argument that

9   ConnectU accessed information that was not freely available to all persons viewing its website.

10  Thus, Facebook has alleged nothing more than that ConnectU accessed its website and made use of

11  the data freely attainable therein. Therefore, Facebook has failed to allege the "extra element"

12  necessary to avoid preemption. *Id.*

13      Facebook's argument that ConnectU has waived its right to argue preemption is also

14  incorrect as a matter of law. First, it is unclear whether Facebook is arguing that ConnectU has

15  waived its right to remove, or whether ConnectU has waived its right to argue preemption after

16  properly removing. This Court need not consider the first argument, because it is essentially an

17  argument for remand, and Facebook has failed to petition this Court for remand within thirty days

18  after ConnectU's Notice of Removal.[3] *See* 28 U.S.C. § 1447(c) (motion for remand on grounds

---

[3] Even assuming that Facebook had made a motion to remand within thirty days of removal, Facebook's waiver argument would fail. Facebook argues that ConnectU had to remove within thirty days of filing of the *original* complaint. This would only be true if there were any grounds for removal under the original complaint. As the original complaint contained no federal cause of action, and as there was not complete diversity between the parties, ConnectU could not have removed the original complaint. As such, Facebook's filing of its Amended Complaint was not a "new" basis for removal, but was the *only* basis for removal.

1  other than lack of subject matter jurisdiction must be made within 30 days of removal).[4] As for the

2  latter argument, by failing to argue preemption in its demurrer to the state court, ConnectU has not

3  waived its right to argue it before this Court. ConnectU's preemption argument is made in support

4  of its 12(b)(6) motion for failure to state a claim. Failure to state a claim may be raised at any time

5  before disposition on the merits. *See Snead v. Dept. of Social Services of City of New York*, 409

6  F.Supp. 995, 1000 (S.D.N.Y. 1975); *Van Voorhis v. District of Columbia*, 240 F. Supp. 822, 824

7  (D.D.C. 1965) ("The defense of failure to state a claim upon which relief can be granted cannot be

8  waived and can be asserted at the trial on the merits and hence neither the defendant nor the trial

9  court is precluded by a prior ruling on a motion to dismiss from reconsidering the questions

10 previously raised."); Fed. R. Civ. P. 12(h)(2) ("[a] defense of failure to state a claim upon which

11 relief can be granted . . . may be made in any pleading . . . or by motion for judgment on the

12 pleadings, or at trial on the merits."). Accordingly, ConnectU has not waived its right to argue

13 preemption in the context of a motion to dismiss.

### IV. PLAINTIFF FAILS TO STATE A CAUSE OF ACTION UNDER SECTIONS 17529.4 OR 17538.45 OF THE CALIFORNIA BUSINESS AND PROFESSIONS CODE

#### A. The CAN-SPAM Act Preempts These State Code Allegations

17 Facebook argues that Congress' use of the word *supersedes* in Section 7701(b) of the CAN-

18 SPAM Act means that Congress only intended to preempt statutes that were in effect prior to the

19 enactment of CAN-SPAM, not statutes that were enacted contemporaneously with CAN-SPAM.

20 Notably, Facebook cites no authority for the proposition that "supersedes" is meant to have only a

---

[4] To the extent Facebook is arguing that ConnectU had to remove within thirty days of filing of the original complaint based on a theory of "complete preemption" this argument is wrong. *See Metropolitan Life Ins. Co. v. Taylor*, 481 U.S. 58, 63-64 (1987) (complete preemption is where the federal law is so powerful that it displaces any state law cause of action and leaves room only for a federal claim). ConnectU asserts for defensive preemption, not complete preemption, and a state law action cannot be removed on the ground that federal law preempts the claim even in the case where federal preemption is the only real issue. *See Gully v. First Nat'l Bank in Meridian*, 299 U.S. 109, 116 (1936) ("By unimpeachable authority, a suit brought upon a state statute does not arise under an Act of Congress or the Constitution of the United States because prohibited thereby.").

retroactive effect and no prospective effect.  To the contrary, courts have frequently used the term supersede and preempt interchangeably and have not held that "supersede" has a non-prospective effect.  *See, e.g., Pacific Gas and Elec. Co. v. State Energy Res. Conservation & Dev. Comm'n*, 461 U.S. 190, 203-4 (1983); *In re Baker & Drake, Inc.* 35 F.3d 1348, 1352-53 (9th Cir. 1994); *Chamberlan v. Ford Motor Co.*, 314 F. Supp.2d 953, 957 (N.D. Cal. 2001) (citing *Pacific Gas*, 461 U.S. at 203-4).

In fact, the case cited by Facebook in support of its argument for limiting the scope of CAN-SPAM preemption addressed a state statute that had been enacted more than two years *after* the CAN-SPAM Act.  That court made no mention of the non-prospective applicability of the preemption language in determining whether the state law was preempted.  *Free Speech Coalition, Inc. v. Shurtleff*, No. 05-949, 2007 WL 922247, at *1 (D. Utah. Mar. 23, 2007) (the allegedly preempted state statute went into effect on May 1, 2006).[5]  Thus, Facebook's argument that the Sections 17529.4 and 17538.45 are not preempted because they were enacted contemporaneously with the CAN-SPAM Act is without merit.

**B.    Section 17529.4 Does Not Fall Within the Savings Clause of the CAN-SPAM Act**

Facebook's argument that Section 17529.4 is not preempted because it does not regulate the *use* of electronic mail is without merit.  As Facebook recognizes, the preemption clause of the CAN-SPAM Act preempts any state statute that "expressly regulates the use of electronic mail to send commercial messages."  15 U.S.C. § 7707(b)(1).  Section 17529.4, on its face, regulates the use of electronic mail.  Section 17529.4 reads, in relevant part:

> (a) It is unlawful for any person or entity to collect electronic mail addresses posted on the Internet if the purpose of the collection is for the electronic mail addresses to be used to do either of the following:

---

[5]    Facebook cites *Shurtleff* in support of its claim that the preemption clause of the CAN-SPAM Act should be read narrowly.  However, this case is inapposite because the court in *Shurtleff* held that a state statute addressing computer crime was not preempted because of the Act's express exception for State laws relating to computer crime.  2007 WL 922247, at *10; 15 U.S.C. § 7707(b)(2)  ("This chapter shall not be construed to preempt the applicability of . . . (B) other State laws to the extent that those laws relate to . . . computer crime.").  Here, California Business and Professions Code Sections 17529.4 and 17538.45 are not criminal statutes.

>      (1) Initiate or advertise in an unsolicited commercial e-mail advertisement from California, or advertise in an unsolicited commercial e-mail advertisement sent from California.
>
>      (2) Initiate or advertise in an unsolicited commercial e-mail advertisement to a California electronic mail address or advertise in an unsolicited commercial e-mail advertisement sent to California electronic mail address.

Cal. Bus. & Prof. Code § 17529.4(a).

The Code does not merely regulate the collection of electronic mail addresses, as Facebook contends. If that were the case, the collection of electronic mail addresses, in and of itself, would be a violation of the Code. It is not. Instead, the Code regulates the collection of electronic mail addresses when the purpose of the collection is to *send* unsolicited commercial emails. *Id.* It is of no importance that the Code contemplates regulating the incomplete act of *intending* to send email address. The Code still "expressly regulates the use of electronic mail to send commercial messages." 15 U.S.C. § 7707(b)(1). Indeed, subsection (b) of Section 17529.4 does not contain the "intent" language that Facebook references. Cal. Bus. & Prof. Code § 17529.4(b) ("It is unlawful for any person . . . to use an electronic mail address obtained by using automated means . . . to do either of the following: (1) initiate . . . an unsolicited commercial e-mail advertisement . . ."). The effect of this regulation is to make illegal collection of email addresses for the purpose of sending unsolicited emails, even when the unsolicited emails contain no false or misleading information. This is contrary to Congress' intent in enacting the CAN-SPAM Act. *See Omega World Travel, Inc. v. Mummagraphics, Inc.*, 469 F.3d 348, 354-355 (4th Cir. 2006) ("The Act's enacted findings make clear that Congress saw commercial e-mail messages as presenting both benefits and burdens."); 18 U.S.C. s. 7701(a)(2) (Electronic mail's "low cost and global reach make it extremely convenient and efficient, and offer unique opportunities for the development and growth of frictionless commerce."); 18 U.S.C. s 7701(a)(2) ("The convenience and efficiency of electronic mail are threatened by the extremely rapid growth in the volume of unsolicited commercial electronic mail.")

Section 17529.4 expressly regulates the use of email to send unsolicited commercial emails. Therefore, it is preempted by the CAN-SPAM Act.

### C. The Limited Exceptions to the Preemption Clause Do Not Save Section 17529.4 or 17538.45 of the California Business and Professions Code

In relevant part, Section 17538.45 makes illegal any conduct that is in violation of an electronic mail service provider's policy prohibiting or restricting the use of its equipment for the initiation of unsolicited email advertisements. Cal. Bus. and Prof. Code § 17538.45(b) & (c). The savings clause of the CAN-SPAM Act removes from preemption any state law that "prohibits falsity or deception in any portion of a commercial electronic mail message or information attached thereto." 15 U.S.C. § 7707(b)(1). Without citing any support, or any explanation for its contention, Facebook argues that the savings clause "necessarily includes the origin of the message." (Opp. at 15.) Essentially Facebook argues that because Section 17538.45 prohibits the attainment of email addresses in violation of a service provider's policy, it thereby "prohibits falsity or deception" and is therefore protected from preemption by the savings clause. 15 U.S.C. § 7701(b)(1). But this reading completely ignores the language that follows the words "falsity or deception" in the savings clause. *Id.* (preempting any State law that expressly regulates commercial email "except to the extent any such statute . . . prohibits falsity or deception *in any portion of a commercial electronic mail message or information attached thereto*.") (emphasis added). The savings clause only removes from preemption laws that prohibit falsity or deception contained within the email itself or in any attachments thereto. It does not save state laws that regulate falsity or deception in the *attainment* of email addresses. Indeed, the savings clause only protects state laws that further the overall purpose of the CAN-SPAM Act, which was to regulate deceptive content in unsolicited commercial emails. *See* 15 U.S.C. § 7701(b)(2) ("senders of commercial electronic mail should not mislead recipients as to the source or content of such mail.")

Facebook's contention that because violations of Sections 17529.4 and 17538.45 are based in contract, trespass or fraud that the Sections therefore are not preempted, is also without merit. The CAN-SPAM Act's exception to preemption for state laws that are based in tort, contract or trespass reads: "This chapter shall not be construed to preempt the applicability of--(A) State laws that are not specific to electronic mail, including State trespass, contract or tort law; or (B) other State laws to the extent that those laws relate to acts of fraud or computer crime." 15 U.S.C.

§ 7707(b)(2). Subsection (A) of this section does not save Sections 17529.4 and 17538.45 because that subsection only exempts "laws that are not specific to electronic mail." *Id.* Both sections of the California Business and Professions Code pled by Facebook are specific to electronic mail. Indeed, Article 1.8, the Article of the Code in which the Sections are codified, is entitled "Restrictions on Unsolicited Commercial E-Mail Advertisers." Subsection (B) does not save these Sections from preemption because it only saves those laws related to fraud or computer crime. *Id.* Neither Section 17529.4 or Section 17538.45 is a criminal statute, and neither Section addresses fraud. Accordingly, none of the exceptions to preemption enumerated by the CAN-SPAM Act save Sections 17529.4 and 17538.45 from preemption.

### D.  Facebook Lacks Standing to Assert Sections 17529.4 and 17538.45 Because it is not an Electronic Service Provider

Facebook's conclusory argument that it has standing because it is an "intermediary" as that term is used in Sections 17529.4 and 17538.45 is without merit. For the first time, in its Opposition to ConnectU's Motion to Dismiss, Facebook alleges that it "enables its[sic] the transmission of electronic messages between members", (Opp. at 17), and that this therefore classifies it as an "intermediary in sending or receiving electronic mail." Cal. Bus. and Prof. Code §§ 17529.1(h) & 17538.45(a)(3). Nowhere in Facebook's Amended Complaint does it allege facts to support a claim that it enables the transmission of "electronic messages between members." Moreover, even if this enablement contention were in the complaint, it is not clear that enabling the transmission of "electronic messages between members" would classify Facebook as an intermediary. Notably, Facebook does not allege that it enables the transmission of *electronic mail*, even though the definition of "Electronic Service Provider" in the definition sections of both Sections 17529.4 and 17538.45 is limited to intermediaries "in sending or receiving *electronic mail* or that provide[] to end users of the *electronic mail* the ability to send or receive *electronic mail*." Cal. Prof. & Bus. Code § 17529.1(h) (emphasis added). Facebook does not allege that it provides users with the "ability to send or receive electronic mail" because the email addresses used by Facebook users must be from a University or college, and therefore it is the servers of the Universities or colleges that provide the users with the ability to send or receive electronic mail and

1  that act as an intermediary in sending or receiving electronic mail.  Facebook has failed to plead, nor
2  could it plead, that it has standing as an Electronic mail service provider under Sections 17529.4 and
3  17538.45.

## V. FACEBOOK FAILS TO PLEAD A CAUSE OF ACTION UNDER CAN-SPAM

### A. Attainment of Recipients' Email Addresses by False or Fraudulent Means does not Make All Header Information Materially Misleading

Facebook correctly states that in order to state a claim under the CAN-SPAM Act it must allege that any email sent by ConnectU contained "materially false or materially misleading" header information.  Yet Facebook has failed to allege this, and its argument that ConnectU's improper access to email addresses makes all header information contained on emails sent to those addresses misleading, is without merit.  Facebook's amended complaint fails to even refer to "header" content in any email address which is the subject of this count.  For this reason alone, this count must be dismissed.  Facebook has alleged that ConnectU obtained email addresses through "unauthorized access" to Facebook's website, and then sent emails to the email addresses obtained therein.  (Opp. at 18)  Facebook claims that this behavior is in violation of Section 7704(a)(1)(A) of the CAN-SPAM Act.  (*Id.* at 17).  But this subsection makes header information misleading only if the "*originating* electronic mail address . . . was obtained by means of false or fraudulent pretenses or representations."  15 U.S.C. § 7704(a)(1)(A) (emphasis added).  The subsection does not make header information misleading if the *recipients'* electronic mail addresses were obtained by false or fraudulent means.  Facebook has not alleged, nor could it allege that the originating email addresses that ConnectU allegedly used to send emails to other Facebook members were obtained through unauthorized access or false or fraudulent means.  Instead, Facebook alleges that the recipients' email addresses were obtained by false or fraudulent means.  Such conduct does not make header information materially misleading under the CAN-SPAM Act.  *See* 15 U.S.C. § 7704(a)(1)(A).  Accordingly, Facebook has failed to state a claim under the CAN-SPAM Act.

### B.  Facebook Lacks Standing Under the CAN-SPAM Act Because it is not a Provider of Internet Access Service

In an attempt to obtain standing as a provider of Internet access service, Facebook now asserts for the first time that it "enables its registered . . . users to . . . send electronic mail messages to other registered users." (Opp. at 18.) Tellingly, nowhere in Facebook's Amended Complaint does it allege facts to support its claim that it enables its users to send electronic mail messages. Indeed, as explained above, it is the servers at Universities and colleges that ultimately receive and send all emails that are addressed to any of Facebook's users.[6] Because there are no factual allegations in the amended complaint to support these conclusory assertions regarding Facebook's status as an Internet Access Service provider, the CAN-SPAM count must be dismissed. *Paralyzed Veterans of America v. McPherson*, No. 06-4670 , 2006 WL 3462780, at *4 (N.D. Cal. Nov. 28, 2006) (quoting *Miranda v. Clark County, Nev.*, 279 F.2d 1102, 1106 (9th Cir. 2002)) ("'Conclusory allegations of law and unwarranted inferences will not defeat a motion to dismiss for failure to state a claim.'"). Facebook has no standing as to this cause of action.

## VI.  CONCLUSION

For the reasons detailed above, and for the reasons set forth in the moving papers, Facebook's First, Second, Fourth, Fifth and Sixth Causes of Action in its Amended Complaint must be dismissed.

Respectfully submitted,

Dated: April 18, 2007

FINNEGAN, HENDERSON, FARABOW,
  GARRETT & DUNNER, L.L.P.

By:  /s/ *Scott R. Mosko*
  Scott R. Mosko
  Attorneys for ConnectU LLC

---

[6]  A University or college may have standing as a provider of Internet access service. *See White Buffalo Ventures, LLC v. University of Texas at Austin*, 420 F.3d 366, 373 (5th Cir. 2005) (noting that a University that provided email accounts and email access to its students and faculty was a provider of Internet access service under the CAN-SPAM Act).