The Facebook, Inc. v. Connectu, LLC et al                                                                Doc. 118 Att. 2
Case 5:07-cv-01389-RS    Document 118-3    Filed 07/19/2007    Page 1 of 18

Page 1

LEXSEE 203 F. SUPP. 2D 601

**VERIZON ONLINE SERVICES, INC., Plaintiff, v. ALAN RALSKY, ET AL., Defendants.**

Civil Action No. 01-432-A

UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF VIRGINIA, ALEXANDRIA DIVISION

*203 F. Supp. 2d 601; 2002 U.S. Dist. LEXIS 10224*

**June 7, 2002, Decided**

**DISPOSITION:** [**1] Defendants' motions to dismiss for lack of personal jurisdiction, to dismiss for improper venue, and to transfer venue denied.

**COUNSEL:** For Plaintiff: Jon Linden Praed, Internet Law Group, Arlington, Virginia.

For Defendants: Erik Anderson Cox, Esquire, John Francis Hundley, Esquire, Washington, D.C.

**JUDGES:** Gerald Bruce Lee, United States District Judge.

**OPINION BY:** Gerald Bruce Lee

**OPINION:**

[*604] **MEMORANDUM OPINION**

THIS MATTER is before the Court on Defendants Alan Ralsky, Lance McDonald, and corporate Defendant Additional Benefits, LLC's ("Defendants") Motion to Dismiss for Lack of Personal Jurisdiction and Improper Venue, or in the alternative Motion to Transfer Venue to the Eastern District of Michigan. Plaintiff Verizon Online Services, Inc. ("Verizon") has brought an action against Defendants based on their alleged transmission of millions of unsolicited bulk e-mail ("UBE" or "spam") to Verizon's subscribers through Verizon's proprietary on-line network. Seven of Verizon's Virginia e-mail servers that processed the deluge of spam allegedly sent by Defendants are located in Virginia. Verizon contends [**2] that Defendants' alleged transmissions overwhelmed Verizon's servers causing delays in the processing of legitimate e-mails and leading to consumer complaints.

The issue presented is whether Defendants' transmission of millions of UBE to Verizon's subscribers through Verizon's servers in Virginia constitutes sufficient minimum contacts to satisfy the demands of the Due Process Clause of the Fourteenth Amendment of the Constitution. For the reasons discussed below, the Court finds that it does. Crediting the allegations in Verizon's Amended Complaint, Defendants deliberately transmitted millions of UBE to and through Verizon's e-mail servers in Virginia. In doing so, Defendants solicited business from Verizon's subscribers for pecuniary gain, while at the same time trespassing on Verizon's proprietary network causing harm to its servers located in Virginia.

Defendants knew or should have known that such trespass violated Verizon's public anti-UBE policy and that the brunt of the harm caused by their allegedly tortious conduct would fall on Verizon's servers. Allowing Defendants to escape personal jurisdiction in a forum they have exploited for pecuniary gain while causing a tort to [**3] a Virginia resident would constitute a manifest unfairness to the rights of Verizon and the interests of Virginia. Defendants cannot bombard with impunity a Virginia Internet Service Provider ("ISP"), consuming server capacity and deluging the ISP's customers with spam, and then avoid jurisdiction by asserting ignorance of where the UBE was going or the harm such spam would cause the ISP's servers and its customers. Defendants knew or should have known that their UBE was harming Verizon and that Verizon would bring suit against them where Defendants' spam caused Verizon the greatest injury. When a business directs UBE

Case 5:07-cv-01389-RS    Document 118-3    Filed 07/19/2007    Page 2 of 18

Page 2

203 F. Supp. 2d 601, *604; 2002 U.S. Dist. LEXIS 10224, **3

advertising of its products to a Virginia ISP and causes a tort within Virginia, the business tortfeasor is purposefully availing itself of the laws of Virginia and thereby subjects itself to long-arm jurisdiction in Virginia within the contours of the Constitution.

The Court also finds that venue is proper in the Eastern District of Virginia under *28 U.S.C. § 1391*(b)(2). A fair reading of Verizon's Amended Complaint indicates that the heart of this lawsuit deals with millions of e-mails that were sent to and through Verizon's e-mail servers, **[**4]** seven of which are in Virginia. Therefore, a substantial part of the events and property harmed involved in Verizon's claims occurred in Virginia. Similarly, Defendants have failed to show that this case should be transferred to the Eastern District of Michigan under *28 U.S.C. § 1404*(a). Verizon is a Virginia resident, the majority of its employee-witnesses and documents relevant **[*605]** to this action are in Virginia, and the tortious conduct complained of occurred in Virginia. Accordingly, Defendants' Motion to Dismiss for lack of personal jurisdiction and improper venue is DENIED. Further, Defendants' alternative motion to transfer venue is DENIED as well.

## I. BACKGROUND

Each new development in communications technology brings new challenges to applying the principles of personal jurisdiction. As the Supreme Court and others have frequently noted, "the confluence of the 'increasing nationalization of commerce' and 'modern transportation and communication'" carries with it a "resulting relaxation of the limits that the Due Process Clause imposes on courts' jurisdiction." *CompuServe Inc. v. Patterson, 89 F.3d 1257, 1262 (6th Cir. 1996)*(quoting **[**5]** *World-Wide Volkswagen Corp. v. Woodson, 444 U.S. 286, 293, 62 L. Ed. 2d 490, 100 S. Ct. 559 (1980)).* Such is the case here, where the question presented concerns the use of the Internet to send large volumes of commercial transmissions that cause tortious injury in the Commonwealth of Virginia.

### A. The Internet, Spam and ISPs.

The Internet, as we all know, has brought about a revolution in the way we work and communicate. Courts have addressed in detail the basic structure of this new medium and the Court will not belabor the basics of the Internet here. *See, e.g., Reno v. American Civil Liberties Union, 521 U.S. 844, 849-853 (1997)* (discussing the history and fundamental architecture of the Internet). Suffice it to say that the Internet is a network of networks "that enables anyone with the right equipment and knowledge . . . to operate an international business cheaply, and from a desktop." *CompuServe, 89 F.3d at 1262*. For the purposes of this opinion, however, a brief review of one particular facet of the Internet is appropriate - e-mail.

E-mail is essentially a method of communicating and doing business over the Internet. **[**6]** It "enables an individual to send an electronic message--generally akin to a note or letter--to another individual or to a group of addressees. The message is generally stored electronically, sometimes waiting for the recipient to check her 'mailbox' and sometimes making its receipt known through some type of prompt." *Reno, 521 U.S. at 851*. In addition to text, an e-mail can contain hyperlinks to Web sites located on the World Wide Web. The World Wide Web is a communications platform that allows Internet users to search for and retrieve information stored in remote computers connected to the Internet.

To send or receive e-mail to or from other Internet users, one must obtain Internet access through an ISP. *See generally,* Anne E. Hawley, Comment, *Taking Spam Out of Your Cyberspace Diet: Common Law Applied to Bulk Unsolicited Advertising Via Electronic Mail, 66 UMKC L.REV. 381, 683 (1997)*(discussion of e-mail basics). An ISP operates a computer communication service through a proprietary network. In addition to allowing access to the content available within its own network, an ISP provides its subscribers with a doorway to the Internet. Subscribers **[**7]** use the ISP's domain name, *e.g,* "verizon.net," together with their own personal identifier to form a distinctive e-mail mailing address, *e.g.,* "tmarshall@verizon.net." The subscriber's e-mail address is used to send and receive e-mail from other Internet users throughout the world. An e-mail address does not contain any geographic designation, nor does it correspond to any geographic location. The ISP subscriber **[*606]** can retrieve her e-mail using any computer connected to the Internet from anywhere in the world.

However, e-mail transmitted to an ISP subscriber is processed and stored on the ISP's e-mail computer servers. The e-mail server is located in a discrete geographic location. An e-mail server processes every e-mail that is addressed to the ISP's customer. In other

203 F. Supp. 2d 601, *606; 2002 U.S. Dist. LEXIS 10224, **7

words, once the e-mail is transmitted, it must first pass through the ISP's computer server to reach its ultimate destination - the subscriber's computer.

One of the most explosive commercial developments involving the use of e-mail over the Internet is spam, or unsolicited bulk e-mail ("UBE"). Spam is defined as "an unsolicited, often commercial, message transmitted through the Internet as a mass mailing to [**8] a large number of recipients." MICROSOFT ENCARTA COLLEGE DICTIONARY 1383 (2001). n1 Anyone who has ever operated an e-mail account is familiar with spam. Spam is the twenty first century version of junkmail and over the last few years has quickly become one of the most popular forms of advertising over the Internet, as well as one of the most bothersome. *See* Scot N. Graydon, *Much Ado About Spam: Unsolicited Advertising, the Internet, and You, 32 ST. MARY'S L. J. 77, 81-82 (2000).* UBE is particularly attractive to advertisers because of its minimal start up costs and the fact that the marginal cost of sending additional e-mail messages is practically zero. *See* Michael A. Fisher, *The Right to Spam? Regulating Electronic Junk E-mail, 23 COLUM.-VLA J.L. & ARTS 357, 377 (2000).*

> n1 SPAM (R)(Spiced Pork and Ham) in upper case letters is the registered trademark of Hormel Foods. The term "spam" in lower case letters, and used in connection with UBE, derives from the sketch by the British comedy troupe Monty Python, where a group of Vikings chant the word spam in a cafe whose breakfast menu is devoid of all else. *See* MONTY PYTHON'S FLYING CIRCUS, JUST THE WORDS Vol. II at 27-29 (Methun London 1989).

[**9]

Spam affects e-mail servers and thus the e-mail service to the consumer in several ways. Computer servers process and distribute e-mail transmitted between an ISP's subscribers and between an ISP's subscribers and other Internet users. The system must spend time and resources processing all e-mail, legitimate as well as spam. When an ISP's servers face an onslaught of large amounts of UBE, the deluge can overcome its computer servers and impair the e-mail delivery system for a substantial period of time. Spam makes up a substantial portion of all e-mail traffic, consuming massive amounts of network bandwidth, memory, storage space, and other resources. *See* David Sorkin, *Technical and Legal Approaches to Unsolicited Electronic Mail, 35 U.S.F.L. REV. 325, 336 n.48 (2001); See also* Graydon, *32 ST. MARY'S L. J. at 83.* Most ISPs have a stated policy against the transmission of UBE over their systems to subscribers, which is usually maintained on their Web sites. Several courts, including this one, have held that under certain circumstances, the transmission of UBE through a computer system constitutes the tort of trespass to chattel. *See America Online v. LCGM, 46 F. Supp. 2d 444, 451-52 (E.D. Va. 1998);* [**10] *Hotmail Corp. v. Van$ Money Pie, Inc., 1998 U.S. Dist. LEXIS 10729, 47 U.S.P.Q. 2d 1020, 1022 (N.D. Cal. 1998); CompuServe Inc. v. Cyber-Promotions, Inc., 962 F. Supp. 1015, 1018 (S.D. Ohio 1997).*

ISPs have responded to spam by attempting to filter out the domain names that are the apparent source of the UBE. Spammers, in turn, have countered with various techniques to conceal their identities known as "forged spamming" or [*607] "spoofing," as well as "domain name hijacking." Dianne Plunkett Latham, *Spam Remedies, 27 WM. MITCHELL L. REV. 1649, 1650 (2001).* "Forged spamming" occurs when spammers transmit UBE using false domain names that will evade the filters, whereas "hijacking" occurs when large amounts of UBE are relayed through an unsuspecting server permitting the spam to "originate" from a server with apparent credibility. *See id.* Spammers also harvest e-mail addresses for UBE purposes through software programs specifically designed to capture screen names, or by simply purchasing lists from other Internet advertising companies. *See* Graydon, *32 ST. MARY'S L. J. at 83.* Numerous states, including Virginia, have adopted [**11] legislation to address spam. n2 Various forms of anti-spam legislation are currently working their way through Congress. n3

> n2 *See Latham, 27 WM. MITCHELL L. REV. at 1657* (listing eighteen states that have passed spam legislation); *see also* David E. Sorkin, *Spam Laws: United States: State Laws,* at http://www.spamlaws.com/state/index.html (Last visited May 7, 2002) (listing twenty three states that have passed some form of anti-spam legislation).

> n3 In 2001 alone, eight bills addressing spam in some form or another were introduced in Congress. *See* Unsolicited Commercial Electronic

Case 5:07-cv-01389-RS    Document 118-3    Filed 07/19/2007    Page 4 of 18

Page 4
203 F. Supp. 2d 601, *607; 2002 U.S. Dist. LEXIS 10224, **11

Mail Act of 2001, H.R. 95, 107th Cong. (2001); Wireless Telephone Spam Protection Act, H.R. 113, 107th Cong. (2001); Anti-Spamming Act of 2001, H.R. 718, 107th Cong. (2001); Anti-Spamming Act of 2001, H.R. 1017, 107th Cong. (2001); Who Is E-Mailing Our Kids Act, H.R. 1846, 107th Cong. (2001); Protect Children From E-Mail Smut Act of 2001, H.R. 2472, 107th Cong. (2001); Netizens Protection Act of 2001, H.R. 3146, 107th Cong. (2001); "CAN SPAM" Act of 2001, S. 630, 107th Cong. (2001).

 [**12]

**B. Verizon's Amended Complaint.**

The Plaintiff in this case, Verizon Online Services, Inc., ("Verizon"), is an ISP who is a Delaware corporation with its principal place of business in Reston, Virginia. It provides a proprietary, content-based online service to its customers that includes the use of e-mail and access to the Internet. Verizon operates a computer network throughout the United States that includes seven e-mail servers in Reston, Virginia. Every e-mail addressed to a Verizon subscriber who uses the domain name @bellatlantic.net is processed by Verizon's e-mail servers in Reston, Virginia. The Reston servers may also process e-mails addressed to non-Verizon subscribers and Verizon subscribers using the domain names @verizon.net and @gte.net that are relayed through the Reston servers.

Defendants Alan Ralsky and Lance McDonald are residents of Michigan. The corporate Defendant, Additional Benefits, LLC., is a Michigan limited liability company whose principal place of business is Michigan. These named Defendants are alleged to have acted in concert with four to a hundred as-of-yet unidentified John Does to send UBE to and through Verizon's servers in Virginia. [**13]

Verizon alleges that from at least November 2000 through December 2000, Defendants transmitted, or facilitated the transmission of millions of UBE messages addressed to Verizon subscribers through Verizon's computer network. Verizon has policies prohibiting the transmission of spam over its network. These policies are available at various Verizon Web sites. The messages allegedly transmitted by Defendants contained hypertext links to Web sites advertising goods and services including credit repair tools, new car buying services, computer programs, diet pills, and online gambling. According to Verizon, Defendants used a number of fraudulent and deceptive methods to cloak their [*608] identities and remain anonymous. n4

> n4 These methods allegedly included (1) using non-existent e-mail user names and domain names in the "to" line of headers of their UBE messages; (2) employing false registration, technical and payment information to obtain e-mail addresses to target with UBE; (3) using false registration, technical and payment information to insert into the "from" or "return-path" lines of the headers of the UBE messages; (4) sending UBE from e-mail accounts acquired through false registration, technical and payment information, or by hacking into innocent third party e-mail accounts; (5) relaying UBE messages through third party servers; (6) using false registration, technical and payment information to obtain temporary Internet hosting services for their Web sites connect to the hypertext in the body of their UBE; and (7) falsely claiming that links found in the text of UBE messages were used to submit removal requests, when in fact, they were used to confirm the e-mail addresses of recipients for further spamming.

 [**14]

According to Verizon, the UBE allegedly transmitted by Defendants harmed Verizon on several levels. The spam imposed burdens on Verizon's computer system by consuming the network services needed to deliver non-UBE e-mail to Verizon subscribers. Verizon's servers have a finite capacity that is designed to accommodate the demands of its subscribers. UBE sent to Verizon subscribers at the domain name @bellatlantic.net are routed through Verizon's Virginia servers. The UBE can and did consume dozens of gigabytes of storage and memory capacity on the servers, as well as hours of processing time. Defendants' use of fraudulent headers and other means to avoid detection doubled the burden on the network servers because the system had to handle the same UBE multiple times. Finally, the UBE generated consumer complaints by inundating Verizon consumers' e-mail as well as causing the delay in the delivery of legitimate e-mail and thereby

Case 5:07-cv-01389-RS   Document 118-3   Filed 07/19/2007   Page 5 of 18

Page 5
203 F. Supp. 2d 601, *608; 2002 U.S. Dist. LEXIS 10224, **14

damaging Verizon's goodwill and reputation. For instance on December 9, 2000, Verizon alleges that UBE messages from Defendants consumed an estimated 56 gigabytes of storage capacity on Verizon's servers, which included seven in Virginia.

On March 19, 2001, unable [**15] to identify the alleged spammers, Verizon filed a "John Does" suit in this Court. After initial discovery, Verizon filed an Amended Complaint on December 6, 2001, naming Ralsky, McDonald and Additional Benefits as Defendants. n5 The Amended Complaint alleges three counts under the Virginia Computer Crimes Act, *VA. CODE § 18.2-152.1, et seq.,* three counts under the Federal Computer Fraud and Abuse Act, *18 U.S.C. § 1030, et seq.,* as well as common law trespass to chattel and conspiracy. Defendants moved for dismissal of the case for lack of personal jurisdiction under *Rule 12(b)(2) of the Federal Rules of Civil Procedure* ("FRCP"). Defendants also moved to dismiss the case for improper venue under *28 U.S.C. § 1406*(b) and *FRCP 12(b)(3)*. In the alternative, Defendants sought to transfer the matter to the [*609] Eastern District of Michigan under *28 U.S.C. § 1404*(a). Defendants submitted affidavits denying allegations that either Ralsky, McDonald, or any employee of Additional Benefits, had ever knowingly or unknowingly transmitted any UBE to any e-mail address located in Virginia. On April 17, 2002, this Court denied [**16] Defendants' motions to dismiss and motion to transfer venue in a preliminary Order. The Order indicated that the Court would later release a substantive Memorandum Opinion explaining the merits of the decision. The instant Memorandum Opinion provides the rationale for the April 17th Order.

n5 According to Verizon, the initial discovery revealed that many of the spam messages originated from addresses controlled by either UUNet (a Virginia based company) or a Michigan based ISP called Digital Realm with ties to Ralsky. Many of the UBE originated from telephone lines in Detroit, Michigan. These phone lines were set up under accounts using false names from a house titled to Lia McDonald, Defendant Lance McDonald's wife. (Pl.'s Ex. 2.) One of the domain names used for spamming was registered to Lance McDonald. (Pl.'s Ex. 3.) Some of the Web sites advertised in the UBE were hosted by Digital Realms as well as stored on Defendant Ralsky's computer servers until December 2000. Finally, Verizon avers that another Michigan ISP that hosted the advertised sites, SpeedNet, produced a cancelled check used by Ralsky to pay for the services bearing the name "Additional Benefits." (Pl.'s Ex. 5.) Ralsky serves as the registered agent for Defendant Additional Benefits and his home is listed as the address for service of process.

[**17]

## II. DISCUSSION

### A. Standard of Review: Personal Jurisdiction.

Pursuant to *Rule 12(b)(2) of the Federal Rules of Civil Procedure*, the Court may dismiss a claim for lack of personal jurisdiction. *See FED. R. CIV. P. 12(b)(2)*. The plaintiff bears the burden of proving "the existence of a ground for jurisdiction by a preponderance of the evidence." *Combs v. Bakker, 886 F.2d 673, 676 (4th Cir. 1989)*. Where, "as here, the court addresses the question on the basis only of motion papers, supporting legal memoranda and the relevant allegations of a complaint, the burden on the plaintiff is simply to make a prima facie showing of a sufficient jurisdictional basis in order to survive the jurisdictional challenge." *Id.; America OnLine v. Huang, 106 F. Supp. 2d 848, 852 (E.D. Va. 2000)*. n6 In resolving this issue, a court must construe all relevant allegations in the light most favorable to the plaintiff and draw the most favorable inferences for the existence of jurisdiction. *See Combs, 886 F.2d at 676*.

n6 When jurisdiction turns on a disputed fact, the court may in its discretion hold an evidentiary hearing. *See Combs, 886 F.2d at 676*. However, in this case, the determination of personal jurisdiction turns largely on whether Defendants transmitted UBE to Verizon's servers, which is also the heart of the lawsuit itself. As a general matter, when jurisdictional facts are inextricably intertwined with underlying claims, the proper course is to resolve the issue by proceeding on the merits. *See Raymond, Colesar Glaspy & Huss, P.C. v. Allied Capital Corp., 761 F. Supp. 423, 429 (E.D. Va. 1991)*(citing *Carter v. Trafalgar Tours, Ltd., 704 F. Supp. 673, 674 n.2 (W.D. Va. 1989)*). Defendants have submitted affidavits denying allegations that they transmitted UBE to

Case 5:07-cv-01389-RS   Document 118-3   Filed 07/19/2007   Page 6 of 18

Page 6

203 F. Supp. 2d 601, *609; 2002 U.S. Dist. LEXIS 10224, **17

Verizon's subscribers, servers or Virginia. Under such circumstances, the court should not weigh the controverting assertions of the party seeking dismissal because to do so would allow Defendants to "avoid personal jurisdiction simply by filing an affidavit denying all jurisdictional facts." *CompuServe, 89 F.3d at 1262; Professional Investors Life Ins. Co. v. Roussel, 445 F. Supp. 687, 692 (D. Kan. 1978)* (defendant cannot defeat personal jurisdiction with affidavits amounting to "bald denials of pleaded facts.").

[**18]

To determine whether personal jurisdiction exists over a nonresident defendant, courts engage in a two step inquiry. First, the court looks to the law of the forum state, in this case the Virginia long-arm statute, to assess whether the plaintiff's cause of action against the defendant and the nature of the defendant's contacts with Virginia fall within the law's scope. *See Huang, 106 F. Supp. 2d at 853.* Second, the court must determine whether the reach of the long-arm statute's grasp under the circumstances comports with the Due Process Clause of the Fourteenth Amendment of the United States Constitution. *Id. 106 F. Supp. 2d at 853-54; Christian Science Bd. of Dirs. of the First Church of Christ v. Nolan, 259 F.3d 209, 215 (4th Cir. 2001).*

Notwithstanding that Virginia's long-arm statute is construed to assert jurisdiction over nonresident defendants to the fullest extent permissible under the Due Process Clause, it is possible for the [*610] contacts of a nonresident to satisfy due process but not meet a basis for jurisdiction under the Virginia long-arm statute. *See Huang, 106 F. Supp. 2d at 854.* The Court therefore appropriately begins its jurisdictional [**19] inquiry with the statutory analysis.

**B. Personal Jurisdiction under Virginia's Long-arm Statute.**

Pursuant to § 8.01-328.1(A)(3), a court may exercise personal jurisdiction under Virginia's long-arm statute "over a person, who acts directly or by an agent, as to a cause of action arising from the person's . . . causing tortious injury by an act or omission in this Commonwealth." *VA. CODE § 8.01-328.1(A)(3).* Under § 8.01-328.1(A)(4), a court may exercise personal jurisdiction over a defendant "causing tortious injury in this Commonwealth by an act or omission outside this Commonwealth if he [1] regularly does or solicits business, or [2] engages in any other persistent course of conduct, or [3] derives substantial revenue from goods used or consumed or services rendered, in this Commonwealth." *Id.* § 8.01-328.1(A)(4).

Jurisdiction is appropriate in this case under subsection (A)(3) of the long-arm statute. Verizon alleges that Defendants transmitted millions of unsolicited commercial e-mails to and through Verizon's servers in Virginia that amounted to the commonlaw tort of trespass to chattel. *See LCGM, 46 F. Supp. 2d at 451-52* (holding that transmission [**20] of UBE over computer servers constitutes trespass to chattel). Virginia's long-arm statute was recently amended to specifically address the case at bar. The statute states that "using a computer or computer network located in the Commonwealth shall constitute an act in the Commonwealth." *VA. CODE § 8.01-328.1(B).* Liberally read, Verizon's Amended Complaint alleges the "use" of a computer under the long-arm statute by transmitting commercial UBE to and through its computer servers. n7 The use of Verizon's e-mail servers was an integral component of the trespass. Since the injury from the tort Verizon complains of occurred in Virginia, jurisdiction under § 8.01-328.1(A)(3) is proper. *See Bochan[v. La Fontaine], 68 F. Supp. 2d 692, 698* (jurisdiction under § 8.01-328.1(A)(3) is proper because publication of defamatory statement occurred in Virginia); *Telco Communications v. An Apple a Day, 977 F. Supp. 404, 408 (E.D. Va. 1997)* (jurisdiction under long-arm statute is appropriate if plaintiff absorbs harm in Virginia).

---

n7 The term "use" under § 8.01-328.1(B) has the same meaning as under the Virginia Computer Crimes Act, *VA. CODE § 18.2-152.2*. That statute provides that an individual "uses a computer or computer network when he (1) attempts to cause or causes a computer network to perform or to stop performing computer operations; (2) attempts to cause or causes the withholding or denial or the use of a computer, computer network, computer programs, computer data or computer software to another user; or (3) attempts to cause or causes another person to put false information into a computer." *Id.; see also Bochan v. [La] Fontaine, 68 F. Supp. 2d at 698 (E.D. Va. 1999)*(in assessing personal jurisdiction under the Virginia long-arm statute "courts have focused in

Case 5:07-cv-01389-RS    Document 118-3    Filed 07/19/2007    Page 7 of 18

Page 7
203 F. Supp. 2d 601, *610; 2002 U.S. Dist. LEXIS 10224, **20

large measure on the location of the Internet Service Provider . . . .").

**[**21]**

Jurisdiction under § 8.01-328.1(A)(4) is also satisfied. As indicated above, the Amended Complaint adequately alleges a tortious injury occurring in Virginia. To extend long-arm jurisdiction under § 8.01-328.1(A)(4), in addition to alleging that the defendant causes a tort in Virginia, the complaint must allege that a defendant regularly conducted or solicited business, or engaged in any other persistent course of conduct, or derived substantial revenue from goods used or consumed **[*611]** or services rendered in Virginia. The Amended Complaint claims that Defendants engaged in a conspiracy from November 2000 to December 2000, exploiting Verizon's computer servers in Virginia to gain free advertising for Defendants' Web sites by transmitting millions of UBE through those servers. On its face, Defendants' purposeful, persistent, commercial conduct arguably satisfies any of the three prongs under § 8.01-328.1(A)(4).

However, an exhaustive assessment of whether Defendants regularly solicited business, or engaged in any other persistent course of conduct, or derived substantial revenue from goods used or consumed or services rendered in Virginia necessarily converges with the Due Process analysis **[**22]** of minimum contacts. Since the "dual jurisdictional requirements collapse into a single inquiry," the Court proceeds directly to the heart of this case - whether haling Defendants into Virginia would "offend traditional notions of fair play and substantial justice" under the Constitution. *Christian Science Bd., 259 F.3d at 215.*

### C. Due Process.

The Due Process Clause requires "that no defendant shall be haled into court unless the defendant has 'certain minimum contacts [with the state] . . . such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice.'" *Huang, 106 F. Supp. 2d at 853* (quoting *International Shoe Co. v. Washington, 326 U.S. 310, 316, 90 L. Ed. 95, 66 S. Ct. 154 (1945)*(alteration in original)). There are two types of personal jurisdiction a federal court may exercise over a nonresident defendant - general or specific. *See Helicopteros Nacionales de Colombia, S.A., v. Hall, 466 U.S. 408, 414-416, 80 L. Ed. 2d 404, 104 S. Ct. 1868 (1984).* In this case, as Verizon concedes, Defendants have not subjected themselves to general jurisdiction, which concerns **[**23]** the exercise of jurisdiction over the defendant in a suit unrelated to the defendant's contacts with the forum. *See id. at 414.* Rather, the inquiry in this case is whether Defendants' contacts flowing from Verizon's claims are sufficient to establish specific jurisdiction. In determining minimum contacts for specific personal jurisdiction, "a court properly focuses on the 'relationship among the defendant, the forum, and the litigation.'" *Calder v. Jones, 465 U.S. 783, 787, 79 L. Ed. 2d 804, 104 S. Ct. 1482 (1984)* (citations omitted). This analysis entails three steps. *See Christian Science Bd., 259 F.3d at 215.*

First, the Court must determine whether Defendants "purposefully availed [themselves] of the privilege of conducting activities within the forum State . . . ." *Burger King Corp. v. Rudzewicz, 471 U.S. 462, 475, 85 L. Ed. 2d 528, 105 S. Ct. 2174 (1985).* Second, the Court must assess whether the causes of action alleged by Verizon arise from Defendants' activities here in Virginia. *See Christian Science Bd., 259 F.3d at 215; CompuServe, 89 F.3d at 1267.* Finally, the Court **[**24]** must ask whether the acts by Defendants, or the consequences of the acts caused by Defendants, have a substantial enough connection with Virginia to render the exercise of jurisdiction over Defendants "constitutionally 'reasonable.'" *Christian Science Bd., 259 F.3d at 215* (quoting *Burger King, 471 U.S. at 476-77).* Addressing these three steps in turn, the Court finds that the exercise of personal jurisdiction over Defendants in this case does not violate Due Process.

### 1. Purposeful availment.

Commercial UBE presents a jurisdictional conundrum from the perspective of determining whether its purveyors have **[*612]** purposefully availed themselves of the forum state. On the one hand, there is the technological fact that one cannot discern the geographical destination of an e-mail by its address. More importantly for the purposes of this case, the e-mail address does not indicate the geographical location of the server processing the e-mail. All the address indicates is the domain name of the server, *e.g.,* "oholmes@bellatlantic.net." Based on these basic propositions, Defendants maintain that they have not purposefully availed themselves of the laws **[**25]** and privileges of Virginia because their alleged conduct

Case 5:07-cv-01389-RS    Document 118-3    Filed 07/19/2007    Page 8 of 18

Page 8

203 F. Supp. 2d 601, *612; 2002 U.S. Dist. LEXIS 10224, **25

centers on transmitting e-mails to addressees throughout the world without knowingly targeting Virginia. Defendants therefore conclude that even if they transmitted the alleged e-mails they could not have purposefully directed this activity to Virginia.

On the other side of the ledger, a spammer is clearly purposefully and deliberately sending commercial UBE. The spammer intentionally enters the e-mail address into the "to" space of the e-mail and is thus fully aware of the identity of the server who will process the e-mail because the domain name is part of the address. The spammer sends, not one or two, but millions of e-mails to and through an ISP's server for the express purpose of soliciting business at little to no cost to the spammer while causing a tort where the e-mail servers of the forum resident are located. Accordingly, Verizon maintains, when Defendants allegedly exploited Verizon's e-mail servers to gain free advertising for their products and trespassed Verizon's property in the process, Defendants should have reasonably expected to be haled into a court in any state where they violated Verizon's public anti-UBE [**26] policy and compromised its servers. Any other result would grant spammers like Defendants carte blanche to spam with impunity.

### a. *Burger King, Calder,* **and purposeful availment.**

The answer to this question lies in the basic principles of personal jurisdiction and purposeful availment. The seminal case in this regard is *Burger King Corp. v. Rudzewicz, 471 U.S. 462, 85 L. Ed. 2d 528, 105 S. Ct. 2174 (1985).* In that case, the Supreme Court held that the defendant's reaching out beyond Michigan to negotiate with a Florida corporation for the purchase of a long-term franchise was sufficient to establish minimum contacts necessary for personal jurisdiction. In doing so, the Supreme Court recapitulated various guideposts for determining whether a nonresident defendant has purposefully availed itself of a forum state.

The focus begins with "foreseeability." Foreseeability in the sense that the "the defendant's conduct and connection with the State are such that he should reasonably anticipate being haled into court there." *Id. 471 U.S. at 474* (quoting *World-Wide Volkswagen Corp., 444 U.S. at 297).* Drawing from other precedents, the Court elaborated [**27] that the application of this rule "will vary with the quality and nature of the defendant's activity, but it is essential in each case that there be some act by which the defendant purposefully avails itself of the privilege of conducting activities with in the forum State . . . ." *Burger King, 471 U.S. at 474-75* (quoting *Hanson v. Denckla, 357 U.S. 235, 253, 2 L. Ed. 2d 1283, 78 S. Ct. 1228 (1958)).*

The "'purposeful availment' requirement is satisfied when the defendant's contacts with the forum state 'proximately result from actions by the defendant *himself* that create a substantial connection with the forum State . . . .'" *CompuServe, 89 F.3d at 1263* (quoting *Burger King, 471 U.S. at 475)* [*613] (emphasis in original). Thus, such deliberate contacts cannot be "random," "fortuitous," or "attenuated." *Burger King, 471 U.S. at 475* (quoting *Keeton v. Hustler Magazine, Inc., 465 U.S. 770, 774, 79 L. Ed. 2d 790, 104 S. Ct. 1473 (1984)).* Further, the contacts cannot flow from the "unilateral activity of another party or third person." *Burger King, 471 U.S. at 475* (quoting [**28] *Helicopteros Nacionales, 466 U.S. at 417).* Finally, in light of the "inescapable fact of modern life that a substantial amount of business is transacted solely by mail and wire communications across state lines," the absence of physical contact or presence in the state will not defeat jurisdiction so long as the defendant is deliberately engaged in efforts within the state. *Burger King, 471 U.S. at 476.*

The Supreme Court has recognized that the inquiry slightly shifts when the application of the purposeful availment prong turns on a tort claim. In *Calder v. Jones,* the Court established an "effects test" for intentional torts aimed at the forum *State. 465 U.S. 783 (1984).* The Court held that it was proper for a California court to exercise jurisdiction over Florida reporters for *The National Enquirer* who the plaintiff alleged had published a libelous article. Finding that the "article was drawn from California sources, and the brunt of the harm . . . was suffered in California," the Court concluded that c was proper because the "'effects' of their Florida conduct [was based] in California." *Id. 104 S. Ct. at 1487* [**29] (quoting *World-Wide Volkswagen, 444 U.S. at 297-98).*

The Court concluded that under the circumstances, Defendants must "reasonably anticipate being haled into court" in California to "answer for the truth of the statements made in their article." *Id. 465 U.S. at 790* (citations omitted). Similarly, in *Keeton v. Hustler Magazine,* the Court found that a publisher's regular circulation of its magazine in New Hampshire constituted minimum contacts with the forum state to establish that

Case 5:07-cv-01389-RS    Document 118-3    Filed 07/19/2007    Page 9 of 18

Page 9
203 F. Supp. 2d 601, *613; 2002 U.S. Dist. LEXIS 10224, **29

the publisher should "reasonably anticipate being haled into court there in a libel action based on the contents of its magazine." *465 U.S. at 781* (citing *World-Wide Volkswagen, 444 U.S. at 297-98*).

### b. Application to the Internet.

Building on this foundation, courts have labored to apply the teachings of *Burger King* and its progeny to conduct over the borderless Internet. Courts first wrestled with applying the principles of personal jurisdiction to a defendant's conduct with the forum state through a Web site on the World Wide Web. In doing so, many courts have applied the "sliding scale" test set forth in *Zippo Mfg. Co. v. Zippo Dot Com, Inc., 952 F. Supp. 1119, 1124 (W.D. Pa. 1997)*. **[\*\*30]** *See Cybersell, Inc. v. Cybersell, Inc., 130 F.3d 414 (9th Cir. 1997)* (adopting sliding scale analysis to distinguish between active and interactive Web sites); *Mink v. AAAA Development LLC., 190 F.3d 333 (5th Cir. 1999)*(same). n8 The **[\*614]** basic premise of this heuristic tool is that the "likelihood that personal jurisdiction can be constitutionally exercised is directly proportionate to the nature and quality of commercial activity that an entity conducts over the Internet." *Atlantech Distribution, Inc. v. Credit Gen. Ins. Co., 30 F. Supp. 2d 534, 536-37 (D. Md. 1998)*(citing *Zippo Mfg., 952 F. Supp. at 1124*).

> n8 The *Zippo* court identified three types of Internet web presences and their effects on personal jurisdiction:
>
>> At one end of the spectrum are situations where a defendant clearly does business over the Internet. If the defendant enters into contracts with residents of a foreign jurisdiction that involve the knowing and repeated transmission of computer files over the Internet, personal jurisdiction is proper. At the opposite end are situations where a defendant has simply posted information on an Internet Web site which is accessible to users in foreign jurisdictions. A passive Web site that does little more than make information available to those who are interested in it is not grounds for the exercise of personal jurisdiction. The middle ground is occupied by interactive Web sites where a user can exchange information with the host computer. In these cases, the exercise of jurisdiction is determined by examining the level of interactivity and commercial nature of the exchange of information that occurs on the Web site.
>
> *Zippo Mfg., 952 F. Supp. at 1124* (citations omitted).

**[\*\*31]**

In tort cases involving Web sites, some courts have foregone the "sliding scale test" and applied the "effects test" set forth in *Calder. See, e.g., Panavision Int'l, L.P. v. Toeppen, 141 F.3d 1316 (9th Cir. 1998)*(employing *Calder* "effects test" in cyber-squatting case); *Remick v. Manfredy, 238 F.3d 248 (3d Cir. 2001)*(analyzing misappropriation of image claim on Web site using "effects test"). Applying *Calder* the Ninth Circuit explained that "personal jurisdiction can be based on (1) intentional actions (2) expressly aimed at the forum state (3) causing harm, the brunt of which is suffered - and which the defendant knows is likely to be suffered - in the forum state." *Panavision, 141 F.3d at 1321*.

The court held that personal jurisdiction over the defendant in California was proper because he purposefully registered the plaintiff's trademark as his own domain name to extort the plaintiff for money, the brunt of the harm was felt in California, and the defendant knew or should have known that the plaintiff would likely suffer harm in that forum because the plaintiff's principal place of business was in California and the motion **[\*\*32]** picture and television industry was located there. *See id. at 1321-22. But see Remick, 238 F.3d at 259* (finding that personal jurisdiction was inappropriate over defendant on basis of misappropriation of likeness of plaintiff's image where defendant posted image on Web site and was unaware that placing image on Web site would cause injury in forum state).

Courts have also addressed purposeful availment where e-mail contacts were a significant factor in

Case 5:07-cv-01389-RS    Document 118-3    Filed 07/19/2007    Page 10 of 18

Page 10

203 F. Supp. 2d 601, *614; 2002 U.S. Dist. LEXIS 10224, **32

determining the appropriateness of exercising personal jurisdiction over the nonresident defendant. In *CompuServe v. Patterson,* the Sixth Circuit found that the defendant had purposefully availed himself of the forum state, Ohio, by entering into an electronic contract governed by Ohio law with the plaintiff over the Internet, advertising and distributing his software over the plaintiff's computer system centered in Ohio, and making threats and demands on the plaintiff via e-mail. *89 F.3d at 1262-63.*

Based on these facts, the court found that "Patterson deliberately set in motion an ongoing marketing relationship with CompuServe, and he should have reasonably foreseen that doing so [**33] would have consequences in Ohio." *CompuServe, 89 F.3d at 1265. See also Resuscitation Techns., Inc. v. Cont'l Health Care Corp.,* 1997 U.S. Dist. LEXIS 3523, No. IP 96-1457-C-M/S, 1997 WL 148567, at * 5 (S.D. Ind. March 24, 1997) (finding personal jurisdiction based primarily on defendants' extensive communications with plaintiff, a known Indiana corporation, via e-mails concerning formation of a new company that "were directed toward setting in motion a business operation that would have significant commercial impact on Indiana."). *But see Hearst Corp. v.* [*615] *Goldberger,* 1997 U.S. Dist. LEXIS 2065, No. 96 Civ. 3620, 1997 WL 97097, at * 12 (S.D.N.Y. Feb. 26, 1997)(analogizing e-mails to telephone calls and letters from outside forum state to find that electronic communications by themselves did not establish jurisdiction in trademark infringement action). n9

------

n9 *See also EDIAS Software Int'l v. Basis Int'l Ltd,* 947 F. Supp. 413, 419 (D. Ariz. 1996) ("E-mail does not differ substantially from other recognizable forms of communication, such as traditional mail or phone calls, where one person has an address or phone number to reach another person.").

------

[**34]

Finally, a few courts have addressed the issue of whether a defendant purposefully avails himself of the forum state based solely on e-mail contacts. In *Intercon, Inc. v. Bell Atlantic Internet Solutions, Inc.,* the Eleventh Circuit found that the defendant had purposefully directed its conduct toward Oklahoma after it received notice that it was routing customers' e-mails, albeit inadvertently, through the plaintiff's Oklahoma e-mail server. *205 F.3d 1244, 1247-48 (11th Cir. 2000).* The court focused on the fact that the defendant was using a "computer or network service located in a particular state" and that it knew that "its conduct was causing injury in Oklahoma . . . and should reasonably have expected to be sued there." *Id. 205 F.3d at 1248.*

In *Internet Doorway, Inc. v. Parks,* the plaintiff, a Mississippi ISP, brought Lanham Act and trespass to chattel claims against various defendants, including Connie Davis, a resident of Texas, alleging that Davis falsified the "from" header in unsolicited e-mails to make it appear as if the e-mails had originated from the plaintiff. *138 F. Supp. 2d 773 (S.D. Miss. 2000).* Notwithstanding that Davis [**35] had indiscriminately transmitted her e-mails all over the world, the court found that "by sending an e-mail solicitation to the far reaches of the earth for pecuniary gain, one does so at her own peril, and cannot then claim that it is not reasonably foreseeable that she will be haled into court in a distant jurisdiction to answer for the ramifications of that solicitation." *Id. 138 F. Supp. 2d at 779-80.* Holding that Davis had purposefully directed her conduct toward Mississippi, the court emphasized that in contrast to an Internet Web site, "the active as opposed to passive nature of e-mail weighs in favor of finding personal jurisdiction in the forum where the e-mail is received." *Id. 138 F. Supp. 2d at 777.*

Citing *Internet Doorway,* the court in *Reliance Nat'l Indem. Co. v. Pinnacle Cas. Assur. Corp., et al.,* agreed with the proposition that "e-mails, like letters and phone calls, can constitute minimum contacts, at least if the defendant or his agents send the message for pecuniary gain rather than substantially personal purposes." *160 F. Supp. 2d 1327, 1333 (M.D. Al. 2001).* However, in that case, the court found that the defendant had not purposefully availed [**36] itself of the forum state because the two mass e-mails upon which jurisdiction hinged were forwarded to the plaintiff by third parties. *See id.* Thus, "because contacts resulting from unilateral activity of others [were] insufficient" the motion to dismiss was granted. *Id.* ("E-mails are bound to be copied and sent to all corners of the world; it does not follow that the author opens himself up to jurisdiction similarly."). n10

------

n10 *Cf. Hockerson-Halberstadt, Inc. v. Costco Wholesale Corp.,* 93 F. Supp. 2d 738

Case 5:07-cv-01389-RS    Document 118-3    Filed 07/19/2007    Page 11 of 18

Page 11

203 F. Supp. 2d 601, *615; 2002 U.S. Dist. LEXIS 10224, **36

(D.C. La. 2000) (holding that nonresident *defendant's response* to e-mail from patent infringement plaintiff's attorney requesting information on possible purchase of allegedly infringing products did not constitute purposeful availment of Louisiana).

### c. Defendants' conduct and Verizon's servers.

The Court finds that Defendants have purposefully availed themselves of Virginia. **[*616]** Applying the basic principles undergirding personal jurisdiction and after reviewing the current state **[**37]** of personal jurisdiction based on Internet use, Defendants reasonably should have expected to be haled into court in Virginia for deliberately exploiting Verizon's e-mail servers for pecuniary gain while trespassing Verizon's property.

First, an examination of the "nature and quality" of Defendants' conduct favors exercising personal jurisdiction in Virginia. *See Bochan, 68 F. Supp. 2d at 701 (E.D. Va. 1999)* ("Courts determining personal jurisdiction primarily on the basis of Internet activity generally focus on the nature and quality of activity that a defendant conducts over the Internet.")(citations and internal quotations omitted). *See also Burger King, 471 U.S. at 474-75* (application of purposeful availment varies on the "quality and nature of the defendant's activity . . . .").

One of the key factors courts have focused on in finding purposeful availment of a forum state concerning conduct over the Internet is whether the activity was driven by pecuniary gain rather than personal purposes. *See Internet Doorway, 138 F. Supp. 2d at 779-80* (e-mail sent for purpose of advertising pornographic Web site basis for personal jurisdiction); **[**38]** *Reliance Nat'l, 160 F. Supp. 2d at 1333* (noting that e-mail sent for pecuniary gain rather than personal purpose could be basis for personal jurisdiction); *Cf. Zippo Mfg., 952 F. Supp. at 1124* (noting commercial nature of the exchange of information between a Web site and visitors as possible basis for exercising personal jurisdiction).

Defendants allegedly conspired with approximately one hundred other individuals to send millions of UBE to Verizon's subscribers through Verizon's e-mail servers in Virginia. The purpose of this venture was to gain free advertising for Defendants' products and services. The alleged acts were "knowing and repeated" commercial transmissions over the Internet. *See Zippo Mfg., 952 F. Supp. at 1124* (noting that personal jurisdiction is proper over defendant who enters into contracts that involve knowing repeated transmissions over the Internet). This case is not about transmitting a protest chain letter over the Internet or sending large volumes of e-mails in a get out the vote campaign. The conduct at issue is unabashedly commercial in nature. Further, this case does not turn on a few e-mails that were **[**39]** merely used as a communicative device like in *Hearst Corp., 1997 U.S. Dist. LEXIS 2065, 1997 WL 97097*, or *EDIAS Software, 947 F. Supp. 413*. n11 Rather, this case concerns employing millions of e-mails in a commercial venture that form the basis of the cause of action itself.

> n11 In this regard, the difference between UBE and communicative personal e-mails is similar to the disparity between a personal fax and an unsolicited commercial fax message. The latter can cause substantial problems to the recipient in the form of consumption of resources and essentially shifts advertising costs from the advertiser to the consumer. Congress adopted legislation that prohibits the use of "any telephone facsimile machine, computer, or other device to send an unsolicited advertisement to a telephone facsimile machine ...." *47 U.S.C. § 227(b)(1)(C)*. *See Kenro v. Fax Daily, Inc., 962 F. Supp. 1162, 1167-169 (S.D. Ind. 1997)*(explaining that ban on unsolicited commercial faxes is narrowly tailored to government's interest in protecting consumers from unfair shifting of advertising costs and from interruption of their use of their own fax machines); *see also Destination Ventures, Ltd. v. Federal Communications Commission, 46 F.3d 54 (9th Cir. 1995)* (denying First Amendment challenge to section 227(b)(1)(C)).

**[**40]**

Second, the "nature and quality" of Defendants' Internet contacts caused a tort in the Commonwealth of Virginia against a Virginia resident. As the Supreme Court has noted "the Framers . . . intended that **[*617]** the States retain many essential attributes of sovereignty, including, in particular, the sovereign power to try causes in their courts." *World Wide Volkswagen, 444 U.S. at 293-294*. A state maintains a "'manifest interest' in providing its residents with a convenient forum for

Case 5:07-cv-01389-RS    Document 118-3    Filed 07/19/2007    Page 12 of 18

Page 12

203 F. Supp. 2d 601, *617; 2002 U.S. Dist. LEXIS 10224, **40

redressing injuries inflicted by out-of-state actors." *Burger King, 471 U.S. at 473* (citations omitted).

A state's interest in exercising personal jurisdiction over a tortfeasor takes on a stronger role than in other contexts such as a contract dispute. Generally speaking, a "state has power to exercise judicial jurisdiction over an individual who has done, or has caused to be done, an act in the state with respect to any claim in tort arising from the act." RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 36(1) (1988).

> A state has an especial interest in exercising judicial jurisdiction over those who commit torts within its territory. This is because torts involve wrongful [**41] conduct which a state seeks to deter, and against which it attempts to afford protection, by providing that a tortfeasor shall be liable for damages which are the proximate results of a tort.

*Id.* at cmt c. *See Humphreys v. Pierce, 512 F. Supp. 1321, 1326 (W.D. Va. 1981)* (relying on second restatement to hold that material misrepresentations in Virginia causing plaintiff to sustain economic injury were sufficient minimum contacts to exercise personal jurisdiction); *see also Keeton, 465 U.S. at 776* (citing favorably New Hampshire's Court of Appeals citation of Second Restatement regarding importance of state exercising jurisdiction over tortfeasors).

The sending of spam to and through an ISP's e-mail servers constitutes the tort of trespass to chattel in the state of Virginia. *See LCGM, 46 F. Supp. 2d at 451-52.* Defendants allegedly committed this tort by intentionally transmitting millions of spam messages into Verizon's servers in Virginia over the course of several weeks in violation of Verizon's public anti-UBE policy. In doing so, they also allegedly employed an arsenal of fraudulent techniques to avoid detection and [**42] continue spamming Verizon's customers.

With this backdrop in mind, *Calder* and its progeny counsel that personal jurisdiction is appropriate in this case. First, as discussed above, Defendants' alleged acts of transmitting millions of UBE to and through Verizon's servers were clearly intentional. The sending of UBE in this case was not a "one-shot affair." *See CompuServe,* *89 F.3d at 1265.* In contrast to the posting of material on a Web site, Defendants' alleged actions were active, not passive. *See Internet Doorway, 138 F. Supp. 2d at 777.* In addition, these e-mails were expressly aimed at Verizon's servers, seven of which are located in Virginia. Defendants' alleged transmission of millions of UBE to and through Verizon's servers in Virginia can hardly be considered "random," "fortuitous," or "attenuated" contacts. *Burger King, 471 U.S. at 475.* Defendants purposefully entered the e-mail addresses with Verizon's domain name, transmitted the deluge of e-mails, and then deliberately undertook steps to avoid getting caught.

Finally, the brunt of the harm suffered by Verizon was in Virginia. *See Blue Ridge Bank v. Veribanc, Inc., 755 F.2d 371, 374 (4th Cir. 1985)* [**43] (additional factor for exercising personal jurisdiction was fact that "brunt of the alleged injuries" in defamation case happened to a local bank in Virginia). In the case of injuries to computer systems, various courts have concluded that the "use of a computer or network service located in a particular state creates sufficient contacts to establish personal jurisdiction." *Intercon, 205* [*618] *F.3d at 1248* (citing *CompuServe, 89 F.3d at 1257; Zippo Mfg., 952 F. Supp. at 1124-1127; Plus Sys. Inc. v. New England Network, Inc., 804 F. Supp. 111, 118-19 (D. Colo. 1992))*.

Every e-mail sent by Defendants addressed to subscribers with the domain name of bellatlantic.net passed through Verizon's Virginia servers. Additionally some of the spam addressed to addresses with the domain name gte.net and verizon.net were relayed through the Virginia servers. Defendants' spam spanned the course of several weeks, allegedly consuming 56 gigabytes of memory on a single day on Verizon's servers, seven of which are in Virginia. The injury in Verizon's trespass tort claim did not occur in cyber-space. It occurred in the forum state of Virginia [**44] where the UBE harmed a substantial portion of Verizon's e-mail servers by impairing its e-mail delivery system and leading to delays and consumer complaints. *See Panavision, 141 F.3d at 1321* (registering plaintiff's trademark as a domain name and extorting money from plaintiff inflicted injury in plaintiff's principal place of business not cyberspace); *Indianapolis Colts, Inc. v. Metro. Baltimore Football Club Ltd., 34 F.3d 410, 411-412 (7th Cir. 1994)*(finding that nationwide broadcast of football games with infringing trademark inflicted injury in Indiana where plaintiff used trademarks).

Case 5:07-cv-01389-RS    Document 118-3    Filed 07/19/2007    Page 13 of 18

Page 13

203 F. Supp. 2d 601, *618; 2002 U.S. Dist. LEXIS 10224, **44

Defendants knew, or reasonably should have known, that the alleged transmission of their UBE would harm Verizon's e-mail servers. In *Indianapolis Colts v. Metro. Baltimore Football Club Ltd.,* the Seventh Circuit held that a district court in Indiana had personal jurisdiction in a trademark infringement action over a Canadian Football League's team in Baltimore because, *inter alia,* "by choosing a name that might be found to be confusingly similar to that of the Indianapolis Colts, Defendants assumed the risk of injuring valuable property located in Indiana. [**45]** " *34 F.3d at 411.* The court also relied on the "entry" of Defendants into Indiana via the nationwide transmission of Baltimore CFL Colts football games. *See id. at 412.*

Similarly, here Defendants assumed the risk of injuring valuable property in Virginia by deliberately sending millions of UBE to and through Verizon's e-mail servers located in Virginia for pecuniary gain. *See Internet Doorway, 138 F. Supp. 2d at 779-80* (defendant's e-mail solicitation assumes risk of being haled into court in a foreign jurisdiction to answer for ramifications of actions). Defendants are allegedly professional spammers who use various techniques to avoid detection. It strains credulity to believe that they would be unaware that their UBE would overwhelm Verizon's e-mail servers causing delays in the delivery of legitimate e-mails. Likewise, as alleged professional spammers, Defendants were surely aware of Verizon's public anti-UBE policy and that Verizon would attempt to make them answer for the consequences of violating such policy and harming its servers. It is common knowledge that ISPs like Verizon frequently sue bulk e-mailers for violations of their **[**46]** anti-spam policy under a theory of trespass to chattel and other laws. *See* discussion *supra* Part I.A. Further, like Defendants in *Indianapolis Colts,* Defendants "entered" Virginia when their spam overloaded Verizon's servers. And like the nationwide broadcasts in *Indianapolis Colts,* personal jurisdiction is not inappropriate simply because the UBE entered other jurisdictions in addition to Virginia.

By allegedly transmitting millions of e-mails to make money at Verizon's expense, knowing or reasonably knowing that such conduct would harm Verizon's e-mail servers, Defendants should have expected to get dragged into court where their actions **[*619]** caused the greatest injury. *See Calder, 465 U.S. at 789* (publishers of nationally circulated magazine must reasonably anticipate being haled into court where defendants should reasonably know where the libelous story would inflict greatest harm on reputation of article's subject); *Keeton, 465 U.S. at 779* (publisher should reasonably anticipate being haled into court in a libel action in state where magazine is regularly circulated); *Panavision, 141 F.3d at 1320* (trademark infringer **[**47]** knew or should have known that injury would have largest impact in California where the movie and television industry is centered); *First Am. First Inc. v. Nat'l Ass'n of Bank Women, 802 F.2d 1511, 1516 (4th Cir. 1986)* (defendant knew or should have known that allegedly defamatory letters would inflict greatest harm on plaintiff in Virginia where he resided and conducted business). Thus, jurisdiction is proper in Virginia because of the "effects" of Defendants' tortious conduct in Virginia. *See Calder, 465 U.S. at 789.*

Defendants argue that since they did not know that the UBE would harm Verizon's servers in Virginia, then they could not have purposefully availed themselves of the forum. In support, Defendants rely on an analogy of their conduct to the "stream of commerce" cases such as *World-Wide Volkswagen,* where the Supreme Court held that an automobile simply passing through Oklahoma did not constitute minimum contacts with Oklahoma so as to permit Oklahoma courts to exercise personal jurisdiction over the nonresident defendant auto-maker. *444 U.S. 286.* n12

n12 Defendants also rely heavily on *ESAB Group, Inc. v. Centricut, Inc.,* to support the argument that they cannot be haled into Virginia because they were unaware their UBE was injuring Verizon's servers in *Virginia. 126 F.3d 617 (4th Cir. 1997).* That case dealt with a conspiracy between a New Hampshire corporation and a Florida resident where the Florida resident provided information regarding companies throughout the United States that would give the New Hampshire defendant a competitive advantage vis-a-vis its competitors. *See id. 126 F.3d at 625.* One of those competing corporations was the plaintiff, located in South Carolina, who argued that because the New Hampshire defendant should have known that the scheme would financially harm the plaintiff, it should reasonably anticipate being haled into South Carolina. The Fourth Circuit found that this connection was "too attenuated to constitute a 'substantial connection' with South Carolina,"

Case 5:07-cv-01389-RS    Document 118-3    Filed 07/19/2007    Page 14 of 18

Page 14

203 F. Supp. 2d 601, *619; 2002 U.S. Dist. LEXIS 10224, **47

especially since no sales from the New Hampshire defendant corporation were ever made in South Carolina. *Id. 126 F.3d at 625*. Defendants' reliance on *ESAB Group* is misplaced. There is nothing attenuated about the connection between Defendants' conduct and Verizon's Virginia e-mail servers. Crediting the allegations in the Amended Complaint, the millions of e-mails sent over a span of several weeks constitute a substantial connection between Defendants' Internet activity and the harm inflicted on Verizon.

 [**48]

But Defendants' argument fails for several reasons. First, they ignore the simple fact that they could have easily structured their conduct to avoid being haled into Virginia by not spamming Verizon's subscribers. *See Burger King, 471 U.S. at 473* (explaining that Due Process is primarily concerned with giving a "degree of predictability to the legal system that allows potential defendants to structure their primary conduct with some minimum assurance as to where that conduct will and will not render them liable to suit."). Unlike a car manufacturer who places its product into the "stream of commerce" ignorant of where it may wind up, Defendants knew precisely where their spam was going - Verizon's e-mail servers and its customers. And they knew, or reasonably should have known, that such conduct violated Verizon's public anti-spam policy and would result in litigation. This is not a case where Defendants allegedly posted an image or message on a Web site [*620] or simply released an e-mail onto the information superhighway with no direction. Defendants could have "alleviated the risk of burdensome regulation" by electing not to exploit Verizon's e-mail servers for personal [**49] gain. *World-Wide Volkswagen, 444 U.S. at 297*.

Second, one of the cornerstones of *World-Wide Volkswagen* and its progeny is the concern that the defendant not be forced to defend himself in a foreign jurisdiction when *he himself* did not create the substantial connection to the forum state. Hence, a nonresident car manufacturer cannot be haled into a state where its only connection resulted from a customer's decision to drive it there. *See World Wide Volkswagen, 444 U.S. at 297*. For the same reasons, a defendant does not purposefully avail itself of a forum when the mass e-mails upon which jurisdiction is based were forwarded to the plaintiff by third parties. *See Reliance Nat'l, 160 F. Supp. 2d at 1333*. ==In this case, Defendants' conduct and connections to Virginia were of their own choosing, not someone else's. Defendants allegedly purposefully transmitted millions of UBE to Verizon's e-mail servers. They cannot seek to escape answering for these actions by simply pleading ignorance as to where these severs were physically located.==

To do so would constitute a manifest injustice to Verizon and Virginia. This is a case where Defendants [**50] allegedly "'purposefully derived benefits' from their interstate activities" at the expense of Verizon. *Burger King, 471 U.S. at 473*. It would be "unfair to allow individuals who purposefully engage in interstate activities for profit to escape having to account in other states for the proximate consequences of their actions." *CompuServe, 89 F.3d at 1265* (citing *Burger King, 471 U.S. at 473)*. Such is the case here. Defendants' alternative would allow spammers to send UBE with impunity, avoiding personal jurisdiction simply by alleging that they did not know the exact location of an ISPs' e-mail servers, yet knowing full well that their conduct harmed those computers and the ISP's business. n13 Fundamental fairness does not favor that result and neither does the Due Process Clause of the Constitution. *See Cybersell, 130 F.3d at 419* (defendants "should not be permitted to take advantage of modern technology via the Internet or other electronic means to escape traditional notions of jurisdiction.") (citations and internal quotations omitted).

> n13 Further, following Defendants' argument to its logical conclusion, a tortfeasor could escape personal jurisdiction for deliberate acts by simply pleading ignorance of where the harm of his action would lie. For instance, a hunter on the county line between Virginia and North Carolina who negligently fired a shot into the air could escape personal jurisdiction in Virginia for accidentally shooting someone in Virginia because he did not intend or even know that the shot would land in Virginia.

 [**51]

**2. The cause of action arises from Defendants' activities in Virginia.**

Case 5:07-cv-01389-RS   Document 118-3   Filed 07/19/2007   Page 15 of 18

Page 15

203 F. Supp. 2d 601, *620; 2002 U.S. Dist. LEXIS 10224, **51

The second requirement for specific personal jurisdiction is that the claim asserted arises out of the defendant's forum related activities. *See Christian Science Bd., 259 F.3d at 215; CompuServe, 89 F.3d at 1267.* "If a defendant's contacts with the forum state are related to the operative facts of the controversy, then an action will be deemed to have arisen from those contacts." *CompuServe, 89 F.3d at 1267.*

The Court holds that the cause of action in this case arises from Defendants' activities in the Commonwealth of Virginia. Here, the connection to Virginia is the claim itself - the transmission of UBE to and through Verizon's e-mail servers. Verizon's Amended Complaint alleges **[*621]** three counts under the Virginia Computer Crimes Act, *VA. CODE § 18.2-152.1, et seq.,* three counts under the Federal Computer Fraud and Abuse Act, *18 U.S.C. § 1030, et seq.,* as well as common law trespass to chattel and conspiracy. All of these claims turn on Defendants' alleged act of transmitting millions of UBE to and through Virginia e-mail **[**52]** servers. But for Defendants alleged transmission of this spam to Verizon's e-mail servers, Verizon would not have incurred an injury. *See Panavision, 141 F.3d at 1321* ("but for" defendant's registration of plaintiff's trademark, plaintiff would not have suffered injury in the forum state). Therefore, the second requirement of personal jurisdiction is satisfied.

### 3. The reasonableness requirement.

Finally, the Court turns to the issue of whether Defendants' actions have a substantial enough connection with Verizon and Virginia to make the exercise of personal jurisdiction over Defendants constitutionally reasonable. *See Christian Science Bd., 259 F.3d at 215.* To be reasonable, jurisdiction "must comport with 'fair play and substantial justice.'" *Panavision, 141 F.3d at 1322* (quoting *Burger King, 471 U.S. at 476).* Once a court finds "the first two elements of a prima facie case - purposeful availment and a cause of action arising from the defendant's contacts with the forum state - then an inference arises that this third factor is present." *CompuServe, 89 F.3d at 1268.*

There are several factors **[**53]** a court should look to in resolving this question. A court should consider "the burden on the defendant, the forum State's interest in adjudicating the dispute, the plaintiff's interest in obtaining relief, the interstate judicial system's interest in obtaining the most efficient resolution of controversies, and the shared interest of the several States in furthering fundamental substantive social policies." *Burger King, 471 U.S. at 477* (citations and internal quotations omitted).

Applying these factors, the exercise of personal jurisdiction over Defendants in this case is constitutionally reasonable. n14 Although it may be somewhat burdensome for Defendants to defend a suit in Virginia, Defendants should have been aware of the possibility of being sued where their UBE inflicted the greatest injury to Verizon. Virginia has a strong interest in resolving this dispute because it involves a Virginia resident and Virginia law. *See Blue Ridge Bank, 755 F.2d at 374* (Virginia has an interest in providing forum for local bank to seek redress for defamation). Indeed, Virginia recently enacted the Virginia Computer Crimes Act, *VA. CODE § 18.2-152.1, et seq.* **[**54]** , to specifically address the conduct Defendants are accused of committing.

> n14 The Supreme Court has indicated that "these considerations sometimes serve to establish the reasonableness of jurisdiction upon a lesser showing of minimum contacts that would otherwise be required." *Burger King, 471 U.S. at 477* (citations omitted). Therefore, even if the Court were to find Defendants' contentions persuasive on the purposeful availment prong of the jurisdiction analysis, the Court concludes that application of the "fair play and substantial justice" considerations outweigh any arguable problem with establishing jurisdiction based predominantly on Defendants' Internet conduct.

ISPs sell access to their customers. ISPs also sell advertising to customers. Defendants here are allegedly conducting a business by transmitting free advertising, consuming Verizon's computer space and securing access to Verizon's customer's without paying Verizon fees for these **[*622]** services. Defendants have allegedly caused tortious **[**55]** injury to Verizon in Virginia by bombarding Verizon's servers with UBE, consuming processing time, and harming Verizon's relationship with its customers. Verizon has a vital interest in pursuing this action in Virginia because its principal place of business is in this forum and the brunt of the harm to Verizon's business occurred in Virginia.

Case 5:07-cv-01389-RS    Document 118-3    Filed 07/19/2007    Page 16 of 18

Page 16
203 F. Supp. 2d 601, *622; 2002 U.S. Dist. LEXIS 10224, **55

Finally, the exercise of personal jurisdiction over Defendants in this case dovetails with the judicial interest in efficient resolution of spam suits and the underlying interest of the states in addressing this problem. As discussed above, permitting Defendants to escape personal jurisdiction simply because they claim they were unaware that Verizon's e-mail servers were located in Virginia would be fundamentally unfair. Setting such a precedent would allow spammers to transmit UBE with impunity and only face suit if the injured party had the resources to pursue the litigation where the tortfeasor resides rather than where the injury occurred. Over twenty states have adopted anti-spam legislation and several courts in various states have found that spam constitutes the tort of trespass to chattel. *See* discussion *supra* Part I.A. Just **[\*\*56]** as in this case, allowing the spammer to evade personal jurisdiction in the forum where their conduct causes the greatest harm would frustrate many of these laws.

### 4. Personal jurisdiction and each Defendant.

In sum, exercising personal jurisdiction over Defendants in this case would not offend traditional notions of justice and fair play. And under the circumstances, the Court can properly exercise jurisdiction over each Defendant. Defendants Ralsky, McDonald and Additional Benefits are alleged to have been involved in a conspiracy to transmit the UBE at issue here. *See Ethanol Partners Accredited v. Wiener, Zuckerbrot, Weiss & Brecher, 635 F. Supp. 15, 18 (E.D. Pa. 1995)*("When co-conspirators have sufficient contacts with the forum, so that due process would not be violated, it is imputed against the 'foreign' co-conspirators who allege there is [sic] not sufficient contacts; co-conspirators are agents for each other.").

The allegations in the Amended Complaint and the information that surfaced on discovery, adequately tie the named Defendants to the UBE conspiracy forming the basis of establishing personal jurisdiction. Many of the spam messages originated **[\*\*57]** from addresses controlled by a Michigan based, ISP called Digital Realm, which has ties to Ralsky. Many of the UBE originated from telephone lines in Detroit, Michigan that were set up under accounts using false names from a house titled to Lia McDonald, Defendant Lance McDonald's wife. One of the domain names used for spamming was registered to Lance McDonald. Some of the Web sites advertised in the UBE were hosted by Digital Realms as well as stored on Defendant Ralsky's computer servers until December 2000. SpeedNet, another Michigan ISP that hosted Defendants' advertised sites, produced a cancelled check used by Ralsky to pay for the services bearing the name Additional Benefits. Finally, Ralsky serves as the registered agent for Defendant Additional Benefits and his home is listed as the address for service of process.

In conclusion, the Court finds that exercise of personal jurisdiction over Defendants in this case does not offend traditional notions of justice and fair play. Defendants allegedly caused a tort in Virginia by purposefully transmitting UBE to Verizon's servers located in Virginia for pecuniary gain. Defendants should have **[\*623]** reasonably expected to be haled into court **[\*\*58]** where their spam inflicted the greatest harm, and cannot avoid jurisdiction by simply pleading ignorance of the jurisdictional facts. Accordingly, Defendants motion to dismiss for lack of personal jurisdiction is denied.

### D. Venue and Motion to Transfer.

Defendants also seek to dismiss the Amended Complaint for improper venue under *28 U.S.C. § 1406*(b) and *FRCP 12(b)(3)*. In the alternative, Defendants move to transfer to the Eastern District of Michigan under *28 U.S.C. § 1404*(a) if the Court finds that venue is proper in this forum. Both motions are denied.

### 1. Venue is proper.

Verizon asserts that venue is proper pursuant to *28 U.S.C. § 1391*(b)(2). Section 1391(b)(2) provides that venue is proper in a "judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of the property that is the subject of the action is situated." Several courts have looked to the situs of the injury in a tort claim in evaluating venue under section 1391(b)(2). *See Myers v. Bennett Law Offices, 238 F.3d 1068, 1075-76 (9th Cir. 2001);* **[\*\*59]** *Bates v. C&S Adjusters, Inc., 980 F.2d 865, 867-68 (2d Cir. 1992). See also Eastern Scientific Mktg., Inc. v. Tekna-Seal, Inc., 696 F. Supp. 173, 179 (E.D. Va. 1988)* (evaluating pre-1990 version of § 1391(b) and finding that "locus of the claim" as well as availability of witnesses and evidence, are relevant factors in venue analysis).

As discussed above, a substantial portion, if not the gravamen, of Verizon's Amended Complaint concern

Case 5:07-cv-01389-RS    Document 118-3    Filed 07/19/2007    Page 17 of 18

Page 17

203 F. Supp. 2d 601, *623; 2002 U.S. Dist. LEXIS 10224, **59

millions of spam messages sent to and through Verizon's computer e-mail servers located in Virginia. Although Defendants' conduct may have originated in Michigan, under Virginia's long-arm statute Defendants' transmission of UBE to and through Verizon's Virginia computers constitutes a "use" of those servers which in turn constitutes an act within the Commonwealth. *See VA CODE § 8.01-328.1(B)*. Thus, because a substantial portion of Defendants' actions giving rise to Verizon's claims occurred in Virginia and a substantial part of the property harmed by these actions occurred in Virginia, venue is proper in this forum under *28 U.S.C. § 1391*(b)(2).

**2. Transfer of venue.**

"If it [**60] be in the interest of justice," a court may transfer a case to any district or division in which the action could have been brought. *Hohn v. United States, 524 U.S. 236, 248-49, 141 L. Ed. 2d 242, 118 S. Ct. 1969 (1998); 28 U.S.C. § 1404*(a). The decision to grant a motion for change of venue under section 1404(a) "is committed to the sound discretion of the district court." *BHP Int'l Investment Inc. v. Online Exchange, Inc., 105 F. Supp. 2d 493, 498 (E.D. Va. 2000)*. The party moving for a transfer of venue bears the burden of showing that the transfer is warranted. *Beam Laser Sys., Inc. v. Cox Communications Inc., 117 F. Supp. 2d 515, 518 (E.D. Va. 2000)*.

The factors courts should consider when determining whether to grant a motion to transfer include (1) the plaintiff's choice of venue; (2) the convenience of the parties and witnesses, (3) the cost of obtaining the attendance of witnesses, (4) the interest of having local controversies decided at home, (5) the ease of access to sources of proof, and (6) the interests of justice. *Cognitronics Imaging Sys., Inc. v. Recognition Res. Inc., 83 F. Supp. 2d 689, 696 (E.D. Va. 2000)*. [**61] A plaintiff's choice of forum is entitled to "substantial weight," unless the plaintiff chooses a foreign forum [*624] and the cause of action bears little relation to the chosen forum. *Id. at 696* (citations omitted); *Acterna, L.L.C. v. Adtech, Inc., 129 F. Supp. 2d 936, 938-39 (E.D. Va. 2001)*. It is well settled that a court should rarely disturb a plaintiff's choice of forum unless the balance of hardships clearly favor transfer in favor of the defendant. *See Nossen v. Hoy, 750 F. Supp. 740, 742 (E.D. Va. 1990); Eastern Scientific Mktg., 696 F. Supp. at 179*.

Applying these factors to the instant case, the balance weighs in favor of retaining jurisdiction in the Eastern District of Virginia. Foremost is the consideration of Verizon's selection of venue. Here, Verizon's choice holds substantial weight because its principal place of business is in Virginia and the case has substantial connections to Virginia in that the causes of action arise from injuries to Verizon's customers and computer servers in Virginia. Accordingly, Verizon's choice of venue is entitled to substantial weight and should only be disturbed if the balance [**62] strongly favors transfer.

A review of the remaining factors indicate that transfer is unwarranted. First, the convenience of the parties does not weigh in favor of transfer. Defendants' motion to transfer largely amounts to contending that it would be inconvenient for them to litigate this case in Virginia rather than their home state of Michigan. Obviously, Defendants would like to litigate this case in their native venue. But transferring the case to Michigan solely on the ground that it would be more convenient for Defendants, merely "shifts the balance of inconvenience from the defendant to the plaintiff" and is not a sufficient justification for a change in venue. *See Scheidt v. Klein, 956 F.2d 963, 966 (10th Cir. 1992)*.

In addition, the cost and convenience of the witnesses and the evidence counsel toward keeping the case in Virginia. Many of Verizon's employee-witnesses reside in Virginia. Most of the documents relevant to this matter are also located in Virginia. Finally, there is a substantial interest in having the instant controversy decided in Virginia because Verizon is a company with its principal place of business in Virginia and the Commonwealth has [**63] enacted legislation seeking to protect Virginia corporations from the type of unlawful conduct allegedly at issue in this case. In sum, Defendants' motion to transfer venue is denied.

**III. CONCLUSION**

For the foregoing reasons, it is hereby

ORDERED that Defendants' Motion to Dismiss for Lack of Personal Jurisdiction is DENIED, Defendants' Motion to Dismiss for Improper Venue is DENIED, and Defendants' Motion to Transfer Venue to the Eastern District of Michigan is DENIED.

The Clerk is directed to forward a copy of this Order to counsel.

203 F. Supp. 2d 601, *624; 2002 U.S. Dist. LEXIS 10224, **63

Entered this 7th day of June, 2002.

 Gerald Bruce Lee

 United States District Judge

Alexandria, Virginia
06/07/02

Case 5:07-cv-01389-RS     Document 118-3     Filed 07/19/2007     Page 18 of 18

203 F. Supp. 2d 601, *624; 2002 U.S. Dist. LEXIS 10224, **63