LEXSEE

**MARYCLE, LLC, ET AL. v. FIRST CHOICE INTERNET, INC., ET AL.**

**No. 2321, September Term, 2004**

**COURT OF SPECIAL APPEALS OF MARYLAND**

*166 Md. App. 481; 890 A.2d 818; 2006 Md. App. LEXIS 2*

**January 26, 2006, Filed**

**PRIOR HISTORY:** Appeal from the Circuit Court for Montgomery County. Durke G. Thompson, JUDGE.

**DISPOSITION:** [***1] JUDGMENT OF THE CIRCUIT COURT FOR MONTGOMERY COUNTY REVERSED. CASE REMANDED FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION. COSTS TO BE PAID BY APPELLEE.

**COUNSEL:** ARGUED BY: Michael S. Rothman of Rockville, MD. FOR APPELLANT.

ARGUED BY: Andrew M. Dansicker (Schulman, Treem, Kaminkow, Gilden & Ravenell, PA on the brief) all of Baltimore, MD. FOR APPELLEE

**JUDGES:** ARGUED BEFORE: Salmon, Adkins, Barbera, JJ.

**OPINION BY:** Adkins

**OPINION**

[**821] [*487] Opinion by Adkins, J.

This case requires us to consider how established law governing personal jurisdiction and the Commerce Clause applies in cyberspace. Asserting claims for both monetary and injunctive relief, appellants MaryCLE, LLC (MaryCLE) and NEIT Solutions, LLC (NEIT) filed suit against appellees First Choice Internet, Inc. and Joseph Frevola, the president of First Choice, in the Circuit Court for Montgomery County. Appellants maintained that appellees, whom we designate as "First Choice," [1] violated the Maryland Commercial Electronic [*488] Mail Act ("MCEMA"), Md. [**822] Code (1975, 2005 Repl. Vol.), *§ 14-3001 et seq. of the Commercial Law Article (CL)*, by sending them 83 unsolicited false and misleading commercial emails.

1 Although we generally refer to First Choice Internet, Inc. and its president, Frevola, collectively as "First Choice," in some contexts we shall distinguish between the corporation and the individual. Similarly, we refer to appellants collectively as "MaryCLE," but also sometimes refer to each appellant separately.

[***2] First Choice responded by filing a "Motion to Dismiss, or Alternatively, Motion for Summary Judgment," alleging that (1) MCEMA violates the "dormant Commerce Clause" of the United States Constitution, (2) the circuit court lacked personal jurisdiction over First Choice and Frevola, (3) Frevola could not be sued individually, and (4) First Choice had not violated MCEMA. After a hearing, the circuit court granted the motion to dismiss and issued a written opinion in which it ruled that (1) MCEMA violates the "dormant Commerce Clause" of the U.S. Constitution as applied in this case, (2) Maryland lacks personal jurisdiction over First Choice and Frevola, and (3) no cause of action was stated against Frevola individually. In doing so, the circuit court considered affidavits submitted by the parties. Accordingly, we treat the motion as one for summary, judgment as required by Md. Rule 2-322(c).

As discussed in detail below, we shall reverse because we conclude that personal jurisdiction over First Choice is proper and that *MCEMA* as applied in this case does not offend the Commerce Clause. We also determine that there were material disputed facts concerning the individual liability of [***3] Frevola that rendered the grant of summary judgment in his favor erroneous. *See* Md. Rule 2-501.

## FACTS AND LEGAL PROCEEDINGS

### The Parties

MaryCLE, LLC (pronounced "miracle"), an acronym for "Maryland Consumer Legal Equity," describes itself as a "consumer protection firm" that "protects con-

sumers wronged **[*489]** by online . . . marketers[.]" [2] MaryCLE was founded by Eric Menhart, who at the time of the proceedings below, was a third-year law student at the George Washington University Law School. Mary-CLE maintains a website on which it states its mission to "protect[] consumers via promotion of responsible marketing practices, mediation, and litigation." First Choice, on the other hand, describes MaryCLE as a company that

> set up Internet email accounts to receive emails from Internet marketing companies . . . and, when it received a substantial number of email solicitations, [] contacted the targeted marketing company and demanded a substantial payment as "settlement" of its statutory damages claims under MCEMA in return for MaryCLE's promise not to file a lawsuit[.]

Although MaryCLE is registered in Maryland and has a Maryland mailing address, **[***4]** which is Mr. Menhart's home address in Adelphi, Maryland, the complaint and MaryCLE's own website and letterhead list its principal place of business as Washington, D.C. One of the email addresses "registered to and used by MaryCLE" is emj at maryland-state-resident.com. [3]

> 2   On review of a motion for summary judgment, we resolve all factual inferences against appellees, as the moving parties. *See Merchants Mortgage Co. v. Lubow, 275 Md. 208, 217, 339 A.2d 664 (1975)*. This summary of facts reflects that standard.

> 3   "EJM" are Mr. Menhart's initials.

NEIT Solutions, LLC is an interactive computer service provider ("ISP") that provides internet services, including the hosting of web space and use of email addresses, to MaryCLE. NEIT is a registered Maryland limited liability company **[**823]** that is located in Frederick, Maryland, although its computer servers are located in Colorado.

First Choice is an Internet marketing company based in New York that describes its purpose as "promoting products **[***5]** for various third-party customers through 'opt-in' email mailings and promotions[.]" Joseph Frevola, who lives in New York, is the President of First Choice.

**[*490] Background**

Before the events in this case began, First Choice entered into a partnership agreement with a company called Wow Offers, LLC. [4] Wow Offers supplied First Choice with email addresses of people who had allegedly "opted-in" to Wow Offers' services. First Choice asserts that ejm at maryland-state-resident.com was registered on a website called www.idealclick.com, which in turn provided that email address to Wow Offers. First Choice engaged the services of Master Mailings, LLC, [5] to send promotional emails, including those at issue in this case, to the email addresses obtained through Wow Offers. First Choice alleges that Master Mailings is located in Virginia. [6]

> 4   Wow Offers, LLC is not a party to this action.

> 5   Master Mailings, LLC is not a party to this action.

> 6   We can find no affidavit or other support for this contention in the record.

**[***6]** MaryCLE denies signing up for any "opt-in" services through www.idealclick.com or in any other way giving the email address ejm at maryland-state-resident.com to Wow Offers or First Choice. Nevertheless, on September 18, 2003, First Choice sent an email to MaryCLE at that address. The "From" line of the email indicated that the sender was "Exceptional Deals," with an email address of promotions at firstchoiceinternet.com. The "Subject" line of the email was "Interest Rates are at a 36 Year low - Act Now."

Although the email contained an "unsubscribe" link as well as a postal mailing address to which requests to be removed from the email list could be sent, MaryCLE did not avail itself of the "unsubscribe" option. Instead, it attempted to "Reply" to the email and requested to be removed from the mailing list. The reply was returned to MaryCLE as "undeliverable." MaryCLE did not send any written communications to the postal address contained in the email. Instead, for reasons not explained in the record, MaryCLE attempted to find a street mailing address for "Exceptional Deals" through the **[*491]** United States Postal Service. The Postal Service indicated that it had no address for "Exceptional **[***7]** Deals."

MaryCLE then utilized the free "WHOIS" feature on www.networksolutions.com, a website on which any member of the public can find contact information for the registrants of domain names. [7] After entering the domain "firstchoiceinternet.com," MaryCLE obtained Mr. Frevola's name, as well as an email and mailing address for First Choice. MaryCLE attempted to contact First Choice using this **[**824]** email address, but this email was also returned as "undeliverable." MaryCLE did not attempt to contact First Choice by postal mail at this point.

7    A "domain name" is the "address of a computer network connection . . . that identifies the owner of the address," or ISP, such as "verizon.net" or "hotmail.com." *See* The American Heritage Dictionary of the English Language, 4th ed.    2000, http://www.bartleby.com/61/18/D0331850.html (last visited Jan. 13, 2005). *See also Verizon Online Servs., Inc. v. Ralsky, 203 F. Supp. 2d 601, 605 (E.D. Va. 2002)*("Subscribers use the ISP's domain name, . . . together with their own personal identifier to form a distinctive e-mail mailing address").

**[***8]**  By September 30, 2003, MaryCLE had received an additional 23 emails from First Choice. MaryCLE maintains that it replied to each email with a request to be removed from the mailing list, but each time the reply was returned as "undeliverable."

MaryCLE next visited the First Choice website, www.firstchoiceinternet.com. On this site, MaryCLE found a working email address and phone number. MaryCLE sent an email to the email address, joe at firstchoiceinternet.com, [8] and left a voice mail at the phone number to inform First Choice that it did not wish to receive further emails. This email was not returned as undeliverable, which led MaryCLE to conclude that an email had finally been received by First Choice. MaryCLE's phone message was not returned.

8    We assume this to be the email address of Mr. Frevola.

Despite these efforts, MaryCLE continued to receive 59 additional emails throughout the month of October, at a rate **[*492]** of approximately two per day. MaryCLE maintains that all 83 of the emails it received were **[***9]** opened in either Maryland or Washington, D.C. Examples of subject lines from these emails include "Urgent: Claim Now or Forfeit" and "Confirmation # 87717." MaryCLE asserts that it replied to every email, and each time its reply bounced back as "undeliverable." At no time, however, did MaryCLE click on the "unsubscribe" link located within the emails or send any written requests via postal mail to be removed from the mailing list. MaryCLE explains that it did not do so because "'unsubscribe' links are notoriously unreliable, and have been recognized by many to be a method via which marketers collect 'live' e-mail addresses to be resold to other marketers."

On October 28, 2003, MaryCLE sent a second email to joe at firstchoiceinternet.com, and for the first time followed up with a letter sent via postal mail to Frevola. The letter was entitled "Notification of Violation of Maryland Law." [9] On October 29, 2003, the emails to

MaryCLE ceased. On November 10, 2003, Mr. Frevola sent MaryCLE a letter in which he stated that MaryCLE's email address had been removed from First Choice's mailing list and that First Choice had ceased *all* of its mailings indefinitely.

9    This letter is not contained in the record.

## [***10] Court Proceedings

On December 31, 2003, MaryCLE and NEIT filed suit against First Choice and Frevola in the Circuit Court for Montgomery County. They alleged two counts for statutory damages under the Maryland Commercial Electronic Mail Act, and one count for injunctive relief. Before filing an answer, First Choice and Frevola filed a "Motion to Dismiss or, Alternatively, Motion for Summary Judgment," and MaryCLE filed a response. *See* Md. Rule 2-322(a). A hearing was held on October 13, 2004, and on December 9, 2004, the circuit court entered an order granting the motion to dismiss.

**[*493]**  Relying on the Maryland long arm statute, the circuit court determined that First Choice had not caused tortious injury in Maryland. Nor had it "regularly conducted business, engaged in persistent conduct or derived revenues from Maryland." *See* Md. Code (1974, 2002 Repl. Vol. 2005 Cum. Supp.), *§ 6-103(b)(3)-(4) of the Courts and Judicial Proceedings Article* **[**825]** (CJP). [10] The circuit court also declared that the exercise of personal jurisdiction over First Choice would violate its right to due process, because First Choice "did not intentionally direct their emails to the Plaintiffs in Maryland **[***11]** because the Defendants did not even know, and had no ability to know, where the Plaintiffs would actually open the email." The court explained that the geographic options were limitless.

The email addresses of MaryCLE are connected to a computer registered in Virginia, MaryCLE's principal place of business is in Washington, D.C. and MaryCLE is a registered Maryland corporation. The Defendants had no way of knowing whether MaryCLE would receive its email in Virginia, D.C., Maryland, or any other state for that matter. Thus, the Defendants did not "purposely" direct their emails to Maryland residents.

10    In 2000, the General Assembly added *subsection (c) to Md. Code (1975, 2005 Repl. Vol.), section 6-103 of the Commercial Law Article*

166 Md. App. 481, *; 890 A.2d 818, **;
2006 Md. App. LEXIS 2, ***

*(CL)*, which states that its provisions apply to "computer information and computer programs in the same manner as they apply to goods and services." "Computer information" is defined in *CL section 22-102* as "information in electronic form which is in a form capable of being processed by a computer."

**[\*\*\*12]** In considering the constitutionality of MCEMA, the circuit court explained that, "on its face, [the] language [of MCEMA] does not discriminate against residents from other states." It determined, however, that, "when the language **is applied to the case at bar** it does violate the dormant Commerce Clause because the law crosses state boundaries to reach persons who open their email in other states." *Id.* (emphasis added). The court reasoned that First Choice "had no contact with the State of Maryland because their emails were sent from New York, routed through Virginia and Colorado, **[\*494]** and finally were received in Washington, D.C." It explained that MCEMA violates the Commerce Clause because it regulates conduct occurring wholly outside Maryland borders.

> The statute does not provide that the email must be received in Maryland, instead the statute pertains to situations where an email sender in one state[] sends an email to a Maryland resident living or working in another state. Thus, the statute, *as applied in this case,* seeks to regulate the transmission of commercial email between persons in states outside of Maryland, even when the email never enters Maryland, **[\*\*\*13]** as long as the recipient is a Maryland resident. (Emphasis added.)

The circuit court finally ruled that Frevola had no personal liability for the alleged MCEMA violations. It reasoned that, under Maryland law, an officer of a corporation can only be held personally liable for a tort if he "specifically directed the particular act to be done or participated or co-operated therein." *Shipley v. Perlberg, 140 Md. App. 257, 265-66, 780 A.2d 396, cert. denied, 367 Md. 90, 785 A.2d 1293 (2001).* The court decided, as a matter of law, that Mr. Frevola "did not specifically direct First Choice to send an email to MaryCLE or to any Maryland residents."

**QUESTIONS PRESENTED**

MaryCLE poses three questions for our review:

I. Did the circuit court err when it determined that Maryland lacks personal jurisdiction over First Choice and Frevola?

II. Did the circuit court err when it determined that, as applied in this case, the Maryland Commercial **[\*\*826]** Electronic Mail Act violates the *Commerce Clause of the U.S. Constitution*? [11]

**[\*495]** III. Did the circuit court err when it determined that Mr. Frevola could not be held personally liable for the statutory **[\*\*\*14]** violations alleged by MaryCLE? [12]

Because we conclude that jurisdiction is proper and that this application of MCEMA does not offend the Commerce Clause, we will reverse the grant of summary judgment in favor of First Choice. We also reverse the circuit court's order granting summary judgment in favor of Frevola.

11   The circuit court decided the constitutional issue first, and then addressed jurisdiction "to further substantiate" its ruling. We will address the jurisdictional question first, for if we have no jurisdiction, then the constitutional issue is not properly before us. *See, e.g., Curran v. Price, 334 Md. 149, 171, 638 A.2d 93 (1994)* ("If a decision on a constitutional question is not necessary for proper disposition of the case, we will not reach it").

12   MaryCLE framed the issues in a different manner:

> I. Whether the trial court erred, as a matter of law, when it granted Appellees' Motion to Dismiss and found the MCEMA violative of the dormant Commerce Clause because it regulated conduct occurring wholly outside of Maryland and unduly burdened interstate commerce, even though the MCEMA applied by its very terms only to entities who send spam to Maryland residents.

> II. Whether the trial court erred, as a matter of law, when it held that Maryland could not exercise personal jurisdiction over Appellees because they did not purposefully direct their electronic

mail to Maryland residents, despite the fact that the Complaint clearly stated the facts essential to the exercise of jurisdiction and the court made its own independent, unsupported findings of fact regarding Appellees' connections to Maryland without allowing jurisdictional discovery.

III. Whether the trial court erred, as a matter of law, when it held that Appellee Frevola could not be held personally liable for fraudulent and misleading email sent to Petitioners although the Complaint clearly stated Frevola's personal involvement in sending the spam and the court was required to assume the truth of all well-pleaded facts contained in the complaint, as well as the logical inferences that flow from those allegations.

**[***15] DISCUSSION**

**Standard Of Review**

Whether the circuit court erred in granting summary judgment in favor of First Choice and Frevola is a question of law that we review on the same record as the motion court, to determine if its decision was legally correct. *See Heat & Power Corp. v. Air Prods. & Chems., Inc., 320 Md. 584, 591,* **[*496]** *578 A.2d 1202 (1990).* Summary judgment is proper where there is no dispute as to any material fact and the moving party is entitled to judgment as a matter of law. *See* Md. Rule 2-501.

**The Maryland Commercial Electronic Mail Act**

The Maryland Commercial Electronic Mail Act ("MCEMA," or "the Act") was passed by the Maryland General Assembly in 2002, and became effective October 1 of that year. [13] *See CL § 14-3001 et seq.* The Court of Appeals has recognized that **[**827]** this statute was passed "to curb the dissemination of false or misleading information through unsolicited, commercial e-mail, as a deceptive business practice." *Beyond Sys., Inc. v. Real-time Gaming Holding Co., LLC, 388 Md. 1, 16, 878 A.2d 567 (2005).* At the time of its enactment, 21 other states had enacted laws **[***16]** to curb the proliferation of "spam" [14] email, or "UCE" (unsolicited commercial email). [15] *See id.* "Spam is **[*497]** the twenty first century version of junkmail and over the last few years has

quickly become one of the most popular forms of advertising over the Internet, as well as one of the most bothersome." *Verizon Online Servs., Inc. v. Ralsky, 203 F. Supp. 2d 601, 606 (E.D. Va. 2002).*

13 Federal legislation to control the proliferation of unwanted email also exists. In 2003, Congress passed the "Controlling the Assault of Non-Solicited Pornography and Marketing Act of 2003" ("CAN-SPAM Act"), which became effective January 1, 2004. *See 15 U.S.C. § 7701 et seq.* This law expressly supercedes all state regulation of email "except to the extent that any such statute, regulation, or rule prohibits falsity or deception in any portion of a commercial electronic mail message or information attached thereto." *15 U.S.C. § 7707(b)(1).*

The circuit court determined that because the federal law specifically reserves to states the right to control fraudulent and deceptive emails, which the Maryland statute does, the analysis in this case should focus on MCEMA. Neither party disputes this approach, and thus we also focus on the Maryland Act.

**[***17]**

14 The term "spam" originates from a skit by the British comedy troupe Monty Python, in which a group of Vikings, singing about the Hormel Foods meat product SPAM, "sang a chorus of 'spam, spam, spam . . . ' in an increasing crescendo, drowning out other conversation. Hence, the analogy applied because [spam email] was drowning out normal discourse on the Internet." Spam and the Internet, http://www.spam.com/ci/ci_in.htm (last visited Jan. 16, 2006). *See also Beyond Sys., Inc. v. Real-time Gaming Holding Co., LLC, 388 Md. 1, 16 n.12, 878 A.2d 567 (2005)*(spam can be either commercial or noncommercial).

15 Because not all spam is UCE, and because MCEMA only regulates UCE, we will be cautious in our use of these terms throughout this opinion.

MCEMA provides that a person may not "initiate," "conspire to," or "assist in" the "transmission of commercial electronic mail" either **from** a computer within Maryland or **to** an email address "that the sender knows or should have known is held by a resident of" Maryland, if the mail "contains false or misleading information" **[***18]** about either the origin or transmission path of the email, *see CL § 14-3002(b)(2)(ii),* [16] or "in the subject line" of the email, *see § 14-3002(b)(2)(iii).* "Commercial electronic mail" is defined as "electronic mail that adver-

tises real property, goods, or services for sale or lease." *§ 14-3001(b)(1)*.

> 16  In this section, unless otherwise noted, all citations to statutory sections refer to the Commercial Law Article.

The Act contains a presumption that the sender of UCE knows the recipient is a Maryland resident "if the information is available on request from the registrant of the Internet domain name contained in the recipient's electronic mail address." *§ 14-3002(c)*. The statutory damages allowed by the Act are the greater of $ 500 or actual damages to the recipient of the email, and the greater of $ 1000 or actual damages to the ISP. *See § 14-3003(1) and (3)*. The Act also provides for the recovery of reasonable attorneys' fees. *See § 14-3003*.

**[***19] I.**

**Personal Jurisdiction**

**A.**

**Constitutional Framework**

The question of whether a Maryland court can exercise personal jurisdiction over an out-of-state defendant starts with a two-part inquiry. *See Beyond Sys., 338 Md. at 14*. "First, we consider whether the exercise of jurisdiction **[*498]** is authorized under Maryland's long arm statute," which is *CJP section 6-103*. *Id.* "Our second task is to determine whether the exercise of jurisdiction comports with due process requirements of the *Fourteenth Amendment*" of the Federal Constitution. *Id. at 15*. With respect to this two-part test, Maryland **[**828]** courts "have consistently held that the purview of the long arm statute is coextensive with the limits of personal jurisdiction set by the *due process clause of the Federal Constitution*." *Id.* Thus, "our statutory inquiry merges with our constitutional examination." *Id. at 22*.

In order to pass constitutional muster under the *Due Process Clause*, the defendant must have "minimum contacts" with Maryland such that our exercise of jurisdiction "does not offend 'traditional notions of fair play and substantial **[***20]** justice.'" *Int'l Shoe Co. v. Washington, 326 U.S. 310, 316, 66 S. Ct. 154, 158, 90 L. Ed. 95 (1945)*(citation omitted). "It is essential in each case that there be some act by which the defendant purposefully avails itself of the privilege of conducting activities" within Maryland. *Hanson v. Denckla, 357 U.S. 235, 253, 78 S. Ct. 1228, 1240, 2 L. Ed. 2d 1283 (1958)*. While the "nature" of the defendant's contacts with Maryland are important, *Helicopteros Nacionales de Colombia, S.A. v. Hall, 466 U.S. 408, 416-17, 104 S. Ct. 1868, 1872-73, 80 L. Ed. 2d 404 (1984)*, we must additionally consider "the

relationship among the defendant, the forum, and the litigation," *Shaffer v. Heitner, 433 U.S. 186, 204, 97 S. Ct. 2569, 2580, 53 L. Ed. 2d 683 (1977)*, to determine whether the defendant "should reasonably anticipate being haled into court" in Maryland. *World-Wide Volkswagen Corp. v. Woodson, 444 U.S. 286, 297, 100 S. Ct. 559, 567, 62 L. Ed. 2d 490 (1980)*.

Generally, there are two types of jurisdiction: "specific" and "general." [17] "If the defendant's contacts with [Maryland also] form the basis for the **[***21]** suit," then Maryland courts have specific jurisdiction. *Beyond Systems, 388 Md. at 26*. **[*499]** "If the defendant's contacts . . . are not the basis for the suit," then the defendant must have "continuous and systematic" contacts with Maryland such that we may exercise general jurisdiction. *Id. at 22* (citations omitted).

> 17  The Court of Appeals has explained that sometimes cases do not fit "neatly" into one category or the other. *See Camelback Ski Corp. v. Behning, 312 Md. 330, 338-39, 539 A.2d 1107, cert. denied, 488 U.S. 849, 109 S. Ct. 130, 102 L. Ed. 2d 103 (1988)("Camelback II")*. If this is the case, then

>> there is no need to jettison the concept, or to force-fit the case. In that instance, the proper approach is to identify the approximate position of the case on the continuum that exists between the two extremes, and apply the corresponding standard, recognizing that the quantum of required contacts increases as the nexus between the contacts and the cause of action decreases.

> *Id. at 339*.

**[***22]** Because First Choice's email contacts with Maryland also form the basis of this suit, our analysis will be focused on whether Maryland can exercise specific jurisdiction over First Choice. [18] The Court of Appeals has adopted the Fourth Circuit's three-part test for determining whether specific jurisdiction exists:

> In determining whether specific jurisdiction exists, we consider (1) the extent to which the defendant has purposefully availed itself of the privilege of conducting activities in the State; (2) whether the plaintiffs' claims arise out of those activities directed at the State; and (3) whether

166 Md. App. 481, *; 890 A.2d 818, **;
2006 Md. App. LEXIS 2, ***

the exercise of personal jurisdiction would
be constitutionally reasonable.

*Id. at 26* (citing *Carefirst of Md., Inc. v. Carefirst Pregnancy Ctrs., Inc., 334 F.3d 390, 397 (4th Cir. 2003)).* We **[**829]** will discuss each prong of this test, and its application to First Choice, in the sections that follow.

> 18   Neither party specifically addresses the type of jurisdiction that would or would not be appropriate here, although MaryCLE's argument more closely resembles one for specific jurisdiction.

**[***23] B.**

**The Parties' Contentions**

MaryCLE's argument in favor of personal jurisdiction boils down to the allegation that "sending 'hundreds of thousands' **[*500]** of commercial email messages would lead any rational marketer to believe that his messages would be received and read by residents in most any state in the nation." MaryCLE analogizes First Choice's email contacts with Maryland residents to "traditional mail, telephone calls, or even advertisements placed in a newspaper," which it contends Maryland courts have found to be sufficient contacts to meet jurisdictional requirements. MaryCLE further points out that, under the terms of MCEMA, the sender of a commercial email is presumed to know that the recipient of the email is a resident of Maryland if the information about the holder of the email account is available upon request from the domain name registrant. *See CL § 14-3002(c).* Referring to free searches available on websites such as www.networksolutions.com, MaryCLE explains that the domain name registry for "maryland-state-resident.com" contains a Maryland address.

First Choice, on the other hand, maintains in its brief that there is **[***24]** no way of knowing where the owner of an email address resides or where he might open up his email. It argues that the fact that it could have found out that "maryland-state-resident.com" was registered in Maryland does not mean that it "knew that the emails would be *received* in Maryland[.]" At oral argument, First Choice conceded that it knew some emails would be opened in Maryland, but insisted that, because its emails were being distributed across the country, it was not **purposefully** availing itself of any particular jurisdiction.

**C.**

**Jurisdiction Over First Choice Is Proper In Maryland**

This case amply demonstrates that "each new development in communications technology brings new challenges to applying the principles of personal jurisdiction." *Verizon Online, 203 F. Supp. 2d 601, 604 (E.D. Va. 2002). See also McGee v. Int'l Life Ins. Co., 355 U.S. 220, 222-23, 78 S. Ct. 199, 201, 2 L. Ed. 2d 223 (1957)*(recognizing that advances in communications **[*501]** and technology have expanded the "permissible scope of personal jurisdiction"); *Hanson, 357 U.S. at 250-51, 78 S. Ct. at 1238* ("As technological progress has increased **[***25]** the flow of commerce between States, the need for jurisdiction over nonresidents has undergone a similar increase"); *World-Wide Volkswagen, 444 U.S. at 293, 100 S. Ct. at 565* (observing that, since *McGee,* "historical developments" have further relaxed the limits of due process).

Maryland state appellate courts have not had many opportunities to consider the application of personal jurisdiction law to cases concerning email and the Internet. *Beyond Systems* involves both, but is quite unlike this case. [19] Indeed, at oral argument, **[**830]** each party acknowledged that, because of the factual differences, *Beyond Systems* did not advance its arguments here. In the absence of an analogous email case, we will apply the three-part test adopted in *Beyond Systems,* [20] *see 338 Md. at 26,* using three cases decided by other courts to help shape our reasoning.

> 19   In *Beyond Systems,* the Court of Appeals affirmed the Circuit Court for Montgomery County's dismissal of an MCEMA-based lawsuit on the grounds that the defendants did not have sufficient minimum contacts with Maryland. *Beyond Systems, 388 Md. at 28.* Unlike First Choice, the defendants in *Beyond Systems* did not direct the sending of the allegedly MCEMA-violative emails, and the connection between the sender of the email and the defendants was distant and tenuous. These contacts are markedly more attenuated than those in this case, and thus *Beyond Systems* is not particularly instructive, beyond its statement of the general principles.

**[***26]**
> 20   The circuit court relied on a more specific personal jurisdiction test for cases involving the Internet, articulated by the Fourth Circuit in *ALS Scan, Inc. v. Digital Serv. Consultants, Inc., 293 F.3d 707 (4th Cir. 2002).* Under this test,
>
> > a State may, consistent with due process, exercise judicial power over a person outside of the State when that person (1) directs electronic activity into the State, (2) with the manifested intent of en-

gaging in business or other inter-
actions within the State, and (3)
that activity creates, in a person
within the State, a potential cause
of action cognizable in the State's
courts.

*Id. at 715.*

We conclude that the result is the same no
matter which of these tests is applied.

[*502] **1.**

**The Reasoning Of Three Other Courts**

In a case in which the defendant corporation sent
**one** commercial email to the plaintiff, a Utah resident,
the Court of Appeals of Utah decided that the one email
was sufficient to warrant the exercise of personal juris-
diction in a cause of action for violation of Utah's com-
mercial [***27] email statute. *See Fenn v. MLeads En-
ters., Inc., 2004 UT App 412, 103 P.3d 156, 164 (Utah
Ct. App. 2004), cert. granted 109 P.3d 804 (Utah 2005).*
The Utah court, considering that the Utah long arm stat-
ute (like Maryland's) extends as far as the limits of due
process, found that the defendant "directed its agent [a
marketing company] to solicit business, and that direc-
tion instantiates the purpose that makes the connection
more than an 'attenuated nexus.'" *Id. at 162* (citation
omitted). The court further determined that, even though
the sender of the email did not know where geographi-
cally the email was opened, it was reasonable for the
defendant to expect to be haled into court "wherever its
emails were received." *Id.* Finally, the court concluded
that Utah has an interest in "preventing its residents from
receiving noncompliant email" and that this interest,
among others, outweighed the burden placed on the out-
of-state defendant. *See id. at 163-64.*

The U.S. District Court for the Southern District of
Mississippi reached a similar conclusion in a case in
which the defendant sent an unsolicited email to people
"all over the world, including [***28] Mississippi resi-
dents, advertising a pornographic web-site." *See **Internet
Doorway, Inc. v. Parks, 138 F. Supp. 2d 773, 774 (S.D.
Miss. 2001)**.* The defendant altered the email so that it
appeared to have been delivered from an email address
held by the plaintiff corporation. *See id.* The corporation
complained that the emails caused it to suffer damages in
the form of losing goodwill in the community and ex-
pending time and resources in responding to the com-
plaints of people who received the offensive email. Ap-
plying the Mississippi long arm statute, which is similar
to Maryland's, the court determined:

[*503] When [the defendant] allegedly
transmitted the e-mail to a recipient or re-
cipients in Mississippi, it was an attempt
to solicit business for a particular web-
site. Thus, [the defendant] committed a
purposeful act that occurred in Missis-
sippi, just as if she had sent via United
States Mail a letter to a Mississippi resi-
dent [**831] advertising a particular
product or service.

*Id. at 776.*

The federal court went on to explain that, in sending
emails all over the world, the defendant "had to have
been aware that the e-mail would be received [***29]
and opened in numerous fora, including Mississippi." *Id.
at 779.* Thus, it was fair for Mississippi to exercise per-
sonal jurisdiction.

By sending an e-mail solicitation to the
far reaches of the earth for pecuniary gain,
one does so at her own peril, and cannot
then claim that it is not reasonably fore-
seeable that she will be haled into court in
a distant jurisdiction to answer for the
ramifications of that solicitation.

*Id. at 779-80.*

The U.S. District Court for the Eastern District of
Virginia has also decided that email solicitations can
constitute the basis for the exercise of personal jurisdic-
tion. *See Verizon Online Servs. Inc. v. Ralsky, 203 F.
Supp. 2d 601, 622-23 (E.D. Va. 2001).* In *Verizon
Online,* the court considered the defendants' argument
that they had not purposefully availed themselves of the
laws of Virginia because they did not know, or have any
way of knowing, that they were sending commercial
emails to Virginia residents or through a server located in
Virginia. *See id. at 612.* In a carefully reasoned opinion,
the court found that the emails were "knowing and re-
peated commercial [***30] transmissions" that the de-
fendants knew would be routed through Verizon's servers
in Virginia because the defendants sent their emails to
Verizon-based domain names. *See id. at 617-18* (cita-
tions omitted).

When the defendants compared their emails to the
placement of an item in the stream of commerce, which a
plurality of the Supreme Court has rejected as the sole
basis for the [*504] exercise of jurisdiction, *see Asahi
Metal Indus. Co. v. Superior Court of Cal., 480 U.S. 102,
112, 107 S. Ct. 1026, 1032, 94 L. Ed. 2d 92 (1987),* the
federal court rejected the argument. In its view, "defen-

dants' conduct and connections to Virginia were of their own choosing, not someone else's . . . They cannot seek to escape answering for these actions by simply pleading ignorance as to where the servers were physically located." *Id. at 620.* The court further concluded that, considering Virginia's interests in adjudicating the claim, which was filed by a Virginia corporation under a Virginia statute governing email use, jurisdiction was constitutionally reasonable. *See id. at 621-22.*

We find the reasoning of these three cases instructive, and rely on them in performing **[***31]** our analysis under the three-part inquiry adopted by the Court of Appeals in *Beyond Systems.* [21]

> 21    We have found that other cases in which emails have not served as a sufficient basis for personal jurisdiction are easily distinguishable from this case and therefore not instructive. *See, e.g., Burleson v. Toback,* 391 F. Supp. 2d 401, 421-22 (M.D.N.C. 2005)(email from defendant to plaintiff insufficient for personal jurisdiction where plaintiff had not shown relationship between email and claim asserted, or that email created the cause of action); *Bible & Gospel Trust v. Wyman,* 354 F. Supp. 2d 1025, 1031 (D. Minn. 2005)(email not authorized by out-of-state defendant but received by him and forwarded to Minnesota resident was not sufficient contact for exercise of jurisdiction); *Hydro Eng'g, Inc. v. Landa, Inc.,* 231 F. Supp. 2d 1130, 1135-36 (D. Utah 2002)(in a libel suit, there was no proof that emails were received in Utah to constitute "publication" in Utah, so exercise of jurisdiction was improper); *Reliance Nat'l Indem. Co. v. Pinnacle Cas. Assurance Corp.,* 160 F. Supp. 2d 1327, 1333 (M.D. Ala. 2001)(emails not sent to Alabama residents but forwarded to them were insufficient for exercise of jurisdiction).

**[***32] [**832] 2.**

## Claim Arising Out Of Forum Activities

We begin with the second factor, as it is the simplest. "If a defendant's contacts with the forum state are related to the operative facts of the controversy, then an action will be deemed to have arisen from those contacts." *Compuserve, Inc. v. Patterson,* 89 F.3d 1257, 1267 (6th Cir. 1996). Here, the "connection to [Maryland] is the claim **[*505]** itself - the transmission of [email] to Maryland residents." *Verizon Online,* 203 F. Supp. 2d at 620. MaryCLE's claims are based upon First Choice's action in sending emails to MaryCLE in Maryland. Thus, First Choice's alleged contacts with Maryland are related to the "operative facts" of this case. In other words, "but for [First Choice's] alleged transmission of

this spam," MaryCLE and NEIT "would not have suffered an injury." *Id. at 621.* This requirement for personal jurisdiction is therefore met.

**3.**

## Purposeful Availment

We next address the first factor, purposeful availment. The Supreme Court has emphasized that the "quality and nature" of the defendant's contacts are critical to the question of purposeful availment. *Hanson,* 357 U.S. at 253, 78 S. Ct. at 1240. **[***33]** Looking to the quality and nature of First Choice's contacts, we observe that First Choice admits that it sent "hundreds of thousands" of email advertisements to recipients all over the country.

First Choice contends that, although it sent emails everywhere, it did not purposefully avail itself of "the privilege of conducting business in Maryland." We disagree. This argument resembles the one made in *World-Wide Volkswagen,* 444 U.S. at 295, 100 S. Ct. at 566, that "foreseeability" that a product would cause injury in another state was insufficient for jurisdiction. In *World-Wide Volkswagen,* the Supreme Court did conclude that "mere" "foreseeability" that a product (in that case, an automobile), would "find its way into the forum State" was not enough **on its own** to exercise jurisdiction. *See id., 444 U.S. at 297, 100 S. Ct. at 567.* It cautioned, however, that jurisdiction could be proper when "the defendant's conduct and connection with the forum State" rendered it foreseeable that he might be expected to answer for his actions in that State. [22] *See id.*

> 22    Several years later, a plurality of the Supreme Court clarified the meaning of *World-Wide Volkswagen. See Asahi Metal Indus. Co. v. Superior Ct. of Cal.,* 480 U.S. 102, 112, 107 S. Ct. 1026, 1032, 94 L. Ed. 2d 92 (1987). The plurality rejected cases decided after *World-Wide Volkswagen* that interpreted it to mean that jurisdiction could be founded on the foreseeability that a product would enter other states because of its placement in the stream of commerce. *See id., 480 U.S. at 111, 107 S. Ct. at 1032.* The plurality determined that, because the exercise of jurisdiction requires that the defendant have purposefully directed some action towards the forum, "the placement of a product into the stream of commerce, **without more,** is not an act of the defendant purposefully directed toward the forum State." *Id., 480 U.S. at 112, 107 S. Ct. at 1032.* The plurality did advise, however, that jurisdiction could be justified if "additional conduct of the defendant [] indicates an intent or purpose to serve the market in the forum State, for example .

166 Md. App. 481, *; 890 A.2d 818, **;
2006 Md. App. LEXIS 2, ***

. . **advertising** in the forum State, . . . or **marketing** the product through a distributor[.]" *Id.*

Four justices disagreed and joined in the opinion of Justice Brennan, who wrote separately to explain their belief that *World-Wide Volkswagen* does in fact stand for the proposition that foreseeability that a product would enter another state through the stream of commerce **is, by itself, enough** for jurisdiction. *See id. at 116-21* (Brennan, J., concurring in part and concurring in the judgment). Justice Brennan reasoned that

> the stream of commerce refers not to unpredictable currents or eddies, but to the regular and anticipated flow of products from manufacture to distribution to retail sale. As long as a participant in this process is aware that the final product is being marketed in the forum State, the possibility of a lawsuit there cannot come as a surprise.

*Id., 480 U.S. at 117, 107 S. Ct. at 1034* (concurring opinion).

[***34] [*506] [**833] First Choice's emails did not merely "find [their] way" into Maryland the way a car, sold in one state by the defendant, might find its way to another because the **plaintiff** drove it into another state. *See id.* Rather, First Choice **directly** caused the emails to be sent to Maryland, among other states. It is thus reasonable for First Choice to expect to answer for those emails in Maryland, or any other state to which they were sent. *See Fenn, 103 P.3d at 162*; **Internet Doorway, 138 F. Supp. 2d at 776**.

The Court of Appeals has explained that there is a difference between a merchant who purposefully "sends a product" into another jurisdiction and one that simply receives business from another state. In *Camelback Ski Corp. v. Behning, 312 Md. 330, 340-41, 539 A.2d 1107, cert. denied, 488 U.S. 849, 109* [*507] *S. Ct. 130, 102 L. Ed. 2d 103 (1988)("Camelback II"),* the Court elaborated:

> [A] significant difference exists between regularly placing goods into a stream of commerce with knowledge they will be sold in another state on the one hand, and knowingly accepting the economic benefits brought by [***35] interstate customers on the other hand. Ordinarily, one who **purposefully sends a product into**

another jurisdiction for purposes of sale may reasonably expect to be haled into court in that State if the product proves to be defective and causes injury there. In addition to having caused a direct injury within the forum State, **that manufacturer or distributor has purposefully availed himself of the laws of the forum State that regulate and facilitate such commercial activity.** The same cannot be said of the fixed-site merchant who is simply aware that a portion of his income regularly is derived from the patronage of customers coming from other states . . . Although he may cause an indirect impact on the forum State by injuring one of its residents, he causes no direct injury in the State, and does not avail himself of the protection or assistance of its laws. (Emphasis added.)

The Court in *Camelback II* concluded that jurisdiction was not proper. *See id. at 343.* The defendant in *Camelback II,* however, was a "fixed-site" ski resort whose limited contacts with Maryland included mailing brochures to Maryland ski shops **upon the request of the Maryland** [***36] **shops.** [23] *See id. at 341.* [**834] In contrast, First [*508] Choice **reached out** to other jurisdictions, including Maryland, by sending their uninvited advertisements there. [24]

23    Camelback's other "involvement" with Maryland included awareness that

> others, for their own economic purposes, were publicizing the Camelback resort within the Washington and Baltimore metropolitan areas; that wire services routinely carried information concerning snow conditions on its slopes and that this information was reproduced in Maryland newspapers; that Maryland residents could, and probably were, using a toll-free telephone number to obtain information concerning snow conditions at the resort[.]

*Camelback II, 312 Md. at 341.* None of this "involvement" constitutes attempts by the resort itself to reach out to Maryland residents. Indeed,

the *Camelback II* Court indicated that Camelback rejected Maryland as a target for its business:

> Camelback did not devote its energy or financial resources to the marketing of Maryland. It allocated no part of its advertising budget to Maryland, and following one very brief and unsuccessful attempt to solicit business in this State in 1982, it abandoned any attempt to include Maryland in its primary marketing area, or to conduct any active solicitation here.

*Id.*
[***37]

24    Although First Choice alleges that MaryCLE "opted-in" to its mailings, at this juncture we must view the parties' contentions in the light most favorable to MaryCLE as the non-moving party. *See Faya v. Almaraz, 329 Md. 435, 443, 620 A.2d 327 (1993)*. MaryCLE pleaded that it never submitted its email address to www.idealclick.com or First Choice.

Additionally, unlike *Camelback II* and *World-Wide Volkswagen*, **the emails themselves were the product**. First Choice made its money by the very act of identifying email account holders nationwide, and transmitting emails from one state to residents of other states, including Maryland. Without the information identifying email addresses and transmittal to those addresses, First Choice **had no product.** In contrast, Camelback's product was a ski resort located in Pennsylvania, and World-Wide Volkswagen's product was a car sold to a New York customer in New York, and driven **by the customer** to Oklahoma, the forum in which the plaintiff tried to sue for injuries allegedly caused by a defect in the car.

We also reject [***38]  First Choice's claim that jurisdiction is not proper because, even if it knew where the recipients **reside**, it had no idea where the emails would **be opened**. This allegation has little more validity than one who contends he is not guilty of homicide when he shoots a rifle into a crowd of people without picking a specific target, and someone dies. *See Digital Equip. Corp. v. AltaVista Tech., Inc., 960 F. Supp. 456, 469 n.27 (D. Mass. 1997)*(likening the sending of advertisements via the Internet to a gunman "repeatedly firing a shotgun into a crowd across the state line, not aiming at anyone in particular, but knowing nonetheless that harm in [*509] the forum state may be caused by its actions outside it"). *Cf.* Charles E. Moylan, Jr., *Criminal Homicide Law* § 3.25 (MICPEL 2002)("Where a wide-ranging

lethal attack is unleashed, even though its primary intended target is a single person in the killing zone or target area, there may be a murderous *mens rea* with respect to all persons who are also coincidentally in the line of fire. . . . There is a concurrent murderous intent directed towards all who are in harm's way").

In *Digital Equipment,* a trademark [***39]  infringement case, the federal court reasoned that jurisdiction was proper because,

> **where the case involves torts that create causes of action in a forum state . . . the threshold of purposeful availment is lower.** The defendant allegedly causing harm in a state may understandably have sought no privileges there; instead **the defendant's purpose may be said to be the targeting of the forum state and its residents.**

*Digital Equip., 960 F. Supp. at 469* (emphasis added). First Choice's purpose in sending commercial emails was likewise the targeting of its email recipients, who included Maryland residents.

==In sum, First Choice cannot plead lack of purposeful availment because the "nature" of the Internet does not allow it to know the geographic location of its email recipients.== *See Verizon Online, 203 F. Supp. 2d at 620.* Rather, when considering the "nature" of First Choice's contacts, our focus should be on the fact that the emails are communications specifically and deliberately designed to convince the recipients to engage the services of First Choice and to promote the products of its [**835] customers. ==Although First Choice did not [***40] deliberately select Maryland or any other state in particular as its target, it knew that the solicitation would go to Maryland residents. Its broad solicitation of business "instantiates the purpose that makes the connection more than an 'attenuated nexus,'" and thus it should be subject to jurisdiction "wherever its emails were received."== *Fenn, 103 P.3d at 162* (citations omitted).

[*510] **4.**

## Constitutional Reasonableness

We also conclude that the exercise of jurisdiction over First Choice would be constitutionally reasonable. To determine what is reasonable, we look to several factors:

> the forum State's interest in adjudicating the dispute, the plaintiff's interest in obtaining convenient and effective relief . . .,

166 Md. App. 481, *; 890 A.2d 818, **;
2006 Md. App. LEXIS 2, ***

the interstate judicial system's interest in obtaining the most efficient resolution of controversies[,] and the shared interest of the several States in furthering fundamental substantive social policies.

*World-Wide Volkswagen, 444 U.S. at 292, 100 S. Ct. at 564* (citations omitted). The Supreme Court has asserted that, once purposeful availment has been established, a defendant must make a "compelling case" that [***41] it is unreasonable or unfair to require it to defend a suit out of State. *Burger King Corp. v. Rudzewicz, 471 U.S. 462, 477, 105 S. Ct. 2174, 2184-85, 85 L. Ed. 2d 528 (1985).*

First Choice contends that the burden on it to comply with MCEMA is too great because there is no way to know where the emails will be received. It disputes MaryCLE's contention that it can discover the location of the email recipient by looking up the domain name registrant's address on searches such as the one available on www.networksolutions.com, explaining that in cases where the domain is a common one, such as "hotmail," it is impossible to figure out where an individual recipient of an email would be located.

We reject First Choice's argument for two reasons. First, while it might be impossible to determine the location of an email recipient in cases of common domain names such as "hotmail," in this case that is not true. MaryCLE has demonstrated that a search on www.networksolutions.com indicates that "maryland-state-resident.com" is, unsurprisingly, registered in Maryland.

Second, we reject First Choice's approach to analyzing the "burden" imposed on it. The burden of complying with [***42] MCEMA [*511] is to disseminate truthful, non-deceptive emails; it is **not** to determine the location of email recipients. *See Washington v. Heckel, 143 Wn.2d 824, 24 P.3d 404, 411 (Wash.), cert. denied, 534 U.S. 997, 122 S. Ct. 467, 151 L. Ed. 2d 383 (2001)*(discussed *infra* in Section II). First Choice remains free to send emails into Maryland so long as it does not violate the truth requirements of MCEMA. This is not a great burden to meet. First Choice attempts to distract us from the real burden here - sending only truth - by arguing that it is impossible to determine residency or location of receipt. "This focus on the burden of *non*-compliance" misses the point. *See id. at 411; see also Ferguson v. Friendfinders, Inc., 94 Cal. App. 4th 1255, 1265, 115 Cal. Rptr. 2d 258 (Cal. Ct. App. 2002)*(rejecting argument that burden imposed by UCE statute to determine residency is too great; concluding that real burden is to comply with statute's substantive terms).

Turning to Maryland's interest in adjudicating this dispute, we observe that MCEMA was passed largely because the [**836] financial and social burden of UCE on Maryland consumers is great. Maryland certainly [***43] has an interest in protecting its consumers, not only from the costs associated with UCE proliferation, but also from becoming the victims of fraud and schemes initiated by false and misleading email. *Cf. Verizon Online, 203 F. Supp. 2d at 621-22* ("Virginia has a strong interest in resolving this dispute because it involves a Virginia resident and Virginia law. Indeed, Virginia recently enacted [a computer crime statute] to specifically address the conduct Defendants are accused of committing"); *Heckel, 24 P.3d at 411* (state has a legitimate interest in creating a penalty for sending false and misleading spam to its residents).

Additionally, as the State of Maryland and the United States Internet Service Provider Association ("US ISPA") point out in the *amici* briefs filed in this case, the financial costs of spam and UCE are great. [25] To this effect, a recent [*512] University of Maryland study concluded that deleting unwanted email costs nearly $ 22 billion annually in lost productivity. *See* National Survey Finds 22.9 Million Hours a Week Wasted on Spam, http://www.rhsmith.umd.edu/ntrs/)(last visited Jan. 16, 2006). Congress has similarly concluded [***44] that "spam would cost corporations over $ 113 billion by 2007." S. Rep. No. 108-102 (2003), http://www.thomas.loc.gov/cgi-bin/cpquery/T?&report=sr102&dbname108/ (last visited Jan. 16, 2006). The costs associated with spam or UCE can largely be explained by the time and effort that must be expended to delete it. Each unwanted email that a recipient attempts to respond to "instantly becomes three separate e-mail messages (and additional computer log entries)[.]" *Heckel, 24 P.3d at 410 n.8.* This is

> because: (1) the ISP server that is the victim of the fraudulent return address or domain name sends an error message back to the Internet user and their ISP announcing that the return path was invalid, (2) a message is sent to the server administrator requesting an investigation of the return address for potential problems, and (3) a message is sent to the server log in case the ISP wishes to track down the problem later.

*Id.* With mass mailings such as those sent by First Choice, "these messages snowball to clog ISP resources, and ISPs have little choice but to purchase additional equipment at a significant cost." *Id.* The cost is then passed onto [***45] consumer subscribers of Internet

services. *See also Heckel*, 24 P.3d at 409-11 (detailing the costs associated with spam); *Ferguson*, 94 Cal. App. 4th at 1267-68 (same); 15 U.S.C. §§ 7701(a)(Congressional findings for the CAN-SPAM Act on the costs associated with spam).

25    Again, we observe that not all spam is UCE.

With respect to MaryCLE's interest in obtaining relief, we similarly conclude that Maryland is the appropriate forum. MaryCLE has a financial interest in recovering for the injury it allegedly suffered and has also asserted a claim for injunctive relief. Maryland is the state in which MaryCLE **[*513]** suffered that injury. [26] The Supreme Court has reasoned that jurisdiction is proper in the state in which "the brunt of the injury would be felt[.]" [27] **[**837]** *Calder v. Jones*, 465 U.S. 783, 789-90, 104 S. Ct. 1482, 1487, 79 L. Ed. 2d 804 (1984). First Choice is aware that by sending potentially false and misleading emails, any injuries caused **[***46]** by those emails would be felt in the state in which they were received, rather than the state from which they were sent. *See Verizon Online*, 203 F. Supp. 2d at 617-18, 621-22.

26    *Although it admits that some of the emails were opened in Washington, D.C., MaryCLE alleged that some were opened in Maryland at Mr. Menhardt's residence. Further, NEIT Solutions, MaryCLE's ISP, is a Maryland corporation located in Maryland.*

27    *This case, along with Keeton v. Hustler Magazine, Inc., 465 U.S. 770, 104 S. Ct. 1473, 79 L. Ed. 2d 790 (1984), establish what has become known as the Supreme Court's "effects test" in personal jurisdiction cases. See Verizon Online, 203 F. Supp. 2d at 613. Under this approach, jurisdiction is proper if the "brunt of the injury," or the effects of the defendant's wrongful conduct, is felt most in the forum State. See Calder v. Jones, 465 U.S. 783, 789-90, 104 S. Ct. 1482, 1487, 79 L. Ed. 2d 804 (1984).*

Regarding the interstate **[***47]** judicial system's interest in obtaining the most efficient resolution of controversies, we conclude that because this claim is based on a Maryland state statute, the most efficient locus for the suit is Maryland itself. As we explained above, the Maryland legislature created a private cause of action to further the state's financial and social goals in reducing the number of deceptive emails sent here. The interstate judicial system has an interest in Maryland adjudicating this claim because it seeks to enforce a Maryland prohibitory statute. Maryland courts can do so most efficiently because they are familiar with the Maryland statute.

We also consider that there is no showing in the record that this is a case in which the defendant will be required to bring numerous witnesses from another state. *See Burger King*, 471 U.S. at 483, 105 S. Ct. at 2188. This is simply not a case in which defending the suit in Maryland is "'so gravely difficult and inconvenient' that [First Choice] unfairly is at a 'severe disadvantage' in comparison" to MaryCLE, or a disadvantage **[*514]** of "constitutional magnitude." *Id.*, 471 U.S. at 476, 484, 105 S. Ct. at 2185, 2188. **[***48]**

Finally, we look at the shared interest of the several states in furthering fundamental substantive social policies. In doing this aspect of the analysis, we consider whether there might be a potential conflict between two states' social policies that would impact the exercise of jurisdiction. *See Burger King*, 471 U.S. at 477, 105 S. Ct. at 2185. We observe that New York has no commercial email or spam statute; thus, there is no potential conflict with respect to the two states' "social policies." *See* David    E.    Sorkin,    Spam    Laws, http://www.spamlaws.com/state/ny/shtml    (information verified through Mar. 20, 2005)(last visited Jan. 16, 2006).

If we were to accept First Choice's argument that jurisdiction is not proper in Maryland because it is impossible to determine the residency of an email recipient, that would be equivalent to saying that First Choice could only be sued in New York. While certainly New York courts are capable of adjudicating a suit based entirely on a Maryland statute, limiting jurisdiction to New York does not promote Maryland's social policies *or* efficiency, particularly when the alleged harm occurs in Maryland. Applying similar reasoning, **[***49]** the federal court in *Verizon Online* commented that jurisdiction is proper in the state in which the harm is suffered, especially considering that many states have enacted anti-spam laws:

Permitting Defendants to escape personal jurisdiction simply because they claim they were unaware that Verizon's e-mail servers were located in Virginia would be fundamentally unfair. Setting such a precedent would allow spammers to transmit UBE [28] ] with impunity and only face suit if the injured party had **[**838]** the resources to pursue the litigation where the tortfeasor resides rather than where the injury occurred. . . . Allowing the spammer to evade personal **[*515]** jurisdiction in the forum where their conduct causes the greatest harm would frustrate [anti-spam] laws.

*Verizon Online*, 203 F. Supp. 2d at 622.

> 28   "UBE" is "unsolicited *bulk* email."

Because we determine that all three parts of the jurisdictional test are met, we conclude that personal jurisdiction over First Choice is proper. [***50] Our next step is to examine First Choice's challenge to MCEMA under the *Commerce Clause of the Federal Constitution*.

## II.

### The Commerce Clause

#### A.

#### Constitutional Framework

The *Commerce Clause, U.S. Const., art. I, § 8, cl. 3*, empowers Congress "to regulate Commerce with foreign Nations, and among the several States." "The Clause is both an affirmative grant of legislative power to Congress and an implied limitation on the power of state and local governments to enact laws affecting foreign or interstate commerce." *Bd. of Trs. of the Employees' Ret. Sys. of Baltimore City v. Mayor and City Council of Baltimore, 317 Md. 72, 131, 562 A.2d 720 (1989), cert. denied, 493 U.S. 1093, 110 S. Ct. 1167, 107 L. Ed. 2d 1069 (1990)*(citations omitted). "The aspect of the Commerce Clause which operates as an implied limitation upon state and local government authority is often referred to as the 'dormant' or 'negative' Commerce Clause." *Id.*

In *Pike v. Bruce Church, 397 U.S. 137, 142, 90 S. Ct. 844, 847, 25 L. Ed. 2d 174 (1970)*, the Supreme Court established a two-part inquiry for determining whether a state statute violates the dormant [***51] Commerce Clause. A reviewing court must first decide whether "the statute regulates evenhandedly to effectuate a legitimate local public interest, and its effects on interstate commerce are only incidental[.]" *Id. See County Comm'rs of Charles County v. Stevens, 299 Md. 203, 208, 473 A.2d 12 (1984)*. In *Brown-Forman Distillers Corp. v. N.Y. State Liquor Auth., 476 U.S. 573, 579, 106 S. Ct. 2080, 2084, 90 L. Ed. 2d 552 (1986)*, the Court explained that, if the [*516] statute does not regulate evenhandedly, or, in other words, discriminates against out-of-state commerce, then the statute is unconstitutional.

If the statute survives the first part of the test, a court must then engage in a balancing test to determine whether "the burden imposed on such commerce is clearly excessive in relation to the putative local benefits." *Pike, 397 U.S. at 142, 90 S. Ct. at 847*. With respect to both parts of the *Pike* test, the Supreme Court has held that "the critical consideration is the overall effect of the statute on both local and interstate activity." *Brown-Forman Distillers, 476 U.S. at 579, 106 S. Ct. at 2084*.

In several cases [***52] applying the *Pike* test, the Supreme Court has invalidated statutes on the grounds that their "extraterritorial effect" rendered them unconstitutional. [29] *See* Jack L. Goldsmith & Alan O. Sykes, *The Internet and the Dormant Commerce Clause, 110 Yale L.J. 785, 804-06 (2001)*(examining cases and commenting on extraterritoriality jurisprudence). In *Healy v. Beer Institute, 491 U.S. 324, 336-37, [**839] 109 S. Ct. 2491, 2499-2500, 105 L. Ed. 2d 275 (1989)*(plurality opinion), the Supreme Court explained its extraterritoriality jurisprudence:

> The principles guiding [an extraterritoriality] assessment, principles made clear in *Brown-Forman* and in the cases upon which it relied, reflect the Constitution's special concern both with the maintenance of a national economic union unfettered by state-imposed limitations on interstate commerce and with the autonomy of the individual States with their respective spheres. Taken together, our cases concerning the extraterritorial effects of state economic regulation stand at a minimum for the following propositions: First, **the "Commerce Clause . . . precludes the application of a state statute to commerce [***53] that takes place wholly outside of the State's borders, whether or not the [*517] commerce has effects within the State**" . . . . Second, a statute that directly controls commerce occurring wholly outside the boundaries of a State exceeds the inherent limits of the enacting State's authority and is invalid regardless of whether the statute's extraterritorial reach was intended by the legislature. **The critical inquiry is whether the practical effect of the regulation is to control conduct beyond the boundaries of the State**. Third, the practical effect of the statute must be evaluated not only by considering the consequences of the statute itself, but also by **considering how the challenged statute may interact with the legitimate regulatory regimes of other States and what effect would arise if not one, but many or every, State adopted similar legislation.** Generally speaking, the Commerce Clause protects against inconsistent legislation arising from the projection of one state regulatory regime into the jurisdiction of

another State. (Emphasis added; citations
and footnotes omitted.)

> 29   We are mindful that some legal scholars have
> concluded that the Supreme Court's extraterritori-
> ality jurisprudence, the major decisions of which
> are plurality opinions, are "unsettled and poorly
> understood[.]" Jack L. Goldsmith & Alan O.
> Sykes, *The Internet and the Dormant Commerce
> Clause, 110 Yale L.J. 785, 789 (2001).*

[***54]   The *Healy* Court explained that the extra-
territoriality principles detailed above are not a separate
or distinct Commerce Clause analysis. *See id., 491 U.S.
at 337 n.14, 109 S. Ct. at 2500 n.14.* Rather, they are
simply a more detailed way of explaining the two-part
test established in *Pike* and clarified in *Brown-Forman:*

> We further recognized in *Brown-
> Forman* that the critical consideration in
> determining whether the extraterritorial
> reach of a statute violates the Commerce
> Clause is the overall effect of the statute
> on both local and interstate commerce.
> Our distillation of principles from prior
> cases involving extraterritoriality is meant
> as **nothing more than a restatement of
> those specific concerns that have
> shaped this inquiry.**

*Id.* (emphasis added).

**B.**

**The Parties' Contentions**

MaryCLE asserts that the circuit court's ruling is er-
roneous for several reasons. First, MaryCLE maintains
that the court [*518] made "unsupported evidentiary
findings" in determining that the emails never "entered"
Maryland, because the pleadings asserted that MaryCLE
and NEIT are Maryland corporations with principal
places of business in Maryland. [***55] Second, argu-
ing that the relevant inquiry is whether the email was
sent to a Maryland resident, MaryCLE states that "the
plain language of the MCEMA focuses on the intent of
the entity that is sending . . . unsolicited, commercial
email. It does not focus on where the email is opened."

Finally, MaryCLE presses us to adopt the reasoning
employed by courts in Washington and California, which
determined that statutes specifically relating to [**840]
the sending of spam and UCE passed constitutional mus-

ter. *See Washington v. Heckel, 143 Wn.2d 824, 24 P.3d
404 (Wash.), cert. denied, 534 U.S. 997, 122 S. Ct. 467,
151 L. Ed. 2d 383 (2001); Ferguson v. Friendfinders,
Inc., 94 Cal. App. 4th 1255, 115 Cal. Rptr. 2d 258 (Cal.
Ct. App. 2002).* MaryCLE points out, as does the State of
Maryland in its *amicus* brief, that MCEMA is modeled
on the Washington statute found to be constitutional in
*Heckel,* and that the Maryland legislature relied on the
Washington Supreme Court's decision when deciding
whether to enact MCEMA.

In response, First Choice argues that "there are two
fundamental legal problems" with MCEMA. First, it
asserts that the Act subjects parties [***56] to liability if
they send commercial email "not to Maryland, but rather
to Maryland residents, even if those residents do not re-
ceive email in Maryland, the email is not sent to those
residents in Maryland, the residents are not harmed in
Maryland, and the email never enters Maryland." This
broad application, argues First Choice, is burdensome to
the point that it is "impossible for First Choice to con-
tinue to do business," and has a "chilling effect on inter-
state commerce." First Choice also asserts that the Act is
burdensome because the "false and misleading" standard
is subject to different interpretations such that senders of
emails will self-censor in order to avoid prosecution un-
der the Maryland Act.

[*519]   Second, First Choice reiterates its concerns
that the Act "fails to explain how a party can realistically
obtain knowledge of the residency of a holder of an
email address." Challenging MCEMA's residency pre-
sumption, *see CL § 14-3002(c)*, First Choice urges us to
rely on the same three cases as the circuit court to con-
clude that "the reality of the Internet cries out for federal
regulation" because "the Intenet does not recognize geo-
graphic [***57] boundaries." *See Am. Booksellers
Found. v. Dean, 342 F.3d 96, 103 (2d Cir. 2003); PSI-
Net, Inc. v. Chapman, 362 F.3d 227 (4th Cir. 2004); Am.
Libraries Ass'n v. Pataki, 969 F. Supp. 160 (S.D.N.Y.
1997).*

**C.**

**MCEMA Does Not Violate The Commerce Clause As
Applied In This Case**

The Commerce Clause question is closely inter-
twined with the jurisdictional question addressed in Sec-
tion I. The Supreme Court has recognized this correla-
tion.

> The limits on a State's power to enact
> substantive legislation are similar to the
> limits on the jurisdiction of state courts. In
> either case, "any attempt 'directly' to as-
> sert extraterritorial jurisdiction over per-

sons or property would offend sister States and exceed the inherent limits of the State's power."

*Edgar v. MITE Corp., 457 U.S. 624, 643, 102 S. Ct. 2629, 2641, 73 L. Ed. 2d 269 (1982)*(quoting *Shaffer v. Heitner, 433 U.S. 186, 197, 97 S. Ct. 2569, 2576, 53 L. Ed. 2d 683 (1977)*)(plurality opinion)(citation omitted). For many of the same reasons that we disagreed with the circuit court's jurisdictional analysis, we also find error in the court's **[\*\*\*58]** invalidation of MCEMA under the Commerce Clause.

Although the parties and *amici* seem to interpret the circuit court's ruling to be that MCEMA is unconstitutional **on its face**, a closer examination of the court's opinion reveals that it determined the Act to be unconstitutional **as applied** in this case. The court wrote that "the statute, **as applied in this case**, seeks to regulate the transmission of commercial email between persons in states outside of Maryland[.]" (Emphasis **[\*520]** added.) In its conclusion, the court again stated that MCEMA "violates the dormant Commerce Clause **[\*\*841]** when applied to the case at bar." (Emphasis added.)

The circuit court reasoned that First Choice "had no contact with the State of Maryland because its emails were sent from New York, routed through Virginia and Colorado, and finally **were received in Washington, D.C.**" [30] (Emphasis added.) This statement is inaccurate. An affidavit filed by MaryCLE with its opposition to the motion to dismiss alleges that all of the emails were opened "in Maryland **and** Washington, DC[.]" (Emphasis added.) Viewing the evidence in the light most favorable to MaryCLE, as the applicable standard **[\*\*\*59]** of review requires, we must assume that at least some of the emails did "enter" Maryland, so that the circuit court's conclusion to the contrary was erroneous. This erroneous factual premise permeated its Commerce Clause analysis, causing it to distinguish and reject the decision of the Supreme Court of Washington in *Washington v. Heckel, 143 Wn.2d 824, 24 P.3d 404 (Wash), cert. denied, 534 U.S. 997, 122 S. Ct. 467, 151 L. Ed. 2d 383 (2001)*, a case we consider instructive and persuasive.

[30] In *Heckel, 24 P.3d at 407 n.4*, the Washington court explained the transmission path of an email:

The message generally passes through at least four computers: from the sender's computer, the message travels to the mail server computer of the sender's Internet Service Provider (ISP); that com-

puter delivers the message to the mail server computer of the recipient's ISP, where it remains until the recipient retrieves it onto his or her own computer.

In *Heckel*, **[\*\*\*60]** the Supreme Court of Washington considered the constitutionality of the Washington version of MCEMA, which is virtually identical to the Maryland Act. *See Wash. Rev. Code, § 19.190.010 et seq.* The court applied the *Pike* test diligently, first deciding that the Washington UCE act was not facially discriminatory because it "applies evenhandedly to in-state and out-of-state spammers" in declaring that "no person" can transmit emails with a false or misleading subject line. *Id. at 409. See Wash. Rev. Code § 19.190.020(1).*

**[\*521]** With respect to the balancing part of the *Pike* test, the Washington court determined that the "local benefits surpass any alleged burden on interstate commerce[.]" *Id.* The court recognized the benefits of shifting the costs of UCE away from consumers, and explained that the burden on senders of commercial email was minimal because the statute only requires them to send truthful emails. *See id. at 409-11.* The Washington court further explained that the trial court's focus on the alleged burden to determine which recipients were Washington residents was misplaced:

The **[\*\*\*61]** trial court apparently focused not on what spammers must do to comply with the Act but on what they must do if they choose to use deceptive subject lines or to falsify elements in the transmission path. To initiate *deceptive* spam without violating the Act, a spammer must weed out Washington residents by contacting the registrant of the domain name contained in the recipient's e-mail address. **This focus on the burden of noncompliance is contrary to the approach in the *Pike* balancing test**, where the United States Supreme Court assessed the cost of compliance with a challenged statute. *Pike, 397 U.S. at 143, 90 S. Ct. 844.* Indeed, the trial court could have appropriately considered the filtering requirement a burden only if Washington's statute had banned outright the sending of UCE messages to Washington residents. We therefore conclude that Heckel has failed to prove that "the burden imposed on . . . commerce [by **[\*\*842]** the Act] is *clearly excessive* in relation to the puta-

tive local benefits." *Id. at 142, 90 S. Ct. 844* (emphasis added).

*Id. at 411* (bold added).

The *Heckel* Court also rejected the advertisers' extra-territoriality **[***62]** argument that the statute included regulation of conduct occurring wholly outside Washington because Washington residents might open their email while traveling in another state. *See id. at 412.* It explained that there was "no 'sweeping extraterritorial effect' that would outweigh the local benefits of the Act" because the statute regulates only those **[*522]** emails directed to a Washington resident, or sent from a computer located within Washington. *See id. at 412-13* (*quoting Edgar v. MITE Corp., 457 U.S. 624, 642, 102 S. Ct. 2629, 73 L. Ed. 2d 269 (1982)*). It pointed out that "the Act does not burden interstate commerce by regulating **when** or **where** recipients may open the proscribed UCE messages. Rather, the Act addresses the conduct of spammers in targeting Washington consumers." *Id. at 412* (emphasis added).

The Washington law at issue in *Heckel* is virtually identical to MCEMA. Indeed, the legislative history reveals that the Maryland General Assembly modeled MCEMA on the Washington law and relied on *Heckel* when it did so. [31] We also must give deference to the legislature and presume the constitutionality of a statute unless the party challenging **[***63]** it "'affirmatively and clearly establishes its invalidity.'" *Governor of Maryland v. Exxon Corp., 279 Md. 410, 426, 370 A.2d 1102 (1977), aff'd, 437 U.S. 117, 98 S. Ct. 2207, 57 L. Ed. 2d 91 (1978)*(citation omitted).

> 31    MaryCLE attached to its opposition to the motion to dismiss a letter, which is in the legislative Bill File for the bill that became MCEMA, sent from the Attorney General's Office to the Chairman of the House Economic Matters Committee. *See* Letter from Steven M. Sakamoto-Wengel, Ass't Att'y Gen., to Del. Michael E. Busch, Maryland House of Delegates, Economic Matters Committee Chair, regarding House Bill 915 (Feb. 28, 2002)(on file with Md. Dep't of Legislative Servs.). This letter states that the Attorney General "believes that the Committee should consider the approach taken by the Washington State law concerning deceptive spam[.]"
>
>     To that effect, the Floor Report for the bill directly states that it is "modeled after a Washington statute[.]" Floor Rep., H.B. 915, 2002 General Assembly, Economic Matters Committee. Documents written by the Attorney General's office indicate that the bill was given a favorable

constitutional review by the Attorney General's office, which relied on *Heckel*. *See* Letter from Kathryn M. Rowe, Ass't Att'y Gen., to Del. Robert C. Baldwin, Maryland House of Delegates, regarding H.B. 280 and H.B. 915 (Feb. 19, 2002)(on file with Md. Dep't of Legislative Servs.).

**[***64]** Applying the *Pike* test, we, like the Washington Supreme Court, find that MCEMA is facially neutral because it applies to all email advertisers, regardless of their geographic location. It does not discriminate against out-of-state senders. **[*523]** As discussed in greater detail above with regard to personal jurisdiction, we further conclude that the benefits of MCEMA clearly outweigh the burden on First Choice and other email advertisers. When the only burden MCEMA imposes is that of sending truthful and non-deceptive email, "that [First Choice] considers [MCEMA's] requirements inconvenient and even impractical does not mean that statute violates the Commerce Clause." *Ferguson, 94 Cal. App. 4th at 1265.*

We similarly agree with the Washington court that MCEMA does not regulate exclusively extraterritorial conduct because its focus is not on "when or where recipients may open the proscribed . . . messages. Rather, the Act addresses the **[**843]** conduct of spammers in targeting [Maryland] consumers**." [32] *Heckel, 24 P.3d at 412* (emphasis added). The choice to send UCE all over the country, invoking the probability that it will be received by Maryland **[***65]** residents, is First Choice's "business decision." *Ferguson, 94 Cal. App. 4th at 1265.* "Such a business decision simply does not establish that [MCEMA] controls conduct occurring wholly outside" Maryland. *Id.*

> 32    In so reasoning, the *Heckel* Court addressed the facial validity of the statute. The court also noted that the issue of a Washington resident opening his email in another State was not before it. *See Heckel, 24 P.3d at 413.*

The Supreme Court's extraterritoriality cases invalidated laws that had markedly different "practical effects" than MCEMA. *See Brown-Forman, 476 U.S. at 583, 106 S. Ct. at 2086* (holding that the "practical effects" of the statute should be considered in a Commerce Clause analysis). In *Edgar v. MITE Corp., 457 U.S. at 643, 102 S. Ct. at 2641*, the Court struck down the Illinois Business Takeover Act because the statute had a "nationwide reach which purported to give Illinois the power to determine whether **[***66]** a tender offer may proceed anywhere." MCEMA does not have such a nationwide reach; nor does it purport to give Maryland any "power" to determine where an email is sent. It only mandates

that all **[\*524]** email addressed to Maryland residents be truthful and non-deceptive.

Similarly, in *Brown-Forman* the Court invalidated the New York Alcoholic Beverage Control Law, which required liquor distillers and producers who sold liquor to wholesalers in New York to do so at prices no greater than those used in any other state. Because the liquor prices must be filed with the New York State Liquor Authority the 25th day of the month preceding their effective dates, the statute "force[ed] a merchant to seek regulatory approval in one State before undertaking a transaction in another[.]" *Brown-Forman, 476 U.S. at 582, 106 S. Ct. at 2086*. In other words, "once a distiller has posted prices in New York, it is not free to change its prices elsewhere . . . during the relevant month[,]" which was an unconstitutional projection of legislation into other states. *See id., 476 U.S. at 582-83, 106 S. Ct. at 2086*.

*MCEMA*, in contrast, does not prevent senders of email advertisements **[\*\*\*67]** from soliciting the residents of other states; it merely regulates those that are sent **to** Maryland residents or from equipment located in Maryland. The Act does not project Maryland's regulatory scheme into other states because email advertisers remain free to send emails to other states.

The *Brown-Forman* Court also considered whether the statute subjected defendants to "inconsistent obligations in different States." *Id., 476 U.S. at 583, 106 S. Ct. at 2086. See also Healy, 491 U.S. at 339-40, 109 S. Ct. at 2501* (explaining that the grant of power to the Federal Government under the Commerce Clause is designed to prevent inconsistent state regulations). Although First Choice argues that MCEMA has "an enormous chilling effect on interstate commerce," undoubtedly other states would neither desire the sending of false and misleading emails into their borders, nor object to Maryland's exclusion of them.

As the Supreme Court has explained,

The Commerce Clause [has a] purpose of preventing a State from retreating into economic isolation or jeopardizing the **[\*525]** welfare of the Nation as a whole, as it would do if it were free to place burdens **[\*\*\*68]** on the flow of commerce across its borders that commerce wholly within those borders would not bear. The provision **[\*\*844]** thus "'reflects a central concern of the Framers that was an immediate reason for calling the Constitutional Convention: the conviction that in order to succeed, the new Union would have to avoid the tendencies toward eco-

nomic Balkanization that had plagued relations among the Colonies and later among the States under the Articles of Confederation.'"

*Oklahoma Tax Comm'n v. Jefferson Lines, Inc., 514 U.S. 175, 179-80, 115 S. Ct. 1331, 1335-36, 131 L. Ed. 2d 261 (1995)* (quoting earlier Supreme Court cases). We cannot imagine how MCEMA's regulation of false or misleading commercial email addressed to Maryland residents would promote "economic Balkanization" or "plague relations" between Maryland and other states. No state is likely to consider that the welfare of a business that engages in false or misleading advertising is a legitimate interest, worthy of state protection. We therefore conclude that MCEMA does not subject email advertisers to inconsistent obligations.

To be clear, MCEMA avoids violation of the Commerce Clause because it has built-in **[\*\*\*69]** safeguards to ensure that it does **not** regulate conduct occurring wholly outside Maryland. In order to violate the Act, an email advertiser must either use equipment located in the State of Maryland or send prohibited UCE to someone he knows or should know is a Maryland resident. *See CL § 14-3002(b)(1). CL section 14-3002(c)* states that Maryland residency is presumed if the sender of UCE can discover that an email address is registered to a Maryland resident. In this case, First Choice could have done so. [33]

> 33    In other cases, such as those involving more common domain names like "hotmail," First Choice argues that it would be impossible to determine residency, and so the statutory presumption would not apply. That issue is not before this Court.

**[\*526]** The cases relied upon by First Choice and the circuit court do not persuade us otherwise. *See PSINet, 362 F.3d 227; Am. Booksellers Found., 342 F.3d 96;* **[\*\*\*70]** *Am. Libraries Ass'n, 969 F. Supp. 160*. The statutes that were invalidated in these cases regulated the dissemination of sexually explicit material to minors over the Internet. They prohibited posting material on a website accessible across the United States, where the user must choose and take affirmative steps to access the site and view the contents. We consider MCEMA to be markedly different because it regulates only those commercial marketers who purposefully send emails to passive recipients, who have no choice about receiving the email.

Additionally, whereas a commercial emailer can choose between one recipient and another, "no Web siteholder is able to close his site to" persons from other states. *See Am. Libraries Ass'n, 969 F. Supp. at 174*. In

contrast, as we said earlier, First Choice could have determined that MaryCLE was a Maryland resident by accessing, *inter alia*, www.networksolutions.com., and then excluded MaryCle from its mailing list.

The cases relied on by First Choice are also different because the statutes at issue were sufficiently broad to prohibit non-commercial speech that is protected by the *First Amendment*. For example, **[\*\*\*71]** the statute in *Am. Libraries Ass'n* made it a crime for an individual to use any computer system to engage in communication with a minor, which, to the knowledge of the individual, "depicts actual or simulated nudity, sexual conduct or sado-masochistic abuse, and which is harmful to minors[.]" *Id. at 169*. The federal District Court stated that "the range of Internet communications potentially **[\*\*845]** affected by the Act is far broader than the State suggests. . . . In the past, various communities . . . have found works including . . . *The Adventures of Huckleberry Finn* by Mark Twain, and *The Color Purple* by *Alice Walker* to be indecent." *Id. at 180*. Although a challenge on *First Amendment* grounds stands separately and independently from a Commerce Clause analysis, the nature of the speech prohibited is **[\*527]** still significant because it reflects the nature and extent of the burden imposed by the statutes on interstate commerce. [34]

> 34    We observe that the Commerce Clause still applies to regulation of interstate internet use by non-profit entities. *See Am. Libraries Ass'n, 969 F. Supp. at 172*.

**[\*\*\*72]** Unlike in First Choice's cases, there are no *First Amendment* concerns here because MCEMA regulates only false or misleading commercial emails. "Commercial speech enjoys a lower level of protection when it is true, and **no protection at all** when it is false or misleading." *Lubin v. Agora, Inc., 389 Md. 1, 22, 882 A.2d 833 (2005)*. In conclusion, for the foregoing reasons, we hold that the circuit court erred in declaring MCEMA unconstitutional as applied to the facts of this case. [35]

> 35    We recognize that on remand that trier of fact may ultimately decide that MaryCLE did not open any of the emails in Maryland. If so, the circuit court likely would have to decide whether MCEMA is constitutional as applied to those circumstances. Although we do not decide that issue on this appeal, we urge the circuit court to consider on remand the reasoning in *Heckel* that the statute "addresses the conduct of spammers in targeting [Maryland's] consumers[,]" rather than the location the Maryland resident opened the email. *Heckel, 24 P. 3d at 412*.

**[\*\*\*73] III.**

## Individual Liability

Our final issue is whether Frevola was properly dismissed as a defendant in this suit. MaryCLE asserts that it named Frevola in the complaint "because it could uncover no evidence that First Choice is anything more than an alter ego of Frevola to avoid liability for the false and misleading email he had been sending to Maryland residents." MaryCLE asserts that Mr. Frevola is the only human being associated with First Choice.

First Choice argues that Mr. Frevola did not personally play any role in obtaining MaryCLE's email address or sending any emails, and that "those actions were performed by First Choice through its partnership with Wow Offers" and Master Mailings.

**[\*528]** MaryCLE sued Frevola in an individual capacity for his limited liability company's alleged violation of a civil statute. In *T-Up, Inc. v. Consumer Prot. Div., 145 Md. App. 27, 72, 801 A.2d 173, cert. denied, 369 Md. 661, 802 A.2d 439 (2002)*, this Court held that a corporate officer could be personally liable for his corporation's violations of the Consumer Protection Act. *See CL § 13-101 et seq.* We reasoned **[\*\*\*74]** that violations of the Consumer Protection Act violations are "'in the nature of a tort action[,]'" then explained Maryland law on personal liability for torts committed by a corporation:

> Officers of a corporation may be individually liable for wrongdoing that is based on their decisions. And, where a corporate officer is present on a daily basis during commission of the tort and gives direct orders that cause commission of the tort, the officer may be personally liable. **If an officer either specifically directed, or actively participated or cooperated in the corporation's tort, personal liability may be imposed.**

**[\*\*846]** *Id. at 72-73* (emphasis added and citations omitted). Thus, officers and agents of a corporation or limited liability company may be held personally liable for CPA violations when they direct, participate in, or cooperate in the prohibited conduct. *See id.*; *B&S Marketing Enters., LLC v. Consumer Protection Div., 153 Md. App. 130, 170-71, 835 A.2d 215 (2003), cert. denied, 380 Md. 231, 844 A.2d 427 (2004)*.

MCEMA violations, like violations of the Consumer Protection Act, are "in the nature of a tort. **[\*\*\*75]** " Indeed, both statutes regulate false and deceptive trade

166 Md. App. 481, *; 890 A.2d 818, **;
2006 Md. App. LEXIS 2, ***

practices. *See CL § 13-303.* Both are included in the same Article of the Maryland Code, and MCEMA falls under Chapter 14, entitled "Miscellaneous Consumer Protection Provisions." Thus, the same principles that guide us when faced with questions of individual liability for torts apply here.

In *Shipley v. Perlberg, 140 Md. App. 257, 780 A.2d 396*, cert. denied, *367 Md. 90, 785 A.2d 1293 (2001)*, this Court reviewed the grant of summary judgment in favor of a corporate officer. We affirmed the circuit court because the director had put **[*529]** forward sufficient evidence to show his **lack of** participation in the wrongful act, while the plaintiff had not "shown with 'some precision' that there was a genuine dispute" regarding the director's participation. *Id. at 268* (citations omitted). This Court explained that a "simple failure of proof" on the part of the plaintiff was sufficient grounds to grant summary judgment in favor of the defendant director. *See id. at 281.* First Choice prevailed on a similar theory below.

But here, **[***76]** Frevola did **not** put forth sufficient evidence to show his lack of participation. MaryCLE's amended complaint included the following allegations about Frevola:

> . Frevola is the president of First Choice and is a New York resident. His home address is also listed as First Choice's resident agent address.

> . Frevola sent 83 UCE messages to MaryCle, including UCE that "disguised the origins of these messages," and he "created misleading subject lines" for these messages. He "transmitted or assisted in the transmission of" these messages.

Frevola's affidavit, attached to First Choice's motion to dismiss, was carefully worded:

> I did not play any role in **choosing MaryCLE's email address** or **actually sending any promotional emails to MaryCLE's email address** - those actions were performed by First Choice through its partnership with Wow Offers, LLC. In fact, . . . First Choice retained the services of Master Mailings, LLC, a company that specializes in delivering promotional messages to "opt-in" email address lists, to send the promotional emails to MaryCLE's email address along with

hundreds of thousands of other email addresses. **At no time did I or [***77] First Choice actually perform the physical act of sending any promotional emails or mailings to MaryCLE,** as the emails were sent through the servers operated by Master Mailings, LLC.

Close examination of his words reveal that important disclaimers are missing from this affidavit. Frevola does not deny making the decision to cause a mass mailing of emails, **[*530]** including the ones sent to MaryCLE. He does not deny personally arranging to retain the services of Master Mailings to achieve the goal of transmitting mass advertising emails to, as he phrased it, "hundreds of thousands of other email addresses." He does not deny **[**847]** "playing any role" in directing that the mass mailings be done. He never attested that First Choice had any employees or officers other than himself.

It is **not** the law that corporate officers and agents can escape personal liability for tortious violations of a consumer protection statute committed by the corporation **merely** because they were not "hands on" at every step of the way. As Judge Rodowsky said in *T-Up*, "officers of a corporation may be individually liable for wrongdoing that is based on their decisions." *T-up, 145 Md. App at 72.* **[***78]** Frevola's denials that he "actually sent" or committed "the physical act of sending" the emails leaves a gaping hole: the answer to the question of whether he intentionally directed the mass mailings to be made.

Frevola specifically denies "playing any role in choosing MaryCLE's email address." This is not enough. If Frevola directed First Choice to send hundreds of thousands of email advertisements to persons all over the country, it is not necessary for him to have selected any particular recipient for him to be personally liable for tort violations of this consumer protection statute. Just as First Choice knew it was sending emails into Maryland, so did Frevola, if he directed that mass mailing.

In sum, we hold that MaryCLE's allegations that Frevola transmitted or assisted in the transmission of mass email advertisements to Maryland that violated MCEMA were sufficient to surpass a motion for summary judgment because Frevola did not produce an affidavit denying his participation in those mailings.

## CONCLUSION

For the foregoing reasons, we reverse the summary judgment granted by the circuit court, and remand to that

166 Md. App. 481, *; 890 A.2d 818, **;
2006 Md. App. LEXIS 2, ***

court for further proceedings consistent with this opinion.

[***79]    [*531]  JUDGMENT OF THE CIRCUIT COURT FOR MONTGOMERY COUNTY

**REVERSED. CASE REMANDED FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION. COSTS TO BE PAID BY APPELLEE.**