1  DONALD S. HONIGMAN (SBN 106914)
   JUDE A. CISNEROS (SBN 220391)
2  KENNEY & MARKOWITZ L.L.P.
   255 California Street, Suite 1300
3  San Francisco, CA 94111
   Telephone:    (415) 397-3100
4  Facsimile:    (415) 397-3170

5  Attorneys for Defendant and Cross Defendant MARK SAJJADI and
   Intervenor GREAT AMERICAN INSURANCE COMPANY
6
   David S. Rand, No. 102410
7  LAW OFFICES OF DAVID S. RAND
   655 Redwood Highway, Ste 250
8  Mill Valley, CA 94941
   Telephone:    (415) 284-0700
9
   Attorney for Plaintiff MARK SAJJADI
10
                    UNITED STATES DISTRICT COURT
11
                 NORTHERN DISTRICT OF CALIFORNIA
12
                    SAN JOSE DIVISION – **E-FILING**
13

14  STEVE FUNDERBURG, et al.,                  CASE NO.  C 02-05461JW
                                               Consolidated with Action  C-03-4066JW
15          Plaintiffs,
                                               **MEMORANDUM OF POINTS AND**
16      v.                                     **AUTHORITIES IN SUPPORT OF**
                                               **MOTION FOR SUMMARY**
17  UNITED STATES OF AMERICA,                  **ADJUDICATION**
                                               [F.R.C.P. 56]
18          Defendants.

19  GREAT AMERICAN INSURANCE                   DATE:        October 18, 2004
    COMPANY,                                   TIME:        9:00 a.m.
20                                             COURTROOM:   8, 4th Floor
           Cross-Complainant,                               Judge James Ware
21
        v.
22
    UNITED STATES OF AMERICA,
23
           Cross-Defendants.
24

25

26

27

28

Kenney
&
Markowitz
L.L.P.

Dockets.Justia.com

| | |
|---|---|
| 1 | COUNTY OF TRINITY, a political subdivision of the State of California, |
| 2 | |
| 3 | Plaintiff, |
| | v. |
| 4 | |
| 5 | UNITED STATES OF AMERICA, MARK SAJJADI, and DOES 1 through 50, inclusive, |
| 6 | |
| 7 | Defendants |

Kenney
&
Markowitz
L.L.P.

# TABLE OF CONTENTS

**Page**

I.  INTRODUCTION ................................................................................................ 1

II. FACTS ............................................................................................................... 3

    A.    The X's at the north end..................................................................... 7

    B.    The sign.............................................................................................. 9

    C.    The Lampert accident...................................................................... 10

    D.    The trees at the north end of the runway........................................ 12

    E.    Runway grade................................................................................... 13

III. ARGUMENT ..................................................................................................... 14

    A.    Summary Adjudication of the County's Liability is Appropriate on its Claims for Total and Partial Indemnity Because the County's Negligence Caused the Accident. .......................................................... 14

            1.    The County's Negligence................................................... 14

            2.    The County's Design Immunity Defense Does Not Apply. .................. 14

                    (a)    The Cause of This Crash was the Inadequate Signage and Confusing Markings and the Presence of Trees at the North End, Not the 1953 Approval of the Current Site for an Airport. ...................................... 14

                    (b)    The Design Was Not Approved by the Authorized Public Body or Official. ........................................... 15

                    (c)    There is No Substantial Evidence Establishing the Reasonableness of the Design. ................................. 17

                    (d)    The X's at One End of the Runway Only Violate the Design Standard Mandated by California Regulations............ 18

                    (e)    The Gravity and Potential for Injury and Death Easily Outweighs the Cost and Practicality of Protection ................. 19

                    (f)    There are Changed Conditions that Vitiate Design Immunity. .............................................................. 20

            3.    The County is Liable Because it Committed Tortious Acts Apart from the Airport Design. .................................... 21

IV. CONCLUSION .................................................................................................. 21

Kenney
&
Markowitz
L.L.P.

# TABLE OF AUTHORITIES

**Cases**                                                                      **Page**

*Baldwin v. State of California* (1972)
    6 Cal.3d 424 ................................................................. 18

*Bunker v. City of Glendale* (1980)
    111 Cal.App.3d 325, 328 .......................................... 18

*Callahan v. City & County of San Francisco* (1971)
    15 Cal.App.3d 374, 377 ............................................. 18

*Cameron v. State of California* (1972)
    7 Cal.3d 318, 325 ............................................... 14, 21

*Cornette v. Department of Transp.* (2001)
    26 Cal.4th 63, 66 ............................................... 14, 20

*De La Rosa v. City of San Bernardino* (1971)
    16 Cal.App.3d 739, 745, 746 ................................... 18

*Flournoy v. State of California* (1969)
    275 Cal.App.2d 806 ................................................. 15

*Genrich v. State of California* (1988)
    202 Cal.App.3d 221, 227-228 ................................. 18

*Grenier v. City of Irwindale* (1997)
    57 Cal.App.4th 931, 940, 941, fn. 7 ....................... 15

In *De La Rosa v. City of San Bernardino* (1971)
    16 Cal.App.3d 739, 748 ........................................... 15

*Johnston v. Yolo County,* (1969)
    274 Cal.App.2d 46 ................................................... 17

*Levin v. State of California,*
    146 Cal.App. 3rd 410 at 417, 418 ................... 16, 17, 19

*Levine v. City of Los Angeles* (1977)
    68 Cal.App.3d 481, 489 ........................................... 18

*Mozzetti v. City of Brisbane* (1977)
    67 Cal.App.3d 565, 574 ................................... 15, 16, 21

*Muffett v. Royster* (1983)
    147 Cal.App.3d 289, 307 ......................................... 17

*Uyeno v. State of California,*
    supra, 234 Cal.App.3d at 1376 ............................... 17

*Zuniga v. Housing Authority* (1995)
    41 Cal.App.4th 82, 93 ............................................. 14

Kenney
&
Markowitz
L.L.P.

1

**Statutes**

2   California Code of Regulations Section 3542.................................................................20

3   *California Government Code §830.6* ..............................................................14, 16, 22

4   FRCP 56 ................................................................................................................... 3

5   Government Code §835 ......................................................................................... 14

6   Government Code section 835.4(a).......................................................................21

7   Section 3543(a) ...................................................................................................20

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

Kenney
&
Markowitz    27
L.L.P.

28

# I. INTRODUCTION

With this motion, Dr. Mark Sajjadi seeks to have this Court determine that the County of Trinity's affirmative defense of "design immunity" for the dangerous conditions at its Weaverville Airport cannot stand. The issue is directly raised by the Complaint the County has filed against Dr. Sajjadi in this Court for indemnity and contribution. With such a defense, if it stands, the County could well escape any responsibility for the airplane crash at issue in this case notwithstanding the fact that the markings and signage at the airport were clearly inadequate and clearly a cause of the crash. Such a finding may well drive the resolution of the County's Complaint against Dr. Sajjadi.

To prevail in its defense, the County must first establish the its three elements: discretionary approval of the plan or design before construction/improvement; a causal relationship between the plan and the crash; and "substantial evidence supporting the reasonableness of the plan or design". The burden is on the County to establish each of these elements for each of the dangerous conditions at issue in this case.

For purposes of this motion, the dangerous conditions at issue are twofold: The signage and markings (consisting of the runway markings and the one warning sign - and absence of other signs - to pilots on the ground) at the airport were not only inadequate, but entirely misleading; which was entirely inadequate and which pilots have failed to see before; and, secondly, the tall trees immediately off the north end of the runway, which the County Risk Manager had instructed be cut down after the last fatal crash into those trees by an aircraft departing to the north. Because of the extreme slope of the runway, the nature of the terrain and the illusory appearance created by such conditions, the need for appropriate warnings about take off direction was and will always be a matter of life and death importance. This precise accident, involving a take off to the north by a pilot who had seen the X's and failed to see the sign, had happened before, and County airport management had clearly and expressly predicted, in writing, that it was going to happen again. In yet another incident, six people were killed when their aircraft departed to the north and their plane was brought down by the very same trees.

Kenney
&
Markowitz
L.L.P.

There is no evidence that there has been the requisite "approval" of the markings and signage, or the presence of the trees. The County claims the single X was "approved" by the Board of Supervisors, when it approved the terms for a runway painting contract. That purported approval was not an approval of the X after any consideration of its aviation related ramifications; it was instead simply an approval of a painting contract proposal. Neither the sign (or the absence of any other signs), nor the trees, were ever "approved". In fact, the sign was designed, written and built by an airport employee who consulted no County officials whatsoever for approval. The size, lettering text and location of the sign was determined with no reference to any design guide or by anyone with any experience whatsoever in airport signage design. It was, at best, a "homemade" invention of an employee with no aviation background whatsoever.

The trees had been the subject of an express directive from the County Risk Manager who wanted them cut down and wrote a memo so requesting after the conclusion of the six fatality crash. That request was not fulfilled because the airport employees thought the trees served the beneficial purpose of, literally, catching errant aircraft departing to the north, and creating a "visual barrier" that would hopefully deter pilots. In other words, the trees were intentionally left in place, for those reasons, notwithstanding the request of the County's own Risk Manager, who wanted them cut down. This is hardly evidence of "approval" let alone "reasonableness", both of which are required for the immunity to apply.

The County has hailed the fact that, in 1953, plans for the airport were drawn and approved. These dangerous conditions, however, have all come about since and subsequent to the approval of the plans to construct an airport at its current site, with a runway oriented north/south. In fact, those original plans did not even call for the airport to be a "one way" airport, let alone include any X's, signs, or tall trees. As such, there is no way that the County is entitled to design immunity.

Dr. Sajjadi brings this Motion to this Court because the County has just filed its own affirmative motion in the Superior Court of Trinity County, seeking summary judgement, on design immunity, in the Trinity County Superior Court. The question of design immunity should

{30726.301591 0109916.DOC}

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
MOTION FOR SUMMARY ADJUDICATION; C 02-05461JW
Consolidated with Action C-03-4066JW

Kenney
&
Markowitz
L.L.P.

and is properly before this Court and should be decided by this Court. The County's blatant "forum shopping" should not be tolerated. The County sued Dr. Sajjadi in this Court in a case that this Court has already ordered is a "related case", seeking a determination that it bears no fault for the crash and that, therefore, Dr. Sajjadi owes the County indemnity for all its costs, expenses and any judgement obtained by the plaintiffs. Thus, the County's defense of design immunity will effectively drive the resolution of the Complaint the County filed in this Court. This Court has already traveled to Weaverville to inspect the airport and is thus fully prepared to evaluate the reasonableness of the design and the evidence presented herein. At no time during the CMC in this case, when this Court announced it wanted to travel to see the airport, did the attorney for Trinity County advise this Court that it intended to seek relief from the Trinity County Superior Court. Instead, counsel encouraged this Court to make the trip and accompanied this Court on a walking tour of the airport. By seeking to have its own Superior Court adjudicate the key issue raised in the Complaint it chose to file against Dr. Sajjadi in this Court, the County has engaged in forum shopping of the most cynical kind.

Dr. Sajjadi hereby moves this Court for an Order, pursuant to FRCP 56 determining that the County cannot prevail in its design immunity defense in this case.

## II. FACTS

The airplane crash underlying this litigation occurred when Mark Sajjadi attempted a take off from the Weaverville Airport on Runway 36.[1] On the morning of the crash, just hours before attempting to take off, Dr. Sajjadi called the Flight Service Station, a pilot briefing service operated by the Federal Aviation Administration. A recording of the phone conversation was automatically made by the FAA and thereafter transcribed by the FAA. A copy of the transcript of the briefing, which all parties agree is accurate, is attached to the accompanying Declaration of Donald Honigman ("Honigman Decl.") as Exhibit A. The transcript reveals that the first and

---

[1] By convention, runways are designated by the compass direction to which they point. Runway 36 points to 360 degrees, or due north. The reciprocal runway, Runway 18, points to 180 degrees on the compass, or due south. Pilots are supposed to land on Runway 36, to the north, and take off on Runway 18, to the south.

Kenney
&
Markowitz
L.L.P.

foremost issue in Dr. Sajjadi's mind, about which he asked the flight briefer over and over, was how he should interpret the X at the north end of the runway and which way he should take off. Because the Flight Service Station briefer gave him the incorrect information, the United States is a defendant in this case.

Weaverville Airport is admittedly owned and operated by the County of Trinity. It was initially issued a public use permit to operate in 1954 (Exhibit B) and, according to California's Division of Aeronautics, has essentially been "grandfathered" to continue to operate from that time, not required to comply with safety standards developed thereafter. At the time of the crash, it was operating under an Airport Permit reissued in 1982 to reflect a "change in conditions." It was first at that time that it became a "one-way airport". (Exhibit C) The change in the permit, to turn the airport into a "one way" airport, followed a 1978 letter from the State of California's (Caltrans) Division of Aeronautics *requesting*, but not directing, that the County place an X at only one end. (Exhibit D).[2] The letter referenced an FAA airport design guide, AC 150/5340 - 1D, which states in relevant part:

> Permanently Closed Runways and Taxiways: ... Place crosses near the ends and at 1.000 foot intervals on each closed runway or taxiway. (Exhibit E).

Significantly, the referenced FAA Advisory Circular does *not* authorize the placement of an X at only one end. It specifies, to the contrary, that X's are to be placed near the _ends_ (plural) and at 1,000 ft intervals. In other words, the advisory does not support the recommendation of the State.

Similarly, the pilot's "reference bible", the Aeronautical Information Manual (AIM), published by the FAA, lacks any information of how a pilot should interpret a single X at only one end of a runway. It too specifies that closed runways are designated as such with "yellow crosses (are) placed at each end of the runway and at 1,000 foot intervals". (Exhibit I)

---

[2]The letter to the County's Road Commissioner stated: "To enhance compliance with Weaverville Airport recommended operations, i.e., landings on Runway 36 and takeoffs on Runway 18 only, *it is recommended* that Runway 18 approach end be marked with a yellow cross as referenced in FAA Advisory Circular 150/5340 - 1D. .... Please notify this office by December 20, 1978 of your intended actions ..."

Kenney
&
Markowitz
L.L.P.

1    Following that 1978 request, and with no apparent check on the FAA advisory cited, or the

2    AIM, the County issued a "Notice to Contractors - Proposal and Contract for Asphalt Concrete

3    Overlay and Striping at Weaverville Airport", in which the X was set forth in the drawing for

4    contractors to bid upon. (Exhibit F). Because the Chairman of the Board of Supervisor's

5    signature is set forth on that drawing, used in connection with the painting contract, the County

6    asserts that the use of a single X was "approved" for purposes of Government Code section 830.6.

7    There is no evidence whatsoever that any member of the Board of Supervisors, or any other

8    County employee, ever considered the question of whether the placement of a single X on a

9    runway was, in fact, authorized by the FAA design guides cited, or whether such a marking would

10   or would not confuse pilots on the ground wondering whether they could commence a take off roll

11   on a runway marked with a giant X. Indeed, and because there is no evidence that the Board of

12   Supervisors suggested or required that the painting of one X only be accompanied by ground

13   signage to clarify the warning to pilots preparing to take off, the strong inference is that the

14   potential for confusion to such pilots or the fact that it was contrary to the applicable design guide

15   were never considered. There is no evidence that the Board was even aware that the prevailing

16   FAA design guide was contrary to the State's recommendation.

17       The State of California has the authority to issue and /or revoke public use airport permits.

18   Significantly, however, the State has *never unilaterally* revoked a public use airport permit for

19   non-compliance with mandatory standards. (Exhibit J, Cathey deposition, at 47:9 - 49:9; 54:19 -

20   55:7) The State is not required to revoke or even suspend a permit even if it finds non-compliance

21   with applicable airport design standards. (Exhibit H, Gargas deposition at 27:19 - 23).    The

22   issuance and/or revocation of such permits, as well as the inspections it conducts in connection

23   with its permitting functions, are a purely discretionary function, for which the State clearly has

24   discretionary immunity.[3]    The State neither owns nor controls what the County does or does not

25   do with its own airport. In other words, the County was certainly free to advise the State that the

26

27   [3]For this reason, Plaintiffs have dismissed the State of California from this litigation.

28

Kenney
&
Markowitz
L.L.P.

1  recommendation was contrary to the applicable design guide. The County was also free to install
2  whatever signage it thought appropriate and necessary to adequately warn pilots on the ground
3  preparing to take off, that they should use the south facing runway notwithstanding the fact that
4  the X indicated that it was closed.

5  It is also interesting to note that the Caltrans employee who inspected the Weaverville
6  Airport through most of the 1990's and to the present time, Daniel Gargas, advised the County that
7  it should install additional signs after the crash (Exhibit G). In his letter to the County of June 5,
8  2003, Mr. Gargas wrote: "Recommend an additional take-off warning sign for south end of the
9  runway on the other side of the runway from the existing sign to increase visibility to pilots. ..."
10 To this date, the County has refused follow that recommendation, thus indicating the County's
11 own admission that it is perfectly free to disregard recommendations made by the State.

12 Mr. Gargas made that particular request after the crash at issue in this case, and expressly
13 because of it. (Exhibit H, Gargas deposition, at 83:21 - 84:3). County personnel had never
14 advised him, before the subject crash, that there had been other instances of pilots who took off to
15 the north, or commenced take off rolls to the north, having not seen the one and only sign. (Gargas
16 at 74:17 - 76:8) In one of those instances, an airplane hit the very same trees that brought down
17 Dr. Sajjadi's airplane and causing a huge one foot hole in the leading edge of one wing, almost
18 killing both occupants aboard. The circumstances of that frighteningly similar incident are more
19 fully described below. Mr. Gargas had never been told of that 1988 incident, let alone the others
20 where pilots who had commenced take off rolls to the north, only to be successfully flagged off
21 by a bystander.[4] It is not a great leap of faith to believe that Mr. Gargas would have asked for the
22 additional signage much earlier had the County's personnel been straightforward about the
23 dangers of the markings and signage during Mr. Gargas' prior inspections.

24

25 [4]Carl Bonomini, who had been in charge of the airport until 2001, conceded that he was aware of
   other instances of pilots who mistakenly started their take offs to the north and who were flagged off by the
26 fuel concessionaire at the airport. Bonomini was expressly unconcerned about what would happen after
   the airport lost its fuel concessionaire and became entirely unmanned (as it was at the time of the accident).
27 There was also an incident where a deputy sheriff had departed to the north and crashed (with no fatalities,
   Bonomini notes). (Exhibit L, Bonomini deposition at 118:18 - 121:1; 161:8 - 162:1)
28

Kenney
&
Markowitz
L.L.P.

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
MOTION FOR SUMMARY ADJUDICATION; C 02-05461JW
Consolidated with Action C-03-4066JW

## A. The X's at the north end

As a preliminary matter, Dr. Sajjadi contends that the danger of the X's at only one end is that they carry the very substantial and real danger of confusion to pilots preparing to take off. The X's signify a closed runway, i.e., closed for both landings and take-offs. As noted above, there is no provision in the FAA's design guide (Exhibit E) for a single X at only one end of a runway. Similarly, there is no provision in the pilot's "reference bible", the Aeronautical Information Manual (AIM), for a single X at only one end of a runway. (Exhibit I) The obvious danger of such an unauthorized marking is that, without adequate signage to fully inform pilots on the ground that they should, indeed must, use the ostensibly closed runway for take off, pilots will predictably be misled into thinking that the runway is closed for both landings and take offs. It is for this reason that an evaluation of the X's at only the north end cannot be made alone and without consideration of the inadequacy of the signage. In its own motion filed in the Trinity Superior Court, the County seeks consideration of the X's separate from and without any reference to the signage, hoping that the Court will similarly engage in such a piecemeal evaluation of the warnings at Weaverville Airport.[5] It does so in apparent recognition of the fact that the drawing attached to the County's bid proposal does not include anything about signage and stands in obvious violation of both the applicable design guide and the applicable pilot reference guide.

Dr. Sajjadi's request for briefing from Ms. Sessions was, as the transcript (Exhibit A) reveals, first and foremost a request for clarification of the large X at the north end of the runway. Without exception, every single pilot who has been asked, in this case, for his/her interpretation of an X at only one end of a runway has interpreted it as meaning that the runway is closed - for both take offs and landings. The FAA briefer was of the same impression.[6] There is nothing,

---

[5]Dr. Sajjadi attaches a copy of the County's Memorandum of Points and Authorities in Support of its Motion for Summary Judgment, filed in Trinity County Superior Court, as Exhibit K.

[6]As the FAA briefer, Ms. Sessions, herself testified, "An "X" on the end means that it's closed, you can't do anything with it." Exhibit M, Sessions depo, at 88:19 - 89:6. George Pettersen, the chief investigator into this crash from the United States National Transportation Safety Bureau said about the X when he saw it: "It totally confused me. I never did figure it out. ... And I had been taught when you have an "X" runway off, you have an "X" on both runways and it's closed, period. I don't know how you close one end of a runway with using a white "X" and a yellow "X". I don't understand that. And I don't think the FAA would have done it that way." (Exhibit N, Pettersen depo, at 156:5 - 157:17) Brian Cassidy, the

{30726.301591 0109916.DOC}                    -7-

Kenney
&
Markowitz
L.L.P.

published anywhere in any FAA airport design standards or any pilot training materials, where it is explained that an X at only one end of the runway means landings are permitted but take offs are prohibited.

The County of Trinity asserts that it painted the large X at the north end of the runway at the suggestion of the State of California, and it uses that fact and that fact alone to demonstrate the "reasonableness" of the design of the X. Before complying with the suggestion, however, the County employee in charge of the County's airports did not himself make (and to this date has not ever made) any effort to evaluate whether the placement of an X at only one end of the runway complied with any applicable FAA design standard. (Exhibit L, Bonomini depo at 50:5-9) Mr. Bonomini is not a pilot, has himself never taken flying lessons, and has never had any training in any subject that would inform him about how pilots interpret X's on runways. He has similarly never had any concern that the X at the north end of the runway might confuse pilots. (Exhibit L, Bonomini depo at 61:19 - 62:7; 68:17 - 21)[7] He is and was unaware that the runway markings were "nonstandard", even after the FAA wrote to the County warning that the runway's "nonstandard runway marking" needed review. (Exhibit L, Bonomini depo at 70:3 - 72:19, Exhibit 45)

With respect to the fact that the State requested the X marking in conjunction with the institution of the "one way" designation, Mr. Bonomini himself recognizes that the responsibility for compliance with the standards belongs to the County, irrespective of whether the State communicates that there is a problem or not. (Exhibit L, Bonomini depo at 46:11 - 20).

---

air safety investigator brought into this investigation by the NTSB, testified that he too was confused by the X as it suggested to him that the runway was closed for both landing and take off. (Exhibit O, Cassidy depo at 223:11 - 224:9)

[7]Bonomini's complete ignorance of appropriate airport markings was best demonstrated when he explained that the X he painted should have been interpreted as a prohibition for landings only, since X's intended to prohibit take offs are to be painted only on the *taxiways* leading to the runway closed for take off. Such an statement could not be further from the truth and Dr. Sajjadi fully anticipates that the defense will not dispute this point. (Exhibit L, Bonomini depo at 62:20 - 65:25)

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
MOTION FOR SUMMARY ADJUDICATION; C 02-05461JW
Consolidated with Action C-03-4066JW

Kenney
&
Markowitz
L.L.P.

## B.    The sign

Preliminarily, and as noted above, the warnings at the airport (and lack thereof) must be considered in their entirety.    The dangerous condition that existed because of the placement of X's at only one end of the runway might have been ameliorated if there had been adequate signage on the ground, to ensure that pilots preparing for take off were not misled by the signal intended for pilots in the air preparing for landing.    It is the presence of the X's at the north end only, in combination with the wholly inadequate ground signage, that creates the dangerous condition.

The Court has had the opportunity to see the single warning sign located at the south end of the airport, advising pilots that they should "use Rwy 18" for take off.[8]  *It faces south and is thus entirely invisible to pilots taxiing south on the runway to reach a take off point on Rwy 36.*   It is 125 feet off the edge of the runway and, as the Beechcraft air safety investigator working on the investigation with the NTSB concluded,  Dr. Sajjadi simply missed the sign because it is "far away (from the runway) and small." (Exhibit O, Cassidy depo, at 220:3 - 221:1)

Mr. Bonomini himself erected the sign, sometime between 1980 and 1984, when he was an associate engineer working under the Director of the Trinity County Public Works Department, who had overall responsibility for the County airports.  Mr. Bonomini was the employee who handled day to day operations at the Trinity County airports.   He had no formal education in airport or markings design, nor any pilot training.  (Exhibit L, Bonomini depo, at 15:23 - 25; 21:1 - 11).   Mr. Bonimini himself, with no assistance from the State or the FAA, decided on the sign's location, size, text and colors.  He did not seek input from any airport design consultants or even Caltrans' Division of Aeronautics.    Its size and location "was kind of a seat of the pants in reality."  No effort was made to evaluate, from the standpoint of a pilot preparing to take off, whether the sign was adequately placed to catch his attention.  (Exhibit L, Bonomini depo, at 94:16-25; 157:9 - 16; 159:15 - 19; 161:4 - 7; 162:2 - 9).

---

[8]There is, in fact, no runway marked 18 at Weaverville.  The County painted large X's, instead of the required runway number, at the north end of the runway.   Only Runway 36 has the standard threshold bars and runway number painted on it, further adding to the confusion.

Kenney
&
Markowitz
L.L.P.

1       Bonomini concedes that there is absolutely no warning visible to pilots mistakenly taxiing

2 for take off on Runway 36 that would be visible to them while they are taxiing, that Runway 36 is

3 closed for take offs. (Exhibit L, Bonomini depo, at 65:3 - 66:2; 66:21 - 67:6). In almost the same

4 breath, however, Bonomini recognizes that it is important to issue warnings to pilots *while they*

5 *are taxiing* to a wrong runway for take off, "to stop them before they get to the end of the runway

6 for the takeoff."

7       The one sign is the only warning on the airport to pilots that Runway 36 should not be used

8 for take off. (Exhibit L, Bonomini depo, at 80:22 - 81:21)[9] Bonomini never considered placing

9 additional signs on the edge of the parking apron or the aircraft hangars for example. (Exhibit L,

10 Bonomini depo at 82:11 - 18), even after the incident involving Mr. Lampert's wrong way take

11 off, described below.

12     **C.    The Lampert accident**

13       The County's Steve Roberts was well aware, at as of 1988, of the very real probability that

14 pilots would miss the sign. It was in that year that pilot David Lampert mistakenly took off to the

15 north, on Runway 36, and barely escaped with his life and that of his passenger. Mr. Roberts'

16 investigated that near fatal incident and wrote a report about it. (Exhibit P) In his report, he noted

17 that Lampert had been wrongly advised (like Dr. Sajjadi) to take off on Runway 36 by an

18 employee of the fuel concessionaire at the airport and that he had never seen the "large 4' x 8' sign

19 adjacent to the south end of the runway". Roberts' report states: "(Pilot) stated that that neither

20 he nor his passenger, Toni (?), saw anything that indicated he was not to use the runway for take-

21 off." Lampert hit the same trees which brought down the Sajjadi plane and a huge one foot by six

22 inch hole was created in the leading edge of a wing of his Beechcraft Bonanza plane, as

23 photographed by Roberts. Somehow, Mr. Lampert was able to keep his plane flying and was able

24 to circle back around for an emergency landing on the same runway.

25

26     [9]Bonomini notes that there is a form, posted in the "pilot lounge" on 8 ½ x 11 paper, which also
mentions the closure (albeit in very small print), although he doesn't know whether pilots typically enter

27 the dilapidated structure. Roberts concedes that the form is frequently not on the wall. (Exhibit Q, Roberts
depo at 90:25 - 91:16)

Kenney
&
Markowitz
L.L.P.

28

1     *The warning sign which Lampert missed is precisely the same as the one Dr. Sajjadi*

2     *missed: entirely unchanged in size, location, color, configuration and text*.  Roberts conceded that

3     he never even thought about whether Lampert's failure to notice the sign had in any way

4     contributed to the incident, nor did he ask the fuel concessionaire then manning the airport

5     whether there had been any other similar incidents.  (Exhibit Q, Roberts depo at 102:5 - 107:18;

6     110:12 - 18).

7          Bonomini was aware of still other instances of pilots who mistakenly started their take offs

8     to the north and who were saved by the fuel concessionaire at the airport.  The fuel concessionaire

9     had told him about them and the fact that on each occasion he happened to be at the airport and

10    was able to flag them down before they crashed.      However, in the early 90's, the fuel

11    concessionaire ceased business and the airport became entirely unmanned.      Bonomini was

12    apparently unconcerned about whether such close calls would continue and how they could be

13    stopped before tragedy struck.  (Exhibit L, Bonomini depo 118:18 - 121:1; 161:8 - 162:1)

14         If the incidents involving David Lampert and these other pilots didn't put the County

15    employees on indisputable notice about the likelihood of this accident, then a 1997 County

16    evaluation for zoning purposes certainly should have.  In 1997, this same Steve Roberts wrote a

17    memo to the Trinity County Planning Department, which was considering allowing the

18    construction of residences north of the airport.  After explaining that departures to the north are

19    not permitted, he wrote:

20         Even though this condition prevails, errant aircraft enter this airspace on occasion.
           Several close calls have occurred by aircraft either taking off to the north, not
21         allowed, or making an aborted landing attempt where trees at the north end of the
           runway have been clipped by passing aircraft.  These close calls did not result in
22         crashes but did damage aircraft and nerves.  More serious results were averted by a
           matter of inches.
23

24    (Exhibit 51, included within Exhibit Q)  Roberts now concedes that those "more serious results"

25    did in fact occur when Dr. Sajjadi's airplane crashed and killed his daughter.       (Exhibit Q,

26    Roberts depo at 140:20 - 143:18).

Kenney
&
Markowitz
L.L.P.

27

28

The County has, to this day, still failed to make any improvements to the signage or markings at the airport, even though the State of California has suggested that it consider additional signs. (Exhibit G; Exhibit Q, Roberts depo at 113:19 - 114:13; 123:13 - 124:6) Apparently, it feels perfectly free to ignore the recommendations of the State.

### D.    The trees at the north end of the runway

In 1988, the Trinity County Risk Manager, John Larkin, wrote a memo to Bonomini in which he indicated that Bonomini should "reduce height or eliminate trees at the north end of the runway." Larkin wrote that memo at the conclusion of a lawsuit arising out of the deaths of six people who were killed in 1983 when the pilot attempted to depart Weaverville to the north and hit the trees at the end of the runway.[10]    The Risk Manager made the request to eliminate the trees, noting "Due to this case and the information that was presented, some suggestions were made that would reduce our liability exposure at Weaverville Airport" one of which was "Reduce height, or eliminate trees at the north end of the runway." (Exhibit R; Exhibit L, Bonomini depo at 101:17 - 102:24) Bonomini testified that he had acted on that suggestion by having his subordinate, Mr. Roberts, contact the United States' Bureau of Land Management (which owned the land on which the northern one third of the airport is located) to seek its permission. According to Bonomini, the BLM refused the request because they did not want to appear to be "condoning" the operation of the airport at this particular site. (Exhibit L, Bonomini depo at 104:5 - 105:12; 122:22 - 123:20). No effort was ever made to cut the dangerous trees. (Exhibit L, Bonomini depo at 154:10 - 155:5)

Roberts testified quite differently. He had no recollection of asking BLM to cut trees north of the airport. To the contrary, he testified that the trees were not cut down because they served two beneficial purposes. First, the trees served to bring down errant aircraft, stating "that it's better to bring down (aircraft mistakenly taking off to the north) right at the airport by those trees than to allow them to try to climb out." Secondly, the trees served the beneficial purpose of creating a "visual barrier" to pilots. (Exhibit Q, Roberts depo at 148:8 - 149:21; 154:17 - 155:6;

---

[10] This incident arose out of an aborted landing and "go around", where the pilot touched down on Runway 36 and then decided to take off again on the same roll. Thus, and while the inadequacies of the signage were not an issue in that particular crash, the presence of the trees at the north end definitely was.

Kenney
&
Markowitz
L.L.P.

1   159:25 - 160:21)   This is the thinking behind what the County would describe as a "reasonable"

2   design.

3          Instead of cutting the trees just north of the runway, the County chose to simply paint a

4   white bar across the north end of the runway in order to create the  required "clear zone" north of

5   the runway. (Exhibit L, Bonomini depo at 148:1 - 151:21) According to Roberts, "Weaverville

6   Airport did not have a physical clear area at the (north) end.  So by painting a new stripe, we

7   created that area at the end of the runway." (Exhibit Q, Roberts depo at 80:2 - 4)  In that manner,

8   the County was able to comply with a design standard that it maintain a 200 foot obstacle free

9   "clear zone" just north of the runway and ignore Mr. Larkin's demand that the trees at the north

10  end of the field be cut down.

11         **E.     Runway grade**

12         The runway is sloped upward to the north.  While the fact that there is a slope may

13  be apparent, its steepness is not visually apparent.   Dr. Sajjadi concedes that the location of an

14  airport on such a steep slope was part of the 1953 approval of the decision to put an airport there,

15  but  contends that the deceptive appearance of the steepness is part of the dangerous conditions

16  that mandate full and adequate signage on the ground.   Mr. Bonomini himself has conceded that

17  fact.  Indeed, the illusory nature of the slope is what motivated him to erect the sign in the first

18  place. (Exhibit L, Bonomini depo at 175:6 - 20).   It is not a question of whether Dr. Sajjadi had

19  realized there was any slope to the north; it is instead a question of whether the slope appeared so

20  steep that he should have known not to take off to the north because of it.

21         The undisputed evidence in this case is that uphill take offs are neither impermissible nor

22  even unwise.  According to Brian Cassidy, the Beechcraft air safety investigator assigned to assist

23  the NTSB investigation, there are no recommendations, let alone restrictions, against  uphill take

24  offs by Beechcraft.  Beechcraft does not publish any warnings of any kind, in any portion of its

25  Pilot Operating Handbook or in any publication, against uphill take offs.  Beechcraft does not, as

26  part of its graphs and data that pilots are supposed to use to evaluate runway length requirements,

27  incorporate any information whatsoever on whether the airplane will experience any degradation

Kenney
&
Markowitz
L.L.P.

28

of take off performance, or a longer take off run.  Mr. Cassidy, himself a long time pilot of

Beechcraft airplanes, has *never* been taught that he should avoid uphill take off runs.  (Cassidy at

230:9 - 237:1; 256:1 - 7).

## III.  ARGUMENT

**A.  Summary Adjudication of the County's Liability is Appropriate on its Claims for Total and Partial Indemnity Because the County's Negligence Caused the Accident.**

### 1.  The County's Negligence.

A public entity is liable for a dangerous condition of its property.  *Government Code §835.*[11]  Sajjadi does indeed have substantial evidence proving all of the required elements of a dangerous condition, but focuses herein on the elements that the County must establish for its design immunity defense.

### 2.  The County's Design Immunity Defense Does Not Apply.

Design immunity under *California Government Code §830.6* is an affirmative defense that the defendant public entity must plead and prove.  *Cameron v. State of California* (1972) 7 Cal.3d 318, 325.  Under design immunity, a public entity is not liable for injuries caused by a dangerous condition of public property if all three of the following elements are established: (1) A causal relationship between the plan or design and the accident, (2) discretionary approval of the plan or design before construction, and (3) substantial evidence supporting the reasonableness of the plan or design.  *Cornette v. Department of Transp.* (2001) 26 Cal.4th 63, 66.

**(a)  The Cause of This Crash was the Inadequate Signage and Confusing Markings and the Presence of Trees at the North End, Not the 1953 Approval of the Current Site for an Airport.**

As a preliminary matter, this crash was caused by the inadequate signage *in combination with the confusing X's at only the north end*, and the presence of the trees at the north end.  Trinity

---

[11]To establish liability, the plaintiff must show that the property was in a dangerous condition at the time of the injury, that the injury was proximately caused by the dangerous condition, that the dangerous condition created a reasonably foreseeable risk of the kind of injury that occurred, and either (1) the dangerous condition was created by a public employee acting in the scope of his employment, or (2) the public entity had actual or constructive notice of the dangerous condition sufficiently prior to the injury to have taken measures to protect against the dangerous condition. *Zuniga v. Housing Authority* (1995) 41 Cal.App.4th 82, 93.

Kenney & Markowitz L.L.P.

{30726.301591 0109916.DOC}                                     -14-

1 County goes to great lengths, in the motion it filed in the Trinity Superior Court, to establish an

2 approval of 1953 plans to construct an airport on the current site. In so doing, the County attempts

3 to defeat an argument that Dr. Sajjadi is not making.

4     Significantly, the 1953 approval so prominently argued by the County does not even

5 address the signage, the X's or the trees. Indeed, it was not until 1982 that the airport was made a

6 "one way" airport and, thus, neither the plainly inadequate signage or the confusing runway

7 markings were part of those plans. Similarly, the trees at the north end have undoubtedly grown in

8 the 38 years between those plans and the crash. In other words, the causes of this crash is not

9 related to the features of the 1953 plans. It is clearly the law that f the injury producing condition

10 was not part of the approved design, the immunity is defeated. *Grenier v. City of Irwindale* (1997)

11 57 Cal.App.4th 931, 940, 941, fn. 7. In *De La Rosa v. City of San Bernardino* (1971) 16

12 Cal.App.3d 739, 748, design immunity was not established because there was no showing that the

13 installation and position of a stop sign, obscured by trees and shrubbery, was part of the approved

14 plan. Similarly, in *Mozzetti v. City of Brisbane* (1977) 67 Cal.App.3d 565, 574, the immunity was

15 not established because the one page drawing did not show the requisite details of the road design,

16 and there was no showing that several material changes made during construction were caused

17 solely by a defect in the design, as opposed to poor maintenance and/or clogging of the drainage

18 system. In *Flournoy v. State of California* (1969) 275 Cal.App.2d 806, design immunity not

19 established because the dangerously icy condition of the bridge resulted from environmental

20 conditions, not from engineering features of the plan or design.

21     Thus, as it pertains to both the inadequacy of the signage and markings at the Airport and

22 the trees that exist at the north end, which caused this crash, the County cannot show that they

23 were part of any "approved design."

24         **(b)    The Design Was Not Approved by the Authorized Public Body or Official.**

25

26     Under the second element of the design immunity defense, the defendant must show that

27 the plan or design reflecting existing conditions was approved, before construction, by the

28 appropriate legislative body of the public entity or by some other body or employee exercising

Kenney
&
Markowitz
L.L.P.

{30726.301591 0109916.DOC}    -15-

discretionary authority to give such approval. *Government Code §830.6; Levin v. State of California,* 146 Cal.App. 3rd 410 at 417, 418; *Mozzetti, supra,* 67 Cal.App.3d 565.

Importantly, it must also be shown that the feature at issue was actually considered and that it was the subject of an actual exercise of discretion. Additionally, the County must offer evidence that establishes that fact. As noted in *Levin, supra,*

> As our Supreme Court pointed out in *Cameron v. State of California* (1972) 7 Cal.3d 318, 326 [102 Cal.Rptr. 305, 497 P.2d 777], the rationale of the design immunity defense is to prevent a jury from simply reweighing the same factors considered by the governmental entity which approved the design. *An actual informed exercise of discretion is required. The defense does not exist to immunize decisions that have not been made.* Here, as in *Cameron, supra,* the design plan contained no mention of the steep slope of the embankment. The state made no showing that Legarra, who alone had the discretionary authority, decided to ignore the standards or considered the consequences of the elimination of the eight feet shoulder. It follows that the state also failed to establish the second element of the defense.

146 Cal.App. 3rd 410 at 418 (emphasis added).

In this case, the "approval" relied upon by the County, apart from the irrelevant 1953 plans' approval, is effectively that the X is indicated in a drawing that was used in connection with the County's solicitation of bids for a runway painting contract. There is no evidence whatsoever that any Board member considered confusion that would arise by painting an X at only one end of a runway or was even aware that such a marking is not authorized by the FAA's runway marking standards.

As a second matter, the Board's approval of the painting contract specifications was for a single X at the end of the runway. On the day of the accident (and as of this Court's inspection of the Airport) there were *two X's* at the north end of the runway. The "approval" alleged by the County was for only *one X.*

Finally, and as noted above, the one and only sign, which must be considered in concert with the runway markings as part of the package of warnings at the airport, was erected by Bonomini without any consultation or approval by the Board (or any other airport design consultant for that matter). There is no evidence whatsoever that the Board approved the placement of only one sign at the time it approved the painting contract for a single X at the north

Kenney
&
Markowitz
L.L.P.

1  end only. As noted above, the County's attempt to separately evaluate the runway X's apart from

2  the inadequate signage is not supported by law or logic. Both the X's and the sign must be

3  evaluated together and there has been no approval for them, together.

**(c)      There is No Substantial Evidence Establishing the
          Reasonableness of the Design.**

6      The third element of the design immunity defense requires that the public entity present

7  "substantial evidence" regarding the reasonableness of the design. *Uyeno v. State of California,*

8  *supra*, 234 Cal.App.3d at 1376. In determining whether there is substantial evidence that the plan

9  or design was reasonably approved, the courts consider whether the evidence "reasonably inspires

10  confidence" and "is of solid value". *Muffett v. Royster* (1983) 147 Cal.App.3d 289, 307.

11  Evidence showing that the design, even if it was approved, failed to satisfy accepted engineering

12  standards and thereby created a substantial but avoidable risk of harm, is sufficient to prove that

13  the design approval was unreasonable. *Levin v. State* (1983), 146 Cal.App. 3d 410; *Johnston v.*

14  *Yolo County,* (1969) 274 Cal.App.2d 46. In *Johnston*, the engineer who approved the design

15  regarded it as not conforming to accepted engineering standards.

16      In the present case, the County offers no evidence whatsoever of the reasonableness of the

17  signage and warnings at the airport, and falls back on the fact that the State of California had

18  initially asked the County to paint an X at the north end. Thus, and without attempting to defend

19  the X's and the signage, the County essentially argues that since the State asked the County to

20  paint an X, it must be reasonable by virtue of that fact alone. That is hardly the sort of evidence

21  that "reasonably inspires confidence" and "is of solid value". *Muffett v. Royster*, *supra*, 147

22  Cal.App.3d at 307.     The placement of a single X, and the inadequacy of the ground signage,

23  would and already had so predictably confused pilots that it cannot be described as "reasonable."

24  It should also be remembered that the State, as soon as it learned that indeed Dr. Sajjadi had taken

25  off the wrong way, asked for additional signage. The County, in contrast, had long known, before

26  the Sajjadi crash, that there had been other pilots, including Mr. Lampert, who had been confused

27  and not seen the sign.     Such a prior accident history bears directly on the question of

Kenney
&
Markowitz
L.L.P.

28

{30726.301591 0109916.DOC}                    -17-
MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
MOTION FOR SUMMARY ADJUDICATION; C 02-05461JW
Consolidated with Action C-03-4066JW

reasonableness. *Baldwin v. State of California* (1972) 6 Cal.3d 424; *Genrich v. State of California* (1988) 202 Cal.App.3d 221, 227-228. *Callahan v. City & County of San Francisco* (1971) 15 Cal.App.3d 374, 377.

Finally, approval of the design may be unreasonable if the hazard to foreseeable users posed by the approved plan or design would not be "obvious" to any reasonable person. *Levine v. City of Los Angeles* (1977) 68 Cal.App.3d 481, 489. In *Levine*, the abrupt change from a double lane of paved road to a single lane without tapering to the narrower width or adequate illumination or warning signs created an obvious trap for motorists traveling at night and, therefore, was an unreasonable design to which the design immunity did not apply.

Even where warning signs are provided, as occurred here, their location may be so negligently chosen or their maintenance so negligently disregarded that a dangerous condition is created. In *Bunker v. City of Glendale* (1980) 111 Cal.App.3d 325, 328, the court affirmed a verdict that, because the sign advising oncoming motorists to "slow to 15 miles an hour" was sited three intersections away from and below the dangerous crest of a steep hill, the city failed to properly warn of the dangerous condition. Similarly, in *De La Rosa v. City of San Bernardino* (1971) 16 Cal.App.3d 739, 745, 746, evidence that a stop sign was partially blocked by trees or shrubbery on *adjacent property*, was held sufficient to raise a question of fact for the jury as to whether the intersection was unreasonably dangerous.

> **(d)** **The X's at One End of the Runway Only Violate the Design Standard Mandated by California Regulations**

California law mandates compliance with AC 150/5340. *Each arguably applicable version of that AC, the one in effect when the X was painted, the one referenced in the California regulations, and the one in effect at the time of the crash make it plainly apparent that X's must be placed at "__each end and at 1,000 ft. intervals__".* The runway marking at Weaverville plainly violated the California regulations.

California Code of Regulations Section 3542, a copy of which is attached hereto as Exhibit U, provides in pertinent part:

Kenney
&
Markowitz
L.L.P.

As a minimum, the following items are required for a permitted airport:

....

(d) runway and taxiway markings in accordance with Section 3543(a) of these regulations

Section 3543(a), also included within Exhibit U, provides in pertinent part:

(a) Airport marking. Airport markings are as follows:

...

(2) markings of a closed or abandoned runway shall be in accordance with FAA AC 150/5340 1G.

The FAA AC (Advisory Circular) 150/5340/1G referenced in these regulations is the successor to the AC referenced by the State in its 1978 letter (Exhibit D), 150/5340/1D. It provided, in pertinent part:

34. MARKING AND LIGHTING OF PERMANENTLY CLOSED RUNWAYS AND TAXIWAYS

... The runway threshold, runway designation and touchdown zone markings are obliterated and yellow crosses are placed at each end and at 1,000 foot (300m) intervals.

(Exhibit V). AC 150/5340/1G was superceded by version 150/5340/1H, effective August 31, 1999. Version 1H was the version that was in effect on the day of the crash, August 5, 2001. It provided, in pertinent part, precisely the same thing:

40. MARKING AND LIGHTING OF PERMANENTLY CLOSED RUNWAYS AND TAXIWAYS

The runway threshold, runway designation and touchdown zone markings are obliterated and solid, not striated, yellow X's are placed at each end and at 1,000 foot (300m) intervals.

Under such circumstances, the markings must be considered unreasonable. *Levin v. State* (1983), 146 Cal.App. 3d 410 (guardrail standards for highways disregarded and therefore unreasonable).

(e)  **The Gravity and Potential for Injury and Death Easily Outweighs the Cost and Practicality of Protection**

Government Code section 835.4(a) states: "The reasonableness of the act or omission that created the dangerous condition shall be determined by weighing the probability and gravity of

Kenney
&
Markowitz
L.L.P.

potential injury to persons and property foreseeably exposed to the risk of injury against the practicality and cost of taking alternative action that would not create the risk of injury or of protecting against the risk of injury."

In this case, quite literally, all the County had to do was paint the back side of the sign that existed and place a few additional signs at the airport. The County could have easily done that at a *de minimis* cost. The County could have erected the warning sign closer to the runway, albeit with frangible (break away) legs. In that way, the confusion created by the X at the north end, intended only for pilots preparing to land, would not misled pilots on the ground.

The County could have and should have also cut down the trees at the north end of the runway, as its own Risk Manager had directed in his memo. It was sheer lunacy to keep those trees in place to catch errant aircraft and/or to create a "visual barrier" so that pilots cannot see the rising terrain beyond the trees.

The probability for another incident, like Mr. Lampert's and the commencement of take off rolls to the north, described by Mr. Bonomini, was significant. The County cannot seriously argue, after Mr. Roberts expressly predicted this crash in his memo to the Planning Department, that this crash was not foreseeable.

**(f)    There are Changed Conditions that Vitiate Design Immunity.**

The design immunity under Government Code §830.6 is not perpetual. In *Cornette v. Department of Transp.* (2001) 26 Cal.4th 63 , the court held that design immunity is lost if the condition has undergone changed physical conditions since the design was originally approved. To establish changed conditions, Dr. Sajjadi must establish (1) the plan or design has become dangerous because of a change in physical conditions, (2) the public entity had actual or constructive notice of the dangerous condition, and (3) the public entity had a reasonable time to obtain the funds and carry out the necessary remedial work to make the design comport with a reasonable design or failed to make a reasonable attempt to provide adequate warnings. *Id.* at 72.

All three elements are present in the case at bar. First, the airport design has become dangerous due to the unchecked growth and proximity of the trees at the north end of the runway.

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
MOTION FOR SUMMARY ADJUDICATION; C 02-05461JW
Consolidated with Action C-03-4066JW

Kenney
&
Markowitz
L.L.P.

Neither the growth of these trees, nor any "X", nor the sign were part of the airport design plan approved in 1953. Even if one considers the Board's approval of the terms of a painting contract bid a sufficient approval of the X (even though the dangers presented thereby were apparently never considered), there is still no approval of the trees or the sign. The second element is satisfied since the County had actual notice of the inadequacy of the signage if, from nothing else, Roberts' interview with pilot Lampert after his near fatal wrong way take off. There is little doubt that the County had notice of the trees' presence. Its own risk manager had asked that they be cut down after six people crashed into them and died.

### 3. The County is Liable Because it Committed Tortious Acts Apart from the Airport Design.

Even assuming that the County could establish its design immunity defense, which it cannot, it is not absolved from liability for tortious acts and omissions operating concurrently with, but independent of, the airport design. *Cameron v. State of California* (1972) 7 Cal.3d 318, 327-328. Negligent maintenance constitutes an independent concurrent cause. *Mozzetti v. City of Brisbane* (1977) 67 Cal.App.3d 565, 575 (flood damage to plaintiff's property not solely attributable to design defect, but also to poor maintenance and clogging of the drainage system). Here, the County's negligent failure to keep the trees at the north end of the airport trimmed to a very low height is negligent maintenance. Similarly, the very faded nature of the painted lettering on the sign, in comparison to its more readable fresh paint as of the time this Court inspected the sign is negligent maintenance. (Compare Exhibit S, a photo of the sign taken the day after the crash by NTSB investigator Petersen, with the condition of the sign after it was repainted as reflected in Exhibit T).

### IV. CONCLUSION

The airport is a deceptively dangerous airport and cries out for appropriate warnings. The trees at the north end are dangerous not only because they are too close to the runway and thus likely to "catch" an errant airplane; they are dangerous because they conceal the rising terrain to the north which may be too tall for an airplane to outclimb. There is absolutely no reason that the

Kenney
&
Markowitz
L.L.P.

County of Trinity could not have installed additional ground signage to ensure that the mistake made by Mr. Lampert and other pilots was not again made with the "more serious results" that Mr. Roberts had so accurately predicted would happen. Such conditions can hardly be described as reasonable.

There has been no approval of the sign or the trees at the north end. The sign was erected by Mr. Roberts, by himself, with no consultation with the Board of Supervisors, or even his own supervisor who was in charge of the airports at the time. The trees not only lack approval; they were actually supposed to be cut down and were not.

For these reasons, Dr. Sajjadi respectfully submits that this Court conclude that the County of Trinity is not entitled to design immunity.

Respectfully submitted,

DATED: September _10_, 2004      **KENNEY & MARKOWITZ L.L.P**

By:_____
    DONALD S. HONIGMAN
    JUDE A. CISNEROS
    Attorneys for Defendant and Cross
    Defendant MARK SAJJADI and
    Intervenor GREAT AMERICAN
    INSURANCE COMPANY

**LAW OFFICES OF DAVID S. RAND**
Attorneys for Plaintiff MARK SAJJADI

Kenney
&
Markowitz
L.L.P.

*Steve Funderburg, et al. v. State of California, et al. Group, et al. (Case No. 02CV062)*
*Great American insurance Company v. State of California, et al. (Case No. 02CV064)*
*Steve Funderburg, et al. v. United States of America, et al. (Case No. C02-0541 JW)*

## PROOF OF SERVICE
### [C.C.P.§2008, F.R.C.P. Rule 5]

I, the undersigned, state:

I am a citizen of the United States. My business address is 255 California Street, Suite 1300, San Francisco, California 94111. I am employed in the City and County of San Francisco. I am over the age of eighteen years and not a party to this action. On the date set forth below, I served the foregoing documents described as follows:

### MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR SUMMARY ADJUDICATION [F.R.C.P. 56]

on the following person(s) in this action by placing a true copy there of enclosed in a sealed envelope addressed as follows:

### SEE ATTACHED SERVICE LIST

[]     BY FIRST CLASS MAIL - I am readily familiar with my firm's practice for collection and processing of correspondence for mailing with the United States Postal Service, to-wit, that correspondence will be deposited with the United States Postal Service this same day in the ordinary course of business. I sealed said envelope and placed if for collection and mailing this date, following ordinary business practices.

[]     BY PERSONAL SERVICE - Following ordinary business practices, I caused to be served, by hand delivery on this date to the offices of the addressee(s).

[X]     BY OVERNIGHT MAIL - I caused such envelope to be delivered by a commercial carrier service for overnight delivery to the office(s) of the addressee(s).

[]     BY FACSIMILE - I caused said document to be transmitted by Facsimile machine to the number indicated after the address(es) noted above.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct and that this declaration was executed this date in San Francisco, California.

Dated: September 10, 2004

_____
Sandy E'Bell

Kenney
&
Markowitz
L.L.P.

*Steve Funderburg, et al. v. State of California, et al. Group, et al. (Case No. 02CV062)*
*Great American insurance Company v. State of California, et al. (Case No. 02CV064)*
*Steve Funderburg, et al. v. United States of America, et al. (Case No. C02-0541 JW)*

## SERVICE LIST

David S. Rand, Esq.
LAW OFFICES OF DAVID S. RAND
655 Redwood Highway, #250
Mill Valley, CA 94941
(Counsel for Plaintiffs Steve Funderburg, Robert
Dale Booth, Guardian ad Litem for Mark Dexter
Booth, a minor and Mark Sajjadi, M.D.

Keven Steinberg, Esq.
BAILEY & PARTNERS
2828 Donald Douglas Loop North
2nd Floor
Santa Monica, CA 90405
(Counsel for Defendant County of Trinity)

Joseph L. Naegele
1530 The Alameda, Suite 205
San Jose, CA 95126
(Counsel for Plaintiffs Steve Funderburg, et al.)

Debra D. Fowler
Senior Aviation Counsel
Civil Division, Torts Branch
U.S. Department of Justice
P.O. Box 14271
Washington, D.C. 20044-4271
(Attorneys for United States of America)

Kevin V. Ryan
United States Attorney
Joann M. Swanson
Acting Chief, Civil Division
Claire T. Cormier
Assistant U.S. Attorney
United States Attorney's Office
Northern District of California
San Jose Branch
150 Almaden Blvd., Suite 900
San Jose, CA 95113

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
MOTION FOR SUMMARY ADJUDICATION; C 02-05461JW
Consolidated with Action C-03-4066JW

Kenney
&
Markowitz
L.L.P.