STEVEN C. HOLTZMAN (CA BAR NO. 144177)
  sholtzman@bsfllp.com
BOIES, SCHILLER & FLEXNER LLP
1999 Harrison Street, Suite 900
Oakland, CA 94612
Telephone: (510) 874-1000
Facsimile: (510) 874-1460

D. MICHAEL UNDERHILL (*pro hac vice*)
  munderhill@bsfllp.com
BOIES, SCHILLER & FLEXNER LLP
5301 Wisconsin Avenue NW
Washington, D.C. 20015
Telephone: (202) 237-2727
Facsimile: (202) 237-6131

Attorneys for Defendant
CONNECTU, INC.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| THE FACEBOOK, INC. and MARK ZUCKERBERG,<br><br>    Plaintiffs,<br><br>  v.<br><br>CONNECTU, INC. (formerly known as CONNECTU, LLC), PACIFIC NORTHWEST SOFTWARE, INC., WINSTON WILLIAMS, and WAYNE CHANG,<br><br>    Defendants. | Case No. 5:07-CV-01389-JW<br><br><br>**CONNECTU, INC.'S MOTION TO STAY EXECUTION OF JUDGMENT PENDING APPEAL** |

# TABLE OF CONTENTS

TABLE OF AUTHORITIES .................................................................................................. ii

NOTICE OF MOTION ...................................................................................................... 1

MEMORANDUM OF POINTS AND AUTHORITIES ..................................................... 2

I.      INTRODUCTION ................................................................................................. 2

II.     STATEMENT OF FACTS .................................................................................... 2

        A.      The Judgment requires ConnectU and its shareholders to tender
                shares and submit dismissals and releases. ..............................................2

        B.      Facebook has refused to agree not to interfere with ConnectU's
                appeal if it obtains control of ConnectU. .................................................3

III.    ARGUMENT ......................................................................................................... 4

        A.      The Ninth Circuit's standard for a stay pending appeal is fully
                satisfied here. ............................................................................................5

                1.      Absent a stay pending appeal, ConnectU and its shareholders
                        may be irreparably harmed ............................................................5

                2.      Because staying the Judgment pending appeal would not
                        harm Facebook's legitimate interests, the balance of
                        hardships tips sharply in ConnectU's favor. .................................7

                3.      At a minimum, ConnectU's appeal raises serious legal
                        questions that should be heard by the Ninth Circuit. ...................8

        B.      The public interest favors a stay. .............................................................14

IV.     THERE IS NO NEED FOR A BOND IN ADDITION TO THE
        MONEY AND STOCK TO BE HELD IN ESCROW BY THE SPECIAL
        MASTER ............................................................................................................. 14

V.      CONCLUSION ..................................................................................................... 15

**TABLE OF AUTHORITIES**

**CASES**

*Basic Inc. v. Levinson,*
  485 U.S. 224 (1988)...................................................................14

*Bates v. Jones,*
  958 F. Supp. 1446 (N.D. Cal. 1997) .........................................13

*Callie v. Near,*
  829 F.2d 888 (9th Cir. 1987) ......................................................9

*Casey v. Proctor,*
  59 Cal. 2d 97 (Cal. 1963).........................................................11

*Country Squire Assocs., L.P. v. Rochester Community Sav. Bank,*
  203 B.R. 182 (2nd Cir. BAP 1996)..............................................5

*Ctr. for Int'l Envtl. Law v. Office of the United States Tr. Rep.,*
  240 F. Supp. 2d 21 (D.D.C. 2003) ..............................................5

*EEOC v. Quad/Graphics,* 875 F. Supp. 558 (E.D. Wis. 1995)....................5

*Employers Ins. of Wausau v. Granite State Ins. Co.,*
  330 F.3d 1214 (9th Cir. 2003) ...................................................11

*Golden Gate Rest. Ass'n v. City and County of San Francisco,*
  512 F.3d 1112 (9th Cir. 2008) .....................................................5

*Gould v. Control Laser Corp.,*
  866 F.2d 1391 (Fed. Cir. 1989)....................................................6

*Hanig v. Qualcomm Inc.,*
  2002 Cal. App. Unpub ...............................................................11

*In re "Agent Orange" Prod. Liab. Litig.,*
  804 F.2d 19 (2d Cir. 1986)..........................................................5

*In re Advanced Mining Sys., Inc.,*
  173 B.R. 467 (S.D.N.Y. 1994)....................................................5

*In re Grandview Estates Assocs., Ltd.,*
  89 B.R. 42 (Bankr. W.D. Mo. 1988)............................................5

*Lockyer v. Mirant Corp.,*
  398 F.3d 1098 (9th Cir. 2005) .....................................................7

*McClain v. Octagon Plaza, Inc.,*
  159 Cal. App. 4th 784 (2d Dist. 2008).......................................11

*McCormick v. Fund Am. Cos.*,
    26 F.3d 869 (9th Cir. 1994) ..................................................................10

*NLRB v. GMC*,
    510 F. Supp. 341 (S.D. Ohio 1980) ...................................................7, 14

*In re Norwich Historic Pres. Trust, LLC*,
    No. 3:05CV12, 2005 U.S. Dist. LEXIS 7171, 2005 WL. 977067 (D.
    Conn. 2005)...........................................................................................5

*Ozyagcilar v. David*,
    701 F.2d 306 (4th Cir. 1983) ................................................................9

*Pearlstein v. Scudder & German*,
    429 F.2d 1136 (2d Cir. 1970) ..............................................................13

*Perfect 10, Inc. v. Cybernet Ventures, Inc.*,
    213 F. Supp. 2d 1146 (C.D. Cal. 2002) .................................................6

*Petro-Ventures, Inc. v. Takessian*,
    967 F.2d 1337 (9th Cir. 1992) .............................................................11

*Republic of Philippines v. Marcos*,
    862 F.2d 1355 (9th Cir. 1988) .............................................................13

*Sammartano v. First Judicial Dist. Court*,
    303 F.3d 959 (9th Cir. 2002) ..............................................................14

*Sea Ranch Assoc. v. California Coastal Com.*,
    552 F. Supp. 241 (N.D. Cal. 1982) .......................................................6

*Simon Property Group, Inc. v. Taubman Centers, Inc.*,
    262 F. Supp. 2d 794 (E.D. Mich. 2003)...............................................13

*In re St. Johnsbury Trucking Co.*,
    185 B.R. 687 (S.D.N.Y. 1995)...............................................................5

*Superintendent of Ins. v. Bankers Life & Cas. Co.*,
    404 U.S. 6 (1971)................................................................................12

*United States v. Cleveland Electric Illuminating Co.*,
    689 F.2d 66 (6th Cir. 1982) ..................................................................7

*United States v. Jones*,
    84 A.F.T.R.2d (RIA) 6830 (D.S.C. 1999) .............................................14

*United States v. Leach*,
    1990 U.S. Dist. LEXIS 12728 (D. Kan. Sept. 14, 1990) ........................7

*Weddington Prods., Inc. v. Flick*,
    60 Cal. App. 4th 793 (Cal. Ct. App. 1998) .............................................8

iii

# STATUTES

Cal. Civ. Code § 1542......................................................................................................11

Cal. Civ. Code § 1668......................................................................................................11

Conn. Gen. Stat. § 33-816(b)...........................................................................................10

FRCP 62 ............................................................................................................................7

# MISCELLANEOUS

Richard Jennings & Harold Marsh, *Securities Regulation* 1044 n.12 (6th
    ed. 1987) ......................................................................................................................10

VII Louis Loss & Joel Seligman, *Securities Regulation* 1505 (3d ed.
    1991) ...........................................................................................................................10

# NOTICE OF MOTION

TO THE PARTIES OF RECORD:

PLEASE TAKE NOTICE that on October 27, 2008, at 9:30 A.M., or as soon thereafter as it may be heard, in Courtroom 8 of this Court, before the Honorable James Ware, Defendant ConnectU, Inc. will move for an order staying the execution of the JUDGMENT ENFORCING SETTLEMENT AGREEMENT ("Judgment") entered by the Court on July 2, 2008. ConnectU's motion is based on the accompanying Memorandum, the Declaration of D. Michael Underhill, and all pleadings and papers that are of record and are on file in this case. ConnectU files this motion without waiving any rights to appeal or otherwise to set aside the Judgment and reserving all rights with respect thereto.

In accordance with the Court's individual practices, this motion bears a return date of October 27, 2008. Because, however, of recent positions taken by Plaintiffs relating to the upcoming Judgment deadline, filed herewith is a Motion to Shorten Time requesting expedited consideration of the instant motion on August 14, 2008. ConnectU would not object to the Court addressing the instant motion on an earlier date, including on August 6, 2008, during the hearing currently scheduled on the Motion to Intervene by Cameron Winklevoss, Tyler Winklevoss and Divya Narendra (Docket No. 574).

## MEMORANDUM OF POINTS AND AUTHORITIES

## I. INTRODUCTION

ConnectU respectfully submits that to prevent irreparable injury to ConnectU, this Court should stay enforcement of the Judgment pending appeal. If ConnectU's shareholders are forced to tender their shares to the Special Master and those shares are conveyed to Facebook, then Facebook would effectively control ConnectU. Given that control, Facebook would attempt to dismiss or otherwise hamper ConnectU's appeal from the Judgment, as well as any malpractice claim it may have against its former attorneys. Facebook may also argue that if it has control of ConnectU, it is entitled to ConnectU's books and records. Such access would pose a substantial risk of compromising privileged communications between ConnectU and its counsel.

Whether or not such tactics would succeed, they would at a minimum complicate the appeal and threaten to irreparably impair ConnectU's value, even if the Ninth Circuit overturns the Court's order on appeal — and for no good reason. Because neither of the underlying lawsuits between Facebook and ConnectU will proceed while the appeal is pending, Facebook's legitimate interests will not be harmed if this Court stays its judgment pending appeal.

## II. STATEMENT OF FACTS

The facts leading up to the Judgment are detailed in ConnectU's Opposition and Surreply (together with supporting declarations) filed in connection with Plaintiffs' Confidential Motion to Enforce, which we incorporate by reference.

### A. The Judgment requires ConnectU and its shareholders to tender shares and submit dismissals and releases.

On June 25, 2008, the Court granted Facebook's motion to enforce a handwritten "Term Sheet & Settlement Agreement" ("Term Sheet"). *See* Docket No. 461. The Court ordered the parties to appear for a hearing on July 2, 2008, to show cause as to why

judgment should not be entered and to address the form of the judgment. *Id.*

At the July 2 hearing, the Court stated that it was contemplating entering a judgment that would order the parties to submit to a special master the documents and cash that they were to deliver under the Term Sheet. Ex. A to the Declaration of D. Michael Underhill ("Underhill Decl.") (hearing transcript), at 27:1-28:7. The Court thereafter entered the Judgment (Docket No. 476) and entered a Notice appointing attorney George Fisher as Special Master. *See* Docket No. 475. The Notice provided that the Special Master would, *inter alia*, accept and maintain documents, money, and other things deposited by the parties, subject to disbursement upon further Order of the Court. *Id.* By its terms, the Judgment required the parties:

- to submit proposed forms of release to the Court by July 9, 2008;
- to provide a "legally sufficient dismissal with prejudice of all cases by and between the parties pending as of the date of the Agreement" to the Special Master by August 4, 2008; and
- to deposit the cash and stock required to be exchanged under the provisions of the Term Sheet with the Special Master by August 4, 2008.

Docket No. 476 at 1-4.

### B. Facebook has refused to agree not to interfere with ConnectU's appeal if it obtains control of ConnectU.

Facebook and ConnectU both initially proposed forms of judgment that would unquestionably have preserved ConnectU's ability to appeal. For example, Facebook's proposed documentation for the judgment filed before the show cause hearing provided that the date for exchanging the cash and stock and the "effective date" of the releases would be five days after all appeals from the judgment enforcing the Term Sheet became final. (Docket No. 469-2 at 3-4, 10). But Facebook later changed its position. At the show cause hearing, Facebook asked that the judgment provide it with "all of the stock to

3

the company [ConnectU] within 30 days of entry of judgment." Ex. A to the Underhill Decl. at 33:8-11; *see id.* at 34:9-13 (explaining Facebook's intention to "get control of the company [ConnectU] through owning the shares"). Later, Facebook sought to make the releases effective upon approval by the Court. *See* Docket No. 479 at 1 ("[t]his Release of Claims…shall be effective upon approval of the Court").[1]

ConnectU has repeatedly tried without success to reach an agreement with Facebook that would protect ConnectU's rights pending appeal. Now, in response to direct questions from ConnectU's counsel, Facebook's counsel has conveyed his client's refusal to agree to refrain from interfering with ConnectU's appeal and its malpractice claim. Instead, Facebook's counsel has stated that although Facebook will evaluate its options after Facebook receives the ConnectU stock, "it would be reasonable to assume that Facebook would act in its own interests." Declaration of D. Michael Underhill at ¶ 3 and Ex. B. And on July 25 Facebook's counsel told ConnectU's counsel that "if you want to file a motion to stay, we will respond in due course." *Id.*, Ex. B.

It requires little imagination to conclude that Facebook is unlikely to view as in its interests a continued appeal by ConnectU to obtain reversal of the Judgment. And whether out of vindictiveness or a desire to pressure ConnectU's shareholders, it is entirely plausible that Facebook would either release ConnectU's malpractice claim against Quinn Emanuel or threaten to do so, which would harm third-party Howard Winklevoss, who guaranteed payment of Quinn's fees if ConnectU does not pay them, and would substantially impair ConnectU's value if the Ninth Circuit reverses the Judgment.

## III.    ARGUMENT

ConnectU respectfully requests that the Court stay the Judgment because (a) absent a stay, ConnectU and its shareholders would be irreparably harmed, while a stay

---

[1] ConnectU filed objections to Facebook's proposed release. Docket No. 488.

4

would not harm Facebook, and (b) at a minimum, ConnectU's appeal raises serious legal questions that should be heard by the Ninth Circuit.

## A. The Ninth Circuit's standard for a stay pending appeal is fully satisfied here.

There are "two interrelated tests" in this Circuit for whether to stay a judgment pending appeal. *Golden Gate Rest. Ass'n v. City and County of San Francisco*, 512 F.3d 1112, 1115 (9th Cir. 2008). "At one end of the continuum, the moving party is required to show both a probability of success on the merits and the possibility of irreparable injury." *Id.* (internal citations omitted). "At the other end of the continuum, the moving party must demonstrate that serious legal questions are raised and that the balance of hardships tips sharply in its favor." *Id.* at 1116 (inner citations omitted). These tests "represent two points on a sliding scale" where "the required degree of irreparable harm increases as the probability of success decreases." *Id.* Both tests are satisfied here.

### 1. Absent a stay pending appeal, ConnectU and its shareholders may be irreparably harmed.

ConnectU and its shareholders would be irreparably harmed if actions they take to comply with the Judgment deprive them of their "basic right[s] to appeal." *Ctr. for Int'l Envtl. Law v. Office of the United States Tr. Rep.*, 240 F. Supp. 2d 21, 22-23 (D.D.C. 2003); *EEOC v. Quad/Graphics*, 875 F. Supp. 558, 560 (E.D. Wis. 1995). Indeed, many courts have found irreparable harm where, absent a stay pending appeal, the appellant stood to lose its ability to appeal. *See, e.g., Country Squire Assocs., L.P. v. Rochester Community Sav. Bank,* 203 B.R. 182, 183 (2nd Cir. BAP 1996) (holding that the prospect of a mooted appeal if stay were denied "would be the 'quintessential form of prejudice'").[2] Facebook's refusal to undertake not to interfere with ConnectU's appeal

_____

[2] *Accord, e.g., In re Norwich Historic Pres. Trust, LLC,* No. 3:05CV12, 2005 U.S. Dist. LEXIS 7171, 2005 WL 977067, at *3 (D. Conn. 2005) (acknowledging "persuasive" arguments that although foreclosure sale would not injure appellant, appellant's concern that his appeal would be mooted satisfied the irreparable harm

makes clear that, without a stay, ConnectU's right to appeal would be at risk — and given Facebook's obvious interest in avoiding an appeal it is likely that Facebook would attempt to do so.[3] And giving Facebook control of ConnectU — including such of its books and records as are protected by attorney-client privilege and the work-product doctrine and, potentially, the right to waive those protections — would further threaten irreparable harm to ConnectU and its shareholders.

Moreover, giving Facebook control of ConnectU could also potentially affect the malpractice claim that ConnectU and its shareholders may assert against their former counsel Quinn Emanuel. For example, if ConnectU, controlled by Facebook, were to release Quinn, it would at a minimum complicate the claim and could injure Howard Winklevoss, who has guaranteed ConnectU's obligations to Quinn. *See Perfect 10, Inc. v. Cybernet Ventures, Inc.*, 213 F. Supp. 2d 1146, 1191 (C.D. Cal. 2002) (considering

---

requirement); *In re St. Johnsbury Trucking Co.*, 185 B.R. 687, 690 (S.D.N.Y. 1995) (finding sufficient irreparable injury where denying a stay would threaten government's ability to appeal); *In re Advanced Mining Sys., Inc.*, 173 B.R. 467, 468-69 (S.D.N.Y. 1994) (finding irreparable injury where, absent a stay, the distribution of assets to creditors would moot any appeal and thus quintessentially prejudice appellants); *In re Grandview Estates Assocs.*, Ltd., 89 B.R. 42, 42-43 (Bankr. W.D. Mo. 1988) (declining to stay the foreclosure sale of an asbestos-ridden apartment complex, but holding that irreparable injury is clearly shown where such sales moot any appeal, and concluding that to hold otherwise would preclude appellate review, thus running "contrary to the spirit of the bankruptcy system [and also] subvert[ing] the entire legal process"). *Cf. In re "Agent Orange" Prod. Liab. Litig.*, 804 F.2d 19, 20 (2d Cir. 1986) (declining to lift stay of distribution of a settlement award because objecting parties had "a right to appellate review," and "[d]istribution of the challenged settlement award before its validity [could be] tested would deprive those parties of that right").

[3] Under some circumstances, a party may give up appellate rights by complying with a court order. *See Sea Ranch Assoc. v. California Coastal Com.*, 552 F. Supp. 241, 245 (N.D. Cal. 1982) (rights to appeal mooted by complying with terms of settlement agreement); *see also Gould v. Control Laser Corp.*, 866 F.2d 1391, 1394 (Fed. Cir. 1989) (holding a case moot where, "[b]y virtue of the settlement agreement, Patlex has become the *dominus litis* on both sides"). Although *Sea Ranch* and *Gould* are distinguishable — and ConnectU reserves all its rights to argue that any attempt to interfere with its appeal would not be effective — this body of law would at a minimum complicate the appeal.

6

impact on third parties in balancing the harms).[4]

Indeed, to preserve its right to appeal, ConnectU would have no choice but to seriously — albeit reluctantly — consider risking contempt if ordered to comply with the Judgment by causing its shareholders to convey their stock to the Special Master. *See, e.g., United States v. Cleveland Electric Illuminating Co.*, 689 F.2d 66, 68 (6th Cir. 1982) (appeal dismissed because party failed to court contempt to preserve right to appeal). The irreparable harm flowing from this situation warrants a stay. *See NLRB v. GMC*, 510 F. Supp. 341, 343 (S.D. Ohio 1980) ("There is no question that the respondents will suffer irreparable harm if this stay is denied. If they obey the subpoenas, their appeal is mooted; if they ignore them, they could be held in contempt of court. If a trade-off is necessary, it must favor rights. We will not force such a choice"); *United States v. Leach*, 1990 U.S. Dist. LEXIS 12728, at *2-3 (D. Kan. Sept. 14, 1990) (same).

> **2.  *Because staying the Judgment pending appeal would not harm Facebook's legitimate interests, the balance of hardships tips sharply in ConnectU's favor.***

Although Facebook would doubtless prefer to dispense with an appeal altogether, staying the Judgment pending completion of an appeal would cause it no legally cognizable harm. Apart from the appeal — and Facebook can hardly complain that ConnectU's exercise of its fundamental right to appeal constitutes cognizable harm[5] — Facebook will face no further litigation either here or in Massachusetts unless the Ninth Circuit reverses the Judgment. Although Facebook has expressed concern that

---

[4] It also remains unclear whether Quinn can or will contend that the malpractice claim would be affected if the shareholders transfer their shares to the Special Master. If so, this would be further significant harm to ConnectU and Howard Winklevoss that weighs in favor of a stay.

[5] *See FTC v. Standard Oil Co.*, 449 U.S. 232, 244 (1980) ("the expense and annoyance of litigation is part of the social burden of living under government....Mere litigation expense, even substantial and unrecoupable cost, does not constitute irreparable injury.") (internal citations and quotations omitted).

ConnectU's value might diminish during the course of the appeal and suggested posting a bond (July 2 Tr. at 50) pursuant to FRCP 62, as a practical matter there is no such risk in this case. First, ConnectU has offered to allow the Special Master or even Facebook to oversee its day-to-day business operations. (July 2 Tr. at 37-38.) And if the Court grants the requested stay, ConnectU is prepared to make no operational — as distinct from litigation — decisions without the approval of the Special Master. Second, Facebook could seek to offset any proven damages against the cash and stock it would be required to pay ConnectU's shareholders if the Judgment is upheld on appeal.

Balancing the complete lack of cognizable harm to Facebook against the potential harm to ConnectU's rights shows that the balance of hardships tips sharply in ConnectU's favor.

### 3. At a minimum, ConnectU's appeal raises serious legal questions that should be heard by the Ninth Circuit.

At a minimum, ConnectU's appeal raises serious legal questions that should be heard by the Ninth Circuit. ConnectU respectfully submits that the Court erred in rejecting its contract and securities fraud defenses to the motion to enforce.[6]

#### a. Contract defenses.

With respect to ConnectU's contract defenses, ConnectU intends to argue, among other things, the following grounds for reversal in the Court of Appeals:

*First*, the Court should not have limited its review of the evidence to "the four corners of the Agreement." Order at 7. Well-established California case law holds that conduct subsequent to the execution of a purported settlement is to be considered in determining the enforceability of the alleged agreement. *See Weddington Prods., Inc. v. Flick*, 60 Cal. App. 4th 793, 800-01 (Cal. Ct. App. 1998). The Court also did not

---

[6] This motion does not contain an exhaustive description of ConnectU's grounds for appeal; ConnectU reserves the right to raise other issues on appeal.

8

consider the complex set of documents (totaling over 100 pages) that Facebook initially proffered as "required" to enforce the alleged agreement between the parties. Those documents are strong proof of the ambiguity and incompleteness of the Term Sheet under *Weddington* and other cases.

Second, the Order incorrectly concluded that the Term Sheet "clearly defines the structure of the transaction." Order at 7. At the least, the Court should have held an evidentiary hearing in light of the sworn expert declaration submitted by a Columbia University School of Business professor and other evidence establishing that the Term Sheet was ambiguous as to the material question of the form of the transaction.[7] Professor Donna Hitscherich's declaration stated that the Term Sheet was ambiguous as to whether the transaction was a stock purchase from the ConnectU shareholders or a merger. Corrected Declaration of Donna M. Hitscherich ¶ 12. Professor Hitscherich also offered sworn testimony that this ambiguity was highly material because "the structure of the transaction is of primary importance to the seller for a variety of reasons, including but not limited to, tax planning where a principal goal of the seller is to maximize its after-tax proceeds attendant to the sale of its asset." *Id.*, ¶ 12. This ambiguity as to a highly material term – the structure of the transaction – rendered the Term Sheet unenforceable. "If no meeting of the minds has occurred on the material terms of a contract, basic contract law provides that no contract formation has occurred. If no contract formation has occurred, there is no settlement agreement to enforce. . . ." *Weddington*, 60 Cal. App. 4th at 797.

Third, with regard to the expert declaration referenced above and other evidence, the Court should have held an evidentiary hearing prior to summary enforcement. *Callie v. Near*, 829 F.2d 888, 891 (9th Cir. 1987); *see also Ozyagcilar v. David*, 701 F.2d 306, 307-08 (4th Cir. 1983). The Court should have heard testimony regarding the

---

[7] Indeed, the documents Facebook initially proffered to enforce the Term Sheet characterize the transaction both as a "merger" and as a "stock acquisition."

9

enforceability of the Term Sheet.

*Fourth*, the Court placed undue reliance on the Term Sheet's recitation that it was "binding." Order at 8. In *Weddington*, the term sheet had provided that it was "enforceable," 60 Cal. App. 4th at 800, but the court there gave such recitation little weight and denied enforcement.

*Finally*, the Term Sheet is not properly enforceable as a "share exchange transaction" under Connecticut law. Order at 7. Under Connecticut law, a foreign corporation, such as Facebook, may be a party to a share exchange transaction with a Connecticut corporation, such as ConnectU, only if "[t]he share exchange is permitted by the law of the state . . . under which such corporation . . . is organized or by which it is governed . . . ." CONN. GEN. STAT. § 33-816(b). Facebook is a Delaware corporation. Delaware does not permit share exchange transactions. LOU R. KLING, NEGOTIATED ACQUISITIONS OF COMPANIES, SUBSIDIARIES AND DIVISIONS § 1.02[5]. Thus, enforcing the Term Sheet as a "share exchange transaction" was error.

### b. *Securities fraud defense.*

The Order rejected ConnectU's securities fraud defense under section 29(b) of the Securities Exchange Act of 1934, on the grounds that (a) the prohibition of the securities laws against fraud in the inducement does not apply in the settlement context, and (b) apparently as a matter of law, this case was outside "the context of insider trading." Order at 11-12. These determinations broke new ground and are inconsistent with the statutory language, contrary to controlling case-law, and unsupported by the authorities cited.

*First*, the summary conclusion that, apparently as a matter of law, insider trading is "not an issue in this case," Order at 11, cannot be squared with binding Ninth Circuit case law establishing that a company that trades in its own stock is a corporate insider that must abide by the "disclose or abstain" rule. *See, e.g.*, *McCormick v. Fund Am. Cos.*, 26 F.3d 869, 876 (9th Cir. 1994) (*citing* VII Louis Loss & Joel Seligman, *Securities*

*Regulation* 1505 (3d ed. 1991) ("When the issuer itself wants to buy or sell its own securities, it has a choice: desist or disclose"); and Richard Jennings & Harold Marsh, *Securities Regulation* 1044 n.12 (6th ed. 1987) ("the issuer itself is, of course, also covered" by insider trading laws)).

*Second*, the conclusion — based on *Petro-Ventures, Inc. v. Takessian*, 967 F.2d 1337, 1338, 1342 (9th Cir. 1992) — that "a broad release in a signed settlement agreement operates to prevent a party from collaterally attacking the agreement by alleging it violates the securities laws under § 29," Order at 11, is not supported by case law. *Petro-Ventures* does not bar a claim that a settlement agreement induced by securities fraud is void under § 29*(b)*. Rather, that case addressed a very different question under § 29*(a)* of the 1934 Act:

The plaintiff had settled an underlying lawsuit in which it had asserted state-law claims but not securities claims. *Petro-Ventures*, 967 F.3d at 1338. The settlement agreement released all claims, "'whether or not said claims have been set forth in the [underlying litigation],'" and expressly waived the plaintiff's rights under Cal. Civ. Code § 1542.[8] *Id.* The plaintiff later filed a new lawsuit alleging only securities fraud claims.

---

[8] Here, although the Term Sheet called for "releases as broad as possible," it did not even mention a waiver of the parties' rights under § 1542. Such waivers may not be implied from broad release language. *Casey v. Proctor*, 59 Cal. 2d 97, 105 (Cal. 1963) ("It therefore appears beyond reasonable doubt that Civil Code section 1542 was intended by its drafters to preclude the application of a release to unknown claims in the absence of a showing, *apart from the words of the release* of an intent to include such claims") (emphasis added). In any event, even an express waiver of rights under § 1542 does not bar a claim that the agreement containing that waiver is void due to fraud in the inducement. *See, e.g., Hanig v. Qualcomm Inc.*, 2002 Cal. App. Unpub. LEXIS 11288 at *13 (4th Dist., Dec. 6, 2002) ("the existence of the section 1542 waiver in the release does not bar . . . this action. Fraud in the inducement renders the whole agreement voidable, including this waiver. (*See* 1 Witkin, Summary of Cal. Law (9th ed. 1987) Contracts, § 410, pp. 368-369.)"). Note that in predicting what the state courts would hold state law to be, federal courts should consider unpublished appellate opinions as an indication of how the state's highest court would rule. *Employers Ins. of Wausau v. Granite State Ins. Co.*, 330 F.3d 1214, 1220 n.8 (9th Cir. 2003).

Nor does the Term Sheet contain a waiver of rights under Cal. Civ. Code § 1668,

CONNECTU'S MOTION TO STAY
EXECUTION OF JUDGMENT
5:07-CV-01389-JW

*Id.* When the defendants moved to dismiss the new lawsuits as barred by the release, the plaintiff argued that when it signed the release it did not know that it could have asserted securities law claims *in the underlying litigation* and that § 29(a) barred the release of securities fraud claims unless the releasing party had actual knowledge of those claims. *Id.* at 1338, 1342. The Ninth Circuit held that the release of all claims connected to the underlying securities transaction "'regardless of whether or not said claims have been set forth in this litigation referred to . . . in this agreement'" coupled with the plaintiff's express waiver of Section 1542 rights made clear the plaintiff's intent to waive its securities claims relating to the underlying transaction and that this was not barred by § 29(a). *Id.* at 1342.

But unlike this case, the party seeking to avoid the release in *Petro-Ventures* made no argument that the settlement agreement itself was procured through securities fraud; nor could it have since (unlike in this case) the settlement did not involve a securities transaction. Thus, *Petro-Ventures* does not support a rule under which a party can induce a settlement agreement through securities fraud with impunity.

And such a rule would be flatly inconsistent with: (a) the plain language of § 29(b): "*Every* contract made in violation of this title or any rule or regulation thereunder, shall be void . . . ." (emphasis supplied); (b) the plain language of § 10(b): "It shall be unlawful . . . to use or employ, in connection with the purchase or sale of *any* security . . .

which provides that "[a]ll contracts which have for their object, directly or indirectly, to exempt anyone from responsibility for his own fraud . . . whether willful or negligent, are against the policy of the law." This provision, too, bars waiver of a claim for fraud in the inducement. *McClain v. Octagon Plaza, Inc.*, 159 Cal. App. 4th 784, (2d Dist. 2008) (under § 1668 "as Witkin explains: 'A party to a contract who has been guilty of fraud in its inducement cannot absolve himself or herself from the effects of his or her fraud by any stipulation in the contract, either that no representations have been made, or that any right that might be grounded upon them is waived. Such a stipulation or waiver will be ignored, and parol evidence of misrepresentations will be admitted, for the reason that fraud renders the whole agreement voidable, *including the waiver provision*.'" (emphasis in original)).

12

any manipulative or deceptive device or contrivance . . . ." (emphasis supplied); and (c) the Supreme Court's holding in *Superintendent of Ins. v. Bankers Life & Cas. Co.,* 404 U.S. 6, 10-12 (1971) that the circumstances under which a securities transaction occurs are "irrelevant to the coverage of § 10(b)," which "prohibit[s] *all* fraudulent schemes in connection with the purchase or sale of securities," including "unique form[s] of deception" and "[n]ovel or atypical methods." *Id.* ("we read § 10(b) to mean that Congress meant to bar deceptive devices and contrivances in the purchase or sale of securities whether conducted in the organized markets or face to face"). (Emphasis supplied.) In short, no court has ever held that there is a settlement exception to the scope of the federal securities laws, and the only case to present the issue — *Pearlstein v. Scudder & German*, 429 F.2d 1136, 1142 (2d Cir. 1970) — held exactly the opposite, reversing the district court's refusal to void a settlement agreement under § 29.[9]

At a minimum, the securities fraud issue presents serious questions of public policy and the proper interpretation of Federal laws as to which the Ninth Circuit may well reach a different conclusion than this Court did.[10] On this issue, as on the contract defenses, ConnectU has shown that there are at least serious legal questions to be heard by the Ninth Circuit, which more than meets ConnectU's burden. *See, e.g., Republic of Philippines v. Marcos*, 862 F.2d 1355, 1362 (9th Cir. 1988) (*en banc*) ("[s]erious

---

[9] As the Court observed, *Pearlstein* voided a settlement agreement because margin requirements had been violated rather than because that agreement had been induced through securities fraud. We respectfully submit, however, that a rule under which settlement agreements are void if procured in violation of relatively minor technical rules but enforceable if procured by fraud — arguably a more serious violation of the securities laws — makes little sense.

[10] That the Ninth Circuit has not previously spoken to these issues further favors a stay. *See Bates v. Jones,* 958 F. Supp. 1446, 1472 (N.D. Cal. 1997) (that the case presented issues of first impression favored a stay); *Simon Property Group, Inc. v. Taubman Centers, Inc.*, 262 F. Supp. 2d 794, 797 (E.D. Mich. 2003) ("The Court finds that Defendants have raised serious legal questions . . . which have yet to be clearly addressed in this Circuit. Therefore, the Court finds that this element weighs in favor of granting a stay").

13

questions need not promise a certainty of success, nor even present a probability of success").

## B. The public interest favors a stay

"The public interest inquiry primarily addresses impact on non-parties rather than parties." *Sammartano v. First Judicial Dist. Court*, 303 F.3d 959, 974 (9th Cir. 2002). Here, a stay would be in the public interest. It is in the public interest to preserve a party's basic right to appeal. *GMC*, 510 F. Supp. at 343 ("[P]reservation of the respondents' right to appeal is also within the public interest. . . . Allowing the stay will better serve the public interest."). And this is particularly true when the appeal implicates both Federal and California public policy as expressed in the federal securities laws — *See Basic Inc. v. Levinson*, 485 U.S. 224, 234 (1988) (federal securities laws are designed to "substitute a philosophy of full disclosure for the philosophy of *caveat emptor*" and to "achieve a high standard of business ethics" in securities transactions) (internal citations omitted) — and in California Civil Code §§ 1542 and 1668. And where, as here, an order may create a challenge to the attorney-client privilege, the public interest strongly favors a stay. *United States v. Jones*, 84 A.F.T.R.2d (RIA) 6830 at * 6-7 (D.S.C. 1999) (holding that "the public interest weighs in favor of issuing a stay" where the order to be appealed would put at risk the attorney-client privilege).

By contrast, there is no particular public interest in whether Facebook can obtain the ConnectU shares or the releases as quickly as it might like — particularly given the reality that, apart from the appeal, there will as a practical matter be no active litigation between the parties pending completion of the appeal.

## IV. THERE IS NO NEED FOR A BOND IN ADDITION TO THE MONEY AND STOCK TO BE HELD IN ESCROW BY THE SPECIAL MASTER

This Court has discretion under FRCP 62 to dispense with the posting of a bond. Under Rule 62(c), the Court may "suspend, modify, restore, or grant an injunction on terms for bond *or other terms* that secure the opposing party's rights." (emphasis added).

14

The Ninth Circuit has noted (in a case where funds were deposited in an escrow account pending appeal, much as funds are deposited with the Special Master here) that the Court has "discretion to allow other forms of judgment guarantee" instead of a supersedeas bond. *International Telemeter Corp. v. Hamlin Int'l Corp.*, 754 F.2d 1492, 1495 (9th Cir. 1985).

Here, no bond is needed, and Facebook is protected through "other forms of judgment guarantee." *Id.* ConnectU is a company that has never made a profit, has no revenues, and whose website gets about a hundred hits per month. Moreover, ConnectU is willing not to make any operational decisions—as distinct from decisions concerning litigation strategies—without approval of the special master.

Finally, a bond would be particularly inappropriate here, where the Special Master will be holding both cash and Facebook shares far in excess of any possible diminution in ConnectU's value. If Facebook succeeds on appeal, the cash and Facebook shares would be available to satisfy any claim if one were appropriately proven.

## V. CONCLUSION

ConnectU respectfully requests that the Court stay the Judgment pending appeal. At a minimum, ConnectU's appeal raises serious legal questions that the Ninth Circuit should decide. Absent a stay, ConnectU will suffer substantial irreparable harm.

Facebook, by contrast, will suffer no cognizable harm if a stay issues. Thus, the balance of hardships tips sharply in favor of a stay.

July 31, 2008

BOIES, SCHILLER & FLEXNER LLP

_____/s/ Evan A. Parke_____
D. Michael Underhill
Steven C. Holtzman
Evan A. Parke

Attorneys for Defendant ConnectU, Inc.

## CERTIFICATE OF SERVICE

I hereby certify that this document(s) filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on July 31, 2008.


Dated:  July 31, 2008

_____/s/ Evan A. Parke_____

Evan A. Parke
