1  JAMES E. TOWERY -- BAR NO. 74058
   ALISON P. BUCHANAN -- BAR NO. 215710
2  HOGE, FENTON, JONES & APPEL, INC.
   Sixty South Market Street, Suite 1400
3  San Jose, California 95113-2396
   Phone: (408) 287-9501
4  Fax:  (408) 287-2583

5  Attorneys for
   CONNECTU, INC.
6  (Formerly CONNECTU, LLC)

7

8                    UNITED STATES DISTRICT COURT

9                   NORTHERN DISTRICT OF CALIFORNIA

10                        SAN JOSE DIVISION

11

12  THE FACEBOOK, INC. and MARK          Case No.  5:07-CV-01389-JW (MEJ)
    ZUCKERBERG,
13                                        **DECLARATION OF ALISON P.**
                    Plaintiffs,           **BUCHANAN IN SUPPORT OF**
14                                        **CONNECTU'S REQUEST FOR**
         v.                               **HEARING DATE RELATING TO**
15                                        **PRODUCTION OF CONNECTU'S**
    CONNECTU, INC. (formerly known as     **DOCUMENTS**
16  CONNECTU, LLC) PACIFIC
    NORTHWEST SOFTWARE, INC.
17  WINSTON WILLIAMS, and WAYNE
    CHANG,                                Chief Magistrate Judge Maria-Elena
18                                        James (San Francisco Division)
                    Defendants.
19

20

21

22

23

24

25

26

27

28

Dockets.Justia.com

1        I, Alison P. Buchanan, declare:

2        1.      I am an associate in the law firm of Hoge, Fenton, Jones & Appel, Inc., counsel for

3    ConnectU, Inc ("ConnectU").  I am a member of the State Bar of California and the U.S. District

4    Court Northern District of California.  I make this declaration in support of ConnectU's Request

5    for Hearing Date Relating to the Production of ConnectU Documents.

6        2.      Attached hereto and incorporated herein as **Exhibit A** is a true and correct copy of

7    the September 2, 2009 Order Granting ConnectU's Motion to Disqualify Counsel; Granting in

8    Part and Denying in Part Motion for Delivery of Client Files; Referring the Parties to Chief

9    Magistrate James for an *In Camera* Review of ConnectU's Client Files.

10       3.      Attached hereto and incorporated herein as **Exhibit B** is a true and correct copy of

11   the September 14, 2009 Notice of Appeal filed by the Founders.  ConnectU has intentionally

12   omitted the attachments to the Notice of Appeal, which include the Founders' Representation

13   Statement, the Civil Appeals Docketing Statement, and the Court's September 2, 2009 Order (See

14   Ex. A).  ConnectU will supplement this filing with those attachments, should the Court wish it to

15   do so.

16       4.      Attached hereto and incorporated herein as **Exhibit C** is a true and correct copy of

17   the October 9, 2009 Order from the Ninth Circuit relating to the Founders' Notice of Appeal.

18       I declare under penalty of perjury under the laws of the United States that the above facts

19   are within my personal knowledge; that I can testify to the same if called to do so in a court of

20   law; that the foregoing is true and correct; and that this declaration was executed on the 16th day

21   of October, 2009, at San Jose, California.

22                                      /s/
                                        _____
23                                      Alison P. Buchanan
                                        HOGE, FENTON, JONES & APPEL, INC.
24                                      Attorneys for ConnectU, Inc.

25

26

27

28

DECLARATION OF ALISON P. BUCHANAN IN SUPPORT OF
                                        CONNECTU'S REQUEST FOR HEARING
                                        5:07-CV-01389-JW (MEJ)

1

## CERTIFICATE OF SERVICE

2        I hereby certify that this document(s) filed through the ECF system will be sent

3   electronically to the registered participants as identified on the Notice of Electronic Filing (NEF)

4   and paper copies will be sent to those indicated as non registered participants on October 16,

5   2009.

6   DATED: October 16, 2009

7                                                   /s/
                                          _____
8                                         Alison P. Buchanan
                                          HOGE, FENTON, JONES & APPEL, INC.
9                                         Attorneys for ConnectU, Inc.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DECLARATION OF ALISON P. BUCHANAN IN SUPPORT OF
CONNECTU'S REQUEST FOR HEARING
5:07-CV-01389-JW (MEJ)

# EXHIBIT A

1

2

3

4

5

6

7      IN THE UNITED STATES DISTRICT COURT

8      FOR THE NORTHERN DISTRICT OF CALIFORNIA

9      SAN JOSE DIVISION

10  The Facebook, Inc., et al.,                    NO. C 07-01389 JW

11              Plaintiffs,              **ORDER GRANTING CONNECTU'S
         v.                              MOTION TO DISQUALIFY COUNSEL;
12                                       GRANTING IN PART AND DENYING IN
    ConnectU, Inc., et al.,              PART MOTION FOR DELIVERY OF
13                                       CLIENT FILES;  REFERRING THE
              Defendants.                PARTIES TO CHIEF MAGISTRATE JUDGE
14                                       JAMES FOR AN *IN CAMERA* REVIEW OF
                                         CONNECTU'S CLIENT FILES**
15  _____/

16                                 **I.  INTRODUCTION**

17          This is a further proceeding in an action initiated in this Court by The Facebook, Inc. to

18  enforce a mediated Settlement Agreement between its founder, Mark Zuckerberg, and ConnectU,

19  Inc. and ConnectU's founding shareholders (the "Founders").  During the proceedings before this

20  Court and initially on appeal to the Ninth Circuit, ConnectU and the Founders were jointly

21  represented by the same attorneys.  During the appeal, however, ownership of ConnectU changed

22  and its new owner retained separate counsel, who, on behalf of ConnectU, have moved to dismiss

23  the appeal.  The attorneys for the Founders oppose the motion made by their former client on the

24  ground that a dismissal and other conduct by the new owner would have an adverse affect on their

25  remaining client, the Founders.  In response, ConnectU moved to disqualify its former joint

26  attorneys from continuing to represent the Founders on the ground that, having previously

27  represented both, the California Rules of Professional Conduct preclude the attorneys from now

28

1  representing one client against the other in the same case.  The Ninth Circuit remanded the motion to

2  this Court for a ruling.  (See Docket Item No. 686.)

3        The Court conducted a hearing on August 17, 2009.  Based on the papers submitted to date

4  and oral argument, the Court GRANTS ConnectU's Motion to Disqualify Counsel and GRANTS in

5  part and DENIES in part ConnectU's Motion for Delivery of its Client Files.

6                    **II.  FACTUAL AND PROCEDURAL BACKGROUND**

7  **A.      History of the Attorney Client Relationships at Issue**

8        The background facts and procedural history of the proceedings to enforce the Settlement

9  Agreement are well-documented and need not be recited in detail.  (See Docket Item Nos. 461, 610.)

10 In summary, litigation between Facebook, ConnectU, and the Founders had been ongoing since

11 2004, both in the Santa Clara County Superior Court, this District ("Underlying Northern District

12 Action"), and in the United States District Court for the District of Massachusetts ("Massachusetts

13 Action").  Beginning in 2004-05, the law firm of Finnegan Henderson Farabow Garrett & Dunner

14 ("Finnegan") undertook joint representation of the Founders and ConnectU in the Underlying

15 Northern District and the Massachusetts Actions.  (Opposition to Motion to Disqualify at 3,

16 hereafter, "Opposition.")  On February 22, 2008, pursuant to private mediation, the parties signed a

17 document entitled "Term Sheet & Settlement Agreement," in which they agreed to exchange

18 consideration, gave mutual releases, and agreed to dismiss all pending litigation.

19        On June 28, 2008, Facebook moved this Court to order the Founders and ConnectU to

20 comply with the Settlement Agreement.  Finnegan represented both the Founders and ConnectU

21 with respect to those proceedings.[1]  On July 2, 2008, this Court entered Judgment enforcing the

22 Settlement Agreement between the parties.  (Docket Item No. 476.)  On November 21, 2008, the

23 Court issued an Amended Judgment, in which it ordered specific performance of the Settlement

24 Agreement.  (Docket Item No. 665.)  In December 2008, the law firm of Boies Schiller & Flexner

25

26      [1]  There is a legal issue whether the Founders appeared in opposition to the motion to enforce
   the Settlement Agreement.  However, there is no dispute that the Founders and ConnectU were
27 jointly represented.

28                                        2

**United States District Court**
For the Northern District of California

1   ("Boies") became counsel of record for the Founders and ConnectU. (Id.) The law firm of O'Shea

2   Partners ("O'Shea") has also appeared on behalf of both ConnectU and the Founders in this

3   litigation. (Id.) An appeal from the Judgment was filed with the Ninth Circuit.[2] ConnectU's

4   application for a stay of execution was denied by this Court and the Ninth Circuit. (See Docket Item

5   Nos. 601, 613.) The Court gave the parties until December 15, 2008 to transfer the settlement

6   consideration.

7          On December 15, 2008, after the Ninth Circuit had denied ConnectU's application for a stay,

8   the parties executed the exchange of settlement consideration. As provided in the Settlement

9   Agreement, the Founders transferred their ConnectU stock to Facebook. In return, Facebook

10   transferred cash and Facebook stock to the Founders and requests for dismissals were filed in the

11   respective courts. (Docket Item No. 667.) After execution of the Judgment, Facebook became the

12   sole shareholder of ConnectU and appointed new management. ConnectU's new management

13   retained the law firm of Hoge, Fenton, Jones & Appel ("Hoge") to serve as its counsel. (Motion, Ex.

14   H.) On December 16, 2008, Hoge contacted Finnegan and Boies and sought their stipulation to

15   substitute counsel.[3] (Id., Ex. J.) On December 18, 2008, attorney Michael Underhill of Boies wrote

16   to Hoge, declining to stipulate to a substitution and suggested that under the circumstances, a motion

17   to the Ninth Circuit for substitution would be preferable. Underhill stated:

18          Finally, on behalf of the Founders, we request that ConnectU not take any action that
            would interfere with the pending appeal. As you are probably aware, ConnectU owes
19          substantial debts to the Founders, and ConnectU's most significant assets are its
            claims against Facebook and person associated with Facebook. Consequently, we
20          believe any attempt by ConnectU to benefit its current shareholder by extinguishing
            that claim would be a fraudulent conveyance and legally actionable.
21
22   (James Towery Declaration in Support of ConnectU's Motion to Disqualify, hereafter, "Towery

23   Decl.," Ex. G.)

24          [2] Cross-appeals were filed by Facebook. Indeed, numerous related appeals and cross-
     appeals are pending. The Ninth Circuit consolidated three appeals, which were filed in July and
25   August 2008: Appeal Nos. 08-16745, 08-16849, 08-16873. After consolidation, two more appeals
     were filed in December 2008: Appeal Nos. 09-15021, 09-15133.
26
27          [3] On December 17, 2008, O'Shea indicated to Hoge that it was not counsel of record for
     ConnectU before the Ninth Circuit, so had no need to stipulate to withdrawal as counsel.
28
                                                    3

1    On December 18, 2008, ConnectU made a motion to the Ninth Circuit to order substitution

2 of counsel. On December 22, 2008, Underhill wrote proposing to stipulate to substitution of Hoge

3 as counsel of record for ConnectU on the condition that Facebook and ConnectU agree to

4 completely indemnify Boise for any liabilities arising from or related to the substitution. (Towery

5 Decl., Ex. K.)

6    On July 1, 2009, the Ninth Circuit granted ConnectU's motion for substitution of counsel.

7 (See Docket Item No. 686.)

8 **B.    Motion to Disqualify**

9    On January 20, 2009, on behalf of ConnectU, the Hoge law firm made a motion to the Ninth

10 Circuit to disqualify Boies, Finnegan, and O'Shea from continued representation of the Founders on

11 appeal. Hoge contends that Finnegan and Boies' continued representation of the Founders now

12 against ConnectU would constitute a conflict of interest in violation of California Rule of

13 Professional Conduct ("CRPC") 3-310 and ABA Model Rules of Professional Conduct ("MRPC")

14 1.7 and 1.9. (Motion at 2.) The Founders filed an opposition to ConnectU's Motion, contending

15 that Facebook, through its ownership of ConnectU, "seeks to use conflict of interest rules to cripple

16 its long-time litigation adversaries, [the Founders], by depriving them of their chosen counsel

17 midway through the appeal process." (Opposition at 1.) On July 1, 2009, the Ninth Circuit

18 remanded ConnectU's Motion to Disqualify to this Court "for the limited purpose of enabling the

19 [Court] to consider the issues raised" in the motion. (Docket Item No. 686.)

20                        **III. DISCUSSION**

21 **A.    Legal Standards for Disqualification Based on Prior Joint Representation**

22       **1.    California Case Law**

23    In the Ninth Circuit, motions to disqualify counsel are subjected to strict judicial scrutiny.

24 Optyl Eyewear Fashion Inst. v. Style Co., 760 F.2d 1045, 1050 (9th Cir. 1985). Ruling on a motion

25 to disqualify counsel is a "discretionary exercise of the trial court's inherent powers." Certain

26 Underwriters at Lloyd's, London v. Argonaut Ins. Co., 264 F. Supp. 2d 914, 918 (N.D. Cal. 2003).

27 Given that a disqualification motion "is often tactically motivated and tends to derail efficient

28                                              4

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

1    progress of litigation . . . . [t]he party seeking disqualification has a heavy burden and must satisfy a

2    high standard of proof." Travelers Cas. & Sur. Co. of Am. v. Claude E. Atkins Enters., No. CV-F-

3    05-0852 REC LJO, 2006 U.S. Dist. LEXIS 93189, at *21 (E.D. Cal. Dec. 11, 2006) (citing Evans v.

4    Artek Systems Corp., 75 F.2d 788, 791 (2d Cir. 1983)).

5        Pursuant to Northern District of California Local Rule 11-4(a)(1), every attorney before this

6    Court must "comply with the standards of professional conduct required of the members of the State

7    Bar of California." Accordingly, in this matter, the Court applies California law to determine the

8    propriety of disqualification. See Certain Underwriters, 264 F. Supp. 2d at 918 (citing Civ. L.R. 11-

9    4(a)(1)).

10       With respect to representing a client against a former client, California courts apply the State

11   Bar Rules of Professional Conduct. In Western Continental Operating Co. v. Natural Gas Corp.,

12   relying on then Rule 4-101, the court stated that the Rules of Professional Conduct prohibit a lawyer

13   from accepting employment adverse to a client or former client "relating to a matter in reference to

14   which he has obtained confidential information by reason of or in the course of his employment by

15   such . . . former client." 212 Cal. App. 3d 752, 759 (1989). Some courts have recognized an

16   exception to the holding in Western and hold that the prohibition accepting employment that is

17   adverse to a former client does not apply if the two clients were previously jointly represented. See,

18   e.g., Christensen v. United States District Court for the Central District of California, 844 F.2d 694

19   (9th Cir. 1988). Interestingly, although both Western and Christensen involved joint representation,

20   the attorneys were not disqualified in Christensen but were disqualified in Western. Thus, closer

21   scrutiny of the two cases is warranted.

22       In Christensen, beginning in 1983, the firm of Wyman, Bautzen, Christensen, Kuechel &

23   Silbert ("Wyman") commenced representation of the Amir group in their attempt to take

24   management control of Beverly Hills Savings & Loan ("BHSL") away from the Fitzpatrick group.

25   After the Amir group's efforts were successful, Wyman commenced joint representation of both the

26   Amir group and BHSL in various matters. Terry Christensen, a Wyman partner, joined the board of

27   BHSL. In 1986, BHSL became insolvent and was taken over by the Federal Savings and Loan

28                                         5

United States District Court

For the Northern District of California

1    Insurance Corporation ("FSLIC").  The FSLIC filed a lawsuit against both the Amir group and the

2    Fitzpatrick group for mismanagement.  The Amir group retained Wyman to represent it.  The

3    Fitzpatrick group impleaded Christensen and he in turn, retained Wyman represent him.  The FSLIC

4    moved the district court to disqualify Wyman on the ground that the firm had previously represented

5    the BHSL and was now representing the Amir group against its former client.  The district court

6    granted the motion to disqualify Wyman from representing Amir against BHSL.  However, on a

7    petition for a writ of mandate, the Ninth Circuit reversed.  The Ninth Circuit held that the prohibition

8    against an attorney's accepting employment against former client BHSL did not apply to Wyman's

9    representation of Amir and Christensen because during the time Wyman had received confidential

10   information as attorneys for BHSL, Wyman was jointly representing BHSL and Amir:

11           BHSL necessarily knew that any information it gave to Wyman would be conveyed to
             Christensen as a BHSL director and a senior partner in the law firm.  Moreover, even if
12           Wyman is disqualified, Wyman is effectively still in this lawsuit through Christensen.  He
             has access to any confidences previously revealed by BHSL.  Disqualification would thus be
13           futile in terms of furthering the purpose of the rule.

14   Christensen, 844 F.2d at 698.

15           Under similar factual circumstances, however, in Western, the California Court of Appeals

16   ordered disqualification of counsel.  In 1979, Natural Gas Corporation of California ("NGC"), a

17   subsidiary of PG&E, and Western Continental Operating Company ("Western") agreed to jointly

18   develop a natural gas production facility.  NGC was responsible for operating the facility.  In 1982,

19   the law firm of Bright & Brown was retained to represent jointly NGC and Western against a third-

20   party co-tenant.  During the course of the co-tenant dispute, NGC provided Bright & Brown with

21   information about how it performed its functions as the operator, including details of NGC's

22   relationship with PG&E.  Ultimately, the dispute with the co-tenant was settled.

23           In 1987, Western retained Bright & Brown to represent it in a lawsuit against NGC and

24   PG&E for breach of the development agreement.  Among the allegations made in the lawsuit was a

25   claim that PG&E was the alter ego of NGC.  NGC moved to disqualify Bright & Brown from

26   representing Western on the ground that the law firm's former representation of both NGC and

27   Western with respect to the co-tenant dispute was substantially related to the current lawsuit.  NGC

28                                                    6

1    contended that it had disclosed to Bright & Brown confidential information that would be used

2    against NGC in the lawsuit filed by Western.  In response to the disqualification motion, Western

3    contended that the joint client exception applied to preclude disqualification.  However, the trial

4    court granted the motion to disqualify Bright & Brown.  The disqualification order was affirmed on

5    appeal:

6    > It is well settled that an attorney is prohibited from doing either of two things after severing a
     > relationship with a former client. ". . . He may not do anything which will injuriously affect
7    > his former client in any [matter][4] in which he formerly represented him nor may he at any
     > time use against his former client knowledge or information acquired by virtue of the
8    > previous relationship."

9    Western, 212 Cal. App. 3d at 759 (quoting People ex rel. Deukmejian v. Brown, 29 Cal. 3d 150, 155

10   (1981)).

11           The Christensen case was reviewed by the court in Western.  The joint client exception was

12   not applied.  The California Court of Appeals held that although California law recognizes a joint

13   client exception to confidential communications,[5] the exception does not affect the duty an attorney

14   owes to his or her client to not take on representation adverse to the client on a related matter:

15   > Western next urges that rule 4-101 contemplates an exception where the attorney jointly
     > represented the parties in the former matter.  In such a case, Western argues, no
16   > confidentiality privilege exists as to one of the jointly represented clients with respect to
     > information disclosed to the other client.  Western submits that during Bright & Brown's
17   > joint representation of NGC and Western, each party fully understood that information
     > disclosed by either party should be shared with both parties.  In support of its position,
18   > Western relies on Evidence Code section 962, setting forth a joint client exception to the
     > evidentiary privilege accorded to attorney-client communications.  Additionally, Western

19

20

---

21           [4] The word "manner" was used in the cited case.  However, the original source for the
     quotation is Wutchumna Water Co. v. Bailey, which uses the word "matter":
22   > From these pronouncements it appears that an attorney is forbidden to do either of two things
     > after severing his relationship with a former client.  He may not do anything which will
23   > injuriously affect his former client in any **matter** in which he formerly represented him nor
     > may he at any time use against his former client knowledge or information acquired by virtue
24   > of the previous relationship.
     216 Cal. 564, 573-74 (emphasis added).
25
             [5] In California, "[b]y selecting the same attorney, and making their communications in the
26   presence of each other, each joint client waives his right to place those communications under the
     shield of professional confidence." Travelers, 2006 U.S. Dist. LEXIS 93189, at *21 (quoting Croce
27   v. Superior Court, 21 Cal. App. 2d 18, 20 (1937)).

28                                                   7

relies on two federal cases, <u>Allegaert</u>[6] . . . and <u>Christensen</u> . . ., which hold that the substantial relationship test is inapposite where the former client has no reasonable expectation that information given to counsel will not be disclosed to the current client.

We are unpersuaded under the circumstances of this case that there is a joint client exception to the prohibition against representation adverse to a former client.

We disagree that the privilege exception or the cases cited have any application here.  In the first instance, we are not concerned in this case with discovery of allegedly privileged communications.  Instead, the pertinent issue is the propriety of an attorney's representation adverse to a former client.  Our courts have distinguished the rule against representing conflicting interest from the attorney-client evidentiary privilege noting that the former is broader than the latter.  The evidentiary privilege and the ethical duty not to disclose confidences both arise from the need to encourage clients to disclose all possibly pertinent information to their attorneys, and both protect only the confidential information disclosed.  The duty not to represent conflicting interest . . . is an outgrowth of the attorney-client relationship itself, which is confidential, or fiduciary, in a broader sense.  Not only do clients at times disclose confidential information to their attorneys; they also repose confidence in them.  The privilege is bottomed only on the first of these attributes, the conflicting-interests rule on both.

212 Cal. App. 3d at 761-62.

## 2.    New York Case Law

Since both parties have cited cases outside of California that apply identical Rules of Professional Conduct, the Court also gives a closer scrutiny to these cases for comparison.

In <u>Tekni-Plex, Inc. v. Meyner and Landis</u>, the issue was whether an attorney who had jointly represented a shareholder and a close corporation should be disqualified from representing the shareholder in a post-merger claim made by the corporation against the shareholder.  674 N.E. 2d 663 (N.Y. 1996).  Tekni-Plex,[7] a pharmaceutical company, had been represented by the law firm of Meyner and Landis on various legal matters including environmental compliance since 1971.   In 1986, Tom U.C. Tang, one of its directors and shareholders became the sole shareholder, director and officer of Tekni-Plex.  Meyner and Landis continued their representation under this sole-shareholder structure.

---

[6]   <u>Allegaert v. Perot</u>, 565 F.2d 246 (2d Cir. 1977).

[7]   Since the surviving corporation had taken the same name as the acquired corporation, to avoid confusion, later in this Order the Court will refer to the pre-merger target corporation as "old Tekni-Plex."

United States District Court
For the Northern District of California

United States District Court

For the Northern District of California

1    In 1994, Tang entered into an agreement to sell Tekni-Plex to a group of purchasers. Meyner

2    and Landis represented both Tekni-Plex and Tang during the negotiations and execution of the sale.

3    The transaction was structured as follows: (1) the purchasers created a shell corporation called TP

4    Acquisition Company; (2) upon close of the sale, Tekni-Plex conveyed to Acquisition all of its

5    tangible and intangible assets, rights and liabilities, Tang's stock was cancelled and "pre-

6    transaction" Tekni-Plex ceased existence. The sales agreement contained representations and

7    warranties by Tang that Tekni-Plex was in full compliance with all applicable environmental laws.

8    In the agreement, Tang agreed to indemnify Acquisition for any losses incurred by Acquisition as a

9    result of breach of warranty by either Tang or Tekni-Plex.

10    After the transaction was closed, the purchasers changed the name of TP Acquisition

11    Company to Tekni-Plex, Inc. ("new Tekni-Plex"). Later in 1994, new Tekni-Plex initiated an

12    arbitration proceeding against Tang, contending that he had breached representations and warranties

13    regarding environmental matters. Tang retained Meyner and Landis to represent him in the

14    arbitration. New Tekni-Plex moved to disqualify Meyner and Landis from representing Tang on the

15    ground that the law firm could not represent one former client against the other. The disqualification

16    motion was taken from the arbitrator to the New York Supreme Court, which granted the motion to

17    disqualify Meyner and Landis. The disqualification order was affirmed by the Appellate Division

18    and came before the New York Court of Appeals.

19    The New York Court of Appeals affirmed the disqualification order. With respect to new

20    Tekni-Plex and matters concerning the acquisition where Meyner and Landis represented both Tang

21    and old Tekni-Plex, the Court of Appeals found that:

22    New Tekni-Plex . . . does not control the attorney-client privilege with regard to discrete
      communications made by either old Tekni-Plex or Tang individually to [Meyner and Landis]
23    concerning the *acquisition* – a time when old Tekni-Plex and Tang were joined in an
      adversarial relationship to Acquisition. Consequently, new Tekni-Plex cannot assert the
24    privilege in order to prevent [Meyner and Landis] from disclosing the contents of such
      communications to Tang. Nor is new Tekni-Plex entitled to the law firm's confidential
25    communications concerning its representation of old Tekni-Plex with regard to the
      acquisition.

26

27

28                                                  9

United States District Court
For the Northern District of California

1   674 N.E. 2d at 130 (emphasis added).  In essence, the Court of Appeals found that new Tekni-Plex

2   did not succeed to old Tekni-Plex's position with respect to rights to loyalty and confidentiality from

3   Meyner and Landis for representation during the negotiations that led up to the sale to Acquisition

4   because Tang and old Tekni-Plex were adversaries of Acquisition on these matters.

5          However, with respect to the *environmental matters* that were the subject of the arbitration,

6   the Court of Appeals found that Meyner and Landis represented only old Tekni-Plex and did not

7   jointly represent Tang with respect to those matters.  Thus, as to these business operation matters,

8   the Court of Appeals found that Meyner and Landis owed a duty of loyalty and confidentiality to

9   new Tekni-Plex:

10         As a practical matter, then, old Tekni-Plex did not die.  To the contrary, the business
           operations of old Tekni-Plex continued under the new managers.  Consequently, control of
11         the attorney-client privilege with respect to any confidential communications between
           [Meyner and Landis] and corporate actors of old Tekni-Plex concerning these operations
12         passed to the management of new Tekni-Plex.  [Citation omitted.]  An attorney-client
           relationship between [Meyner and Landis] and new Tekni-Plex necessarily exists.
13
14  Id. at 669.

15         The New York Court of Appeals went on to hold that if the dispute were limited to the sales

16  transaction, there would be no cause to disqualify Meyner and Landis from representing Tang

17  because they would be consistently representing the seller in opposition to the buyer.  However,

18  because the dispute involved matters beyond the merger and touched on matters for which Meyner

19  and Landis owed a continuing duty of loyalty and confidentiality to new Tekni-Plex, Meyner and

20  Landis were disqualified:

21         The dispute here . . . goes beyond the merger negotiations.  It also involves issues relating to
           the law firm's longstanding representation of the acquired-corporation on matters arising out
22         of the company's business operations – namely, [Meyner and Landis'] separate
           representation of old Tekni-Plex prior to the merger on environmental compliance matters.
23         Any environmental violations will negatively affect not only the purchasers but also the
           business interests of the merged corporation.  In this regard, the interests of [Meyner and
24         Landis'] current client Tang are adverse to the interests that new Tekni-Plex assumed from
           old Tekni-Plex.

25         Indeed, [Meyner and Landis'] earlier representation of old Tekni-Plex provided the firm with
           access to confidential information conveyed by old Tekni-Plex concerning the very
26         environmental compliance matters at issue in the arbitration.  [Meyner and Landis'] duty of
           confidentiality with respect to these communications passed to new Tekni-Plex; yet its

27

28                                                 10

United States District Court

For the Northern District of California

1   current representation of Tang creates the potential for the law firm to use these confidences

2   against new Tekni-Plex in the arbitration.

Id. at 670.

3

4       In Occidental Hotels v. Westbrook, Westbrook, a conglomerate of companies involved in

5   real estate investment, was represented by Cravath, Swaine & Moore ("Cravath").  440 F. Supp. 2d

6   303 (S.D.N.Y. 2006).  From 1987 to 1997, various matters for which Cravath had represented

7   Westbrook were handled by an associate attorney named Kent Richey.  In 1997, under Richey's

8   representation, Westbrook acquired Allegro Resorts Corporation.  Allegro Resorts operated hotel

9   properties in various countries through several wholly-owned subsidiaries.  After the acquisition,

10  Richey left Cravath to become general counsel to Allegro Resorts and served as an officer and

    member of the board of its wholly-owned subsidiaries.

11

12      In 2000, Westbrook entered into negotiations with Occidental Hotels to sell its stock in

13  Allegro Resorts to Occidental.  As General Counsel for Allegro Resorts, Richey participated in the

14  due diligence, negotiations, drafting and execution of various transaction documents.  In April 2000,

15  a sales agreement was reached.  Shortly afterward, Richey resigned as General Counsel for Allegro

    Resorts.

16

17      In 2004, Richey joined the Jones Day law firm.  Later that year, Occidental filed a lawsuit in

18  the district court alleging that Westbrook had breached several of the representations and warranties

19  in the Sales Agreement.  Westbrook was represented by Jones Day in that lawsuit.  Occidental

20  moved to disqualify Jones Day as Westbrook's counsel on the ground that it was unethical for

21  Richey, who had previously represented Allegro Resorts with respect to the matters that were now

22  the subject of the alleged breaches of representations and warranties, to represent Westbrook in

23  defense of claims brought by Allegro's new owner.  Occidental contended that Richey would be in

24  the position of revealing Allegro Resorts' privileged information to Westbrook, to the disadvantage

25  of his former client, Allegro.

26      Occidental relied on New York law, which, similar to California's, provided that an attorney

27  may be disqualified from representing a client in two kinds of cases: (1) if the representation caused

28                                          11

1   a conflict of interest that undermines the court's confidence in the attorney's representation of the

2   interest of the client; and (2) if the attorney is, or potentially is, in a position to use privileged

3   information gained from the other side through prior representation, thus giving the present client an

4   unfair advantage. Id. at 310.  The district judge denied Occidental's disqualification motion.  The

5   district judge reasoned that in post-merger litigation by the buyer against the seller, disqualifying the

6   attorney who had represented the seller and the target corporation from continuing to represent the

7   seller would not serve the purpose of protecting the former client's expectation of loyalty and

8   confidentiality:

9           It is Allegro Resorts and its subsidiaries rather than Richey, that have changed positions from
            alignment with Westbrook to alignment with Occidental.  Richey represented Westbrook
10          while at Cravath, prior to joining Allegro Resorts as General Counsel. [Citation omitted.]
            During the merger, Richey negotiated on behalf of pre-merger Allegro Resorts and
11          Westbrook as seller.  Post-merger, Richey resigned his position with post-merger Allegro
            Resorts.  Subsequently, Richey has continued to represent Westbrook in the numerous
12          indemnification-related disputes with Occidental.  Richey has consistently represented
            Westbrook-aligned interest, including pre-merger Allegro Resorts, and pre- and post-merger
13          Westbrook sellers.  Occidental has clearly understood that Richey was aligned with the seller
            and that, in any dispute arising out of the merger, Richey would continue to be associated
14          with Westbrook.  Jones Day's representation of Westbrook in this litigation is consistent with
            Richey's prior representation.
15
16  440 F. Supp. 2d at 311.  The Occidental court distinguished Tekni-Plex on the ground that there, the

17  attorney was found to owe confidences to the former client which survived the merger.

18      **3.      Conclusion**

19          This review of the cases shows that courts differ with respect to the issue of disqualification

20  of counsel.  Universally, however, it appears that in considering a motion to disqualify counsel, the

21  "paramount concern is the preservation of public trust in the scrupulous administration of justice and

22  the integrity of the bar."  Sharp v. Next Entertainment, Inc., 163 Cal. App. 4th 410, 425 (2008)

23  (quoting Jessen v. Hartford Casualty Ins. Co., 111 Cal. App. 4th 698, 705 (2003)).  In addition, it

24  appears that disqualification decision is tied to the circumstances of the cases.  Although none of the

25  cases reviewed above involve the same facts presented to the Court here, from these cases, the Court

26  discerns the following principles:

27

28                                              12

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

1      *In the absence of informed consent by both clients, an attorney is disqualified from*

2      *accepting representation of one joint client against the other in the same or a*

3      *substantially related matter. Although a joint client waives the attorney-client*

4      *privilege with respect to the attorney's disclosure of information from one joint client*

5      *to the other, the duty of loyalty persists and precludes the attorney from representing*

6      *one joint client against the other with respect to the matter.*

7      If the rule were otherwise, joint clients would be required to calculate how much information to

8      disclose to the attorney in order to protect themselves from the eventuality that later in the action or

9      in a subsequent action, their attorney would use information disclosed to the attorney against them.

10            The Court now applies these principles to this case.

11     **C.     Whether Finnegan and Boies Should be Disqualified from Representing the Founders**

12            There is no question that the matter on which ConnectU seeks to disqualify its former

13     attorneys, continuing to represent the Founders in the current appeal, is substantially related to the

14     matter on which those firms previously represented both the Founders and ConnectU.[8]  Indeed, the

15     matter is identical.  The Court presumes that in the course of the representation, ConnectU reposed

16     trust and confidence, albeit through its officers and directors, that Finnegan and Boies would not

17     undertake representation against it with respect to this matter.  The real issue in this case is whether

18     the change in ownership that came about as a result of the execution of the Judgment places

19     Finnegan and Boies in a position of representing the Founders "against" ConnectU.

20            The Founders and ConnectU are co-appellants and co-respondents.  Presently, there is no

21     cross-appeal that has been filed by one against the other.  However, an adverse interest can arise

22     even between co-parties.  Here, ConnectU wishes to dismiss its appeal and the Founders oppose

23     dismissal.  Under some circumstances, opposition to a motion by a co-party to dismiss its appeal

24     might not be the type of adversarial position that would trigger disqualification.  In this case,

25

26            [8] In light of the fact that the Ninth Circuit granted ConnectU's motion to substitute counsel,
       Hoge is the only firm representing ConnectU on appeal.  Accordingly, the Court need not consider
27     ConnectU's argument that Finnegan and Boies are engaging in concurrent adverse representation of
       ConnectU and the Founders.

28                                                    13

**United States District Court**
For the Northern District of California

1   however, ConnectU's motion could have significant adverse legal consequences to the Founders and

2   *vice-versa.* First, an issue that has been raised on appeal is the Founders' independent standing to

3   prosecute the appeal.[9] ConnectU's withdrawal as an appellant might adversely affect the Founders'

4   rights to continue to prosecute the appeal. Second, in post-execution correspondence, the Founders

5   notified ConnectU that the Founders contend that it owes them $8,240,372.[10] Furthermore, the

6   Founders contend that this debt will be extinguished if the underlying Judgment is affirmed. (Id.)

7   As illustrated by Underhill's correspondences, the Founders have threatened to pursue legal action

8   against ConnectU if it dismisses its appeal or takes any action that would affect the debt. Thus, the

9   Founders oppose ConnectU's motion to dismiss its appeal in order to preserve a debt ConnectU

10  allegedly owes to them. Third, if the Founders are successful on appeal, the release and other

11  consideration ConnectU received in the execution of the Judgment would be cancelled.

12         In weighing any harm the Founders might face in not having their chosen attorneys to

13  represent them for the duration of these appeals against the public interest served by the professional

14  rules of ethics, the Court strikes the balance in favor of the public interest. There is no argument that

15  the Founders' positions could not be advanced, perhaps with equal force, by new attorneys.

16  However, the ethical duty owed to ConnectU would be harmed by having its former attorneys take

17  a position adverse to it. More importantly, the public would be assured that should they seek joint

18  representation in a matter, with the inherent prospect that a conflict of interest could arise, they

19  could, nevertheless, have full trust and confidence that the attorney would never become an advocate

20  for their adversary in the same or substantially related matter.

21         The Court finds that ConnectU has met its burden of demonstrating that the Court should

22  disqualify the Founders' counsel. Accordingly, the Court GRANTS ConnectU's Motion to

23  Disqualify.

24  _____

25      [9] The issues of the timeliness of the appeal and the standing of the Appellants are not before
26  this Court.

        [10] (Founders' Response to Court's Request at August 17, 2009 Hearing Concerning
27  ConnectU Debt at 1, hereafter, "Response re: Debt," Docket Item No. 693.)

28                                          14

**D.**     <u>Whether ConnectU is Entitled to its Client Files</u>

ConnectU also moves for an order directing Finnegan and Boies to turn over its client files. (Motion at 19-20.) Although it somewhat softened its position during oral argument, ConnectU contends that both law firms have improperly refused to turn over its files, preventing it from being able to assess its rights and obligations. The Founders oppose ConnectU's motion, contending that "[t]he guise that [the] files somehow belong to ConnectU is a smokescreen to cripple Facebook's adversaries by peering into their counsel's attorney-client and work product materials." (Opposition at 15.)

In California, once an attorney's representation of a client has been terminated, the attorney must "promptly release to the client, at the request of the client, all the client papers and property. 'Client papers and property' includes correspondence, pleadings, deposition transcripts, exhibits, physical evidence, expert's reports, and other items reasonably necessary to the client's representation, whether the client has paid for them or not." CRPC 3-700(D).

In this case, the Court recognizes that, as with the disqualification issue, there are competing interests that must be considered. First, ConnectU has a separate legal identity and has interests, rights, and liabilities that are separate from either the Founders or Facebook. These separate interests are reflected by the fact that ConnectU has itself been a party to this litigation, causing ConnectU to retain several law firms as its counsel. Certain files in the possession of those law firms may reflect the independent rights, interests, and liabilities of ConnectU. As the current principal of ConnectU, Facebook now has the right to examine those files so that it can competently conduct the business of ConnectU.

At the same time, as the Court recognized in the prior section, the representation collectively received by the Founders and ConnectU related to the litigation against their mutual adversary, Facebook. As a consequence, it is likely that documents were generated on behalf of both the Founders and ConnectU which reflect privileged communications between the Founders and their

United States District Court

For the Northern District of California

United States District Court
For the Northern District of California

1  counsel, the Founders' litigation positions, and other confidential information.[11]  These documents

2  likely include confidential information relating to the Settlement Agreement now in dispute.  To

3  require Finnegan and Boies to hand over all of ConnectU's client files would necessarily cause the

4  Founders to expose confidential information to Facebook that relates to the exact subject of this

5  litigation, potentially prejudicing the Founders on appeal and thereafter.

6  　　　To resolve this dispute, therefore, the Court must reconcile ConnectU's right to documents in

7  its client files with the practical realities relating to the interrelationships between the various parties

8  and their attorneys.  The main California case relied on by both parties is Moeller v. Superior Court

9  of Los Angeles, 16 Cal. 4th 1124 (1997).  In Moeller, the California Supreme Court addressed the

10  question of whether a predecessor trustee could assert the attorney-client privilege against a

11  successor trustee, to withhold from the successor trustee documents reflecting confidential

12  communications between the predecessor trustee and an attorney on matters of trust administration.

13  Id. at 1127.  The California Supreme Court concluded that the attorney-client privilege passes from

14  one trustee to its successor trustee, and required the predecessor trustee to produce the confidential

15  attorney-client communications requested by the successor.  Id. at 1139.

16  　　　The Court, however, is not persuaded that Moeller is controlling in this case, given that its

17  holding related to whether the attorney-client privilege passes between successive trustees of the

18  same trust.  More relevant to the present case is Tekni-Plex, in which the New York Court of

19  Appeals addressed the question of who controls the attorney-client privilege as to pre-merger

20  communications, where a close corporation merged with another corporation to create a new

21  corporate entity, and where the pre-merger corporation and its sole shareholder had been jointly

22

---

23  　　　[11]  The Court recognizes that there is a tension embodied even in the use of the term
24  "confidential."  The Court has already found that there is no reasonable expectation on the part of
   ConnectU that information shared with Finnegan and Boies would not be disclosed to the Founders.
25  This principle, of course, extends in the opposite direction.  The Founders had no reasonable
   expectation that information shared with joint counsel would not be disclosed to ConnectU.  On its
26  face, this reciprocal non-confidentiality could support the conclusion that the Founders cannot now
   object to ConnectU having access to all mutual client files.  Nonetheless, as the Court has repeatedly
27  acknowledged, the Founders exerted complete control over ConnectU, such that ConnectU never
   operated in a manner independent of the Founders.

28  　　　　　　　　　　　　　　　　　　　16

United States District Court
For the Northern District of California

1   represented by the same law firm. 89 N.Y. 2d at 127. In <u>Tekni-Plex</u>, the merged corporate entity

2   attempted to access attorney-client communications between the law firm and the pre-merger

3   corporation. The court separated the documents at issue into two analytical categories: (1) general

4   business communications, and (2) communications relating to the merger negotiations.

5        As to the first category, the court held that "ownership of the law firm's files regarding its

6   pre-merger representation of old Tekni-Plex on environmental compliance matters passed to the

7   management of new Tekni-Plex."[12] <u>Id.</u> at 137. As to the second category, the court found that the

8   merged corporation did not control the attorney-client privilege as to communications between the

9   pre-merger corporation and the law firm. The court stated that this conclusion was "especially

10  compelling . . . where at the time of the acquisition the seller corporation was solely owned and

11  managed by one individual. . . ." <u>Id.</u> at 138. After noting the blurred individual-corporation

12  distinctions in close corporations, the court stated that "[t]o allow new Tekni-Plex access to the

13  confidences conveyed by the seller company to its counsel during the negotiations would, in the

14  circumstances presented, be the equivalent of turning over to the buyer all of the privileged

15  communications of the seller concerning the very transaction at issue." <u>Id.</u> Moreover, the court

16  stated that granting the merged corporation control over communications concerning the merger

17  transaction would thwart the purposes underlying the attorney-client privilege, because it would

18  "significantly chill attorney-client communication during the transaction." <u>Id.</u> at 139.

19       The Court is persuaded that the logic of <u>Tekni-Plex</u> governs the outcome in this case,

20  because it reflects an appropriate balance between the legitimate competing interests at play. That

21  is, the Founders and their attorneys cannot obstruct access to ConnectU's general business

22  documents. To deny ConnectU access to such files would inhibit the ability of its ownership to

23  appropriately direct the affairs of the company. Accordingly, the Court finds that ConnectU is

---

[12] The Court stated that this holding "comports with new Tekni-Plex's right to invoke the
pre-merger attorney client-relationship should it have to prosecute or defend against third-party suits
involving the assets, rights, or liabilities that it assumed from old Tekni-Plex." 89 N.Y. 2d at 137.
Notably, however, the record reflected that the law firm had only represented the corporation, and
not the sole shareholder, on the environmental compliance issues to which those documents
pertained. <u>Id.</u>

17

United States District Court

For the Northern District of California

1    entitled all documents pertaining to ConnectU's general business, including but not limited to

2    documents relating to ConnectU's financials, assets, and liabilities.

3          At the same time, the Court finds that to order Finnegan and Boies to turn over all ConnectU

4    files would be anathema to the principles underlying the policy of fostering unfettered attorney-

5    client communication.  The transaction at issue here resulted from the settlement of a protracted

6    litigation.  To require a handover of all ConnectU files would be to expose to the Founders'

7    adversary all of their relevant litigation documents.  Directing the handover of those files would

8    thus create a rule that would chill communication between attorneys and clients, and may ultimately

9    impede the type of settlement that was reached here between the parties.  Certainly, the principals of

10    a close corporation may be reluctant to engage in this type of stock for cash settlement if their

11    attorney-client communications could be obtained by their adversary and used against them in any

12    subsequent dispute over the settlement.[13]  The Court, therefore, declines to order Finnegan and Boies

13    to hand over files pertaining to ConnectU's litigation against Facebook.

14          Accordingly, ConnectU's Motion with respect to a handover of its client files is GRANTED

15    in part and DENIED in part.  With respect to documents necessary for new ConnectU to carry on

16    ConnectU's business operations, the motion is GRANTED.  With respect to documents relating to

17    the litigation against Facebook, the motion is DENIED.

18                        **IV.  CONCLUSION**

19          The Court GRANTS ConnectU's Motion to Disqualify the law firm of Finnegan Henderson

20    Farabow Garrett & Dunner and the law firm of Boies Schiller & Flexner from further representation

21    of the Founders with respect to this matter.  The Court GRANTS in part and DENIES in part

22    ConnectU's Motion directing a handover of its client files.  The parties are referred to Chief

23

24

25         [13]  It is not lost on the Court that many of the concerns could have been avoided if either the
Founders and ConnectU had gotten separate representation or if the parties had incorporated

26    document ownership issues into their Settlement Agreement.  Nonetheless, neither of these *ex ante*
solutions were implemented.  Thus, the Court must craft an *ex post* solution that best comports with

27    the professional responsibility principles at issue.

28                            18

United States District Court

For the Northern District of California

1    Magistrate Judge James for further proceedings with respect to which documents should be turned

2    over to the current owners.[14]

3           This Order does not address the circumstances on appeal or afterward should the interests of

4    ConnectU and the Founders merge.

5

6

7    Dated:  September 2, 2009

        *[signature: James Ware]*

        JAMES WARE
        United States District Judge

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

_____

26      [14] In light of this Order, the parties' administrative Motions for Leave to File Supplemental
        Briefing are DENIED as moot.  (See Docket Item Nos. 692, 696.)  The Court GRANTS ConnectU's
27      Motion for Leave to File Promissory Notes Under Seal.  (See Docket Item No. 700.)

28                                         19

**United States District Court**

For the Northern District of California

1   **THIS IS TO CERTIFY THAT COPIES OF THIS ORDER HAVE BEEN DELIVERED TO:**

2   Chester Wren-Ming Day cday@orrick.com
    D. Michael Underhill Munderhill@BSFLLP.com
3   David A. Barrett dbarrett@bsfllp.com
    Evan A. Parke eparke@bsfllp.com
4   George Hopkins Guy hopguy@orrick.com
    I. Neel Chatterjee nchatterjee@orrick.com
5   James Earl Towery jet@hogefenton.com
    Jonathan M. Shaw jshaw@bsfllp.com
6   Mark A. Weissman mweissman@osheapartners.com
    Mark Andrew Byrne markbyrne@byrnenixon.com
7   Monte M.F. Cooper mcooper@orrick.com
    Rachel E. Matteo-Boehm rachel.matteo-boehm@hro.com
8   Roger Rex Myers roger.myers@hro.com
    Scott Richard Mosko scott.mosko@finnegan.com
9   Sean Alan Lincoln slincoln@Orrick.com
    Sean F. O'Shea soshea@osheapartners.com
10  Steven Christopher Holtzman sholtzman@bsfllp.com
    Theresa Ann Sutton tsutton@orrick.com
11  Tyler Alexander Baker Tbaker@fenwick.com
    Valerie Margo Wagner vwagner@gcalaw.com
12  Warrington S. Parker wparker@orrick.com
    Yvonne Penas Greer ygreer@orrick.com

13

14

15  Dated:  September 2, 2009                    Richard W. Wieking, Clerk

16

17                                          By:_____/s/ JW Chambers_____
                                                  Elizabeth Garcia
18                                                Courtroom Deputy

19

20

21

22

23

24

25

26

27

28

**EXHIBIT B**

1   JEROME B. FALK, JR. (No. 39087)
    Email: jfalk@howardrice.com
2   SEAN M. SELEGUE (No. 155249)
    Email: sselegue@howardrice.com
3   JOHN P. DUCHEMIN (No. 250501)
    Email: jduchemin@howardrice.com
4   HOWARD RICE NEMEROVSKI CANADY
              FALK & RABKIN
5   A Professional Corporation
    Three Embarcadero Center, 7th Floor
6   San Francisco, California 94111-4024
    Telephone:   415/434-1600
7   Facsimile:   415/217-5910

8   Attorneys for CAMERON WINKLEVOSS,
    TYLER WINKLEVOSS AND DIVYA
9   NARENDRA

10                  UNITED STATES DISTRICT COURT

11                 NORTHERN DISTRICT OF CALIFORNIA

12                        SAN JOSE DIVISION

13

14

15  THE FACEBOOK, INC., et al.,              No. C 07-01389 JW

16                  Plaintiffs,

17          v.                               NOTICE OF APPEAL

18  CONNECTU, INC., et al.,

19                  Defendants.

20

21

22

23

24

25

26

27

28

W03 091309-066660510/U6/1579188/v2

1    Cameron Winklevoss, Tyler Winklevoss and Divya Narendra hereby appeal from the

2  Order Granting ConnectU's Motion to Disqualify Counsel Granting in Part and Denying in

3  Part Motion for Delivery of Client Files; Referring the Parties to Chief Magistrate Judge

4  James for an *In Camera* Review of ConnectU's Client Files ("Order"), entered in this case

5  on September 2, 2009.

6    Accompanying this Notice are: (1) a copy of the Order; (2) a Representation Statement

7  pursuant to Federal Rule of Appellate Procedure 12(b) and Ninth Circuit Rule 3-2(b)

8  identifying the parties to the action, along with the names, addresses and telephone numbers

9  of their respective counsel; and (3) a civil appeals docketing statement.

10

11  DATED: September 14, 2009.

12                                          Respectfully,

13                                          JEROME B. FALK, JR.
                                            SEAN M. SELEGUE
14                                          JOHN P. DUCHEMIN
                                            HOWARD RICE NEMEROVSKI CANADY
15                                                  FALK & RABKIN
                                            A Professional Corporation
16

17                                          By: _____
                                                       SEAN M. SELEGUE
18
                                            Attorneys for CAMERON WINKLEVOSS,
19                                          TYLER WINKLEVOSS AND DIVYA
                                            NARENDRA
20

21

22

23

24

25

26

27

28

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN
A Professional Corporation

NOTICE OF APPEAL                                    C 07-01389 JW
W03 091309-066660510/U6/1579188/v2

**EXHIBIT C**

FILED

UNITED STATES COURT OF APPEALS

OCT 09 2009

FOR THE NINTH CIRCUIT

MOLLY C. DWYER, CLERK
U.S. COURT OF APPEALS

| | |
|---|---|
| THE FACEBOOK, INC.; et al., | No. 09-17050 |
| Plaintiffs, | D.C. No. 5:07-cv-01389-JW |
| v. | Northern District of California, San Jose |
| CONNECTU, INC., f.k.a. ConnectU, LLC, | |
| Defendant - Appellee, | ORDER |
| CAMERON WINKLEVOSS; et al., | |
| Defendants - Appellants, | |
| and | |
| PACIFIC NORTHWEST SOFTWARE, INC.; et al., | |
| Defendants. | |

A review of the record suggests that this court may lack jurisdiction over the appeal because orders disqualifying counsel are not immediately appealable orders. *See Richardson-Merrell, Inc. v. Koller,* 472 U.S. 424, 440-41 (1985).

Within 21 days after the date of this order, appellants shall move for voluntary dismissal of the appeal or show cause why it should not be dismissed for

nmg/MOATT

lack of jurisdiction.  If appellants elect to show cause, a response may be filed within 8 days after service of the memorandum.

If appellant does not comply with this order, the Clerk shall dismiss this appeal pursuant to Ninth Circuit Rule 42-1.

Briefing is suspended pending further order of the court.

FOR THE COURT:

Molly Dwyer
Clerk of Court

By:  Nina A. M. Greeley
Motions Attorney/Deputy Clerk
9th Cir. R. 27-7
General Orders/Appendix A