# EXHIBIT C

Dockets.Justia.com



HOGE, FENTON
JONES & APPEL, INC.

Attorneys at Law | Serving Northern California since 1952

Alison P. Buchanan
408.947.2415
apb@hogefenton.com

September 3, 2009

<u>VIA EMAIL AND U.S. MAIL</u>

John Edwards
Jones Day
1755 Embarcadero Road
Palo Alto, CA 94303

   Re:  Facebook, Inc./ConnectU, Inc.
      Our File No.: 80696

Dear Mr. Edwards:

  As you know, ConnectU has been requesting its general business files since ConnectU transferred to Facebook ownership in December 2008. It has been Jones Day's position that you would not produce any such documents without a court order. (I am enclosing a copy of your March 18, 2009 email for your convenience).

  As you may have heard, the U.S. District Court for the Northern District of California ruled yesterday that ConnectU is, in fact, entitled to its general business files. I enclose a copy of that order here for your information. The September 2, 2009 order should more than satisfy your previous request for a court order. Thus, we expect that Jones Day will immediately produce to our office all of ConnectU's general business files. Please advise when we can expect to receive these documents.

     Sincerely,

     HOGE, FENTON, JONES & APPEL, INC.

     Alison P. Buchanan

APB: apb
ENCLOSURES

cc:  Mark Howitson (via email only)

\\HFJAFS\NDrive\80696\Lct\484314.doc

**San Jose Office** | 60 South Market Street, Suite 1400, San Jose, California 95113-2396
phone 408.287.9501 fax 408.287.2583 www.hogefenton.com

**Buchanan, Alison P.**

| | |
|---|---|
| **From:** | John W. Edwards II [jwedwards@jonesday.com] |
| **Sent:** | Wednesday, March 18, 2009 1:27 PM |
| **To:** | Buchanan, Alison P. |
| **Cc:** | mweissman@osheapartners.com; mpeterella@osheapartners.com; munderhill@bsfllp.com; Brian F. Toohey; Gidon M. Caine; Catriona F Cairns; Robert T Clarkson |

**Subject:** ConnectU

I have received your letter asking that Jones Day produce certain files and documents to ConnectU. Our Firm's position is that we will comply with our professional obligations to our former clients. The issue is, of course, who are our former "clients." You know and we know that the issue of ConnectU's status as a former client is currently before the 9th Circuit and the District of Massachusetts. Although no one has favored us with updates on the status of those matters, our assessment has been that a ruling by the 9th Circuit should be dispositive of our situation. If any of the parties has a contrary view, please let us know promptly, and we will take such steps, including intervention, as may be needed to ensure a resolution of any issues regarding our obligations.

Our position is that we will produce the requested, non-work product documents to any of the parties claiming to be our former client only when and if we receive either: (A). written consent from all of the parties to production, or (B). a definitive judicial ruling on whether new ConnectU qualifies as a "former client" under California law. Without one of those conditions being satisfied, our Firm is in the untenable position of having to anticipate what the judicial ruling will be on pain of potential exposure to liability and/or disciplinary sanctions. Mr. Weissman, counsel to our former clients has informed us that we do not have his clients' consent at this point to produce documents to ConnectU. Mr. Weissman has, however, asked us to produce documents to him, and we therefore ask for ConnectU's consent to accede to that request.

Since we have had requests from both ConnectU and the clients of Mr. Weissman for our documents, we suggest that the parties talk directly to see whether they can reach a consensual resolution of this issue.

John W. Edwards II
Jones Day
1755 Embarcadero Road
Palo Alto, CA 94303
650-739-3912
650-773-4168 (cell)

33912

==========
This e-mail (including any attachments) may contain information that is private, confidential, or protected by attorney-client or other privilege. If you received this e-mail in error, please delete it from your system without copying it and notify sender by reply e-mail, so that our records can be corrected.
==========

9/3/2009

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| The Facebook, Inc., et al., | NO. C 07-01389 JW |
| Plaintiffs, | ORDER GRANTING CONNECTU'S |
| v. | MOTION TO DISQUALIFY COUNSEL; |
| | GRANTING IN PART AND DENYING IN |
| ConnectU, Inc., et al., | PART MOTION FOR DELIVERY OF |
| | CLIENT FILES;  REFERRING THE |
| Defendants. | PARTIES TO CHIEF MAGISTRATE JUDGE |
| | JAMES FOR AN *IN CAMERA* REVIEW OF |
| | CONNECTU'S CLIENT FILES |

## I.  INTRODUCTION

This is a further proceeding in an action initiated in this Court by The Facebook, Inc. to

enforce a mediated Settlement Agreement between its founder, Mark Zuckerberg, and ConnectU,

Inc. and ConnectU's founding shareholders (the "Founders").  During the proceedings before this

Court and initially on appeal to the Ninth Circuit, ConnectU and the Founders were jointly

represented by the same attorneys.  During the appeal, however, ownership of ConnectU changed

and its new owner retained separate counsel, who, on behalf of ConnectU, have moved to dismiss

the appeal.  The attorneys for the Founders oppose the motion made by their former client on the

ground that a dismissal and other conduct by the new owner would have an adverse affect on their

remaining client, the Founders.  In response, ConnectU moved to disqualify its former joint

attorneys from continuing to represent the Founders on the ground that, having previously

represented both, the California Rules of Professional Conduct preclude the attorneys from now

United States District Court
For the Northern District of California

1  representing one client against the other in the same case.  The Ninth Circuit remanded the motion to

2  this Court for a ruling.  (See Docket Item No. 686.)

3         The Court conducted a hearing on August 17, 2009.  Based on the papers submitted to date

4  and oral argument, the Court GRANTS ConnectU's Motion to Disqualify Counsel and GRANTS in

5  part and DENIES in part ConnectU's Motion for Delivery of its Client Files.

## II.  FACTUAL AND PROCEDURAL BACKGROUND

7  **A.    History of the Attorney Client Relationships at Issue**

8         The background facts and procedural history of the proceedings to enforce the Settlement

9  Agreement are well-documented and need not be recited in detail.  (See Docket Item Nos. 461, 610.)

10  In summary, litigation between Facebook, ConnectU, and the Founders had been ongoing since

11  2004, both in the Santa Clara County Superior Court, this District ("Underlying Northern District

12  Action"), and in the United States District Court for the District of Massachusetts ("Massachusetts

13  Action").  Beginning in 2004-05, the law firm of Finnegan Henderson Farabow Garrett & Dunner

14  ("Finnegan") undertook joint representation of the Founders and ConnectU in the Underlying

15  Northern District and the Massachusetts Actions.  (Opposition to Motion to Disqualify at 3,

16  hereafter, "Opposition.")  On February 22, 2008, pursuant to private mediation, the parties signed a

17  document entitled "Term Sheet & Settlement Agreement," in which they agreed to exchange

18  consideration, gave mutual releases, and agreed to dismiss all pending litigation.

19         On June 28, 2008, Facebook moved this Court to order the Founders and ConnectU to

20  comply with the Settlement Agreement.  Finnegan represented both the Founders and ConnectU

21  with respect to those proceedings.[1]  On July 2, 2008, this Court entered Judgment enforcing the

22  Settlement Agreement between the parties.  (Docket Item No. 476.)  On November 21, 2008, the

23  Court issued an Amended Judgment, in which it ordered specific performance of the Settlement

24  Agreement.  (Docket Item No. 665.)  In December 2008, the law firm of Boies Schiller & Flexner

25

26         [1] There is a legal issue whether the Founders appeared in opposition to the motion to enforce
    the Settlement Agreement.  However, there is no dispute that the Founders and ConnectU were
27  jointly represented.

28                                                  2

1    ("Boies") became counsel of record for the Founders and ConnectU.  (Id.)  The law firm of O'Shea

2    Partners ("O'Shea") has also appeared on behalf of both ConnectU and the Founders in this

3    litigation.  (Id.)  An appeal from the Judgment was filed with the Ninth Circuit.[2]  ConnectU's

4    application for a stay of execution was denied by this Court and the Ninth Circuit.  (See Docket Item

5    Nos. 601, 613.)  The Court gave the parties until December 15, 2008 to transfer the settlement

6    consideration.

7         On December 15, 2008, after the Ninth Circuit had denied ConnectU's application for a stay,

8    the parties executed the exchange of settlement consideration.  As provided in the Settlement

9    Agreement, the Founders transferred their ConnectU stock to Facebook.  In return, Facebook

10   transferred cash and Facebook stock to the Founders and requests for dismissals were filed in the

11   respective courts.  (Docket Item No. 667.)  After execution of the Judgment, Facebook became the

12   sole shareholder of ConnectU and appointed new management.  ConnectU's new management

13   retained the law firm of Hoge, Fenton, Jones & Appel ("Hoge") to serve as its counsel.  (Motion, Ex.

14   H.)  On December 16, 2008, Hoge contacted Finnegan and Boies and sought their stipulation to

15   substitute counsel.[3]  (Id., Ex. J.)  On December 18, 2008, attorney Michael Underhill of Boies wrote

16   to Hoge, declining to stipulate to a substitution and suggested that under the circumstances, a motion

17   to the Ninth Circuit for substitution would be preferable.  Underhill stated:

18          Finally, on behalf of the Founders, we request that ConnectU not take any action that
            would interfere with the pending appeal.  As you are probably aware, ConnectU owes
19          substantial debts to the Founders, and ConnectU's most significant assets are its
            claims against Facebook and person associated with Facebook.  Consequently, we
20          believe any attempt by ConnectU to benefit its current shareholder by extinguishing
            that claim would be a fraudulent conveyance and legally actionable.
21
22   (James Towery Declaration in Support of ConnectU's Motion to Disqualify, hereafter, "Towery

23   Decl.," Ex. G.)

24          [2] Cross-appeals were filed by Facebook.  Indeed, numerous related appeals and cross-
     appeals are pending.  The Ninth Circuit consolidated three appeals, which were filed in July and
25   August 2008: Appeal Nos. 08-16745, 08-16849, 08-16873.  After consolidation, two more appeals
     were filed in December 2008: Appeal Nos. 09-15021, 09-15133.
26
          [3] On December 17, 2008, O'Shea indicated to Hoge that it was not counsel of record for
27   ConnectU before the Ninth Circuit, so had no need to stipulate to withdrawal as counsel.

28                                                     3

United States District Court
For the Northern District of California

1    On December 18, 2008, ConnectU made a motion to the Ninth Circuit to order substitution

2  of counsel. On December 22, 2008, Underhill wrote proposing to stipulate to substitution of Hoge

3  as counsel of record for ConnectU on the condition that Facebook and ConnectU agree to

4  completely indemnify Boise for any liabilities arising from or related to the substitution. (Towery

5  Decl., Ex. K.)

6    On July 1, 2009, the Ninth Circuit granted ConnectU's motion for substitution of counsel.

7  (See Docket Item No. 686.)

8  **B.    Motion to Disqualify**

9    On January 20, 2009, on behalf of ConnectU, the Hoge law firm made a motion to the Ninth

10  Circuit to disqualify Boies, Finnegan, and O'Shea from continued representation of the Founders on

11  appeal. Hoge contends that Finnegan and Boies' continued representation of the Founders now

12  against ConnectU would constitute a conflict of interest in violation of California Rule of

13  Professional Conduct ("CRPC") 3-310 and ABA Model Rules of Professional Conduct ("MRPC")

14  1.7 and 1.9. (Motion at 2.) The Founders filed an opposition to ConnectU's Motion, contending

15  that Facebook, through its ownership of ConnectU, "seeks to use conflict of interest rules to cripple

16  its long-time litigation adversaries, [the Founders], by depriving them of their chosen counsel

17  midway through the appeal process." (Opposition at 1.) On July 1, 2009, the Ninth Circuit

18  remanded ConnectU's Motion to Disqualify to this Court "for the limited purpose of enabling the

19  [Court] to consider the issues raised" in the motion. (Docket Item No. 686.)

20                          **III. DISCUSSION**

21  **A.    Legal Standards for Disqualification Based on Prior Joint Representation**

22       **1.    California Case Law**

23    In the Ninth Circuit, motions to disqualify counsel are subjected to strict judicial scrutiny.

24  Optyl Eyewear Fashion Inst. v. Style Co., 760 F.2d 1045, 1050 (9th Cir. 1985). Ruling on a motion

25  to disqualify counsel is a "discretionary exercise of the trial court's inherent powers." Certain

26  Underwriters at Lloyd's, London v. Argonaut Ins. Co., 264 F. Supp. 2d 914, 918 (N.D. Cal. 2003).

27  Given that a disqualification motion "is often tactically motivated and tends to derail efficient

28                                   4

United States District Court
For the Northern District of California

1    progress of litigation . . . . [t]he party seeking disqualification has a heavy burden and must satisfy a

2    high standard of proof." Travelers Cas. & Sur. Co. of Am. v. Claude E. Atkins Enters., No. CV-F-

3    05-0852 REC LJO, 2006 U.S. Dist. LEXIS 93189, at *21 (E.D. Cal. Dec. 11, 2006) (citing Evans v.

4    Artek Systems Corp., 75 F.2d 788, 791 (2d Cir. 1983)).

5         Pursuant to Northern District of California Local Rule 11-4(a)(1), every attorney before this

6    Court must "comply with the standards of professional conduct required of the members of the State

7    Bar of California." Accordingly, in this matter, the Court applies California law to determine the

8    propriety of disqualification. See Certain Underwriters, 264 F. Supp. 2d at 918 (citing Civ. L.R. 11-

9    4(a)(1)).

10        With respect to representing a client against a former client, California courts apply the State

11   Bar Rules of Professional Conduct. In Western Continental Operating Co. v. Natural Gas Corp.,

12   relying on then Rule 4-101, the court stated that the Rules of Professional Conduct prohibit a lawyer

13   from accepting employment adverse to a client or former client "relating to a matter in reference to

14   which he has obtained confidential information by reason of or in the course of his employment by

15   such . . . former client." 212 Cal. App. 3d 752, 759 (1989). Some courts have recognized an

16   exception to the holding in Western and hold that the prohibition accepting employment that is

17   adverse to a former client does not apply if the two clients were previously jointly represented. See,

18   e.g., Christensen v. United States District Court for the Central District of California, 844 F.2d 694

19   (9th Cir. 1988). Interestingly, although both Western and Christensen involved joint representation,

20   the attorneys were not disqualified in Christensen but were disqualified in Western. Thus, closer

21   scrutiny of the two cases is warranted.

22        In Christensen, beginning in 1983, the firm of Wyman, Bautzen, Christensen, Kuechel &

23   Silbert ("Wyman") commenced representation of the Amir group in their attempt to take

24   management control of Beverly Hills Savings & Loan ("BHSL") away from the Fitzpatrick group.

25   After the Amir group's efforts were successful, Wyman commenced joint representation of both the

26   Amir group and BHSL in various matters. Terry Christensen, a Wyman partner, joined the board of

27   BHSL. In 1986, BHSL became insolvent and was taken over by the Federal Savings and Loan

28

5

United States District Court
For the Northern District of California

1   Insurance Corporation ("FSLIC"). The FSLIC filed a lawsuit against both the Amir group and the

2   Fitzpatrick group for mismanagement. The Amir group retained Wyman to represent it. The

3   Fitzpatrick group impleaded Christensen and he in turn, retained Wyman represent him. The FSLIC

4   moved the district court to disqualify Wyman on the ground that the firm had previously represented

5   the BHSL and was now representing the Amir group against its former client. The district court

6   granted the motion to disqualify Wyman from representing Amir against BHSL. However, on a

7   petition for a writ of mandate, the Ninth Circuit reversed. The Ninth Circuit held that the prohibition

8   against an attorney's accepting employment against former client BHSL did not apply to Wyman's

9   representation of Amir and Christensen because during the time Wyman had received confidential

10  information as attorneys for BHSL, Wyman was jointly representing BHSL and Amir:

11          BHSL necessarily knew that any information it gave to Wyman would be conveyed to
            Christensen as a BHSL director and a senior partner in the law firm. Moreover, even if
12          Wyman is disqualified, Wyman is effectively still in this lawsuit through Christensen. He
            has access to any confidences previously revealed by BHSL. Disqualification would thus be
13          futile in terms of furthering the purpose of the rule.

14  Christensen, 844 F.2d at 698.

15          Under similar factual circumstances, however, in Western, the California Court of Appeals

16  ordered disqualification of counsel. In 1979, Natural Gas Corporation of California ("NGC"), a

17  subsidiary of PG&E, and Western Continental Operating Company ("Western") agreed to jointly

18  develop a natural gas production facility. NGC was responsible for operating the facility. In 1982,

19  the law firm of Bright & Brown was retained to represent jointly NGC and Western against a third-

20  party co-tenant. During the course of the co-tenant dispute, NGC provided Bright & Brown with

21  information about how it performed its functions as the operator, including details of NGC's

22  relationship with PG&E. Ultimately, the dispute with the co-tenant was settled.

23          In 1987, Western retained Bright & Brown to represent it in a lawsuit against NGC and

24  PG&E for breach of the development agreement. Among the allegations made in the lawsuit was a

25  claim that PG&E was the alter ego of NGC. NGC moved to disqualify Bright & Brown from

26  representing Western on the ground that the law firm's former representation of both NGC and

27  Western with respect to the co-tenant dispute was substantially related to the current lawsuit. NGC

28

6

1  contended that it had disclosed to Bright & Brown confidential information that would be used

2  against NGC in the lawsuit filed by Western.  In response to the disqualification motion, Western

3  contended that the joint client exception applied to preclude disqualification.  However, the trial

4  court granted the motion to disqualify Bright & Brown.  The disqualification order was affirmed on

5  appeal:

6      It is well settled that an attorney is prohibited from doing either of two things after severing a
       relationship with a former client.  ". . . He may not do anything which will injuriously affect
7      his former client in any [matter][4] in which he formerly represented him nor may he at any
       time use against his former client knowledge or information acquired by virtue of the
8      previous relationship."

9  Western, 212 Cal. App. 3d at 759 (quoting People ex rel. Deukmejian v. Brown, 29 Cal. 3d 150, 155

10 (1981)).

11     The Christensen case was reviewed by the court in Western.  The joint client exception was

12 not applied.  The California Court of Appeals held that although California law recognizes a joint

13 client exception to confidential communications,[5] the exception does not affect the duty an attorney

14 owes to his or her client to not take on representation adverse to the client on a related matter:

15     Western next urges that rule 4-101 contemplates an exception where the attorney jointly
       represented the parties in the former matter.  In such a case, Western argues, no
16     confidentiality privilege exists as to one of the jointly represented clients with respect to
       information disclosed to the other client.  Western submits that during Bright & Brown's
17     joint representation of NGC and Western, each party fully understood that information
       disclosed by either party should be shared with both parties.  In support of its position,
18     Western relies on Evidence Code section 962, setting forth a joint client exception to the
       evidentiary privilege accorded to attorney-client communications.  Additionally, Western

19

20

21     [4] The word "manner" was used in the cited case.  However, the original source for the
   quotation is Wutchumna Water Co. v. Bailey, which uses the word "matter":
22     From these pronouncements it appears that an attorney is forbidden to do either of two things
       after severing his relationship with a former client.  He may not do anything which will
23     injuriously affect his former client in any **matter** in which he formerly represented him nor
       may he at any time use against his former client knowledge or information acquired by virtue
24     of the previous relationship.
   216 Cal. 564, 573-74 (emphasis added).
25
       [5] In California, "[b]y selecting the same attorney, and making their communications in the
26 presence of each other, each joint client waives his right to place those communications under the
   shield of professional confidence."  Travelers, 2006 U.S. Dist. LEXIS 93189, at *21 (quoting Croce
27 v. Superior Court, 21 Cal. App. 2d 18, 20 (1937)).

28                                              7

United States District Court
For the Northern District of California

United States District Court

For the Northern District of California

1    relies on two federal cases, Allegaert[6] . . . and Christensen . . ., which hold that the
     substantial relationship test is inapposite where the former client has no reasonable
2    expectation that information given to counsel will not be disclosed to the current client.

3    We are unpersuaded under the circumstances of this case that there is a joint client
     exception to the prohibition against representation adverse to a former client.
4
     We disagree that the privilege exception or the cases cited have any application here. In the
5    first instance, we are not concerned in this case with discovery of allegedly privileged
     communications. Instead, the pertinent issue is the propriety of an attorney's representation
6    adverse to a former client. Our courts have distinguished the rule against representing
     conflicting interest from the attorney-client evidentiary privilege noting that the former is
7    broader than the latter. The evidentiary privilege and the ethical duty not to disclose
     confidences both arise from the need to encourage clients to disclose all possibly pertinent
8    information to their attorneys, and both protect only the confidential information disclosed.
     The duty not to represent conflicting interest . . . is an outgrowth of the attorney-client
9    relationship itself, which is confidential, or fiduciary, in a broader sense. Not only do clients
     at times disclose confidential information to their attorneys; they also repose confidence in
10   them. The privilege is bottomed only on the first of these attributes, the conflicting-interests
     rule on both.
11
     212 Cal. App. 3d at 761-62.
12
13        **2.    New York Case Law**

14        Since both parties have cited cases outside of California that apply identical Rules of

15   Professional Conduct, the Court also gives a closer scrutiny to these cases for comparison.

16        In Tekni-Plex, Inc. v. Meyner and Landis, the issue was whether an attorney who had jointly

17   represented a shareholder and a close corporation should be disqualified from representing the

18   shareholder in a post-merger claim made by the corporation against the shareholder. 674 N.E. 2d

19   663 (N.Y. 1996). Tekni-Plex,[7] a pharmaceutical company, had been represented by the law firm of

20   Meyner and Landis on various legal matters including environmental compliance since 1971. In

21   1986, Tom U.C. Tang, one of its directors and shareholders became the sole shareholder, director

22   and officer of Tekni-Plex. Meyner and Landis continued their representation under this sole-

23   shareholder structure.

24

25        [6]   Allegaert v. Perot, 565 F.2d 246 (2d Cir. 1977).

26        [7]   Since the surviving corporation had taken the same name as the acquired corporation, to
     avoid confusion, later in this Order the Court will refer to the pre-merger target corporation as "old
27   Tekni-Plex."

28                                                  8

1    In 1994, Tang entered into an agreement to sell Tekni-Plex to a group of purchasers. Meyner

2   and Landis represented both Tekni-Plex and Tang during the negotiations and execution of the sale.

3   The transaction was structured as follows: (1) the purchasers created a shell corporation called TP

4   Acquisition Company; (2) upon close of the sale, Tekni-Plex conveyed to Acquisition all of its

5   tangible and intangible assets, rights and liabilities, Tang's stock was cancelled and "pre-

6   transaction" Tekni-Plex ceased existence. The sales agreement contained representations and

7   warranties by Tang that Tekni-Plex was in full compliance with all applicable environmental laws.

8   In the agreement, Tang agreed to indemnify Acquisition for any losses incurred by Acquisition as a

9   result of breach of warranty by either Tang or Tekni-Plex.

10   After the transaction was closed, the purchasers changed the name of TP Acquisition

11   Company to Tekni-Plex, Inc. ("new Tekni-Plex"). Later in 1994, new Tekni-Plex initiated an

12   arbitration proceeding against Tang, contending that he had breached representations and warranties

13   regarding environmental matters. Tang retained Meyner and Landis to represent him in the

14   arbitration. New Tekni-Plex moved to disqualify Meyner and Landis from representing Tang on the

15   ground that the law firm could not represent one former client against the other. The disqualification

16   motion was taken from the arbitrator to the New York Supreme Court, which granted the motion to

17   disqualify Meyner and Landis. The disqualification order was affirmed by the Appellate Division

18   and came before the New York Court of Appeals.

19   The New York Court of Appeals affirmed the disqualification order. With respect to new

20   Tekni-Plex and matters concerning the acquisition where Meyner and Landis represented both Tang

21   and old Tekni-Plex, the Court of Appeals found that:

22       New Tekni-Plex . . . does not control the attorney-client privilege with regard to discrete
         communications made by either old Tekni-Plex or Tang individually to [Meyner and Landis]
23       concerning the *acquisition* – a time when old Tekni-Plex and Tang were joined in an
         adversarial relationship to Acquisition. Consequently, new Tekni-Plex cannot assert the
24       privilege in order to prevent [Meyner and Landis] from disclosing the contents of such
         communications to Tang. Nor is new Tekni-Plex entitled to the law firm's confidential
25       communications concerning its representation of old Tekni-Plex with regard to the
         acquisition.

26

27

28                                                   9

United States District Court

For the Northern District of California

1    674 N.E. 2d at 130 (emphasis added).  In essence, the Court of Appeals found that new Tekni-Plex

2    did not succeed to old Tekni-Plex's position with respect to rights to loyalty and confidentiality from

3    Meyner and Landis for representation during the negotiations that led up to the sale to Acquisition

4    because Tang and old Tekni-Plex were adversaries of Acquisition on these matters.

5         However, with respect to the *environmental matters* that were the subject of the arbitration,

6    the Court of Appeals found that Meyner and Landis represented only old Tekni-Plex and did not

7    jointly represent Tang with respect to those matters.  Thus, as to these business operation matters,

8    the Court of Appeals found that Meyner and Landis owed a duty of loyalty and confidentiality to

9    new Tekni-Plex:

10        As a practical matter, then, old Tekni-Plex did not die.  To the contrary, the business
          operations of old Tekni-Plex continued under the new managers.  Consequently, control of
11        the attorney-client privilege with respect to any confidential communications between
          [Meyner and Landis] and corporate actors of old Tekni-Plex concerning these operations
12        passed to the management of new Tekni-Plex.  [Citation omitted.]  An attorney-client
          relationship between [Meyner and Landis] and new Tekni-Plex necessarily exists.
13

     Id. at 669.
14

15        The New York Court of Appeals went on to hold that if the dispute were limited to the sales

16   transaction, there would be no cause to disqualify Meyner and Landis from representing Tang

17   because they would be consistently representing the seller in opposition to the buyer.  However,

     because the dispute involved matters beyond the merger and touched on matters for which Meyner
18
     and Landis owed a continuing duty of loyalty and confidentiality to new Tekni-Plex, Meyner and
19
     Landis were disqualified:
20

21        The dispute here . . . goes beyond the merger negotiations.  It also involves issues relating to
          the law firm's longstanding representation of the acquired-corporation on matters arising out
22        of the company's business operations – namely, [Meyner and Landis'] separate
          representation of old Tekni-Plex prior to the merger on environmental compliance matters.
23        Any environmental violations will negatively affect not only the purchasers but also the
          business interests of the merged corporation.  In this regard, the interests of [Meyner and
24        Landis'] current client Tang are adverse to the interests that new Tekni-Plex assumed from
          old Tekni-Plex.
25        Indeed, [Meyner and Landis'] earlier representation of old Tekni-Plex provided the firm with
          access to confidential information conveyed by old Tekni-Plex concerning the very
26        environmental compliance matters at issue in the arbitration.  [Meyner and Landis'] duty of
          confidentiality with respect to these communications passed to new Tekni-Plex; yet its
27

28                                                    10

current representation of Tang creates the potential for the law firm to use these confidences against new Tekni-Plex in the arbitration.

Id. at 670.

In <u>Occidental Hotels v. Westbrook</u>, Westbrook, a conglomerate of companies involved in real estate investment, was represented by Cravath, Swaine & Moore ("Cravath").  440 F. Supp. 2d 303 (S.D.N.Y. 2006).  From 1987 to 1997, various matters for which Cravath had represented Westbrook were handled by an associate attorney named Kent Richey.  In 1997, under Richey's representation, Westbrook acquired Allegro Resorts Corporation.  Allegro Resorts operated hotel properties in various countries through several wholly-owned subsidiaries.  After the acquisition, Richey left Cravath to become general counsel to Allegro Resorts and served as an officer and member of the board of its wholly-owned subsidiaries.

In 2000, Westbrook entered into negotiations with Occidental Hotels to sell its stock in Allegro Resorts to Occidental.  As General Counsel for Allegro Resorts, Richey participated in the due diligence, negotiations, drafting and execution of various transaction documents.  In April 2000, a sales agreement was reached.  Shortly afterward, Richey resigned as General Counsel for Allegro Resorts.

In 2004, Richey joined the Jones Day law firm.  Later that year, Occidental filed a lawsuit in the district court alleging that Westbrook had breached several of the representations and warranties in the Sales Agreement.  Westbrook was represented by Jones Day in that lawsuit.  Occidental moved to disqualify Jones Day as Westbrook's counsel on the ground that it was unethical for Richey, who had previously represented Allegro Resorts with respect to the matters that were now the subject of the alleged breaches of representations and warranties, to represent Westbrook in defense of claims brought by Allegro's new owner.  Occidental contended that Richey would be in the position of revealing Allegro Resorts' privileged information to Westbrook, to the disadvantage of his former client, Allegro.

Occidental relied on New York law, which, similar to California's, provided that an attorney may be disqualified from representing a client in two kinds of cases: (1) if the representation caused

11

**United States District Court**
For the Northern District of California

1    a conflict of interest that undermines the court's confidence in the attorney's representation of the

2    interest of the client; and (2) if the attorney is, or potentially is, in a position to use privileged

3    information gained from the other side through prior representation, thus giving the present client an

4    unfair advantage. Id. at 310. The district judge denied Occidental's disqualification motion. The

5    district judge reasoned that in post-merger litigation by the buyer against the seller, disqualifying the

6    attorney who had represented the seller and the target corporation from continuing to represent the

7    seller would not serve the purpose of protecting the former client's expectation of loyalty and

8    confidentiality:

9           It is Allegro Resorts and its subsidiaries rather than Richey, that have changed positions from
            alignment with Westbrook to alignment with Occidental. Richey represented Westbrook
10          while at Cravath, prior to joining Allegro Resorts as General Counsel. [Citation omitted.]
            During the merger, Richey negotiated on behalf of pre-merger Allegro Resorts and
11          Westbrook as seller. Post-merger, Richey resigned his position with post-merger Allegro
            Resorts. Subsequently, Richey has continued to represent Westbrook in the numerous
12          indemnification-related disputes with Occidental. Richey has consistently represented
            Westbrook-aligned interest, including pre-merger Allegro Resorts, and pre- and post-merger
13          Westbrook sellers. Occidental has clearly understood that Richey was aligned with the seller
            and that, in any dispute arising out of the merger, Richey would continue to be associated
14          with Westbrook. Jones Day's representation of Westbrook in this litigation is consistent with
            Richey's prior representation.
15

16   440 F. Supp. 2d at 311. The Occidental court distinguished Tekni-Plex on the ground that there, the

17   attorney was found to owe confidences to the former client which survived the merger.

18          **3.      Conclusion**

19          This review of the cases shows that courts differ with respect to the issue of disqualification

20   of counsel. Universally, however, it appears that in considering a motion to disqualify counsel, the

21   "paramount concern is the preservation of public trust in the scrupulous administration of justice and

22   the integrity of the bar." Sharp v. Next Entertainment, Inc., 163 Cal. App. 4th 410, 425 (2008)

23   (quoting Jessen v. Hartford Casualty Ins. Co., 111 Cal. App. 4th 698, 705 (2003)). In addition, it

24   appears that disqualification decision is tied to the circumstances of the cases. Although none of the

25   cases reviewed above involve the same facts presented to the Court here, from these cases, the Court

26   discerns the following principles:

27

28                                                       12

*In the absence of informed consent by both clients, an attorney is disqualified from*

*accepting representation of one joint client against the other in the same or a*

*substantially related matter. Although a joint client waives the attorney-client*

*privilege with respect to the attorney's disclosure of information from one joint client*

*to the other, the duty of loyalty persists and precludes the attorney from representing*

*one joint client against the other with respect to the matter.*

If the rule were otherwise, joint clients would be required to calculate how much information to disclose to the attorney in order to protect themselves from the eventuality that later in the action or in a subsequent action, their attorney would use information disclosed to the attorney against them.

The Court now applies these principles to this case.

**C.   Whether Finnegan and Boies Should be Disqualified from Representing the Founders**

There is no question that the matter on which ConnectU seeks to disqualify its former attorneys, continuing to represent the Founders in the current appeal, is substantially related to the matter on which those firms previously represented both the Founders and ConnectU.[8] Indeed, the matter is identical. The Court presumes that in the course of the representation, ConnectU reposed trust and confidence, albeit through its officers and directors, that Finnegan and Boies would not undertake representation against it with respect to this matter. The real issue in this case is whether the change in ownership that came about as a result of the execution of the Judgment places Finnegan and Boies in a position of representing the Founders "against" ConnectU.

The Founders and ConnectU are co-appellants and co-respondents. Presently, there is no cross-appeal that has been filed by one against the other. However, an adverse interest can arise even between co-parties. Here, ConnectU wishes to dismiss its appeal and the Founders oppose dismissal. Under some circumstances, opposition to a motion by a co-party to dismiss its appeal might not be the type of adversarial position that would trigger disqualification. In this case,

---

[8] In light of the fact that the Ninth Circuit granted ConnectU's motion to substitute counsel, Hoge is the only firm representing ConnectU on appeal. Accordingly, the Court need not consider ConnectU's argument that Finnegan and Boies are engaging in concurrent adverse representation of ConnectU and the Founders.

13

United States District Court
For the Northern District of California

**United States District Court**
For the Northern District of California

1  however, ConnectU's motion could have significant adverse legal consequences to the Founders and

2  *vice-versa*. First, an issue that has been raised on appeal is the Founders' independent standing to

3  prosecute the appeal.[9] ConnectU's withdrawal as an appellant might adversely affect the Founders'

4  rights to continue to prosecute the appeal. Second, in post-execution correspondence, the Founders

5  notified ConnectU that the Founders contend that it owes them $8,240,372.[10] Furthermore, the

6  Founders contend that this debt will be extinguished if the underlying Judgment is affirmed. (Id.)

7  As illustrated by Underhill's correspondences, the Founders have threatened to pursue legal action

8  against ConnectU if it dismisses its appeal or takes any action that would affect the debt. Thus, the

9  Founders oppose ConnectU's motion to dismiss its appeal in order to preserve a debt ConnectU

10  allegedly owes to them. Third, if the Founders are successful on appeal, the release and other

11  consideration ConnectU received in the execution of the Judgment would be cancelled.

12      In weighing any harm the Founders might face in not having their chosen attorneys to

13  represent them for the duration of these appeals against the public interest served by the professional

14  rules of ethics, the Court strikes the balance in favor of the public interest. There is no argument that

15  the Founders' positions could not be advanced, perhaps with equal force, by new attorneys.

16  However, the ethical duty owned to ConnectU would be harmed by having its former attorneys take

17  a position adverse to it. More importantly, the public would be assured that should they seek joint

18  representation in a matter, with the inherent prospect that a conflict of interest could arise, they

19  could, nevertheless, have full trust and confidence that the attorney would never become an advocate

20  for their adversary in the same or substantially related matter.

21      The Court finds that ConnectU has met its burden of demonstrating that the Court should

22  disqualify the Founders' counsel. Accordingly, the Court GRANTS ConnectU's Motion to

23  Disqualify.

24

25  [9] The issues of the timeliness of the appeal and the standing of the Appellants are not before
    this Court.

26

27  [10] (Founders' Response to Court's Request at August 17, 2009 Hearing Concerning
    ConnectU Debt at 1, hereafter, "Response re: Debt," Docket Item No. 693.)

28

**D.      Whether ConnectU is Entitled to its Client Files**

ConnectU also moves for an order directing Finnegan and Boies to turn over its client files.
(Motion at 19-20.) Although it somewhat softened its position during oral argument, ConnectU
contends that both law firms have improperly refused to turn over its files, preventing it from being
able to assess its rights and obligations. The Founders oppose ConnectU's motion, contending that
"[t]he guise that [the] files somehow belong to ConnectU is a smokescreen to cripple Facebook's
adversaries by peering into their counsel's attorney-client and work product materials." (Opposition
at 15.)

In California, once an attorney's representation of a client has been terminated, the attorney
must "promptly release to the client, at the request of the client, all the client papers and property.
'Client papers and property' includes correspondence, pleadings, deposition transcripts, exhibits,
physical evidence, expert's reports, and other items reasonably necessary to the client's
representation, whether the client has paid for them or not." CRPC 3-700(D).

In this case, the Court recognizes that, as with the disqualification issue, there are competing
interests that must be considered. First, ConnectU has a separate legal identity and has interests,
rights, and liabilities that are separate from either the Founders or Facebook. These separate
interests are reflected by the fact that ConnectU has itself been a party to this litigation, causing
ConnectU to retain several law firms as its counsel. Certain files in the possession of those law
firms may reflect the independent rights, interests, and liabilities of ConnectU. As the current
principal of ConnectU, Facebook now has the right to examine those files so that it can competently
conduct the business of ConnectU.

At the same time, as the Court recognized in the prior section, the representation collectively
received by the Founders and ConnectU related to the litigation against their mutual adversary,
Facebook. As a consequence, it is likely that documents were generated on behalf of both the
Founders and ConnectU which reflect privileged communications between the Founders and their

United States District Court
For the Northern District of California

15

counsel, the Founders' litigation positions, and other confidential information.[11]  These documents

likely include confidential information relating to the Settlement Agreement now in dispute.  To

require Finnegan and Boies to hand over all of ConnectU's client files would necessarily cause the

Founders to expose confidential information to Facebook that relates to the exact subject of this

litigation, potentially prejudicing the Founders on appeal and thereafter.

     To resolve this dispute, therefore, the Court must reconcile ConnectU's right to documents in

its client files with the practical realities relating to the interrelationships between the various parties

and their attorneys.  The main California case relied on by both parties is Moeller v. Superior Court

of Los Angeles, 16 Cal. 4th 1124 (1997).  In Moeller, the California Supreme Court addressed the

question of whether a predecessor trustee could assert the attorney-client privilege against a

successor trustee, to withhold from the successor trustee documents reflecting confidential

communications between the predecessor trustee and an attorney on matters of trust administration.

Id. at 1127.  The California Supreme Court concluded that the attorney-client privilege passes from

one trustee to its successor trustee, and required the predecessor trustee to produce the confidential

attorney-client communications requested by the successor.  Id. at 1139.

     The Court, however, is not persuaded that Moeller is controlling in this case, given that its

holding related to whether the attorney-client privilege passes between successive trustees of the

same trust.  More relevant to the present case is Tekni-Plex, in which the New York Court of

Appeals addressed the question of who controls the attorney-client privilege as to pre-merger

communications, where a close corporation merged with another corporation to create a new

corporate entity, and where the pre-merger corporation and its sole shareholder had been jointly

---

[11] The Court recognizes that there is a tension embodied even in the use of the term "confidential."  The Court has already found that there is no reasonable expectation on the part of ConnectU that information shared with Finnegan and Boies would not be disclosed to the Founders. This principle, of course, extends in the opposite direction.  The Founders had no reasonable expectation that information shared with joint counsel would not be disclosed to ConnectU.  On its face, this reciprocal non-confidentiality could support the conclusion that the Founders cannot now object to ConnectU having access to all mutual client files.  Nonetheless, as the Court has repeatedly acknowledged, the Founders exerted complete control over ConnectU, such that ConnectU never operated in a manner independent of the Founders.

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

1    represented by the same law firm. 89 N.Y. 2d at 127. In Tekni-Plex, the merged corporate entity

2    attempted to access attorney-client communications between the law firm and the pre-merger

3    corporation. The court separated the documents at issue into two analytical categories: (1) general

4    business communications, and (2) communications relating to the merger negotiations.

5          As to the first category, the court held that "ownership of the law firm's files regarding its

6    pre-merger representation of old Tekni-Plex on environmental compliance matters passed to the

7    management of new Tekni-Plex."[12] Id. at 137. As to the second category, the court found that the

8    merged corporation did not control the attorney-client privilege as to communications between the

9    pre-merger corporation and the law firm. The court stated that this conclusion was "especially

10   compelling . . . where at the time of the acquisition the seller corporation was solely owned and

11   managed by one individual. . . ." Id. at 138. After noting the blurred individual-corporation

12   distinctions in close corporations, the court stated that "[t]o allow new Tekni-Plex access to the

13   confidences conveyed by the seller company to its counsel during the negotiations would, in the

14   circumstances presented, be the equivalent of turning over to the buyer all of the privileged

15   communications of the seller concerning the very transaction at issue." Id. Moreover, the court

16   stated that granting the merged corporation control over communications concerning the merger

17   transaction would thwart the purposes underlying the attorney-client privilege, because it would

18   "significantly chill attorney-client communication during the transaction." Id. at 139.

19         The Court is persuaded that the logic of Tekni-Plex governs the outcome in this case,

20   because it reflects an appropriate balance between the legitimate competing interests at play. That

21   is, the Founders and their attorneys cannot obstruct access to ConnectU's general business

22   documents. To deny ConnectU access to such files would inhibit the ability of its ownership to

23   appropriately direct the affairs of the company. Accordingly, the Court finds that ConnectU is

24

25   [12] The Court stated that this holding "comports with new Tekni-Plex's right to invoke the
     pre-merger attorney client-relationship should it have to prosecute or defend against third-party suits
     involving the assets, rights, or liabilities that it assumed from old Tekni-Plex." 89 N.Y. 2d at 137.
26   Notably, however, the record reflected that the law firm had only represented the corporation, and
     not the sole shareholder, on the environmental compliance issues to which those documents
27   pertained. Id.

28
                                              17

United States District Court
For the Northern District of California

1 | entitled all documents pertaining to ConnectU's general business, including but not limited to

2 | documents relating to ConnectU's financials, assets, and liabilities.

3 |     At the same time, the Court finds that to order Finnegan and Boies to turn over all ConnectU

4 | files would be anathema to the principles underlying the policy of fostering unfettered attorney-

5 | client communication.  The transaction at issue here resulted from the settlement of a protracted

6 | litigation.  To require a handover of all ConnectU files would be to expose to the Founders'

7 | adversary all of the their relevant litigation documents.  Directing the handover of those files would

8 | thus create a rule that would chill communication between attorneys and clients, and may ultimately

9 | impede the type of settlement that was reached here between the parties.  Certainly, the principals of

10 | a close corporation may be reluctant to engage in this type of stock for cash settlement if their

11 | attorney-client communications could be obtained by their adversary and used against them in any

12 | subsequent dispute over the settlement.[13]  The Court, therefore, declines to order Finnegan and Boies

13 | to hand over files pertaining to ConnectU's litigation against Facebook.

14 |     Accordingly, ConnectU's Motion with respect to a handover of its client files is GRANTED

15 | in part and DENIED in part.  With respect to documents necessary for new ConnectU to carry on

16 | ConnectU's business operations, the motion is GRANTED.  With respect to documents relating to

17 | the litigation against Facebook, the motion is DENIED.

18 |                                     **IV.  CONCLUSION**

19 |     The Court GRANTS ConnectU's Motion to Disqualify the law firm of Finnegan Henderson

20 | Farabow Garrett & Dunner and the law firm of Boies Schiller & Flexner from further representation

21 | of the Founders with respect to this matter.  The Court GRANTS in part and DENIES in part

22 | ConnectU's Motion directing a handover of its client files.  The parties are referred to Chief

23 |

24 |

25 |     [13] It is not lost on the Court that many of the concerns could have been avoided if either the
Founders and ConnectU had gotten separate representation or if the parties had incorporated
26 | document ownership issues into their Settlement Agreement.  Nonetheless, neither of these *ex ante*
solutions were implemented.  Thus, the Court must craft an *ex post* solution that best comports with
27 | the professional responsibility principles at issue.

28 |                                            18

1   Magistrate Judge James for further proceedings with respect to which documents should be turned

2   over to the current owners.[14]

3        This Order does not address the circumstances on appeal or afterward should the interests of

4   ConnectU and the Founders merge.

5

6   Dated:  September 2, 2009

7                                                JAMES WARE
                                                 United States District Judge

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26   [14]  In light of this Order, the parties' administrative Motions for Leave to File Supplemental
     Briefing are DENIED as moot.  (See Docket Item Nos. 692, 696.)  The Court GRANTS ConnectU's
27   Motion for Leave to File Promissory Notes Under Seal.  (See Docket Item No. 700.)

28                                                19

United States District Court
For the Northern District of California

**United States District Court**
For the Northern District of California

1   **THIS IS TO CERTIFY THAT COPIES OF THIS ORDER HAVE BEEN DELIVERED TO:**

2   Chester Wren-Ming Day cday@orrick.com
    D. Michael Underhill Munderhill@BSFLLP.com
3   David A. Barrett dbarrett@bsfllp.com
    Evan A. Parke eparke@bsfllp.com
4   George Hopkins Guy hopguy@orrick.com
    I. Neel Chatterjee nchatterjee@orrick.com
5   James Earl Towery jet@hogefenton.com
    Jonathan M. Shaw jshaw@bsfllp.com
6   Mark A. Weissman mweissman@osheapartners.com
    Mark Andrew Byrne markbyrne@byrnenixon.com
7   Monte M.F. Cooper mcooper@orrick.com
    Rachel E. Matteo-Boehm rachel.matteo-boehm@hro.com
8   Roger Rex Myers roger.myers@hro.com
    Scott Richard Mosko scott.mosko@finnegan.com
9   Sean Alan Lincoln slincoln@Orrick.com
    Sean F. O'Shea soshea@osheapartners.com
10  Steven Christopher Holtzman sholtzman@bsfllp.com
    Theresa Ann Sutton tsutton@orrick.com
11  Tyler Alexander Baker Tbaker@fenwick.com
    Valerie Margo Wagner vwagner@gcalaw.com
12  Warrington S. Parker wparker@orrick.com
    Yvonne Penas Greer ygreer@orrick.com
13

14

15

16  Dated:  September 2, 2009                        Richard W. Wieking, Clerk

17                                             By:___/s/ JW Chambers_____
                                                   **Elizabeth Garcia**
18                                                 **Courtroom Deputy**

19

20

21

22

23

24

25

26

27

28