DORSEY & WHITNEY LLP
Gabrielle M. Wirth (State Bar No. 106492)
Kathlene W. Lowe (State Bar No. 145404)
38 Technology Drive
Irvine, CA 92618-5312
Telephone: (714) 424-5555
Facsimile: (714) 424-5554

DIANE MASON (Sate Bar No. 168202)
DORSEY & WHITNEY LLP
Four Embarcadero Center, Suite 3400
San Francisco, California 94111-4187
Telephone: (415) 781-1989]
Facsimile: (415) 398-3249

Attorneys for Defendant
BROBECK, PHLEGER & HARRISON, LLP

E-FILING

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ROBERT MCCAFFREY a/k/a BROKE BECK, et al., on behalf of themselves, the general public and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>BROBECK, PHLEGER & HARRISON, LLP and MORGAN, LEWIS & BOCKIUS, and Does 1-99<br><br>Defendants. | CASE NO.: C 03-2082 CW<br><br>Assigned for all Purposes to Dept. 2<br><br>**REPLY OF DEFENDANT BROBECK, PHLEGER & HARRISON LLP IN SUPPORT OF ITS MOTION TO DISMISS OR IN THE ALTERNATIVE FOR SUMMARY JUDGMENT; DECLARATION OF JAMES L. MILLER**<br><br>HEARING:<br>DATE: AUGUST 8, 2003<br>TIME: 10:00 A.M.<br>DEPT: 2 |

302636

1

REPLY OF DEFENDANT BROBECK, PHLEGER & HARRISON LLP
IN SUPPORT OF MOTION TO DISMISS OR FOR SUMMARY JUDGMENT

# TABLE OF CONTENTS

PAGE

I. THE FIRST AMENDED COMPLAINT SHOULD BE DISMISSED FOR FAILURE TO STATE A CLAIM UPON WHICH RELIEF CAN BE GRANTED.................................1

II. PLAINTIFFS MUST BE REQUIRED TO PLEAD FACTS THAT WOULD ALLEGE THAT EACH PLAINTIFF MEETS THE STATUTORY DEFINITION OF AN "EMPLOYEE" AT A "COVERED ESTABLISHMENT" UNDER THE CALIFORNIA WARN ACT..............2

III. THE FEDERAL WARN ACT UNFORESEEN BUSINESS CIRCUMSTANCE EXCEPTION EXEMPTS BROBECK FROM GIVING NOTICE................................4

IV. BROBECK WAS ACTIVELY SEEKING CAPITAL AND THUS EXERCISED FROM GIVING NOTICE UNDER BOTH FEDERAL AND STATE WARN ACTS ..................7

V. PLAINTIFFS' THIRD CAUSE OF ACTION FAILS TO STATE A CLAIM FOR *JEWEL V. BOXER* RELIEF.......................................................................7

    A.    *Jewel* Has No Application Here......................................................8

    B.    Plaintiffs Cannot Preserve This Claim by Alleging Fraudulent Transfer............9

    1.    Due Process Limitations..............................................................9

    2.    There Has Been No Fraudulent Transfer..........................................10

    3.    The Case Cited by Plaintiffs Is Inapplicable....................................12

    C.    The 2003 Partnership Agreement Is Not Unconscionable....................12

# TABLE OF AUTHORITIES

**Cases**

*A&M Produce Co. v. FMC Corp.* 135 Cal. App. 3d 473 (1982) .................................................. 13

*Champion v. Superior Court,* 201 Cal. App. 3d 777 (1988) ...................................................... 13

*Donovan v. RRL Corp.,* 26 Cal. 4th 261 (2001) ........................................................................ 13

*Dosenberry v. United States,* 534 U.S. 161 (2001) .................................................................... 10

*Jewel v. Boxer,*
   156 Cal. App. 3d 171 (1984) ............................................................................................ passim

Jones v. Kayser-Roth Hosiery, Inc., 748 F. Supp. 1276 E.D.Tenn.1990) .................................... 5

Morilon v. Royal Packing Company, 22 Cal. 4th 575 (2002) ....................................................... 2

*Rosenfeld, Meyer & Susman v. Cohen,* 146 Cal. App. 3d 200 (1983) ....................................... 12

*Ryan v. Cal. Interscholastic Federation, San Diego Section,* 94 Cal. App. 4th 1048 (2001) ......... 10

Walnut Creek Manor v. Fair Employment and Housing Commission, 54 Cal. 3d 345 (1991) ........ 3

Wholesale and Retail Food Distribution Local 63, 826 F. Supp. 326 (C.D. Cal. 1993) ................. 5

*Williams v. Borgwardt,*
   119 Cal. 80 (1897) ................................................................................................................ 13

**Statutes**

20 C.F.R. § 639.-9(b)(1) ................................................................................................................. 5

20 CFR § 639 ...................................................................................................................... 3, 5, 6, 7

20 CFR § 639.3(j) ........................................................................................................................... 3

20 CFR § 639.9 ............................................................................................................................... 6

29 U.S.C. § 2102(b)(2)(A) ............................................................................................................. 5

California Civil Code §§ 3439.04, 3439.05 ................................................................................. 11

California Civil Code §§ 3439.08(a), (d) ..................................................................................... 10

California Code of Civil Code § 3439.08(b) ............................................................................. 8, 9

**Other Authorities**

§ 1

| | | |
|---|---|---|
| 1 | Business and Professions Code § 17200 | 1 |
| 2 | Cal. Corp. Code § 15018(f) | 8 |
| 3 | California Corporations Code § 16401(h) | 9 |
| 4 | California Labor Code § 1400 | 2, 3, 4 |
| 5 | California Labor Code § 1400(a) | 2 |
| 6 | California Labor Code § 1400(h) | 2 |
| 7 | California Labor Code § 1401(b) | 2 |
| 8 | California Labor Code § 1404 | 2 |

# I. THE FIRST AMENDED COMPLAINT SHOULD BE DISMISSED FOR FAILURE TO STATE A CLAIM UPON WHICH RELIEF CAN BE GRANTED

That five Plaintiffs concededly cannot allege the requisite facts which would entitle them to relief emphasizes the necessity for adhering to the requirement that the pleader state sufficient facts to adequately outline his cause of action. Plaintiffs offer no evidence or argument with respect to the motion for summary judgment on the WARN Act claims of Plaintiffs Ziegler (Colorado), Clecker (Texas), Hamill (Texas) or Holland (D.C.). These Plaintiffs did not and cannot allege that they worked at sites with 50 employees as required under the Federal WARN Act. While Plaintiffs point out that additional employment losses during the 90 days prior to Brobeck's closure at the same site can be aggregated to meet the threshold, that rule is irrelevant here. The undisputed facts are that the Colorado Brobeck office did not have 50 employees at any time after October 14, 2002, 120 days before the February 14, 2003 closure. *See* Hansen Declaration ¶ 2 (filed with Brobeck's opening brief). The Brobeck Dallas office <u>never</u> had 50 or more employees (*See* Hansen Declaration ¶ 3) and there is no evidence that Reston or D.C. met the threshold within either 30 or 90 days.[1] Thus, summary judgment is proper as to these named Plaintiffs.

Equally troubling is Plaintiffs' one line argument -- devoid of any citation to authority -- that <u>all</u> Plaintiffs may bring the Second Cause of Action for violations of Business and Professions Code § 17200. If Plaintiffs are truly contending that, under these circumstances, a person residing outside of California can make a claim under § 17200, the Complaint should so plead so that that assertion can be litigated. *See* Complaint ¶ 51. Defendant is aware of no case authorizing an out of state plaintiff as to whom the practice was not illegal to bring a § 17200 claim. Even as to Plaintiff Tinsley, who worked for Brobeck's San Francisco for more than 60 days after receiving notice, Plaintiffs tacitly concede that summary judgment can be granted on his WARN Act claims but argue that he can bring a representative claim under § 17200 on behalf of others. If that is his claim, the Complaint should so state. He cannot bring a claim under

---

[1] Plaintiff Holland was the HR and Recruitment Coordinator in D.C. and the Court can infer from the absence of

302636                                              1

California Labor Code § 1404, which only allows a person to bring a claim "on behalf of the person, other persons similarly situated or both." Tinsley, who received more than the alleged required notice and worked at least through April 25, 2003, has no individual claim and cannot allege that he is similarly situated to employees who were terminated in February 2003 who received substantially less than sixty days notice. *See* Complaint ¶ 14. Thus, summary judgment is proper as to these Plaintiffs on the First Cause of Action.

## II. PLAINTIFFS MUST BE REQUIRED TO PLEAD FACTS THAT WOULD ALLEGE THAT EACH PLAINTIFF MEETS THE STATUTORY DEFINITION OF AN "EMPLOYEE" AT A "COVERED ESTABLISHMENT" UNDER THE CALIFORNIA WARN ACT

As pointed out in the moving papers, Plaintiffs' conclusory allegations that "they are persons who have standing to bring a class action under California Labor Code § 1400 *et seq.* because they were entitled to 60 days notice . . ." are insufficient to allege that Plaintiffs are "employees" under California Labor Code § 1400(h) or that they worked at a "covered establishment." *See* Complaint at ¶ 6. Specifically, Plaintiffs have not, because many of them cannot, allege that they worked in California for six of the last twelve months preceding the date on which notice was required, nor that they worked at a commercial facility that employed 75 or more persons within the past 12 months. Cal. Labor Code § 1400(a). In response to all the arguments set forth in the moving papers, Plaintiffs' response is a two sentence suggestion in their introduction that

> there is no 'site of employment' restriction under the definition section of Labor Code § 1400, which is limited to a 'covered establishment' which means 'any industrial or commercial facility or part thereof that employees, or has employed within the preceding 12 months, 75 or more persons. Since the state enacted its statute after the Federal WARN Act was passed, if the California legislature had wished to incorporate the terms of the federal act, it would have used the same words, or made direct reference to the federal statute as it did in the notice section of Labor Code § 1401(b).

Plaintiffs cite for this proposition <u>Morilon v. Royal Packing Company</u>, 22 Cal. 4th 575 (2002), which holds that where the language of a statute is plain and unambiguous, a court should

---

her declaration that the size of that office is not in dispute.

2

302636

give that language its ordinary meaning and not go beyond it. See also <u>Walnut Creek Manor v. Fair Employment and Housing Commission</u>, 54 Cal. 3d 345, 268 (1991) (words in a statute should, unless otherwise indicated, be given their usual ordinary common sense meaning). In fact, though, a plain reading of Labor Code § 1400 indicates that the requirement of 75 employees at a commercial facility is the equivalent of the "site of employment" provision under the Federal WARN Act..

Labor Code § 1400(a) provides that a "covered establishment means any industrial or commercial facility or part thereof." The plain meaning of a "facility" is a *single* facility, whether or not that facility includes one or several buildings. The state statute does not use the plural (facilities), and so its plain meaning suggests that the statute should be construed in the same manner as its federal counterpart, i.e., to require a minimum number of total employees at the single "facility" and a minimum number of affected employees at that facility. Had the legislature intended the statute to apply to all employees scattered across the entire state at multiple facilities, regardless of size, it could easily have so stated in the legislation. It did not do so.

The federal use of the term "facility" likewise imposes a geographic limitation to a single site of employment. The Federal WARN Act regulations define facility as "a building or buildings." 20 CFR § 639.3(j). With respect to plant closings § 639.3 provides: "The term 'Plant Closing' means the permanent or temporary shutdown of a 'single site' of employment, or one or more 'facilities or operating units' within a 'single site' of employment."

The legislative history of the state law is consistent with the interpretation that "facility" is meant to refer to a building or group of buildings in the same geographic location where a single employer is doing business. The legislative history shows that the legislature intended to reduce the total number of affected employees which will trigger WARN notice from that in federal law because of the impact of layoffs on small communities. It did *not* focus on requiring WARN notice to one or a few employees in a single employment site whose employer was also laying off larger numbers of employees in some other distant California site.

3

302636

REPLY OF DEFENDANT BROBECK, PHLEGER & HARRISON LLP
IN SUPPORT OF MOTION TO DISMISS OR FOR SUMMARY JUDGMENT

For example, the Assembly Committee on the Judiciary comments on the California WARN Act defined the "Key Question" raised by the bill as "should employees and local governments receive 60 days advance notice of large layoffs in order to respond to and if possible prevent the economic dislocation and other costs to the community?" The analysis stated:

> <u>Increased Notice of Large Layoffs.</u> The Federal WARN Act applies to layoffs of 500 or more workers, or 50 or more workers who constitute at least one-third of the entire workforce. Frequently, substantial layoffs that may have major impacts on small communities nevertheless do not trigger the notification requirement under the federal law. <u>For example, a layoff of 400 employees in a small or medium sized community may have a dramatic impact, but would not be covered by the federal act. By lowering the notice trigger to 50 employees</u> or one-third of the total workforce, this bill would reach and allow for intervention in many more large layoffs. *See* Request for Judicial Notice <u>Exhibit A</u>.

This goal to give notice of large layoffs in small communities was repeated throughout legislative history. Moreover, the final analysis in the Senate reveals that the intent of the bill was to lower the triggers under federal law: "It lowers the requirement to facilities with 50 or more persons and requires notification of layoffs, relocations or terminations that will affect at least 50 employees or one-third of the employer's workforce, provided it employs at least 50 people."[2]

Clearly, Plaintiffs' reading of the statute is inconsistent with the stated intent of the legislature. Plaintiffs' interpretation would require notice even if only one employee in the local community was affected, so long as there were 49 other employees laid off somewhere else. There is no support for this interpretation in the legislative history of Labor Code § 1400. In any event, Plaintiffs should be required to plead which Plaintiffs are covered by the California Act and the facts.

### III. THE FEDERAL WARN ACT UNFORESEEN BUSINESS CIRCUMSTANCE EXCEPTION EXEMPTS BROBECK FROM GIVING NOTICE

WARN provides that less than sixty (60) days' notice is allowed where the mass layoff is caused by an unforeseeable business circumstance. Specifically, the unforeseeable business

---

[2] The Legislature subsequently removed the requirement that the layoff or termination impact one-third of the work force in addition to impacting 50 employees and raised the number of employees required at a facility to 75.

4
302636

circumstance exception provides:

> An employer may order a plant closing or mass layoff before the conclusion of the 60-day period if the plant closing *or* mass layoff is caused by business circumstances that were not reasonably foreseeable as of the time that notice would have been required. 29 U.S.C. § 2102(b)(2)(A).

The DOL Regulations, 20 C.F.R. § 639.-9(b)(1), state:

> An important indicator of a business circumstance that is not reasonably foreseeable is that the circumstance is caused by some sudden, dramatic, and unexpected action or condition outside the employer's control . . . The employer must exercise such commercially reasonable business judgment as would a similarly situated employer in predicting the demands of a particular market . . . .

For example, in Jones v. Kayser-Roth Hosiery, Inc., 748 F. Supp. 1276, 1289 (E.D.Tenn.1990), the court found that the employer's loss of a major customer constituted an unexpected business circumstance. The court in Jones found that the mere fact that the major customer had voiced complaints about the quality of merchandise at least sixty (60) days prior to the plant closure did not trigger the statutory notice requirement. *Id.* at 1287-88. Similarly, in Wholesale and Retail Food Distribution Local 63, 826 F. Supp. 326, 332 (C.D. Cal. 1993), the court found the unforeseen business circumstance exception applicable when a layoff was caused by a customer's unexpected cancellation of a contract. The court held that the unforeseen business circumstance exception applied even though some of the employer's employees also sat on the Board of the customer which cancelled the contract. Id. at 332.

Plaintiffs deliberately ignore the undisputed facts and argue that there was "no change in the economics of the practice except that the lack of 'hoped for merger money' to pay bonuses[3] caused the merger." The undisputed evidence,[4] however, is that Brobeck's closure occurred because there was a sudden unexpected departure of partners, which was expected to and did

---

Labor Code § 1400(a). This amendment does not alter the analysis.

[3] The bonuses are relevant only in that Morgan had committed to them to insure that Brobeck and then the merged entity would retain its partners.

[4] Plaintiff did not assert that a continuance under FRCP Rule 56(f) was needed to explore further the details of Morgan's sudden cancellation of merger talks or the unexpected departure of sufficient partners to cause a default under Brobeck's just acquired financing.

5

302636

cause the firm to be in default under its line of credit rendering the capital Brobeck had just obtained unavailable to it, as well as the unexpected failure to obtain additional capital and business through merger discussions with Morgan Lewis and Bockius LLP.

As indicated in the Declaration of Richard Odom (filed with Brobeck's opening brief), these circumstances were not reasonably foreseeable as of December 14, 2002, the time notice would have been required for a February 14, 2003 plant closing. As late as the day before Morgan announced it was terminating merger discussions in late January 2003, it had presented a revised term sheet to Brobeck which substantially resolved the outstanding issues. Less than a week before partners announced their impending departures, they had voted to restructure the firm's debt and obtain new financing conditioned on the retention of partners. Odom Decl. ¶ 9. Many of the partners departing, such as Mr. Zager in Austin, had publicly committed to stay with Brobeck as late as December 2002 and pledged support of the merger. These undisputed facts show that none of the events which occurred were reasonably foreseeable. Thus, Brobeck was not required to give notice under the "unforeseen business circumstances" exception contained in 20 CFR § 639.9.

Plaintiff's sole "evidence" does not refute the two unexpected events which occurred in January 2003. Rather, Plaintiffs offer incompetent evidence that there had been preliminary discussions regarding various reduction in force alternatives in October 2002, one of which may have involved up to 126 employees and had been inadvertently disclosed to the partners as alternatives in the November 5, 2003 partner meeting. That "fact" does not refute Mr. Odom's testimony that <u>after</u> the November partners' meeting, <u>after</u> further progress with the Morgan merger and <u>after</u> 90% of the partners preliminarily approved the restructuring of Brobeck's debt and obtaining additional capital, as of the relevant date December 14, 2002, Exhibit A was the document which reflected Brobeck's 2003 Forecast Assumptions[5] and its tentative plans. Given the undisputed evidence of the unexpected events of January 2003, Brobeck is entitled to

---

[5] As Odom declared, no final decisions had been made.

302636

6

judgment on its claim of exemption under 20 CFR § 639.

## IV. BROBECK WAS ACTIVELY SEEKING CAPITAL AND THUS EXCUSED FROM GIVING NOTICE UNDER BOTH FEDERAL AND STATE WARN ACTS

Despite Plaintiffs' unsupported assertions, no triable issue of fact exists as to whether Brobeck was "actively seeking capital". Businesses raise capital to fund operations through a variety of techniques, including both equity and debt financings (Financing California Businesses, Continuing Education of the Board, 2d Ed. June 1997, Section 5.1, p. 5-3 "Loan financing is used by the entire range of commercial enterprises"). The Federal WARN Act specifically envisions both the external Citibank financing and refinancing and the money internally raised by the Brobeck partners as efforts meeting the exception set forth in under 20 CFR 639.9:

> "An employer must have been actively seeking capital or business at the time that 60-day notice would have been required. That is, the employer must have been seeking financing or refinancing through the arrangement of loans, the issuance of stocks, bonds, or other methods of internally generated financing; or the employer must have been seeking additional money, credit or business through any other commercially reasonable method. The employer must be able to identify specific actions taken to obtain capital or business."

Brobeck was actively negotiating a new loan arrangement with Citibank. In connection with the new loan financing Brobeck additionally sought, and did obtain, additional equity capital from its partners in order to pay down a substantial portion of the then existing loan. This capital was raised by Brobeck partners electing to forego approximately $30 million in distributions to which such partners were entitled. These facts are undisputed and they clearly demonstrate that Brobeck was actively seeking capital during December 2002 and January 2003.

## V. PLAINTIFFS' THIRD CAUSE OF ACTION FAILS TO STATE A CLAIM FOR *JEWEL V. BOXER* RELIEF

Brobeck's opening brief explained that there are five separate and independently sufficient reasons why Plaintiffs do not and cannot state a claim for establishment of a lien pursuant to *Jewel v. Boxer*, 156 Cal. App. 3d 171 (1984). Plaintiffs respond to none of those points directly, arguing instead only that the partners' waiver of *Jewel* rights in their February 10, 2003

7

302636

REPLY OF DEFENDANT BROBECK, PHLEGER & HARRISON LLP
IN SUPPORT OF MOTION TO DISMISS OR FOR SUMMARY JUDGMENT

Partnership Agreement was a fraudulent transfer and unconscionable. They therefore tacitly concede the merit of Brobeck's arguments that:

- *Jewel* (like the cases cited in Plaintiffs' Opposition) addressed the circumstances under which partners were entitled to compensation for post-dissolution services when the partnership agreement was silent on the issue. Since Brobeck's Partnership Agreement does expressly address that question, *Jewel* and related cases have no application here.

- The Revised Uniform Partnership Act (RUPA), as amended in 1999, expressly eliminates the no-compensation rules on which *Jewel* was based.

- Neither *Jewel* nor The Uniform Fraudulent Transfer Act (UFTA), Cal. Civil Code § 3439.08(b), allows an action to be brought against the transferor (here, Brobeck). Instead, the creditor may obtain judgment only against the first and later transferees.

- While Plaintiffs now contend that the transfer of future billings was fraudulent, they make no such allegation in their pleadings. Given the heightened standards for pleading fraud, this is obviously a material defect. Moreover, it is not a curable flaw, since they cannot plead that compliance with a client's directive to transfer business to a new firm is a "transfer" of the original firm's "assets."

- Plaintiffs do not and cannot allege that Brobeck did not or will not receive a reasonable equivalent value in connection with the transfer of future billings. Allowing the transfer of client files to new firms, with continued representation by the same former Brobeck partner who was responsible for the file before transfer, actually facilitates Brobeck's collection of its accounts receivable for the client's past work.

A. ***Jewel* Has No Application Here.**

The Court need not even reach Plaintiffs' fraudulent transfer argument because the premise of this cause of action is founded on the wrong statute, i.e., the pre-1999 Uniform Partnership Act, since this was the statute on which *Jewel* was premised. *Jewel,* 156 Cal. App. 3d at 176 ("No partner (except a surviving partner) is entitled to extra compensation for services rendered in completing unfinished business")(citing former Cal. Corp. Code § 15018(f)). The no

8

302636

REPLY OF DEFENDANT BROBECK, PHLEGER & HARRISON LLP
IN SUPPORT OF MOTION TO DISMISS OR FOR SUMMARY JUDGMENT

compensation rule of former section 15019(f) is the linchpin of *Jewel*. For example, *Jewel* explains the need for its ruling by pointing out that section 15019(f) "unequivocally prohibit[s]" post-dissolution compensation, except in the case of a surviving partner. *Id.* at 178. *Jewel* goes on to explain that the no compensation rule has the salutary effect of "prevent[ing] partners from competing for the most remunerative cases during the life of the partnership in anticipation that they might retain those cases should the partnership dissolve." *Id.* at 179. The court further indicated that the no compensation rule "discourages former partners from scrambling to take physical possession of files and seeking personal gain by soliciting a firm's existing clients upon dissolution." *Id.*

The *Jewel* court understood the benefits of the no compensation rule, but also understood the potential for unfairness if dissolution forces one partner to bear a disproportionate share of the burden of winding up. To find a fair way to distribute shared assets after dissolution, despite the no compensation rule, the *Jewel* doctrine was crafted.

The California legislature then changed the UPA in 1999. The RUPA expressly eliminates the no-compensation rule on which *Jewel* was based. The new statute provides that "[a] partner is not entitled to remuneration for services performed for the partnership, *except for reasonable compensation for services rendered in winding up the business of the partnership.*" Cal. Corp. Code § 16401(h) (emphasis added).

Plaintiffs ignore the fundamental changes in the statute that constitutes the basis for the unfinished business doctrine articulated in *Jewel*, and assume, without discussion, that the doctrine survives the enactment of RUPA. In fact, Plaintiffs cite no authority applying *Jewel* to a partnership agreement governed by the RUPA and Brobeck's research likewise discloses no such case.

B. **Plaintiffs Cannot Preserve This Claim by Alleging Fraudulent Transfer.**

1. **Due Process Limitations**

As noted earlier, the UFTA allows a fraudulent conveyance action only against the initial and later transferees, not the transferor. Cal. Civil Code § 3439.08(b). Here, the transferees of

9

302636

the purported *Jewel* asset are the more than 150 former Brobeck partners. The subsequent transferees are the dozens of law firms with whom these former partners are associated.

None of these former partners or their firms, with the exception of Morgan Lewis, is a party to this action. Thus, any determination in this action that *Jewel* applies to Brobeck's dissolution without notice and an opportunity to be heard by the former partners and their new law firms would deprive those parties of due process of law in contravention of the Fifth Amendment to the United States Constitution and Article 1, section 7 of the California Constitution. *Dosenberry v. United States*, 534 U.S. 161, 167 (2001)(" individuals whose property interests are at stake are entitled to notice and an opportunity to be heard")(quotation omitted); *Ryan v. Cal. Interscholastic Federation, San Diego Section*, 94 Cal. App. 4th 1048, 1072 (2001)( due process requires "notice reasonably calculated to apprise interested parties of the pendency of the action affecting their property interest and an opportunity to present their objections").

The deprivation of these parties' due process rights is underscored by the fact that the UFTA contains express exemptions for bona fide purchasers for value. *See, e.g.,* Cal. Civil Code §§ 3439.08(a), (d). New law firms, which have devoted their time and resources to old Brobeck business, must be afforded the opportunity to be heard on any defense they may have to Plaintiffs' claim that they are the recipients of a fraudulent transfer, including that they are bona fide purchasers. In short, Plaintiffs cannot properly ask this Court to adjudicate the substantive rights of dozen of different parties, without providing those parties the requisite notice and opportunity to be heard. If Plaintiffs truly want to take on this fight, they must file a new action naming all former Brobeck partners and a long list of major national law firms. This Court cannot do what Plaintiffs request in this action.

### 2. There Has Been No Fraudulent Transfer.

Under the UFTA, a transfer is avoidable if the debtor does not receive reasonably equivalent value for the transfer and the transfer leaves the debtor insolvent, unable to pay its debts as they become due or with insufficient assets to continue its business. Cal. Civil Code

10

302636

REPLY OF DEFENDANT BROBECK, PHLEGER & HARRISON LLP
IN SUPPORT OF MOTION TO DISMISS OR FOR SUMMARY JUDGMENT

§§ 3439.04, 3439.05. If creditors are not harmed by the transfer, it is not avoidable. Brobeck (and its individual partners) did in fact receive reasonably equivalent value for the "transfer" of their *Jewel* rights, and creditors were not prejudiced by the "transfer."

Plaintiffs argue that Brobeck amended its partnership agreement on the eve of dissolution, presumably at a time when the transfer of open matters left the firm insolvent. It should be noted, however, that Brobeck demonstrated its intent to waive *Jewel* rights as early as 1999. Section 9(f) of its March 15, 1999 Amended Partnership Agreement provided that, upon the disassociation of any partner, that partner was to have no interest in the partnership or its assets except the right to receive the partner's capital account and his share of the firm's undistributed income. Wirth decl. ¶ 2. This amendment, made after the *Jewel* decision and long before Brobeck's dissolution, demonstrates the partners' intent to waive any *Jewel* rights. Plaintiffs therefore err in contending that the partners waived those rights only on the eve of dissolution.

In addition, as Brobeck explained in its opening brief (at 16), Plaintiffs err in arguing that there will be more money available to pay creditors if *Jewel* applies to capture post-dissolution income than if it does not, since clients would not likely pay amounts owed to Brobeck if the Brobeck partners are unwilling to continue working on their cases because of a *Jewel* lien on all proceeds. If *Jewel* applied to capture all post-dissolution income for the benefit of the firm's creditors, most former Brobeck partners would substitute out of the Brobeck cases they took with them to new firms. In addition, if a *Jewel* lien is allowed, future profits for unfinished business will never be realized: the partners will instead devote their time to new matters, which clearly do not constitute unfinished business. Former Brobeck partners and their new firms have no financial incentive to work on cases which will generate no profit. The revenue for unfinished business which Plaintiffs seek to preserve would therefore vanish.

In contrast, the pre-dissolution waiver of *Jewel* rights in the 2003 Partnership Agreement creates an incentive for the former Brobeck partners (and their new firms) to continue working on old Brobeck business and maximizes Brobeck's realization on its accounts receivable for the benefit of the firm's creditors. Therefore, any waiver of *Jewel* rights provided substantial benefits

(in the form of increased realization of accounts receivable) for creditors that outweigh the potential detriment (loss of speculative post-dissolution income).

### 3. The Case Cited by Plaintiffs Is Inapplicable.

Plaintiffs cite only one case to support their fraudulent transfer argument (Opp. at 12:17), *Rosenfeld, Meyer & Susman v. Cohen,* 146 Cal. App. 3d 200 (1983).[6] *Rosenfeld* was not a UFTA case, and it presented facts not remotely analogous to those here. There, departing partners took a very large contingent fee case (a patent antitrust action) with them, after some high-handed demands on their partners. Their former firm was left with enormous amounts of uncompensated time and expense[7] and no prospect of being made whole. The appellate court therefore imposed a fiduciary duty on the former partners to compensate the prior firm, in the absence of any partnership agreement specifying post-dissociation responsibilities for unfinished business. There is no discussion of fraud or fraudulent transfer in the decision, and the case simply provides no support for any fraudulent transfer argument.

### C. The 2003 Partnership Agreement Is Not Unconscionable.

Plaintiffs' only argument other than fraudulent transfer is unconscionability. They contend that the 2003 Partnership Agreement is unconscionable because it allows the partners to "loot" partnership assets without making adequate provision for creditors.[8] The preceding arguments explain why there has been no such fraud on creditors. Nor is the new Partnership Agreement unconscionable.

Unconscionability is generally recognized to include "an absence of meaningful choice on the part of one of the parties together with contract terms which are unreasonably favorable to the

---

[6] Plaintiffs' cite identifies this as a 1993 case. In fact, it was decided in 1983.
[7] The former firm had invested over 19,000 attorney hours, almost 60,000 hours of paralegal and document clerk time, and had incurred the expense of renting additional office space, hiring more support personnel, and employing more attorneys, all to handle that lawsuit.
[8] The contention of partner "looting" is a startling claim, since the partners agreed (when restructuring the Citibank loan) to forego all compensation for the first quarter of 2003, all of them have now lost the entire value of their capital accounts as well as certain vested pension benefits, and they have potential personal liability to Citibank under the restructuring agreement.

12
302636

other party." *A&M Produce Co. v. FMC Corp.,* 135 Cal. App. 3d 473, 486 (1982). It has both procedural and substantive aspects: (1) oppression or surprise due to unequal bargaining power, and (2) overly harsh or one-sided results. *Id.*; *Donovan v. RRL Corp.,* 26 Cal. 4th 261, 291-92 (2001). Here, no one does or could contend that the parties (Brobeck partners) had no meaningful choice when they agreed to this amendment. Nor can it be claimed that those terms are unreasonably favorable to some of the contracting partners but not others. The concept of unconscionability, in other words, applies only when there is overreaching by one contracting party in dealing with the other party to the contract; it has no application to claims by strangers to the contract, such as creditors. Plaintiffs do not have standing to assert this claim.[9]

Unsurprisingly, then, the one case cited by Plaintiffs to support their unconscionability argument does not involve any claim by third party creditors. Instead, it involved claims by a departing partner against his former partners, challenging a partnership agreement provision which provided that all fees paid to the departing partner at his new firm would remain the property of his former firm. *Champion v. Superior Court,* 201 Cal. App. 3d 777, 783 (1988). Because the agreement allowed the former firm to claim all such fees even if it had devoted little or no resources to the case, and because the partnership agreement impaired clients' ability to transfer their cases to new firms, the court refused to enforce the fee provision.

No claim can be made here that the 2003 amendment would deprive Brobeck of fees and expenses it incurred to perform services for clients, as all clients have been billed for the costs and fees incurred up to the date when each former client transferred its files to another firm. Provision is made in the amendment for Brobeck to retain its pro rata interest in the sole category

---

[9] Contracts cannot be avoided by strangers to them with the few exceptions allowed by law. 16 Cal. Jur. 3d, Creditors' Rights and Remedies § 408, at 522; *Williams v. Borgwardt*, 119 Cal. 80, 83 (1897).

13

302636

REPLY OF DEFENDANT BROBECK, PHLEGER & HARRISON LLP
IN SUPPORT OF MOTION TO DISMISS OR FOR SUMMARY JUDGMENT

of cases – contingent fee arrangements – where this would not be the case. There is therefore no basis for any contention that the 2003 amendment is unconscionable.

DATED: July 25, 2003　　　　　　　　　　　　DORSEY & WHITNEY LLP


By: /s/ _____
　　　GABRIELLE M. WIRTH
　　　DIANE MASON
　　　　Attorneys for Defendant
　　BROBECK, PHLEGER & HARRISON, LLP.