KEVIN V. RYAN (SBN 118321)
United States Attorney
JOANN M. SWANSON (SBN 88143)
Chief, Civil Division
ABRAHAM A. SIMMONS (SBN 146400)
Assistant United States Attorney

    450 Golden Gate Avenue,10th Floor
    San Francisco, California 94102-3495
    Telephone:   (415) 436-7264
    Facsimile:    (415) 436-6748
    Email:      abraham.simmons@usdoj.gov

Attorneys for Federal Defendants

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| NAOMI WALTON,<br><br>               Plaintiff,<br><br>       v.<br><br>UNITED STATES MARSHALS SERVICE,<br>MARC A. FARMER, Chief, Judicial<br>Protective Services-Judicial Security<br>Division; LOUIS CHELTON, M.D.,<br>Division of Federal Occupational Health,<br>Department of Health & Human Services;<br>UNITED STATES DEPARTMENT OF<br>HEALTH and HUMAN SERVICES,<br>BENIGNO G. REYNA, Director, United<br>States Marshals Service.<br><br>               Defendants. | No. C 03-1460 SI<br>**E-FILING CASE**<br><br>**FEDERAL DEFENDANTS'<br>RENOTICE OF MOTION AND<br>MOTION FOR SUMMARY<br>JUDGMENT<br>[Fed.R.Civ.P. 56]**<br><br>Date:      April 29, 2005<br>Time:     9:00 a.m.<br>Place:    Courtroom 10, 19th Fl.<br>Before:  Hon. Susan Illston |

# TABLE OF CONTENTS

PAGES

TABLE OF AUTHORITIES .................................................... iii

NOTICE OF MOTION AND MOTION .......................................... 1

MEMORANDUM OF POINTS AND AUTHORITIES ............................ 1

I.     INTRODUCTION AND SUMMARY OF ARGUMENT ......................... 1

II.    FACTUAL AND PROCEDURAL BACKGROUND ........................... 4

     A.    STATEMENT OF FACTS ........................................ 4

          1.    The Court Security Officer Program ........................... 4

          2.    Development of the CSO Medical Standards ..................... 6

          3.    Hearing Standards Under Which Plaintiff Was Disqualified ......... 7

          4.    Medical Review Process ..................................... 10

          5.    Naomi Walton ............................................. 11

     B.    PROCEDURAL POSTURE ...................................... 12

III.   DEFENDANT IS ENTITLED TO JUDGMENT AS A MATTER
OF LAW ON ALL PLAINTIFF'S CLAIMS .................................. 14

     A.    THE LEGAL REQUIREMENTS FOR SUMMARY JUDGMENT ........ 14

     B.    DEFENDANTS ARE ENTITLED TO SUMMARY JUDGMENT WITH
RESPECT TO PLAINTIFF'S REHABILITATION ACT CLAIM .......... 15

          1.    There Is Only One Proper Defendant Under the Rehabilitation Act .... 15

          2.    Legal Requirements of the Rehabilitation Act Are Not
Met In This Case .......................................... 15

               a.    Plaintiff Is Not Actually Disabled within the
Meaning of the Act ................................. 16

               b.    Plaintiff Is Not "Regarded As" Disabled ................... 17

                      1.)    Federal Defendants Did Not Believe Plaintiff to Be
Substantially Limited in Her Ability to Work in a Broad
Range of Jobs ............................................ 17

                      2.)    Federal Defendants Did Not Regard Plaintiff as
Substantially Limited in the Major Life Activity
of Hearing ............................................... 18

               c.    Plaintiff Is Not "Otherwise Qualified" for the
CSO Position ................................... 19

d.     The Application of the CSO Medical Standards
       to Plaintiff Was Legitimate and Non-Discriminatory ........ 20

e.     Even if the CSO Medical Standards Were Discriminatory,
       They Would Not Violate the Rehabilitation Act Because
       They Are Justified by Business Necessity .................. 20

C.    DEFENDANTS ARE ENTITLED TO JUDGMENT
      WITH RESPECT TO PLAINTIFF'S APA CLAIM ..................... 21

IV.   CONCLUSION ........................................................ 23

# TABLE OF AUTHORITIES

## FEDERAL CASES

Albertson's, Inc. v. Kirkingburg,
    527 U.S. 555 (1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

Alexander v. The Northland Inn,
    321 F.3d 723 (8th Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

Anderson v. Liberty Lobby, Inc.,
    477 U.S. 242 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

Barsen v. Department of the Interior,
    896 F.2d 422 (9th Cir. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

Bay v. Cassens Transport Co.,
    212 F.3d 969 (7th Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

Campbell v. Federal Express Corp.,
    918 F. Supp. 912 (D. Md. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

Celotex v. Catrett,
    477 U.S. 317 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

Collings v. Longview Fibre Co.,
    63 F.3d 828 (9th Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

Cook v. Department of Labor,
    688 F.2d 669 (9th Cir. 1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

Cripe v. City of San Jose,
    261 F.3d 877 (9th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

Crocker v. Runyon,
    207 F.3d 314 (6th Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

Daubert v. Merrell Dow Pharmaceuticals, Inc.,
    43 F.3d 1311 (9th Cir. 1995),
    cert. denied, 516 U.S. 869 (1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

Dean v. United States,
    484 F. Supp. 888 (D.C. N.D. 1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

Deas v. River West, L.P.,
    152 F.3d 471 (5th Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

Environmental Def. Ctr., Inc. v. EPA,
    344 F.3d 832 (9th Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

Farrell v. United States Department of Justice,
    910 F. Supp. 615 (M.D. Fla 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

Frank v. United Airlines,
    216 F.3d 845 (9th Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20, 21

Godwin v. Hunt Wesson, Inc.,
    150 F.3d 1217 (9th Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

Hernandez v. Hughes Missile Systems Co.,
    362 F.3d 564 (9th Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

Kaplan v. City of North Las Vegas,
    323 F.3d 1226 (9th Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15, 17

Maffei v. Northern Insurance Co. of New York,
    12 F.3d 892 (9th Cir. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

McGregor v. National R.R. Passenger Corp.,
    187 F.3d 1113 (9th Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

Morton v. United Parcel Service,
    272 F.3d 1249 (9th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

Murphy v. United Parcel Service, Inc.,
    527 U.S. 516 (1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

Peters v. City of Mauston,
    311 F.3d 835 (7th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

Puckett v. Porsche Cars of North America,
    976 F. Supp. 957 (D. Nev. 1997),
    aff'd, 165 F.3d 917 (9th Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

Reynolds v. Brock,
    815 F.2d 571 (9th Cir. 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

Stone v. Millstein,
    804 F.2d 1434 (9th Cir. 1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

Thornton v. McClatchy Newspapers,
    261 F.3d 789 (9th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

Triton Energy Corp. v. Square D Co,
    68 F.3d 1216 (9th Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14, 15

Wilderness Society v. United States Fish & Wildlife Service,
    353 F.3d 1051 (9th Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

**DOCKETED CASES**

Beck v. USMS,
    Civil Action No. 02-1579-L (W.D. Okla. Dec. 1, 2004) . . . . . . . . . . . . . . . . . . . . . . 18

Strolberg, et al. v. AKAL Security, Inc., et al.,
    Civil Action No. CIV 03-0004-S-DOC (District of Idaho) . . . . . . . . . . . . . . . . . . . passim

# FEDERAL STATUTES

5 U.S.C. § 701 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

5 U.S.C. § 702 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

5 U.S.C. § 703 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

5 U.S.C. § 5596 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

28 U.S.C. § 566(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

28 U.S.C. § 604(a)(22) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 6

29 U.S.C. § 701 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

42 U.S.C. § 12102(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

42 U.S.C. § 12111(8) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

42 U.S.C. § 12113(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

# FEDERAL RULES

Fed. R. Civ. P. 12(e) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

Fed. R. Civ. P. 56 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Fed. R. Civ. P. 65 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

# NOTICE OF MOTION AND MOTION

PLEASE TAKE NOTICE THAT on April 29, 2005 at 9:00 a.m., before Hon. Susan Illston, 450 Golden Gate Avenue, San Francisco, California, the Federal Defendants, by and through their attorney of record, will move this Court for an order granting summary judgment in favor of defendants with respect to all the claims in plaintiff's Third Amended Complaint.

Said motion is made on the ground that facts material to both of plaintiff's causes of action are not in dispute and the Federal Defendants are entitled to judgment as a matter of law. This motion is based on this Notice; the following points and authorities filed in support of the motion; the pleadings on file in this matter; the declarations filed in this matter on December 17, 2004 (including the declarations of Marc Kramer, Marc Farmer, Jane Roth, Louis Chelton (both certified and supplemental), John Barson, Richard Miller and Abraham Simmons); the Supplemental Declaration of Abraham Simmons file herewith; and on such oral argument and additional evidence as the Court may permit.

# MEMORANDUM OF POINTS AND AUTHORITIES

## I.    INTRODUCTION AND SUMMARY OF ARGUMENT

Plaintiff Naomi Walton, a former Court Security Officer ("CSO") employed by Akal Security, Inc. ("Akal"), has filed a Third Amended Complaint ("TAC") suing various individuals and federal agencies under the Rehabilitation Act of 1973, 29 U.S.C. §§ 701 *et seq.* ("Rehabilitation Act" or the "Act") and the Administrative Procedures Act, 5 U.S.C. §§ 701, *et seq.* ("APA").  Defendants hereby move for summary judgment on all plaintiff's pending claims. Judgment in favor of defendants is appropriate because facts material to each of the claims in the TAC are undisputed and the evidence demonstrates defendants are entitled to judgment as a matter of law. *See* Fed. R. Civ. Proc. 56.

At bottom, this case is about the authority of the federal judiciary and the United States Marshals Service ("USMS") to take reasonable steps to ensure the safety and security of the federal courts. By statute, the USMS is responsible for providing security for U.S. District Courts, U.S. Courts of Appeals, and other facilities.  The judiciary, working through the United

1  States Judicial Conference and the Administrative Office of the U.S. Courts, provides the

2  funding for and oversees these security measures.  One way in which the USMS carries out its

3  responsibilities is by contracting with private security companies, including Akal, to provide

4  CSOs as armed security guards at federal courthouses.  CSOs guard the entrances to the

5  courthouses; patrol inside, and under certain circumstances outside, courthouses; provide security

6  inside courtrooms; and perform other security-related tasks.  Amid rising concerns regarding the

7  adequacy of security in the late 1990s, the judiciary directed the USMS to implement changes in

8  the medical standards required for CSOs.  Among the changes implemented were the minimum

9  hearing standards required for CSOs.  The hearing standards were adopted to ensure CSOs are

10 physically capable of performing functions essential to their jobs.  Under the new hearing

11 standard, CSOs must establish that they can hear sounds at certain minimum thresholds without

12 the use of hearing aids– even if they choose to wear hearing aids on the job.

13     Plaintiff was medically disqualified by the USMS and subsequently terminated by her

14 employer, Akal, after it became clear that she cannot meet the new hearing standard.  She brings

15 this action alleging that the standards should not be applied to her because to enforce them in her

16 case would violate the Rehabilitation Act (or, by extension, the APA if she is not entitled to bring

17 a claim directly under the Rehabilitation Act).  Specifically, plaintiff alleges "with the use of a

18 hearing aid, plaintiff could perform the essential requirements of the job without a reasonable

19 probability of substantial injury to herself or others." TAC at ¶ 57.  Plaintiff further alleges that

20 the failure to accommodate her by permitting her to wear hearing aids is illegal discriminatory

21 conduct.  TAC at ¶ 57-58.  Defendants are entitled to judgment on plaintiff's claims.

22     Defendants are entitled to judgment with respect to plaintiff's Rehabilitation Act claim

23 for four independent reasons:  First, plaintiff cannot establish a prima facie case because she is

24 not disabled within the meaning of the Rehabilitation Act.  Plaintiff acknowledges the facts

25 establishing she is neither actually disabled nor has a record of disability.  Specifically, plaintiff

26 can identify no significant limitation of any life activity that she has encountered as a result of a

27 deficit in her hearing.  Further, the undisputed facts establish that the USMS did not "regard" her

28

as disabled. The sole focus of the medical reviews was to determine whether Plaintiff was capable of performing the essential job functions of the CSO position. Thus, with respect to the life activity of "working," no federal actor considered whether plaintiff was unable to work in the broad job category of law enforcement. Similarly, with respect to the life activity of "hearing," no federal actor considered whether plaintiff's hearing would limit her daily activities as compared to an unimpaired person. Moreover, even assuming plaintiff had the limitations defendants thought she had, there is no evidence that plaintiff's level of deficit would result in a substantial limitation as compared to others. Accordingly, plaintiff is not "regarded as" disabled within the meaning of the Rehabilitation Act.

Second, plaintiff cannot establish a prima facie case because plaintiff is not "otherwise qualified" for the CSO position. The undisputed evidence demonstrates plaintiff did not meet the standards that are required of CSOs and therefore is not otherwise qualified. Moreover, plaintiff does not have three years experience in a law enforcement position in which she had general arrest authority, a basic requirement for being a CSO. Accordingly, for these two reasons, plaintiff was not otherwise qualified for the position and cannot establish a prima facie case of discrimination.

Third, plaintiff's Rehabilitation Act claim must fail because the application of the CSO medical standard requiring hearing without hearing aids is legitimate and non-discriminatory. When establishing the standards, the USMS and the judiciary considered the fact that hearing aids, by their nature, preclude localization of sound (i.e., the ability to determine from where a sound is coming), reduce the ability to discern important sounds in noise and may be subject to mechanical problems. Accordingly, the policy on hearing aids as set out in the hearing standard, establishes legitimate criteria for ensuring CSOs are able to carry out their responsibilities even in an emergency and even in noise. Plaintiff has no evidence that this rational is a pretext for imposing an exclusionary rule for persons with disabilities, including hearing disabilities.

Fourth, even if the CSO medical standards were discriminatory, their enforcement still would be permitted because they are justified by a business necessity. CSOs must have sufficient

hearing in order to function safely.  The evidence is undisputed that the USMS reasonably concluded hearing is required and use of hearing aids on the job compromises a CSO's ability to complete his or her job functions.  Thus, the requirement that CSOs meet the hearing standard is justified by a business necessity.  For all these reasons, defendants are entitled to summary judgment with respect to plaintiff's Rehabilitation Act claim.

Plaintiff's claim under the APA also is meritless.  This Court has determined that the United States Marshals Service ("USMS") is plaintiff's joint employer with Akal for purposes of the federal anti-discrimination laws.  Accordingly, plaintiff has a remedy for violations of the Rehabilitation Act and may not bring a cause of action under the APA.  Further, even if plaintiff were not an employee, the determination that she was not medically qualified to serve as a CSO was not arbitrary or capricious.  Accordingly, plaintiff cannot prevail under the APA.

For these reasons, the federal defendants move this Court for an order entering summary judgment in favor of defendants.

## II.    FACTUAL AND PROCEDURAL BACKGROUND

### A.    STATEMENT OF FACTS

#### 1.    The Court Security Officer Program

Congress has given the United States Marshals Service ("USMS") the responsibility to "provide for the security and to obey, execute, and enforce all orders of the United States District Courts, the United States Courts of Appeals, and the Court of International Trade."  28 U.S.C. § 566(a).  The USMS carries out that responsibility, in part, by contracting with private companies to provide security officers at federal courthouses.  *See* 28 U.S.C. § 604(a)(22).  The contracts are negotiated on a circuit-by-circuit basis.  *See* Certified Copy of Declaration of Marc A. Farmer filed in *Strolberg, et al. v. AKAL Security, Inc., et al.*, CIV 03-0004-S-DOC (District of Idaho), ¶ 5 ("Farmer Decl.").[1]  Akal Security, Inc. currently holds the contracts for federal courthouses in

_____

[1] The CSO program has been challenged in a number of districts, including in *Strolberg, et al. v. AKAL Security, Inc., et al.*, CIV 03-0004-S-DOC in the District of Idaho.  On December 1, 2004 the federal defendant filed a motion for summary judgment, which is set for hearing on January 5, 2005, and supporting declarations from, among others, Mark Farmer, the Honorable

the Second, Fourth, Fifth, Sixth, Seventh, Eighth, Ninth, Tenth, and Eleventh Circuits. *Id.* Marc A. Farmer is the acting Assistant Director of the Judicial Security Division of the U.S. Marshals Service and provides oversight for judicial security issues. *Id.* at ¶ 1. Attached as Exhibit B to Mr. Farmer's declaration are excerpts from the Ninth Circuit contract that was in effect until October 1, 2004.

"Although the exact nature of their responsibilities may vary from courthouse to courthouse and from day to day, CSOs typically guard courthouse entrances, screen visitors, inspect packages and mail, and provide a security presence inside courtrooms. In addition to these frequent activities, they may be called upon to perform a variety of other security services and respond promptly and effectively to all types of emergencies." Certified Copy of the Declaration of Judge Jane R. Roth ("Roth Decl."), ¶ 3. For example, following the events of September 11, 2001, additional temporary CSOs were hired "primarily for the purpose of perimeter security, extended hours of security coverage and to ensure the proper flexibility in scheduling." Supp. Declaration of Abraham A Simmons, Exh. 5 (Memorandum dated January 10, 2002). The CSO ranks have always included a significant number of retired law enforcement and military police officers. Farmer Decl., ¶ 31; Roth Decl., ¶ 11. By contract, Akal is required to provide CSOs who have "at least three years of law enforcement experience in positions with general arrest authority, or five years experience in equivalent military positions. In addition, CSOs must have graduated from a certified law enforcement training academy." Farmer Decl. ¶ 31; *see also* Contract §§ C-13(6), C-15(a). As of October 1, 2004, there were 4,621 CSOs nationwide. Farmer Decl. ¶ 39.

Along with the USMS and the private security contractors, the United States Judicial Conference plays a key role in the judicial security program. Farmer Decl. ¶ 16. By statute, it is the judiciary that funds and ultimately has authority over courthouse security. The Director of

---

Jane Roth, Dr. Louis Chelton III, Dr. John Barson and Dr. Richard Miller. Pursuant to Rule 1005, Fed. R. Evid., the federal defendants have filed certified copies of those declarations in opposition to Plaintiff's Motion for Summary Judgment.

1   the Administrative Office of the U.S. Courts (AOUSC), under the supervision and direction of

2   the Judicial Conference, "[r]eceives and expends, either directly or by transfer to the United

3   States Marshals Service or other Government agency, funds appropriated for the procurement,

4   installation, and maintenance of security equipment and protective services for the United States

5   Courts in courtrooms and adjacent areas, including building ingress/egress control, inspection of

6   packages, directed security patrols, and other similar activities." 28 U.S.C. § 604(a)(22). The

7   Judicial Conference's Committee on Security and Facilities (the "Judicial Conference" or the

8   "Committee"), recommends security policies to the full Judicial Conference, including policies

9   regarding the CSO program. Roth Decl. ¶ 2. The Committee consists entirely of federal judges

10  and is currently chaired by the Honorable Jane R. Roth. *Id.* ¶¶ 1-2.

### 2. Development of the CSO Medical Standards

12          Under the contracts, Akal is "responsible for providing employees that meet the

13  qualifications and requirements established under the Contract," including those related to

14  medical and physical standards. Contract § H-3(a) (Farmer Decl. Ex. 8). Before a CSO may be

15  assigned to a federal courthouse, he or she must undergo a pre-employment medical examination.

16  *Id.* § C-8(a). Incumbent CSOs must also undergo an examination at least once each year. *Id.*

17  The purpose of the examination is to ensure that applicants and current CSOs are "able to

18  withstand physical demands of the job and [are] capable of responding to emergency situations."

19  *Id.* § C-6(2). "Failure to meet any one of the required medical and/or physical qualifications will

20  disqualify" the CSO from duty. *Id.* § C-8(e).

21          Until a few years ago, CSOs were evaluated for medical conditions using a Civil Service

22  Commission form that had been developed in the 1960s. Farmer Decl. ¶ 18. The form could be

23  filled out by a CSO's private physician, who was unlikely to be familiar with the particular job

24  requirements of the position. *Id.* The hearing standard required as follows:

25          Hearing:     Using an audiometer for measurement there should be no loss of
                         30 or more decibels in each ear at the 500, 1000, and 2000 CPA
26                       levels. The use of a hearing aid is permitted; however, the hearing
                         aid must provide corrected hearing that meets this standard.

27          Beginning in 1997, a number of judges became concerned that some CSOs were not

28

1     physically capable of responding to security threats and other strenuous emergency situations.

2     Farmer Decl. ¶ 19; Roth Decl. ¶ 4.  The judges on the committee had always been concerned

3     about security at federal courthouses, but their concerns took on new significance following the

4     1995 bombing of the federal building in Oklahoma City.  Roth Decl. ¶ 4; Farmer Decl. ¶ 19.  In

5     response to the judges concerns, Mr. Farmer, on behalf of the USMS, proposed that the

6     Committee identify the essential job functions, or "bona fide occupational requirement[s]," of the

7     CSO position, and then develop standards that would apply.  1997 Agenda (USMS-DC 08128).

8          The Judicial Conference, working with USMS, arranged for the U.S. Public Health

9     Service's office of Federal Occupational Health ("FOH") to conduct a job-task analysis of the

10    CSO position.  Roth Decl. ¶ 5; Farmer Decl. ¶ 21.  Richard J. Miller, M.D., who was then the

11    Director of Law Enforcement Medical Programs within FOH, conducted the study.  Roth Decl. ¶

12    5; Farmer Decl. ¶ 21; Certified Declaration of Richard J. Miller ("Miller Decl.") ¶ 6.  The

13    purpose of the study was to identify the essential job functions of the CSO position and then

14    recommend whether any changes needed to be made to the CSO medical standards or

15    procedures.  Roth Decl. ¶ 5; Certified Farmer Decl. ¶ 21; Miller Decl. ¶ 6.  As part of the study,

16    Dr. Miller visited five courthouses, where he conducted focus groups of CSOs, interviewed

17    judges and USMS personnel, and observed CSOs on the job.  *E.g.*, Miller Decl. ¶ 8.  He

18    produced a final report dated February 4, 2000.  *Id*. ¶ 9.  After discussion and consideration of the

19    report, the Committee concluded that "Dr. Miller had satisfactorily determined the essential

20    functions of the CSO position and that the standards he recommended would accurately assess

21    the ability of CSOs to perform those functions."  Roth Decl. ¶ 6.  The Committee therefore

22    directed the Marshals Service to implement a number of changes to the CSO medical standards

23    and procedures based on Dr. Miller's recommendations.  Roth Decl. ¶ 6; Farmer Decl. ¶ 24.

24              **3.      Hearing Standards Under Which Plaintiff Was Disqualified**

25         Dr. Miller's job-task analysis identified six hearing-related essential job functions of the

26    CSO position: (1) comprehend speech during face-to face conversations; (2) comprehend speech

27    during telephone conversations; (3) comprehend speech during radio transmissions; (4)

28

comprehend speech when you cannot see another CSO; (5) hear sounds that require investigation; and (6) determine the location of sound. Miller Decl. Ex. B at 12. It is critical that CSOs be able to carry out these functions not only while conducting their routine activities, but also during emergencies, when they may be faced with a loud and chaotic environment. As Judge Roth explains in her declaration,

> [H]earing is extremely important in carrying out the CSOs' duties, especially in emergency situations. For example, during a disruption in a courthouse, a CSO with inadequate hearing may not be able to identify noises that require investigation or a response and may have difficulty determining the direction from which a sound is coming. In an emergency situation, a CSO also needs to be able to understand radio commands and to distinguish voices from background noises.

Roth Decl. ¶ 10. Likewise, Dr. Miller explains that, "[b]ased on the focus groups and interviews with CSOs, USMS personnel, and judges, and our observations of the job, it was clear that CSOs must possess and maintain adequate hearing in order to carry out their assigned duties in a safe and effective manner. The safety of the federal judiciary, court personnel, and the public depends on CSOs' ability to hear, localize, discriminate, recognize, and/or understand a variety of environmental and speech sounds." Miller Decl. ¶ 20. "CSOs must . . . be able to clearly understand directions in times of crisis . . . hear communications at a level of sound that does not inform persons causing an incident of the CSOs' response plans . . . [and] discern the direction of a disturbance or detect an approaching threat." Id. ¶ 22.

Based on these concerns, the Committee directed Dr. Miller's organization (FOH/Law Enforcement Medical Programs) to implement minimum hearing standards for CSOs. Roth Decl. ¶ 10. The standards have been adjusted slightly over the years based on FOH's experience with the program and consultations with Lynn Cook, an Occupational Audiologist for the U.S. Naval Medical Center. Miller Decl. ¶¶ 24-25. The basic approach, however, has remained the same. First, CSOs undergo an unaided screening test called a pure-tone audiogram. Id. ¶ 23.a. If their test results do not meet the minimum requirements, they are asked to visit an audiologist to undergo "functional" hearing tests, which measure their ability to hear and distinguish speech in both quiet and noisy environments. Id. ¶ 23.b.

Since the adoption of the new medical standards in January 2001, CSOs have always

1  been required to meet the hearing requirements unaided – *i.e.*, without the use of hearing aids.

2  Roth Decl. ¶ 10; Farmer Decl. ¶ 26; Miller Decl. ¶ 25. Based on FOH's experience and

3  consultations with Dr. Cook and other experts in the field, Dr. Miller initially recommended that

4  CSOs be prohibited from using hearing aids at all. Miller Decl. ¶ 25. This was based on FOH's

5  determination that hearing aids do not restore "normal" hearing, that they are least effective in

6  the most difficult hearing environments (which is where the CSO's ability to hear is most

7  important), and that they generally do not improve (and in some cases degrade) a wearer's ability

8  to identify the direction from which sound is coming. Miller Decl. ¶ 26. In addition, there were

9  concerns about battery failure, malfunctions, and breakage during physical confrontations or

10  other crisis situations. *Id.*

11      Judges on the Committee expressed concern, however, that banning hearing aids entirely

12  would have too great an impact on the CSO workforce. Roth Decl. ¶ 10. Accordingly, it was

13  decided that CSOs would be required to pass the hearing tests unaided, but then would be

14  allowed to use hearing aids on the job. *Id.* After determining that a CSO who wears hearing aids

15  has passed the unaided functional hearing tests, FOH also reviews the results of aided tests to

16  make sure the CSO's hearing aids are functioning and do not worsen the individual's hearing

17  abilities. Miller Decl. ¶ 23.b.

18      Additional experts support the methodology and content of Dr. Miller's report as adopted

19  by the Committee. Dr. Marc B. Kramer, Ph.D. opines that "the CSO hearing standards and the

20  manner in which they are implemented are clearly acceptable with respect to their development,

21  content and form. " Declaration of Marc B. Kramer, Ph.D. ("Kramer Decl.), Attachment 5, at 4.

22  Additionally, experts who have been retained by plaintiffs in similar cases such as Dr. Sigmund

23  Soli, acknowledge that use of hearing aids by weapons carrying law enforcement raises

24  significant issues for public safety. *See id.* citing *Soli*, "Use of Hearing Aids by Law Enforcement

25  Officers and Special Agents" (1996). No expert has provided testimony to challenge the findings

26  that use of hearing aids is contra-indicated for the CSO job.

27      Since January 2001, when the new medical standards were implemented, hundreds of

28

CSOs who wear hearing aids have passed the relevant tests unaided and been qualified to work under the contracts. Miller Decl. ¶ 29; Declaration of Dr. Louis Chelton ("Certified Chelton Decl.") (reports specific to *Strolberg* plaintiffs omitted.) ¶ 3; Certified Declaration of Dr. John V. Barson ("Barson Decl.") (reports specific to *Strolberg* plaintiffs omitted) ¶ 3.

### 4. Medical Review Process

With regard to procedures, one change that occurred in 2001 is that the annual medical examinations are now conducted by physicians designated by the contractors rather than by each CSO's personal physician. Farmer Decl. ¶ 33. The results of the examinations are forwarded through the contractor to USMS, which checks them for completeness. *Id.* ¶ 34. The information is then given to FOH for review. *Id.* A physician at FOH who specializes in law enforcement occupational medicine reviews the forms and medical data and makes one of two findings - either that the CSO is medically qualified or that more information is required. *Id.* ¶ 35. Except in the most unusual circumstances, no CSO is disqualified at this point in the process. Instead, he or she is given an opportunity to undergo additional testing or provide additional information before any final decision is made. *Id.* This supplemental information often comes from the CSO's treating physician (if he or she is already under medical care for the condition at issue) or from a specialist (such as an audiologist). *Id.* The new information is again forwarded to the Public Health Service, which reviews it and issues a recommendation as to whether the CSO meets the relevant medical standard. *Id.* If PHS recommends disqualification, USMS writes to the contractor and requests that the CSO be removed from the contract and that a replacement CSO be provided. *Id.*

From October 2000 (two months before the new medical standards were implemented) until September 30, 2004, CSO incumbents were found to be medically qualified 14,402 times. *Id.* ¶ 39. (This exceeds the total number of CSOs at any one time because CSOs are examined yearly; thus, some CSOs have been examined four times during that period.) In addition, 2,189 applicants were found to be medically qualified. *Id.* Over that same period, between incumbents and applicants, there were 256 medical disqualifications. *Id.*

1   //

2          **5.      Naomi Walton**

3          On January 17, 2002, Dr. Louis Chelton, who is one of the medical review officers for the

4   FOH, reviewed Walton's medical submissions.  Supplemental Declaration of Louis Chelton

5   ("Supp. Chelton Decl.") ¶¶ 2, 6.  The submissions included a report of a medical examination

6   performed by Walton's physician on October 19, 2001 and the report of a hearing test,

7   specifically, a pure tone audiogram, performed by an audiologist on November 5, 2001.  Supp.

8   Chelton Decl. ¶7. Dr. Chelton completed a medical review form noting that Walton's hearing did

9   not meet the required standard.  Supp. Chelton Decl. ¶7.  Dr. Chelton did not disqualify Chelton

10  at that time;  instead, he noted that a medical determination was deferred pending further

11  documentation.  Supp. Chelton Decl. ¶8.  Dr. Chelton further noted additional tests that would

12  have to be completed before a final determination was completed. Supp. Chelton Decl. ¶8.

13         Walton later submitted the results of an April 5, 2002 audiogram.  Supp. Chelton

14  Decl. ¶9.  The audiogram confirmed that Walton's left and right ears could discern sounds at

15  significantly different levels.  Supp. Chelton Decl. ¶9.  Dr. Chelton reviewed the additional

16  results on May 31, 2002 and concluded that Walton has "a significant hearing impairment

17  according to the results of the tests provided by [Walton]. . .."  Supp. Chelton Decl. ¶9 and

18  Exh. 2.  Dr. Chelton concluded that Walton could not perform the essential job function of

19  localizing sound and therefore was not qualified to perform the job of CSO.  Supp. Chelton

20  Decl. ¶ 9-10.

21         Plaintiff has retained an expert who agrees that "ear differences of this magnitude are

22  likely to severely/significantly restrict an individual's ability to localize sound relative to the

23  normal hearer."  Simmons Decl., Exhibit 1, (Report of Dr. Robert Sweetow).  Although Dr.

24  Miller concluded localizing sound by hearing is critical to the CSO position, it is also clear that

25  persons typically localize sound in less efficient ways using cues other than hearing. *See*

26  Simmons Decl., exh. 2 (Kramer Rebuttal Report).

27         Plaintiff acknowledges that she does not wear hearing aids and that she obtained a

28

1    hearing aid for the sole purpose of attempting to meet the hearing standard.  *See* Simmons Decl.,

2    Exh. 3 (Excerpts of Deposition of Naomi Walton, at 95) Plaintiff states that the sole manner in

3    which her life activities are limited is because she has "limited opportunities to work in jobs that

4    require "normal" hearing or audiological testing scores better than plaintiff's such as weapons

5    carrying law enforcement and public service."  Simmons Decl., Exh. 4 (Plaintiff's Response to

6    Interrogatories, Set Two at 3:15-17).

7            **B.    PROCEDURAL POSTURE**

8            On April 7, 2003 plaintiff filed a Complaint for Review of Administrative Order &

9    Injunctive Relief against Louis Chelton, Marc A. Farmer, the United States Department of Health

10   and Human Services (DHHS) and the USMS.  On May 30, 2003 plaintiff filed a First Amended

11   Complaint (FAC) and on August 28, 2003, she filed a Second Amended Complaint (SAC).

12           On September 5, 2003 plaintiff filed an Amended Motion for a Preliminary Injunction

13   pursuant to Rule 65, Fed. R. Civ. Proc.  On January 15, 2004, the Court issued an order granting

14   plaintiff's second amended motion for reinstatement "if, and only if, plaintiff meets current

15   hearing standards for CSOs."[2]  The Court denied "plaintiff's motion with respect to

16   disqualification of CSOs under current audiological testing standards."

17           In July 2004 the plaintiff and federal defendants filed cross motions on the joint employer

18   issue.  By order dated August 27, 2004, the Court denied the federal defendants' motion and

19   granted the plaintiff's motion.

20           Plaintiff filed a motion for partial summary judgment on December 3, 2004.  Plaintiff

21   sought an order establishing that the USMS regarded her as disabled, that within the meaning of

22   the Rehabilitation Act, that the audiological standards under which she was disqualified

23   constitute a discriminatory qualifying standard and that there are no triable issues in support of

24   the defendant's defense that the standards are justified by a job-related business necessity.  This

25   Court denied plaintiff's motion on January 20, 2005.  Order Denying Plaintiff's Motion for

26   Partial Summary Judgment ("Order").  This court concluded that plaintiff failed to show the

27   _____

28           [2] Plaintiff has not presented evidence that she can meet those standards.

absence of a triable issue of fact that the USMS "regarded" her as disabled in the major life activity of working because she presented no evidence regarding other jobs in the field of law enforcement, other than active duty government law enforcement positions; therefore, plaintiff has not demonstrated that if disabled as defendants believed, she should be "substantially limited" in working. Order at 6:10-13.

Second, this court concluded Plaintiff failed to demonstrate she was regarded as disabled in the major life activity of hearing for two reasons. First, plaintiff failed to demonstrate that the ability to localize the direction of sound is "a key hearing skill in most aspects of daily life." Order at 6:25-26. Second, plaintiff presented no evidence or expert testimony regarding plaintiff's perceived hearing problems in comparison to how unimpaired people hear normally in everyday life. Order at 7:15-16.

This court also concluded defendants have submitted evidence that the medical standards are job-related and consistent with business necessity. On this issue, the court noted that plaintiff presented no evidence in support of the argument that hearing aids should be compared to eyeglasses. Plaintiff also presented no evidence regarding the likelihood of malfunction for hearing aids. Plaintiff also presented no evidence that Dr. Miller was unqualified to make the determination regarding proper medical standards because he is not an audiologist. Order at 8.

The parties did not address plaintiff's claim that she is actually disabled (as opposed to "regarded" as disabled), nor did the parties address plaintiff's claim under the APA.

Plaintiff sought leave to file a Third Amended Complaint on January 7, 2005. Defendant counter-moved for an order requiring plaintiff to provide a more definite statement under Fed.R.Civ.P. 12(e).

This court granted the motion in part and denied the motion in part. Plaintiff was permitted to add as a defendant the Attorney General of the United States but was denied leave to file a claim under the Back Pay Act, 5 U.S.C. § 5596 and was denied leave to file class allegations. The court also granted the motion and ordered plaintiff to identify in the TAC "the defendants for each cause of action in the complaint itself." Order at 6.

Plaintiff filed her TAC on February 25, 2005. The TAC names as defendants the USMS, Marc A . Farmer, the U.S. Department of Health and Human Services, Benigno Reyna and Alberto Gonzales. Plaintiff alleges that all defendants are proper parties for purposes of the APA. Plaintiff further alleges that Alberto Gonzales is a proper party within the meaning of the Rehabilitation Act. The TAC does not, however, specify what decisions are being challenged pursuant to the APA nor that only Alberto Gonzales is being sued under the Rehabilitation Act.

## III. DEFENDANTS ARE ENTITLED TO JUDGMENT AS A MATTER OF LAW ON ALL PLAINTIFF'S CLAIMS

### A. THE LEGAL REQUIREMENTS FOR SUMMARY JUDGMENT

The party moving for summary judgment has no burden to produce any evidence on elements of a claim on which the non-moving party will bear the burden of trial, but can merely point out an absence of evidence to support any such element. *Celotex v. Catrett,* 477 U.S. 317, 322-23 (1986); *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 43 F.3d 1311, 1315 (9th Cir. 1995) *cert. denied*, 516 U.S. 869 (1995); *Maffei v. Northern Insurance Co. of New York*, 12 F.3d 892, 899 (9th Cir. 1993). Once the moving party points out the absence of evidence, then the non-moving party must come forward with specific evidence to show there is a genuine issue for trial. *Id.* If the non-moving party fails to make this showing, then the moving party is entitled to judgment as a matter of law. *Celotex,* 477 U.S. at 323 (1986).

Summary judgment is not only proper if plaintiff fails to produce *any* evidence on an element of his case, but summary judgment is also proper if plaintiff fails to produce *sufficient* evidence on an element of his case. The Supreme Court has specifically held that summary judgment is proper against a party who "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322 (1986). The mere existence of a "scintilla" of evidence in support of the non-moving party's position is not sufficient. The non-moving party has the burden of establishing sufficient evidence on each element of his case so that a jury could return a verdict for him. *Anderson v. Liberty Lobby, Inc*, 477 U.S. 242, 249 (1986).

Stated in another way, the standard for summary judgment mirrors the standard for a

directed verdict. *Anderson*, 477 U.S. at 252; *Triton Energy Corp. v. Square D Co.,* 68 F.3d 1216, 1221 (9th Cir. 1995). The standard is whether the evidence presents a sufficient disagreement as to require jury consideration, or whether the evidence is so one-sided that one party must prevail as a matter of law. *Id.*

**B.  DEFENDANTS ARE ENTITLED TO SUMMARY JUDGMENT WITH RESPECT TO PLAINTIFF'S REHABILITATION ACT CLAIM**

**1.  There Is Only One Proper Defendant under the Rehabilitation Act**

This Court has directed plaintiff to specify in her TAC which causes of action were being brought against which defendants. Order at Granting in Part Plaintiff's Motion to file Third Amended Complaint at 6. Nevertheless, the TAC still is unclear.

The proper defendant in a claim under section 701 of the Rehabilitation Act is the head of the agency. *See Barsen v. Department of the Interior*, 896 F.2d 422 (9th Cir. 1990) (only proper party defendant in section 701 claim is head of the agency, however court will not dismiss claim that properly describes defendant in the body of the complaint). Accordingly, the only proper defendant here is Roberto Gonzalez (Dept. of Justice). *See, e.g., Farrell v. United States Dept. of Justice*, 910 F. Supp. 615 (M.D. Fla 1995); *Dean v. United States*, 484 F. Supp. 888 (D.C.N.D. 1980). This court should enter judgment in favor of all other defendants on plaintiff's Rehabilitation Act claim because they are not the proper party.

**2.  Legal Requirements of the Rehabilitation Act Are Not Met In This Case**

To establish a prima facie case of disability discrimination under section 501 of the Rehabilitation Act , a plaintiff must show that (1) he is disabled within the meaning of the ADA, (2) he is qualified to perform the essential functions of the job with or without a reasonable accommodation, and (3) he suffered from an adverse employment action because of his disability. The ADA defines "disability" as: (1) "a physical or mental impairment that substantially limits one or more of the major life activities of such individual"; (2) "a record of such an impairment" or (3) "being regarded as having such an impairment." 42 U.S.C. § 12102(2); *Kaplan v. City of North Las Vegas*, 323 F.3d 1226, 1229 (9th Cir. 2003).

If the plaintiff can make out a prima facie case, the burden of production shifts to the employer to show a legitimate, nondiscriminatory reason for the adverse action. *Reynolds v. Brock*, 815 F.2d 571, 574 (9th Cir. 1987). If the employer in an ADA case offers a legitimate, non-discriminatory reason for its decision to terminate the employee, the employee is "required to produce specific, substantial evidence of pretext in order to avoid summary judgment." *Collings v. Longview Fibre Co.*, 63 F.3d 828, 833-34 (9th Cir. 1995). Throughout the burden-shifting process, plaintiffs bear the ultimate burden of proving that the federal defendants intentionally discriminated against them by disqualifying them as CSOs. *See Godwin v. Hunt Wesson, Inc.*, 150 F.3d 1217, 1220 (9th Cir. 1998).

Under the ADA, a plaintiff bears the burden of establishing "that his disability actually played a role in the employer's decision making process and had a determinative influence on the outcome." *Hernandez v. Hughes Missile Systems Co.*, 362 F.3d 564, 568 (9th Cir. 2004) (internal punctuation omitted). While an individualized assessment of the applicant's ability to perform the essential functions of the job is normally required under disability discrimination laws, *see, e.g., McGregor v. National R.R. Passenger Corp.*, 187 F.3d 1113, 1116 (9th Cir. 1999), an employer may require disabled employees as well as others to meet an across-the-board qualification standard if it can establish the "stringent elements" of the business necessity defense. *Morton v. United Parcel Service*, 272 F.3d 1249 (9th Cir. 2001) citing *Albertson's, Inc. v. Kirkingburg*, 527 U.S. 555, 568, 119 S. Ct. 2162, 144 L.Ed.2d 518 (1999); *Cripe v. City of San Jose*, 261 F.3d 877, 890 (9th Cir. 2001).

> a. **Plaintiff Is Not Actually Disabled Within the Meaning of the Act**

Plaintiff alleged in her TAC that she is actually disabled. Nevertheless, this form pleading has not been accompanied by any evidence. The undisputed evidence demonstrates that plaintiff's hearing impairment does not amount to a disability because the impairment does not substantially limit any life activity.

Plaintiff has suggested that her life activities of hearing or working may be impaired. The evidence demonstrates otherwise. Plaintiff's life activity of hearing is not substantially impaired

for three reasons. First, her deficit is in only one ear and therefore is not substantially limited. Second, plaintiff has produced no evidence that she has difficulty with any life activity as a result of her impairment. To the contrary, she acknowledges that the impairment has not affected the way she performs tasks and she does not even wear her hearing aid. *See* Simmons Decl., Exh. 3 (Excerpts of Deposition of Naomi Walton, at 95); Exh. 4 (Plaintiff's Response to Interrogatories, Set Two at 3:15-17). Third, although plaintiff's impairment may impact how she can localize sound, localization is of "minimal importance" in life functions. See Simmons Decl., Exh. 2.

### b. Plaintiff Is Not "Regarded As" Disabled[3]

This Court already has considered plaintiff's arguments regarding whether she is regarded as disabled. This Court concluded that plaintiff was not entitled to a decision that defendants regarded her as disabled with respect to either hearing or working. *See* Order Denying Motion for Partial Summary Judgment at 4-7. Instead, this Court concluded that plaintiff presented insufficient evidence with respect to both of these life activities. Now, discovery on these issues is complete and the record demonstrates that defendants are entitled to judgment as a matter of law.

### 1.) Federal Defendants Did Not Believe Plaintiff to Be Substantially Limited in Her Ability to Work in a Broad Range of Jobs

This Court determined that plaintiff "need only demonstrate that defendants believed she had a physical impairment, and that, if plaintiff was impaired as defendant believes, then plaintiff would be unable to perform in a broad range of jobs." Order Denying Plaintiff's Motion for Partial Summary Judgment at 5. Plaintiff has failed to meet this burden.

Plaintiff cannot submit any expert opinions to support a claim that she would be precluded from a broad class of jobs. The record contains no specific evidence about relevant labor markets, which is something that would be required to defeat a summary judgment on this

---

[3]  Plaintiff is "regarded as" disabled, as opposed to being actually disabled, she not entitled to a reasonable accommodation. *Kaplan*, 323 F.3d at 1232.

issue.  *Thornton v. McClatchy Newspapers*, 261 F.3d 789, 795 (9th Cir. 2001).

**2.)  Federal Defendants Did Not Regard Plaintiff as Substantially Limited in the Major Life Activity of Hearing**

In this regard, this Court acknowledged plaintiff's argument that the ability to localize the direction of sound is "a key hearing skill in most aspects of daily life." Pl.'s reply at 15.  This Court concluded that plaintiff presented no evidence in support of this assertion, and that summary judgment in favor of plaintiff therefore was not appropriate.  The continued absence of evidence on this point now establishes that defendants are entitled to judgment on this issue.

To make a prima facie case, plaintiff must produce sufficient evidence for a reasonable trier of fact to conclude that federal defendants perceived her as having an "impairment," *and* that this impairment, if it existed as perceived by federal defendants, would have substantially limited her in the major life activity of hearing.  *Deas v. River West, L.P.*, 152 F.3d 471, 476 (5th Cir. 1998).  Here, none of the relevant decision makers regarded plaintiff as substantially limited in the major life activity of hearing.  Instead, at every stage of the process – Dr. Miller's job-task analysis, the Judicial Conference's adoption of the medical standards, the reviewing physicians' individual assessments, and the Marshals Service's request that plaintiffs be removed from the contract — the consultants and decision makers were concerned only with whether CSOs could perform the essential functions of the CSO position.  *See* Roth Decl. ¶ 8; Miller Decl. ¶¶ 6, 12, 31; Chelton Decl. ¶ 5; Barson Decl. ¶ 5; Farmer Decl. ¶¶ 35-37.  Having such a concern does not amount to regarding plaintiffs as disabled.   There is no evidence that any decision maker perceived plaintiff as disabled; therefore defendant is entitled to summary judgment on this claim.  *See Beck v. USMS*, Civil Action No. 02-1579-L (W.D. Okla. Dec. 1, 2004) (Ex. 38).

Moreover, plaintiff could only have been regarded as disabled if federal defendants had viewed her hearing loss as severely restricting her hearing as compared with how unimpaired individuals would normally use their hearing in daily life.  The only statement from plaintiff in the record is the single line in the report of plaintiff's expert, Dr. Sweetow who opines, "being unable to localize sound severely/significantly restricts one's hearing as compared to how

1  unimpaired people normally hear in everyday life."  Simmons Decl., Exh. 1.  This conclusion is

2  not supported by any facts, analysis or study.  It simply is not evidence sufficient to carry

3  plaintiff's burden on this issue at trial.  Defendant therefore is entitled to judgment on this issue.

4              c.       **Plaintiff Is Not "Otherwise Qualified" for the CSO Position**

5              In a motion for summary judgment, an employer's determination of the essential

6  functions of the job position is entitled to deference.  *See* 42 U.S.C. § 12111(8); *Alexander v. The*

7  *Northland Inn*, 321 F.3d 723, 727 (8th Cir. 2003); *Peters v. City of Mauston*, 311 F.3d 835, 845

8  (7th Cir. 2002).  Plaintiff is not a "qualified individual" because she cannot perform the essential

9  functions of the CSO position, as assessed by the medical standards adopted by the Judicial

10  Conference.

11              Presently, in order to be employed as a CSO, an individual must pass a two-part test

12  administered to determine whether he or she possesses the ability to perform the six hearing-

13  related essential CSO job functions.  Miller Decl. ¶¶ 15-17; Farmer Decl. ¶ 26.  Dr. Miller

14  determined, consistent with expert opinion in the field, that it would be inappropriate to allow the

15  use of hearing aids to pass the two-part hearing test.  Certified Miller Decl. ¶ 19.  The prohibition

16  against using hearing aids to pass the audiological tests was both rational and supported by expert

17  opinion in the field.  *See* Kramer Decl. Ex. A ("Kramer Report") at 5-6; Sigfrid D. Soli, Use of

18  Hearing Aids by Law Enforcement Officers and Special Agents at 3.1 (1996) (attached to

19  Kramer Report).  Plaintiff was medically disqualified from her CSO position because she failed

20  to satisfy the required hearing standards.  The reviewing physician applied the CSO hearing

21  standards correctly.  *Compare* Supp. Chelton Decl. ¶¶ 6-10 *with* Kramer Report at 7.  Because

22  plaintiff cannot perform the hearing-related job functions of the CSO position in a safe and

23  effective manner, she is not "otherwise qualified" for the CSO position.

24              Further, plaintiff does not have the requisite law enforcement experience to be a CSO.

25  *See* Simmons Decl., ¶ 5; Decl. of Marc Farmer, ¶ 31.  Because plaintiff is not "otherwise

26  qualified," there is an independent basis for a finding that defendants are entitled judgment on the

27  Rehabilitation Act claim.

28

### d. The Application of the CSO Medical Standards to Plaintiff Was Legitimate and Non-Discriminatory

The USMS's reliance on a determination of medical unsuitability is a legitimate, non-discriminatory reason not to permit plaintiff to continue working as a CSO. *See Campbell v. Federal Express Corp.*, 918 F. Supp. 912, 919 (D. Md. 1996). The reviewing physicians made determinations that were both rational and founded upon scientific evidence.

In disability discrimination cases, a defendant is entitled to rely upon the opinions made by its medical professionals. *E.g., Murphy v. United Parcel Service*, 527 U.S. 516, 522 (1999); *Cook v. Dep't of Labor*, 688 F.2d 669 (9th Cir. 1983) (per curiam); *Puckett v. Porsche Cars of North Am.*, 976 F. Supp 957, 965 (D. Nev. 1997), *aff'd,* 165 F.3d 917 (9th Cir. 1998); *Crocker v. Runyon*, 207 F.3d 314, 319 (6th Cir. 2000); *Campbell*, 918 F. Supp. at 915-18; *Bay v. Cassens Transport Co.*, 212 F.3d 969, 976 n.4 (7th Cir. 2000).

Here, the federal defendants were entitled to rely on the conclusions reached by the reviewing physician that plaintiff was not qualified to perform essential functions of the CSO position. Further, contrary to plaintiff's arguments, the federal defendants gave plaintiff ample opportunity to submit new medical evidence and seek review of their determination of her medical condition. Suppl. Chelton Decl. ¶¶ 8-9. Plaintiff has not submitted any evidence that the federal defendants' concerns about medical qualifications were pretextual. Accordingly, plaintiff is unable to carry her burden on this issue at trial and defendants are entitled to judgment on this issue.

### e. Even of the CSO Medical Standards Were Discriminatory, They Would Not Violate the Rehabilitation Act Because They Are Justified by Business Necessity

The evidence demonstrates that the standard that was objectively reasonable. *Frank v. United Airlines*, 216 F.3d 845, 853 (9th Cir. 2000); *see* Suppl. Chelton Decl. and the Certified Declarations of Judge Roth, Marc Farmer, Drs. Miller, Chelton, Kramer and Barson filed in the *Strolberg* case. Further, as set forth in the Certified Declarations of Judge Roth, Marc Farmer, Drs. Miller and Dr. Kramer and as discussed above at pages 8-11, the CSO medical standards are job-related and consistent with business necessity. *See* 42 U.S.C. § 12113(a); *Frank,* 216 F.3d at

855.  The standards applied to CSOs are "reasonable necessary to the normal operation of the CSO's particular business."  *See id.*  Specifically, employing CSOs that cannot meet the hearing standard increases the risk is that officers charged with protecting the judiciary will be incapable of responding properly to a life-threatening situation.  Moreover, the medical standards are closely tied to the requirements of the CSO position.  They also promote the USMS's paramount interest in obtaining security officials who are medically fit and capable of performing all of the essential functions of the CSO position, both on a daily basis and during emergencies.

In the course of the medical review process, each CSO is examined individually.  For hearing, the USMS has in place a set of specific requirements that must be met in order to qualify for the CSO position.  Satisfying the hearing standards cannot be accomplished by using hearing aids.  The Judicial Conference carefully considered whether to allow the use of hearing aids to meet the hearing standards and relied on expert medical advice as to whether such use would be appropriate.  The judges concluded that the use of hearing aids to satisfy the requirements would be inconsistent with the very nature of the hearing-related CSO job functions.  In short, Plaintiffs cannot prevail even if she could properly challenge the CSO medical standards.  *Frank*, 216 F.3d at 855.

## C.  DEFENDANTS ARE ENTITLED TO JUDGMENT ON PLAINTIFF'S APA CLAIM

Defendants reserves their arguments on, but do not reargue, the merits of this Court's resolution of the joint employer issue.  Nevertheless, should this Court's decision on the joint employer issue be successfully challenged on appeal, a decision on the merits of plaintiff's APA claim would permit a final resolution of this case without remand.  *See i.e., Stone v. Millstein*, 804 F.2d 1434, 1438 (9th Cir. 1986).  Accordingly, defendants respectfully request a ruling on plaintiff's APA claim.

To the extent that plaintiff seeks damages pursuant to the APA, Defendants are entitled to judgment.  By its own terms, section 702 of the APA does not apply to claims for "money damages." 5 U.S.C. § 702.  Moreover, to the extent that plaintiff seeks injunctive relief, her claim again is meritless.

5 U.S.C. § 703 permits an action to be filed against "the United States, the agency by its official title, or the appropriate officer." Plaintiff does not specify the precise decisions that are being challenged in this case; nevertheless, the only evidence in the record suggests plaintiff wishes to challenge the USMS' enforcement of the medical standard with respect to hearing. Marc Farmer made the only "final agency decision" in this regard when he approved the decision made by Thomas Galgon that plaintiff was not qualified to continue in her position as a CSO.

Under the APA, the court may set aside agency action only if it was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Wilderness Soc'y v. United States Fish & Wildlife Serv.,* 353 F.3d 1051, 1059 (9th Cir. 2003) (en banc). The standard is a narrow one, and the courts may not substitute our judgment for that of the agency. *Envtl. Def. Ctr., Inc. v. EPA,* 344 F.3d 832, 858 n. 36 (9th Cir. 2003). However, "the agency must articulate a rational connection between the facts found and the conclusions made." *Id* . Thus, this Court should consider whether final decision of the United States Marshals Service disqualifying plaintiff from her position as a Court Security Officer is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.

For all the reasons identified above, the decision to disqualify plaintiff under the standard was reasonable. The judicial counsel adopted and directed implementation of reasonable standards that are supported by valid medical opinions and legitimate safety concerns. The disallowance of hearing aids in the absence of minimum hearing requirements is reasonable and supported by sufficient rational. There is no evidence that the decision in this case was arbitrary and substitution of plaintiff's judgment for that of the USMS is not permitted. Accordingly, defendants are entitled to judgment with respect to plaintiff's APA cause of action.

//
//
//
//

**IV.    CONCLUSION**

There have been no evidentiary revelations since the plaintiff filed her motion for summary judgment.  The evidence now makes clear that defendants are entitled to summary judgment.  Plaintiff has not been able to overcome the deficiencies in her case: (1) she cannot demonstrate she is either disabled or regarded as disabled, (2) she cannot demonstrate that she is otherwise qualified to be a CSO, (3) she cannot show that the enforcement of medical, and in particular, audiological, standards violated the Rehabilitation Act, and (4) she cannot establish a claim under the APA.

For all these reasons, defendants respectfully request that this Court grant summary judgment in favor of defendants.

Respectfully submitted,

KEVIN V. RYAN
United States Attorney

Dated: March 25, 2005                          _____/s/_____
                                                                ABRAHAM A. SIMMONS
                                                                Assistant United States Attorney