### *TOPICAL INDEX*

                                                        Page

TOPICAL INDEX. . . . . . . . . . . . . . . . . . . . 1

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . 4

MEMORANDUM OF POINTS & AUTHORITIES . . . . . . . . . . . . . 5

    STATEMENT OF FACTS. . . . . . . . . . . . . . . . . 5
    1. The Commitment Offense. . . . . . . . . . . . . . . 5
    2. The Criminal Conviction. . . . . . . . . . . . . . 8
    3. Term Setting    . . . . . . . . . . . . . . . . . 8
    4. Social Background . . . . . . . . . . . . . . . . . 9
    5. In Prison Programming . . . . . . . . . . . . . . . 9
    6. Parole Consideration History . . . . . . . . . . . .12

    LEGAL ARGUMENT . . . . . . . . . . . . . . . . . . 17

        I.    THE FAILURE OF THE PROSECUTION TO SUBMIT
        SPECIAL FINDINGS TO THE JURY ON THE ASPECTS OF THE
        CRIME RELIED ON BY THE BOARD TO JUSTIFY DEPARTING
        FROM THE "SHALL NORMALLY" FORMULATION OF PENAL
        CODE §3041 PRECLUDES THOSE FINDINGS FROM NOW BEING
        MADE BY THE BOARD.. . . . . . . . . . . . . . . .**22**

        A. The United States Supreme Court Decisions of
           Appendi And Blakely Prohibit Any Sentencing
           Authority From Imposing Greater Punishment Than
           That Authorized By The Jury's Findings. . . .**22**

    II.  THE BOARD VIOLATES DUE PROCESS BY REPEATEDLY
        RELYING ON THE UNCHANGING FACTS OF THE CRIME IN
        THE FACE OF CLEAR EVIDENCE OF REHABILITATION, &
        BY MAKING RECOMMENDATIONS OF WHAT TO DO TO BE
        FOUND SUITABLE AT EACH HEARING, A FINDING OF
        EGREGIOUSNESS IS BARRED BY THE INMATE'S
        COMPLIANCE WITH THOSE AGREED TERMS. . . . . . . **29**

    III. CONTINUED RELIANCE ON THE UNCHANGING FACTS OF THE
        CRIME VIOLATES DUE PROCESS. . . . . . . . . . **31**

    IV.  THE BOARD'S DENIAL OF PAROLE IS NOT SUPPORTED
        BY ANY EVIDENCE, & THUS VIOLATES PETITIONER'S
        RIGHT TO DUE PROCESS OF LAW.. . . . . . . . . .**35**

        A.   THE COMMITMENT OFFENSE . . . . . . . . . .**35**

1

***B.*** THE FINDING OF A "NEED" FOR THERAPY\SELF HELP. .**49**

V.   THE DANNENBERG DECISION LEAVES OPEN THE ISSUE OF
     WHETHER THE TERM HAS BECOME DISPROPORTIONATE. . . **53**

     VI.   THE    NO    PAROLE    POLICY    ARGUMENT    IS
           MISCONSTRUED BY RESPONDENTS.. . . . . . ..**55**
VII. REQUEST FOR EVIDENTIARY HEARING. . . . . . . **55**

Federal Cases

Apprendi v. New Jersey, 530 U.S. 466, (2000) .......................................... 18
Biggs v. Terhune, 333 F.3d 910, at 915-916 (9th Cir. 2003) ............. 15, 25
Blakely v. Washington __ U.S. __, [124 S. Ct. 2531, 159 L.Ed.2d. 403 ... 18, 19, 20
Brown v. Poole, 337 F.3d 1155 (9th Cir.2003) ......................................... 14
Hill, supra, 472 U.S. 445 ................................................... 32, 33, 40, 41
McQuillion v. Duncan [McQuillion I] (306 F. 3rd 895 ............................. 50
McQuillion v. Duncan [McQuillion II], 342 F. 3rd 1012 (9th Cir. 2003) ... 15, 16, 25
Thompson v. Sandoval, 282 F.3rd 780 (2002) ............................................. 9
U.S v. Guagliardo, (9th Cir. 2002) 278 F.3d 868, 872 ........................... 26
U.S v. Guagliardo, 278 F.3d 868, 872, (9th Cir. 2002) .......................... 26

State Cases

In re Capistran, 107 Cal.App.4th 1299 (2003) ......................................... 16
In re Dannenberg, 34 Cal.4th 1061 (2005) ................................... 13, 15, 33
In re Ernest Smith, 114 Cal.App.4th 343, at 366-367 ............................. 12
In re Hogan (1986) 187 Cal. App. 3d 819, 824 ....................................... 23
In re Leslie Van Houten, 116 Cal.App.4th 339, (2004) ............................ 37
In re Mark Smith, 109 Cal.App.4th 489 (2003) ................................. 15, 37
In re Ramirez, 94 Cal.App.4th 549, at 571 (2001) ........................... passim
In re Scott 119 Cal.App.4th 871, 890-892, (2004) .......................... passim

Federal Statutes

Cal. Rules of Court. (Penal Code § 3041(a) ........................................... 23
FORMULATION OF PENAL CODE §3041 ............................... 18, 33, 51
Penal Code § 3041 ................................................................................ 36
Penal Code section 3041 ....................................................................... 40
Penal Code section 654 .......................................................................... 4

State Statutes

hearing in 2002 .................................................................................... 11
hearings in 2003 .................................................................................. 28

Federal Rules

9th Cir. 2002 ......................................................................................... 50

State Regulations

Cal. Pen Code §654 ......................................................................... 41, 42
Cal. Pen. Code §3041 ..................................................................... passim
Pen. Code § 1168 ............................................................................ 22, 24
Pen. Code § 1170 .................................................................................. 24
Pen. Code § 3041 ....................................................................... 43, 44, 48
Pen. Code §12022.53(b) ........................................................................ 19
Pen. Code §215(a) ................................................................................. 19
Pen. Code §3000 ............................................................................. 38, 40
Pen. Code §3041(a) ......................................................................... 21, 23
Pen. Code §3041(b) ............................................................................... 24
Pen. Code §3041.5 ................................................................................ 21

STEVE M. DEFILIPPIS
SBN 117292
PICONE & DEFILIPPIS, A P.L.C.
45 E. Julian Street
San Jose CA 95112
(408) 292-0441

Attorneys for Petitioner,
HAROLD HARVEY HAWKS

## *IN THE UNITED STATES DISTRICT COURT*
## *FOR THE NORTHERN DISTRICT OF CALIFORNIA*

| | |
|---|---|
| HAROLD HARVEY HAWKS, | CASE NO. C-04-01822 JSW |
| Petitioner, | *MEMORANDUM OF POINTS &* |
| | *AUTHORITIES IN SUPPORT OF* |
| -vs- | *TRAVERSE TO RESPONDENT'S* |
| | *RETURN TO THE OSC* |
| ANTHONY P. KANE, Warden, | |
| Respondent. | |
| On Habeas Corpus. | |

_____/
ARNOLD SCHWARZENEGGER,
Governor, BOARD OF PRISON
TERMS,

    Real Parties in Interest.
_____/

### *STATEMENT OF FACTS*

### *1. The Commitment Offense*

The facts underlying the conviction of Mr. Hawks are well
known to this Court, and were set out in detail in the
Memorandum of Points & Authorities In Support of The Petition
For Writ of Habeas Corpus filed in this matter, and the same are
incorporated herein by reference as though set forth in full.

Petitioner will not set out all of the facts here, but will only highlight certain facts that are particularly relevant to this discussion.

First, it is important to fully understand the background against which the crime occurred. Mr. Hawks had no violent history whatsoever. However, just before the shooting, an argument had occurred over the custody arrangements Mr. Hawks had with newly separated wife, when she was late to the meeting to pick up his son. Depressed over his failing marriage and the stress of financially having to deal with the separation, by that point, Mr. Hawks was regularly dealing with his situation by drinking to excess, and by the time she arrived, had already consumed 6-8 beers. He then left with his son at approximately 10:30 p.m., eventually getting on eastbound Freeway 91. Michael Dwyer was also headed eastbound in a van. The van had no side windows, and persons outside the van could not see in. There was no way for Mr. Hawks to see anything but the driver, as the side of the van was completely paneled behind the front doors, the front passenger window was darkly tinted, and the rear doors were mirrored. There was never any indication that there were other occupants in the van. From all external appearances, it seemed that Mr. Dwyer was by himself in the van.

The record is clear that the ensuing events included Mr. Dwyer tailgating the Hawks vehicle while repeatedly flashing his bright lights, followed by Dwyer quickly pulling around Mr. Hawks, throwing a hard object of some sort at the vehicle, and sharply cutting Mr. Hawks off, sending his car veering out into the median, and causing Mr. Hawks' son to fall partially out of his car seat. This interchange continued on for some distance down the freeway, with the primary aggressor in the driving behavior being Mr. Dwyer. The passenger who was wounded in the

incident, Wendy Varga, made the following accusations[1] about Mr.
Dwyer's erratic driving that night:

1. Mr. Dwyer recklessly changed lanes with the van in a
   manner to intentionally cut in front of Mr. Hawks'
   vehicle in a manner that affected the course of the
   vehicle.

2. Mr. Dwyer threw a metal object, bottle or missile at
   Mr. Hawks' vehicle or at Mr. Hawks himself, with
   malicious intent to do great bodily injury.

3. Mr. Dwyer flashed his high beam lights at Mr. Hawks
   while following the car too closely and in an
   extremely unsafe manner.

4. Mr. Dwyer did all of the above, and more, despite
   pleas from Mrs. Varga and other passengers in the van
   for Mr. Dwyer to stop operating the vehicle in such a
   dangerous and hazardous manner. See Appendix A,
   Exhibit I, Second Amended Complaint of Wendy Varga,
   pp. 364-367.

   Of course, it is equally clear that Mr. Hawks overreacted
to Mr. Dwyer's rage. Acting with irrational anger, frustrated
by the actions of Dwyer and with his judgment clouded by
intoxication, Mr. Hawks made a foolish choice with tragic
consequences, grabbing his shotgun[2] from the back floorboard and
one shell of what he believed to be a trap load. In the dark,
these differing loads cannot be distinguished, but their effect
is dramatically different. A trap shell contains small pellets,
has a very short range, and would have bounced off the side of
the van. A slug, as it did here, can apparently penetrate the
van's metal side. It is also important that Mr. Hawks believed
he was aiming above and behind the van, firing what he intended
to be a "warning" shot to the driver. Of course, the most

---

[1] Ms. Varga sued Mr. Dwyer, who ultimately settled the lawsuit and paid Mrs. Varga
substantial six figure compensation for his actions which provoked his
confrontation with Mr. Hawks. See Ex. I.

[2] Mr. Hawks had the gun in his car as he was going trap shooting the next day.

significant miscalculation is that, unbeknownst to Mr. Hawks, the back of the van was occupied by three passengers.

## 2. *The Criminal Conviction*

The jury resolution of the case is significant in evaluating the nature of the criminal intent harbored by Mr. Hawks. The jury found Mr. Hawks not guilty of the first-degree murder of Patricia Dwyer, and instead found him guilty of second-degree murder. More important to analyzing the intent issue is the resolution of the attempted murder charges brought as to Mr. Dwyer and Ms. Varga. Here, the jury acquitted Mr. Hawks, and instead found him guilty of the alternative two counts of assault with a deadly weapon. Obviously, the only distinction is due to the requirement of intent to kill, an express element of attempted murder, while ADW is a general intent crime, meaning the acquittal was due to the lack of intent to kill.

The manner of sentencing is also significant to this evaluation. Mr. Hawks received a term of fifteen (15) years to life for the murder, plus a two (2) year determinate term for the use of a firearm. However, the Court made an express finding that, because there was only a single shot into the van, and not separate assaults, the ADW charges were both found to be part of one singular act, the terms for those lesser charges were stayed pursuant to *Penal Code* section 654. Ex. C., p.65.

## 3. *Term Setting*

Mr Hawks was received by CDC on July 2, 1987, with pre-prison credits of 15 months. Thus, he has seventeen (17) years nine (9) months in CDC, for which he is entitled to at least five (5) years eleven (11) months of post-commitment credits[3]

---

[3] Under <u>Cal. Code of Regs.</u>, tit. 15, §2410, an inmate is entitled to at least 4 months of additional credit for each year served free of serious discipline.

plus his fifteen (15) months pre-prison time, giving him a total credited term served of one month shy of twenty five years. He is now entering the matrix of proportional terms for the greater crime of first degree murder. <u>Cal. Code of Regs.</u>, tit. 15, §2403.

### 4. *Social Background*

Mr. Hawks is currently forty five (45) years old, and although both parents are now deceased, he still has strong ties with the rest of his family, who regularly write to the Board in support of his parole. Even Mr. Hawks' ex-wife, Roxanna Leigh Fleming, is still very supportive of him and writes supportive letters to the Board for his hearings. Ex. G, p. 270. Of course, his prior record is perfectly clear as well, with no juvenile or adult arrests or convictions, or any incidents of violence whatsoever. Ex. C, p. 69; Ex. B, p. 48.

### 5. *In Prison Programming*

During his time in custody, Mr. Hawks' positive programming has been repeatedly recognized by CDC staff. See generally Ex. A, B and D. Correctional Officer R. Schramm, a veteran officer with eight (8) years experience as a parole agent, stated that Mr. Hawks would "…**make an excellent candidate for parole**…[and] shows a **high propensity for a successful and productive social reassimilation**." Ex. A, p.1, emphasis added. Correctional Officer A. Ramos described him as a "model prisoner and…an excellent candidate for parole." Similar strongly positive statements are contained within Mr. Hawks central file from other correctional offices, Academic Counselors, Senior Librarians, Teachers, and volunteers. Ex. A, pp.5, 7, 10, 11, 12, 13. Amazingly, in nineteen (19) years of incarceration, Mr. Hawks has **never** had a single negative comment put in his C-file.

Mr. Hawks educational advancements in prison are remarkable, getting his A.A. Degree from Hartnell College in

1992 (3.85 GPA), his B.S.G.S. from Indiana University in 1995 (3.70 GPA), and an M.A. from California State University, Dominguez Hills in 1998 (3.79 GPA), regularly appearing on the Deans list at each school. Ex. D, pp. 83-91. He has also studied Spanish since December 1997. Ex. D, pp. 92-93. However, Mr. Hawks did not stop at just advancing his education, using his time in prison to enhance his already good pre-prison work skills and to obtain vocational training. While most inmates, at best, may complete one vocation, he has received certificates of completion in Vocational Drafting, Vocational Data Processing, Vocational Computer Repair and an A+ Certification as a Computer Repair Technician. Ex. D.[4] Once again, his grades in these programs were always at the top level. See Ex. A.

Mr. Hawks has received a complete psychological clearance for parole, which will be discussed more fully in connection with his parole consideration history, _infra_. On 11-16-00, Bruce Bakeman, Ph.D., Senior Psychologist wrote:

> "Inmate Hawks has successfully completed 2 Lifeskills 10-week courses. He has had several extensive individual courses since 1992. I have known him since 1992 – almost nine years so far – and have conducted numerous individual sessions with him. He has successfully completed a Parenting class and has attended Alcoholics Anonymous faithfully for ten years. Inmate Hawks has requested additional psychotherapy as mandated by the Board of Prison Terms**. _Inmate Hawks neither requires additional psychotherapy, nor do we have those resources available at this time_**." Ex. B, p.50.

Mr. Hawks self-help programming is nothing short of amazing. Despite psychiatric clearance, he has completed every

---

[4] Mr. Hawks has subsequently received his A+ Certification, achieving it in 12/00. (Ex. D, pp. 80-82.)

program at the institution that is applicable to him. Ex. F, pp. 195-199.[5] Mr. Hawks self help programming includes:

[a]1990 through the present—Alcoholics Anonymous. Ex. F, pp. 24-25);

[b]Participated in one-on-one therapy with Senior Psychologist Bruce Bakeman, PhD, before such therapy programs were discontinued;

[c]Completed two 10 week phases of the Life Skills therapy program. Ex. F, pp 26-28, 195-199; Ex. B, pp. 6, 9, 50, 53.)

[d]Completed the Parenting program

[e]Completed the set of courses in awareness of infectious diseases given by the Inmate Peer Education Program;

[f]Very active in the Arts in Corrections program, having participated in a wide variety of volunteer activities. Ex. A.;

[g]Volunteer—Friends Outside, Artichoke Festival, Magazine Donation, Monterey H.S., Teacher's Aide, donations to Hobby Dept, Donations to Women's Crisis Center & MCAP;

[h]Impact Program—11/01;

[i]Anger Mgmt—2/02;

[j]Father's Group (14 wks)—started 4/02-One of top 2 students;

[k]Accepted into Lifer's Group w/ Dr. Fishback (in depth understanding of crime)[6]

---

[5]    However, CDC has substantially reduced the availability of "self-help" programs for inmates in the past ten (10) years, and even the Board has recognized this lack of availability of programs. Ex. F, p. 199.

[6]Amazingly, despite the aforementioned achievements, the Board found Mr. Hawks had "not yet sufficiently participated in beneficial self help and therapy programming," then turned around and "commended" his participation in these programs.  Ex. F, pp. 265-266. Deputy Commissioner Harmon even stated, "I do realize that there are limitations as for [sic] what you can take," just after he had noted that Mr. Hawks has "continually participated in various self-help group programs - and that is commendable…" Ex. F, p. 199.  When

As expected, Mr. Hawks has a perfect disciplinary record, with no disciplinaries of any kind during his nineteen (19) years in cusody, either CDC 115 or even non-disciplinary write-ups (CDC 128A's). Ex. C, p. 63. His classification score has been at "0" security points since 1994, the lowest possible rating of dangerousness. This was also achieved at the earliest date at which he could achieve the necessary reductions of points, which is annually limited to eight (8) points. He is also housed under a Level II override, since lifers are not ordinarily allowed to be housed such facilities. See e.g., Cal. Code of Regs., tit. 15, §3375.2(a). His housing and privilege categories are at the highest available level, A1A. Ex. C, pp. 72-73.

### 6. *Parole Consideration History*

As can easily be seen, Mr. Hawks' institutional adjustment has been exemplary in every way possible. Under each of the regulatory factors of suitability (Cal. Code of Regs., tit. 15, §2402(d)), the evidence was irrefutable that Mr. Hawks was suitable for parole. Of course, the killing itself was an unintentional act, and although grossly reckless, the conduct involved was on a far lesser order than traditional second degree murders founded on express intent to kill. Thus, one would expect that this would be the type of case where the Board would have no choice but to follow the mandate of Cal. Pen. Code §3041 that a parole date "shall normally" be given at the initial hearing. Because of this, the progress of his parole consideration hearings was quite intriguing. Instead of the expected finding of suitability, Mr. Hawks has been a series of denials, even starting with multiple year denials.

---

Harmon said this, his statements went unchallenged by the other two commissioners. Id.

Mr. Hawks' initial parole consideration hearing was on February 25, 1997, but despite consistently favorable custody, counselor and psychological reports, the Board Panel found him unsuitable for parole and gave him a three (3) year denial. The Board's stated basis for the decision was primarily based on the crime, describing it as involving a "very callous disregard for the life and suffering of other human beings" and saying that it was committed in a "very dispassionate manner." They then purported to rely on "social factors" by stating "[w]e find that you've had a previous history of problems with alcohol.[7] You were having some unstable relationships with your wife…" The Board then claimed that he needed "additional programming…upgrade vocationally.[8]...And…find some available therapy."[9] Appendix A, Exhibit E, pp. 166-167. The Panel recommended that Petitioner do several things to become "parole suitable" that simply included "[r]emain disciplinary free. You upgrade both vocationally and educationally, as you have been doing. You continue to participate in AA." Id. p. 168. In other words, the Panel simply told him to continue programming exactly as he had already been doing.

Mr. Hawks' first subsequent parole consideration hearing was on October 31, 2000. Appendix A, Exhibit F, p. 172. He had met each of the Board's recommendations from the 1997 hearing, including getting his master's degree with honors and completing

---

[7] This claimed basis for denial of parole has recently been found to be inappropriate, as applied to inmates who have entered into recovery, as constituting a violation of the Federal Americans With Disabilities Act. Thompson v. Sandoval, 282 F.3rd 780 (2002).

[8] Even at this early stage, Mr. Hawks was through the Associates and bachelor's degree programs, and on his way to his master's degree. He had a consistently excellent work record, completed a vocation, and had job skills that pre-dated prison. The Board simply failed to acknowledge those gains.

[9] Of course, no such therapy is available any longer to general population inmates, and when it was, Mr. Hawks participated extensively with Dr. Bakeman. Appendix A, Exhibit B, p.50. When Mr. Hawks attempted to request therapy after this hearing, the mental health department denied his request, citing both unavailability and Mr. Hawk's lack of need for therapy. Id.

a vocation. Appendix A, Exhibit C, p. 57. The most recent counselor report showed Mr. Hawks' lack of disciplinary write-ups, and further self-help. Ex. F, p. 195. He again presented eighteen (18) letters of strong support, from family, in-laws, friends, former neighbors, employers and co-workers, all with extensive personal knowledge of Mr. Hawks' character. His parole plans were solid, including firm offers of housing, employment, transportation and any other support needed. See Appendix A, Exhibit J. A strongly positive psychological report was done by Dr. Reed (discussed more fully, infra, in connection with the 2002 hearing).

The Board again found Petitioner unsuitable. This time, while still relying primarily on the crime, the Board dropped the "dispassionate and calculated" finding, but added a finding, contrary to the trial Court's determination that there was only one singular act, that "[m]ultiple victims were attacked and injured." In their traditional contradictory fashion, the Board stated that "[i]nstitutionally, he's done very well" and then turned around and said that "*…in the determination of the Board, [he] has not yet sufficiently participated in beneficial self-help and therapy programming.* Appendix A, Exhibit F, pp. 265-266. Amazingly, despite having an explicit offer of employment from Breck Spencer's Roofing Company (id, at p. 393), the Board found that Mr. Hawks "does not have current proof of acceptable employment plans." Appendix A, Exhibit F, p. 265.[10] Of course, the Board also made the traditional "finding" that was condemned in the Ramirez decision that the *prisoner does need therapy in*

---

[10] The Spencer letter was written on 11/14/99 in preparation for what should have been a February 2000 hearing. Likewise, the backup job offer from Richard Hill (Appendix A, Exhibit J, p.394) was written 10/25/99. If the Board is calling these old or outdated when they were responsible for delaying the hearing over eight months, their position is nothing less than outrageous. The letters were timely submitted. The Board's conduct of its hearing was not timely.

*order to face, discuss, understand and cope with stress in a nondestructive manner.*"[11] Id, emphasis added. This time denial was for two (2) years. Id. at p. 266.

Then, at Mr. Hawk's second subsequent parole hearing in 2002, the Board once again improperly relied on the facts of the commitment offense to deny parole, while ignoring all of the evidence of parole suitability and efforts of self-improvement. Ex. F, p.103. The Board's only recommendation that Mr. Hawks "needs to continue with his self-help programming" deserves some special attention. Ex. F, 199; see ftnt. 7, supra. The evidence at the hearing established that Mr. Hawks has completed all of such programs available to him, which was acknowledged by the commissioners, who acknowledged that he has been "continually" participating in self help programming. Ex. F, p. 199. Obviously, the Board's recommendation is made with absolutely no foundational support. Ex. F, p. 266.

Of course, this "finding" was directly refuted in the most recent psychological evaluation by Dr. Reed who was particularly impressed with Mr. Hawks' lack of disciplines, lack of violence, participation in self-help, and overall good programming. Ex. B, p. 48. Dr. Reed had concluded that Mr. Hawks "does not have a mental health disorder which would necessitate treatment either during his incarceration or following upon parole." (Id.) However, the Board simply ignored this finding, which likewise permeates all of the past psychological reports as well. Dr. Reed also found "[Mr. Hawks'] prognosis for community living appears to be very good," found that "he has no personality disorder or psychopathy," noted he "acknowledged full responsibility" for the crime, found that he has "excellent

---

[11] This is the identical finding to the one found by the Court of Appeals in Ramirez to be so offensive. Ramirez, at 571. It comes from language on a pre-printed form, BPT 1000(a). App. AR.

insight" into the causative factors of the crime, and shows "excellent empathy" for the victim. Ex. B, pp. 47-48. Most important was the assessment of violence potential, which the doctor found to be "significantly below this Level II inmate population," and in the free community his "violence potential is considered to be no more than the average citizen." Ex. B, p. 48. As has consistently been the case with Mr. Hawks, there were no negative comments in the psychological evaluation.

In addition to two (2) more years of outstanding programming, the Board had before it the same evidence as before, showing Mr. Hawks' history of positive psychological evaluations, his vocational certificates in drafting, data processing and computer repair, his numerous laudatory chronos and above average to exceptional work performance ratings, his continued active participation in AA, and new completions of the Father's Therapy Group, Anger Management Group, Impact Victims Awareness Program and a Stress Management Seminar. Mr. Hawks also remained active in the Arts in Corrections program, and of course, stayed discipline free. This time, the Board took less than a half of an hour "consider" these factors, along with other evidence presented during the hearing, and came back with a decision to deny parole for a period of one[12] year, again citing the crime as the primary basis, finding it was committed in a "cruel manner," with a "callous disregard[13] for human suffering," had a motive that was "trivial," and again, contrary

---

[12] While the Board appears to be moving downward in the length of its denials, this trend has been meaningless for Mr. Hawks. Since the 2002 hearing, he was denied parole for one year in November of 2003, and again denied for one year in March of 2005. With each successive hearing, it seems that the "one year" gets longer and longer, the last two being 14 months and 16 months, respectively. The hearing after the 3 year denial in 1997 was 7 months late.

[13] Of course, these findings are legally inadequate on their face, as every murder is "cruel" and "callous" by definition. See In re Ernest Smith, 114 Cal.App.4th 343, at 366-367. The regulatory factor requires that it be "especially heinous, atrocious and cruel" or involve an "exceptionally callous disregard…" The Board here did not make these requisite findings.

to the trial court finding of a singular act, that "multiple victims were attacked." Appendix A, Exhibit F, p. 103-5. As they always do, the Board again "commended" Mr. Hawks for being discipline free, for his participation in AA, for his tremendous educational accomplishments, participating in prison arts, taking the peer education courses, and completion of three trades. (Ex. F, p. 266.) However, they then proceeded to ignore those accomplishments and not only find Mr. Hawks unsuitable, but conclude that he "…needs to continue with his self-help programming." Appendix A, Exhibit F, p.103-5.

## *LEGAL ARGUMENT*

The analysis in this case requires a multi-level, structured approach. While much is made by respondents of the "some evidence" review that is done in parole challenges (see generally, In re Dannenberg, 34 Cal.4th 1061 (2005)), in this case, that is clearly not the appropriate starting point. At the first level, before considering the evidentiary sufficiency of the Board's findings, the analysis must focus on the question of whether the commitment offense can even lawfully be relied on to any degree in finding Mr. Hawks unsuitable for parole. To the extent the DA at the hearing, the Board, or the AG in their brief is arguing that elements of a first degree murder are present to make the crime particularly egregious, their position violates the Apprendi-Blakely[14] rules established by the U.S. Supreme Court. There, the Court announced principles that preclude the use of "findings" to take a case out of the ordinary sentencing range, here the matrix, unless those findings were alleged in the information and either found true by the jury or were admitted by the defendant as part of a plea.

---

[14] Apprendi v. New Jersey, 530 U.S. 466, (2000); Blakely v. Washington, __ U.S. __ (2004), [124 S. Ct. 2531, 159 L.Ed.2d. 403].

Thus, when, as they did here, the Board makes "findings" that the crime was committed in a "cruel" manner, involves a "callous disregard for human suffering," that "multiple victims were attacked" or is based on a motive that is "trivial" in relation to the offense, the rules of Apprendi-Blakely are violated, since the result is to remove the case from the requirement in Pen. Code §3041 that the Board "shall normally" set a proportional parole release date consistent with the matrix. While *Dannenberg* gives the Board the discretion to do that in appropriate cases, it is not a "blank check" to do so in the absence of findings by the jury on the factual issues relied upon to justify the departure. Here, an even stronger case is presented, as it is not just an absence of findings on those issues by the jury, but the jury explicitly rejected every charge having express malice (intent to kill) as an element. As these findings by the Board are being used to take the case outside the normal sentence range, the Apprendi-Blakely rules require that they be submitted to the trier of fact at the time of conviction. Here, the jury's actual findings negate the existence of intent to kill, and therefore preclude the Board from reaching the decision it did.

Again, this is not a "some evidence" evaluation. Instead, it is a legal issue that precludes the Board from making the findings that it relies on to conclude that the crime justifies the refusal to set a parole release date. The result of a finding in favor of Petitioner on this issue is that the Board loses jurisdiction to continue to rely on the facts of the commitment offense as the basis for precluding parole. See e.g., Brown v. Poole, 337 F.3d 1155 (9th Cir.2003). Since, as will be seen, the only non-crime factor, the claimed "need" for self help, lacks any evidentiary support, there would be no basis for a return of the case to the Board for further review,

and an order of direct release would be proper. (See <u>McQuillion</u>
v. <u>Duncan</u> [<u>McQuillion II</u>], 342 F. 3rd 1012 (9th Cir. 2003) [where
no evidence exists to support the decision, remand for further
consideration would be an idle act], and <u>In re Mark Smith</u>, 109
Cal.App.4th 489 (2003).)

The second level of review is under the analysis noted by
the Ninth Circuit in <u>Biggs</u> v. <u>Terhune</u>, 333 F.3d 910, at 915-916
(9th Cir. 2003). There, the court discussed the limits on using
the immutable and unchanging facts of the crime to deny parole
in the face of evidence that the inmate has achieved
rehabilitation. The 9th Circuit was clear that, at some point,
the crime cannot any longer be used in that fashion without
violating federal due process. This point was also addressed in
the case of <u>In re Ramirez</u>, 94 Cal.App.4th 549, at 571 (2001),
when that court noted that reliance on the crime after 7
hearings, 17 years in prison and 9 years after the inmate's
minimum term was arbitrary. While the proportionality aspects
of the *Ramirez* decision were disapproved by the California
Supreme Court in the case of <u>In re Dannenberg</u>, <u>supra</u>, the
entirety of the <u>Ramirez</u> decision, including this aspect, was not
disapproved.

Here, Mr. Hawks has been in custody 19 years, is also 9
years over his minimum term, and the only reason that he had not
had more hearings by 2002 is that the Board improperly used
multiple year denials. The evidence of rehabilitation is
overwhelming, and absolutely no contrary evidence was submitted
at the hearing. In fact, not only do the CDC staff
psychologists established a low violence potential, but prison
staff, including multiple correctional officers (one with 8
years of parole agent experience), are gratuitously writing
chronos documenting Mr. Hawks' suitability for parole and
stating that he would be an excellent candidate for parole.

Furthermore, the Board Panels at each hearing have given directives to Mr. Hawks to follow in order to achieve parole suitability, and he has fully complied with every one of them after his documentation, initial and two (2) subsequent hearings.[15] If the crime was to forever stay an impediment to parole, compliance with these directives would be an idle act, serving no purpose, and one would have to wonder why the Board would be giving them to the inmate. The fact that they are utilized is an implied admission that, if complied with, the crime will no longer bar the setting of a parole date. If this level of analysis is decided in favor of Petitioner, since the remaining finding of the Board, the claimed "need" for self help, is not supported by the evidence, once again, the proper ruling would be a direct order of release. McQuillion II, supra, Mark Smith, supra. Even if the non-crime finding is found to have some evidentiary support, it could not, on its face, be sufficient to justify the finding of unsuitability (see In re Ernest Smith, supra., and In re Capistran, 107 Cal.App.4th 1299 (2003), and the result would be a referral back to the Board for a new hearing within 45 days under a set of strict directives to the Board similar to those utilized in the case of In re Ramirez, supra, at 573 [cannot rely on the crime, psychological and programming factors are to be considered as favorable to parole, etc.].

The third level of analysis would be the "some evidence" review under Dannenberg. Since the murder bears no evidence beyond the minimum necessary to establish the elements, as a matter of law, it cannot be "particularly egregious" so as to allow the Board to defer setting a parole date after three (3)

---

[15] Of course, Mr. Hawks has continued to meet the Board's recommendations following the 2002 hearing, and at the 2003 and 2005 hearings showed his compliance with the recommendations from each prior hearing.

hearings and nineteen (19) years. In fact, the jury findings rejecting the "intent to kill" based offenses is sufficient to preclude the use of the crime as evidence of unsuitability. The facts of the crime certainly do not contain evidence that went beyond the minimum necessary to establish the elements. The evidence was easily susceptible to a manslaughter interpretation, on the theory of provocation, but just went too far as the provocation was not adequate to negate implied malice, irrespective of the lack of intent to kill. Thus, the crime really has nothing beyond the bare elements of an implied malice second degree murder. Certainly, there was no evidence to support a finding that elements of a first degree murder, such as premeditation and deliberation, were present.[16] Again, since the Board had absolutely no evidence upon which to make its only non-crime finding, the assertion that Petitioner "needs" self help, which was made in the face of exclusively positive and contrary psychological opinion and the completion of every available program, the Board's decision fails under the "some evidence" analysis. Here, the result would be a referral back to the Board for a new hearing within 45 days under a set of strict directives to the Board similar to those utilized in the case of In re Ramirez, supra, at 573 [cannot rely on the crime, psychological and programming factors are to be considered as favorable to parole, etc.].

As will be seen, Petitioner prevails under all three levels of analysis. Accordingly, the writ must issue.

---

[16] Yet, at the 2000 hearing, recall that the Board made a finding under Cal. Code of Regs., tit. 15, §2402(c)(1)(B), that the "offense was carried out in a dispassionate and calculated manner, *such as an execution style murder*." (Emphasis added.) As would be expected, that terminology has a particularized meaning in prison jargon, and a CDC memorandum was actually issued to define it as "those crimes wherein the victim was shot in the head after being bound or cuffed, made to kneel, made to lie down, or made to face a wall." Certainly, that finding was wholly unsupported by the evidence.

**I. THE FAILURE OF THE PROSECUTION TO SUBMIT SPECIAL FINDINGS TO THE JURY ON THE ASPECTS OF THE CRIME RELIED ON BY THE BOARD TO JUSTIFY DEPARTING FROM THE "SHALL NORMALLY" FORMULATION OF PENAL CODE §3041 PRECLUDES THOSE FINDINGS FROM NOW BEING MADE BY THE BOARD.**

**A. The United States Supreme Court Decisions of Appendi And Blakely Prohibit Any Sentencing Authority From Imposing Greater Punishment Than That Authorized By The Jury's Findings.**

In two recent United States Supreme Court decisions, our High Court has stated that the constitutional right to due process, and the right to a jury trial, requires that each and every fact used to increase the penalty for a crime **must be alleged and found true by the trier of fact**, be it by jury or a defendant's own admission of facts in a plea of guilty. (Apprendi v. New Jersey, 530 U.S. 466, (2000); Blakely v. Washington __ U.S. __, [124 S. Ct. 2531, 159 L.Ed.2d. 403], (2004).) As will be discussed herein, these principles bar the Board from making findings that take the inmate's case outside the normal sentencing structure, the matrix of uniform terms established by the Board for indeterminately sentenced prisoners. As the U.S. Supreme Court initially stated the rule:

> "Other than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." (Apprendi *v*. New Jersey, supra, at 490.)

Recently, a California Court of Appeal gave an excellent dissertation of the impact of Apprendi and Blakely on California term-setting, and the California Supreme Court is now reviewing that decision, which found California's sentencing scheme to violate federal law by allowing a judge to make findings not previously submitted to the jury. (People *v*. Juarez (2nd DCA,

Nov. 16, 2004) __Cal. App.4th ___, 2004 DJDAR 13887 [rev. granted, S130032].)[17]  In Juarez, the defendant was charged and convicted of car jacking (Pen. Code §215(a)) with the personal use of a firearm (Pen. Code §12022.53(b)).  The trial court sentenced the defendant to the upper term of nine years for the carjacking and a consecutive ten-year term for the firearm enhancement.  The trial court supported its imposition of the upper term with its own finding of aggravating circumstances, including the "Court finds that there was planning and sophistication involved in the commission of this crime," and "[the Court is] also going to find Mr. Comstock was a vulnerable victim…." (People v. Juarez, supra, at 13889.)  At the time of Juarez's sentencing, in California "the trial judge was empowered to make the above factual findings" and "order an upper term sentence." (Id.)  But then, Blakely v. Washington, supra, came down and the Supreme Court made even clearer what it meant by a "statutory maximum term" as referenced in Apprendi. Thus, the appellate court reversed the trial court, finding this sentencing practice unconstitutional, and the California Supreme Court will now be considering this issue for the first time in Juarez and a series of other cases that raise the same issue.

In Blakely, the defendant pled guilty to second-degree kidnapping with a firearm, a crime which carried a "statutory" maximum term of ten years, but absent any of the specific "aggravating factors" listed in the statute, the offense ordinarily carried a "standard term" of 53 months.  At sentencing, the trial judge found Blakely had committed the offense "with deliberate cruelty," one of the aggravating factors listed in the statute, and sentenced him to 90 months, a

---

[17] There are a series of over a dozen cases pending in the California Supreme Court on this issue.  The lead cases are People v. Black, Case # S126182, and People v. Towne, Case # S125677.  Juarez and the rest are being held pending the decision in Black and Towne.

term 37 months greater than the "standard term". (See <u>Blakely</u>, <u>supra</u>, at 2535.) Justice Scalia explained why the trial Court's imposition of a term greater than the "standard" term was impermissibly excessive, even though it did not exceed the "statutory maximum" term of 10 years:

> In this case, [the defendant] was sentenced to more than three years above the 53-month *statutory maximum of the standard range* because he had acted with 'deliberate cruelty.' The facts supporting that finding were neither admitted by [the defendant] nor found by a jury. The State nevertheless contends that there was no <u>Apprendi</u> violation because the relevant 'statutory maximum' is not 53 months, but the 10-year maximum for class B felonies....It observed that no exceptional sentence may exceed that limit. [Citation.] Our precedents make clear, however, that '**the statutory maximum' for Apprendi purposes is the maximum sentence a judge may impose solely on the basis of the facts reflected in the jury verdict or admitted by the Defendant.** (*Blakely v. Washington, supra,* 124 S.Ct. 2531 [159 L. Ed.2d 403, 413].)

To ensure no misunderstanding of what the High Court was saying, Justice Scalia reiterated:

> "In other words, the relevant 'statutory maximum' is not the maximum sentence a judge may impose after finding additional facts, but the maximum he may impose without any additional findings. When a judge inflicts punishment that the jury's verdict alone does not allow**,** the jury has not found all the facts 'which the law makes essential to the punishment,' [citation], and the judge exceeds his proper authority.' [Citation.]") *Blakely v. Washington, supra,* 159 L. Ed.2d at p. 414.].)

Therefore, it is now perfectly clear that a punishment greater than that justified by a jury's findings, with no further expansion of those findings, cannot be imposed. If a sentencing scheme provides a tri-partite structure as it does in California, featuring a low-term for the offense if mitigating circumstances are present, a mid-term if it is a "standard"

occurrence of the crime, and a maximum-term if aggravating circumstances are present, then a term no greater than the mid-term can be imposed unless specific aggravating circumstances have been found by the jury.

<blockquote>

**B.** ***In California, The Board Serves A Function Equivalent To That Of A Sentencing Judge In A Determinate Term Case, & Are Therefore Bound By The Same Rules Under Apprendi & Blakely.***

</blockquote>

The Board's responsibility in setting terms is tightly regulated, structured in the same fashion as the duties of a trial judge in pronouncing sentence. The Board is required to give a written statement of its reasons for denying parole. (<u>Pen. Code</u> §3041.5.) When a date is set, the Board must establish that date by utilizing the prescribed framework of the matrix (<u>Cal. Code of Regs</u>., tit. 15, §2403(a)) to fulfill the policy of establishing uniformity in sentencing. (<u>Pen. Code</u> §3041(a).) The Board is required to set the middle term, unless circumstances in aggravation or mitigation have been found. (<u>Cal. Code of Regs</u>., tit. 15, §2403(a).) The Board is also required to follow the Superior Court sentencing rules (<u>Cal. Rules of Court</u>, Div IV, Rule 4.421) in setting the term. (<u>Pen. Code</u> §3041 (a).) In short, the term setting function of the Board has been set up in a way that is identical to the court's sentencing obligations.

Thus, to the extent the Board is allowed to make findings that were not submitted to the jury, California's sentencing scheme violates <u>Apprendi</u> and <u>Blakely</u> and therefore is unconstitutional. This occurs any time the Board makes rulings about the crime being "exceptionally callous," or "especially heinous, atrocious and cruel," or "dispassionate and calculated," as having a "trivial or insignificant" motive, or

when specific aggravating circumstances are found by the Board that were not tried to the jury at the time of the conviction. The rule announced in the <u>Apprendi-Blakely</u> cases makes it clear that allowing trial judges to impose greater sentences, based on factual findings which have not been submitted to a jury and found true, violates the federal rights to a jury trial and to due process of law. However, no published decision in California has decided the impact of <u>Apprendi</u> and <u>Blakely</u> on the Board's findings that take a case outside the statutory mandate that a parole date be set. Certainly, when the Board makes findings to justify taking the crime outside the normal sentencing range, and under which they refuse to set a proportional term as required by <u>Pen. Code</u> §3041 and <u>Cal. Code of Regs</u>., tit. 15, §2403(a), they are removing the case from the standard sentencing range, the proportional terms established under the matrix. Yet, invariably, as in this case, this is done by way of findings that were never either admitted by the inmate or found true by the jury at the time of the conviction.

Under the Determinate Sentence Law (DSL), the law under which all crimes have been punished in California since July 1, 1977, all offenders, with the exception of those sentenced to death or life without possibility of parole, are sentenced to terms based on criteria that define "uniform terms" for the same crimes committed under similar circumstances. The only difference in the method of imposition of terms is that for offenders sentenced for crimes which carry a "determinate" term (e.g. 3, 5 or 7 years) is that term of incarceration is set by the trial judge, while indeterminately sentenced offenders with life or term to life sentences are merely given a "top" and a "bottom" at the time of pronouncement of judgment, and have their term fixed by the Board. (<u>Pen. Code</u> § 1168.) In those cases, the Board utilizes a matrix of the same tri-partite

structure as that used by the judges in "determinate" term cases, and is instructed by the Legislature to apply the Superior Court sentencing rules in the <u>Cal. Rules of Court</u>. (<u>Penal Code</u> § 3041(a).)

The Board is required to(i.e. "shall") fix a term and set a release date at a life or term to life prisoner's first parole hearing "unless" the "gravity" or "timing and gravity" of the "current" or "current or past convicted offenses" is such that concern for public safety requires further incarceration of the individual. (Pen. Code §3041.) The term ultimately fixed by the Board must be selected in a manner that provides for uniformity in sentencing:

> "The Board, in setting a release date for an indeterminate sentence, performs the same function as does the trial court in ordering a determinate sentence – it fixes a term of definite duration. ***The Board's determination is based upon the same criteria which govern determinate sentencing, including the need to provide uniform terms*** for offenses of similar magnitude and gravity, the number of victims of the crime, and other factors in mitigation or aggravation of the crime." (*In re Hogan* (1986) 187 Cal. App. 3d 819, 824 emphasis added, footnote omitted.)

Statutory provisions require the Board to assure uniformity in its term-setting practices as well:

> "….The release date shall be set in a manner that will provide uniform terms for offenses of similar gravity and magnitude in respect to their threat to the public, and that will comply with the sentencing rules that the Judicial Council may issue and any sentencing information relevant to the setting of parole release dates and in doing so shall consider the number of victims of the crime for which the prisoner was sentenced and other factors in mitigation or aggravation of the crime." (<u>Pen. Code</u> §3041(a).)

The Regulatory provisions also mandate uniformity in the Board's term-setting practices:

"The panel *shall* set a base term for each life
prisoner who is found suitable for parole. The base
term *shall* be established solely on the gravity of the
base offense, taking into account all of the
circumstances of that crime. The base offense is the
most serious of all life offenses for which the
prisoner has been committed to prison.

" The base term *shall* be established by utilizing the
appropriate matrix of base terms provided in this
section for the base offense of which the prisoner was
convicted. The panel *shall* determine the category
most closely related to the circumstances of the
crime. The panel shall impose the middle base term
reflected in the matrix unless the panel finds
circumstances in aggravation or mitigation." (Cal.
Code of Regs., tit. 15 § 2403(a).)

It is clear from the above that the procedure to be
followed in determining the appropriate term by the Board in the
case of an offender sentenced to an indeterminate sentence
pursuant to Pen. Code § 1168 is the same as that followed by a
judge determining the term for a determinate-sentenced offender
sentenced pursuant to Pen. Code § 1170. Thus, the dictates of
Apprendi and Blakely must apply. This means that the Board is
precluded from making findings that take the case out of the
matrix structure, under which they refuse to set a parole date
pursuant to the exception in Pen. Code §3041(b). Such findings
take the case out of the "standard" sentencing structure, *i.e.,*
the "shall normally" formulation of Pen. Code §3041 that in turn
compels the use of the matrix. Therefore, those alleged facts
must be charged and proven, either to the jury or by admission
of the defendant, before they can be utilized to effect the
sentence. Here, the Board made a series of findings to justify
relying on the crime to deny parole. The Board found that the
crime was carried out in a "cruel" and "callous manner," and
that the motive for the crime was "trivial" in relation to the

offense.[18]  None of those findings had been charged in the trial
court and proven to the trier of fact or admitted by Mr. Hawks.
As such, the Board's reliance on them violates the rule of
<u>Apprendi</u> and <u>Blakely</u>.  As will be discussed hereafter, the only
non-crime finding, the claimed need for self help and therapy,
was wholly unsupported by the evidence.  Thus, there is nothing
further to review, and a direct order of release is appropriate.
(<u>McQuillion II, supra, Mark Smith, supra</u>.)

> **II.   THE BOARD VIOLATES DUE PROCESS BY REPEATEDLY
> RELYING ON THE UNCHANGING FACTS OF THE CRIME
> IN THE FACE OF CLEAR EVIDENCE OF
> REHABILITATION, & BY MAKING RECOMMENDATIONS
> OF WHAT TO DO TO BE FOUND SUITABLE AT EACH
> HEARING, A FINDING OF EGREGIOUSNESS IS
> BARRED BY THE INMATE'S COMPLIANCE WITH THOSE
> AGREED TERMS.**

As will be discussed more fully hereafter, when the Board
repeatedly relies on the unchanging facts of the crime to deny
parole, in the face of clear evidence that the inmate has been
rehabilitated, due process is violated.  (<u>Biggs, supra</u>, at 915-
916, <u>Ramirez, supra</u>, at 571.)  However, here, the Board goes a
step further.  At the conclusion of each hearing attended by Mr.
Hawks, the Board gave him a series of recommendations of what to
do in order to be found suitable for parole.  If the crime was
going to continue to be an impediment to parole, then what
difference would it make whether Mr. Hawks followed those
recommendations, since parole would be denied in any event as
the crime will never change?  How could the Board make those

---

[18] Of course, as will be discussed hereafter, Petitioner will show that these
findings are not supported by the evidence, and even if shown by the
evidence, do not establish legal unsuitability for parole within the meaning
of the governing statutes and regulations.  However, for *Apprendi-Blakely*
purposes, it is merely the fact that the findings are being made that
violates the right to have those determinations made by the proper trier of
fact.

recommendations in good faith if the crime was such that parole was not going to occur no matter how well he programs?

The Board has a duty to make all recommendations "sufficiently clear" to inform Mr. Hawks what conduct will result in a grant of parole. (U.S v. Guagliardo, 278 F.3d 868, 872, (9th Cir. 2002) [citing Graynet v. City of Rockford, 408 U.S. 104, 108-109, (1972)])[19] Thus, the onus is on the Board to clearly and specifically state what conduct will warrant a finding of suitability. Therefore, it follows that there is only one way to interpret the recommendations given to Mr. Hawks at the documentation hearing and at each of the previous parole hearings. They constitute the Board's "clear instructions" as to what Mr. Hawks must do to be found suitable. As stated, it is indisputable but that Mr. Hawks has complied with *every single* one of the Board's directives to him, and, thus, must be found suitable for release. If the Board's directions to the inmate are not acknowledged as sincere offers, providing legitimate goals for achieving a status of parole suitability, then they are mere "hoops," designed to support elaborate rouse and a further affront to the due process rights of all prisoners who rely upon them.

As noted, Mr. Hawks sincerely relied upon the recommendations of the prior Board Panels, and he partook to fulfill each one. Mr. Hawks's fulfillment may be recognized through his educational and vocational accomplishments and gains, his ongoing self help work, and his disciplinary free, model behavior throughout his nearly nineteen (19) years of incarceration. Since Mr. Hawks has honored his end of the

---

[19] A prisoner's due process rights are violated if parole conditions are not made "sufficiently clear" so as to inform him of what conduct will result in his being returned to prison. Likewise, the Board of Prison Terms has a duty to make recommendations for parole eligibility "sufficiently clear" so as to inform the inmate of conduct that will warrant a finding of suitability. (See U.S. v. Guagliardo, supra, 278 F.3d 868.)

bargain, by complying with those directives following each and every hearing, the Board should be estopped from relying on the facts of the commitment offense to deny parole in the face of that compliance.

### III. CONTINUED RELIANCE ON THE UNCHANGING FACTS OF THE CRIME VIOLATES DUE PROCESS.

In *Biggs v. Terhune,* the 9th Circuit held that even if the facts of the commitment offense are sufficient to support a denial of parole, the crime alone will not justify repeated denials of parole based upon considerations of due process. (*Biggs v. Terhune, supra,* 334 F.3d at 916.) The *Ramirez* Court[20] also acknowledged that there will always be "some evidence" to support a finding that a prisoner committed the underlying offense. Those facts alone, however, do not justify the denial of parole. Thus, while concluding that there was factual support for the findings as to the crime and priors, the *Ramirez* Court still found the Board's decision arbitrary since there had been seven (7) hearings at that point, nine (9) years had passed beyond the minimum term, and it was 17 years after entering prison, all evidence showed rehabilitation. (*Id.*, at 571.) Likewise, as the *Biggs* Court more recently said, despite the fact that there may remain evidence to support a finding of egregiousness of the crime:

> "A continued reliance in the future on an unchanging factor, the circumstances of the offense and conduct prior to imprisonment, runs contrary to the rehabilitative goals espoused by the prison system and could result in a due process violation." (*Biggs, supra.,* at 916-917.)

The Petitioner in *Dannenberg* did not argue this issue. Of course, his right, as enunciated in Biggs, is a federal due

---

[20] "As previously noted, the California Supreme Court disapproved only of that portion of the *Ramirez* decision that requires a comparative, proportionality analysis of the crime with other similar offenses. This issue, along with the balance of the *Ramirez* decision was not overruled.

process right, which cannot be altered by the California Supreme Court's ruling in *Dannenberg*. Thus, the issue is at what point is due process violated. In fact, in interpreting the rule in *Biggs,* it is clear under the law that, even if the crime may be considered egregious, only the first denial based on the immutable facts of the crime could be proper under federal due process principles, and **any subsequent denial** requires the presence of in-prison behavior showing that the inmate **currently** presents an unreasonable risk of danger if paroled. The provisions of Cal. Pen. Code §3041 only talk of the use of the crime to defer setting a date at the initial hearing. After that, to give the statute a constitutional interpretation that is not unreasonably vague, further denials would have to be based on some facts arising subsequent to the crime that show a continued propensity for violence. See Biggs, supra, at 914-915. It is beyond logical dispute but that this states the correct rule. To rule otherwise puts the inmate in an impossible situation, where no matter what he shows in terms of positive behaviors, self help, work skills, parole plans, or just rehabilitation in general, he would never be able to overcome the unchanging facts of the crime.

Here, including the reversal by the Governor, the facts of the crime have been used as the real reason[21] for denying parole on three (3)[22] separate occasions, yet, those facts have never

---

[21] Although the Board also claimed a need for therapy or self help, that "reason" has absolutely no factual basis, and is made in the face of directly contrary psychological opinions. (*Ramirez, supra,* at 571-572.)

[22] Mr. Hawks since had hearings in 2003 and September of 2004, each of which resulted in a one year denial. The 2003 denial of parole has been challenged through the state courts and Petitioner is currently filing a motion to permit filing of a supplemental petition raising the validity of the decision at that hearing in this proceeding.

been tied to current behaviors showing that Mr. Hawks **still presents an unreasonable risk at this time**. A rule requiring the presence of in prison, adverse behavior to justify further denials based on the crime simply recognizes what the 9th Circuit in *Biggs* alluded to when it talked of the rehabilitative goals of the system, and the need to take into consideration that a person can change. At this point, Mr. Hawks has been incarcerated for nineteen (19) years, eligible for parole for more than the last eight (8) of those years. His programming clearly shows his full rehabilitation. In drawing the line as to when further denials become arbitrary, that line has definitely been crossed in this case, and in fact was crossed as soon as the crime was used in the second parole hearing without the presence of facts showing a continued risk of danger based on how Mr. Hawks was programming in prison. To the contrary, the in prison facts are exclusively positive.

As the *Ramirez* court noted, the paroling authority must do more than merely commend Petitioner for the hard work done to rehabilitate himself while in prison. They must actually consider these factors "*as…circumstance[s] tending to show his suitability for parole.*" (*Ramirez, supra*, 94 Cal.App. 4th at 571-72 [emphasis in original.] Of course, all the Board did with Mr. Hawks' extensive accomplishments was to brush them aside with several terse lines, and issue superficial compliments. Obviously, no serious consideration was ever given to Mr. Hawks's outstanding programming. Yet, the *Biggs* rule is clear that if an inmate "continue[s] to demonstrate exemplary behavior and evidence of rehabilitation, denying him a parole date simply because of the nature of [his] offense and prior conduct would raise serious questions involving his liberty interests in parole." (*Biggs v. Terhune, supra*, 334 F.3d at

916.)  Here, the evidence of actual rehabilitation is beyond dispute.

In comparing the present case with *Biggs*, it is undeniably clear that the Board lacks even an iota of justification to continue to deny Mr. Hawks a parole date.  In *Biggs*, the inmate was convicted of the premeditated and deliberated, 1st degree murder of a witness in a major theft case against the Defendants, and yet the Court was quick to caution the Board that it could not continue to solely rely on the commitment offense to deny the inmate parole, even though it was only his initial hearing at that point.  In the present case, the death was unquestionably unintentional, as reflected in the jury findings acquitting Mr. Hawks of the 1st degree murder charges, and of the attempted murder of the driver, Mr. Dwyer and the wounded passenger, Wendy Varga. The crime was due to Mr. Hawks's heavy intoxication, his then poor coping mechanisms for the stress he was under, and his resulting poor decision making. Yet, Mr. Hawks has been **denied parole on three (3) separate occasions**, each time effectively relying virtually exclusively upon the unchangeable facts of his commitment offense. The continued reliance upon the commitment offense is simply arbitrary, particularly in the face of the Board's acknowledgement of Mr. Hawks's model behavior in prison and extensive accomplishments, all of which are conceded by the statement of decision.  Mr. Hawks has continued to demonstrate exemplary behavior, and as noted by the Board, has fully rehabilitated himself.  Therefore, as the court stated in *Biggs*, denying him a parole date simply because of the nature of his offense, not only raises serious questions involving his liberty interests in parole, but flatly violates due process.  (*See Biggs v. Terhune, supra*, 334 F.3d at 915-916.)

Again, as is noted above, wherever one draws the line as to when the continued reliance on the unchanging facts of the commitment offense becomes a violation of due process in the abstract, under the facts here, it clearly has passed here. Thus, the Board must do more than simply commend Mr. Hawks for his efforts and accomplishments, and must actually consider them in evaluating parole suitability. (*Ramirez, supra*, @ 572.) This is particularly the case here, where the focus must be on rehabilitation. The Board must do this even if the factors of the commitment offense can be said to be sufficient to deny Mr. Hawks parole, because, as noted in the cases, *supra*, the offense itself cannot justify the three (3) separate denials, or the nineteen (19) years of actual time in custody, or now, its intrusion into the first degree murder matrix when the circumstances are not even on a par with second degree murders where there is express intent to kill.

Mr. Hawks has been entirely disciplinary free throughout his nineteen (19) years in custody, with no history of violence before or after his confinement, has received excellent psychiatric evaluations and has excellent parole plans. There is not one bit of evidence that shows otherwise. Thus, Mr. Hawks has a liberty interest in parole that at this point supercedes the commitment offense, which although a tragedy, cannot be the sole determining factor in the repeated denials of parole and the violation of his due process rights.

## IV. THE BOARD'S DENIAL OF PAROLE IS NOT SUPPORTED BY ANY EVIDENCE, & THUS VIOLATES PETITIONER'S RIGHT TO DUE PROCESS OF LAW.

### A. THE COMMITMENT OFFENSE

Here, Respondents are merely arguing that there is "some evidence" based on the gravity of the offense, and the Board's

claimed finding that Mr. Hawks needed additional self help and therapy, which Respondent then claims is sufficient to support a denial of parole. Respondent still misses the legal concept governing parole decisions under California law, and both the California and United States Constitutions. The assertion that a finding is supported by "some evidence" is not necessarily sufficient, and does not end the inquiry. As the *Ramirez* court concluded,

> "The United States Supreme Court had made it clear the "some evidence' standard discussed in Hill, supra, 472 U.S. 445, is **only one aspect of judicial review for compliance** with minimum standards of due process. [Citation] … The court explained that the 'some evidence' standard applied only to questions of evidentiary sufficiency. It is **an additional requirement of due process, not a substitute for other established due process requirements**. [Citation.]" (Ramirez, at p. 563-564.)

> "Accordingly, were the Board to determine whether inmates are suitable for parole by flipping a coin, it could not insulate its proceedings from judicial correction simply by identifying 'some evidence' in the record to support each result." (*Id*, at p. 564, emphasis added.)

In circumstances similar to the case at bar, the *Ramirez* court dealt with this precise issue, and held that more is required than to simply create the appearance of satisfying due process. There, that Court rejected the Board's contention that due process is satisfied by the mere fact that the hearing panel goes through the right litany of phrases and buzz words, divides the hearing into the relevant statutory and regulatory categories, and discusses the evidence relating to the individual inmate. That Court described the Board's argument as follows:

> "The Board … claims that 'due consideration' of [Ramirez's parole] application is demonstrated by the [Board's] references in its decision to the

nature of Ramirez's crimes, his previous criminal
record, his failure to correct his criminality …,
his unstable social history, his need for
therapy, and his 'institutional programming.'
The Board argues that 'some evidence' supported
its findings, because the record before it was
replete with evidence relating to the factors
relied on in the decision." (*Ramirez,* at p.
568.)

However, in the face of the claim, the court concluded that the
Board's decision "…was arbitrary in the sense that the Board
failed to apply the controlling legal principles to the facts
before it" and that the lack of support for the findings
"supports Ramirez's claim that his parole hearing was a sham."
(*Id.,* at 571.) *Penal Code* §3041 requires that the factors
relied upon, and supported by some evidence, must be factors
that indicate a legitimate concern that the prisoner currently
poses a threat to public safety if released. (See <u>Ernest Smith</u>*,
supra;* see also <u>In re Scott</u> 119 Cal.App.4[th] 871, 890-892,
(2004).) The <u>Ramirez</u> Court acknowledged that there will always
be "some evidence" to support a finding that a prisoner
committed the underlying offense. Those facts alone, however,
do not justify the denial of parole. Thus, while finding that
there was factual support for the findings as to the crime and
priors, the <u>Ramirez</u> Court still found the Board's decision
arbitrary since there had been multiple hearings, nine (9) years
had passed beyond the minimum term, and it was 17 years after
entering prison. (<u>Id</u>., at 571.) Thus, for the crime to support
the denial of parole, there must be evidence going beyond the
elements of the offense which shows the inmate continues to
present an unreasonable risk of danger to society if paroled.
(See *Dannenberg, supra*, and *Rosenkrantz V, supra*.) Here, the
Board had three (3) times used the facts of the crime as the
real reason for denying parole, yet, they have never tied those

facts to current behaviors showing that Mr. Hawks **still presents an unreasonable risk at this time**. As the 9th Circuit in *Biggs* alluded to when it talked of the rehabilitative goals of the system, the paroling authority must take into consideration that a person can change.

In <u>Rosenkrantz V</u>, <u>supra</u>, the Supreme Court looked to evidence showing that the crime although found to be a second degree murder, had substantial attributes of a first degree murder. In that case, the inmate had thought about killing his victim over a one week period of time, even telling others that he planned to do it. He tried to purchase a gun, but when unsuccessful, rented an Uzi. He took the gun to a range for target practice, to get ready for the killing. He spent a period in excess of ten hours lying in wait for his victim, then shot him ten times, including shooting him as he lay on the ground. Afterwards he bragged of the shooting. The Court found that these facts showed significant evidence of premeditation and deliberation, and even special circumstances (lying in wait), which were proper for the Governor to rely on in finding current dangerousness. Here, no such evidence of premeditation existed, and there was not even an intent that the victim be killed. The crime by Mr. Hawks was spontaneous, not the product of a pre-existing design or reflection, and was influenced by his intoxication and poor response to anger generated from the stress he was under due to the divorce and custody situation.

It is also instructive to look at the circumstances of cases such as *In re Ernest Smith, supra*, the facts of which the Board ignores in its return. The petitioner in *Ernest Smith* was likewise convicted of second degree murder, there in connection with the murder of the inmate's wife. Smith had a history of abuse towards the victim, and very actively prevented her from leaving him or seeking help. When she fled from Oregon to her

parents' house in San Jose, Smith followed her to try to prevent her from leaving him. On the day of the murder, he got into an argument with her, became enraged and shot her three (3) times in the head.[23] Yet, while the court found the crime was callous, it was not "exceptionally" so within the meaning of Cal. Code of Regs, tit. 15, §2402(c)(1)(D). (Ernest Smith, supra at 366-367.) Here, the facts are even less egregious, as the murder arose in the context of a freeway altercation started by the driver of the other vehicle. Mr. Hawks response to that altercation was clearly inappropriate, but when view in a proper context, not one that even compares to a deliberate killing. Certainly in light of Mr. Hawks strides in overcoming his alcoholism, and learning proper behavioral responses and controls the crime no longer shows current dangerousness. Nor is there any evidence of any facts showing an extreme level of callousness beyond what is typically present in any murder.

In Ernest Smith, the court also noted Smith's background, which included time spent in Juvenile Hall due to his uncontrollable behavior; being taken into custody for joyriding; being AWOL from the Army twice; spending one year in the stockade, and receiving an undesirable discharge. Smith committed repeated acts of domestic violence during his marriage, slapping and/or grabbing his wife many times. When a minister convinced the victim to seek protection in a battered women's shelter, Smith interceded and told the minister that the Charles Manson case was nothing compared to what he would do to his wife and anyone else who got in his way. The court also noted Smith's history of sniffing glue, drinking alcohol and

_____

[23] Ernie Smith and his wife had a tumultuous marriage in which Mr. Smith had a long history of spousal abuse and illegal drug participation. Despite being separated from his wife, Mr. Smith remained very jealous and abusive. On the day of the crime, Mrs. Smith told Mr. Smith she no longer wanted to see him, whereupon Mr. Smith pulled out a gun and shot her three times in the head.

using drugs including marijuana, methamphetamines, amphetamines, LSD, barbiturates, mescaline, PCP, cocaine and heroin. The Court described Smith's offense as follows: "When Mr. Smith asked his wife if she was seeing another man, [she] replied in the affirmative and stated she did not want anything further to do with [him]. [Smith] began pounding his head with his fists and stated he could not take anymore of this anxiety. [He] took a .22 caliber handgun from a dresser drawer and shot his wife once in the head. He shot [her] twice more as she was falling to the floor." (Ernest Smith, supra, at 351.)

In its analysis, the Ernest Smith court noted that Pen. Code § 3041 requires that "parole is the rule, rather than the exception." (Id., at 351.) The Court found "There is no evidence that Smith acted with cold, calculated, dispassion; or that he tormented, terrorized, or injured [his wife] before deciding to shoot her; or that he gratuitously increased or unnecessarily prolonged her pain and suffering." (Id.) Nor could any of those characterizations be fairly made regarding the crime here. The offense was in the heat of the moment, in the midst of an ongoing altercation. While he certainly killed the victim, he did not "…gratuitously increase[] or unnecessarily prolong[] her pain and suffering." In fact he did not even intend to cause her death. The Court noted that the Governor had determined that Smith "was not suitable for parole because he would pose an unreasonable risk of danger to society if released at this time. [fn omitted.] The Governor based this conclusion on a combination of factors: the gravity of the offense, Smith's history of past *violence* against his wife, his unstable social history and findings that his propensity for *violence* cannot be adequately predicted and that he requires additional anger-management and substance-abuse treatment." (Id., at pp. 366.) The court evaluated Smith's crime to see if

the Board's criteria could be applied to define the crime as *"exceptionally callous."* (<u>Id</u>. )  The Court concluded as follows:

> "Was the crime callous? Yes. However, are the facts of the crime some evidence that Smith acted with *exceptionally callous* disregard for [his wife's] suffering; or do the facts distinguish this crime from other second degree murders as *exceptionally callous?* **No.** (Cf. <u>In re [Mark] Smith</u> 109 Cal.App. 4th 489, 504, 506, (2003) [no evidence that crime especially heinous, etc.].)" (<u>Id</u>.)

The above disposition by the court in <u>Ernest Smith</u> shows a level of analysis that was never performed as required by the Board in Mr. Hawks's case. Likewise, the decision in *Scott, supra,* is another example of a crime that is egregious, but not sufficiently egregious so to justify denying parole. There, the inmate had killed his wife's lover in front of his spouse and their child. The court found it significant that the prosecution had offered a manslaughter plea pretrial, which they felt showed that the facts could not establish something more than a second degree murder. (<u>Id</u>, at 890.) Then, in yet another published opinion, a unanimous 4th District Court of Appeals panel reasoned that for the purposes of denying parole, a crime is *"particularly egregious"* when elements of *"special circumstances"* were found that would authorize a sentence of life without the possibility of parole or the death penalty. (<u>In re Leslie Van Houten</u>, 116 Cal.App.4th 339, (2004).)  Mr. Hawks's case factors pale in comparison to the <u>Van Houten</u> "Manson Family" murders, or even those of <u>Ernest Smith</u> or <u>Mark Smith</u>, <u>supra</u> [Mark Smith, a drug dealer, shot the victim twice over a drug related dispute, then ordered the codefendant to drown the victim as he fell into a nearby creek], by any stretch of the imagination. Lastly, in September 2003, the Ninth Circuit put an end to the long-litigated case of <u>McQuillion</u> v.

*Duncan*.  The Court reaffirmed earlier rulings that <u>Pen</u>. <u>Code</u> §3041 creates a protected liberty interest in an expectation that parole will be granted if certain conditions are met, even in a case of a double 1st degree murder, committed execution style during the course of a spree of robberies.  That Court ruled that the crimes did not justify rescission of the parole date, despite being a double homicide where the inmate and co-part killed the father and son proprietors of a store they were robbing, shooting them while they were tied up.  Additionally, the Court determined that since the maximum period of parole was three years, where the prisoner had been incarcerated longer than three years beyond his appropriate term of incarceration, he was entitled to release free of parole, and ruled that the courts do in fact have the power to order the immediate release of an offender who is incarcerated beyond his legal term with no further review by the Respondent permitted.  Thus, the 9th Circuit ordered Carl McQuillion's immediate release, and when the request for a stay was denied, and he was released forthwith.  Thus, the actual killers in the <u>Scott</u>*,* <u>Ernest Smith</u>*,* <u>Mark Smith</u>*,* and <u>McQuillion</u> cases have been release, despite having personally been involved in murders that were far more egregious than the circumstances of this case.

Mr. Hawks is the first to admit the seriousness of his offense and the traumatic consequences his actions imposed on the victim and her family.  But, as the Court cautioned in the *Ramirez* case:

> "All violent crime demonstrates the perpetrator's potential for posing a grave risk to public safety, yet parole is mandatory for violent felons serving determinate sentences.  (Pen. Code §3000, subd. (b)(1).)  And the Legislature has clearly expressed its intent that when murderers - who are the great majority of inmates serving indeterminate sentences - approach their minimum

41

eligible parole date, the Board 'shall normally set a parole release date.' [Citaiton.] The Board's authority to make an exception based on the gravity of a life term inmate's current or past offenses should not operate so as to swallow the rule that parole is 'normally' to be granted…

"Therefore, *a life term offense* or any other offenses underlying an indeterminate sentence must be ***particularly egregious to justify the denial*** of a parole date." (<u>Ramirez</u>, at p. 570, emphasis added.)

In this case, the circumstances cannot be deemed so "egregious" in light of the crimes of <u>Ernest Smith</u>, <u>Van Houten</u>, <u>Mark Smith</u>, <u>McQuillion</u> or <u>Ramirez</u> that they warrant or justify Mr. Hawks's continued incarceration some eight (8) years after his minimum term, after nearly nineteen (19) years in custody, and after three (3) hearings. As the <u>Ramirez</u> Court found, and the 9th Circuit in <u>Biggs</u> stated, even if there "some evidence" showing that the crime can suffice to justify denying parole, continued denials based on the unchanging facts of the offense can be unlawful:

We do, however, conclude that the Board's reliance on the nature of these commitment offenses to deny Ramirez parole for the seventh time, nine years after he first became eligible and 17 years after he entered prison, reflects a determination that was arbitrary in the sense that the Board failed to apply the controlling legal principles to the facts before it. [Citations.]" (<u>Ramirez</u>, at p. 571.)

This aspect of the *Ramirez* decision was not disapproved in <u>Dannenberg</u>. Mr. Hawks has paid his debt to society, served the term contemplated by his conviction and called for by the circumstances of his crime, and has demonstrated an unceasing commitment to change and to be a productive part of society. Obviously, as he has exceeded his proper term for his offense,

42

and his term has become grossly disproportionate to his culpability for this uncomplicated second degree murder.

This background is in the context of a record of perfect programming by Mr. Hawks in prison. In Ramirez, the court found "Since Ramirez entered CDC on 11/29/83, he has programmed positively." (Id., at p. 555.) The Court noted Ramirez had received one adverse transfer as the consequence of a CDC-115 for overfamiliarity with staff. Ramirez had two other 115's, one serious for tattooing and one administrative for altering a light fixture. (Id.) The Court noted that Ramirez had "received no disciplinaries for any violence, weapons, or possession of substances." (Id., at p. 555-556.) Yet, these facts were insufficient to support a finding of unsuitability. Here, Mr. Hawks has no adverse transfers, no disciplines whatsoever, and has literally programmed in a flawless manner for nearly nineteen (19) years.

The Ramirez Court explained its reasoning as to why the controlling principles of law were violated when the Board denied parole:

> "The Board's authority to make an exception based on the gravity of a life term inmate's current or past offenses should not operate so as to swallow the rule that parole is 'normally' to be granted. Otherwise, the Board's case-by-case rulings would destroy the proportionality contemplated by Penal Code section 3041, …" (Ramirez, supra., at p 570, cited with approval on this issue in Rosenkrantz V, at 683.)
> …
>
> "The facts considered by the Board also included Ramirez's juvenile record and the fighting conviction he suffered after his release from CYA. We do not reweigh the facts for purpose of determining Ramirez's suitability for parole - that is the Board's function upon remand. **Nor can we say the Board's finding on the gravity of Ramirez's commitment offenses**, which the Board declared to be the real reason for its decision, **was unsupported by 'some evidence'.** We do,

however, conclude that the Board's **reliance on the nature of these commitment offenses to deny Ramirez parole for the seventh time, nine years after he first became eligible and 17 years after he entered prison, reflects a determination that was arbitrary** in the sense that the Board failed to apply the controlling legal principles to the facts before it. [Citations.]" (<u>Ramirez</u> at p. 571, emphasis added.)

The determinations made by these courts have established a level of analysis under which it must be clearly recognized that the circumstances of Mr. Hawks's case, when analyzed in light of the principles discussed in cases such as <u>Mark Smith</u>, <u>Ernest Smith</u>, <u>Scott</u>, <u>McQuillion</u>, <u>Ramirez</u>, and others, are not sufficiently "particularly egregious" or "especially callous" to support the denial of parole. It is not enough that the crime is egregious, or exhibits callousness, or cruelness, as those are elements present in every murder. Yet, that is precisely what the Board found, saying simply that the crime was "cruel" and "callous." Resp. Ex. 2, p. 103. That simply is a statement of a minimum necessary element, that of implied malice. Here, the evidence on this point has to be on a lesser order than what is present when the inmate acts with express intent to kill, without any element of provocation. In addition, the holdings of <u>Biggs</u>, <u>supra</u>, and <u>Ramirez</u>, <u>supra</u>, preclude the repeated use of the unchanging facts of the commitment offense to deny parole, absent evidence of in prison behavior.

The Board finding of "multiple victims" deserves some comment as well. This comes from <u>Cal. Code of Regs.</u>, tit. 15 §2402(c)(1)(A), which references the "multiple victims" being "attacked" by the defendant. Here, there was only one shot. As a result, the Court made an explicit finding that <u>Cal. Pen Code</u> §654 barred separate punishment for the assaults as to Mr. Dwyer or Wendy Varga, since there was only one shot that was the factual basis for the murder and the two (2) assault charges.

Thus, there are two problems with the Board's finding here. First, since there was only one act, it would defy logic to assert that the one act constituted separate "attacks" on the victims. The philosophy behind the regulation is that someone who commits separate acts resulting in injury or death is more dangerous, and that rationale for the rule would not apply here. Secondly, for the same reasons that Cal. Pen Code §654 bars multiple punishment by the trial court, that same rule would bar using the multiple charges to justify incarcerating Mr. Hawks for a longer period of time. To hold otherwise would frustrate the rule of section 654.

The Board also made a "finding" that the motive for the crime was "trivial." As noted by the court in In re Scott, supra.:

> "The epistemological and ethical problems involved in the ascertainment and evaluation of motive are among the reasons the law has sought to avoid the subject. As one authority has stated, '[h]ardly any part of penal law is more definitely settled than that motive is irrelevant. An "inexplicable" motive, as we understand it, is one that is unexplained…[a] person whose motive for a criminal act cannot be explained or is unintelligible is therefore usually unpredictable and dangerous'." (In re Scott, supra, 119 Cal.App.4th at pp. 892-893 (quoting ' (Hall, General Principles of Criminal Law (2d ed. 1960) at p. 88; see also Husak, Motive and Criminal Liability (1989) vol. 8, No. 1, Crim. Justice Ethics 3.)

Mr. Hawks' motive clearly does not fit this definition. Given Mr. Hawks's FEAR OF THE AGGRESSIVE ACTIONS BY Mr. Dwyer, the effect of his intoxication on his ability to make rational judgments, and his anger at what Mr. Dwyer had done, the motive for the crime is not inexplicable. Instead, he simply grossly overreacted. Contrary to the Board's finding, the motive is easily explainable, just not excusable, by virtue of Mr. Hawks's unreasonable response to the aggressive actions of Dwyer and in

his choice of means of response stating that the motive for the crime was trivial negates the effect of the ongoing altercation between Mr. Hawk and Mr. Dwyer. This is an improper characterization of Mr. Hawks's participation in the offense, which certainly was not an unprovoked event, but rather one that was related to a significant altercation albeit an extreme over reaction. Of course, as the *Scott* court suggests, the motive can never be adequate, since if it justified or excused the killing, there would be no crime. Furthermore, the decision in Scott*,* supra, at 892-893, makes it clear that fear and anger are commonplace motives for a murder, which certainly gives it equal dignity in this offense. Again, saying the motive is not legally trivial is not equated with saying the defendant's actions were justified. They could not be, or there would be no crime. It is simply to say they existed, and are of a type that can operate to provoke a killing.

While everyone would agree that Mr. Hawks's actions nineteen (19) years ago were clearly criminal and deserving of punishment, that is not the standard in determining parole. To the extent that the Board is permitted to consider Mr. Hawks's commitment offense in determining his parole, the Court must consider it in light of the foregoing principles, not simply view it as being outside ordinary social norms and thus deserving of repeated refusals to grant parole. *(*In re Ramirez*,* supra*,* at 570.) Furthermore, the Board must consider accurate facts, based on the record, not the unsubstantiated claims about the facts that the Attorney General is now alleging.[24] Properly viewed in this fashion, the commitment offense simply cannot be deemed to be so "particularly egregious" as to justify the

---

[24] The Board makes it clear at the inception of every hearing that they will accept as true the findings of the court regarding the facts of the case, and will not relitigate those facts at the Board hearing. (Resp. Ex. 2, p. 5 ["the Panel accepts as true the findings of the court."].)

multiple denials of parole pursuant to Pen. Code § 3041. For the sake of this petition, Mr. Hawks accepts the maximum penalty for a second degree murder under the circumstances of this case: i.e. 17-18-19 years, less credits. Mr. Hawks has already long ago completed that aggravated term. Thus, the sentence has become grossly disproportionate to Mr. Hawks's current incarceration of just under nineteen (19) years. HAWKS has consistently received positive psychiatric evaluations. Dr. Reed was particularly impressed with Mr. Hawks' lack of disciplines, lack of violence, participation in self-help, and overall good programming. Ex. B, p. 48. Dr. Reed had concluded that Mr. Hawks "does not have a mental health disorder which would necessitate treatment either during his incarceration or following upon parole." (Id.) He found "[Mr. Hawks'] prognosis for community living appears to be very good," found that "he has no personality disorder or psychopathy," noted he "acknowledged full responsibility" for the crime, found that he has "excellent insight" into the causative factors of the crime, and shows "excellent empathy" for the victim. Ex. B, pp. 47-48. Most important was the assessment of violence potential, which the doctor found to be "significantly below this Level II inmate population," and in the free community his "violence potential is considered to be no more than the average citizen." Ex. B, p. 48. As has consistently been the case with Mr. Hawks throughout his history of evaluations, there were no negative comments in the psychological evaluation.

It is obvious that the Board's ruling in Mr. Hawks's case is not reflective of the currently defined guidelines establishing a prisoner's offense to be so "particularly egregious" as to justify the denial of parole. Thus, no evidence exists to justify the Board's findings, and a conclusion of current dangerousness is not supported by the

record. Furthermore, the Board's continued reliance on the unchanging facts of the crime to repeatedly deny parole violates due process. (<u>Biggs, supra</u>., at 916-917.)

In short, on the first question of whether the crime constitutes "some evidence" of unsuitability, the crime simply cannot properly be viewed as being so particularly egregious that a parole date cannot be set after three (3) hearings on a case where the murder was truly a fear based, unreasonable act, Even if the crime can be considered as a factor of unsuitability under the <u>Apprendi-Blakely</u> rule, and even if there is "some evidence" to support the finding that the crime is "particularly egregious," the repeated reliance on that crime violates due process in light of the unrefuted evidence of rehabilitation and the lack of any adverse conduct in prison that shows a current level of unreasonable risk. As such, the writ must be granted.

### B. THE FINDING OF A "NEED" FOR THERAPY\SELF HELP

The fact that the Board made a finding that Mr. HAWKS needs to engage in additional self-help programming in order be found suitable for release shows the utter lack of due consideration given, and the failure to truly analyze the facts. First of all, recommendations for therapy must be made by mental health, not the Board, and the Board has been repeatedly advised of this fact. (See Ex. B, p. 50; Ex. AL.) No mental health professional has recommended that Mr. Hawks receive any form of treatment or participate further in self help. Of course, the Board does not, and cannot identify a single applicable self help program that was available to Mr. Hawks that he did not participate in. In fact, Petitioner has taken every opportunity to improve himself, pursuing vocational education, and participating in all of the available self-help programs open to him. There are no available programs at the institution where he is presently held that he has not already completed. The

Board acknowledged this fact the Board's recommendation at the parole hearing merely suggests that Mr. HAWKS "continue" to seek involvement in any self-help programs. (Ex. F, pp. 199, 265-266.) Of course, this recommendation is unattainable, as there are no such programs. Secondly, the Board shows it utter lack of substance to this finding by its own actions. In all of the prior hearings, the panels have recommended that Mr. Hawks participate in further self help in order to be suitable by the next hearing, and although he has repeatedly done so, the Board not only finds him unsuitable each time, they have persisted in the claim that he continues to "need" more self help. Of course, since Petitioner has completed all applicable programs, the Board was careful not to identify even a single specific program that they expected Mr. Hawks to participate in, or which they claimed he had not completed. Nor do they point to any psychological evidence whatsoever to support the claim of a "need" for self help. In fact, the mental health department has already directly and repeatedly said there is no such need.

Mr. Hawks has had several psychological evaluations, and his last report, conducted by Dr. Joe Reed, was extremely favorable in every way possible. Despite this, the Board claimed that Mr. Hawks "needs" to continue to participate in self-help. The use of a similarly unsupported finding in *Ramirez* was severely criticized by that court, calling it an "affront" to both the inmate and CDC, who had provided all the prior psychological evaluations and treatment and found Ramirez' participation exemplary. (Ramirez, supra, at 571.) The Ramirez Court's sharp criticism of the Board for even making this finding, applies to this case as well. This recommendation as to Mr. Hawks is, in fact, even more egregious, since his psychologist not only said that Mr. Hawks needed no additional therapy or other self help programs, but to the contrary,

directly said he needed no treatment at all. (Ex. B, pp. 47-50.) Moreover, CDC psychiatrists have repeatedly notified the Board that they do not have the authority to direct additional therapy. (See Ex. B, p. 50; Ex. AL.)

This finding by the Board was not based on any evidentiary foundation, and was directly contrary to all of the psychological evidence, and particularly to the report by Dr. Reed, rather than reflecting an individualized assessment of the facts as to Mr. Hawks. Specifically, he did not recommend that Petitioner engage in therapy or self help of any type, and had no need for any such treatment felt that Mr. Hawks would He made no recommendations for any programs whatsoever. Despite this, when reviewing Mr. Hawks's psychological evaluations, the Board failed and/or refused to recognize the CDC's own experts' conclusions that he does not need any additional therapy or programs to be suitable for release.[25] To the contrary, Mr. Hawks has participated every self-help program that has been available to him. The Board's insistence on ignoring the experts' conclusions and recommendations regarding the psychological concerns of term-to-life prisoners was addressed at length by the Court of Appeal in the case of <u>In re Ramirez</u>, where the Court condemned the Board's behavior, stating,

> "The Board's finding on Ramirez's need for further therapy is an even more troubling aspect of its decision. The Life Prisoner Evaluation Report prepared for the 1999 hearing characterized Ramirez's participation in self-help and therapy programs as consistently outstanding. The clinical psychologist who prepared the psychosocial report for the hearing noted Ramirez's successful participation in numerous substance abuse programs and therapy groups, and concluded that 'his

---

[25] In 1998, the Board and the CDC reached agreement that only CDC mental health professionals can recommend therapy for term-to-life prisoners, not members of the Board. (Exh. AL.)

psychological issues are in prolonged remission.' **The psychologist specifically advised the Board that there was no psychiatric ground for denying parole.**

On this record, the Board lacked even 'some evidence' to support its finding that '[t]he prisoner needs therapy in order to face, discuss, understand and cope with stress in a non-destructive manner. And until progress is made, the prisoner continues to be unpredictable and a threat to others.' **This finding was an affront not only to Ramirez, whose progress in therapy was undisputedly exemplary, but also to the Department of Corrections, which provided the therapeutic programs and found Ramirez's participation in them to be outstanding. The Board's readiness to make a finding so at odds with the record supports Ramirez's claim that his parole hearing was a sham.**" (In re Ramirez, supra. at 571, emphasis added.)

Thus, since the Board's finding of a need for further self help and therapy has absolutely no factual support, it cannot serve as the basis for the denial of parole. As the court in *Ramirez* stated, the "Board's readiness to make a finding so at odds with the record supports [Mr. Hawks's] claim that his parole hearing was a sham. It is not surprising that the trial court regarded the Board's findings with deep suspicion." (*Ramirez*, at 571.) Likewise, here, the Board's decision should be viewed with "deep suspicion" since the psychologist has directly contradicted this finding and it is "so at odds with the record." (Id.) The Board's disregard of the clear applicability of the suitability factors to Mr. Hawks, shows that "deep suspicion" to be well founded.[26]

---

[26] The Board in its return at pp. 24-30 raises arguments regarding a "challenge" to the 2000 hearing. Mr. Hawks is challenging the 2002 hearing, not 2000. However, the lack of validity of the 2000 hearing shows the sham nature of the proceedings.

### V. THE DANNENBERG DECISION LEAVES OPEN THE ISSUE OF WHETHER THE TERM HAS BECOME DISPROPORTIONATE.

The *Dannenberg* decision left open the issue first addressed in the case of <u>In re Ramirez</u> (2001) 94 Cal. App. 4th 549, at 571, that at some point, the continued denials of parole constitute an abuse of discretion even where there is "some evidence" that the crime was "particularly egregious." <u>Pen. Code</u> §3041 makes it clear that the Board is required to "normally" find an inmate suitable for parole, and must do so at the first parole hearing. The *Dannenberg* Court did not dispense with that rule. As noted by the court in <u>Ramirez</u>, repeated denials of parole eventually become arbitrary. Here, Mr. Hawks has served nearly 19 actual years in custody and has exceeded every single term under the matrix for second degree murder, and with his credits under <u>Cal. Code of Regs</u>., tit. 15, §2410, he has now entered into the first degree murder matrix. Thus, at this point despite the fact that his offense was not a first degree murder, he is serving a term comparable to that more serious offense. Therefore, he has clearly served a term that is disproportionate to his offense. As is discussed herein, Mr. HAWKS's term is grossly disproportionate as a second-degree murder conviction, and will rapidly become disproportionate as compared to even first-degree murders. Mr. HAWKS has had three (3) parole hearings and passed his minimal eligible date more than nine (9) years ago, yet the Parole Board has not even set a future date.

The suggestion that the Board acts lawfully in refusing to set a date in Mr. HAWKS's case at this point, in the face of the mandate of <u>Pen. Code</u> §3041 that parole "shall normally" be granted, is patently ludicrous. Mr. HAWKS is entitled to the presumption of parole suitability as part of his federal due

process rights under <u>McQuillion</u> v. <u>Duncan [McQuillion I]</u> (306 F. 3rd 895, 9th Cir. 2002). The Board has simply failed to follow this mandate, and the result is Mr. HAWKS is serving a disproportionate term to his offense.

Here, the Board is addressing the wrong type of proportionality issue, addressing the eighth amendment question of whether a sentence, ***viewed prospectively at the time it is imposed***, is so constitutionally excessive as to be disproportionate to the crime. That is ***not*** the type of proportionality addressed herein. As is discussed at length in the petition, There are two issues of proportionality presented in this case. The first issue involves consideration of what the Board must look at when determining the question of suitability, starting at the time of the initial parole consideration hearing where the inmate is required to be presumed suitable under the doctrine of <u>McQuillion I</u>, <u>supra</u>, 306 F.3d at pp.901-902. The second issue is the determination addressed by the court in the case of <u>Ramirez</u>, <u>supra</u>, 94 Cal.App.4th at p.571, when the court noted that even if the finding regarding the offense is supported by "some evidence," continued reliance on the crime after years in custody and over the course of multiple parole hearings becomes arbitrary. The analysis is discussed at length in the petition, and is not effected in the slightest by the analysis of the Board in their brief, or the ensuing decision in <u>Dannenberg</u>. That argument is incorporated herein by reference as though set forth in full and will not be repeated. (See also <u>In re Scott</u>, <u>supra</u>, at 890-892.)

Instead, the question is whether the sentence has ***become*** disproportionate by virtue of actions of the Board in failing to set a term ***subsequent*** to the time of sentencing. The principles applicable to those issues are discussed at length in the

petition and will not be re-argued herein. Furthermore, the failure of the Board to address those arguments in their return results in those claims being admitted for purposes of these proceedings. (See California Rule of Court 260(b) [failure to address a claim results in it being deemed admitted].) Thus, the writ is properly issued on that basis alone.

## VI. THE NO PAROLE POLICY ARGUMENT IS MISCONSTRUED BY RESPONDENTS.

Here, Petitioner is not raising the same argument that was addressed in <u>Rosenkrantz V</u>. Instead, it is an argument that the Board is failing to follow the statutory mandate that parole dates "shall normally" be set. Contrary to the assertion by respondents that no valid theory is advanced, this argument is premised on the failure to follow the statutory mandate of <u>Pen. Code</u> §3041 that parole dates "shall normally" be set, which results in a due process and equal protection violation. That argument is not effected by the ruling in <u>Rosenkrantz V</u>. As is discussed below, the facts will be available by the time of an evidentiary hearing, and the issue will be resolvable in light of that proof.

## VII. REQUEST FOR EVIDENTIARY HEARING

Two (2) potential issues exist for an evidentiary hearing. First, if the Court relies on the finding of a need for self help and therapy as "some evidence" of unsuitability, a hearing is requested to challenge the entire foundation of that claim, at which the evaluating doctor, Joe Reed, PhD., would be called to testify. Secondly, and only if "some evidence" is found, a hearing is requested to establish the existence of the unlawful policy of the executive branch in violation of the mandate of <u>Penal Code</u> §3041 that a parole date "shall normally" be set. By then, Petitioner will have the updated statistics to submit to the Court to support the finding of an unlawful policy.

Dated:_____          Respectfully submitted,

                                   LAW OFFICES OF PICONE & DEFILIPPIS


                                   By_____
                                        STEVE M. DEFILIPPIS
                                        Attorneys for Petitioner,
                                        HAROLD HARVEY HAWKS