United States District Court
For the Northern District of California

NOT FOR CITATION

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| National Union Fire Insurance Co. of Pittsburgh, PA, et al., <br><br> Plaintiff(s), <br><br> v. <br><br> Seagate Technology, Inc., <br><br> Defendant(s). | NO. C 04-01593 JW <br><br> **ORDER GRANTING PLAINTIFF AISLIC'S MOTION FOR SUMMARY JUDGMENT AND DENYING PLAINTIFFS NATIONAL'S AND AIU'S MOTION FOR SUMMARY JUDGMENT** |

## I. INTRODUCTION

This lawsuit arises out of contract disputes between, on the one hand, Plaintiffs National Union Fire Insurance Company of Pittsburg, PA ("National"), American International Underwriters Insurance Company ("AIU"), and American International Specialty Lines Company ("AISLIC") (collectively "Plaintiffs") and, on the other hand, Defendant Seagate Technology, Inc. ("Seagate" or "Defendant"). Plaintiffs are three insurance companies and Defendant is their insured. Plaintiffs pray for, inter alia, a declaratory judgment finding that they have no obligation to defend or indemnify Defendant in connection with a separate lawsuit pending in New York (the "Underlying Action"). (Complaint for Declaratory Judgment, hereinafter Complaint, Docket Item No. 1, at 17:24-18:2.) Presently before this Court are Plaintiffs' Motions for Summary Judgment. (See National's and AIU's Motion for Summary Judgment, hereinafter National's and AIU's Motion, Docket Item No. 29, and AISLIC's Motion for Summary Judgment, hereinafter AISLIC's Motion, Docket Item No. 38.) This Court has

jurisdiction over this lawsuit pursuant to 28 U.S.C. § 1332(a)(1) (diversity of citizenship).[1] On March 21, 2005, this Court held a hearing regarding Plaintiffs' Motions. Based upon the arguments advanced by counsel at the hearing and in their briefs, and for the reasons set forth below, this Court GRANTS AISLIC's Motion and DENIES National's and AIU's Motion.

## II. BACKGROUND

**A. The Underlying Action**

On July 13, 2000, Convolve, Inc. ("Convolve") and the Massachusetts Institute of Technology ("MIT") filed the Underlying Action against Seagate and Compaq Computer Corp. ("Compaq") in the Southern District of New York. (Declaration of Sam O'Rourke in Support of Seagate's Opposition to National's and AIU's Motion, hereinafter O'Rourke Decl., Docket Item No. 41, Ex. A at 29.) In the Underlying Action, Convolve and MIT "seek to recover damages caused by [Seagate's and Compaq's] theft of [Convolve's and MIT's] proprietary technology and to prevent [Seagate and Compaq] from continuing to use technology stolen from [Convolve and MIT] and/or that infringes [Convolve's or MIT's] patents." (Declaration of Cheryl A. Jorgensen in Support of Summary Judgment, hereinafter Jorgensen Decl., Docket Item No. 31, Ex. D ¶ 1.)

**1. Convolve's and MIT's Technologies: Input Shaping and Quick and Quiet**

According to the Amended Complaint in the Underlying Action, Convolve is the exclusive licensee of MIT's Input Shaping technology, which is covered by MIT's United States Patent No. 4,916,635 ("'635 Patent") and Convolve's United States Patent No. 5,638,267 ("'267 Patent"). (Jorgensen Decl. Ex. D ¶ 3.) Input Shaping is a method for commanding equipment to move as quickly as possible without excitation of vibrations. (Jorgensen Decl. Ex. D ¶ 3.) Between early 1997 and early 1998, Convolve developed a new application for Input Shaping in the context of computer disk drives. (Jorgensen Decl. Ex. D ¶ 4.) "All disk drives operate at a trade-off between speed and

---

[1] National is a Pennsylvania corporation with its principal place of business in New York, AIU is a New York corporation with its principal place of business in New York, and AISLIC is an Alaska corporation with its principal place of business in New York. (Complaint ¶¶ 3-5.) Defendant is a California corporation with its principal place of business in California. (Complaint ¶ 6.) The amount in controversy exceeds $75,000 exclusive of interests and costs. (Complaint ¶ 7.)

2

noise—<u>i.e.</u>, the quicker the disk drive operates, the louder the acoustics from the drive. Convolve's disk drive technologies permit disk drives to operate both more quickly and more quietly . . . ." (Jorgensen Decl. Ex. D ¶ 4.) In addition, Convolve developed Quick and Quiet, a computer control panel feature that enables users of the disk drive to select the fastest performance, the quietest performance, or a setting in between. (Jorgensen Decl. Ex. D ¶ 6.) Quick and Quiet is covered by Convolve's United States Patent No. 6,314,473 ("'473 Patent"). (Jorgensen Decl. Ex. D ¶ 6.)

**2. Convolve Discloses Input Shaping to Compaq and Seagate**

Compaq manufactures computing systems including desktop and laptop computers. (Jorgensen Decl. Ex. D ¶ 16.) Seagate manufactures disk drives and is Compaq's primary disk drive supplier. (Jorgensen Decl. Ex. D ¶ 17.) In early 1998, Convolve approached Compaq to discuss the potential application of Convolve's disk drive technologies to Compaq's products. (Jorgensen Decl. Ex. D ¶ 27.) Compaq expressed interest, but because Compaq did not itself manufacture disk drives, it invited Seagate to join the discussion. (Jorgensen Decl. Ex. D ¶ 27.) A meeting between Convolve, Compaq, and Seagate was scheduled on October 16, 1998 to discuss Seagate's and Compaq's possible interest in licensing Convolve's disk drive technologies. (Jorgensen Decl. Ex. D ¶ 27.) Prior to that meeting, Compaq and Seagate signed confidentiality and nondisclosure agreements with Convolve. (Jorgensen Decl. Ex. D ¶ 28.)

At the October 16, 1998 meeting, Convolve gave a presentation on Input Shaping. (Jorgensen Decl. Ex. D ¶ 34.) "While the Compaq representatives at the meeting expressed significant interest in Convolve's disk drive technologies, Compaq stated its preference that Convolve work with Seagate to implement Convolve's disk drive technologies on a Seagate disk drive." (Jorgensen Decl. Ex. D ¶ 34.) However, according to Convolve and MIT, Seagate "had no intention of working cooperatively with Convolve[.]" (Jorgensen Decl. Ex. D ¶ 35.) "[F]or six years up to and including the October 16 meeting, Seagate had been attempting to develop the very same technology that Convolve had presented at the meeting." (Jorgensen Decl. Ex. D ¶ 35.)

**3. Convolve Discloses Quick and Quiet to Compaq**

Less than one month after the October 16, 1998 meeting, Convolve disclosed its Quick and Quiet control panel feature to Compaq. (Jorgensen Decl. Ex. D ¶ 39.) This disclosure was followed by a letter dated November 19, 1998, in which Convolve informed Compaq that the information regarding Quick and Quiet was confidential. (Jorgensen Decl. Ex. D ¶ 39.) Compaq assured Convolve that it would take measures to ensure the confidentiality of Quick and Quiet. (Jorgensen Decl. Ex. D ¶ 39.) Compaq expressed interest in Quick and Quiet and "again encouraged Convolve to work with Seagate to implement this new technology along with the Input Shaping[] technology discussed at the October 16 meeting." (Jorgensen Decl. Ex. D ¶ 40.) Convolve and MIT allege that Compaq "disclosed to Seagate in violation of . . . Compaq['s] [confidentiality and nondisclosure agreement] the information that it had learned from Convolve about its 'Quick and Quiet[]' feature." (Jorgensen Decl. Ex. D ¶ 42.)

**4. Convolve Demonstrates Its Technology to Seagate on a Seagate Drive**

In April 1999, after Seagate provided Convolve with the software and hardware necessary to install Convolve's technology on a Seagate drive, Convolve traveled to a Seagate facility in Oklahoma to demonstrate Convolve's disk drive technologies on a Seagate drive. (Jorgensen Decl. Ex. D ¶ 47.) Unbeknownst to Convolve, Seagate sent to the April meetings several engineers who had been attempting to develop the very technologies that Convolve was then demonstrating. (Jorgensen Decl. Ex. D ¶ 50.) In fact, Evert Cooper, Seagate's engineer in charge of the effort, was among Seagate's representatives in attendance at the April meetings. (Jorgensen Decl. Ex. D ¶ 50.) Not long after the April meetings, Cooper changed his approach to his internal Seagate project. (Jorgensen Decl. Ex. D ¶ 51.) "Only after Cooper essentially copied Convolve's methodology was he, after six years of failed attempts, able to achieve results similar to those achieved by Convolve." (Jorgensen Decl. Ex. D ¶ 51.)

**5. Seagate Announces Its Sound Barrier Technology**

Between April 1999 and August 1999, Seagate dragged its feet regarding a decision to license

4

Convolve's disk drive technologies. (Jorgensen Decl. Ex. D ¶ 54.) On June 7, 1999, Convolve sent Seagate a licensing proposal that highlighted the benefits of Convolve's disk drive technologies. (Jorgensen Decl. Ex. D ¶ 54.) Although Seagate had previously represented that it would license Convolve's disk drive technologies if they worked as predicted, Seagate now indicated that it first wanted to evaluate the work of its own engineers. (Jorgensen Decl. Ex. D ¶ 54.)

On June 7, 2000, Seagate issued a press release announcing its new disk drive technology called Sound Barrier Technology. (Jorgensen Decl. Ex. D ¶ 58.) Convolve and MIT allege that "Seagate used the confidential information that Convolve disclosed to Seagate . . . to develop technologies that are identical to Convolve's disk drive technologies, including Convolve's 'Quick and Quiet[]' control panel feature." (Jorgensen Decl. Ex. D ¶ 58.) Seagate's press release allegedly describes Sound Barrier Technology as:

> includ[ing] a silent seek mode that can be configured <u>during manufacturing or by the end user</u>. Now the PC or other host can tell a disk drive to perform in quiet mode for home entertainment applications, or to deliver faster seeks for business applications where data must be gathered quickly from various sectors on the disk drive.

(Jorgensen Decl. Ex. D ¶ 59.)

On June 28, 2001, Seagate issued another press release announcing its new disk drive called the Barracuda ATA IV, which contains Sound Barrier Technology. (Jorgensen Decl. Ex. D ¶ 62.) To Convolve and MIT, Seagate's press release "confirms the importance of the Convolve disk drive technologies to Seagate[.]" (Jorgensen Decl. Ex. D ¶ 62.) The press release allegedly reads: "Silence has been a sort of 'holy grail' in PC engineering circles. . . . Now we've devised a breakthrough that makes it real." (Jorgensen Decl. Ex. D ¶ 62.)

> Upon information and belief, Seagate did not 'devise' a 'breakthrough' to create a 'superfast' and 'silent' drive; instead, to achieve that result, it stole the Convolve disk drive technologies and implemented these technologies on the Barracuda drive (the very drive that Seagate used to test Convolve's disk drive technologies at Seagate's Oklahoma operations center).

(Jorgensen Decl. Ex. D ¶ 62.) Convolve and MIT assert nine claims for relief against Seagate: (1) Breach of Contract (by allegedly breaching its confidentiality and nondisclosure agreements with Convolve); (2) Tortious Interference with Contract (by allegedly encouraging Compaq to disclose

Convolve's Quick and Quiet technology in violation of Compaq's confidentiality and nondisclosure agreements with Convolve); (3) Fraud (by allegedly inducing Convolve to disclose Convolve's disk drive technologies by falsely representing that it intended to assess the possibility of a licensing agreement and promising to maintain the confidentiality of the information); (4) Misappropriation of Trade Secrets; (5) Patent Infringement (of the '635 and '267 Patents); (6) Patent Infringement (of the '473 Patent); (7) Violation of CAL. BUS. & PROF. CODE § 17200 et seq.; (8) Breach of Confidence; and (9) Breach of Implied Covenant of Good Faith and Fair Dealing. (Jorgensen Decl. Ex. D ¶¶ 72-76, 82-85, 91-95, 102-130, 135-138.) Convolve and MIT pray for, inter alia, $800 million in compensatory damages. (Jorgensen Decl. Ex. D at 33.)

**B. Plaintiffs' and Seagate's Insurance Policies**

Each Plaintiff insures Seagate under its own insurance policy.

**1. National's General Policy**

National issued to Seagate a Commercial General Liability Policy ("General Policy") with an effective period from July 1, 1999 to July 1, 2000. (See Jorgensen Decl. Ex. A.) National renewed its General Policy for the period from July 1, 2000 to July 1, 2001. (See Jorgensen Decl. Ex. A at 1 of 2.) Under the terms of National's General Policy, "This insurance applies to: (1) 'Personal injury' caused by an offense arising out of your business, excluding advertising, publishing, broadcasting or telecasting done by or for you; [and] (2) 'Advertising injury' caused by an offense committed in the course of advertising your goods, products or services[.]" (See Jorgensen Decl. Ex. A at 4 of 13.) "Personal injury" and "advertising injury" both include "injury . . . arising out of . . . [o]ral or written publication of material that slanders or libels a person or organization or disparages a person's or organization's goods, products or services[.]" (See Jorgensen Decl. Ex. A at 10, 12.) National's General Policy "does not apply to: 'Personal injury' or 'advertising injury' arising out of, or directly or indirectly related to, . . . any oral or written statement . . . which is claimed as . . . [a] violation of legal rights relating to . . . : [p]atent[] [or] [t]rade secrets[.]" (See Jorgensen Decl. Ex. A (Endorsement).)

### 2. AISLIC's Technology Liability Policy

AISLIC issued to Seagate a Technology Liability Insurance Policy ("Technology Liability Policy") with an effective period from July 1, 1999 to July 1, 2000. (AISLIC's Motion at 1:18-19.) AISLIC renewed its Technology Liability Policy for the period from July 1, 2000 to July 1, 2001. (Declaration of Anne C. Bailey in Support of AISLIC's Motion, hereinafter Bailey Decl., Docket Item No. 38, Ex. A.) Under the terms of AISLIC's Technology Liability Policy, AISLIC:

> shall pay . . . those amounts . . . [Seagate] [is] legally obligated to pay as damages resulting from any claim(s) first made against [Seagate] and reported to [AISLIC] . . . for [Seagate's] wrongful act(s). Such wrongful act(s) must . . .
> (1) be in [Seagate's] performance of technology services; or
> (2) result in the failure of [Seagate's] technology products to perform the function or serve the purpose intended.

(Bailey Decl. Ex. A § I.A.) "Technology services" means "any computer or electronic information technology services performed by [Seagate], or others acting under [Seagate's] trade name, for others, including systems analysis, systems programming, data processing, system integration, outsourcing development and design and the management, repair and maintenance of computer products, networks and systems." (Bailey Decl. Ex. A § II.) "Technology products" means "any computer hardware, software or related electronic product, equipment or device that is created, manufactured, developed, distributed, licensed, leased or sold by [Seagate] or for [Seagate] by others acting under [Seagate's] trade name to others, including training in the use of such computer hardware, software or related technology products." (Bailey Decl. Ex. A § II.) AISLIC's Technology Liability Policy does not cover, <u>inter alia</u>, claims "arising out of any alleged or actual infringement of patent or misappropriation of trade secret[.]" (Bailey Decl. Ex. A § III.A.8.)

### 3. AIU's Umbrella Policy

AIU issued to Seagate a Commercial Umbrella Policy ("Umbrella Policy") with an effective period from July 1, 1999 to July 1, 2000. (<u>See</u> Jorgensen Decl. Ex. C (Policy No. BE 701 62 45).) AIU renewed its Umbrella Policy for the period from July 1, 2000 to July 1, 2001. (<u>See</u> Jorgensen Decl. Ex. C (Policy No. BE 740 10 06).) Under the terms of the Umbrella Policy, AIU "will pay . . . those sums . . . that the Insured becomes legally obligated to pay by reason of liability imposed by law

. . . because of . . . Personal Injury or Advertising Injury that takes place during the Policy Period[.]" (Jorgensen Decl. Ex. C at (1) (Policy No. BE 740 10 06).) "Personal injury" and "advertising injury" are defined exactly as they are in National's General Policy. (See, supra, Part II.B.1. and Jorgensen Decl. Ex. C at (3), (5)-(6) (Policy No. BE 740 10 06).) Furthermore, AIU shall have the:

> duty to defend any claim or suit seeking damages covered by the terms and conditions of this policy when:
> 1. The applicable Limits of Insurance of the underlying policies listed in the Schedule of Underlying Insurance . . . have been exhausted by payment of claims to which this policy applies; or
> 2. Damages are sought for . . . Personal Injury or Advertising Injury covered by this policy but not covered by any underlying insurance listed in the Schedule of Underlying Insurance . . . .

(Jorgensen Decl. Ex. C at (1) (Policy No. BE 740 10 06).) The Schedule of Underlying Insurance attached to AIU's Umbrella Policy specifically identifies National's General Policy and AISLIC's Technology Liability Policy as underlying insurance. (Jorgensen Decl. Ex. C (Schedule of Underlying Insurance to Policy No. BE 740 10 06).)

National, AISLIC, and AIU each move for summary judgment arguing that, under the terms of their respective policies, they do not have a duty to defend Seagate.

### III. STANDARDS

Summary judgment is proper when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(c). The purpose of summary judgment "is to isolate and dispose of factually unsupported claims or defenses." Celotex v. Catrett, 477 U.S. 317, 323-24 (1986).

A movant for summary judgment always "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answer to interrogatories, and admissions on file, together with the affidavits, if any' which it believes demonstrate the absence of a genuine issue of material fact." Id. at 323. If the movant does not satisfy this initial burden, the non-movant has no obligation to produce anything and summary judgment must be denied. If, however, the movant meets this initial burden, then the burden shifts to the non-movant to "designate 'specific facts showing that there is a genuine issue for trial.'" Id. at 324. In particular,

8

to preclude entry of summary judgment, the non-movant must bring forth genuine issues of material fact. An issue of fact is "genuine" if it can reasonably be resolved in favor of either party. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). An issue of fact is "material" if it "might affect the outcome of the suit under the governing law . . . . Factual disputes that are irrelevant or unnecessary will not be counted." Id. In other words, the non-movant "must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co. v. Zenith Radio, 475 U.S. 574, 586 (1986).

It is this Court's responsibility "to determine whether the 'specific facts' set forth by the non-movant, coupled with undisputed background or contextual facts, are such that a rational or reasonable jury might return a verdict in its favor base don that evidence." T.W. Elec. Serv. v. Pac. Elec. Contractors, 809 F.2d 626, 631 (9th Cir. 1997). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" Matsushita, 475 U.S. at 587. In conducting its analysis, this Court must draw all reasonable inferences in favor of the non-movant. Masson v. New Yorker Magazine, Inc., 501 U.S. 496, 520 (1991) (citing Anderson, 477 U.S. at 255).

## IV. DISCUSSION

**A. National's General Policy**

### 1. National Fails to Establish that the Underlying Action Raises No Potential of a Disparagement Claim

National's General Policy only covers "personal injuries" and "advertising injuries." Although there are some differences between "personal injuries" and "advertising injuries," for purposes here, they are identical. That is, both "personal injury" and "advertising injury" include "injury . . . arising out of . . . [o]ral or written publication of material that *slanders* or *libels* a person or organization or *disparages* a person's or organization's goods, products or services." (Jorgensen Decl. Ex. A at 10, 12 (emphasis added).) National argues that the Amended Complaint in the Underlying Action alleges neither "slander" nor "libel" against Seagate. (National's and AIU's Motion at 14:24-16:23.) Seagate does not dispute this. The issue is whether Convolve and/or MIT potentially allege "disparagement"

9

1  against Seagate in the Underlying Action.  National argues that they do not.  (National's and AIU's
2  Motion at 16:24-18:28; National's and AIU's Reply in Support of Summary Judgment, hereinafter
3  National's and AIU's Reply, Docket Item No. 50, at 2:14-6:13.)  Seagate argues that they do.
4  (Seagate's Opposition to National's and AIU's Motion at 6:10-8:16.)

Resolution of the issue partially turns upon whether the word "disparage" as it appears in National's General Policy refers narrowly to the law of disparagement or refers broadly to its ordinary meaning.  (See, e.g., Seagate's Opposition to National's and AIU's Motion at 7:13-15 ("In ordinary usage, to 'disparage' includes 'to discredit or bring reproach upon by comparing with something inferior,' precisely what Seagate is alleged to have done").)  In this Court's opinion, "disparage" refers more narrowly to the law of disparagement.

"Slander" and "libel" clearly refer to two well-established legal doctrines from the law of defamation.  According to the hoary legal maxim noscitur a sociis, "the meaning of particular words may be indicated or controlled by associated words."  11 WILLISTON ON CONTRACTS § 32:6; see also Seid Pak Sing v. Barker, 197 Cal. 321, 341 (1925) ("[T]he ancient maxim of noscitur a sociis has still some degree of application to the use of the context in determining the scope and meaning of the words, sentences, and clauses of contracts").  Thus, just as "slander" and "libel" refer to specific legal doctrines, so "disparage" must refer to a specific legal doctrine.  (See Jorgensen Decl. Ex. A at 10, 12 (National's General Policy covers injuries arising out of oral or written publication of material that "*slanders* or *libels* a person or organization or *disparages* a person's or organization's goods, products or services") (emphasis added).)  The doctrine of "disparagement" encompasses two distinct torts:  slander of title and trade libel.  5 E.B. WITKIN, SUMMARY OF CALIFORNIA LAW (9th ed. 1990) § 567 ("Slander of title and trade libel are distinct torts, but are classified in the Restatement under the general heading of *disparagement*").  Trade libel is the relevant tort here.[2]  "A trade libel is an intentional disparagement of the *quality* of property, which results in pecuniary damage."  Id. § 573.

---

[2] "Slander of title is a false and unprivileged disparagement, *oral or written*, of the title to *real or personal property*, resulting in actual pecuniary damage."  5 E.B. WITKIN, SUMMARY OF CALIFORNIA LAW (9th ed. 1990) § 569.  Neither party claims that slander of title is at issue here.

10

In the Underlying Action, Convolve and MIT allege that:

> [B]ased on its press releases, Seagate is claiming that its technology performs the same functions as Convolve's proprietary technology. However, upon information and belief, Convolve's disk drive technologies are superior to those of Seagate, notwithstanding that Seagate has misappropriated Convolve's technology in 'developing' [Sound Barrier Technology]. The threat of confusion in the marketplace—i.e., that the computer industry will perceive that the two products are identical, when in fact Seagate's is inferior—threatens irreparable harm to the reputation of the Convolve disk drive technologies.

(Jorgensen Decl. Ex. D ¶ 65.) Notably, the passages quoted in the Underlying Action's Amended Complaint, which allegedly are excerpted from Seagate's press releases, do not mention Convolve or its products at all. (See Jorgensen Decl. Ex. D ¶¶ 58-62.) However, in response to one of Seagate's interrogatory request, Convolve claimed that, "The defendants [Compaq and Seagate] . . . embarked on a campaign to prevent Convolve from successfully and profitably licensing its technologies to others by, *inter alia*, . . . *falsely disparaging Convolve's image and its technologies*." (O'Rourke Decl. Ex. B at 4 (emphasis added).)

To prevail on summary judgment, National bears a heavy burden because an insurer's duty to defend is broad. See Horace Mann Ins. Co. v. Barbara B., 41 Cal. 4th 1076, 1081 (1993) ("the duty to defend is broader than the duty to indemnify"). An insurer has a duty to defend its insured if a third party claimant "*potentially* seeks damages within the coverage of the policy." Id. at 1081 (quoting Gray v. Zurich Ins. Co., 65 Cal. 2d 263, 275 (1966)); see also Buss v. Superior Court, 16 Cal. 4th 35, 46 (1997) ("The insurer's duty to indemnify runs to claims that are actually covered, in light of the facts proved. . . . By contrast, the insurer's duty to defend runs to claims that are merely *potentially* covered in light of facts alleged or otherwise disclosed.") (emphasis added). Courts "look not to whether noncovered acts predominate in the third party's action, but rather to whether there is *any* potential for liability under the policy." Horace Mann, 41 Cal. 4th at 1084. In other words, National must show that the Underlying Action raises no conceivable theory which could bring it within the policy coverage. Courts may look to the facts alleged in the complaint as well as facts extrinsic to the complaint. Id. at 1081 ("Facts extrinsic to the complaint also give rise to a duty to defend when they reveal a possibility that the claim may be covered by the policy") (citing Gray v. Zurich Ins. Co., 65

Cal. 2d 263, 276 (1966) ("[C]ourts do not examine only the pleaded word but the potential liability created by the suit")). "Any doubt as to whether the facts give rise to a duty to defend is resolved in the insured's favor." Id. at 1081 (citing CNA Cas. of California v. Seaboard Surety Co., 176 Cal. App. 3d 598, 607 (1986)).

The facts in this case present a close issue. National argues that, although Convolve's interrogatory response alleges that Seagate "falsely disparag[ed] Convolve's technologies," Convolve has provided no factual evidence to support its claim. Indeed, of those Seagate press releases that the parties have provided to this Court, not one makes reference to Convolve or its technologies. (See National's and AIU's Motion at 21:7-8 ("The only publications alleged in the amended complaint in the Underlying Action—the press releases—do not name or otherwise identify Convolve"); see also Jorgensen Decl. Ex. D.) As National pointed out at the hearing, the Underlying Action is already five years old: if Convolve has not produced one of Seagate's allegedly disparaging press releases by now, it likely will not in the future. This argument is well made. Nevertheless, this Court must rule against National.

As mentioned above, National's duty to defend is broad. In fact, it is so broad that it even includes groundless, false, and fraudulent claims. See H. WALTER CROSKEY ET AL., INSURANCE LITIGATION § 7:522 (2000) ("The insurer must defend any claim that *would* be covered *if true* even if the claim is in fact groundless, false or fraudulent"). All that is required to trigger the duty to defend is a bare potential or possibility of coverage. Montrose Chem. Corp. of California v. Superior Court, 6 Cal. 4th 287, 300 (1993) ("[A] bare 'potential' or 'possibility' of coverage [is] the trigger of a defense duty"). Undoubtedly, the Underlying Action's putative disparagement claim suffers from serious evidentiary infirmities. However, all that this Court must do is determine whether the *potential* liability created by the Underlying Action triggers the *bare possibility* of coverage under National's General Policy. Although Seagate's press releases do not themselves mention Convolve or its products, Convolve's allegation in its interrogatory response is broader than Seagate's press releases. All that Convolve's interrogatory response states is that, "The defendants [Compaq and Seagate] . . .

embarked on a campaign to prevent Convolve from successfully and profitably licensing its technologies to others by, *inter alia*, . . . *falsely disparaging Convolve's image and its technologies*." (O'Rourke Decl. Ex. B at 4 (emphasis added).) For all this Court knows, Convolve's putative disparagement claim rests upon other press releases not provided to this Court, or other printed material altogether. Construing all ambiguities in Seagate's favor, this Court concludes that the Underlying Action triggers the *bare possibility* of coverage under National's General Policy.

### 2. The Patent/Trade Secret Exclusion Does Not Apply

National's General Policy excludes coverage for "personal injury" or "advertising injury" "arising out of, or directly or indirectly related to, . . . any oral or written statement . . . which is claimed as . . . [a] violation of legal rights relating to . . . : [p]atent[] [or] [t]rade secrets[.]" National argues that, "The entire Underlying Action is premised, without exception, on Seagate's patent infringement and misappropriation of Convolve's trade secrets." (National's and AIU's Reply at 7:18-20.) Therefore, National concludes, it has "demonstrated that the claims alleged in the Underlying Action 'arise out of or [are] directly or indirectly related to . . . violations of legal rights relating to . . . patent [or] trade secrets.'" (National's and AIU's Reply at 7:20-22.)

National fairly represents the nature of the Underlying Action. However, its interpretation of the General Policy omits portions of its text. Under the plain text of National's General Policy, a "personal injury" or "advertising injury" is excluded if it "aris[es] out of, or directly or indirectly relate[s] to, . . . *any oral or written statement . . . which is claimed as* . . . [a] violation of legal rights relating to . . . : [p]atent[] [or] [t]rade secrets[.]" National's interpretation of the General Policy entirely omits the italicized language. That is, according to the General Policy's plain text, the patent/trade secret exclusion only applies when a statement *itself* is claimed as a violation of legal rights relating to patent or trade secrets. See Founding Members of the Newport Beach Country Club v. Newport Beach Country Club, Inc., 109 Cal. App. 4th 944, 957 (2003) ("An interpretation rendering contract language nugatory or inoperative is disfavored"). Because, as Seagate points out, neither Convolve nor MIT "assert that [Seagate's press releases *themselves*] constitute[] a

13

misappropriation of trade secrets or infringement of a patent," this Court concludes that the General Policy's patent/trade secret exclusion does not apply here. (Seagate's Opposition at 22:26-27.) Accordingly, this Court DENIES National's Motion.

**B. AISLIC's Technology Liability Policy**

AISLIC's Technology Liability Policy covers "wrongful acts" committed within Seagate's "performance of technology services" and "wrongful acts" resulting in the "failure of [Seagate's] technology products . . . ." (Bailey Decl. Ex. A § I.A.) AISLIC's Technology Liability Policy does not cover "claims . . . arising out of any alleged or actual infringement of patent or misappropriation of trade secret[.]" (Bailey Decl. Ex. A § III.A.8.) Even if this Court assumed, <u>arguendo</u>, that Seagate's alleged acts were "wrongful," and either committed within its performance of "technology services" or resulted in the failure of its "technology products," AISLIC still would not have to defend Seagate because the Technology Liability Policy's patent/trade secret exclusion would still apply.

As this Court has already observed, the Underlying Action is premised entirely upon Compaq's and Seagate's alleged misappropriation of Convolve's and MIT's trade secrets. (<u>See</u>, <u>supra</u>, Part IV.A.2.; <u>see also</u> National's and AIU's Reply at 7:18-20.) In AISLIC's words:

> The Amended Complaint in the [U]nderlying [A]ction is rife with allegations that Seagate is liable for using [Convolve's and MIT's] confidential and/or trade secret information on Seagate's drives, for disclosing confidential and/or trade secret information, and for misappropriating Convolve's trade secrets. Plainly, if the alleged misappropriation did not occur, none of the other claims would have arisen. Indeed, all of Convolve's claims arise out of Seagate's alleged misappropriation of Convolve's trade secrets and/or infringement of Convolve's patents and are thus excluded from coverage under the policy by way of this exclusion.

(AISLIC's Motion at 12:4-11.) Indeed, without Seagate's alleged misappropriation of Convolve's and MIT's trade secrets, there is no Underlying Action. Thus, the Underlying Action is a claim "arising out of" Seagate's misappropriation of trade secrets. (Bailey Decl. Ex. A § II (defining "claim" as a civil proceeding for monetary or non-monetary relief).) Accordingly, AISLIC's Technology Liability Policy excludes coverage of the Underlying Action. Therefore, this Court GRANTS AILSIC's Motion.

**C. AIU's Umbrella Policy**

14

AIU's Umbrella Policy states that AIU "will pay on behalf of [Seagate] those sums in excess of the Retained Limit that [Seagate] becomes legally obligated to pay by reason of liability imposed by law . . . because of . . . Personal Injury or Advertising Injury." (Jorgensen Decl. Ex. C at (1) (Policy No. BE 740 10 06).) "Personal Injury" and "Advertising Injury" are defined just as they are in National's General Policy; namely, both "Personal Injury" and "Advertising Injury" include "injury . . . arising out of . . . [o]ral or written publication of material that slanders or libels a person or organization or disparages a person's or organization's goods, products or services." (Jorgensen Decl. Ex. C. at (3), (5)-(6) (Policy No. BE 740 10 06).) AIU "shall have the . . . duty to defend any claim or suit seeking damages . . . when: . . . The applicable Limits of Insurance of the underlying policies listed in the Schedule of Underlying Insurance . . . have been exhausted by payment of claims to which this policy applies[.]" (Jorgensen Decl. Ex. C at (1) (Policy No. BE 740 10 06).) The Schedule of Underlying Insurance attached to AIU's Umbrella Policy identifies National's General Policy as an underlying policy. (Jorgensen Decl. Ex. C (Schedule of Underlying Insurance to Policy No. BE 740 10 06).) Because National failed to establish that the Underlying Action raises no potential of coverage under its policy, and because Convolve and MIT pray for sums that are in excess of National's policy limits, this Court concludes that the potential liability created by the Underlying Action triggers the possibility of coverage under AIU's Umbrella Policy. (Compare Jorgensen Decl. Ex. C (Schedule of Underlying Insurance to Policy No. BE 740 10 06) (listing the policy limits of National's General Policy) with Jorgensen Decl. Ex. D at 33 (Amended Complaint of Underlying Action) (praying for $800 million in compensatory damages); see also, supra, Part IV.A.) Therefore, this Court DENIES AIU's Motion.

## V. CONCLUSION

For the reasons set forth above, this Court GRANTS AISLIC's Motion and DENIES National's and AIU's Motion.

Dated: April 4, 2005          /s/James Ware
                                             JAMES WARE
                                             United States District Judge

1  **THIS IS TO CERTIFY THAT COPIES OF THIS ORDER HAVE BEEN DELIVERED TO:**

2  Archie S. Robinson asr@r-winc.com
   Charles A. Reid charles.reid@dbr.com
3  Cheryl A. Jorgensen Cheryl.jorgensen@dbr.com
   John L. Winchester jlw@r-winc.com
4  Mark R. Weinstein mweinstein@whitecase.com
   Robert E. Freitas rfreitas@orrick.com

**Dated: April 4, 2005**                                   **Richard W. Wieking, Clerk**

                                                           **By:/s/JWchambers**
                                                               **Ronald L. Davis**
                                                               **Courtroom Deputy**