Gerald P. Kennedy (Bar No. 105887)
Geraldine A. Valdez (Bar No. 174305)
PROCOPIO, CORY, HARGREAVES &
  SAVITCH LLP
530 B Street, Suite 2100
San Diego, California 92101
Telephone: (619) 238-1900
Facsimile: (619) 235-0398

Attorney for Defendant HOMES.COM, INC.

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MONSTER CONTENT, LLC., a Tennessee limited liability company,<br><br>Plaintiff,<br><br>v.<br><br>HOMES.COM, INC., a Delaware corporation,<br><br>Defendant. | Case No.: C 04 0570 FMS<br><br>**DECLARATION OF PATRICIA ANN McNEASE IN SUPPORT OF DEFENDANT HOMES.COM, INC.'S MOTION FOR PARTIAL SUMMARY JUDGMENT OR, ALTERNATIVELY, SUMMARY ADJUDICATION OF ISSUES**<br><br>Date:   May 12, 2005<br>Time:  2:00 p.m.<br>Dept:   Five<br>Judge: Fern M. Smith |

I, Patricia Ann McNease, declare:

1.   I am the Director of Client Services for Defendant HOMES.COM, INC. ("Homes"). I share responsibility for overseeing its files and records which contain documents, correspondence, memoranda, reports, and electronic communications made at or near the time by, or from information transmitted by a person with knowledge of the event or subject, maintained and preserved by Homes in the ordinary course of business.

2.   As Director of Client Services for Homes, I am responsible for general day-to-day operations for its customer service department, and am also the liaison between the engineering technical department and the business development side for the company for purposes of development, implementation and marketing of new products. I have personal knowledge of the facts stated herein, except for those statements made on information or belief, which are based

**Declaration of Patricia Ann McNease in Support of Motion for Partial Summary Judgment, etc.**
110685.000027/524922.02

upon my review of Homes's business records. If called upon as a witness, I therefore could and would testify competently thereto.

3. I make this declaration in support of Homes's motion for partial summary judgment or, alternatively, summary adjudication of issues (the "Motion") as against the claims asserted in this action by Plaintiff MONSTER CONTENT, LLC ("Monster Content").

**A.  Homes's Portal and AA/BA Sites.**

4. Since 1998, Homes has operated an internet-based real estate listing service centered around a consumer portal located at www.Homes.com© (the "Homes Portal"), and websites sold to and maintained for real estate brokers and agents (the "AA/BA Sites").

5. The Homes Portal currently lists over 700,000 individual properties and exceeds 600,000 unique consumer visitors per month. In addition to real estate listings throughout the country, the Homes Portal also provides consumers with access to real estate brokers and agents, rental listings, moving companies, mortgage calculators, maps, home improvement tips and neighborhood information.

6. Homes receives a one-time upfront fee from the sale of the AA/BA Site templates to brokers and agents. With these templates and assistance from Homes, brokers and agents create and set up their own AA/BA Site, which is then also linked to the Homes Portal.

7. Brokers and agents thereafter pay a monthly subscription fee to Homes for hosting and enhancements to their AA/BA Site, as well as displaying their websites and listings on the Homes's Portal. Homes also receives revenues from professional and consumer advertisements placed on the Homes Portal and from the sale of internet marketing training courses and other office productivity products to brokers and agents.

**B.  The MDI Agreement and MDI Ceasing Operations Prior to the MDI Agreement Being Fully Implemented.**

8. This action concerns two License Agreements between Homes as Licensee, and Monster Content's predecessors in interest, MONSTERDAATA, INC. ("MDI") (the "MDI Agreement"), and FISHMAN & DAVIS LLC ("F&D"), (the "F&D Agreement") (collectively,

1  the "Agreements"). True and correct copies of the Agreements are attached hereto, marked
2  **Exhibits 1 and 12**, respectively.

3      9.    The MDI Agreement between MDI and Homes was executed on or about
4  March 18, 2002, with an effective date of April 1, 2002. However, prior to the MDI Agreement
5  being fully implemented as discussed below, MDI ceased its business operations at the end of
6  April 2002.

7      **C.**    **The "Products" and Schools Lite.**

8      10.    Under the MDI Agreement, "Channel products" and "Listing Plus" (collectively
9  defined as the "Products") were licensed to Homes to "incorporate certain neighborhood
10 information content into the websites it provides for [Homes's] customers as a value added
11 enhancement." (**Exhibit 1**) For a monthly fee of $19.95 for each Product (if purchased
12 separately, $29.95 if purchased together), which was to be split between the parties as provided
13 under the MDI Agreement, Homes's customers (primarily real estate brokers and agents) were to
14 be provided "direct access to the Products by accessing the [Homes's] Site through the Internet."
15 (**Id.**)

16     11.    "Channel products" is not defined under the MDI Agreement. During the
17 implementation process, however, I had discussions with MDI's marketing representative,
18 Charles Ix, who confirmed the "channels" provided under the MDI Agreement would include not
19 only "Community" and "Schools", but also "People," "Money," "Lifestyle," and "Environment"
20 as contained in marketing information to be attached to a joint press release prepared by Mr. Ix.
21 Attached hereto, marked **Exhibit 2**, is a true and correct copy of an electronic mail from and to
22 Mr. Ix dated April 24, 2002, transmitting a listing flyer to be attached to the joint press release.

23     12.    During the implementation process, Homes further understood that "Schools Lite"
24 was both a "channel" and a "subset" of "Schools," in that it included some, but not all of the
25 features offered in the full "Schools" product.

3
**Declaration of Patricia Ann McNease in Support of Motion for Partial Summary Judgment, etc.**
110685.000027/524922.02

**D.  "Bulk Data Delivery of a Subset of the School Data as a Replacement For What is Already On [Homes's] Site."**

13.  Under the MDI Agreement, Homes was also to be provided a "bulk data delivery of a subset of the School data as a replacement for what is already on [Homes's] site. This will be updated annually on servers operated and maintained by or at the direction of [Homes]." (**Exhibit 1**)  Nowhere in the MDI Agreement, however, were the terms "bulk data delivery," "subset," the "School data," or "as a replacement for what is already on [Homes's] site" defined or otherwise described, and there was no provision for any payment to be made by Homes or Homes's customers for such a "subset" of data.

**E.  Homes's Prior Agreement With 2001 Beyond and the Agreement With eSchool.**

14.  During the implementation of the MDI Agreement, it was understood that Homes was looking to replace the school data which had been provided to its customers at no charge on both the Homes Portal and AA/BA Sites by another provider, 2001Beyond.com ("2001Beyond"). A true and correct copy of the Licensing Agreement between Homes and 2001Beyond which had been in effect since December 28, 1999, is attached hereto, marked **Exhibit 3**, and by this reference made a part hereof.

15.  Homes in fact preferred to obtain the school data in "bulk" the way it had obtained the data from 2001Beyond. Getting the bulk data gave Homes and its AA/BA customers more control over how the content would be displayed and formatted, and thereby precluded customers from leaving either the Homes Portal or the particular AA/BA Site as a result of a link.

16.  With MDI's knowledge, Homes had already entered into another agreement with 2001Beyond's successor, eSchool Profile ("eSchool") also effective April 1,. 2002, to provide similar school data by way of a direct link (the "eSchool Agreement"). A true and correct copy of the eSchool Agreement is attached hereto, marked **Exhibit 4**.

17.  Although MDI was to be the "default" for the free school data for Homes's customers, if for any reason MDI was unable to do so, eSchool agreed to provide the same school data on the Homes Portal and through a link to Homes's customers on the AA/BA Sites for a flat

4
**Declaration of Patricia Ann McNease in Support of Motion for Partial Summary Judgment, etc.**
110685.000027/524922.02

annual fee of $5,000.

F. **The Subset of Schools Information as the "Freebie" in Order to "Up-Sell" the Products.**

18. Beginning in mid-March and continuing until MDI ceased operating at the end of April 2002, the technical programmers for MDI and Homes attempted to interpret the various terms of the MDI Agreement as part of the implementation process. Attached hereto, collectively marked **Exhibit 5** are true and correct copies of electronic mail between the representatives of MDI and Homes concerning the implementation.

19. At all times during the implementation of the MDI Agreement, the parties were aware that Homes was looking to use the "subset" of Schools information from MDI as the "freebie" to replace the school data that had been provided to Homes's customers at no charge on the Homes Portal and Homes AA/BA Sites by 2001Beyond. Attached hereto as part of **Exhibit 5 (Homes 38-41)**, are copies of electronic mail between me and one of Homes's engineers responsible for implementing the MDI Agreement with respect to the Homes Portal dated March 29, 2002, that were forwarded on that date to MDI's then Chief Technical Officer and Vice President of Operations, Hank Hubbard and Mark Hensien, respectively. As confirmed in the attached and in the marketing information to be attached to the joint press release noted above, it was further understood that the free access would be provided to Homes's customers in order to "up-sell" the Products.

G. **MDI's Inability/Unwillingness to Provide the Bulk School Data and the Direct Link to Schools Lite.**

20. As part of the implementation process, Homes was provided actual links to the Products, including Schools Lite as a "subset" of the Schools channel. After working through the presentation of the links of Products on its hosted AA/BA sites, Homes's representatives repeatedly requested MDI's representatives to import the "subset" of the school data itself. As confirmed in the attached e-mail between the technical programmers identified as Homes 52-53 in **Exhibit 5**, MDI was unwilling or unable to provide the school data in bulk to Homes at that time.

5
**Declaration of Patricia Ann McNease in Support of Motion for Partial Summary Judgment, etc.**
110685.000027/524922.02

1 21. Getting the school data so it could be provided to Homes's customers for free was
2 a priority for Homes. Since MDI would not or could not provide the school data in bulk at that
3 time, Homes suggested and MDI agreed as an alternative option to simply provide Homes with a
4 direct link to just

5 Schools Lite from both the Homes Portal and the AA/BA Sites on April 5, 2002 (the "Schools
6 Lite Link").

7 22. The separate Schools Lite Link had to be specially created by MDI at the time in
8 response to Homes's concern that no one with free access to Schools Lite could then also have
9 access to the other products. Homes's customers therefore got the URL for the full Products only
10 if they had signed up and agreed to pay for the service. Otherwise, the customer was provided
11 with only the Schools Lite URL, either through the Homes Portal or the AA/BA sites.

12 23. The Schools Lite link was one of several options, however, including eSchool that
13 was provided to Homes's customers to access schools information. Many Homes's customers
14 opted to not receive any school information.

15 **H. Joint Press Release and Marketing to "Up-Sell" the Products.**

16 24. Homes and MDI wanted to complete the implementation of the MDI Agreement
17 as soon as possible so the Products could be immediately marketed to the public. Because of
18 delays in the implementation process, however, the joint press release noted above initially
19 prepared by Charles Ix in March 2002, did not go out until after MDI ceased operations on May
20 1, 2002. Attached hereto as part of **Exhibit 5 (Homes 842), and as Exhibit 6,** respectively are
21 true and correct copies of electronic mail from and to Mr. Ix transmitting the initial press release
22 on March 25, 2002, and the proposed final press release with the attached marketing information
23 on April 25, 2002.

24 25. In a separate e-mail to Homes dated April 23, 2002, a true and correct copy of
25 which is attached hereto, marked **Exhibit 7**, Mr. Ix specifically confirmed: "I spoke with Hank
26 on our end and he has given your tech guys everything they have asked for."

27 26. Consistent with the terms of the MDI Agreement, Homes thereafter also actively
28 marketed the Products through newsletters to over 500 broker customers and 10,000 agent

customers. True and correct copies of the Homes's customer asset newsletters dated May 1, 2002, June 19, 2002 and November 6, 2002, along with other marketing materials are collectively attached hereto, marked **Exhibit 8**.

27. In particular, Homes featured the Products in all of its customers' website control panels, and included the Products in its year end products recap. Additional marketing materials in the form of flyers and news releases were prepared either directly by the Monster Parties, or in conjunction with Homes. (**Exhibit 8**)

28. Homes's marketing materials also made it clear that the school information contained in the full Products was "more information than comes with website," and that in the event the full Products were purchased "the School Information link that comes with website is also enhanced to same detail of school information from Channels (no longer the "lite" version). (**Exhibit** 8 (**Homes 200-201**)

29. The marketing materials also expressly confirmed:

> [T]he School "Lite" data supplied which is included in AA/BA website purchase is a "leaner" version of data than what comes with the upgrade in "Channels" option.

### I. Initial Problems with the Schools Lite Link.

30. Homes's AA/BA customers began having problems with the Schools Lite link almost immediately. As confirmed in the electronic mail collectively attached hereto, marked **Exhibit 9**, between May and August 2002, Homes sent numerous e-mails concerning various "MonsterDaata issues," chief among them the Schools Lite link, to MDI, F&D and Matthew Greene and/or Matthew Hooper of Linux HPC ("Linux"), who was consulting and advising F&D.

### J. "Bulk Data Delivery" of the Schools Lite Data.

31. Consistent with the understanding reached at the time the Schools Lite Link was originally provided by MDI, Homes also continued to request that it be provided with a "bulk delivery" of the Schools Lite data. Attached hereto, collectively marked **Exhibit 10**, are true and correct copies of electronic mail between representatives of Homes and F&D/Linux concerning the bulk data delivery.

32. By electronic mail from Homes to F&D on June 7, 2002, Homes forwarded the following e-mail from Joel Parramore who was one of Homes's technicians involved in the original implementation:

> Talking with Hank and Mark originally, they had agreed to provide us with a copy of their "Schools Lite" data (refreshed once or twice a year --- what does the contract say on that?) for local use on our AA/BA and portal sites, if and when we wanted to control presentation of the data as we were doing with 2001 Beyond/eSchoolProfile originally. So, we want a copy of that data as soon as we can get it. Andrew (or whomever you talk to) can have Matthew call me about what formats they can provide the data and how we'll retrieve it from them. (**Exhibit 10 (Homes 133)**)

33. As confirmed in the attached e-mail, however, it was not until after further e-mails were exchanged between the Homes and Linux representatives, that Homes finally received the Schools Lite data by way of a "bulk data delivery" on June 28, 2002. (**Exhibit 10 (Homes 161)**)

### K. The Termination of the MDI Agreement and Execution of the F&D Agreement.

34. I am informed and believe that F&D acquired substantially all of MDI's assets at a private foreclosure sale in July 2002 (the "First Foreclosure"). Because of the First Foreclosure, the MDI Agreement was terminated and the F&D Agreement executed effective July 22, 2002. (**Exhibit 12**) A true and correct copy of a letter from Mr. Fishman dated July 22, 2002, terminating the MDI Agreement, is attached hereto, marked **Exhibit 11**. Consistent with the prior MDI Agreement, as interpreted and implemented by MDI and Homes, F&D thereafter continued to provide Homes's customers with free access to the Schools Lite data through the Schools Lite link.

### L. Negotiations to Purchase F&D's Assets.

35. I am informed and believe that shortly after the First Foreclosure in July 2002, Homes began negotiating to potentially acquire F&D's assets. Homes representatives had discussions with Andrew S. Fishman and Brent Davis of F&D, and substantial financial information and documentation was exchanged between the two companies as part of their respective due diligence, based upon a Mutual Nondisclosure Agreement executed July 24, 2002, a true and correct copy of which is attached hereto, marked **Exhibit 13**.

36. In late August 2002, Homes became aware that F&D's lender, Commerce Capital, LLC ("Commerce"), was again threatening to foreclose on F&D. Homes therefore continued to discuss the possibility of Homes acquiring F&D's assets directly with Commerce.

37. I am informed and believe that a meeting with Commerce to discuss the potential acquisition of F&D's assets was canceled and, F&D through Commerce instead sent Homes a demand letter on September 13, 2002 (the "Ruark Demand Letter"). A true and correct copy of the Ruark Demand Letter is attached hereto, marked **Exhibit 14**, wherein F&D's lender asserted, among other things, that Homes had allegedly misappropriated F&D's products.

38. Homes had no further contact with F&D, Commerce and/or Monster Content concerning any alleged claims asserted in the Ruark Demand Letter until January 2003, when Monster Content filed an action in the United States District Court, Case No. C03-00152, Monster Content v. Homes.com, et al. (the "Prior Monster Action"). I am informed and believe that Monster Content did not assert any claims in the Prior Monster Action concerning the Agreements, and agreed to voluntarily dismiss the action after Homes filed a motion for summary judgment, expressly reserving the alleged claims now asserted in this action.

**M.** **"MonsterDaata Schools Lite Issue" in October 2002.**

39. On October 9, 2002, Homes sent email to Monster Content regarding a "MonsterDaata Schools Lite Issue (New)," a true and correct copy of which is attached hereto, marked **Exhibit 15**, putting Monster Content on notice that "[t]he Schools Lite feed that we use on the portal for school information appears to have stopped working: the URL that should be displayed comes back with a "500 Server error", e.g. click on the following link to see . . . ." After bringing the problem to Monster Content's attention, the problem was corrected and the Schools Lite link was restored.

**N.** **The Greene Analysis and Homes's Voluntary Termination of the Schools Lite Link.**

40. Based upon contracts with 40-50 of its AA/BA customers, Homes considered the "up-sell" of the Products under the Agreements a relative success. Homes incorrectly believed, however, that it was to be billed by F&D/Monster Content for these customers and, therefore, did

not make its initial report and payment (with accrued late fees) to Monster Content until February 2003. A true and correct copy of the MonsterDaata Product Sales Summary as of February 11, 2003, with supporting schedules attached hereto, is collectively marked **Exhibit 16**, and by this reference made a part hereof.

41. At or about this time, however, Monster Content asserted a breach of the Agreements by Homes. I am informed and believe that based upon Mr. Greene's review of access/server logs, Monster Content claimed that 54,546 Homes' customers (i.e., approximately 5,455 per month) had improperly accessed Schools Lite through the Schools Lite Link between May 2002 and February 2003 (the "Greene Analysis"). Attached hereto, marked **Exhibit 17**, and by this reference made a part hereof, is a true and correct copy of an electronic mail from counsel for Monster Content to counsel for Homes dated February 25, 2003 (without attachments), with an attached spreadsheet setting forth the Greene Analysis.

42. Homes denied any wrongdoing and provided Monster Content with copies of the e-mail noted above to demonstrate that the Schools Lite Link had been provided by MDI/F&D consistent with the implementation of the Agreements. To avoid incurring any additional alleged charges claimed by Monster Content, however, Homes voluntarily agreed to immediately terminate the Schools Lite Link from either the Homes Portal or AA/BA Sites in April 2003.

**O.    Monster Content Ceasing Operation and Termination of the F&D Agreement.**

43. On or about September 7, 2004, Monster Content terminated access to Homes's paying customers to both Products. I am informed and believe that Monster Content ceased

/ / / / /

/ / / / /

/ / / / /

/ / / / /

/ / / / /

1  conducting business in the normal course at or about that time and was therefore unable to further
2  perform under the Agreements.  The total payments by Homes under the Agreements while they
3  were in effect was $6,861.36.
4      I declare under penalty of perjury under the laws of the United States that the foregoing is
5  true and correct.
6      Executed this ____ day of _____, 2005 at Tallahassee, Florida.

                                 /s/  Patricia Ann McNease

11
**Declaration of Patricia Ann McNease in Support of Motion for Partial Summary Judgment, etc.**
110685.000027/524922.02