1

2

3

4

5

6

7

8        IN THE UNITED STATES DISTRICT COURT

9        FOR THE NORTHERN DISTRICT OF CALIFORNIA

10

11   SENORINO R. CRUZ, et al.,                    No. C 01-0892 CRB

12          Plaintiffs,                           **AMENDED MEMORANDUM AND**
                                                  **ORDER RE: MEXICAN DEFENDANTS'**
13     v.                                         **MOTION TO DISMISS**

14   UNITED STATES OF AMERICA, et al.,

15          Defendants.

16   _____

17   THIS DOCUMENT RELATES TO:

18   Case No. C 02-1942-CRB
     Case No. C 02-1943-CRB
19   Case No. C 02-1944-CRB

20   _____/

21          The Court, in order to correct the legal error contained therein, hereby amends its

22   March 30, 2005 Memorandum and Order Granting Mexican Defendants' Motion to Dismiss

23   read as follows:

24          Now before the Court is the Mexican Defendants' motion to dismiss the Second

25   Amended Complaint (SAC) on several bases, including: (1) sovereign immunity; (2) personal

26   jurisdiction; (3) lack of a private right of action; (4) the act of state doctrine; (5) international

27   comity; and (6) statute of limitations.  After carefully considering the papers submitted by the

28   parties and having had the benefit of oral argument and several post-hearing

**United States District Court**
For the Northern District of California

briefs, the Court hereby DENIES the motion to dismiss.

## BACKGROUND

The facts underlying plaintiffs claims in this action have been described in great detail by earlier orders of this Court and will not be repeated here. However, some explanation regarding the procedural history that brought the case to its present posture is necessary to frame the issues now before the Court.

On August 23, 2002, the Court issued an order dismissing all claims in both the Cruz and De la Torre actions. Cruz v. United States, 219 F. Supp.2d 1027 (N.D. Cal. 2002). *Inter alia*, the Court ruled that the Mexican Defendants were entitled to absolute immunity because the Foreign Sovereign Immunity Act ("FSIA") did not apply retroactively. Plaintiffs in the Cruz matter later requested that the Court reconsider that ruling in light of the Ninth Circuit's holding in Altmann v. Republic of Austria, 317 F.3d 954 (9th Cir. 2002) ("Altmann I"). By way of a June 24, 2003 order, the motion for reconsideration was denied on the grounds that the holding regarding retroactivity in Altmann I was limited to the facts presented there. Cruz v. United States, No. 01-0892, 2003 WL 21518119 (N.D. Cal. Jun. 24, 2003).

The Supreme Court then affirmed the Altmann decision, though on the grounds that the FSIA is retroactive generally. Republic of Austria v. Altmann, 541 U.S. 677, 124 S.Ct. 2240, 2253-54 (2004) ("Altmann II"). Accordingly, this Court's basis for dismissing the claims against the Mexican Defendants is no longer valid, and it now may review defendants' motion to dismiss on sovereign immunity grounds pursuant to the understanding that the statute applies retroactively.

## DISCUSSION

### I. Plaintiffs' Remaining Claims

The question of what viable claims remain in the complaint following the Court's prior orders has been the subject of some dispute between the parties and therefore merits some clarification. The Court previously ruled in the De la Torre action that the international

/ / /

/ / /

United States District Court

For the Northern District of California

agreements creating the bracero program did not create a private right of action.[1]  See De la Torre v. United States, No. C 02-1942 CRB, ¶. 12-15 (N.D. Cal. April 14, 2004).  That ruling applies with equal force here, and therefore plaintiffs may not assert causes of action based exclusively on the international agreements.  This finding also precludes plaintiffs from making claims in contract law asserting third-party beneficiary rights under the international agreements.  See Kwan v. United States, 272 F.3d 1360, 1363 (Fed. Cir. 2001) (stating that "the appellants cite no authority, and we know of none, whereby an individual has been found entitled to judicial enforcement of a government-to-government agreement on the legal theory that they are third party beneficiaries of the agreement.").  Similarly, plaintiffs' claims for breach of fiduciary duty, which are premised only upon duties found within the international agreements, see, e.g., SAC at ¶¶ 93-94, must also be dismissed.

However, plaintiffs have also made claims against the Mexican Defendants based on theories of resulting trust, accounting, unjust enrichment, conversion and California's Unfair Competition Law.  Unlike plaintiffs' contract claims, these claims which are inherently equitable in nature do not require the existence of a contract for relief to be granted.  See, e.g. In re Markair Inc., 172 B.R. 638, 641-42 (B.A.P. 9th Cir. 1994) (stating that a resulting trust is established by intentions of the parties); Lectrodryer v. SeoulBank, 77 Cal.App.4th 723, 726 (Cal. Ct. App. 2000) (stating that elements of unjust enrichment are "receipt of a benefit and unjust retention"); In re Emery, 317 F.3d 1064, 1069 (9th Cir. 2003) (per curiam) (conversion claim established by showing plaintiff's ownership or property).[2]  Therefore, because it is possible for plaintiffs to establish an ownership interest in the savings funds based upon causes of action that are independent of the international agreements, these claims survive the Court's earlier ruling.

---

[1] Plaintiffs have, without basis, asked the Court to reconsider this ruling. The request is denied. See Northern District of California Local Rule 7-9(b) (setting forth recognized bases for reconsideration).

[2] The Court has used examples from California law and federal common law. However, as the Court decides infra that Mexican law applies to these causes of action, the Court assumes without deciding that the equivalent causes of action under Mexican law--if any exist--would be similarly structured.

-3-

## II.  FSIA

The Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. § 1602 <u>et seq.</u>, "establishes a comprehensive framework for determining whether a court in this country . . . may exercise jurisdiction over a foreign state." <u>Republic of Argentina v. Weltover, Inc.</u>, 504 U.S. 607, 610 (1992).  The act provides that foreign states shall be immune from suit unless one of its exceptions applies.  28 U.S.C. §§ 1604, 1605.  Plaintiffs contend that this Court has jurisdiction and that Mexico lacks sovereign immunity from this case pursuant to the FSIA's commercial activity exception, which provides for no immunity in any case:

> in which the action is based [1] upon a commercial activity carried on in the United States by the foreign state; or [2] upon an act performed in the United States in connection with a commercial activity of the foreign state elsewhere; or [3] upon an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that act causes a direct effect in the United States;

28 U.S.C. § 1605(a)(2) (numeration added).  The section requires not only that the suit be related to some commercial activity of the foreign state, but also that one of the three forms of nexus with the United States are present.

The parties respective burdens with respect to the application of the FSIA are allocated according to a complex procedure:

> Where . . . the plaintiff alleges in his complaint that his claim is based on a foreign state's strictly commercial acts, the defendant must establish a prima facie case that it is a sovereign state[3] . . . .  This proof establishes a presumption that the foreign state is protected by immunity.  The plaintiff then has the burden of going forward with the evidence by offering proof that one of the FSIA exemptions applies.  Once the plaintiff has presented this evidence, the defendant must prove its entitlement to immunity by a preponderance of the evidence.

<u>Siderman de Blake v. Republic of Argentina</u>, 965 F.2d 699, 708 n.9 (9th Cir. 1992) (citation omitted).  Here, it is undisputed that the Mexican Defendants all fall within the FSIA's definition of a sovereign state.

Plaintiffs have relied on the undisputed structure of the bracero program to establish

---

[3]The Court omits a portion of this passage stating that a prima facie case also requires defendant to establish that "plaintiff's claim arises out of a public act."  The Ninth Circuit has since repudiated such a requirement as dicta. <u>See</u> <u>Phaneuf v. Republic of Indonesia</u>, 106 F.3d 302, 305 (9th Cir. 1997).

that their claims are directed against commercial conduct. Defendants reply that the commercial activity exception does not apply for two reasons: (1) plaintiffs' claims are not "commercial activity;" and (2) there is not a sufficient nexus between plaintiffs' claims and the United States for the exception to apply.

### A. Commercial Activity

The FSIA defines "commercial activity" as:

> Either a regular course of commercial conduct or a particular commercial transaction or act. The commercial character of an activity shall be determined by reference to the nature of the course of conduct or particular transaction or act, rather than by reference to its purpose.

28 U. S. C. § 1603(d). The Supreme Court has clarified that:

> when a foreign government acts, not as regulator of a market, but in the manner of a private player within it, the foreign sovereign's actions are 'commercial' within the meaning of the FSIA. Moreover, because the Act provides that the commercial character of an act is to be determined by reference to its 'nature' rather than its 'purpose,' 28 U. S. C. § 1603(d), the question is not whether the foreign government is acting with a profit motive or instead with the aim of fulfilling uniquely sovereign objectives. Rather, the issue is whether the particular actions that the foreign state performs (whatever the motive behind them) are the *type* of actions by which a private party engages in 'trade and traffic or commerce.'

Weltover, 504 U.S. at 614 (citation omitted, emphasis in original).

Clearly an important stage in making this determination is classifying the relevant conduct. At the outset it should be noted that the heart of plaintiffs' remaining claims against the Mexican Defendants is that they failed to properly safeguard the savings funds after they were received, and then failed to disgorge the funds to the braceros. Viewed in this light, the alleged activities of the Mexican Defendants are indistinguishable from the actions of a private bank or trustee. Indeed, the agreements could have specified that a private bank play the role of the ultimate holder of the savings funds, just as they specified that Wells Fargo would play the role of intermediary. Had the agreements done so, there can be no doubt that such banks would have been amenable to suit. Whether the savings funds are deemed to be bank accounts or trusts, they do not possess any qualities which make them uniquely sovereign. In this regard the present case is similar to Weltover. There, although the case arose out of the Argentine government's issuance of bonds for uniquely sovereign objectives, and its subsequent

1   unilateral extension of their due date by presidential decree, 504 U.S. at 610, the Court still

2   found the commercial activity exception applicable by focusing on the fact that the bonds we

3   "in almost all respects garden-variety debt instruments." Id. at 615.

4       Defendants argue, however, that plaintiffs' claims must be viewed in light of the overa

5   context of the bracero program--including the state-to-state negotiations that brought it abou

6   Although the Court declined in Weltover to decide whether it is proper to consider such

7   contextual details, it later made clear in Saudi Arabia v. Nelson, 507 U.S. 349 (1993), that the

8   proper analysis is focused on "those elements of a claim that, if proven, would entitle a

9   plaintiff to relief under his theory of the case." Id. at 357; see also Siderman de Blake, 965

10  F.2d at 709 n.10 ("[T]he commercial activity exception does not require that every act allege

11  be commercial in nature." (emphasis in original)); Globe Nuclear Services and Supply (GNS

12  Ltd. v. AO Techsnabexport, 376 F.3d 282, 287 (4th Cir. 2004) (reversing district court findin

13  of noncommercial activity based on overall context of disputed contracts as too broad; distric

14  court should have looked only to the particular claims at issue). Therefore, looking only to th

15  conduct that forms the basis of the suit--the refusal of the Mexican Defendants to disgorge

16  funds kept either as a trust or as an ordinary bank deposit--the suit is properly characterized a

17  commercial.

18      Even assuming, though, that the suit should be viewed as defendants would like, to

19  include the executive agreements that made the bracero program possible, the conduct would

20  still bear a greater resemblance to the actions of "a private player" within the market than to a

21  sovereign's activities as "regulator of a market." Weltover, 504 U.S. at 614. The Mexican

22  Defendants mischaracterize their role under the U.S.-Mexico agreements as regulation.

23  Mexico did not exercise the type of control over the treatment of Mexican laborers by

24  employers in the United States that would ordinarily be understood as regulation. Mexico

25  could not, for example, impose fines or other sanctions against employers that violated their

26  obligations to the laborers. Indeed, according to plaintiffs, it was the very absence of such

27  authority in past labor programs that led to the poor treatment of Mexican laborers and gave

28  rise to the necessity of formalizing particular standards in the agreements at issue. Mexico,

instead, was put in the position equivalent to a labor union that negotiates labor terms on behalf

of its members.[4]  Had the employers failed to abide by the conditions of the agreements,

Mexico could only resort to negotiations with the United States government in order to seek

redress on behalf of the braceros.  Mexico could not have, by the force of its own sovereign

authority, forced employers in the United States to abide by the agreements' terms.

Accordingly, the conduct at issue was equivalent to that of a private player and not to a

sovereign regulator.  See Weltover, 504 U.S. at 614 ("a foreign government's issuance of

regulations limiting currency exchange is a sovereign activity because such *authoritative*

*control of commerce* cannot be exercised by a private party . . . ." (emphasis added)).

Therefore, the Court concludes that the complained of conduct constitutes "commercial

activity."

**B. Nexus**

Each of the three clauses of section 1605(a)(2) corresponds with a different theory of

nexus.  Plaintiffs argue all three apply.  The Court finds that the relevant conduct satisfies the

nexus test under the first clause, and therefore only that issue is addressed below.

The first clause of section 1605(a)(2) provides that sovereign immunity does not apply

in cases where "the action is based upon commercial activity carried on in the United States by

the foreign state."  FSIA further defines the "carried on" standard as "carried on by such state

and having substantial contact with the United States."  28 U.S.C. § 1603(e).  The Ninth Circuit

has further elaborated that "the foreign state need not engage in commercial activity in the

United States on a regular basis . . . [i]nstead, the critical inquiry is whether there is a nexus

between the defendant's commercial activity in the United States and the plaintiff's grievance."

Siderman de Blake v. Republic of Argentina, 965 F.2d 699, 709 (9th Cir. 1992) (citation and

internal quotations omitted).  Although, "[t]he focus must be solely upon those specific acts

that form the basis of the suit" Sun v. Taiwan, 210 F.3d 1105, 1109 (9th Cir. 2000) (citation

---

[4]It also makes no difference that Mexico acted in this capacity without receiving any
payment.  See Weltover, 504 U.S. at 614 (stating that "the question is not whether the foreign
government is acting with a profit motive..."); Sun v. Taiwan, 201 F.3d 1105, 1108 (9th Cir.
2000) (rejecting argument that state's operation of tour program, in order to promote
understanding of Chinese culture, at no cost to consumers made the conduct non-commercial

1   and internal quotations omitted), plaintiffs need only demonstrate that "an element of [their]

2   claim consists in conduct that occurred in commercial activity carried on the United States."

3   Sugimoto v. Exportadora de Sal, S.A. de C.V., 19 F.3d 1309, 1311 (9th Cir. 1994).[5]

4       Resort to the legislative history sheds further light on the somewhat opaque standard

5   laid out by clause one and section 1603(e).  The House report states that a "substantial contact

6   with the United States includes:

> cases based on commercial transactions performed in whole or in part in the
> United States, import-export transactions involving sales to, or purchases from,
> concerns in the United States, business torts occurring in the United States (cf.
> Sec. 1605(a)(5)), and an indebtedness incurred by a foreign state which
> negotiates or executes a loan agreement in the United States, or which receives
> financing from a private or public lending institution located in the United
> States--for example, loans, guarantees or insurance provided by the
> Export-Import Bank of the United States. It will be for the courts to determine
> whether a particular commercial activity has been performed in whole or in part
> in the United States. This definition, however, is intended to reflect a degree of
> contact beyond that occasioned simply by U.S. citizenship or U.S. residence of
> the plaintiff.

14  H.R. Rep. No. 94-1487 (1976), reprinted in 1994 U.S.C.C.A.N. 6604, 6615-16, 1976 WL

15  14078.

16      Defendant argues that because payment of the braceros' savings funds was to have

17  occurred in Mexico there is not a sufficient nexus under section 1605(a)(2).  However, in

18  Siderman de Blake the Ninth Circuit found that Argentina's expropriation of the plaintiffs'

19  assets, all of which were located in Argentina, fell within the first clause of section

20  1605(a)(2).  965 F.2d at 709.  The court there found sufficient nexus based on Argentina's

21  alleged advertisement of the expropriated hotel in the United States, and also because

22  Americans had stayed in the hotel and the hotel accepted American credit cards.  Id.  The court

23  further found "a nexus between the commercial activity and the plaintiff's grievance" based

24

_____

25      [5] Plaintiffs argue that, under the FSIA's definition of "commercial activity," the court may
    also look to whether defendants' ultimate failure to repay was a part of a "regular course of
26  commercial conduct," i.e. a part of the overall conduct of the bracero program. In making this
    argument, plaintiffs appear to rely mainly on Ministry of Supply, Cairo v. Universe Tankships, Inc.,
27  708 F.2d 80, 84 (2d. Cir. 1983).  However, the Second Circuit later scaled back the wording of
    that case, finding that a so-called "doing business" approach is "too broad" and that "a nexus is
28  required between the commercial activity in the United States and the cause of action." Barkanic
    v. Gen. Admin. of Civ. Aviation of Peoples Rep. of China, 822 F.2d 11, 13 (2d. Cir. 1987).

the fact that Argentina was continuing to receive profits and benefits from U.S. sources that rightfully belonged to the plaintiffs. Id.

Here, the Court finds that the braceros have alleged more ties between defendants' commercial activity and plaintiffs' claims than was presented in Siderman de Blake. In order to create the bracero program and the savings fund, Mexico conducted cross-border negotiations with the United States which included communications regarding the program directed from Mexico to the United States. See e.g. 56 Stat. 1759 (reproducing notes exchanged in finalizing U.S.-Mexico agreement). The individual contracts signed pursuant to the agreements provided for the withdrawal of savings funds from the braceros' pay, and specified that the money would be deposited in the defendant Mexican banks or their predecessors in interest. See e.g., Plaintiffs' Memo. Opp. Exh. C to Exh. 1 § 5 ("Individual Work Agreement"). During the program, Mexican government officials in the United States were to have informed the braceros of how to retrieve their savings funds. Banco de Mexico also maintained a Wells Fargo account which held the savings funds prior to their transfer to the Mexican banks. Finally the monies were transferred to the defendant Mexican banks from the United States, in concert with the United States government and Wells Fargo.

Given all of these alleged contacts, the Court concludes that the plaintiffs' claims are based on commercial activity "carried on" by defendants which had "substantial contacts with the United States." See 28 U.S.C. § 1603(e). These contacts are similar to those cited in the legislative history, such as "commercial transactions performed in whole or in part in the United States," "import-export transactions involving . . . purchases from[]concerns in the United States," and "indebtedness incurred by a foreign state which negotiates or executes a loan agreement in the United States." U.S.C.C.A.N. at 6615-16. Moreover, these contacts are closely tied to plaintiffs' claims. Plaintiffs' claims for resulting trust, conversion and unjust enrichment require them to establish ownership of the savings funds. Such a showing would involve tracing the path that the savings funds followed from the time they were initially earned pursuant to the labor agreements that Mexico negotiated, through the cross-border banking transactions that resulted in their ultimate arrival in accounts at the defendant banks.

At oral argument, counsel for defendants argued that <u>Security Pacific v. Derderian</u>, 87[6] F.2d 281 (9th Cir. 1989) compels the opposite result.[6]  There, defendant Derderian had forged a check and given it to codefendant, Jocovic, who deposited it in an account at plaintiff Security Pacific in the United States.  <u>Id.</u> at 282.  Jocovic then withdrew the funds, purchased gold coins with the proceeds, crossed the border into Tijuana, Mexico and deposited some of them into an account and safety deposit box at codefendant Banco BCH, an instrumentality of the Mexican government.  <u>Id.</u>  There was no dispute that the banking activities involved constituted commercial activity.  <u>See id.</u> at 285.  With respect to nexus, though, the Ninth Circuit--applying only clause three--found there to be no "direct effects" in the United States. <u>Id.</u>

Even if the Court were to import the clause three analysis there to the clause one analysis here, defendants' attempt to analogize <u>Derderian</u> would still fail.  There, the Mexican bank had no connection with the United States, save for the fact that Jocovic had unilaterally chosen to cross the border from the United States prior to depositing the disputed assets. Recognizing that this contact was too attenuated to provide nexus, the court explicitly distinguished it from a case like the one now before this Court in stating that "[Banco BCH] had no direct or indirect transactions with Security Pacific." <u>Id.</u> at 286.  <u>See also id.</u> (pointing out that Banco BCH did nothing more than "accept[] a deposit *in Tijuana* into an account held by a Mexican national" (emphasis added)).  Here, by contrast, the Mexican Defendants engaged in a series of direct, cross-border transactions with Wells Fargo in the United States.  This direct contact, together with the several other alleged contacts, is sufficient to provide nexus.

As plaintiffs have alleged a commercial activity by defendants with sufficient nexus to the United States, jurisdiction exists and sovereign immunity does not apply.

---

[6]Defense counsel stated that the case he was referring to was "Gregorian v. Security Pacific."  Apparently, counsel confused two important Ninth Circuit sovereign immunities cases: <u>Deridian</u> and <u>Gregorian v. Ivestia</u>, 871 F.2d 1515 (9th Cir. 1989).  If counsel was referring to the latter case, it still would provide no basis for ignoring the significant nexus discussed above.  The court there held that, under a clause three analysis, "mere financial loss suffered by a plaintiff in the United States as a result of the action abroad of a foreign state does not constitute a 'direct effect.'" <u>Id.</u> at 1527.  However, this Court does not reach the question of whether jurisdiction here may be founded upon clause three.  In any event, the Court does not rely on plaintiffs' financial losses in the United States as a sole basis for jurisdiction here.

**III. Personal Jurisdiction**

Defendants Banco Nacional de Credito Rural, S.A. and Patronato del Ahorro Naciona[l] move for dismissal arguing that exercise of personal jurisdiction over them would be unconstitutional. Plaintiffs reply that, as instrumentalities of Mexico, the defendant banks ar[e] not "persons" within the meaning of the Due Process Clause.

The D.C. Circuit held in <u>Price v. Socialist People's Libyan Arab Jamahiriya</u>, 294 F.3[d] 82 (D.C. Cir. 2002) that foreign states are not "persons" under the due process clause. <u>See</u> <u>id</u> at 96-100.[7] The court reasoned first that "in common usage, the term 'person' does not include the sovereign, and the statutes employing the word are ordinarily construed to exclu[de] it." <u>Id.</u> at 96. Based on this understanding the Supreme Court has interpreted the word "person" as used in the Due Process Clause not to encompass the fifty States of the Union. <u>I</u>[d.] (<u>citing</u> <u>South Carolina v. Katzenbach</u>, 383 U.S. 301, 323-24 (1966)). However, rather than simply directly importing this reasoning to foreign states, <u>Price</u> instead analyzed the positio[n] of foreign states within the constitutional framework. The court found that this nation's federal system provides for a mechanism for resolving disputes with foreign sovereigns that [is] separate and distinct from the system of individual rights created by the Constitution. <u>Id.</u> Th[e] rights of foreign states are instead secured by principles derived from international law such [as] comity and sovereign immunity. <u>See</u> <u>id.</u>

The question before this Court--a question not reached in <u>Price, id.</u> at 99-100--is whether that reasoning applies equally to a corporate instrumentality of a foreign state. Of course, corporations--including state-owned corporations--have traditionally been afforded separate juridical status. <u>See</u> <u>First Nat'l City Bank v. Banco Para el Comercio Exterior de Cuba</u>, 462 U.S. 611, 626-27 (1983). It is also settled that privately-owned foreign corporations are protected by the due process clause. <u>See</u> <u>Helicopteros Nacionaled de Colombia, S.A. v. Hall</u>, 466 U.S. 408 (1984). Nonetheless, the reasoning of <u>Price</u>, which thi[s] Court finds sound, counsels against affording the Mexican banks in this case the status of

---

[7]The Ninth Circuit has not weighed in on this question. <u>See</u> <u>Altmann v. Republic of Austria</u>, 317 F.3d 954, 970 (9th Cir. 2002) <u>affirmed by</u> 541 U.S. 677.

"persons" within the scope of that term as used in the Due Process Clause.  First, focusing on

the reasoning that foreign sovereigns are the analogues of state sovereigns, the Court notes

that state agencies and instrumentalities are not treated as distinct entities under the

Constitution.  See Penhurst State School & Hosp. v. Halderman, 465 U.S. 89, 100 (1984)

(holding that state agencies are treated as states under the Eleventh Amendment.); State

Highway Com. v. Utah Constr. Co., 278 U.S. 194, 199 (1928) (ruling that a state commission

is in fact the state under the judiciary act); Marion County Bd. of Review v. State Bd. of Tax

Comm'rs, 516 N.E.2d 1129, 1131 (Ind. Tax 1987) (stating that state instrumentalities are not

protected by Fifth Amendment due process clause); see also Will v. Mich. Dep't of State

Police, 491 U.S. 58, 71 (1989) (suit against a state official in her official capacity is in fact a

suit against the state).  Second, focusing on the status of foreign sovereigns within the

constitutional framework, the Court notes that foreign state-owned corporations are shielded

from suit by the same sovereign immunity and comity protections as their sovereign parents.

See 28 U.S.C. § 1603(a).  Third, the separate juridical status of a foreign corporation is

ignored in cases in which a foreign government so extensively controls the corporation that a

principal-agent relationship is created.  See First Nat'l City Bank, 462 U.S. at 629; see also

Flatow v. Islamic Republic of Iran, 999 F. Supp. 1, 21 n.9 (D.D.C. 1998) (finding that agents

foreign states acting in their official capacity are not "persons" under the Due Process clause

because agents of states sued in their official capacity lack Fifth Amendment protection).

Here, the Mexican bank defendants acted at all relevant times as agencies and instrumentaliti

of the Mexican government.  Therefore, the motion to dismiss them on due process grounds i

denied.

**IV.  Act of State Doctrine**

The act of state doctrine is a non-jurisdictional, prudential limitation on a court's pow

to examine the official actions of a foreign state in order to avoid conflicts with the foreign

policy of the political branches.  Siderman de Blake v. Republic of Argentina, 965 F.2d 699,

707 (9th Cir. 1992); United States v. Merit, 962 F.2d 917, 921 (9th Cir. 1992).  The doctrine

applies where "(1) there is an official act of a foreign sovereign performed within its own

territory; and (2) the relief sought or the defense interposed [in the action would require] a court in the United States to declare invalid the [foreign sovereign's] official act." <u>Credit Suisse v. United States Dist. Ct.</u>, 130 F.3d 1342, 1346 (9th Cir. 1997) (citation and internal quotations omitted). Courts also consider other factors, such as "whether the foreign state was acting in the public interest;" "the degree of international consensus regarding the activity;" whether adjudication would "hinder the Executive Branch in its formulation of foreign policy; and whether the case could "result in differing pronouncements on the same subject." <u>Liu v. Republic of China</u>, 892 F.2d 1419, 1433-34 (9th Cir. 1989) (citations omitted). Only those judgments that involve making a legal determination regarding the legitimateness of an official action, rather than making a factual determination that such an action occurred, are prohibited from review. <u>W.S. Kirkpatrick & Co., Inc. v. Environmental Tectonics Corp. Int'l</u>, 493 U.S. 400, 405-06 (1990) (listing cases). It is defendant's burden to prove that the act in question was an act of state. <u>Republic of Phillippines v. Marcos</u>, 862 F.2d 1355, 1369-70 (9th Cir. 1988).

Plaintiffs argue that the act of state doctrine does not apply because Mexico's retention of the savings funds is not a "statute, decree, order or resolution," i.e. it is not an *act* of state. Plaintiffs are correct. In <u>Alfred Dunhill of London, Inc. v. Republic of Cuba</u>, 425 U.S. 682 (1976), several U.S. cigar importers sued the Cuban government to recover monies they had mistakenly paid the government after the "intervention" (nationalization) of the companies' Cuban assets. The mistaken payments were for pre-nationalization shipments. A majority[8] of the Court held:

> We . . . disagree with the Court of Appeals that the mere refusal of the interventors to repay funds followed by a failure to prove that interventors "were not acting within the scope of their authority as agents of the Cuban government" satisfied respondents' burden of establishing their act of state defense . . . . [T]he only evidence of an act of state other than the act of nonpayment by interventors was 'a statement by counsel for interventors, during trial, that the Cuban Government and the interventors denied liability and had refused to make

---

[8]Plaintiffs mistakenly cite this portion of the opinion as only being joined by a plurality of the Court. However, this passage (located in Part II), was joined by five justices, while the part discussing the more controversial potential of a commercial activity exception to the act of state doctrine (located in Part III) was only joined by a plurality of the Court. <u>See</u> <u>Alfred Dunhill</u>, 425 U.S. at 682 n.* (stating that Part III of the opinion was joined only by three Justices).

repayment' . . . . No statute, decree, order, or resolution of the Cuban Government itself was offered in evidence indicating that Cuba had repudiated its obligations in general or any class thereof or that it had as a sovereign matter determined to confiscate the amounts due three foreign importers.

Id. at 694-95. Alfred Dunhill did not create a formalistic distinction between acts and omissions, but rather held that Cuba's mere failure to pay, without having admitted an obligation and then formally repudiated it, was insufficient to support a finding that the nonpayment was invested with the sovereign authority of the state. See id. at 693 n.8; see also id. at 718-19 (Marshall, J., dissenting) (arguing that the focus of the majority's holding was not on the distinction between action and inaction, but rather whether Cuba had exercised its "sovereign power" in not returning the funds.); Callejo v. Bancomer, S.A., 764 F.2d 1101, 1115 (5th Cir. 1985) (describing the majority's opinion as resting upon whether the repudiation was "invested with the sovereign authority of the state.").

The situation before this Court is indistinguishable. The heart of plaintiffs' complaint, as it now remains, is that Mexico refuses to disgorge funds that are alleged to be plaintiffs' property. As in Alfred Dunhill, defendants here have not met their burden of producing any formal "statute, decree, order, or resolution" of the Mexican government, or any other evidence indicating that Mexico has as a sovereign act formally repudiated its obligations to repay the braceros' savings funds.

Accordingly, the motion to dismiss on act of state grounds is denied.

**V. International Comity**

Defendants next argue that this Court should decline to exercise jurisdiction pursuant to the principle of international comity. The classic definition of comity is as

neither a matter of absolute obligation, on the one hand, nor of mere courtesy and good will, upon the other. But it is the recognition which one nation allows within its territory to the legislative, executive, or judicial acts of another nation, having due regard both to international duty and convenience, and to the rights of its own citizens, or of other persons who are under the protection its laws.

Hilton v. Guyot, 159 U.S. 113, 163-64 (1895) quoted in Wilson v. Marchinton, 127 F.3d 805, 809 (9th Cir. 1997). The party asserting the affirmative defense of international comity bears the burden of proof. In re Grand Jury Proceedings, 40 F.3d 959, 964 (9th Cir. 1994); Sarei v.

-14-

Rio Tinto PLC, 221 F. Supp.2d 1116, 1200 (C.D. Cal. 2002).

Defendant argues that the Mexican Congress's creation of a special commission to investigate the braceros' claims provides a basis for this Court to dismiss on comity grounds. According to a declaration submitted by defendants, the commission was established in April 2001 and two years later, in April 2003, submitted a proposal to the Congress to create a trust for braceros and their spouses. The trust would provide that those braceros who are Mexican citizens and can show documentation evidencing their participation in the bracero program would be given 60,000 pesos (about $5,000). The special commission was renewed by the Mexican Congress in September 2003, and at oral argument, counsel for defendants represented that the Mexican Congress had made an allocation in the federal budget for the fund.

The facts as described by defendants do not present the typical situation in which the principle of international comity is applied. That is, there is no "legislative, executive, or judicial act[]" to which the Court should show deference. Indeed, some courts have viewed the existence of an actual conflict between domestic and foreign law as a threshold requirement for abstention on international comity grounds. See In re Simon, 153 F.3d 991, 998 (9th Cir. 1998) (finding there to be such a requirement in bankruptcy context); In re Maxwell Communication Corp., 93 F.3d 1036, 1049 (2d Cir. 1996) (same). If such a standard were to be applied here, then this court would not abstain, since there is no provision of Mexican law that is in conflict with these proceedings.

However, even if there is no direct conflict requirement, application of the comity doctrine would still be inappropriate. The instant case similar to Bodner v. Banque Paribas, 114 F. Supp.2d 117 (E.D.N.Y. 2000), in which the court concluded that "there [was] little to which th[e] Court could potentially defer, other than a set of recommendations." Id. at 129-3. Defendants here attempt to distinguish Bodner by arguing that, unlike the case there, Mexico's special commission has not been dissolved and thus its work remains ongoing. However, although the mandate of the special commission has been renewed, it too has produced nothing more than recommendations. Any attempts by the Mexican Congress to address the braceros'

claims can at best be described as preliminary. Defendants have therefore failed to satisfy their burden that the doctrine of comity should apply at the present time.

The motion to dismiss on these grounds is therefore denied. However, as defendants have advised the Court that the efforts in the Mexican Congress continue to progress, this ruling is without prejudice to defendants later filing a renewed motion to dismiss on comity grounds based on changed circumstances.

**VI. Statute of limitations**

The Court finds that the intertwined issue of statute of limitations and choice of law should be answered through a three-step process. First, the Court must decide what choice-of-law rule governs the selection of the statute of limitations. Second, the Court must apply that rule to determine which jurisdiction's limitations law applies. Third, and finally, the Court will determine whether plaintiffs' claims fall within the relevant limitations period.

**A. Which Choice-of-Law Rule Governs?**

In cases in which jurisdiction is premised on the FSIA, courts in the Ninth Circuit look to the choice-of-law rules provided by federal common law. See, e.g., Chuidian v. Philippine National Bank, 976 F.2d 561, 564 (9th Cir. 1992); Schoenberg v. Exportadora de Sal, S.A. de C.V., 930 F.2d 777, 782 (9th Cir. 1991). Federal choice-of-law rules follow the approach of the Restatement (Second) of Conflict of Laws ("Restatement"). Id.

Plaintiffs argue that the rule articulated in Chuidian does not govern because Sun Oil Co. v. Wortman, 486 U.S. 717 (1988) and North Star Steel v. Thomas, 515 U.S. 29 (1995) create a presumption that the statute of limitations of the forum applies regardless of any choice-of-law analysis. Neither case is applicable, and therefore Chuidian governs.

First, in Sun Oil the Supreme Court held that a state *may*, consistent with due process and the Full Faith and Credit clause, require its own statute of limitations to be applied to a case in which the state has only minor contacts. 486 U.S. at 728-29. While this principle is beyond challenge, it does not speak to the question at issue here: whether California's statute of limitations in fact *does* apply to this case.

North Star Steel is also off-point. That case was decided in the context of the Worker

1  Adjustment and Retraining Notification Act, a federal statute that created a cause of action b[...]

2  did not specify a statute of limitations. Under those circumstances, the court found it

3  necessary to engage in interstitial federal common lawmaking by creating a statute of

4  limitations. See also Papa v. United States, 281 F.3d 1004, 1011-13 (9th Cir. 2002) (engagin[...]

5  in interstitial lawmaking to create a statute of limitations for the Alien Tort Claims Act). The[...]

6  case at bar is distinct in that the FSIA does not create a federal cause of action. Rather, it

7  merely provides for the circumstances by which a foreign sovereign may be sued in the Unit[...]

8  States. Under the FSIA, the defendant is "liable in the same manner and to the same extent a[...]

9  private individual under like circumstances." 28 U.S.C. § 1606; see Barkanic v. Gen. Admin[...]

10  Civil Aviation of the People's Republic of China, 923 F.2d 957, 959 (2d. Cir. 1991). This

11  means that the cause of action comes from state law. Id. Therefore, in this situation, the

12  choice of statute of limitation is not a matter of interstitial federal common lawmaking, but is[...]

13  instead akin to a classic choice-of-law inquiry that ordinarily occurs in diversity cases in whi[...]

14  a court is asked to choose between the laws of two states each of which have a significant

15  relationship to the lawsuit. See Restatement § 1. However, unlike the Second Circuit which

16  has found that the FSIA mandates a choice-of-law analysis equivalent to that which would o[...]

17  in a diversity action, see Barkanic, 923 F.2d at 960, the Ninth Circuit has rejected the diversi[...]

18  analogy and has instead opted to apply federal common law choice of law rules. See

19  Shoenberg, 930 F.2d at 782; Harris v. Polskie Linie Lotnicze, 820 F.2d 1000, 1004 n.5 (9th

20  Cir. 1987).

21      This distinction also differentiates the case at bar from cases cited by plaintiffs from

22  other circuits in which courts have applied the substance-procedure distinction applicable in[...]

23  diversity cases to FSIA cases in order to conclude that the forum's statute of limitation

24  applied. See Lord Day & Lord v. Socialist Republic of Vietnam, 134 F. Supp.2d 549, 561

25  (S.D.N.Y. 2001); Dar El-Bina Eng'g & Contr. Co., Ltd. v. Republic of Iraq, 79 F. Supp.2d 37[...]

26  388 (S.D.N.Y. 2000); Proctor & Gamble Cellulose Co. v. Viskoza-Loznica, 33 F. Supp.2d 6[...]

27  666 (W.D. Tenn. 1998). The Restatement, which this Court is bound to apply as a presumpti[...]

28  statement of federal common law, provides a contrary rule that "statute of limitations should[...]

-17-

1  not be treated as procedural for choice of law purposes." Restatement § 142, Reporter's Note

2  (citing <u>Keeton v. Hustler Magazine, Inc.</u>, 465 U.S. 770, 778 n.10 (1984)); <u>see also</u> <u>Averbach</u>

3  <u>Vnescheconombank</u>, 280 F. Supp. 2d 945, 951-53 (N.D. Cal. 2003) (after determining under

4  <u>Chuidian</u> that Russian law applied, applying without discussion Russian statute of limitations

5      In sum, the Court concludes that federal common law, as articulated in the Restatement,

6  governs the choice of statute of limitations.

7      **B. Application of Federal Common Law Choice-of-Law Rules**

8      With respect to choice of statute of limitations, the Restatement provides:

9          Whether a claim will be maintained against the defense of the
            statute of limitations is determined under the principles stated in §

10          6. In general, unless the exceptional circumstances of the case
            make such a result unreasonable:

11
                (1) The forum will apply its own statute of

12              limitations barring the claim.
                (2) The forum will apply its own statute of

13              limitations permitting the claim unless:
                    (a) maintenance of the claim would

14                  serve no substantial interest of the
                    forum; and

15                  (b) the claim would be barred under
                    the statute of limitations of a state

16                  having a more significant relationship
                    to the parties and the occurrence.

17

18  Restatement § 142.  Under this analysis either California's or Mexico's limitations law will

19  apply.  Because the parties dispute what rule is provided in each of these jurisdictions, the

20  Court analyzes both below.

21  / / /

22          1.  <u>California Limitations Law</u>

23      The governing California statute provides:

24          Notwithstanding any other provision of law, any action brought by
            a bracero, or heir or beneficiary of a bracero, arising out of a

25          failure to pay or turn over savings fund amounts shall not be
            dismissed for failure to comply with the otherwise applicable

26          statute of limitations, provided the action is filed on or before
            December 31, 2005.

27

28  Cal. Civ. Proc. Code § 354.7(c).  This statute, if applicable, would effectively provide for no

-18-

limitation period in this case. Defendants argue that the statute is preempted because it conflicts with clearly articulated federal policy on this subject. Defendants also claim that the statute is otherwise invalid because it exceeds California's legislative powers by infringing on the exclusively federal arena of foreign affairs.

(a) Implied Preemption[9]

Defendants argue that section 354.7(c)[10] is impliedly preempted by the 1942 and 1943 agreements between Mexico and the United States that established the bracero program. The central case supporting defendant's argument for preemption is <u>American Ins. Ass'n v. Garamendi</u>, 539 U.S. 396 (2003). In that case, the Court evaluated California's Holocaust Victim Insurance Relief Act ("HVIRA"), which required insurers doing business in California to disclose information about holocaust-era insurance policies, while also creating a private cause of action and extending the statute of limitations on individual claims for recovery of unpaid plans. <u>See id.</u> at 408-11. The Supreme Court found the statute preempted, holding that there was a "clear conflict between the policies adopted by" California and the United States. The federal government's policy was represented by a series of executive agreements which together illustrated that "the consistent Presidential foreign policy has been to encourage European governments and companies to volunteer settlement funds in preference to litigation or coercive sanctions." <u>Id.</u> at 421. In short, as the Court colorfully put it, the statute was

_____

[9]Plaintiffs' preemption arguments draw authority from the structure of the Constitution and the Supremacy Clause, and therefore implicate the constitutionality of section 354.7(c). <u>See</u> <u>Crosby v. Nat'l Foreign Trade Council</u>, 530 U.S. 363, 388 (2000). Although the Court must avoid such constitutional questions if it can, <u>see, e.g.</u>, <u>Jean v. Nelson</u>, 472 U.S. 846, 854 (1985), the issue cannot be avoided since the Court finds <u>infra</u> that the California limitations law does apply to this case.

[10]In considering whether section 354.7(c) is preempted, the Court considers only subsection (c) of the statute and does not consider whether other parts of the statute would survive such a challenge. <u>Brockett v. Spokane Arcades, Inc.</u>, 472 U.S. 491, 502 (1985) (citing the "elementary principle that the same statute may be in part constitutional and in part unconstitutional, and that if the parts are wholly independent of each other, that which is constitutional may stand while that which is unconstitutional will be rejected"). Separate consideration of section 354.7(c) is made possible by the severability provision contained in subsection (d) of the statute. <u>See</u> Cal. Code Civ. Proc. § 354.7(d). That section 354.7 on its face makes each provision severable distinguishes it in this regard from section 354.6, which was considered in <u>Deutsch v. Turner Corp.</u>, 324 F.3d 692, 707-08 (9th Cir. 2003). <u>See</u> Cal. Code Civ. Proc. § 354.6.

1    preempted because "California seeks to use an iron fist where the President has consistently

2    chosen kid gloves." Id. at 427.

3         Garamendi does not support preemption here. Defendants are wrong to state that this

4    Court has held that "the signatory nations to the 1942 and 1943 Agreements determined that

5    protection of the braceros was to be provided by the political branches, not the judiciary." D

6    Mtn. to Dismiss at 25. To the contrary, this Court held "[t]he executive agreements did not

7    preclude--and perhaps contemplate--a remedy whereby the bracero would sue the individual

8    employer directly for any violation of the [individual] contract." De la Torre v. United States

9    No. C 02-1942 CRB, p. 14 (N.D. Cal. April 14, 2004). Thus, the agreements do not

10   affirmatively preclude the braceros' resort to judicial resolution of grievances arising out of

11   their employment. Nor is there any indication that the signatory parties in any way

12   contemplated what remedies would be available for grievances arising out of nonpayment of

13   savings funds. Accordingly the agreements, on their own, do not represent a preempting

14   federal policy that bracero claims would be resolved through diplomatic or other non-judicial

15   channels. Cf. Garamendi, 539 U.S. at 421-422 (citing language in U.S.-Germany and

16   U.S.-Austria executive agreements declaring the German Foundation to be the "exclusive

17   forum" for claims against German companies and setting forth other avenues for resolution of

18   claims). Defendants also quote language from the agreements stating that "[t]he Mexican

19   consuls...shall make every effort to extend all possible protection to all those workers on any

20   question affecting them." See 56 Stat. 1759, 1767; see also 47 Stat. 1353, 1357 (similar

21   language). However, this language contains neither the exclusivity nor the specificity of the

22

23   language relied on in Garamendi.[11] Nor is there here, as there was there, evidence produced

24   defendants that the United States government has consistently reaffirmed a policy of

25   non-judicial dispute resolution for the particular claims at issue. See Garamendi, 539 U.S. at

26   _____

27        [11]A reasonable reading of this language is that it was meant to apply to disputes that may
     have arisen while the braceros were working in the United States, and therefore does not reflect
28   upon the signatories' views with respect to disputes that may have arisen regarding the savings
     funds. This interpretation is bolstered by the fact that the cited language appears in the "Wages and
     Employment" section of the agreement, rather than the "Savings Fund" section.

**United States District Court**

For the Northern District of California

421-22.  In addition, whereas in <u>Garamendi</u> there was a federal policy that the claims at issue would be investigated and processed by international and federal commissions established for that purpose, <u>see</u> <u>id.</u> at 406-07 & 428-29, defendants here have not cited any effort by the United States government to specify some other procedure for resolving bracero claims. Simply put, defendants have not identified any federal policy or action that is inconsistent with California's decision to extend the statute of limitations in this case.  As the federal government has not spoken with respect to the claims at issue, <u>Garamendi</u> does not support preemption.

The fact that there is no clearly expressed federal policy regarding resolution of the braceros' claims also distinguishes this case from the other two cited by defendants.  In <u>Deutsch v. Turner Corp.</u>, 324 F.3d 692 (9th Cir. 2003), the Ninth Circuit invalidated a California statute that extended the limitations period for claims brought by World War II forced laborers while also creating a cause of action for such claims.  <u>See</u> Cal. Code Civ. Pro. § 354.6.  The statute is similar to the one at bar.  However, it was not the form but rather the substance of the statute in <u>Deutsch</u> which the court relied on to invalidate it.  <u>See</u> 324 F.3d at 712-13.  Those factors on which the court focused are not present in the case at bar.  First, the court in <u>Deutsch</u> explicitly limited its holding to the "narrow[] consideration" that the statute was "impermissible because it intrudes on the federal government's exclusive power to make and resolve war, including the procedure for resolving war claims."  <u>Id.</u> at 712.  Second, anticipating the holding in <u>Garamendi,</u> the court reached its conclusion regarding preemption by relying centrally on a series of treaties and executive agreements ending the war and making provision for reparations and settlement of claims.  <u>Deutsch</u>, 324 F.3d at 712-13 & 715 ("The federal government, acting under its foreign affairs authority, provided its own resolution to the war; California has not power to modify that resolution.").

Neither justification applies here.  First, the claims contemplated by section 354.7(c) are far removed from the federal government's powers to make and resolve war.  Although the claims concern funds generated during a wartime labor program, the bracero program--like other so-called "guest-worker" programs--drew much more from the federal government's

powers over immigration and commerce.[12]  Second, there is no treaty or executive agreement

that reflects federal policy on how to dispose of bracero claims.  Therefore <u>Deutsch</u> does not

support preemption.

The third case cited by defendants, <u>Taiheiyo Cement Corp. v. Superior Court of Los

Angeles County</u>, 117 Cal. App. 4th 380 (Cal. Ct. App. 2004), closely resembles <u>Deutsch</u> in

that the court there struck down the same California statute discussed in <u>Deutsch</u>, albeit with

the added benefit of guidance from <u>Garamendi</u>.  <u>Taiheiyo</u> clarified that, under the standard laid

out in <u>Garamendi</u>, the California forced labor statute was preempted by the 1951 peace treaty

with Japan which embodied a federal policy that claims by Koreans would be "the subject of

special arrangements" between Korea and Japan.  117 Cal. App. 4th at 393.  Once again, the

specific provision for alternate resolution of claims that were key to the holding there are not

present here.  The Court therefore finds no basis for finding section 354.7(c) preempted

pursuant to a conflict with the 1942 and 1943 agreements.

(b) Field Preemption

Defendants argue that even if section 354.7(c) is not impliedly preempted by the 1942

and 1943 agreements, the statute should still be invalidated nonetheless under the broader

concept of field preemption of state statutes that touch upon foreign affairs.  <u>See</u> <u>Garamendi</u>,

539 U.S. at 418-20 (describing the "contrasting theories of field and conflict preemption" of

state legislation in the area of foreign affairs).  Both <u>Deutsch</u> and <u>Garamendi</u> specifically

limited their findings of preemption to the existence of an actual conflict between the state

statutes at issue and clearly articulated federal policy; those cases therefore do not provide a

basis for such a finding.  <u>See</u> <u>Deutsch</u>, 324 F.3d at 712; <u>Garamendi</u>, 539 U.S. 421-22.

---

[12]If defendants' argument that the program is primarily a creature of the war power were accepted, then almost all federal action during war would have to be deemed derivative of the war power, potentially displacing scores of state legislative acts.  The bracero program was seen at the time as necessary to the war because it supported the United States' domestic economy.  This does not resemble the gravity of the federal war interest at stake in <u>Deutsch</u>--"the power of the federal government to make and resolve war, including the power to establish the procedure for resolving war claims."  324 F.3d at 711.  At bottom, the property claims contemplated by the bracero statute, although contextually related to war, do not intrude upon any of the federal government's war powers.  <u>See</u> <u>Alperin v. Vatican Bank</u>, __ F.3d __, 2005 WL 1355589, *12 (9th Cir. June 9, 2005) ("Reparation for stealing, even during wartime, is not a claim that finds textual commitment in the Constitution.").

However, courts have recognized that "'even in [the] absence of a treaty' or federal statute, a state may violate the constitution by 'establish[ing] its own foreign policy.'" Deutsch, 324 F. at 709 (quoting Zschernig v. Miller, 389 U.S. 429, 441 (1968)). This principle, which finds its roots in Zschernig has been "applied sparingly" and "neither the Constitution nor the courts have defined its precise scope. . . ." Deutsch, 324 F.3d at 710-711. An analysis of the relevant cases demonstrates that a finding of field preemption here would go further than any other court. Given the uncertain contours of the Zschernig doctrine, this Court declines to do so.

Zschernig involved an Oregon probate law which prohibited inheritance by nonreside aliens absent a showing that the alien's home country would not confiscate the inheritance. 389 U.S. at 430-31. The statute also required the courts to ask whether American citizens would enjoy reciprocal rights to inheritance in the alien's home country. Id. The Supreme Court found that, although no treaty or executive order actually conflicted with this law, it wa nonetheless unconstitutional because it invited judges to inquire into, comment on, and even disparage communist regimes. Id. at 440. For this reason, the Court found the statute invade the exclusive federal domain of foreign relations. See Zschernig, 389 U.S. at 440. The Cour pointed out that the Oregon law threatened to "impair the effective exercise of the Nation's foreign policy." Id. Accordingly, although there was no actual conflict between Oregon's policy and that of the federal government, the Court found that the substantial potential for such a conflict rendered the state law unconstitutional. Indeed, the Ninth Circuit has since interpreted Zschernig's holding as heavily influenced by the Cold War and the real potential judicial criticism of communist regimes to have ignited international tensions. Deutsch, 324 F.3d at 711. Section 354.7(c) does not raise the concerns present in Zschernig; therefore preemption is not appropriate.

That Zschernig preemption is inappropriate in this case is illustrated by comparison to other cases in which it has been applied. Most of the cases cited by defendants as applying Zschernig involved state "regulations which amount to embargoes or boycotts" passed with express intent to coerce foreign states into altering their political and social policies. See

Springfield Rare Coin Galleries, Inc. v. Johnson, 115 Ill.2d 221, 237-38 (Ill. 1986) (striking down Illinois tax provision which discriminated against South African coins struck down because "sole motivation was disapproval of [South Africa's] policies" and "encouraging a boycott" of South African products); see also National Foreign Trade Council v. Natsios, 18 F.3d 38, 45 (1st Cir. 1999) affirmed on other grounds by Crosby v. National Foreign Trade Council, 530 U.S. 363 (2000) (affirming invalidation of Massachusetts statute which restricted the ability of state agencies to purchase goods or services from companies that did business with Burma); Tayyari v. New Mexico State University, 495 F. Supp. 1365, 1378 (D.N.M. 1980) (striking down state university's policy of excluding Iranian students from admission in retaliation for the Iranian hostage crisis); New York Times Co. v. City of New York Comm'n on Human Rights, 41 N.Y.2d 354, 353 (N.Y. 1977) (affirming reversal of municipal agency's ruling that newspaper advertisements for employment in South Africa implicitly violated city antidiscrimination laws).  In these cases, the state enactments not only used state commercial power as a tool of foreign policy, their mere existence articulated state condemnation of a foreign nation's conduct by passing the statutes.  See Tayyari, 495 F. Supp. at 1376-80.[13]

Section 354.7(c) does not fit comfortably into this mold.  By lifting the statute of limitations for savings fund claims brought by braceros, California has not expressed its condemnation of Mexico's conduct.  Not only does the statute fail to mention Mexico, c.f. Johnson, 115 Ill.2d at 225; Natsios, 181 F.3d at 56; Tayyari, 495 F. Supp. at 1368, but it also makes no predetermined judgment regarding Mexico's liability.  Although defendants argue

---

[13]The only other case cited to this Court which invalidated a state statute pursuant to Zschernig preemption concerned a "buy-American" act requiring state contracts be awarded only to persons who agree to use materials which have been manufactured in the United States. See Bethlehem Steel Corp. v. Board of Comm'rs, 276 Cal.App.2d 221 (Cal. Ct. App. 1969). Bethlehem Steel differs from the other cases cited in that it did not single out any other country to express state discontent with their social policies. However, by preferring locally made goods over domestic ones, California had created an embargo of foreign goods that significantly impinged upon the federal government's ability to regulate foreign commerce. See Japan Line, Ltd. v. County of Los Angeles, 441 U.S. 434, 449 (1979) (stating that federal dominance over foreign commerce is even greater than power over interstate commerce). Other courts reviewing "buy-American" statutes have disagreed with the outcome of Bethlehem Steel. See Trojan Tech. Inc. v. Pennsylvania, 916 F.2d 903 (3d Cir. 1990); K.S.B. Tech. Sales Corp. v. North Jersey Dist. Water Supply Comm'n, 75 N.J. 272 (N.J. 1977).

that the bracero statute forces this Court to sit in judgment of a foreign power, the fact that the Court can do so is not as much a consequence of the extension of the statute of limitations as it is a consequence of the Foreign Sovereign Immunities Act.  It would be inconsistent with the FSIA if this Court were to deem preempted any state law that makes possible the litigation of claims against a foreign sovereign that has acted in a commercial capacity.  See Mukaddam v. Perm. Mission of Saudi Arabia, 111 F.Supp.2d 457, 472 (S.D.N.Y. 2000) ("The fact that a foreign government . . . that is not entitled to immunity under the FSIA might be found liable under [a state] statute, in the same manner and to the same extent as a private individual, does not lead automatically to the conclusion that the state law intrudes on the foreign affairs powers of the federal government.").  Unlike Zschernig, in which courts were required by the Oregon probate statute to determine the legitimacy of a foreign government, see 389 U.S. at 433, section 354.7(c) merely allows litigation of otherwise time-barred claims pursuant to generally applicable law.  Indeed, as defendants' liability will be determined under Mexican law, see infra Part VII, Mexico cannot complain that it has been prejudged, as in Natasios, Tayyari and Johnson, or that the Court will pass judgment based on a standard biased by political considerations, as was the case in Zschernig.  Section 354.7(c), circumscribed as it is to a single kind of dispute arising out of a single series of transactions that occurred long ago, cannot reasonably be construed as attempt by California to engage in "foreign policy" or to meddle in "foreign relations."  Cf. Zschernig, 389 U.S. at 441 (Oregon statute had a "direct impact upon foreign relations."); see also Garamendi, 539 U.S. at 420 n.11 (endorsing in dicta a test for field preemption that is triggered where a state has "take[n] a position on a matter of foreign policy" or acted "in a way that affects foreign relations").

The Court makes special note of the fact that the United States--a co-defendant in this suit--has not filed a statement of interest representing that the California statute threatens its relations with Mexico.  While the absence of such a statement is clearly not dispositive, see Zschernig, 389 U.S. at 434-35, in a case such as this one in which defendants have not made a showing that the adjudication of this case presents an actual, serious threat to the federal government's exercise of foreign policy, it carries greater weight.  See Container Corp. of Am.

v. Franchise Tax Bd., 463 U.S. 159, 196 (1983) (remarking that the failure of Executive Branch

to file amicus brief "when combined with . . . other considerations . . . suggest[s] that the

foreign policy of the United States--whose nuances, we must emphasize again, are much more

the province of the Executive Branch and Congress than of this Court--is not seriously

threatened by" the California tax there at issue).

For all of these reasons, section 354.7(c) is not preempted.  California law would

therefore provide for no statute of limitations.

2.  Mexican limitations law

If Mexican law were to apply, all of plaintiffs claims would be barred by Article 1159

of the Mexican Civil Code, which provides for a general ten-year statute of limitations in civil

cases:

> In all nonexcepted cases, the right to request performance of any duty shall not
> extinguish until a period of ten (10) years has lapsed since the date on which [the
> performance of] the duty could have first been demanded.

C.C.D.F., Art. 1159 (translation).  If this statute applies, the plaintiff's claims would be barred

since plaintiffs "could have first . . . demanded" their savings fund payments once their

employment ended and they were able to return to Mexico.

Plaintiffs argue, however, that this suit would have been timely if brought in Mexico

pursuant to Article 2080 of the Mexican Civil Code:

> If no term for the payment to be made has been fixed and it is an obligation to
> turn over, the creditor may not claim on it but after thirty days following the
> requirement made, judicially or extrajudicially, before a notary or two witnesses.

C.C.D.F., Art. 2080 (translation).  Interpreting this provision in conjunction with the general

ten-year limitations period imposed by Article 1159, Mexico's First Civil Court of the First

Circuit ruled that:

> [I]n the case of debt obligations where there is no [fixed repayment date], the
> period of prescription cannot run until the pertinent formal demand is made to
> the debtor as well as the passage of thirty days from that time, given that, by that
> time, the creditor would be able to demand the performance thereof, which is the
> condition required by [Art. 1159] in order for the computation of [the ten-year
> statute of limitations] to commence.

No. 1.1o.C.16 C, 5 S.J.F. 778 (1997) (translation).  Essentially, the court ruled that accrual of

the ten-year statute of limitations on a debt for which no fixed due date is specified does not

occur until an official demand pursuant to the procedures of Article 2080 has been made. The

court based its decision in part on the legal principle that "performance of an obligation is only

legally payable when the term therefore has expired and thus obligations where no date has

been established for their performance never become payable." Id. However, that principle

does not apply to the braceros' savings funds, which became legally payable under the

individual contracts upon demand by the individual bracero after his return to Mexico.

Individual Work Agreement § 5.

This Court further notes the awkwardness of applying Article 2080 to the present

dispute since plaintiffs have not provided any basis for the assumption that the relationship

between the braceros and the Mexican banks is equivalent under Mexican law to a

debtor-creditor relationship. Instead, the record indicates that the relationship is much more

comparable to that between a bank and a depositor. See Individual Work Agreement § 5

(providing that savings funds will be placed "on deposit . . . in the form of credits to [the

bracero's] account in the Agricultural Credit Bank of Mexico" (emphasis added)). Therefore,

the Court finds applicable precedent cited by the defendants from the Third Chamber of the

Mexican Supreme Court, which ruled:

> Pertaining to deposits, the length of time must be calculated from the time the
> depository is required to make the return, since in accordance with the nature of
> those contracts, the depository is obligated to store the item in order to return it
> when the depositor requests, for that reason it is understood that the obligation is
> callable, from the moment that the deposit is established, and the term of the
> limitation must be calculated from that date.[14]

---

[14]Plaintiffs attack this resolution as relying on Article 1103 of the now-superceded Mexican Civil Code of 1884. However, the ruling states that Article 1103 "can not be applied to the case pertaining to the return of deposits." 78 S.J.F. at 286. Therefore, whether or not Article 1103 is still good law is immaterial. The rule announced in the resolution that deposits are due at the moment they are made is discussed as a rule that *overcomes* the fact that Article 1103 set no statute of limitations for deposits. See id. Therefore, because the broader principle that the statute of limitations should be calculated from the time of deposit prevailed over the narrower standard set out in Article 1103, even though the statute is now superceded, the broader principle remains sound.

78 S.J.F. 286 (5a época 1943) (translation).[15]  Therefore, the statute of limitations accrued when the deposits were made, which was indisputably more than ten years before this case was filed.  There is no concept of equitable tolling in Mexican law.  The Mexican statute of limitations would therefore warrant dismissal of the complaint if applied.

### 3. Application of the Restatement's substantial interest test

The Restatement instructs courts to determine whether "maintenance of the claim would serve no substantial interest of the forum" and "the claim would be barred under the statute of limitations of a state having a more significant relationship to the parties and the occurrence."  If both conditions apply, Mexico's statute of limitations governs.

Here, California has a substantial interest in the maintenance of bracero claims in this state, i.e. the interests in protecting state citizens, ensuring fair adjudication of claims arising out of labor performed in California for California employers, and a "moral" interest in affording braceros a fair procedure to determine their ownership of savings funds.  See Cal. Code of Civ. Proc. § 354.7; A.B. 2913, 2000-01 Reg. Sess. (Ca. 2002) reprinted at 2002 Cal. Legis. Serv. Ch. 1070 ("California has a moral and public interest in assuring that braceros who are claiming entitlement to savings fund moneys are given a reasonable opportunity to claim their entitlement to wages withheld from them.").

Therefore, California's limitation law governs unless "the exceptional circumstances of the case make such a result unreasonable."

### 4. Application of the Restatement's unreasonableness exception

Under the unreasonableness exception of section 142, California's statute of limitations will not apply if this case presents exceptional circumstances and those circumstances render the application of California law unreasonable.  The Court finds no basis to declare the application of section 354.7(c) unreasonable.  California has articulated a clear policy that courts in this state should adjudicate bracero claims, even if those claims are stale

---

[15]The Court notes that there is a material difference between the two translations of this resolution offered by the parties.  The Court has here relied upon the translation offered by plaintiffs, as it finds that even if that version is used, defendants still prevail on the statute of limitations issue.

under otherwise applicable statutes of limitations.  There is nothing inherently unreasonable

about that choice, particularly given the Restatement's preference for forum limitations law.

The Restatement provides scant instructions with respect to how and when its

unreasonableness proviso should apply.  The text of the rule is drafted narrowly, providing

only that adjudication must be "unreasonable," but also that the unreasonableness must be a

consequence of "exceptional circumstances."  Certainly, the circumstances of the present case

appear to be exceptional because it involves the revival of time-barred claims so long after the

liability-creating conduct occurred.  However, when placed against the broader context of the

place held by civil statutes of limitations in our legal system, section 354.7(c) is not as unique

as it initially appears.

Although uncommon, it is not exceptional within this country's legal system for civil

statutes of limitations to be revived, extended, or originally created such that claims may be

brought long after they accrued.  It has been long settled in California that "[s]tatutes of

limitations are not so rigid as they are sometimes regarded."  <u>Lantzy v. Centex Homes</u>, 31

Cal.4th 363, 388 (Cal. 2003) <u>citing</u> <u>Bollinger v. Nat'l Fire Ins. Co.</u> 25 Cal.2d 399, 411 (Cal.

1944).  The doctrine of equitable tolling, for example, may permit a claim to be brought long

after the expiration of the limitations period if "[p]rinciples of equity and justice" so require.

<u>See</u> <u>Bollinger</u>, 25 Cal.2d at 411.  In addition, some causes of action provide for no statute of

limitations at all.  For example, under California law there is no statute of limitations for

claims--like the ones here--brought to recover bank account deposits.  <u>See</u> Cal. Civ. Code §

348 ("To actions brought to recover money or other property deposited with any bank . . . there

is no limitation.").[16]

It has also long been recognized that a legislature's choice to extend, or even revive, the

_____

[16]This statute, however, would not constitute the governing law in this case if section
354.7(c) were not to apply.  Nothing on the face of the California bank deposit statute of
limitation makes it apply extraterritorially.  More importantly, absent section 354.7(c), the
governing statute of limitations would be California's borrowing statute, <u>see</u> Cal. Code Civ. Proc.
§ 361, which if applicable would require the Court to apply Mexico's statute of limitations
because the claims arose in Mexico and all plaintiffs were citizens of Mexico when their claims
arose.  <u>See</u> <u>Flowers v. Carville</u>, 310 F.3d 1118, 1124 (9th Cir. 2002) (stating that the exception to
section 361 applies only for plaintiffs who were citizens at the time the claim accrued).

statutes of limitations in a civil case does not violate the defendant's right to due process.[17]

Chase Sec. Corp. v. Donaldson, 325 U.S. 304, 316 (1945) ("[C]ertainly it cannot be said that

lifting the bar of a statute of limitation so as to restore a remedy lost through mere lapse of

time is per se an offense against the Fourteenth Amendment.").  In a case

contemporaneous with the events underlying the present action, the Supreme Court explained:

> Statutes of limitation find their justification in necessity and convenience rather
> than in logic. They represent expedients, rather than principles. They are
> practical and pragmatic devices to spare the courts from litigation of stale
> claims, and the citizen from being put to his defense after memories have faded,
> witnesses have died or disappeared, and evidence has been lost. . . .  They are by
> definition arbitrary, and their operation does not discriminate between the just
> and the unjust claim, or the voidable and unavoidable delay. They have come into
> the law not through the judicial process but through legislation.  They represent a
> public policy about the privilege to litigate. Their shelter has never been regarded
> as what now is called a 'fundamental' right or what used to be called a 'natural'
> right of the individual. He may, of course, have the protection of the policy while
> it exists, but the history of pleas of limitation shows them to be good only by
> legislative grace and to be subject to a relatively large degree of legislative
> control.

Id. at 314 (citation omitted).

Extension and revival of statutes of limitations has not been uncommon within this

country's legal system.  In the case just discussed, for example, during the pendency of the

securities fraud litigation at issue there Minnesota created a new statute of limitations for

violations of its Blue Sky law.  Id. at 306-07.  As applied there, the new statute revived

previously time-barred claims.  See id. at 309.  Other examples have arisen in a variety of

contexts.  See Campanelli v. Allstate Life Ins. Co., 322 F.3d 1086 (9th Cir. 2003) (rejecting

Contracts Clause challenge to California statute's temporary revival of insurance claims

arising out of the 1994 Northridge earthquake); Millard v. United Student Aid Funds, Inc., 66

F.3d 252, 253-54 (9th Cir. 1995) (discussing Congress's decision to retroactively abrogate

statutes of limitations on the collection of defaulted student loans (citing 20 U.S.C. § 1091a));

Liebig v. Superior Court, 209 Cal.App.3d 828 (Cal. Ct. App. 1989) (finding valid California

statute's revival of time-barred civil claims for childhood sexual abuse); Hymowitz v. Eli Lil

---

[17]Although the Court has found, supra, that the restrictions imposed by the Due Process
Clause do not protect the defendants in this case, whether that clause prohibits revival of a statute
of limitations in a civil case provides guidance as to the underlying reasonableness of the
application of the statute of limitations that is here at issue.

1   & Co., 73 N.Y.2d 487 (N.Y. 1989) (finding valid New York statute's revival of time-barred

2   claims for injury or death caused by latent effects of exposure to diethylstilbestrol (DES));

3   N.Y.C.P.L.R. § 214-e (reviving time-barred claims brought against manufacturer of blood

4   products for damages involving the transmission of HIV or AIDS).

5        The fact that statutes of limitations have not infrequently been revived in a variety of

6   contexts weighs against the argument that section 354.7(c) is exceptional.  Because claims

7   may also have been brought by operation of tolling or a general banking statute that provides

8   for no limitations period, it further appears that section 354.7(c) is not a radical departure

9   from established legal principles.

10       Defendants rely on the comments to the Restatement to argue that application of

11  California's limitations law is unreasonable nonetheless.  Comment g to section 142 provides

12  two examples which shed light on the drafters' understanding of the relevant rule.  In the first

13  example, two domiciliaries of state X are involved in a car accident in state Y.  In this situation,

14  the comment states, although Y's law would likely govern the tort law that decides the

15  underlying action, it would be appropriate for X's statute of limitation to apply "even though

16  the forum is not the state of most significant relationship to other issues."  Comment g.  This

17  is so because "[e]ntertainment of the claim under such circumstances would not violate any X

18  policy and might further the policy of X."  Id.

19       In the second example, the domicile of the plaintiff is in the forum state and the

20  defendant is domiciled in the state with the more significant relationship to the important

21  issues of the case.  Id.  According to the Comment "[i]n such a situation, the forum should

22  entertain the claim only in extreme and unusual circumstances."  Id.  The second example is

23  more broadly defined as one in which "some forum interest would be served by entertainment

24  of the claim, but this would be at the expense of the interest of another state which has a closer

25  connection with the case and under whose state of limitations the claim would be barred."  Id.

26       The two examples set up convenient guideposts for determining whether application of

27  the bracero statute would be unreasonable.  The case at bar falls somewhere between the two

28  extremes.  The nexus to California is not as great as in the first example, since the defendants

-31-

are not domiciliaries of this state.  However, California's interest is stronger than the facts

presented in the second example since, not only are some of the plaintiffs citizens of this

state, but they also performed the labor in this state that generated the savings funds at issue.

California's interest is therefore greater than what the second example describes as "some

interest."  Because the facts of this case do not fit neatly within either of the comment's

examples, the general rule announced by section 142 should govern.  It is clear that the rule

provides for application of forum law in this case.  The Court therefore cannot find application

of California's limitation law unreasonable.

Therefore, the unreasonableness exception of section 142 does not apply, and

California's statute of limitations governs.

**C.  Application of California's Statute of Limitations**

As discussed above, the California statute of limitations provides that plaintiffs' claim

in this case should not be dismissed as long as they (1) are brought by braceros; (2) arise out

a failure to pay savings fund amounts; and (3) were filed on or before December 31, 2005.  A

all three conditions clearly apply, this action is not time-barred and the motion to dismiss is

denied.

**VII.  Choice-of-law Governing the Merits of the Case**

In the interest of facilitating the timely resolution of this case, the Court has asked the

parties to submit their views on what law should govern the merits of this dispute.  The partie

agree that, in answering this question, the Court should look at least in part to the factors

discussed in section 6 of the Restatement:

> (a) the needs of the interstate and international systems,
> (b) the relevant policies of the forum,
> (c) the relevant policies of other interested states and the relative
> interests of those states in the determination of the particular
> issue,
> (d) the protection of justified expectations,
> (e) the basic policies underlying the particular field of law,
> (f) certainty, predictability and uniformity of result, and
> (g) ease in the determination and application of the law to be
> applied.

Restatement § 6(2).

These criteria favor application of Mexican law. First, with respect to factor (a), application of the Mexican statute of limitations would satisfy the needs of the international system because it would facilitate harmonious relations between the United States and Mexico. See Restatement § 6 comment d. By resolving what Mexico views as an internal dispute according to Mexican law, U.S.-Mexico relations may stand to benefit. There is no similar benefit that could come from application of California law.[18] Moreover, because a state's own trust and tort law typically applies to conduct that occurs within its borders, application of Mexican law would produce certainty, predictability and uniformity of result. See Restatement § 6 comment g.

Balancing factors (b) and (c), which are evaluated together, see Restatement § 6, comment f, also favors Mexican law. In evaluating which state's interests are "most deeply affected," see Restatement § 6 comment f, special note must be made of the fact that Mexico is itself a party and its own conduct is being evaluated. See Alvarez-Machain v. United States, 331 F.3d 604, 634 (9th Cir. 2003) (en banc) (In applying section 6, the court stated that the United States' interests there were "particularly pointed" because the U.S. was itself a party and its conduct was at issue.) reversed on other grounds by 124 S.Ct. 2739 (2004). Mexico's interests are further underscored by the fact that this is a case between Mexico and its current and former citizens, based on money allegedly held by Mexican banks in Mexico. Mexico also has a greater interest in having its own trust and tort laws apply in cases involving money held by Mexican banks because the application of uniform regulations to Mexican banks serves Mexico's commercial interests. In contrast, California's interest in having its common law apply extraterritorially to foreign bank accounts is difficult to articulate. Indeed, there is little indication that the California common law at issue in this case was meant to apply to conduct occurring in foreign nations. See Restatement § 6 comment e (stating that courts should take

_____

[18]Although the Court has held above that defendant has not shown that there is a serious threat to federal foreign policy interests that merits declaring the bracero statute unconstitutional, the standard articulated by the Restatement is somewhat different in that it instructs courts to favor application of whichever law furthers "harmonious relations between states and . . . facilitate[s] commercial intercourse between them." Restatement § 6 comment d. The Court finds that applying the substantive law of Mexico, rather than the law of California, better serves those interests.

-33-

account of the purpose the enacting legislature or court had in creating the rule at issue and if there are no ascertainable intentions on the specific subject involved, "the court is under no compulsion to apply the statute").

Factor (d) also points to Mexican law, as Mexico likely administered the savings fund with its own legal and political system in mind. In contrast, the braceros were unlikely to have relied upon the protections of California law in making their savings fund contributions.

With respect to factor (e), which references the policies underlying the particular field of law, nothing in the record indicates that either state's law more effectively furthers the policies underlying unjust enrichment and conversion, and therefore this factor is neutral.

Factor (f), "certainty, predictability and uniformity of result," favors the law of Mexico. Application of Mexican law would discourage forum shopping, see Restatement § 6 comment I, because Mexican law could be applied no matter where a bracero suit is brought. This also provides for a uniform result since, although braceros worked in several states, they all share common ties to Mexico.

Only factor (g) favors application of California law. California law is much easier to apply given the Court's familiarity with the domestic legal system. However, the Restatement explains that this factor "should not be overemphasized" because the other factors carry greater importance. Restatement § 6 comment j.

In addition to the factors in section 6 of the Restatement, the Court also finds relevant the factors provided in section 221, which governs actions for restitution. In addition to referencing the section 6 factors outlined above, section 221 also provides five additional factors to be analyzed:

> (a) the place where a relationship between the parties was centered, provided that the receipt of enrichment was substantially related to the relationship,
> (b) the place where the benefit or enrichment was received,
> (c) the place where the act conferring the benefit or enrichment was done,
> (d) the domicil, residence, nationality, place of incorporation and place of business of the parties, and
> (e) the place where a physical thing, such as land or a chattel, which was substantially related to the enrichment, was situated at the time of the enrichment.

1    These contacts are to be evaluated according to their relative
2    importance with respect to the particular issue.

3    Restatement § 221(2).

4    These factors further support application of Mexican law. Factors (a), (b) and (d) each

5    strongly favor Mexico. The relationship between the parties in this action was centered in

6    Mexico and the savings funds were received in Mexico. The nationality of all the parties, at

7    least at the time the unjust enrichment originally occurred, was Mexican. Factor (c) is

8    ambiguous since several acts, both in Mexico and the United States, led up to the conferral of

9    the benefit of the savings accounts upon the Mexican banks. Factor (e) does not apply because

10   there is no land or chattel in dispute.

11   Therefore, application of the Restatement's conflict of law principles indicates that

12   Mexican law should apply to plaintiffs' remaining claims.

13   ///

14   ///

15   ///

16   ///

17   ///

18   ///

19   ///

20                               **CONCLUSION**

21   For the reasons stated above, defendants' motion to dismiss is hereby DENIED. The

22   Court further concludes that Mexican law applies to plaintiff's remaining claims.

23   All parties are further ORDERED to appear for a telephonic case management

24   conference on Friday, June 24, 2005 at 10:00 a.m. to set a schedule for future motions to

25   dismiss.

26

27

28

**IT IS SO ORDERED.**

Dated: June 16, 2005

_____/s/_____
CHARLES R. BREYER
UNITED STATES DISTRICT JUDGE