JOSEPH W. COTCHETT (SBN 36324)
FRANK M. PITRE (SBN 100077)
PHILIP L. GREGORY (SBN 95217)
**COTCHETT, PITRE, SIMON & McCARTHY**
San Francisco Airport Office Center
840 Malcolm Road, Suite 200
Burlingame, CA 94010
Telephone: (650) 697-6000

Attorneys for Plaintiffs
EDWARD L. SCARFF; NANCY SCARFF; SCARFF, SEARS
& ASSOCIATES; and PENTOGA PARTNERS

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**SAN JOSE DIVISION**

| | |
|---|---|
| EDWARD L. SCARFF, an individual; NANCY SCARFF, an individual; SCARFF, SEARS & ASSOCIATES, a California partnership; and PENTOGA PARTNERS, a California partnership,<br><br>　　　　　　　　Plaintiffs,<br><br>　　v.<br><br>WELLS FARGO BANK, N.A.; COMERICA BANK, a Michigan corporation; BANK OF AMERICA, N.A.; FIDELITY NATIONAL TITLE CO.; COMPUTING RESOURCES, INC., a Nevada corporation; INTUIT INC., a Delaware corporation; KELLY HVEGHOLM, an individual; CAROL BARBER, an individual; JOAN BURTZEL, an individual; LISA CICCOTTI, an individual; and CAROL HUANG, an individual,<br><br>　　　　　　　　Defendants.<br><br>AND RELATED CLAIMS | Case numbers C 03-03394 JF (PVT)<br>　　　　　　　　　　C 03-04829 JF (PVT)<br><br><br>**PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO MOTION FOR SUMMARY JUDGMENT OR, IN THE ALTERNATIVE, PARTIAL SUMMARY JUDGMENT OF DEFENDANTS WELLS FARGO BANK, N.A., AND CAROL BARBER**<br>**[F.R.C.P. 56]**<br><br>Date:　January 6, 2006<br>Time:　9:00 a.m.<br>Dept.:　3<br>Judge: Hon. Jeremy Fogel |

PLAINTIFFS' MEMORANDUM IN OPPOSITION TO WELLS FARGO DEFENDANTS MOTION FOR SUMMARY JUDGMENT
OR PARTIAL SUMMARY JUDGMENT Case Nos. C 03-03394 JF (PVT), C 03-04829 JF (PVT)

Dockets.Justia.com

# TABLE OF CONTENTS

**Page**

I.   **INTRODUCTION** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **2**

II.  **ISSUES OF MATERIAL FACT** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **5**

   A.   **PRIVATE BANKING AT WELLS FARGO** . . . . . . . . . . . . . . . . . . . . . . **5**

   B.   **SCARFF'S RELATIONSHIP WITH WELLS FARGO** . . . . . . . . . . . . . . **6**

   C.   **MS. BARBER AND THE "SCARFF" DEPOSIT ACCOUNTS** . . . . . . . . . **9**

   D.   **MR. STARRATT AND THE "SCARFF" LOANS** . . . . . . . . . . . . . . . . . . **10**

   E.   **THE "SCARFF" FORGED SIGNATURES** . . . . . . . . . . . . . . . . . . . . . . . **13**

   F.   **GIFTS OR BRIBES?** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **13**

III. **LEGAL ARGUMENT** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **15**

   A.   **THESE DEFENDANTS HAVE FAILED TO SATISFY THEIR
        BURDEN ON SUMMARY JUDGMENT.** . . . . . . . . . . . . . . . . . . . . . . . . . **15**

   B.   **THESE DEFENDANTS ARE LIABLE FOR AIDING AND
        ABETTING AND CONSPIRACY** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **17**

   C.   **WELLS FARGO IS LIABLE IN NEGLIGENCE** . . . . . . . . . . . . . . . . . . **26**

   D.   **WELLS FARGO'S ACTS CONSTITUTING SLANDER OF TITLE
        ARE MORE THAN RECORDING A FORGED DEED OF TRUST** . . . . . . . . **29**

   E.   **CAROL BARBER IS SEPARATELY LIABLE** . . . . . . . . . . . . . . . . . . . . **30**

   F.   **SCARFF WAS DAMAGED BY BARBER'S NEGLIGENT ACTS** . . . . . . **32**

   G.   **SCARFF WAS DAMAGED BY BARBER'S VIOLATIONS OF THE
        FEDERAL BRIBERY ACT.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **33**

   H.   **THERE IS NO STATUTE OF LIMITATIONS ISSUE FOR
        PURPOSES OF SUMMARY JUDGMENT.** . . . . . . . . . . . . . . . . . . . . . **33**

IV.  **CONCLUSION** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **35**

LAW OFFICES
COTCHETT,
PITRE, SIMON &
McCARTHY

**PLAINTIFFS' MEMORANDUM IN OPPOSITION TO WELLS FARGO DEFENDANTS MOTION FOR SUMMARY JUDGMENT
OR PARTIAL SUMMARY JUDGMENT** Case Nos. C 03-03394 JF (PVT), C 03-04829 JF (PVT)

ii

1

## TABLE OF AUTHORITIES

2

Page

*Applied Equip. Corp. v. Litton Saudi Arabia Ltd.*, 7 Cal.4th 503, (1994) . . . . . . . . 4, 20, 23, 31

3

4

*Bank of America v. Sanchez*, 3 Cal.App.2d 238 (1934) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

*Black v. Sullivan*, 48 Cal.App.3d 557, (1975) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

5

*Burns v. Ross* 190 Cal. 269, (1923) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

6

*Copesky v. Superior Court*, 229 Cal.App.3d  (1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

7

*Chazen v. Centennial Bank*, 61 Cal.App.4th (1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

8

*Choate v. County of Orange*, 86 Cal.App.4th 312, (2000) . . . . . . . . . . . . . . . . . . . . . . . . . 20

9

*Coffman v. Kennedy*, 74 Cal. App. 3d 28, (1977) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

10

*Dyke v. Zaiser*, 70 Cal.App.2d 639,(1947) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

11

*Frame v. Pricewaterhousecoopers LLP*, 05 C.D.O.S. 10014 (November 30, 2005). . . . . . . . 19

12

*Forte v. Nolfi* 25 Cal.App.3d 656, (1972) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

13

*Heckmann v. Ahmanson*, 168 Cal.App.3d 119, (1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

14

*Howard v. Superior Court*, 2 Cal.App.4th 745, (1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

15

*Mosier v. S. Cal. Physicians Ins. Exch.*, 63 Cal.App.4th 1022, (1998) . . . . . . . . . . . . . . . . 20

16

*Rookhuizen v. Wilshire Reconveyance, Inc.* 190 Cal.App.3d 1459,(1987) . . . . . . . . . . . . . 30

17

*Orser v. George*, 252 Cal.App.2d 660, (1967) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

18

*Peskin v. Squires*, 156 Cal.App.2d 240, (1957 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

19

*Peterson v. Cruikshank*, 144 Cal.App.2d 148, (1956) . . . . . . . . . . . . . . . . . . . 21, 22, 24, 27

20

*Saunders v. Superior Court*, 27 Cal.App. 4th 832, (1994) . . . . . . . . . . . . . . . . . . . . . . . . . . 21

21

*Software Design and Application, Ltd. V. Hofer & Arnett, Inc.*, 49 Cal.App.4th 472 (1996)  29

22

*Sun 'N Sand, Inc. v. United California Bank*, 21 Cal.3d 671 (1978) . . . . . . . . . . . . . . . . . . 28

23

*Tenzer v. Superscope, Inc.* 39 Cal.3d 18 (1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

24

*Thomas v. Doorley*, 175 Cal.App.2d 545, (1959) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

25

*Wutzke v. Bill Reid Painting Service, Inc.*  151 Cal.App.3d 36 (1984) . . . . . . . . . . . . . . . . . 30

26

*Wyatt v. Union Mort. Co.*, 24 Cal.3d 773, (1979) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 20-23, 31

27

28

LAW OFFICES
COTCHETT,
PITRE, SIMON &
MCCARTHY

**PLAINTIFFS' MEMORANDUM IN OPPOSITION TO WELLS FARGO DEFENDANTS  MOTION FOR SUMMARY JUDGMENT OR PARTIAL SUMMARY JUDGMENT** Case Nos. C 03-03394 JF (PVT), C 03-04829 JF (PVT)

iii

**California Statutes**

Cal. Civ. Code §§ 1714(a)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27, 33

Civ. Code Sec. 1710.  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

**Federal Cases**

*Adickes v. S. H. Kress & Co.*, 398 U.S. 144 (1970)  . . . . . . . . . . . . . . . . . . . . . . . . . . 16, 17

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, (1986)  . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Celotex Corp. v. Catrett*, 477 U.S. 317, (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16, 20

*Clifford v. Hughson*, 992 F.Supp.661, (S.D.N.Y. 1998)  . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*Edison v. Reliable Life Ins. Co*, 664 F.2d 1130, (9th Cir. 1981)  . . . . . . . . . . . . . . . . . . . . 20

*Falls Riverway Realty. Inc. v. City of Niagara Falls*, 754 F.2d 49, (2d Cir. 1985)  . . . . . . . . . 17

*First Nat'l Bank v. Cities Service Co.*, 391 U.S. 253, (1968) . . . . . . . . . . . . . . . . . . . . . 17, 24

*Hastings v. Fidelity Mortgage Decisions Corp.*, 984 F.Supp. 600, (N.D.Ill. 1995)  . . . . . . . . 24

*First Capital Asset Management v.Brickellbush*, 219 F.Supp.2d 578, (S.D.N.Y. 2002) . . . . . 24

*Kelly v. Central Bank & Trust Co.*, 794 P.2d 1037, (Colo.Ct.App. 1989)  . . . . . . . . . . . . . . . 26

*Lawyer's Title Insurance v. United American Bank*, 21 F.Supp.2d 785,  (W.D.Tenn. 1998)  25

*Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, (1986)  . . . . . . . . 16, 17

*Neilson v. Union Bank of California, N.A.*, 290 F.Supp.2d 1101, (C.D.Cal. 2003)  . . . . . . . . 25

*Nissan Fire & Marine Ins. Co. v. Fritz Cos.*, 210 F.3d 1099, (9th Cir. 2000)  . . . . . . . . . . . . 17

*T.W. Elec. v. Pacific Elec. Contractors Ass'n*, 809 F.2d 626,  (9th Cir. 1987)  . . . . . . . . . . 16, 17

*Thornhill Publ'g Co., Inc. v. GTE Corp.*, 594 F.2d 730, (9th Cir. 1979)  . . . . . . . . . . . . . . . . 17

*Wool v. Tandem Computers, Inc.*, 818 F.2d 1433, (9th Cir.1987) . . . . . . . . . . . . . . . . . . . . . . 17

**Other Authorities**

*4 Witkin, Cal. Procedure, Pleading*, § 537, at 634 (4th ed. 1997)  . . . . . . . . . . . . . . . . . . . 27, 33

*Charles Alan Wright et al., Federal Practice and Procedure* § 2727, at 459, (3d ed. 1998)  . 16

*Restate. (2d) of Torts*, § 876(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

LAW OFFICES
COTCHETT,
PITRE, SIMON &
MCCARTHY

**PLAINTIFFS' MEMORANDUM IN OPPOSITION TO WELLS FARGO DEFENDANTS  MOTION FOR SUMMARY JUDGMENT OR PARTIAL SUMMARY JUDGMENT** Case Nos. C 03-03394 JF (PVT), C 03-04829 JF (PVT)

iv

# I.    <u>INTRODUCTION</u>

Both Defendants Wells Fargo Bank, N.A. ("Wells Fargo") and Carol Barber engaged in flagrant abuses of private banking services.  As a result, the Scarff Plaintiffs[1]/ were victimized by a twelve-year pattern and course of conduct between the Defendant financial institutions and their employees and agents, who acted in concert with Scarff Plaintiffs' bookkeeper, Defendant Carol Huang ("Huang"), to siphon over $15 million of assets from the Scarff Plaintiffs through two separate schemes.  The two schemes, described as the "payroll" and "credit line" schemes, are set forth in detail at ¶¶ 51-112 of Plaintiffs' Consolidated Amended Complaint (hereinafter, "ACC").

At the cornerstone of Plaintiffs' ACC is an enterprise in which Huang misused her position of trust, then recruited the assistance and cooperation of the following entities and individuals to facilitate and conceal the embezzlement of *millions* in personal earnings and corporate profits:

    (1)    Defendants Wells Fargo Bank, N.A. ("WFB"), Comerica Bank ("Comerica"), and Bank of America ("Bank of America");

    (2)    The officers and directors of each Defendant bank, including Defendant Wells Fargo Assistant Vice President Carol Barber;

    (3)    WFB's payroll processing services agent, Defendants Intuit, Inc. ("Intuit") and/or Computer Resources, Inc. ("CRI"); and

    (4)    Intuit's and CRI's managing agents, Defendants Kelly Hvegholm ("Hvegholm") and Lisa Ciccotti ("Ciccotti")

ACC  ¶¶ 1, 6-9, 33-34, 101-115.  By their complaint, the Scarff Plaintiffs allege countless facts detailing a pattern of misconduct among the co-Defendants in pursuit of a common venture – the generation of income and profit through acts of deception and mismanagement of Plaintiffs' financial affairs.  In the absence of the concerted acts of her co-Defendants, who were

---

[1]  The Scarff Plaintiffs are: Edward L. Scarff, his wife, Nancy V. Scarff, and two Scarff partnerships, Scarff, Sears & Associates ("SSA") and Pentoga Partners ("Pentoga").

LAW OFFICES
COTCHETT,
PITRE, SIMON &
McCARTHY

1   well-versed in the rules regulating the banking business, the payroll business, and the financial

2   transactions here at issue,  Huang could not have succeeded in concealing the nature and extent

3   of her multi-million dollar swindle of the Scarff Plaintiffs.  ACC ¶¶ 5, 7, 57-78, 83-1115.

4       This Motion for Summary Judgment and Partial Summary Judgment is brought by Wells

5   Fargo and Ms. Barber against Plaintiffs Edward Scarff, Pentoga, and SSA.[2] As a participant in a

6   common course of wrongful conduct, ***Wells Fargo and Carol Barber*** are responsible, as joint

7   tortfeasors, for all damages resulting from Huang's credit fraud and payroll schemes.  This is so

8   irrespective of whether these Defendants were direct actors, and regardless of the degree of their

9   activity.  *Applied Equip. Corp. v. Litton Saudi Arabia Ltd.*, 7 Cal.4th 503, 510-511 (1994)

10  ("*Applied Equip.*"); *Wyatt v. Union Mort. Co.*, 24 Cal.3d 773, 784 (1979) ("*Wyatt*"); *and see*

11  Judicial Council of California Civil Jury Instructions 3600 ("CACI") ("[C]onspiracy may be

12  inferred from circumstances, including the nature of the acts done, the relationships between the

13  parties, and the interests of the alleged co-conspirators. [Plaintiff] is not required to prove that

14  [Defendant] personally committed a wrongful act, or that [he/she] knew all the details of the

15  agreement or the identities of the other participants").

16      This Motion for Summary Judgment ignores the import of facts developed in discovery

17  regarding the numerous acts in conspiring with, or aiding and abetting, Huang's embezzlement of

18  Plaintiffs' funds.[3]  As pertinent for the present Motion, ***the facts specifically demonstrate that***

19  ***Wells Fargo and Carol Barber***:

20      **Accepted kickbacks**, **gifts** and **bribes** from Huang, in violation of the law, as

21      well as Wells Fargo's corporate ethics policies and procedures, in order to aid and

22      abet Huang in their credit fraud schemes;

23

24  [2]  By its Notice of Motion, Wells Fargo moves **both** for summary judgment and for partial summary judgment.  Yet Wells Fargo has not dealt with the Fifteenth cause of action for Declaratory Relief.

25  On that basis alone, Wells Fargo's Motion for Summary Judgment should be denied.

26  [3]  As described in the Gregory Dec., the Rule 30(b)(6) deposition of Wells Fargo has not been completed.  Plaintiffs are working with Wells Fargo to complete that deposition promptly.  Also,

27  Plaintiffs may need to file a motion to compel certain documents and testimony not yet produced by Wells Fargo. Assuming that the deposition goes forward, Plaintiffs may need to seek leave of Court

28  to supplement their Opposition based on the testimony and documents subsequently obtained.

LAW OFFICES
Cotchett,
Pitre, Simon &
McCarthy

**PLAINTIFFS' MEMORANDUM IN OPPOSITION TO WELLS FARGO DEFENDANTS  MOTION FOR SUMMARY JUDGMENT OR PARTIAL SUMMARY JUDGMENT** Case Nos. C 03-03394 JF (PVT), C 03-04829 JF (PVT)

3

**Used various illegal devices**, such as unauthorized telephone transfers to draw monies from accounts; and failed to ensure the validity of signatures, and authorizations on loans, lines of credit, and/or extensions of credit opened in Mr. Scarff's name;

**Violated statutes, regulations, policies, and procedures** requiring "face-to-face" dealings with customers, verification of oral requests to withdraw funds, and verification of signatures on loans, lines of credit, and guarantees;

**Hid and concealed** their wrongdoing from Mr. Scarff by mailing or delivering statements directly to Huang only or by keeping all copies of statements at Wells Fargo's own offices, without authorization from Mr. Scarff;

**Hid and concealed** their wrongdoing from other officers of Wells Fargo, including the loan committee, by not disclosing kickbacks or bribes, granting extensions on loans already past due, failing to obtain proper authorizations, and misstating the level of communications and approvals of Mr. Scarff;

**Failed to communicate** directly with Mr. Scarff or personally alert him to Huang's unauthorized transfers, extensions of credit, disbursements, and/or dissipation of personal assets;

**Increased private banker bonus compensation** based on obtaining Mr. Scarff as a client and increasing the size of his lines of credit; and

**Aided Huang in forging** various line of credit documents, as well as extensions thereon.

The Motions for Summary Judgment and Partial Summary Judgment of Wells Fargo and Carol Barber should be denied in their entirety.[4]

---

[4] The Scarff Plaintiffs hereby incorporate by reference the pleadings and declarations filed in connection with the following Motions for Summary Judgment now pending before this Court: Comerica Bank; Joan Burtzel; Kelly Hvegholm; Intuit Inc.; Computing Resources, Inc.; and Lisa Ciccotti.

LAW OFFICES
COTCHETT,
PITRE, SIMON &
McCARTHY

**PLAINTIFFS' MEMORANDUM IN OPPOSITION TO WELLS FARGO DEFENDANTS MOTION FOR SUMMARY JUDGMENT OR PARTIAL SUMMARY JUDGMENT** Case Nos. C 03-03394 JF (PVT), C 03-04829 JF (PVT)

4

## II.  ISSUES OF MATERIAL FACT

### A.  PRIVATE BANKING AT WELLS FARGO

Wells Fargo had a private banking services group. (Dec. of Philip L. Gregory in Opposition to Wells Fargo and Intuit Defendants' Motions for Summary Judgment or Partial Summary Judgment (hereinafter "Gregory Dec."), Exh. A, p. 57, ll. 19-22.) This services group was divided into four areas: trust, investment management, brokerage, and private banking.(Gregory Dec., Exh. A, p. 58, ll. 8-18.)  Private banking handled loans and deposit accounts. (Gregory Dec., Exh. A, p. 60, l. 11- p. 61, l. 13.)

A private banker was a relationship manager.[5] (Gregory Dec. at Exh. A, p. 46, l. 7 - p. 47, l. 10; p. 56, ll. 8-20; Exh. B, p. 50, ll. 12-25; Britt Dec.) Private bankers had responsibility for developing relationships and then the direct day-to-day management of high net worth clients by knowing what the client's needs were.  (Gregory Dec., Exh. A, p. 81, ll. 1-4; Exh. B, p. 51, l. 20-23; Britt Dec.)  The relationship was developed by meeting and presenting opportunities to expand the relationship with the client. The private banker met with his clients at least monthly or annually. (Gregory Dec., Exh. B, p. 18, l. 17- p. 19, l. 9.) The private banker was expected to increase the volume of business that he did with his private banking clients on an annual basis. (Gregory Dec., Exh. B, p. 25, ll. 8-17.)

The important opportunity for a private banker was the opportunity to cross sell a broader array of the bank's products and services, specifically a deposit relationship, a credit relationship, an investment relationship, or a trust relationship. (Gregory Dec., Exh. B, p. 29, l. 4-12.) The goal would be to keep the client's money in the bank, not going to competitors. (Gregory Dec., Exh. B, p. 30, ll. 10-25.) In fact, the compensation of a private banker was based, in part, on increases in the private banker's book of business of loans and deposits. (Gregory Dec., Exh. A, p. 54, ll. 10-24.)

---

[5]In the industry, private banking "focuses on relationship banking," forming "a team" with the client "that will be in place for the long term."  (Gregory Dec. In Opposition to Comerica Motion for Summary Judgment, Exh. A, p. 25-27, and Exh. 1 and 2 referenced therein.)

**PLAINTIFFS' MEMORANDUM IN OPPOSITION TO WELLS FARGO DEFENDANTS MOTION FOR SUMMARY JUDGMENT OR PARTIAL SUMMARY JUDGMENT** Case Nos. C 03-03394 JF (PVT), C 03-04829 JF (PVT)

5

LAW OFFICES
COTCHETT,
PITRE, SIMON &
MCCARTHY

One of the ways a private banker monitored accounts was through a "balance fluctuation report." It permits a private banker to keep aware of large deposits or large outflows of funds (over $100,000). The balance fluctuation report allowed a private banker to identify opportunities with clients where he might be in a position to offer them additional services through the bank. (Gregory Dec., Exh. A, p. 62, l. 14- p. 65, l. 4; Exh. B., p. 52, l. 1- p. 53, l. 24.)  Wells Fargo's private bankers used these reports to obtain "a better understanding of what was going on in the client's account." (Gregory Dec., Exh. B, p. 54, l. 1 - p. 55, l. 25.)

An important part of being a relationship manager or private banker is to "know your customer."  Knowing your customer included having an understanding of what the client's investment needs and goals were, such a understanding whether the client needed loans.  The best way to know your customer would be to build a personal one-on-one relationship with that customer, including meeting face to face on a regular basis. (Gregory Dec., Exh. A, p. 202, ll. 1-22; Britt Dec.)

### B.      SCARFF'S RELATIONSHIP WITH WELLS FARGO

This Court is entertaining multiple motions detailing Mr. Scarff's background.  His private banker, Richard Starratt, best summarized Mr. Scarff's relationship with Wells Fargo as of 1991:

> "[Scarff] had several checking accounts, I think he had a line of credit that had lapsed and I know he had introduced the bank to an investment in one of his quote deals unquote, on which Wells Fargo made an awful lot of money.  I think he was a personal friend of then CEO Carl Reichardt and I know he was highly regarded by senior management of the bank." (Gregory Dec., Exh. B, p. 31, l. 15 - p. 32, l. 4.)

Mr. Scarff, as a very profitable client for the bank, was a perfect private banking customer. Wells Fargo would calculate a "Relationship Profitability," which is an internal return on equity program where the bank inputs the borrowings (the interest paid thereon) and deposits from the client and calculates a return on equity for that client.  As of 1997, Wells Fargo was earning 27.89 percent return on equity on Scarff's loans and deposits. (Gregory Dec., Exh. A, p.

LAW OFFICES
COTCHETT,
PITRE, SIMON &
MCCARTHY

**PLAINTIFFS' MEMORANDUM IN OPPOSITION TO WELLS FARGO DEFENDANTS  MOTION FOR SUMMARY JUDGMENT OR PARTIAL SUMMARY JUDGMENT** Case Nos. C 03-03394 JF (PVT), C 03-04829 JF (PVT)

6

105, l. 18 - p. 106, l. 15.)  According to Wells Fargo's former head of private banking in San

Francisco, that return was "pretty good." (Gregory Dec., Exh. A, p. 108, l. 24 - p. 109, l. 18.)

Yet, even though Mr. Scarff was a profitable customer, for some, inexplicable reason, Mr.

Starratt had virtually no dealings with him.  Mr. Starratt dealt with Mr. Scarff less than five times

during the time he served as a private banker (1991-2002).  Mr. Starratt testified that every time

he met with Mr. Scarff was documented in the credit file, including what was discussed.

(Gregory Dec., Exh. B, p. 42, l. 16 - p. 43, l. 1.)  In fact, the only services provided to Mr. Scarff

by Mr. Starratt from 2000 to 2002 were "extensions of credit," "extensions" done without Mr.

Scarff's knowledge.(Gregory Dec., Exh. B, p. 190, l.25 - p. 191, l.10.)

If Mr. Starratt contact with Mr. Scarff was virtually non-existent, Carol Barber never met

with or spoke to Mr. Scarff.  She never witnessed his signature on documents or contacted him to

verify any transactions in his account. (Gregory Dec., Exh. C, p. 54, l. 18 - p. 57, l. 12.)  Ms.

Barber dealt with Huang, even though Ms. Barber never checked to see what authority, if any,

Huang had in any of the Scarff accounts.  (Gregory Dec., Exh. C, p. 69, l. 23 - p. 70, l.13.)

It was Mr. Starratt's practice to meet with his private banking clients and review the

terms of any loans so that they fully understood it before they signed the documentation.

(Gregory Dec., Exh. B, p. 43, l. 11-16.)  Yet he did not meet with Mr. Scarff and either verify

that he wanted to renew the line or verify the terms. (Gregory Dec., Exh. B, p. 80, ll. 2-24.)

While Mr. Starratt testified that, as a relationship manager he contacted his clients to make sure

his clients knew of changes in loan terms, he never contacted Mr. Scarff. (Gregory Dec., Exh. B,

p. 84, l. 5 - p. 85, l. 20.)  In fact, he did not attempt to contact Mr. Scarff when Wells Fargo

wanted to covert a $2.5 million line from an unsecured loan to a secured loan.  (Gregory Dec.,

Exh. B, p. 86, ll. 9-24.)[6]  Mr. Starratt believes that "in hindsight" it would have been prudent to

---

[6]Several Wells Fargo documents list the address for Mr. Scarff as 268 Bush St., #117, San Francisco.
Mr. Starratt testified that he went to visit his "client in his new office" at 268 Bush Street, # 117, but
was not sure whether Mr. Scarff "was there."  He distinctly recalls actually going into the "office."
(Gregory Dec., Exh. B., p. 188, l. 2- p.190, l. 24; Exh. 30, 32, 33, 35, & 37.) As indicated in the
Scarff Dec., 268 Bush St., #117 is a Mailboxes Etc. Store where Huang had a secret mailbox.
Contrary to his testimony, Mr. Starratt never visited the "office."

LAW OFFICES
COTCHETT,
PITRE, SIMON &
MCCARTHY

**PLAINTIFFS' MEMORANDUM IN OPPOSITION TO WELLS FARGO DEFENDANTS  MOTION FOR SUMMARY JUDGMENT
OR PARTIAL SUMMARY JUDGMENT** Case Nos. C 03-03394 JF (PVT), C 03-04829 JF (PVT)

7

1  speak directly to Mr. Scarff about the loan extensions and Huang's promises for payment "to find

2  out from the horse's mouth what the plan was." (Gregory Dec., Exh. B, p. 196, ll. 1-6.)

3        Even though Starratt had no contact with Scarff after 1997, he wrote internal memos

4  indicating that he had been in contact. (Gregory Dec., Exh. A, p. 155, l. 12- p. 158, l. 17; Ex. 11,

5  Email from Starratt: "According to Scarff, '00 will approximate '99.")  Yet Starratt had no such

6  contact. It would have been standard practice for the private banker, when a borrower requests an

7  extension on a credit facility, to discuss with the borrower the facts and circumstances justifying

8  the extension. (Gregory Dec., Exh. A, p. 159, l. 3- p. 164, l. 23; Ex. 12.) In fact, the bank never

9  contacted Scarff even though "his" $2.5 million unsecured line had originally matured as of

10  January 2001, was continually extended (at Huang's request), the borrower (supposedly Scarff)

11  was not making timely payments, and, as of was over 30 days past due based on the last

12  extension.  The head of private banking would have been concerned.

13        Yet Wells Fargo continued to extend the loan without contacting Scarff. (Gregory Dec.,

14  Exh. A, p. 208, l. 15- p. 210, l. 5.) Why?  Because the San Francisco private banking group did

15  not want to have the loan go 60 days past due.  Why not 60 days?  Because they did not want past

16  due reports to go to the bank's credit administration. (Gregory Dec., Exh. A, p. 203, l. 12- p. 210,

17  l. 5; p. 215, l.13 - p. 216, l. 12.)

18        In 2002, the $2.5 million unsecured line was converted to a $2.0 million secured line.

19  The head on private banking does not know why this occurred "other than the client may have

20  requested it."  Based on Mr. Scarff's credit reports, the head of private banking could think of no

21  reason why the bank would have requested the conversion from unsecured to secured. (Gregory

22  Dec., Exh. A, p. 167, l. 21- p. 169, l. 20.)  Yet Mr. Starratt requested the conversion. (Gregory

23  Dec., Exh. A, p. 170, l. 18- p. 174, l. 3, Exh. 13.)  Mr. Starratt told Huang (not Mr. Scarff) that

24  there were "tightening credit standards" necessitating the conversion from unsecured to secured.

25  Yet there were no "tightening credit standards, according to Mr. Starratt's boss, the head of

26  private banking. (Gregory Dec., Exh. A, p. 175, l. 5- p. 181, l. 22, Exh. 14.)

27        Also, the $2 million secured line had to be approved by making an exception to the

28  bank's guidelines.  The actual market appraisal was approximately $1 million **less** than

LAW OFFICES
COTCHETT,
PITRE, SIMON &
McCARTHY

**PLAINTIFFS' MEMORANDUM IN OPPOSITION TO WELLS FARGO DEFENDANTS MOTION FOR SUMMARY JUDGMENT
OR PARTIAL SUMMARY JUDGMENT** Case Nos. C 03-03394 JF (PVT), C 03-04829 JF (PVT)

8

anticipated.  In fact, the head of private banking wrote that the bank would **not** approve the $2 million secured line because such an advance would exceed the bank's 65% guideline. According to the bank, Scarff needed to come up with the difference.  Yet Mr. Scarff was never contacted. (Gregory Dec., Exh. A, p. 225, l. 5- p. 228, l. 21, Exh. 25.)  Further, it was Mr. Starratt's responsibility to get the $2 million secured note and the deed of trust signed by Mr. Scarff. (Gregory Dec., Exh. A, p. 235, l. 20- p. 236, l. 14; p.240, l. 18- p. 241, l. 14.)

In all of these loan transactions, Wells Fargo dealt only with Huang, even though there was no written authorization permitting Huang to act as Mr. Scarff's representative in obtaining new loans or in renewing loans on behalf of Scarff. (Gregory Dec., Exh. A, p. 248, l. 23- p. 249, l. 12; p. 251, ll. 3-24.)  There were no documents authorizing Huang to draw down on the $2.5 million line of credit or the $2 million line of credit. (Gregory Dec., Exh. A, p. 254, ll. 13-25.) This was highly improper. (Britt Dec.)

## C.   MS. BARBER AND THE "SCARFF" DEPOSIT ACCOUNTS

Ms. Barber's role primarily involved making account transfers at Huang's request. An example is set forth in Exhibit 29 to Ms. Barber's deposition.  She was perform the transfer at Huang's request and send the documents evidencing the transfer to Huang, again at Huang's request. There was no verification of these transactions with Mr. Scarff.  (Gregory Dec., Exh. C, p. 164, l. 20 - p. 179, l. 20, Exh. 29 & 30.) Also, there were several documents purporting to grant Huang the right to make telephone transfers.  These documents all were purportedly signed by Mr. Scarff on the same date (June 23, 1992) and all are forged.  There was nothing done by Wells Fargo to determine whether or not Mr. Scarff's signature was authentic. (Gregory Dec., Exh. C, p. 255, l. 11- p. 257, l. 11, Exh. 43; Gregory Dec., Exh. D; Scarff Dec.)

At Huang's request, Ms. Barber was even keeping track of the daily balances in the Scarff deposit accounts. (Gregory Dec., Exh. C, p. 182, l. 4- p. 183, l. 19, Exh. 28.)  At Huang's request, Ms. Barber prepared numerous "To Whom It May Concern" letters about the status of Mr. Scarff's deposit accounts.  Ms. Barber never checked to see if Huang was authorized to request these letters.  Ms. Barber did not write this type of letter for any other customer.(Gregory Dec., Exh. C, p. 107, l. 24 - p. 121, l. 14, Exh. 7-15.)

LAW OFFICES
COTCHETT,
PITRE, SIMON &
MCCARTHY

**PLAINTIFFS' MEMORANDUM IN OPPOSITION TO WELLS FARGO DEFENDANTS MOTION FOR SUMMARY JUDGMENT OR PARTIAL SUMMARY JUDGMENT** Case Nos. C 03-03394 JF (PVT), C 03-04829 JF (PVT)

9

1   Finally, at Huang's request, Ms. Barber even adjusted the account address information so

2   that the account statements were not sent to Mr. Scarff, were not sent to Huang, but were sent to

3   Ms. Barber!  **From the bank; to the bank**.  Ms. Barber would hold them in her desk until Huang

4   (or a messenger) picked them up. (Gregory Dec., Exh. C, p. 184, l. 8 - p. 193, l. 15, Exh. 28.)  A

5   forged letter allegedly came from Mr. Scarff asking Ms. Barber to hold all his bank statements

6   for pick up. **No** other customers requested that Ms. Barber hold statements on their behalf so that

7   no copy went to the customer directly.  (Gregory Dec., Exh. C, p. 203, l. 1 - p. 205, l. 18, Exh.

8   35; Scarff Dec.)  As a result of the forged Scarff letter, Ms. Barber made the address change

9   system-wide so that the statements came to her attention. (Gregory Dec., Exh. C, p. 205, l.19 - p.

10   208, l. 24; p. 211, ll. 5-21; Exh. 36 & 37.)  This included statements for Scarff, Sears and

11   Pentoga Partners. (Gregory Dec., Exh. C, p. 218, l. 7 - p. 219, l. 17, Ex. 40 & 41.)

12   **D.   MR. STARRATT AND THE "SCARFF" LOANS**

13   For many years, beginning in approximately 1991, Scarff's personal banking was handled

14   at the main branch of Wells Fargo in San Francisco.   During the period of time at issue, Wells

15   Fargo issued, and repeatedly renewed, at least three lines of credit totaling over $3 million, one

16   of which, the Platinum Equity Line was purportedly secured against Mr. Scarff's Residence.

17   Each of these lines was drawn down without Mr. Scarff's knowledge or consent. Wells Fargo

18   then sought to foreclose the Platinum Equity Line security against the Residence based upon the

19   following forged documents:

20   •  Platinum Equity Line loan agreement dated January 28, 2002.  As stated in the

21   Scarff Declaration and as confirmed in the expert witness Declaration of David Moore attached

22   to the Gregory Dec. as **Exhibit D** (the "Moore Dec."), Scarff's signature on the Platinum Equity

23   Line loan agreement is forged.

24   •  Deed of trust dated March 19, 2002.  The Short Form Deed of Trust ("Deed of

25   Trust") recorded against the Residence was purportedly executed by Mr. Scarff in Yuba City,

26   California, on March 19, 2002, two months after the loan agreement was supposedly signed in

27   San Francisco, California.  As stated in the Scarff Dec. and as confirmed in the expert witness

28   Moore Dec., Mr. Scarff's signature on the Deed of Trust is forged.  Mr. Scarff's signature was

LAW OFFICES
COTCHETT,
PITRE, SIMON &
McCARTHY

PLAINTIFFS' MEMORANDUM IN OPPOSITION TO WELLS FARGO DEFENDANTS  MOTION FOR SUMMARY JUDGMENT
OR PARTIAL SUMMARY JUDGMENT Case Nos. C 03-03394 JF (PVT), C 03-04829 JF (PVT)

10

allegedly notarized by Kulwant S. Johl ("Johl").  As stated in the Declaration of Kulwant S. Johl attached to the Gregory Dec. as **Exhibit E**, and as further evidenced by the notary register log attached thereto, the notary stamp on the Deed of Trust was fraudulently affixed.  Mr. Johl did not notarize Mr. Scarff's signature on the Deed of Trust.

       • <u>Certification of Trust dated March 19, 2002.</u>  Title to the  Residence is held in the name of The Edward L. Scarff and Nancy V. Scarff 1985 Trust (the "Trust").  As part of the fraudulent scheme to secure the Platinum Equity line, a second document, entitled Certification of Trust, was submitted whereby the Trust purports to authorize Mr. Scarff to grant Wells Fargo a security interest in the Residence. As stated in the expert witness Moore Dec., Mr. Scarff's signature on the Certification of Trust is forged.  Further, as stated in the Johl Dec., and as further evidenced by the notary register log attached thereto, the notary stamp on the Certificate of Trust was fraudulently affixed.  Mr. Johl did not notarize Mr. Scarff's signature on Certificate of Trust.

       • <u>Alteration and Recording of Deed of Trust.</u>  The forged Deed of Trust contains alterations, apparently inserted by Fidelity Title, the Trustee under the Deed of Trust, or Wells Fargo.  As evidenced by the certified copy of the Deed of Trust, attached to the Request for Judicial Notice[7] as **Exhibit B** at page two, paragraph 4, the county of recordation was changed from San Francisco to Santa Clara, and the instrument number and recordation information were deleted.  The changes are not initialed.  The Deed of Trust was recorded April 16, 2002, almost 3 months after the Platinum Equity Line agreement was supposedly executed.

       • <u>Notice of Default.</u>  On or about December 3, 2002 American Securities Company was substituted as trustee under the Deed of Trust in place of Fidelity Title Company. [See Request for Judicial Notice, **Exhibit C**.]  On December 19, 2002, a Notice of Default was recorded against the Residence.  [See Request for Judicial Notice, **Exhibit D**.]  Despite the fact that Mr. Scarff provided Wells Fargo with compelling evidence that the Platinum Equity Line, the Deed of Trust and the Certification of Trust were forged and fraudulently notarized, Wells Fargo proceeded to record a Notice of Default against the Residence, and is continuing with the

---

[7]The Request for Judicial Notice is attached to the Gregory Dec. as **Exhibit F**.

LAW OFFICES
COTCHETT,
PITRE, SIMON &
McCARTHY

**PLAINTIFFS' MEMORANDUM IN OPPOSITION TO WELLS FARGO DEFENDANTS  MOTION FOR SUMMARY JUDGMENT OR PARTIAL SUMMARY JUDGMENT** Case Nos. C 03-03394 JF (PVT), C 03-04829 JF (PVT)

11

1   non-judicial foreclosure sale of Scarff's residence. [See Declaration of Heinz Binder and

2   correspondence attached as Exhibits thereto, which are attached to the Gregory Dec. as **Exhibit

3   G**.]

4           It was not until the 11th hour that Mr. Scarff's counsel were able to negotiate a

5   preliminary injunction enjoining and restraining Wells Fargo from publishing or recording a

6   Notice of Sale against the Scarff Residence.  A true and correct copy of that Stipulation and

7   Order for Preliminary Injunction is attached hereto as **Exhibit I**.  In order to obtain the

8   Stipulation and Order, Mr. Scarff was required to file deposit in lieu of an undertaking in the

9   amount of $30,000 on or about March 10, 2003.  Subsequently, Wells Fargo finally reconveyed

10  its interest in the Scarff Residence, thus obviating the need for a Preliminary Injunction.  A true

11  and correct copy of the Ex Parte Application for Exoneration of Deposit, reflecting the foregoing,

12  is attached hereto as **Exhibit J**.

13          Based on the Scarff Declaration filed herewith, as well as the David Moore

14  Declaration (attached as **Exhibit D** to the Gregory Dec.), there were numerous loan transactions

15  in Mr. Scarff's name that were forged and unauthorized. These "Scarff" Loans resulted in

16  withdrawals on lines of credit over five years that were both unauthorized and unusual.

17          For example, the "Scarff" Loans listed the purpose of the credit line because the bank

18  wanted to know what the customer planned to do with the loan proceeds.  This information

19  would be obtained from the borrower. (Gregory Dec., Exh. A, p. 96, ll. 6-21; p. 101, ll. 6-20.)

20  Yet in Mr. Scarff's case, Wells Fargo did not obtain this information from him; Mr. Starratt

21  obtained it from Huang.  She was the person with whom Mr. Starratt had the most frequent

22  contact. (Gregory Dec., Exh. B, p. 129, l. 23 - p. 130, l. 21.)

23          Among the duties of a private banker was to act as a loan officer for loans place with

24  his private banking client.  (Gregory Dec., Exh. B, p. 96, l. 17 - p. 97, l. 2; Britt Dec.) The private

25  banker was responsible for making sure the borrower is in compliance with the loan terms and

26  conditions and would monitor the loan to make sure the borrower stays in compliance. (Gregory

27  Dec., Exh. A, p. 140, ll. 4-15; Britt Dec.)  The "Scarff" Loans were subject to a 30-day annual

28  clean-up provision, where the borrower would be out of debt for 30 consecutive days. (Gregory

LAW OFFICES
COTCHETT,
PITRE, SIMON &
MCCARTHY

**PLAINTIFFS' MEMORANDUM IN OPPOSITION TO WELLS FARGO DEFENDANTS  MOTION FOR SUMMARY JUDGMENT
OR PARTIAL SUMMARY JUDGMENT** Case Nos. C 03-03394 JF (PVT), C 03-04829 JF (PVT)

12

Dec., Exh. A, p. 100, l. 18- p. 101, l. 5.) The 30-day clean-up provision was not met for any of the "Scarff" Loans at any time.(Gregory Dec., Exh. A, p. 114, l. 18 - p. 116, l. 21; Scarff Dec.)

It is the policy of the bank that any address change must be verified with the client. For a loan, the client is the borrower.  It is not the standard practice to have a customer's statement sent directly to a bank employee. (Gregory Dec., Exh. A, p. 146, l. 9- p. 149, l. 19; Britt Dec.)  Wells Fargo has an operations center at 525 Market Street, Floor 17, San Francisco. The Northcliff statements were being sent to "ATTN CAROL BARBER MAC 0101-178, 525 Market Street, Floor 17, San Francisco, CA."  The head of private banking could think of no business purpose "why that may have been done." It would not have been standard practice for the statements to be sent either to the private banker (Starratt) or the private banking operations group (Barber). (Gregory Dec., Exh. A, p. 149, l. 20- p. 155, l. 11, Exh. 10.)

The loans supposedly issued to Mr. Scarff had covenants and repayment obligations. In 2001, $1,000,000 was required on a "Scarff" loan.  In August 2001, Huang met with Mr. Starratt over lunch and asserted that Mr. Scarff could only pay $500,000 due to an administrative error.  Huang promised that the additional $500,000 "will be here by 8/15." (Gregory Dec., Exh. B., p. 167, l. 2-p. 172, l. 10, Ehx. 26.)

## E.  THE "SCARFF" FORGED SIGNATURES

It was Wells Fargo's policy that, if the bank accepted a fax signature on a loan document, the bank would require that the originals be supplied to the bank later.  There was a tickler system to make sure the originals came into the bank's possession. The private banker would be responsible for obtaining the originals would come into the account officer.  (Gregory Dec., Exh. A, p. 132, l. 10 - p. 134, l. 5; Exh. B., p. 143, ll. 1-14.)  However, Wells Fargo private banking approved the "Scarff" Loans "with faxed documents." (Gregory Dec., Exh. A, p. 135, l. 15 - p. 136, l. 21.)

## F.  GIFTS OR BRIBES?

Wells Fargo had an ethics and business conduct policy that bank employees and their family members were limited in accepting gifts to gifts under $100 from clients or people with whom they do business.  If a client offered a gift above $100, then the Wells Fargo employee

LAW OFFICES
COTCHETT,
PITRE, SIMON &
MCCARTHY

PLAINTIFFS' MEMORANDUM IN OPPOSITION TO WELLS FARGO DEFENDANTS  MOTION FOR SUMMARY JUDGMENT OR PARTIAL SUMMARY JUDGMENT Case Nos. C 03-03394 JF (PVT), C 03-04829 JF (PVT)

13

1    must either refuse the gift or inform the supervisor to request permission to accept the gift.

2    **Money** (cash, check, money order or electronic funds) **must never be accepted or given**.

3    (Gregory Dec., Exh. A, p. 142, l. 3-23; Exh. C, Ex. 18.)  The Wells Fargo gift policy is set forth

4    in Exh. 18 to the Barber Depo.

5         Ms. Barber understood these gift-prohibition rules. (Gregory Dec., Exh. C, p. 59, l. 18

6    - p. 60, l.13; p. 128, l. 2 - p. 130, l. 4.)  Using her own words, Ms. Barber received "numerous,"

7    "expensive," even "lavish," gifts and cash from Huang.  The cash was both for Ms. Barber and

8    her family members.  (Gregory Dec., Exh. C, p. 59, l. 18 - p.60, l.13.) The items "given" by

9    Huang to Ms. Barber include: black leather gloves, a red, white, and blue scarf; a white

10   embroidered scarf; a burgundy and black embroidered scarf; black floral scarf; **a pearl bracelet**;

11   Cupid-shaped earrings; a personalized souvenir charm; a souvenir necklace; **a tan Gucci purse**;

12   **a Kate Spade tote bag**; a red and black leather purse; a wire crocheted purse; a black leather

13   purse; a white leather purse; gold lapel pin; a silver dish from New Mexico; a heart-shaped

14   ceramic dish; **a Tse sweater set**; a shawl with gloves; a red macintosh raincoat; a security device;

15   a suitcase; a set of miniature perfumes; various plants; an Easter gift box; box of Christmas

16   ornaments; tickets to charity events and the ballet; various floral bouquets; and **a gift certificate**

17   **for round trip airfare to Morocco**.

18         There were various cash payments: $300; $100; $100-$200; $500; $1,200-$1,500;

19   $300; $300; $800; $1,000; and $2,000.[8]  There are more "gifts," but Ms. Barber could not recall

20   them all.  **Not one of these items was reported to the bank.**  (Gregory Dec., Exh. C, p. 73, l. 8 -

21   p. 78, l.13, Exh. 1.) There were extravagant lunches and dinners (Chez Panisse, Splendidos,

22   Boulevard, XYZ) on a monthly basis. (Gregory Dec., Exh. C, p. 89, ll. 1-8, Ex. 1.) It is difficult

23   how a private banking assistant could receive these items from a bookkeeper and not suspect that

24   they were bribes? (See Britt Dec.)

25

26

_____

27   [8]For the $2,000 cash payment from Huang, Ms. Barber asserts that she never used it.  What actually
     happened was, she kept the money in an envelope and used the funds as she needed them, and then

28   at a later point replenish the money in the envelope. (Gregory Dec., Exh. C, p.146, l. 4 - p.148, l. 15.)

LAW OFFICES
COTCHETT,
PITRE, SIMON &
MCCARTHY

**PLAINTIFFS' MEMORANDUM IN OPPOSITION TO WELLS FARGO DEFENDANTS MOTION FOR SUMMARY JUDGMENT
OR PARTIAL SUMMARY JUDGMENT** Case Nos. C 03-03394 JF (PVT), C 03-04829 JF (PVT)

14

1    In return for the bribes, there were telephone and wire transfers for hundreds of

2  thousands of dollars, documents sent to Huang for Mr. Scarff to sign, blank financial verification

3  forms signed by Ms. Barber at Huang's request (yet unauthorized by Mr. Scarff). (Gregory Dec.,

4  Exh. C, p. 95, l.18 - p. 101, l.12.)  According to Ms. Barber, inside the bank during business

5  hours, her relationship with Huang was business (with Huang as "Mr. Scarff's right-hand man...

6  bookkeeper"); outside the bank, their relationship was personal, with Huang footing most of the

7  bill. (Gregory Dec., Exh. C, p. 103, l. 16- p. 105, l. 8, Ex. 1.)  This is exactly the type of situation

8  that anti-fraud and anti-bribery laws and procedures try to prevent.[9/] (See Britt Dec.)  With Ms.

9  Barber, these laws and procedures completely failed.

10    Wells Fargo provided substantial assistance to Huang in her credit fraud scheme.

11  And Huang paid Barber back with items of substantial value.  Without Ms. Barber's cooperation,

12  Huang would not have been able to withdraw over $3,000,000 in Mr. Scarff's name from Wells

13  Fargo lines of credit.  Through the bribes and bonus compensation arrangement, Ms. Barber and

14  Mr. Starrett had every reason to look the other way as Huang dramatically drew down lines of

15  credit.  The Wells Fargo and Carol Barber Motions should be denied.

16  **III.    LEGAL ARGUMENT**

17    **A.  THESE DEFENDANTS HAVE FAILED TO SATISFY THEIR BURDEN**

18    **ON SUMMARY JUDGMENT.**

19    Under Federal Rules of Civil Procedure, Rule 56(c), summary judgment is

20  appropriate when "there is no genuine issue as to any material fact and that the moving party is

21  entitled to judgment as a matter of law."  The party moving for summary judgment bears the

22  initial burden of demonstrating the "absence of a genuine issue of material fact." *Celotex Corp.*

23  *v. Catrett*, 477 U.S. 317, 322-23 (1986).  Only once the moving party has met this burden is the

24  nonmoving party required to come forward with specific facts demonstrating a genuine factual

25  issue for trial. *See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587

26  (1986).

27  _____

28  [9]In fact, on August 7, 2003, Ms. Barber was terminated by Wells Fargo for violating bank policy in
    accepting items of value from Huang. (Gregory Dec., Exh. C, p. 107, l. 8 - p. 108, l. 20.)

LAW OFFICES
COTCHETT,
PITRE, SIMON &
MCCARTHY

PLAINTIFFS' MEMORANDUM IN OPPOSITION TO WELLS FARGO DEFENDANTS MOTION FOR SUMMARY JUDGMENT
OR PARTIAL SUMMARY JUDGMENT Case Nos. C 03-03394 JF (PVT), C 03-04829 JF (PVT)

15

"[A]t summary judgment, the judge must view the evidence in the light most favorable to the nonmoving party: if direct evidence produced by the moving party conflicts with direct evidence produced by the nonmoving party, the judge must assume the truth of the evidence set forth by the nonmoving party with respect to that fact. Put another way, if a rational trier of fact might resolve the issue in favor of the nonmoving party, summary judgment must be denied." *T.W. Elec. v. Pacific Elec. Contractors Ass'n*, 809 F.2d 626, 630-31 (9th Cir. 1987) (Citations omitted.)  Inferences must be drawn in the light most favorable to the nonmoving party. *See Matsushita*, 475 U.S. at 587-8. *Also see* 10A *Charles Alan Wright et al., Federal Practice and Procedure* § 2727, at 459, 459 n.5 (3d ed. 1998) (citing *Adickes v. S. H. Kress & Co.*, 398 U.S. 144 (1970)).

For purposes of this motion for summary judgment, Wells Fargo has both the initial burden of production and the ultimate burden of persuasion.  The moving party "has both the initial burden of production and the ultimate burden of persuasion on a motion for summary judgment.  In order to carry its burden of production, the moving party must either produce evidence negating an essential element of the nonmoving party's claim or defense or show that the nonmoving party does not have enough evidence of an essential element to carry its ultimate burden of persuasion at trial.  In order to carry its ultimate burden of persuasion on the motion, the moving party must persuade the court that there is no genuine issue of material fact.  If a moving party fails to carry its initial burden of production, the nonmoving party has no obligation to produce anything, even if the nonmoving party would have the ultimate burden of persuasion at trial."  *Nissan Fire & Marine Ins. Co. v. Fritz Cos.*, 210 F.3d 1099, 1102-3 (9th Cir. 2000) (Citations omitted.)

The nonmoving party need not establish a material issue of fact conclusively in its favor. It is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." *First Nat'l Bank v. Cities Service Co.*, 391 U.S. 253, 289 (1968). In other words, the nonmoving party's evidence is sufficient to withstand summary judgment if a reasonable trier of fact could return a verdict in favor of the

LAW OFFICES
COTCHETT,
PITRE, SIMON &
MCCARTHY

**PLAINTIFFS' MEMORANDUM IN OPPOSITION TO WELLS FARGO DEFENDANTS  MOTION FOR SUMMARY JUDGMENT OR PARTIAL SUMMARY JUDGMENT** Case Nos. C 03-03394 JF (PVT), C 03-04829 JF (PVT)

16

nonmoving party based on that evidence. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Wool v. Tandem Computers, Inc.*, 818 F.2d 1433, 1436 (9ᵗʰ Cir.1987).

In *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157-59 (1970), the Supreme Court reversed the lower court's grant of summary judgment, holding that the defendant-movant had not met its burden of affirmatively refuting an essential element of the plaintiff's case. The plaintiff accused the defendant store of conspiring with the police to arrest her, alleging as part of her theory that an officer was in the store at the same time. Because the defendant, upon moving for summary judgment, was unable to establish that there were no officers in the store, the Court held that a jury might infer a conspiracy.

In reviewing evidence for purposes of summary judgment, the Court does not make credibility determinations or weigh conflicting evidence. *See T.W. Elec. v. Pacific Elec. Contractors Ass'n*, 809 F.2d 626, 630-31 (9th Cir. 1987) (citing *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)). The evidence presented by the parties must be admissible. Fed. R. Civ. P. 56(e). Testimony in declarations is sufficient to raise genuine issues of fact and defeat summary judgment. *See Falls Riverway Realty. Inc. v. City of Niagara Falls*, 754 F.2d 49, 57 (2d Cir. 1985); *Thornhill Publ'g Co., Inc. v. GTE Corp.*, 594 F.2d 730, 738 (9ᵗʰ Cir. 1979).

Wells Fargo has come forward with no evidence showing that it is entitled to judgment as a matter of law. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (quoting Rule 56(c)). Plaintiffs have introduced substantial evidence of forgeries, of fraud, of lies, of bribes, of causation, of damages.  Barber even concedes bribes and lies. Therefore, the motions of Wells Fargo and Barber must be denied because they have failed to discharge their preponderance of the evidence burden. *See Edison v. Reliable Life Ins. Co*, 664 F.2d 1130, 1131 (9th Cir. 1981).

## B.    THESE DEFENDANTS ARE LIABLE FOR AIDING AND ABETTING AND CONSPIRACY

Conspiracy is not a cause of action, but a legal doctrine that imposes liability on persons who, although not actually committing a tort themselves, share with immediate tortfeasors a common plan or design in its perpetration.  By

**PLAINTIFFS' MEMORANDUM IN OPPOSITION TO WELLS FARGO DEFENDANTS  MOTION FOR SUMMARY JUDGMENT OR PARTIAL SUMMARY JUDGMENT** Case Nos. C 03-03394 JF (PVT), C 03-04829 JF (PVT)

17

LAW OFFICES
Cotchett,
Pitre, Simon &
McCarthy

participation in a civil conspiracy, a coconspirator effectively adopts as his or her

own the torts of other co-conspirators within the ambit of the conspiracy.  In this

way, a co-conspirator incurs tort liability co-equal with the immediate tortfeasors.

*Applied Equip*., 7 Cal.4th at 510-11; *accord Choate v. County of Orange*, 86 Cal.App.4th 312,

333 (2000) (conspiracy doctrine "provides a remedial measure for affixing liability to all persons

who have 'agreed to a common design to commit a wrong.'") (internal citations omitted).

Dean Prosser notes that "[t]he original meaning of 'joint tort' was that of vicarious

liability for concerted action.  All persons who acted in concert to commit a trespass, in

pursuance of a common design, were held liable for the entire result." W. Prosser, <u>Law of Torts</u>

Sec. 46, at 291 (4th ed. 1971).  His illustration portrays a standard 'joint tort' situation –

combined action by tortfeasors on the scene together: "one might have battered the plaintiff,

while another imprisoned him, and a third stole his silver buttons." <u>Id</u>. (Footnotes omitted.)  Each

is responsible for the others' actions.

The most recent decision on this point is *Frame v. Pricewaterhousecoopers LLP*, 05

C.D.O.S. 10014 (November 30, 2005).  In the *Frame* decision, the First District Court of Appeal

reversed the granting of summary judgment in favor of Pricewaterhouse, finding an issue of fact

regarding an aiding and abetting claim.

In *Frame*, the plaintiffs were investors in two limited partnerships, Graft and Allied.  The

general partner of both limited partnerships was Peregrine Funding.  Peregrine was owned and

managed by James Hillman.  In 1999, Peregrine/Hillman hired Pricewaterhouse to audit the

financial statements of Graton and Allied for 1998.  The partnerships only significant assets were

funds loaned to an entity called PinnFund.  If PinnFund could not repay the loans, the

partnerships had little value.

Peregrine/Hillman and PinnFund delivered to Pricewaterhouse multiple sets of purported

PinnFund audited financials audited by the Levitz accounting firm.  Pricewaterhouse discovered

that there were differences between the financial statements delivered by Peregrine/Hillman and

the financial statements issued by Levitz.  Pricewaterhouse became concerned about the

authenticity of the PinnFund financial statements.  When Pricewaterhouse could not obtain

**PLAINTIFFS' MEMORANDUM IN OPPOSITION TO WELLS FARGO DEFENDANTS  MOTION FOR SUMMARY JUDGMENT OR PARTIAL SUMMARY JUDGMENT** Case Nos. C 03-03394 JF (PVT), C 03-04829 JF (PVT)

18

LAW OFFICES
COTCHETT,
PITRE, SIMON &
MCCARTHY

appropriate assurances from Peregrin/Hillman regarding the PinnFund financials, they withdrew as auditors.  Even though Pricewaterhouse suspected improprieties in the PinnFund financials and told their suspicions to Peregrine/Hillman, they did not communicate their suspicions to the investors.

When the SEC shut down PinnFund, the investors sued Pricewaterhouse.  They asserted that Pricewaterhouse should have gone beyond Grafton and Allied's general partner - Peregrine - and reported directly to the investors what it knew. *Id.* at 10015.  The trial court granted summary judgment in favor of Pricewaterhouse on the aiding and abetting claim, despite expert witness testimony to the effect that Pricewaterhouse had a duty to go beyond the general partner and report what it knew directly to the investors.

The First District found that, based on the record, there was "at least a triable issue as to the existence and extent of [Pricewaterhouse's] actual knowledge of Peregrine's and PinnFund's fraud." *Id.* at 10016.  It then analyzed to "whether there was sufficient evidence that [Pricewaterhouse] provided *substantial assistance* to the fraud with this knowledge." *Id.*

The first issue considered by the court was "inaction," or Pricewaterhouse's contention that the decision "not to issue an audit report... or to otherwise disclose the facts of fraud to the limited partners, was mere inaction on which aiding and abetting liability cannot be based." *Id*. at 10017.  The court declined to adopt Pricewaterhouse's contention: "declining to pull the cover off of a clandestine fraud *did* enable the wrongdoers to perpetrate the fraud – maintaining the secrecy that was critical to their fraudulent scheme." *Id*. at 10018.  The court held that there was a duty to disclose.

Pricewaterhouse also argued that nondisclosure was consistent with auditing standards.  The court stated: "Even if an act (or inaction) is lawful in itself and consistent with regulatory standards, it can still, as a factual matter, substantially assist another party's perpetration of an intentional tort." *Id*.  The court went on to find that "an independent duty is not required for aiding and abetting liability." *Id*.  In so ruling, the court stated: "there is a factual question whether the standard of care that [Pricewaterhouse] owed to Grafton and Allied required

LAW OFFICES
COTCHETT,
PITRE, SIMON &
MCCARTHY

**PLAINTIFFS' MEMORANDUM IN OPPOSITION TO WELLS FARGO DEFENDANTS MOTION FOR SUMMARY JUDGMENT OR PARTIAL SUMMARY JUDGMENT** Case Nos. C 03-03394 JF (PVT), C 03-04829 JF (PVT)

19

{Pricewaterhouse] to go beyond general partner Peregrine/Hillman and disclose the fraud to the limited partner investors, in light of Peregrine/Hillman's ostensible complicity in the fraud." *Id*.

The factual issues presented by the instant case are whether Wells Fargo and Carol Barber had a duty to disclose the bribes, the account improprieties, the failures to follow normal bank practices, the requests by Huang that went beyond her authority. Britt's expert witness declaration clearly provides a basis for a jury determination that Wells Fargo and Carol Barber aided and abetted Huang's fraud.

The only significance to proof of a conspiracy lies with the fact that it renders *each* participant responsible, as a joint tortfeasor, for all ensuing damages. This is so irrespective of whether each named participant was a direct actor, and regardless of the degree of her activity. *Applied Equip.,* 7 Cal.4th at 510-511; *Wyatt,* 24 Cal.3d at 784.

Civil conspiracy exists as against all co-conspirators whenever the facts show: (1) the formation and operation of a conspiracy; (2) the wrongful act or acts done pursuant thereto; and (3) resulting damage. *Mosier v. S. Cal. Physicians Ins. Exch.*, 63 Cal.App.4th 1022, 1048 (1998). Plaintiffs need *not* show that the alleged conspiracy is the result of express agreement. Because civil conspiracies are, by nature, clandestine, they may "may be inferred from the nature of the acts [alleged], the relation of the parties, the interests of the alleged conspirators, and other circumstances." *Wyatt,* 24 Cal.3d at 785; *see Peterson v. Cruikshank*, 144 Cal.App.2d 148, 163 (1956) ("[I]n the usual case the ultimate fact of a conspiracy must be determined from . . . inferences naturally and properly. . .drawn . . . ..")

Secondary liability for aiding and abetting exists if the defendant (1) knows the other's conduct constitutes a breach of duty; and (2) gives substantial assistance or encouragement to the other to commit the breach. *Saunders v. Superior Court*, 27 Cal.App. 4th 832, 846 (1994); *see also Restatement (2d) of Torts*, § 876(b); *Coffman v. Kennedy*, 74 Cal. App. 3d 28, 32 (1977). The difference between conspiracy, and aiding and abetting, is that a conspiracy involves an agreement to participate in wrongful activity; whereas, aiding and abetting focuses on whether a defendant knowingly gave "substantial assistance" to someone whose conduct is wrongful.

LAW OFFICES
COTCHETT,
PITRE, SIMON &
MCCARTHY

**PLAINTIFFS' MEMORANDUM IN OPPOSITION TO WELLS FARGO DEFENDANTS MOTION FOR SUMMARY JUDGMENT OR PARTIAL SUMMARY JUDGMENT** Case Nos. C 03-03394 JF (PVT), C 03-04829 JF (PVT)

20

The key issue raised by this Motion is whether the Wells Fargo Defendants need to have actual knowledge of the breath of Huang's intentional torts. These Motions turn on the fact question of how much assistance is substantial enough. The focus is whether Wells Fargo knowingly gave "substantial assistance."

It is clear that both Mr. Starratt and Ms. Barber provided substantial assistance: both knowingly assisted Huang in improper activity. Both were transferring funds, writing letters, authenticating documents, even negotiating, renewing, and extending lines of credit with Huang, even though they knew that Huang had no authority. Ms. Barber permitted Huang without authorization to advance and withdraw funds from the lines of credit in Mr. Scarff's name. Ms. Barber was having statements held at Wells Fargo's offices, attesting to witnessing documents she did not witness, and, most importantly, never contacting Mr. Scarff about any of this activity. Ms. Barber was accepting expensive bribes and not advising either her superiors or Mr. Scarff of the bribes.

As with conspiracy, proof of the knowledge required to establish aiding and abetting may be inferred from the factual circumstances, such as: (1) the relationship between the primary wrongdoer and the aider and abettor; (2) the aider and abettor's presence during the primary wrongdoer's conduct; and (3) the nature, extent, and duration of the aider and abettor's encouragement and substantial assistance. *See* Comment, *Restate. (2d) of Torts*, § 876(b); *Heckmann v. Ahmanson*, 168 Cal.App.3d 119, 127 (1985) (constructive knowledge sufficient for aiding and abetting liability). Substantial assistance can consist of encouragement or advice alone. *See Orser v. George*, 252 Cal.App.2d 660, 66-69 (1967) (citing *Restate. (2d) of Torts* for law of concerted action.)

Wells Fargo and Ms. Barber knew that Huang only worked as Mr. Scarff's bookkeeper. Huang has admitted the facts surrounding the formation and operation of the above-described conspiracy and has pled guilty to criminal charges of mail fraud and money laundering for her role in these schemes. (*See* this Court's Order Granting in Part and Denying in Part Motions to Dismiss, at p. 24, ftn. 34.) Wells Fargo attempts to disclaim any actual knowledge of Huang's embezzlement scheme, asserting: how could Wells Fargo know that Huang was not authorized to

**PLAINTIFFS' MEMORANDUM IN OPPOSITION TO WELLS FARGO DEFENDANTS MOTION FOR SUMMARY JUDGMENT OR PARTIAL SUMMARY JUDGMENT** Case Nos. C 03-03394 JF (PVT), C 03-04829 JF (PVT)

21

LAW OFFICES
COTCHETT,
PITRE, SIMON &
MCCARTHY

engage in eleven years of substantial bank transactions?  The response is obvious: Wells Fargo never once checked with its customer, Mr. Scarff, to see if Huang **was** authorized.  Plaintiffs need not prove an express agreement among Defendants to embezzle Plaintiffs' monies in order to state cognizable claims based on conspiracy doctrine.  Conspiracy and aiding and abetting "may be inferred [simply] from the nature of the acts [alleged], the relation of the parties, the interests of the alleged conspirators, and other circumstances." *Wyatt*, 24 Cal.3d at 785.

In *Peterson v. Cruickshank*, 144 Cal.App.2d 148 (1956), the issue was "whether there [was] any substantial evidence to support the finding that appellant conspired conspired with his two co-defendants to falsely imprison [appellant's consort]" in a sanitarium where she received shock treatments.  Id. at 163.  The appellant protested that all he had done was pay his consort's bills; he had neither directed the doctor at the sanitarium to imprison her or administer shock treatments.

The *Peterson* court observed that, absent a confession, an agreement between conspirators generally must be inferred from the circumstantial evidence revealing a common intent.  On that basis, it found a number of circumstances that permitted the inference that appellant had reached an understanding with his codefendants about the restraint and treatment of his consort.  There was a motive: the couple's past stormy personal relationship.  There was evidence of a conversation between appellant and one of the consort's doctors, discussing appellant's falling out with the woman, the history of appellant's relationship with her, and appellant's willingness to pay all bills for her "treatment."  After the talk, the physician refused to let the consort's sister take her home.  The doctor also secured, under suspicious circumstances and over the sister's objections, the woman's "consent" to shock treatments.  Appellant also sent an attorney to induce the consort to sign a release of all claims.  The court found such evidence sufficient to sustain a finding of conspiracy between appellant and the doctor to imprison the woman against her will.

The Scarff Plaintiffs' Claims do *not* seek to impose direct liability on Wells Fargo for concealment of material facts.  Instead, the claims rest on the premise that Wells Fargo, together with its directors, officers, and managing agents, including Ms. Barber, "knew the wrongful and

LAW OFFICES
COTCHETT,
PITRE, SIMON &
MCCARTHY

**PLAINTIFFS' MEMORANDUM IN OPPOSITION TO WELLS FARGO DEFENDANTS  MOTION FOR SUMMARY JUDGMENT OR PARTIAL SUMMARY JUDGMENT** Case Nos. C 03-03394 JF (PVT), C 03-04829 JF (PVT)

22

1    illegal acts being perpetrated against the Scarff Plaintiffs, . . .and armed with such knowledge,

2    concealed important information from Plaintiffs, *and further conspired with, aided and abetted,*

3    *and/or otherwise knowingly participated in* the deception and fraudulent payroll scheme and

4    credit scheme perpetrated by Huang." ACC ¶ 184.  Thus, the only issue for the Court to decide,

5    at the summary judgment stage, is whether Wells Fargo has established that there are no issues of

6    material fact to preclude secondary liability against Wells Fargo as a co-conspirator or aider and

7    abetter in Huang's scheme. *Applied Equip.*, 7 Cal.4th at 510-11; *see Wyatt*, 24 Cal.3d at 784

8    ("The effect of charging. . . conspiratorial conduct is to implicate all. . .who agree to commit the

9    wrong as well as those who actually carry it out").

10          As the decision in *Peterson* demonstrates, a court must infer a conspiracy from indirect

11   evidence.  This inference can be made if the joint tortfeasors are pursuing the same goal: getting

12   funds to Huang using Mr. Scarff's credit.  Clearly, Ms. Barber was performing acts in support of

13   Huang.  The acts may be in different places and at different times. A common plan is shown

14   where, as here, the actors are working together over a eleven year period to use Mr. Scarff's

15   credit for more than $3,000,000.

16          Other courts recognize the difficulty in establishing a clandestine scheme to defraud,

17   occurring over the course of several years.  *See, e.g.*, *First Capital Asset Management v.*

18   *Brickellbush*, 219 F.Supp.2d 578, 581 (S.D.N.Y. 2002); *Hastings v. Fidelity Mortgage Decisions*

19   *Corp.*, 984 F.Supp. 600, 608-09 (N.D.Ill. 1995).  As observed in *Peterson v. Cruikshank,* 144

20   Cal.App.2d at 163: "[I]n the absence of a confession by one of the conspirators, it is usually very

21   difficult to secure evidence of a conspiracy."  In such cases, the law permits plaintiff to establish

22   its claim by circumstantial evidence and inference.  As stated by the Court of Appeal in *Black v.*

23   *Sullivan*, 48 Cal.App.3d 557, 566 (1975): "Moreover, since participation, cooperation or unity of

24   action is difficult to prove by circumstantial evidence, it can be inferred from the nature of the act

25   done, the relation of the parties, the interests of the alleged conspirators and other

26   circumstances."  *See Dyke v. Zaiser*, 70 Cal.App.2d 639, 654 (1947); *Peskin v. Squires*, 156

27   Cal.App.2d 240, 249-50 (1957) (fraud can be established by circumstantial evidence).

28

LAW OFFICES
COTCHETT,
PITRE, SIMON &
MCCARTHY

**PLAINTIFFS' MEMORANDUM IN OPPOSITION TO WELLS FARGO DEFENDANTS  MOTION FOR SUMMARY JUDGMENT OR PARTIAL SUMMARY JUDGMENT** Case Nos. C 03-03394 JF (PVT), C 03-04829 JF (PVT)

23

1    In this context, knowledge of the fraud may be inferred from factual circumstances, and

2    constructive knowledge is sufficient to impose secondary liability. *Ibid*; *see also Clifford v.*

3    *Hughson*, 992 F.Supp.661, 668-669 (S.D.N.Y. 1998) (in cause of action involving mail fraud

4    scheme, court held that Rule 9(b) did not require that plaintiffs specify the time, place, and

5    sender of each mail communication, as long as nature and mechanics of underlying scheme, and

6    role of each defendant in that scheme, is alleged); *First Capital Asset Management*, supra, 219

7    F.Supp.2d at 581 ("The requisite strong inference of fraud may be established by alleging facts

8    either (a) showing that defendants had both motive and opportunity to commit fraud, or (b)

9    constituting strong circumstantial evidence of conscious behavior or recklessness."); *Hastings,*

10   *supra,* 984 F.Supp. at 609 (scheme to defraud adequately alleged as long as "it can be reasonably

11   inferred from the Complaint that defendants knew of the fraudulent misrepresentations made by

12   [co-Defendant] and intended to help [that co-Defendant] achieve its objectives.")

13   Aiding and abetting "focuses on whether a defendant knowingly gave 'substantial

14   assistance' to someone who performed wrongful conduct, not whether the defendant agreed to

15   join the wrongful conduct." *Howard v. Superior Court*, 2 Cal.App.4th 745, 748-9 (1992). *See*

16   *Thomas v. Doorley*, 175 Cal.App.2d 545, 550 (1959) (Defendant may not have beat plaintiff, but

17   driving plaintiff to the secluded location and standing by was enough to constitute active

18   participation). The District Court in *Neilson* found knowledge of a Ponzi scheme on the part of

19   banks where the defendants used atypical banking procedures to service accounts, raising an

20   inference that they knew of the Ponzi scheme and sought to accommodate it by altering their

21   normal ways of doing business. This supports the general allegations of knowledge." *Neilson v.*

22   *Union Bank of California, N.A.*, 290 F.Supp.2d 1101, 1120-1 (C.D.Cal. 2003).

23   It is obvious that many variables enter into the equation of how much aid is "substantial

24   aid." The Restatement identifies five factors: the nature of the act encouraged; the amount and

25   kind of assistance given; the defendant's absence or presence at the time of the tort; his relation

26   to the tortious actor; and the defendant's state of mind. *See Restatement (2d) of Torts,* Sec.

27   876(b), comment d (1979); *Lawyer's Title Insurance v. United American Bank*, 21 F.Supp.2d

28   785, 798-99 (W.D.Tenn. 1998).

LAW OFFICES
COTCHETT,
PITRE, SIMON &
McCARTHY

**PLAINTIFFS' MEMORANDUM IN OPPOSITION TO WELLS FARGO DEFENDANTS MOTION FOR SUMMARY JUDGMENT OR PARTIAL SUMMARY JUDGMENT** Case Nos. C 03-03394 JF (PVT), C 03-04829 JF (PVT)

24

The evidence introduced comports with these principles.  Wells Fargo, after assuming the role of Mr. Scarff's personal bank advisor with respect to Mr. Scarff's personal credit needs, knew that Mr. Scarff did not authorize Huang to advance, withdraw funds from a line of credit and did not authorize Huang to negotiate, renew, or extend any line of credit.  Wells Fargo, in the face of this knowledge, gave substantial assistance or encouragement to Huang to carry out the Credit Scheme, by, *inter alia*: (a) repeatedly failing and/or refusing to verify the validity and authenticity of initials, signatures, and authorizations on the credit documents purportedly executed in Mr. Scarff's name;  (b) allowing Huang, who is not a listed "borrower," "obligor" or "undersigned" on any Wells Fargo loan document, to draw down credit lines established for Mr. Scarff's benefit, and to transfer millions of dollars from those credit lines into another bank, without first obtaining Mr. Scarff's knowledge or consent; (c) affirmatively secreting Huang's wrongdoing from Mr. Scarff by repeatedly allowing Huang to use unauthorized telephonic and/or electronic means to withdraw and transfer monies from credit lines established for Mr. Scarff's benefit, and to convert those sums to Huang's own use; and (d) accepting kickbacks and bribes from Huang for assisting her in perpetuating these schemes.

This evidence is further bolstered by the expert opinion of John R. Britt. While Plaintiffs will not restate Mr. Britt's extensive analysis here, his conclusions bear repeating:

1.      Wells Fargo's Private Banking Department is based on developing a **relationship with the customer of knowledge, service and trust**.  Representatives of Wells Fargo should have been having regular meetings with Mr. Scarff to learn and understand his financial needs and help him develop appropriate financial strategy for using Wells Fargo to meet those needs. The communications should have been regular and direct with Mr. Scarff, **not through his assistant**, unless Wells Fargo had received a formal written directive from Mr. Scarff personally.

2.      All of the documents supporting loan applications and evidencing loan commitments should have **presented to Mr. Scarff personally**.  If the private banking officer was dealing through a third party, such as a personal assistant, then it was incumbent upon the private banking officer to check with Mr. Scarff to insure he was in agreement for all significant transactions.

**PLAINTIFFS' MEMORANDUM IN OPPOSITION TO WELLS FARGO DEFENDANTS  MOTION FOR SUMMARY JUDGMENT OR PARTIAL SUMMARY JUDGMENT** Case Nos. C 03-03394 JF (PVT), C 03-04829 JF (PVT)

25

LAW OFFICES
COTCHETT,
PITRE, SIMON &
MCCARTHY

3. There are alterations in the Wells Fargo account. For example, there were change of address request(s). Such requests should only be made or accepted from a then-existing account signer on the account being changed. Any requests for bank statements to be held on specific accounts must come from an authorized account signer at the time of the request. The failure to have the customer approve or otherwise acknowledge these significant alterations is **a breach of the duty that a bank owes to a private banking customer**.

4. It is unclear why the personal assistant of a customer would feel beholden to the private banking officer. **Substantial gifts from bank customers are unacceptable under any standard of conduct. Such incidents have the appearance of an outright bribe**.

5. Wells Fargo's private banking officer should have been regularly reviewing the banking situation with Mr. Scarff personally and obtaining his approval. This point is particularly true as the size of the loans increase from $1,000,000 to $3,000,000. **Had this simple "know your customer" procedure been followed by Wells Fargo, then Huang would not have had access to these funds**.

Wells Fargo was commercially unreasonable in handling loans in Mr. Scarff's name and in processing Huang's requests. *See Kelly v. Central Bank & Trust Co.*, 794 P.2d 1037, 1044 (Colo.Ct.App. 1989) (distinguishing between "normal banking services" and commercially unreasonable handling of checks; failure to inquire about deposits into third parties' accounts of checks endorsed by a corporate payee precluded summary judgment on bank's reckless substantial assistance to fraudulent scheme under Colorado law). Plaintiffs have established sufficient circumstantial and inferential facts to impose secondary liability against Wells Fargo for Huang's fraud and deceit. The Motion for Summary Judgment should be denied.

## C.   WELLS FARGO IS LIABLE IN NEGLIGENCE

The required elements for negligence are: (1) the existence of a duty on the part of the defendant to use reasonable care; (2) breach of the duty; (3) defendant's breach of duty being a legal cause of the harm suffered by plaintiffs; and (4) damages. Cal. Civ. Code §§ 1714(a), 3281, 3282, 3333; 4 Witkin, Cal. Procedure, Pleading, § 537, at 634 (4th ed. 1997). In the banking context, a bank or lender owes its customer at least an ordinary duty of care, although a higher or

LAW OFFICES
COTCHETT,
PITRE, SIMON &
MCCARTHY

**PLAINTIFFS' MEMORANDUM IN OPPOSITION TO WELLS FARGO DEFENDANTS MOTION FOR SUMMARY JUDGMENT OR PARTIAL SUMMARY JUDGMENT** Case Nos. C 03-03394 JF (PVT), C 03-04829 JF (PVT)

26

fiduciary duty may be shown in special circumstances, for example, when a bank provides its client trust or other fiduciary services. *See, e.g., Copesky v. Superior Court*, 229 Cal.App.3d 678 (1991); *Peterson Development Co. v. Torrey Pines Bank*, 233 Cal.App.3d 103, 119 (1991); *Bank of America v. Sanchez*, 3 Cal.App.2d 238 (1934) (court found fiduciary relationship based upon a long-term relationship between the bank and the customer, the bank's specialized knowledge and the customer's justifiably reliance on the bank for advice concerning financial matters.)

The uncontested facts established by Plaintiffs prove a cause of action for negligence against Wells Fargo.  Wells Fargo, together with its officers, directors, agents, and employees, owed Mr. Scarff a duty to exercise reasonable diligence and ordinary care: (a) in providing Mr. Scarff the promised financial services; (b) in inspecting, negotiating, and making reasonable inquiry with regard to opening, extending, renewing, or increasing lines of credit in Mr. Scarff's name; and (c) in making reasonable inquiry with respect to disbursements, transfers, payments, and withdrawals made from lines of credit and/or loans by persons other than Mr. Scarff.  Wells Fargo did not exercise reasonable and ordinary care by, *inter alia*: (a) failing to comply with security procedures; (b) failing to verify whether Mr. Scarff  had authorized extensions, renewals, or increases in credit in his name; (c) failing to verify that disbursements, transfers, and other transactions related to these credit lines were authorized by Mr. Scarff; (d) failing to provide Mr. Scarff with account statements; and (e) failing to keep Mr. Scarff informed about transactions related to credit or loans extended in his name.  Mr. Scarff's damages identify *real*, monetary losses as a result of the tortious actions of Wells Fargo: losses in form of paid fees, interest, and charges paid to Wells Fargo (and others) by Huang, out of Mr. Scarff's funds.

The California Supreme Court in *Sun 'N Sand, Inc. v. United California Bank*, 21 Cal.3d 671 (1978) also rejected the bank's contention that it was relieved from liability because it was a holder in due course. In *Sun 'N Sand,* an employee of Sun 'N Sand presented a number of checks drawn on Sun 'N Sand's account to the defendant bank. The checks, which had been altered by the employee to increase the amount, were made payable to the bank. The bank deposited the checks in the employee's account pursuant to her instructions. The trial court dismissed Sun 'N Sand's negligence claim against the bank on the basis that the bank was a holder in due course.

LAW OFFICES
COTCHETT,
PITRE, SIMON &
MCCARTHY

**PLAINTIFFS' MEMORANDUM IN OPPOSITION TO WELLS FARGO DEFENDANTS  MOTION FOR SUMMARY JUDGMENT OR PARTIAL SUMMARY JUDGMENT** Case Nos. C 03-03394 JF (PVT), C 03-04829 JF (PVT)

27

1  "We hold simply that the bank may not ignore the danger signals inherent in such an attempted

2  negotiation. There must be objective indicia from which the bank could reasonably conclude that

3  the party presenting the check is authorized to transact in the manner proposed. In the absence of

4  such indicia the bank pays at its peril.... While it may be less difficult for the employer to prevent

5  the issuance of such checks than for the bank to detect that an indorsement is forged, this is not

6  the relevant comparison when the bank is presented with checks naming it as payee. In the latter

7  circumstance the bank is confronted with an obvious irregularity when the drawer's dishonest

8  employee attempts to negotiate such checks for his own benefit. The bank does not have to be

9  especially vigilant; its agent need only read what appears on the face of the check to be warned

10 that a fraud may be in progress." Id. at 724-5.

11      Any reliance on *Chazen v. Centennial Bank*, 61 Cal.App.4th 532 (1998), is misplaced.

12 *Chazen* held that a bank generally has no duty to monitor a fidcuiary account as to withdrawals

13 "by authorized persons who draw on the account in an authorized manner." Id. at 541.  As to the

14 loans at issue in the instant case, **Huang was not authorized to engage in any of the loan**

15 **transactions conducted by Wells Fargo**. *Chazen* does not apply.

16      Wells Fargo essentially states that there were no suspicious instruments or circumstances

17 that would give rise to a duty to monitor Scarff's account. There was clear objective indicia that

18 Huang did not have the authority to negotiate these loans, to renew lines of credit, and to request

19 advances.  The testimony was that Mr. Scarff, not Huang, was the customer of the bank and that

20 Huang had no authority to negotiate extensions or renewals of loans.  According to bank officer

21 testimony, Huang was bribing the bank officer; these bribes were not being reported to the bank

22 or to the customer.  The bank officer was being asked to perform acts contrary to internal bank

23 procedures.  Against bank policy, the bank officer committed these acts.  Wells Fargo is not

24 entitled to Partial Summary Judgment on the negligence claim.

25      There is the line of cases where the bank has no duty of care to a non-customer to follow

26 its own internal policies and procedures, such as *Software Design and Application, Ltd. V. Hofer*

27 *& Arnett, Inc.*, 49 Cal.App.4th 472 (1996).  Because **Wells Fargo admits that Mr. Scarff was a**

28 **customer** of the bank, Plaintiffs believe these cases are not on point.  In *Software Design,* a

LAW OFFICES
COTCHETT,
PITRE, SIMON &
MCCARTHY

**PLAINTIFFS' MEMORANDUM IN OPPOSITION TO WELLS FARGO DEFENDANTS  MOTION FOR SUMMARY JUDGMENT OR PARTIAL SUMMARY JUDGMENT** Case Nos. C 03-03394 JF (PVT), C 03-04829 JF (PVT)

28

malefactor agent opened brokerage accounts for a fictitious partnership with the same name as his principal's corporation (which was listed on the accounts as a limited partner, with him as a general partner). The agent deposited securities belonging to his principal (for which his principal had authorized a transfer to the corporation), then transferred the funds to bank accounts in his own name, then transferred them to accounts that his sister had opened.

The *Software Design* court found that nothing about a deposit of securities transferred to the corporation should have raised the suspicions of the brokerage firms because the corporation was listed as a limited partner on the account.  Thus the brokerage firm did not owe a duty to the **noncustomer corporation**; the failure of the malefactor to present indicia of identity and authority did not create suspicious circumstances (and absent suspicious circumstances there was no duty to request them); and the flurry of withdrawals were "expected, routine behavior" because "[a]ccount activity, whether in large sums or small, whether frequent or infrequent, is the nature of the beast ...." Id. at 483-84. The failure of the banks to follow their internal and industry identification policies did not breach any duty owed to the **noncustomer corporation**, nor were there other circumstances surrounding the opening of the accounts triggering a duty to inquire into the regularity of the transactions. Id. at 482.  Finally, the deposit of funds via wire transfer into the bank accounts from the brokerage accounts did not present any "danger signals" creating a duty to the **noncustomer corporation**, even if the court took into account the frequency of the deposits and almost simultaneous withdrawals of large sums from the bank account. Id. at 480-1.

Wells Fargo's Motion for Partial Summary Judgment as to the Cause of Action for Negligence should be denied.

**D.    WELLS FARGO'S ACTS CONSTITUTING SLANDER OF TITLE ARE NOT JUST THE RECORDING OF A FORGED DEED OF TRUST**

In its Motion, Wells Fargo is not entirely candid with this Court.  Wells Fargo not only recorded a deed of trust and trust certification that were obviously forged, Wells Fargo also commenced foreclosure proceedings on the deed of trust against the Scarff family residence located at 631 Morningside Circle, Los Altos, California (the "Residence").

LAW OFFICES
COTCHETT,
PITRE, SIMON &
MCCARTHY

PLAINTIFFS' MEMORANDUM IN OPPOSITION TO WELLS FARGO DEFENDANTS  MOTION FOR SUMMARY JUDGMENT
OR PARTIAL SUMMARY JUDGMENT Case Nos. C 03-03394 JF (PVT), C 03-04829 JF (PVT)

29

<u>The Wells Fargo Deed of Trust was Void</u>.   A forged document is void *ab initio*.  Decisional authority relative to forged instruments other than grant deeds, uniformly holds such instruments to be void. For example, in <u>Burns v. Ross</u> (1923) 190 Cal. 269, 275 the Supreme Court held that the forged assignment of a contract for the sale of real property was void, and the rights of the original owner of title to the contract were not defeated, even as to a bona fide purchaser. This rule regarding forged documents also applies to any instrument through which an interest in property is passed. <u>Wutzke v. Bill Reid Painting Service, Inc.</u> *(*1984) 151 Cal.App.3d 36 , 198 Cal.Rptr. 418.   Since a trust deed obtained by means of forgery is void, it follows that any claim of title flowing from such a deed is void. In <u>Rookhuizen v. Wilshire Reconveyance, Inc.</u> (1987) 190 Cal.App.3d 1459, 236 Cal.Rptr. 49, the court found that the lender's refusal to cancel foreclosure proceedings after credible evidence had been presented to establish that the deed of trust was forged, evidenced a "conscious disregard" of the homeowner's rights and justified an award of punitive damages.  The conduct of Wells Fargo here, is no less reprehensible.

_____Mr. Scarff has alleged, among other causes of action against Wells Fargo, a claim for slander of title. A forged deed of trust is void. *Forte v. Nolfi* (1972) 25 Cal.App.3d 656,671. Recordation of a forged deed of trust constitutes slander of title. *Id*. at 685.  Mr. Scarff has submitted credible evidence that the Deed of Trust was forged.  Therefore, Mr. Scarff is entitled to the relief demanded.

Mr. Scarff would have been irreparably damaged if the foreclosure were allowed to proceed. and would have rendered moot any claim of right by Mr. Scarff to have the validity or invalidity of the trust deed determined. The Scarffs were suffering and suffered extreme emotional distress  caused by these events and the devastating effect the loss of this residence would have on the Scarff family.  Once the house is sold, the Scarffs will have no remedy. Obviously no pecuniary compensation can replace a treasured family home.

**E.   CAROL BARBER IS SEPARATELY LIABLE**

As a participant in a common course of wrongful conduct, *Ms. Barber* is personally responsible, as a joint tortfeasor, for all damages resulting from Huang's embezzlement schemes. *Applied Equip. Corp. v. Litton Saudi Arabia Ltd.*, 7 Cal.4th 503, 510-511 (1994) ("*Applied*

**PLAINTIFFS' MEMORANDUM IN OPPOSITION TO WELLS FARGO DEFENDANTS  MOTION FOR SUMMARY JUDGMENT OR PARTIAL SUMMARY JUDGMENT** Case Nos. C 03-03394 JF (PVT), C 03-04829 JF (PVT)

30

*Equip.*”); *Wyatt v. Union Mort. Co.*, 24 Cal.3d 773, 784 (1979) (“*Wyatt*”); *and see* Judicial Council of California Civil Jury Instructions 3600 (“CACI”) (“[C]onspiracy may be inferred from circumstances, including the nature of the acts done, the relationships between the parties, and the interests of the alleged co-conspirators. [Plaintiff] is not required to prove that [Defendant] personally committed a wrongful act, or that [he/she] knew all the details of the agreement or the identities of the other participants”).

It is undisputed that Ms. Barber performed private banking services at Wells Fargo on the Scarff Accounts.  As set forth in the Britt Declaration, Plaintiffs’ expert witness in private banking, she had various responsibilities and duties. According to Mr. Britt, the purpose of a private banker is to establish a strong client relationship based on knowledge, service, and trust. She had to make an effort to know and understand the customer.

As Mr. Britt goes on to opine, the fundamental rule of private banking is “know your customer.”  Ms. Barber should have been making herself familiar with Mr. Scarff’s financial situation and needs.

Mr. Britt states at length the areas in which Ms. Barber improperly handled Wells Fargo’s private banking relationship with Mr. Scarff.  As his private banker, Ms. Barber made assurances and promises about the level of service she would provide to Mr. Scarff. These are affirmations of fact.  Civ. Code Sec. 1710.  A promise to do something necessarily implies the intention to perform.  A jury may infer from the subsequent total failure of Ms. Barber to provide any service to Mr. Scarff that she never intended to perform her promise when made. *Tenzer v. Superscope, Inc.* (1985) 39 Cal.3d 18, 30.

The only evidence offered by Ms. Barber is her self-serving declaration that she knew nothing, did nothing, and said nothing to harm Mr. Scarff.  Given that Mr. Scarff unknowingly paid almost $1,000,000 of his own money to Wells Fargo for loans he did not authorize; given that Mr. Scarff was sued on promissory notes he did not sign or authorize; given that Ms Barber knowingly took bribes; and given that all of these forgeries were witnessed and/or processed by Ms. Barber on behalf of Wells Fargo, it is obvious that Ms. Barber aided and abetted Huang in an intentional scheme to defraud Mr. Scarff.

LAW OFFICES
COTCHETT,
PITRE, SIMON &
McCARTHY

**PLAINTIFFS’ MEMORANDUM IN OPPOSITION TO WELLS FARGO DEFENDANTS  MOTION FOR SUMMARY JUDGMENT OR PARTIAL SUMMARY JUDGMENT** Case Nos. C 03-03394 JF (PVT), C 03-04829 JF (PVT)

31

### F.    SCARFF WAS DAMAGED BY BARBER'S NEGLIGENT ACTS

The required elements for negligence are: (1) the existence of a duty on the part of the defendant to use reasonable care; (2) breach of the duty; (3) defendant's breach of duty being a legal cause of the harm suffered by plaintiffs; and (4) damages.  Cal. Civ. Code §§ 1714(a), 3281, 3282, 3333; 4 Witkin, Cal. Procedure, Pleading, § 537, at 634 (4th ed. 1997).  In the banking context, a customer is damaged when he pays monies for fees, interest, and other charges on loans he did not request for funds he did not authorize.

The uncontested facts established by Plaintiffs prove a cause of action for negligence against Ms. Barber.  Ms. Barber, as a Private Banking Officer acting on his accounts, owed Mr. Scarff a duty to exercise reasonable diligence and ordinary care: (a) in providing Mr. Scarff the promised financial services; (b) in inspecting, negotiating, and making reasonable inquiry with regard to opening, extending, renewing, or increasing lines of credit in Mr. Scarff's name; and (c) in making reasonable inquiry with respect to disbursements, transfers, payments, and withdrawals made from lines of credit and/or loans by persons other than Mr. Scarff.  Wells Fargo did not exercise reasonable and ordinary care by, *inter alia*: (a) failing to comply with security procedures; (b) failing to verify whether Mr. Scarff  had authorized extensions, renewals, or increases in credit in his name; (c) failing to verify that disbursements, transfers, and other transactions related to these credit lines were authorized by Mr. Scarff; (d) failing to provide Mr. Scarff with account statements; and (e) failing to keep Mr. Scarff informed about transactions related to credit or loans extended in his name.  Mr. Scarff's damages identify *real*, monetary losses as a result of Ms. Barber's tortious actions: losses in form of paid fees, interest, and charges paid to Wells Fargo (and others) by Huang, out of Mr. Scarff's funds; as well as attorneys fees and court costs paid to date.

Ms. Barber fails to offer any evidence to support this point. Ms. Barber failed to determine whether **Huang was authorized to engage in any of the transactions that she conducted through Wells Fargo**.  There was clear objective indicia that Huang did not have the authority to negotiate these loans, to renew lines of credit, and to request advances.  The testimony was that Mr. Scarff, not Huang, was the customer of the bank and that Huang had no

**PLAINTIFFS' MEMORANDUM IN OPPOSITION TO WELLS FARGO DEFENDANTS  MOTION FOR SUMMARY JUDGMENT OR PARTIAL SUMMARY JUDGMENT** Case Nos. C 03-03394 JF (PVT), C 03-04829 JF (PVT)

32

authority to negotiate extensions or renewals of loans.  Ms. Barber was not meeting (or even speaking with) the customer, while at the same time authorizing withdrawals on lines of credit of over $3,000,000.  Huang was bribing Ms. Barber; these bribes were not being reported to the bank or to the customer.  Ms. Barber was being asked to perform acts contrary to internal bank procedures.  Against bank policy, Ms. Barber  committed these acts.

Plaintiffs believe that the issue of Mr. Scarff's own negligence goes to Ms. Barber's affirmative defenses.  Because she has failed to introduce the evidence appropriate for summary judgment as to negligence, Ms. Barber's Motion should be denied.

### G.   SCARFF WAS DAMAGED BY BARBER'S VIOLATIONS OF THE FEDERAL BRIBERY ACT.

Ms. Barber "corruptly" accepted several items of value from Huang and was influenced or rewarded for her assistance in aiding Huang.  An example is Ms. Barber's attesting that she witnessed Mr. Scarff's signature on the power of attorney, a document that permitted Huang to initiate and prolong transactions in the various Scarff accounts.  Ms. Barber joins in the Wells Fargo Motions, yet even Wells Fargo has to concede that her conduct was in violation of the anti-bribery policy.  Ms. Barber was fired for taking these very bribes!

Ms. Barber appears again to assert that Mr. Scarff was not damaged by her continued violations.  As discussed in Mr. Scarff's Declaration, he paid almost $1,000,000 in excessive fees, interest and other charges as a result of the loan withdrawals alone.  Mr. Scarff lost all of those funds as a result of my banking relationship with Wells Fargo and the dealings in his name authorized by Ms. Barber.  There is substantial evidence of forgeries, lies, and bribes tied directly to Ms. Barber.  She should seek to justify her conduct to a jury and her Motions should be denied.

### H.   THERE IS NO STATUTE OF LIMITATIONS ISSUE FOR PURPOSES OF SUMMARY JUDGMENT

Under the delayed discovery rule, the statute of limitations does not apply where the "injury or the act causing the injury, or both, have been difficult for the plaintiff to detect." *April Enterprises, Inc. v. KTTV*, 147 Cal.App.3d 805, 831 (2003); *Leaf v. City of San Mateo*, 104

**PLAINTIFFS' MEMORANDUM IN OPPOSITION TO WELLS FARGO DEFENDANTS MOTION FOR SUMMARY JUDGMENT OR PARTIAL SUMMARY JUDGMENT** Case Nos. C 03-03394 JF (PVT), C 03-04829 JF (PVT)

1  Cal.App.3d 398, 407 (1980).  Here there are no facts indicating discovery by an one of Mr.

2  Scarff, or SSA, or Pentoga.  So these Defendants must prove that the Scarff Plaintiffs should

3  have discovered.  That is a question of fact.

4       In *April Enterprises*, the Court of Appeal held "the discovery rule may be applied to

5  breaches which can be, and are, committed in secret and, moreover, where the harm flowing

6  from those breaches will not be reasonably discoverable by plaintiffs until a future time." *Id.* at

7  832.  The plaintiff in *April Enterprises* sued after the defendant erased videotapes of a television

8  show produced by the plaintiff.  The videotapes were in the custody and control of the defendant.

9  The court concluded that application of the discovery rule was not governed by the presence of

10 deliberate concealment or a heightened level of duty to the plaintiff but by two overarching

11 principles: "plaintiffs should not suffer where circumstances prevent them from knowing they

12 have been harmed" and "defendants should not be allowed to knowing profit from their injuree's

13 ignorance." *Id*. at 831.  The rule applies when the injury or act causing the injury is "difficult" to

14 detect, not impossible. *Id*.

15      In *Allred v. Bekins Wide World Van Services*, 45 Cal.App.3d 984 (1975), the appellate

16 court concluded that the discovery rule applies where the defendant held itself out as specially

17 qualified in a trade.  Because Bekins had held itself out as qualified and equipped to pack and

18 ship articles around the world, the court concluded that the delayed discovery rule applied, even

19 where the plaintiffs filed suit almost four years after improper packing of their goods.

20      Here the evidence is clear that Huang concealed the act causing the injury from the Scarff

21 Plaintiffs, making the acts causing the injury difficult to detect.  Further, there is no question that

22 the Wells Fargo Defendants did not disclose the loans, the telephone transfers, the withdrawals,

23 the extensions, etc. to the Scarff Plaintiffs.  There was virtually no communication at all with any

24 of the Scarff Plaintiffs.  As Mr. Starratt testified, in hindsight he wished he had spoken with Mr.

25 Scarff.  The delayed discovery precludes summary judgment on the grounds of statute of

26 limitations.

27 ///

28 ///

LAW OFFICES
COTCHETT,
PITRE, SIMON &
MCCARTHY

**PLAINTIFFS' MEMORANDUM IN OPPOSITION TO WELLS FARGO DEFENDANTS  MOTION FOR SUMMARY JUDGMENT OR PARTIAL SUMMARY JUDGMENT** Case Nos. C 03-03394 JF (PVT), C 03-04829 JF (PVT)

34

IV.     **CONCLUSION**

For the foregoing reasons, the Motions for Summary Judgment and Partial Summary Judgment of Wells Fargo Bank and Carol Barber should be denied.


Dated: December 7, 2005                    Respectfully submitted,

                                           **COTCHETT, PITRE, SIMON & McCARTHY**



                                           By:  _____/s/_____
                                                        PHILIP L. GRGEORY

                                           *Attorneys for Plaintiffs*
                                           EDWARD L. SCARFF, NANCY V. SCARFF,
                                           SCARFF, SEARS & ASSOCIATES, and
                                           PENTOGA PARTNERS

**PLAINTIFFS' MEMORANDUM IN OPPOSITION TO WELLS FARGO DEFENDANTS  MOTION FOR SUMMARY JUDGMENT OR PARTIAL SUMMARY JUDGMENT** Case Nos. C 03-03394 JF (PVT), C 03-04829 JF (PVT)

35