1  PILLSBURY WINTHROP SHAW PITTMAN LLP
   RONALD E. VAN BUSKIRK  #64683
2  CHRISTOPHER R. BALL  #111280
   50 Fremont Street
3  Post Office Box 7880
   San Francisco, CA 94120-7880
4  Telephone:  (415) 983-1000
   Facsimile:  (415) 983-1200
5  Email:  ronald.vanbuskirk@pillsburylaw.com

6  GIBSON, DUNN & CRUTCHER LLP
   ROBERT S. METZGER  #81294
7  333 South Grand Avenue
   Los Angeles, CA 90071
8  Telephone:  (213) 229-7000
   Facsimile:  (213) 229-7520
9  Email: rmetzger@gibsondunn.com

10 SBC WEST LEGAL DEPARTMENT
   BOBBY C. LAWYER
11 525 Market Street, 20th Floor
   San Francisco, CA 94105
12 Telephone:  (415) 778-1213
   Facsimile:  (415) 882-4458
13 Email:  bl2153@sbc.com

14 Attorneys for Plaintiff and Petitioner
   PACIFIC BELL TELEPHONE COMPANY,
15 doing business as AT&T CALIFORNIA

16              UNITED STATES DISTRICT COURT

17              NORTHERN DISTRICT OF CALIFORNIA

18

19 PACIFIC BELL TELEPHONE COMPANY,  )   No. C 05-04723 MMC
   a California corporation doing business as  )
20 AT&T CALIFORNIA,                          )   AT&T'S MOTION FOR SUMMARY
                                             )
21          Plaintiff and Petitioner,        )   JUDGMENT ON THE FIRST, THIRD
                                             )
22          vs.                              )   AND NINTH CLAIMS FOR RELIEF
                                             )
23 THE CITY OF WALNUT CREEK and THE )   [Fed. R. Civ. P. 56 and Local Rule 16-5]
   CITY COUNCIL OF THE CITY OF       )
24 WALNUT CREEK,                            )   Date:        April 21, 2006
                                             )   Time:        9 a.m.
25          Defendants and Respondents.      )   Courtroom:  7, 19th Floor
                                             )
26                                           )   [Hon. Maxine M. Chesney]
                                             )
27 ─────────────────────────────────────────)

28

<u>TABLE OF CONTENTS</u>

<u>Page</u>

I.      INTRODUCTION. ...........................................................................................1

II.     BACKGROUND. ...........................................................................................3

III.    THE COURT SHOULD GRANT SUMMARY JUDGMENT FOR AT&T
        ON ITS § 253 CLAIM. ..................................................................................5

        A.      Congress Has Preempted Local Regulation Under § 253 in Order to
                Encourage Rapid Deployment of New Telecommunications Facilities
                and Technologies. ...........................................................................................6

        B.      The Franchise Condition Will Affect Telecommunications Services. ...........7

        C.      The Franchise Condition Does Not Fall Within §§ 253(b) or (c). ...............14

IV.     THE COURT SHOULD GRANT SUMMARY JUDGMENT FOR AT&T
        ON ITS THIRD AND NINTH CLAIMS FOR RELIEF. ........................................15

        A.      The City's Attempt to Locally Franchise AT&T's IP Video Services Is
                Preempted by § 7901. ...........................................................................................15

        B.      California Cable Law Does Not Authorize the City to Franchise
                AT&T's Video Services. ...........................................................................................19

        C.      The Federal Cable Act Also Does Not Authorize the City to Locally
                Franchise AT&T's IP Video Services. ..................................................................22

V.      CONCLUSION. ...........................................................................................24

## TABLE OF AUTHORITIES

2      <u>Cases</u>

3   *Anderson v. Time Warner Telecom of California, Inc.*,
      129 Cal. App. 4th 411 (2005) ........................................................................17

4

   *Bell Atl.-Md., Inc. v. Prince George's County*,
5      49 F. Supp. 2d 805 (D. Md. 1999), *vacated and remanded on other
      grounds*, 212 F.3d 863 (4th Cir. 2000) ........................................................13

6

   *City of Auburn v. Qwest Corp.*,
7      260 F.3d 1160 (9th Cir. 2001) .........................................................8, 12, 15, 16

8   *City of Chicago v. Comcast Cable Holdings, L.L.C.*,
      384 F.3d 901 (7th Cir. 2004) ........................................................................25

9

   *Commercial Commc'ns, Inc. v. Pub. Utils. Comm'n*,
10     50 Cal. 2d 512 (1958) ...................................................................................17

11  *County of Inyo v. Hess*,
      53 Cal. App. 415 (1921) ...............................................................................18

12

   *County of Los Angeles v. Southern California Tel. Co.*,
13     32 Cal. 2d 378 (1948) ..............................................................................18, 24

14  *Cox Commc'ns PCS, L.P. v. City of San Marcos*,
      204 F. Supp. 2d 1260 (S.D. Cal. 2002) .....................................................12, 15

15

   *In re Backman Water Co.*,
16     5 CPUC2d 358 (1981) ...................................................................................23

17  *In re State of Minnesota*,
      14 F.C.C.R. 21,697 (1999) .............................................................................8

18

   *In re TCI Cablevision of Oakland County, Inc.*,
19     12 F.C.C.Rcd 21396 (1997) ........................................................................7, 8

20  *Industrial Truck Ass'n v. Henry*,
      125 F.3d 1305 (9th Cir. 1997) .........................................................................6

21

   *Liberty Cablevision of P.R., Inc. v. Municipality of Caguas*,
22     417 F.3d 216 (1st Cir. 2005) ........................................................................27

23  *Pac. Tel. & Tel. Co. v. City of Los Angeles*,
      44 Cal.2d 272 (1955) ...............................................................................passim

24

   *Pacific Tel. & Tel. Co. v. City and County San Francisco*,
25     197 Cal. App. 2d 133 (1961) .....................................................................19, 20

26  *Petaluma v. Pacific Tel. & Tel. Co.*,
      44 Cal. 2d 284 (1955) ...................................................................................24

27

   *Qwest Communications Inc. v. City of Berkeley*,
28     433 F.3d 1253 (9th Cir. 2006) ..................................................................passim

700367674v2            - ii -           AT&T'S MOT. FOR SUMM. JUDG. ON FIRST,
                                                THIRD AND NINTH CLAIMS
                                                Case No. C 05-04723 MMC

*Qwest Corp. v. City of Portland,*
    385 F.3d 1236 (9th Cir. 2004) ................................................................8, 9, 13

*Qwest Corp. v. City of Santa Fe,*
    380 F.3d 1258 (10 Cir. 2004) ......................................................................14, 16

*Reno v. ACLU*, 521 U.S. 844 (1997) ..............................................................6

*San Diego v. Southern California Tel. Corp.,*
    42 Cal. 2d 110 (1954) ..............................................................................18

*Sprint Telephony PCS, L.P. v. County of San Diego,*
    377 F.Supp.2d 886 (S.D. Cal. 2005) ......................................................6, 12

*TCG New York, Inc. v. City of White Plains,*
    305 F.3d 67 (2d Cir. 2002) ........................................................................13

*Tily B., Inc. v. City of Newport Beach,*
    69 Cal. App. 4th 1 (1998) ........................................................................24

*Western Union Tel. Co. v. Hopkins,*
    160 Cal. 106 (1911) ..................................................................................24

*Western Union Telegraph Co. v. Hopkins,*
    160 Cal. 106 (1911) ..................................................................................18

*Williams Communications, Inc. v. Riverside,*
    114 Cal. App. 4th 642 (2003) ............................................................20, 21

## Constitution

California Constitution
    Article 7 ................................................................................................21

United States Constitution
    Article VI, section 2 ..................................................................................6

## Statutes and Codes

California Public Utilities Code
    Section 233 ............................................................................................15
    Section 234 ............................................................................................16
    Section 7901 ....................................................................................passim
    Section 7901.1 ......................................................................................17

Government Code
    Section 53054.2(b) ................................................................................20
    Section 53066 *et seq.*....................................................19, 20, 21, 24
    Section 53066(a)....................................................................................19
    Section 53066(e)....................................................................................19

United States Code
    Title 47, section 151 *et seq.* ..............................................................1
    Title 47, section 153(46)....................................................................8
    Title 47, section 253(a)......................................................................6
    Title 47, section 522(10)...................................................................22
    Title 47, section 522(9).....................................................................23
    Title 47, section 541 ...........................................................1, 22, 24
    Title 47, section 541(a)(2)................................................................23
    Title 47, section 556(b).....................................................................22

<u>Rules and Regulations</u>

Federal Rules of Civil Procedure
    Rule 56..............................................................................................1

Local Rules of the United States District Court
    for the Northern District of California
    Rule 16-5 ..........................................................................................1

<u>Other Authorities</u>

1965 Cal. AG LEXIS 44, at *3 (1965)......................................................21

1976 Cal. Op. Att'y Gen. 376 (1976), 1976 Cal. AG LEXIS 67, at *6 (1976)......................17

1981 Cal. PUC LEXIS 458, at 24-25 (1981)...............................................21

46 Op. Att'y Gen. Cal. 22 (1965)..............................................................21

Conn. Gen. Stat. §§ 16-331-333(J_ (1988 & Supp. 1990)......................23

Del. Code Ann.., title 26, §§ 601 to 616 (1989)......................................23

H.R.Rep. No. 104-458 (1996) (Conf.Rep.)...............................................6

Haw. Rev. Stat., §§ 440G-1 to 16 (Supp. 1990)......................................23

**NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT**

2    PLEASE TAKE NOTICE that on April 21, 2006 at 9:00 a.m., or as soon thereafter as

3    the matter may be heard before the Honorable Maxine M. Chesney, in Courtroom 7 of the

4    above-entitled court, located at 450 Golden Gate Avenue, San Francisco, California, plaintiff

5    and petitioner <u>PACIFIC BELL TELEPHONE COMPANY</u>, doing business as AT&T

6    California ("AT&T"), will and hereby does move for summary judgment, pursuant to Local

7    Rule 16-5 and Rule 56 of the Federal Rules of Civil Procedure, on the first claim for relief

8    (for declaratory judgment based on preemption under § 253 ("§ 253") of the federal

9    Telecommunications Act of 1996 (the "Telecom Act"), 47 U.S.C. § 151 *et seq.*); on the third

10   claim for relief (for declaratory judgment that AT&T's state franchise under California

11   Public Utilities Code § 7901 ("§ 7901") entitles AT&T to use its telephone lines to transport

12   IP video services in addition to traditional voice services without a franchise, and that the

13   § 7901 franchise satisfies the franchise requirements under 47 U.S.C. § 541, to the extent

14   applicable); and on the ninth claim for relief (for a declaration and judgment, and a writ of

15   mandate, that AT&T's state franchise under § 7901 entitles AT&T to use its telephone lines

16   to transport IP video services in addition to traditional voice services without a franchise).

17   This motion is based on this notice of motion and motion; the memorandum of points and

18   authorities that follows; the administrative record of the proceedings before the City of

19   Walnut Creek previously lodged with the Court;[1] and on such matters as may be presented to

20   the Court upon the hearing on this motion.

21   **MEMORANDUM OF POINTS AND AUTHORITIES**

22   I.    <u>INTRODUCTION</u>.

23   The City of Walnut Creek ("Walnut Creek" or "the City") seeks to change the rules

24   under which AT&T has been operating in California for nearly a century. As a telephone

25   corporation, AT&T has a statutory franchise under § 7901 to construct, maintain and operate

26   _____

[1]    *See* Notice of Lodging of Record of Proceedings, dated February 27, 2006. Citations to
27   the record are made to the bates-stamped designation (for example, "AR 0001" refers to
page 1 of the record).

28

1  its telephone lines within the public rights-of-way.  Under long-standing authority, AT&T

2  does not lose its franchise right because its lines will be used to transmit video services,

3  along with other traditional voice services, as long as it does not "incommode the public

4  use."  The City's authority is limited to reasonable controls over the time, place and manner

5  in which the public rights-of-way are accessed.  The City, however, has refused to allow

6  AT&T to improve its telecommunications network by imposing a restrictive permit condition

7  that has nothing to do with the City's management of the rights-of-way.  This action by the

8  City violates both state and federal statutes prohibiting local interference with telecommuni-

9  cations services.  The undisputed material facts, as contained in the administrative record,

10  establish that the City's action is preempted and invalidated under both § 253 and § 7901.

11     Section 253(a) preempts all local government regulation that "may prohibit or have

12  the effect of prohibiting" the provision of telecommunications services.  AT&T sought to

13  improve its network in Walnut Creek so that residents could receive a broad range of benefits

14  that will be available with new technologies that AT&T plans to deploy.  The City, however,

15  has interposed itself as a "gatekeeper" on what services AT&T can provide via its network.

16  The City demanded that AT&T accept a condition on the encroachment permit at issue that

17  AT&T would not provide Internet Protocol ("IP")-based video services over its network,

18  after enhancements are complete, without agreeing to a local "cable franchise agreement"

19  (the "Franchise Condition").

20     This Franchise Condition is preempted under § 253 for two reasons.  First, it may

21  have a prohibitive effect on AT&T's delivery of telecommunications services because it

22  denies residents the ability to choose one type of communications product (video), while

23  purporting to permit others (voice, data, Internet) that are carried over the same network and

24  delivered to consumers over ordinary telephone lines.  Second, municipalities are not free to

25  exercise discretion or assert dominion over which *services* are offered by telephone

26  companies.  By attempting to control AT&T's right to enhance its network based on a

27  particular service, the City has exceeded its limited right to manage AT&T's physical use of

28  the rights-of-way.

- 2 -

1    The City's actions are also preempted by § 7901.  Under long-standing principles of

2    state law, AT&T does not require municipal consent to install, operate or improve its

3    telecommunications network.  In California, that consent—or franchise—is extended by the

4    State through § 7901 for the benefit of telephone companies and the customers they serve.

5    The § 7901 franchise contains no limit on the *type* of communications that can be carried

6    over a telephone company network.  Rather, a long line of well-reasoned cases establishes

7    that § 7901 authorizes AT&T to use its telephone lines to deliver *any* form of electronic

8    communications, including video programming, without the necessity of obtaining any

9    separate "cable franchise" from the City.

10    Because the City's actions unmistakably conflict with these established principles of

11    federal and California law, the Court should grant summary judgment for AT&T on its first,

12    third and ninth claims.

13    II.      BACKGROUND.

14    AT&T and its predecessors have provided communications services to customers in

15    Walnut Creek for over 90 years.  AR 0383 (¶ 1).  AT&T now serves over 67,000 residential

16    and business customers in the City.  AR 0259 (¶ 2).  Historically, AT&T provided local

17    telephone exchange services transmitted over twisted-pair copper wires placed on overhead

18    poles or in underground conduit.  In recent years, AT&T has upgraded its network by

19    installing new fiber optic cable that carries greater communications traffic at higher speeds.

20    AR 0259 (¶ 4); AR 0383.

21    With the advent of "broadband" services by which customers can access the Internet

22    through high-speed connections, AT&T expanded its deployment of fiber optic cable.

23    AR 0260 (¶ 5).  With these improved facilities, AT&T has expanded its services to include a

24    mix of voice telephony (including three-way calling, caller ID, voicemail and video

25    telephoning) and Internet backbone and DSL Internet access services.  AT&T has been able

26    to provide this array of integrated services to businesses and residential customers in Walnut

27    Creek by installing, maintaining and upgrading its telephone lines and related facilities

28    within public rights-of-way pursuant to its long-standing franchise rights under § 7901.  As

1  the City recognizes, "California Public Utilities Code Section 7901 gives [AT&T] a right to

2  install 'telephone lines' throughout the state." AR 0415 (¶ 1).

3      In October 2004, AT&T announced Project Lightspeed, a capital improvement

4  project to significantly increase the efficiency and capacity of AT&T's telephone lines.

5  AR 0261 (¶ 8); AR 0387. In completing Project Lightspeed, AT&T and its affiliated

6  companies will invest approximately $4 billion over the next two to three years to upgrade

7  existing facilities and deploy 38,000 miles of fiber optic cable to increase bandwidth and

8  throughput speeds throughout the 13 states served by AT&T, including California. AR 0261

9  (¶ 8). As part of this work, AT&T will install upgraded facilities to support the communi-

10 cations services that it currently provides, as well as new IP-based services, including IP

11 video services. AR 0261 (¶ 9). *See also* AR 0393 ("The additional fiber and technology will

12 become part of the entire SBC communications network, and will carry both traditional and

13 newer technology based services by telephone or other customer owned devices.");

14 AR 0643:19-20 ("Existing copper wire will carry ultimately the bandwidth over which

15 Lightspeed services are provided."); AR 0287 ("Project Lightspeed facilities will carry

16 traditional voice services as well as DSL, high speed data and other broadband services.").

17     In deploying Project Lightspeed, AT&T needs to maintain and repair existing

18 telephone lines and install new cable and facilities in public rights-of-way in Walnut Creek.

19 In addition to extending fiber optic cable further into the neighborhoods, AT&T will

20 "condition" its existing twisted-pair copper wires, which typically extend the last few

21 thousand feet from the fiber-fed node to the customer premises. AR 0264 (¶¶ 13-14). This

22 requires the removal, in some locations, of equipment known as "bridge taps" and "load

23 coils" that had been placed on the lines in earlier years to extend analog voice grade

24 telephone service, but which are no longer necessary and can have the effect of degrading

25 service quality and performance of the current communications network. Removing this

26 equipment will facilitate the transmission of AT&T's *existing* DSL-delivered broadband,

27 voice and other telecommunications services, as well as its provision of a suite of new, IP-

28 based services over these lines. AR 0264 (¶ 13). *See also* AR 0246 ("Removing these

- 4 -

1  electronics also will facilitate the transmission of ABC's existing DSL broadband and voice

2  services.").

3       On June 7, 2005, AT&T applied to the City for an encroachment permit to perform

4  line conditioning work on overhead wires along one block of Walnut Avenue.  AR 0276.

5  The application noted that the work was related to Project Lightspeed.  On June 21, 2005, the

6  City issued an encroachment permit, Permit No. EP05-0434, for the work.  AR 0276-77.

7  Attached to the permit was a special rider entitled "Additional Permit Conditions for Project

8  Light Speed [sic]" containing the Franchise Condition:

9         By accepting this permit, SBC agrees on behalf of itself and its affiliates that
          it will not provide video programming (including but not limited to
10        programming delivered using internet protocol) over facilities located with
          [sic] the City's rights-of-way to subscribers within the City *without first*
11        *obtaining a cable franchise or an open video system franchise* from the City.
          (Emphasis added).
12

13       AT&T immediately disputed the legality of the franchise condition.  AR 0286-0287.

14  On July 1, 2005, AT&T filed an administrative appeal of the Franchise Condition with the

15  City Council, pursuant to Walnut Creek Municipal Code § 7-1.107.  AR 0290.  On

16  October 18, 2005, the City Council held a hearing on the appeal (AR 0593-0692), received

17  written submissions and oral testimony (AR 0243-0393, 0398-0447), and adopted a

18  resolution denying AT&T's appeal.  AR 0694-0697.  AT&T filed this action 30 days later.

19       III.     THE COURT SHOULD GRANT SUMMARY JUDGMENT FOR AT&T

20                ON ITS § 253 CLAIM.

21       AT&T's first claim is for declaratory judgment based on preemption under § 253 of

22  the Telecom Act.  Compl. ¶¶ 36-43.  Because preemption is a matter of law (*Industrial Truck*

23  *Ass'n v. Henry*, 125 F.3d 1305, 1309 (9th Cir. 1997)), preemption claims are routinely

24  resolved on summary judgment.  That is particularly true for preemption claims based on

25  § 253.  *E.g.*, *Qwest Communications Inc. v. City of Berkeley*, 433 F.3d 1253 (9th Cir. 2006)

26  (affirming summary judgment for Qwest on its § 253 challenge to city ordinance); *Sprint*

27  *Telephony PCS, L.P. v. County of San Diego*, 377 F.Supp.2d 886 (S.D. Cal. 2005) (granting

28  summary judgment on § 253 claim, finding that ordinance was preempted).

1      A.      Congress Has Preempted Local Regulation Under § 253 in Order to

2            Encourage Rapid Deployment of New Telecommunications Facilities and

3            Technologies.

4      The primary purpose of the Telecom Act was "to reduce regulation and encourage the

5    rapid deployment of new telecommunications technologies." *Reno v. ACLU*, 521 U.S. 844,

6    857 (1997). *See also Qwest Communications Inc. v. City of Berkeley*, *supra*, 433 F.3d at

7    1255 ("the purpose of the act was to reduce regulation of telecommunications providers by

8    creating a 'procompetitive, de-regulatory national policy framework'") (quoting H.R.Rep.

9    No. 104-458 (1996) (Conf.Rep.)).  In striking down local efforts to impede the installation of

10   new fiber optic networks, the Federal Communications Commission ("FCC") has stressed

11   that "the administration of the public rights-of-way should not be used to undermine the

12   efforts of either cable or telecommunications providers to either upgrade or build new facili-

13   ties to provide a broad array of new services." *In re TCI Cablevision of Oakland County,*

14   *Inc.*, 12 F.C.C.Rcd 21396, ¶ 78 (1997).  Yet this is precisely what the City is attempting to do

15   in this case.  The administrative record leaves no room for debate that Project Lightspeed will

16   enable residents of Walnut Creek to access new features and functionality through a more

17   powerful, multi-purpose IP-based broadband network.  Equally clear is that the City has

18   improperly wielded its right-of-way authority to stop the Lightspeed build out.

19      Congress has sought to carry out this purpose by preempting local laws that conflict

20   with its deregulatory mandate.  Exercising its powers under the Supremacy Clause (U.S.

21   Const. art. VI, § 2), Congress included an express preemption clause in § 253 of the Telecom

22   Act, providing that "[n]o State or local statute or regulation, or other State or local legal

23   requirement, may prohibit or have the effect or prohibiting the ability of any entity to provide

24   any interstate or intrastate telecommunications service."  47 U.S.C. § 253(a).  Congress

25   assigned a limited role to municipalities in order to avoid a patchwork of local regulation that

26   would thwart national objectives.  As the FCC has observed, a national framework is neces-

27   sary because "an array of local telecommunications regulations that vary from community to

28

1  community is likely to discourage and delay the development of telecommunications

2  competition." *In re TCI Cablevision of Oakland County, Inc., supra*, 12 F.C.C.Rcd 21396.[2]

3          The Ninth Circuit has held that the scope of federal preemption under § 253 "is

4  virtually absolute and its purpose is clear—certain aspects of telecommunications regulation

5  are uniquely the province of the federal government and Congress has narrowly circum-

6  scribed the role of state and local governments in this arena." *City of Auburn v. Qwest Corp.*,

7  260 F.3d 1160, 1175 (9th Cir. 2001) (internal citation and quotation omitted).  As the Ninth

8  Circuit recently reiterated, "[w]e have interpreted this preemptive language to be clear and

9  'virtually absolute' in restricting municipalities to a 'very limited and proscribed role in the

10  regulation of telecommunications.'" *Qwest Communications Inc. v. City of Berkeley, supra*,

11  433 F.3d at 1256.  Thus, § 253 preempts not only regulations that prohibit outright the ability

12  of an entity to provide telecommunications services, but also those that "*may have the effect*

13  *of prohibiting the provision of telecommunications services*[.]" *Qwest Corp. v. City of*

14  *Portland*, 385 F.3d 1236, 1241 (9th Cir. 2004) (emphasis in original).  With respect to public

15  rights-of-way, the "narrowly circumscribed role is set forth in § 253(c).  This 'safe harbor'

16  clause permits state and local government control over the use of the rights-of-way, so long

17  as the control is management of the rights-of-way itself and not control of the telecommuni-

18  cations companies with facilities in the rights-of-way." *Qwest Communications v. City of*

19  *Berkeley, supra*, 433 F.3d at 1256.

20          B.      The Franchise Condition Will Affect Telecommunications Services.

21          1.      AT&T is a telecommunications provider that seeks to upgrade its telephone

22                  lines to provide improved telecommunications services and new IP services.

23          To determine the preemption issue under § 253(a), the Court may consider whether

24  the Franchise Condition "'may have the effect of prohibiting the provision of telecommuni-

25  _____

26  2   As the FCC has ruled, § 253(a)'s preemptive scope is not limited to statutes or regula-
    tions, but includes any "legal requirement."  *See In re State of Minnesota*, 14 F.C.C.R.
27  21,697, ¶ 18 (1999) (§ 253(a) extends to agreement between State and developer requiring
    developer to dedicate fiber-optic cable to state and granting exclusive access to developer).
    Clearly, it applies to the Franchise Condition the City has imposed here.

28

1  cations services.'" *Qwest Communications Inc. v. City of Berkeley*, *supra*, 433 F.3d at 1257

2  (quoting *Qwest Corp. v. City of Portland*, 385 F.3d at 1241).  There is no dispute that AT&T

3  is a telecommunications company and the principal provider of telecommunications services

4  in Walnut Creek.[3]  Those services include local and long distance voice service, private line

5  data services (such as DS1 and DS3 lines), advanced data services such as ATM and frame

6  relay, operator services, 911, special switched access services, Internet access and more.

7  AR 0388.  AT&T provides these telecommunications services over its existing network

8  facilities, including aerial and underground twisted pair copper wires and fiber optic cable.

9      Through Project Lightspeed, AT&T seeks "to upgrade its network in portions of its

10  service territory."  AR 0694 (¶ 2).  *See also* AR 0384 (¶ 1) ("Project Lightspeed will involve

11  enhancements to the existing network in both the outside plant and in SBC's central offices

12  and inter-office network").  As the City recognized, this upgrade includes "constructing

13  *telecommunications facilities* within the public rights-of-way as part of Project Lightspeed."

14  AR 0411 (emphasis added).  *See also* AR 0413 ("SBC has applied for encroachment permits

15  to begin constructing *telecommunications facilities*") (emphasis added).  In imposing the

16  Franchise Condition, the City relied in part on its "Telecommunications Policy" (*see*

17  AR 0609:24-0618:25), under which it believed it had the right to "regulate telecommuni-

18  cations" in order "to promote the widest availability possible to telecommunications

19  services" and "receive fair compensation for the use of public rights-of-way by telecommuni-

20  cations providers."  AR 0415.

21      The City also recognized that, in addition to constructing telecommunications

22  facilities, Project Lightspeed involves maintaining and rehabilitating, or "conditioning,"

23  existing facilities.  *See* AR 0428 (¶ 3) ("Project Lightspeed work will also include

24  'conditioning' work on existing lines, such as removing copper bridges and other devices,

25  which is needed to help provide the additional system capacity.").  It was AT&T's

26  ───────────────

27  [3]  A party provides "telecommunications services" when it offers "telecommunications for a fee directly to the public, or to such classes of users as to be effectively available directly to the public, regardless of the facilities used."  47 U.S.C. § 153(46).

28

1  application for a permit to "condition" existing telephone lines on Walnut Avenue that led to

2  the City's imposition of the Franchise Condition—even though these lines have been (and

3  will continue to be) used for the transmission of telecommunications services, including

4  traditional voice telephone service.  AR 0246, 0264 (¶¶ 13-14); 0267-0268 (¶ 4); 0271-0272

5  (¶¶ 2, 4).  As the City Council was advised, "the network operations in which we [AT&T]

6  are doing construction, maintenance, and rehabilitation work on our existing network does

7  involve the legacy communications services, including plain old telephone service, current

8  data services, dial-up Internet."  AR 0629:14-19.

9       Conditioning the existing phone lines would facilitate the transmission of telecom-

10  munications services in the future, including voice services.  AR 0264 (¶ 13) ("Removing

11  this equipment also facilitates the transmission of SBC's existing broadband services, as well

12  as phone service.").  As the Assistant City Attorney admitted at the hearing, "[t]here will be

13  certain enhancements of the system for their other [i.e., non-video] services."  AR 0612:15-

14  613:11.  Once the Project Lightspeed enhancements are complete, AT&T will provide all of

15  its services over the same network.  AR 0388.  As the City observed, "SBC *will be bundling*

16  its video programming services with telecommunications or information services such as

17  Internet and telephone services . . . ."  AR 0696A (emphasis added).  Thus, "Lightspeed will

18  utilize existing optical fiber within SBC's backbone" (AR 0414) and "[e]xisting copper wire

19  will carry ultimately the bandwidth over which the Lightspeed services are provided."

20  AR 0643:19-20.

21       When completed, Project Lightspeed upgrades will support AT&T's provision of its

22  existing telecommunications services as well as its IP video service.  The City Council was

23  advised by AT&T that  "the video service that will be provided is going to be part of a host

24  of services that will include the traditional voice and other services that we're already

25  providing, albeit in terms of new technologies provided by different and new means."

26  AR 0637:15-19.  While the City argues that Project Lightspeed will enable the provision of

27  certain IP-supported services not falling within the definition of "telecommunications," the

28  essential (and undisputed) point is that the upgrade also will facilitate the provision of

services that indisputably <u>are</u> telecommunications.  As explained at the hearing, Project Lightspeed "is not synonymous with video.  It is a project to enhance the existing network to provide bigger pipes, more bandwidth so that we can provide a variety of services and functions."  AR 0649:11-15.  The undisputed evidence before the City Council established that "Project Lightspeed is SBC's plan to further upgrade its telecommunications network to enable SBC to increase the amount of available bandwidth to resident and end users and in turn provide a bundle of integrated communications services, such as voice, including Voice Over Internet Protocol ('VOIP') service, High Speed Internet Access ('HSIA') and IP video service."  AR 0383 (¶ 2).

        2.      <u>Franchise requirements of the kind at issue here "may have the effect" of prohibiting telecommunications services.</u>

AT&T applied for an encroachment permit for network maintenance, rehabilitation and enhancement, but was given a permit with a special condition that required AT&T to accept classification of its telecommunications network as a cable television system subject to a local cable franchise agreement.  The City proposed that AT&T accept a 58-page Franchise Agreement (AR 0295-0362) with numerous and onerous conditions.  When imposed as a condition to receive permits necessary for enhancements to a *telecommuni-cations* network, this Franchise Agreement serves as a classic example of the sort of local action that Congress sought to preempt under § 253.  Under the proposed Franchise Agreement, for example, AT&T would be required to submit to an architectural design review process, agree to construction deadlines, comply with various tests and inspections, adopt system requirements, comply with interconnection agreements, pay a 5% franchise fee, agree to rate regulation, comply with review requirements, acknowledge the City's right to require the franchise, etc.  A franchise condition which limits AT&T's ability to maintain and enhance its network without accepting burdensome municipal authority over that network has no relationship to the management of the public rights-of-way, as is permitted under § 253(c) and, in addition, "may have" sufficient prohibitive effect on AT&T's provision of telecommunications services to violate § 253(a).  As the Ninth Circuit has observed, a

- 10 -

1   demand for a franchise agreement has "the effect of prohibiting such services" in violation of

2   § 253 because it creates "a substantial and unlawful barrier to entry into and participation in

3   the [cities'] telecommunications markets." *City of Auburn*, *supra*, 260 F.3d at 1176. That

4   burden is even greater on statewide telecommunications providers, such as AT&T, who are

5   already subject to regulation by the California PUC. As explained at the City Council

6   hearing, "[w]hen you start looking at what is the burden, it is not just having to go through

7   the process of hammering out arrangements on a city-by-city basis, when you have over 500

8   local jurisdictions in California to deal with alone. It is the dual regulatory systems. We're

9   already subject to regulation and oversight at multiple levels simply by virtue of being a

10  telecommunications company and providing telecommunications services." AR 0637:4-14.

11      The Ninth Circuit recently reaffirmed that local governments may not impose onerous

12  conditions on a telephone corporation's access to the rights-of-way. *City of Berkeley*, *supra*,

13  433 F.3d at 1257-58 ("[a]lthough not identical to the franchise application process in *Auburn*,

14  the exemption process in this case is similarly onerous, and therefore, has the same

15  discouraging effect"). *See also Sprint Telephony PCS, L.P. v. County of San Diego*, 377 F.

16  Supp. 2d 886, 895 (S.D. Cal. 2005) (regulatory scheme and use permit regulations found

17  preempted by § 253 in part because they included "burdensome submission requirements");

18  *Cox Commc'ns PCS, L.P. v. City of San Marcos*, 204 F. Supp. 2d 1260, 1265 (S.D. Cal.

19  2002) (permit process has "the effect of prohibiting . . . telecommunications companies from

20  using the public rights-of-way" when it requires "a lengthy application process").[4]

21

22

23  4   The Ninth Circuit's holdings are consistent with numerous decisions elsewhere. *E.g.*,
    *TCG New York, Inc. v. City of White Plains*, 305 F.3d 67, 76-77 (2d Cir. 2002) (§ 253 was
24  violated where approval process for franchise under city ordinance suffered from "extensive
    delays"); *Bell Atl.-Md., Inc. v. Prince George's County*, 49 F. Supp. 2d 805, 814-15 (D. Md.
25  1999), *vacated and remanded on other grounds*, 212 F.3d 863 (4th Cir. 2000) (court
    invalidated city ordinance substantially similar to Franchise Condition, holding that "any
26  'process for entry' that imposes burdensome requirements on telecommunications companies
    and vests significant discretion in local governmental decision-makers to grant or deny
27  permission to use the public rights-of-way 'may . . . have the effect of prohibiting' the
    provision of telecommunications services in violation of the [Act]").

28

1    Issuing the permits without a franchise condition would have allowed AT&T to

2   upgrade its network facilities and offer its customers precisely the type of new telecommuni-

3   cations technologies that were anticipated by the Telecom Act.  In fact, the record shows that

4   the franchise condition has caused AT&T to halt the build-out in Walnut Creek.  AR 0265,

5   ¶ 16; *see also* AR 0630:16-17 ("we have shut down our Lightspeed deployment in Walnut

6   Creek").  As AT&T explained, "[w]e will not allow our network to be held hostage in this

7   manner.  We will simply bypass Walnut Creek . . . ."  AR 0673:14-16.

8    AT&T's burden under § 253 is only to show its provision of such services "may be

9   prohibited," a legal determination that can be made based on the terms of the Franchise

10  Condition and the Administrative Record.  In *City of Portland*, the Ninth Circuit rejected the

11  argument that "Qwest was required to make an actual showing of 'a single telecommuni-

12  cations service that it . . . is effectively prohibited from providing.'"  385 F.3d at 1241.  "We

13  do not agree that Qwest was required to make an actual showing of a single telecommuni-

14  cations service that it . . . is effectively prohibited from providing.  We have previously ruled

15  that regulations that *may* have the effect of prohibiting the provision of telecommunications

16  services are preempted."  *Id.*  The same conclusion was reached by the Tenth Circuit in

17  *Qwest Corporation v. City of Santa Fe*, 380 F.3d 1258 (10 Cir. 2004).  Finding that "[i]t is

18  enough that the [state or local requirement] would 'materially inhibit' the provision of

19  services," the court held that a requirement that generates "substantial costs . . . meets the test

20  and is prohibitive under 47 U.S.C. § 253."  380 F.3d at 1271.

21   Here, the same telephone lines are being used to transmit both telecommunications

22  services and multi-purpose IP-based services.  Hence, a restriction that bars provision of

23  AT&T's IP-video services (absent a franchise) may "have the effect" of causing AT&T (or

24  any other telecommunications provider) not to install and upgrade facilities that are used to

25  provide bundled telecommunications services.  As we explain in section IV below, under

26  § 7901, AT&T has a state-wide franchise to use its telephone lines to provide additional

27  services along with traditional telephone services.  A telecommunications carrier such as

28  AT&T should be allowed to integrate new services with its existing services without losing

- 12 -

1  its underlying protection as a carrier or suffering the unnecessary burden of an overlay cable

2  franchise.

3      The basic point is undisputed that in Walnut Creek, AT&T's existing and new

4  services will be transmitted over the same network.  By conditioning AT&T's right to install

5  facilities used to transport both its existing communications services and IP-based services

6  over the same telephone lines, upon AT&T's agreement to enter into a cable franchise, the

7  City is interfering with and obstructing AT&T's ability—and right—to provide telecom-

8  munications services that depend on the same network enhancements.  The City's actions

9  thus are a material impediment to AT&T's ability to timely modifying and upgrading its

10  facilities.  If localities are permitted to demand franchises as a condition of permitting use of

11  the public rights-of-way, construction of new telephone lines may be discouraged and

12  deployment of telecommunications service to new customers inhibited, contrary to Congress'

13  basic mandate under the Telecom Act.

14      3.    The City may not deny AT&T a permit based on factors unrelated to the

15            management or use of the rights-of-way.

16      A local regulation may have the effect of prohibiting telecommunications services

17  when the municipality's actions are based on factors that are unrelated to the physical

18  management of the rights-of-way.  *City of Auburn*, *supra*, 260 F.3d at 1176, 1179 (in holding

19  that § 253 preempted regulations permitting city to "consider discretionary factors that have

20  nothing to do with the management or use of the rights-of-way," the court noted that

21  "perhaps most problematic, the ordinances grant the [cities] unfettered discretion to insist on

22  unspecified franchise terms and to grant, deny, or revoke a franchise based on unnamed

23  factors").

24      Walnut Creek is exercising discretion on whether to allow AT&T access to the public

25  rights-of-way to install and upgrade its telecommunications infrastructure that is used, and

26  will continue to be used, to deliver both traditional telecommunications services as well as a

27  variety of more advanced broadband, voice and Internet access services.  By conditioning

28  access to the rights-of-way upon AT&T's agreement to a restriction that is not directly

- 13 -

1  related to the City's management of AT&T's physical use of the rights-of-way, the City acts

2  in derogation of § 253.  *See*, *e.g.*, *Qwest Communications v. City of Berkeley*, *supra*, 433 F.3d

3  at 1258-59 (municipal ordinances preempted by § 253(a) because they afforded "the City

4  significant discretion to deny the companies the ability of providing telecommunications

5  services[,]" and impermissibly regulated the carrier's "technical and legal qualifications

6  rather than the actual management of the public rights-of-way itself"); *Cox Commc'ns*,

7  204 F. Supp. 2d at 1266 (under § 253, "[t]he courts have clearly said that local governments

8  do not have discretion to deny permits").

9         C.    The Franchise Condition Does Not Fall Within §§ 253(b) or (c).

10        The City cannot satisfy the "safe harbor" subsections of § 253.  Subsection (b) by its

11  terms does not apply to the City (it applies only to states).  Subsection (c) authorizes local

12  regulations only with respect to the physical use and management of the rights-of-way, but

13  does not permit local authorities to regulate either the carrier itself or its services.  Not even

14  the City contends that the Franchise Condition is related to the physical management of the

15  rights-of-way.  Moreover, subsection (c) does not authorize cities to deny permits to telecom-

16  munications providers for access to public rights-of-way based on discretionary factors

17  *unrelated to* the physical use and management of the rights-of-way.  *E.g.*, *City of Auburn*,

18  260 F.3d at 177 ("As the FCC has explained, right-of-way management means control over

19  the right-of-way itself, not control over companies with facilities in the right-of-way[.]");

20  *accord Qwest Corp. v. City of Santa Fe*, 380 F.3d 1258, 1273 (10th Cir. 2004) (provisions of

21  city's ordinance unrelated to "the management of the city's rights-of-way . . . are not saved

22  from preemption by 253(c)").  By imposing a condition on SBC's ability to upgrade its

23  communications network based on AT&T's future services, rather than AT&T's physical use

24  of the public rights-of-way, the City is improperly attempting to regulate a provider and its

25  services, which it is not authorized to do under § 253(c).

26

27

28

1    IV.    THE COURT SHOULD GRANT SUMMARY JUDGMENT FOR AT&T

2           ON ITS THIRD AND NINTH CLAIMS FOR RELIEF

3    A.     The City's Attempt to Locally Franchise AT&T's IP Video Services Is

4           Preempted by § 7901.

5    1.     Section 7901 authorizes AT&T to install its telephone lines without a local

6           franchise.

7    AT&T's existing franchise from the State pursuant to § 7901, in and of itself, is

8    sufficient to authorize AT&T to construct and operate its facilities in the public rights-of-way

9    to provide *any* form of electronic communication, including IP video services, without

10   obtaining an additional local franchise from the City.  Section 7901 provides in relevant part

11   that:

12           Telegraph or telephone corporations may construct lines of telegraph or
             telephone lines along or upon any public road or highway . . . in such manner
13           and at such points as not to incommode the public use of the road or highway.

14   Under the Public Utilities Code, the term "telephone line" is defined broadly to

15   include "*all* conduits and other real estate, fixtures and personal property used to facilitate

16   communication by telephone."  Cal. Pub. Util. Code § 233 (emphasis added).  Thus, under

17   California law, any and all facilities used to "facilitate communication by telephone" are

18   "telephone lines," regardless of whether such facilities are copper, fiber or some other

19   material.  *See, e.g., Commercial Comms., Inc. v. Pub. Utils. Comm'n*, 50 Cal.2d 512, 523

20   (1958) ("[T]he medium over which the communication can be effected is not prescribed by

21   law.").  The Court of Appeal recently reiterated that a "fiber optic network is a telephone

22   line."  *Anderson v. Time Warner Telecom of Cal., Inc.*, 129 Cal. App. 4th 411, 415 (2005).

23   It is undisputed that AT&T's facilities are "telephone lines" because they are, and

24   will be, used to "facilitate communication by telephone."  AR 0393 ("The additional fiber

25   and technology will become part of the entire SBC communications network, and will carry

26   both traditional and newer technology based services by telephone or other customer owned

27   devices."); AR 287 ("Project Lightspeed facilities will carry traditional voice services as well

28   as DSL, high speed data and other broadband services."); AR 0643:19-20 ("Existing copper

1   wire will carry ultimately the bandwidth over which Lightspeed services are provided.").  In

2   fact, the City Attorney acknowledged in response to a question from a City Council member

3   that "if we were to take the position that they [AT&T] cannot even construct their system

4   without a franchise, not only would we be stopping them from building a cable system, *we*

5   *would be stopping them from installing what are truly telephone lines*.  And therefore we

6   might run afoul of certain provisions of state law."  AR 0616:14-20 (emphasis added).

7          It is also undisputed that AT&T is a "telephone corporation" because it has been

8   managing and operating its telephone lines in California for more than a century.  Cal. Pub.

9   Util. Code § 234 (a "telephone corporation" is "any corporation that owns, controls, operates

10   or manages a telephone line for compensation in California").  As such, AT&T possesses a

11   franchise under § 7901 in every place where it is maintaining and operating telephone lines.

12   *See County of Los Angeles v. Southern California Tel. Co.*, 32 Cal. 2d 378 (1948) ("Section

13   [7901] has been judicially construed by many [California Supreme Court] decisions . . . and

14   it has been uniformly held that the statute is a continuing offer extended to telephone and

15   telegraph companies to use the highways, which offer when accepted by the construction and

16   maintenance of lines constitutes a binding contract based on adequate consideration.").

17          Because AT&T is a "telephone corporation" and its facilities constitute "telephone

18   lines," AT&T is authorized under its § 7901 franchise to install and upgrade its facilities in

19   the public rights-of-way without obtaining any separate franchise from the City.  *See, e.g.,*

20   *San Diego v. Southern California Tel. Corp.*, 42 Cal. 2d 110, 116-17 (1954) ("When a

21   telephone corporation obtains a franchise under section 536 [now Section 7901], *it need not*

22   *obtain a franchise from local authorities*.") (emphasis added); *Western Union Telegraph*

23   *Co. v. Hopkins*, 160 Cal. 106, 119 (1911) (holding that the "state franchise included the right

24   to such exclusive occupation by the company of portions of the streets as is maintained for

25   the purpose of its system, *leaving nothing in that behalf to be granted by the municipality*")

26   (emphasis added); *County of Inyo v. Hess*, 53 Cal. App. 415 (1921) ("[U]nder and by virtue

27   of the provision of [Section 7901], telephone corporations are granted the right and privilege

28   to use the public highways over which to construct and operate lines of telephone wires, *free*

- 16 -

1 *from any grant made by subordinate legislative bodies*.") (emphasis added); 1976 Cal. Op.

2 Att'y Gen. 376 (1976), 1976 Cal. AG LEXIS 67, at *6 (1976) ("[W]hen accepted [the 7901

3 franchise] gives the utility a franchise to use all public highways *without the necessity of a*

4 *grant from a city or other subordinate governmental entity*.") (emphasis added).

5       In light of § 7901, the City's only power with respect to AT&T's Lightspeed facilities

6 and services is to "exercise reasonable control as to the time, place, and manner in which the

7 roads, highways and waterways are accessed."  Pub. Util. Code § 7901.1; *Pac. Tel. & Tel.*

8 *Co. v. City and County of San Francisco*, 197 Cal. App. 2d 133, 152 (1961) ("[B]ecause of

9 the state concern in communications, the state has retained to itself the broader police power

10 of granting franchises, leaving to the municipalities the narrower police power of controlling

11 location and manner of installation.").

12       2.       AT&T is entitled to use its telephone lines interchangeably to provide any

13               form of electronic communications, including video programming

14       The City may argue that AT&T's plan to use its telephone lines to provide additional

15 services, such as video programming, exceeds the scope of its § 7901 franchise.  However,

16 the California Supreme Court rejected this argument more than 50 years ago.  In *Pac. Tel. &*

17 *Tel. Co. v. Los Angeles*, 44 Cal.2d 272 (1955), a case involving AT&T's predecessor Pacific

18 Telephone and Telegraph Company, the California Supreme Court held that under then

19 section 536 (now Section 7901) Pacific was "*entitled to use its lines interchangeably* for

20 transmitting telephone messages, telegraph messages, teletypewriter messages, telephoto-

21 graphs, program services *(including radio and television broadcasts) and any other*

22 *communication service* by means of the transmission of electrical impulses."  *Id*. at 281

23 (emphasis added).  Indeed, the Supreme Court held that "[Section 7901], which authorizes

24 telephone companies to construct their lines along public highways, places *no restrictions*

25 upon what may be transmitted by means of electrical impulses over those lines."  *Id*. at 282

26 (emphasis added).  The Court emphasized that requiring a state franchisee to obtain

27 additional local franchises in order to provide non-telephone services "would defeat the very

28

1  purpose of [Section 7901], as it would interfere substantially with the ability of telephone

2  companies to provide adequate communication service to the people of the state." *Ibid.*

3        Four years later, in *Pacific Tel. & Tel. Co. v. San Francisco*, 51 Cal. 2d 766 (1959),

4  the Supreme Court confirmed that "that the construction and maintenance of telephone lines

5  in the streets and other public places within the city is today a matter of state concern and not

6  a municipal affair" (*id*. at 768), even though the lines in question were used to provide non-

7  telephone services such as the transmission of television programs. *Id*. at 772-73.

8  Accordingly, the Court held that "[Section 7901] gives a franchise from the state to use the

9  public highways for the prescribed purposes *without the necessity for any grant by a*

10  *subordinate legislative body*" (emphasis added).

11        In *Williams Communications, Inc. v. Riverside*, 114 Cal. App. 4th 642 (2003), the

12  California Court of Appeal reinforced the broad implications of these Supreme Court

13  decisions.  In that case, Williams sought a refund of franchise fees paid to the City of

14  Riverside (as a condition of installing its telephone lines) on the ground that such fees were

15  prohibited under § 7901.  The trial court ruled that Williams was not entitled to a refund,

16  holding that: (1) "[i]f a telephone company installs cables to be used for non-telephone

17  purposes, it is not protected by Public Utilities Code § 7901" and (2) "Plaintiff Williams . . .

18  had failed to disprove defendants' position that the City could require a license agreement

19  because plaintiff's cable would carry open video, cable TV, [and] Internet services which are

20  not subject to Public Utilities Code § 7901." *Id*. at 649.  The Court of Appeal reversed.

21  Adhering to the Supreme court's *City of Los Angeles* and *San Francisco* decisions, the

22  *Williams* court held that "the fact that *other data is transmitted* over the telephone lines does

23  not deprive Williams of the protection afforded by section 7901," adding that "*[l]ocal*

24  *franchises are prohibited* because '[t]he undisputed evidence in this case discloses that all the

25  communication services provided by the telephone company involve the transmission of

26  intelligence by electrical impulses through its lines.'" *Id*. at 654 (quoting *City of Los*

27  *Angeles*) (emphasis added).

28

1    The City argues in its motion to dismiss that AT&T's IP video service must be

2    classified as a "cable service" subject to local franchising under federal and state cable

3    television laws (Mot. to Dismiss, pp. 11-13); and that even if AT&T's IP video service is not

4    a cable service, the City still has residual municipal power to impose a franchise since no

5    federal law preempts regulation of video services as such (*id.*, pp. 13-15).  The City ignores

6    the California decisions discussed above which categorically prohibit requiring § 7901

7    franchisees to obtain an additional local franchise in order to deliver any form of electronic

8    communications over their telephone lines.  Moreover, neither California nor federal cable

9    law authorizes the City to franchise any services that AT&T may provide via its facilities.

10       B.       California Cable Law Does Not Authorize the City to Franchise AT&T's
11                Video Services.

12       1.       The cable franchising statute has no application to AT&T's facilities.

13    California statutes distinguish between cable television operators, which are subject

14    to local franchising obligations under Government Code § 53066 *et seq.*, and other types of

15    video providers, such as satellite broadcasters, which are not.  In particular, § 53066(a)

16    authorizes cities to franchise only "the construction of a community antenna television

17    system."  Similarly, § 53066(e) provides that "[n]o person may commence the construction

18    of a cable television system without a franchise or license granted by the city, county, or city

19    and county in which the cable television system will operate."

20    Section 53066, which authorizes cities to franchise the construction of systems in

21    public rights-of-way within their control, provides no authority for the City's actions.

22    Because AT&T received authorization from the State to construct its facilities in the public

23    rights-of-way, and to use those facilities to transmit any form of electrical impulse without

24    local franchising, § 53066 is plainly  inapplicable.  Moreover, on their face, these provisions

25    apply only to a system that is constructed from its commencement as a "cable television

26

27

28

system" or "community antenna television system."[5]  Here, however, AT&T did not
construct its facilities as a cable system; it constructed its facilities as a telecommunications
network.  As the California Supreme Court has indicated, these facilities remain a
"telecommunications network" even when the progress of technology means that video
programming now may be delivered over the same wires as basic telephone calls and other
telecommunications services.

Indeed, as reflected in *City of Los Angeles* and its progeny, telephone networks,
including AT&T, actually have been transmitting television signals for decades.  No court
has held that this capability causes such facilities to lose their character as "telephone lines"
or transmutes them into cable systems subject to the cable television franchising laws.
AT&T's Lightspeed enhancements will add capacity to AT&T's telephone network and thus
improve its effectiveness in managing many capacity-intensive applications, including video.
But since AT&T's network (like almost all telecommunications networks) already has the
capacity to transmit video, there is no basis to conclude that AT&T commences the
construction of a cable system simply by enhancing the capacity of its telecommunications
network in a manner that improves its existing capabilities.

> 2. The § 7901 franchise preempts any authority the City may otherwise have
>    under Government Code § 53066 *et seq.*

Even assuming that § 53066 were facially applicable to AT&T's telephone lines, this
section does not effectively delegate the state's franchising authority over such lines to the
City.  Nor does it justify interposing the overlay of a city-by-city franchising regime upon
telephone companies for any services they may provide.  No California case has held that
§ 53066 authorizes a city to impose a cable franchise on the construction of lines installed
pursuant to a telephone company franchise under § 7901.  Indeed, the only relevant authority
suggests that, in case of conflict between §§ 53066 and 7901, the latter must prevail.

---

[5]  A "cable television system" is "a community antenna television system, under common
ownership and control, serving a franchise area or two or more contiguous or electronically
connected franchise areas."  Gov. Code § 53054.2(b).

1  *See* 46 Op. Att'y Gen. Cal. 22 (1965); 1965 Cal. AG LEXIS 44, at *3 (1965) (concluding

2  that if a CATV were also deemed to be a telephone line, "section 7901 . . . probably would

3  require that cable be considered part of the statewide franchise and *thus exempt from local*

4  *franchising*") (emphasis added). The Attorney General's opinion is consistent with general

5  state law principles that preclude local governments from interfering with state-authorized

6  operations. As the California Public Utilities Commission summarized in *In re Backman*

7  *Water Co.,*

8       Even when a city has the general power to regulate an activity normally
         conducted by both utilities and nonutilities, that power cannot be exercised to
9       prevent a utility from commencing a state-authorized operation. (*Harbor
         Carriers, Inc. v Sausalito* (1975) 46 CA 3d 773.). . . . An attempt to use the
10      franchise as a second certificate of public convenience and necessity is not a
         use of the power in the manner prescribed by law; *the franchise power cannot*
11      *govern any topic already governed by statewide law.*

12  5 CPUC2d 358 (1981); 1981 Cal. PUC LEXIS 458, at 24-25 (1981) (emphasis added). *See*

13  *also* Cal. Const., art. § 7 (providing that a "county or city may make and enforce within its

14  limits all local, police, sanitary, and other ordinances and regulations *not in conflict with*

15  *general laws*") (emphasis added); *Tily B., Inc. v. City of Newport Beach*, 69 Cal. App. 4th 1,

16  19 (1998) (holding that local law is preempted where it "duplicates, contradicts or enters an

17  area fully occupied by general laws, either expressly or by implication").

18      If the California Legislature, in enacting Government Code §53066 *et seq.,* had

19  intended to deprive telephone companies of their right to use their lines to transmit any form

20  of electronic communications without a local franchise (which AT&T strongly disputes), this

21  intention could not be given effect because the § 7901 franchise "constitutes a binding

22  contract based on adequate consideration, and that *the vested right established thereby*

23  *cannot be impaired by subsequent acts of the Legislature*." *County of Los Angeles v.*

24  *Southern California Tel. Co*., 32 Cal. 2d 378, 384-85 (1948) (emphasis added); *Petaluma v.*

25  *Pac. Tel. & Tel. Co*., 44 Cal. 2d 284, 288-289 (1955) ("[B]y constructing, maintaining and

26  operating telephone lines, [the utility] acquired a state franchise to use the streets and other

27  public places in the city for telephone lines and equipment. The state franchise rights thus

28  acquired were vested rights which *could not be impaired by a subsequent delegation of*

- 21 -

1     *power to the city . . . ."* (emphasis added)); *Western Union Tel. Co. v. Hopkins*, 160 Cal. 106,

2 120 (1911) (affirming that the state telecommunications franchise, once accepted, "became a

3 contract between the company and the state, secured by the constitution of the United States

4 against impairment by any subsequent state legislation"). It is unlikely that the Legislature in

5 enacting cable laws pertaining to CATV intended to eviscerate or limit the § 7901 rights of

6 telephone corporations in California or cause an unconstitutional impairment of existing

7 contract rights.[6]

8     C.    <u>The Federal Cable Act Also Does Not Authorize the City to Locally Franchise</u>

9          <u>AT&T's IP Video Services.</u>

10     Title VI of the Telecommunications Act of 1996 (the "Cable Act") "leaves to state

11 law most questions about the regulation and taxation of cable TV franchises." *City of*

12 *Chicago v. Comcast Cable Holdings, L.L.C.*, 384 F.3d 901, 905 (7th Cir. 2004). Indeed,

13 47 U.S.C. § 556(b) expressly provides that "[n]othing in this title shall be construed to

14 restrict a State from exercising jurisdiction with regard to cable services consistent with this

15 title." Even assuming *arguendo* that AT&T's IP video service could be categorized as "cable

16 services" being provided over a "cable system" within the meaning of federal cable law,[7] the

17 question of whether the State of California or its municipalities have the authority to issue the

18 franchise required under the Cable Act is a matter of state, not federal law, provided that such

19 state law is consistent with the Cable Act.

20     The Cable Act does not require *local* franchising; it requires that a cable company

21 obtain a franchise from the "franchising authority." 47 U.S.C. § 541. The term "franchising

22 authority" is not limited to *cities*; rather, it includes "any governmental entity empowered by

23 Federal, State, or local law to grant a franchise." 47 U.S.C. § 522(10). Equally important, a

24 _____

25 [6]   AT&T's Eighth Claim is for an unconstitutional impairment of its franchise rights under
§ 7901. Compl. ¶¶ 82-92. However, the Court need not reach this claim since we believe it
26 should hold that the CATV statutes do not apply to a § 7901 franchisee.

[7]   AT&T's Second Claim alleges that its IP video services do *not* constitute "cable
27 services" for purposes of the Cable Act. Compl. ¶¶ 44-55. However, as discussed above, the
Court need not reach this claim for purposes of the present summary judgment motion.

28

1  "franchise" for purposes of the Cable Act need not take the form of a formal franchise

2  agreement but means simply an "initial authorization . . . issued by a franchising authority,

3  whether such authorization is designated as a franchise, permit, license, resolution, contract,

4  certificate, agreement, or otherwise, which authorizes the construction or operation of a cable

5  system." 47 U.S.C § 522(9). Specifically, to satisfy the franchise requirements of the Cable

6  Act, the franchise in question must be construed to authorize the franchise "to construct[] a

7  cable system over public rights-of-way." 47 U.S.C. § 541(a)(2). For AT&T—a telephone

8  company—§ 7901 fulfills these requirements.

9       Typically, cable companies obtain the franchises authorizing them to construct and

10  operate their systems from local governments—because *they* must *construct* a *cable system*,

11  and necessarily need local consent to access public rights-of-way. Nothing in the Cable Act,

12  however, requires *states* to use this procedure.[8] By operation of § 7901, the State of

13  California has given broad authorization to telephone companies, such as AT&T, to use the

14  public rights-of-way to construct their telephone lines (whether or not such lines also

15  constitute a "cable system"), and to use such lines interchangeably to transmit *any form* of

16  electronic communications service (including transmission of television signals), without

17  local franchising. *City of Los Angeles*, *supra*, 44 Cal.2d at 282. Thus, even assuming that

18  AT&T's telephone lines could be considered a cable system for purposes of federal law

19  (which AT&T disputes), AT&T operates today with a legally sufficient franchise, conferred

20  by the State, to construct and operate that system in California. As such, AT&T's existing

21  franchise under § 7901 satisfies federal cable franchise requirements if and to the extent that

22

23  [8]    As permitted by the Cable Act, several states have elected to designate a state entity, such
       as a public utilities commission, as the franchising authority in lieu of permitting local
24     franchising. For example, in Connecticut, cable operators have long been franchised by the
       Connecticut Department of Public Utilities, which has exclusive jurisdiction over cable
25     television and is the franchising authority in that state. *See* Conn. Gen. Stat. §§ 16-331-333J
       (1988 & Supp. 1990). Similarly, in Delaware, the state public utilities commission is the sole
26     franchising authority for cable systems operating in unincorporated areas. Del. Code Ann.,
       title 26, §§ 601 to 616 (1989). And in Hawaii, exclusive authority for the regulation of cable
27     television is vested in the Director of Commerce and Consumer Affairs. Haw. Rev. Stat.,
       §§ 440G-1 to 16 (Supp. 1990).

28

1 such were deemed to be applicable. Nothing in the Cable Act authorizes a local municipality

2 to impose a second tier of cable franchising on AT&T when it already possesses a state

3 franchise satisfying 47 U.S.C. § 541. Indeed, at least one court has held that such "second

4 tier" franchising conflicts with, and is thus preempted by, the Cable Act. *See Liberty*

5 *Cablevision of P.R., Inc. v. Municipality of Caguas*, 417 F.3d 216 (1st Cir. 2005).

6       In short, the City's attempts to franchise AT&T's video services are preempted under

7 § 7901 and are not authorized under either state or federal cable law. The Court should

8 accordingly enter an order holding that the City has no authority to require AT&T to obtain a

9 local cable franchise because under § 7901 AT&T is "entitled to use its lines interchangeably

10 for transmitting telephone messages . . . television broadcasts . . . and any other communi-

11 cation service by means of the transmission of electrical impulses," including cable services.

12 *City of Los Angeles, supra*, 44 Cal.2d at 282. California cable law (Gov. Code § 53066) is

13 inapplicable to AT&T, and AT&T's § 7901 franchise satisfies the franchise requirement

14 under 47 U.S.C. § 541 to the extent that it even applies.

15     V.     <u>CONCLUSION</u>.

16       For each of the foregoing reasons, the Court should grant AT&T's motion for

17 summary judgment on the first, third and ninth claims.

18       Dated: March 17, 2006.

19                               PILLSBURY WINTHROP SHAW PITTMAN
                                RONALD E. VAN BUSKIRK

20                               CHRISTOPHER BALL
                                50 Fremont Street

21                               Post Office Box 7880
                              San Francisco, CA 94120-7880

22

23                               [See caption page for other counsel]

24                               By       /s/ Ronald E. Van Buskirk
                                      Ronald E. Van Buskirk

25

26                               Attorneys for Plaintiff
                              PACIFIC BELL TELEPHONE

27                               COMPANY, doing business as
                              AT&T CALIFORNIA

28